# EXHIBIT 1



INTERNATIONAL | INTERNATIONAL | LEADING DISPUTE
COURT OF | CENTRE | RESOLUTION
ARBITRATION® | FOR ADR | WORLDWIDE

# AWARD

# ICC INTERNATIONAL COURT OF ARBITRATION

## Case No. 18051/CYK

### DEVAS MULTIMEDIA PRIVATE LIMITED

(India)

**vs/**

### ANTRIX CORPORATION LIMITED

(India)

This document is an original of the Final Award rendered in conformity
with the Rules of Arbitration of the ICC International Court of Arbitration.

INTERNATIONAL COURT OF ARBITRATION

OF THE INTERNATIONAL CHAMBER OF COMMERCE

Case No. 18051/CYK

**Devas Multimedia Private Limited**

Claimant

**Antrix Corporation Limited**

Respondent

---

**FINAL AWARD**

---

**Arbitral Tribunal**

Dr Adarsh Sein Anand

Mr V.V. Veeder QC

Dr Michael Pryles (Chairman)

2

## Table of contents

**Introduction** .................................................................................................................... 3

**Procedural Background** .................................................................................................. 5

**Relevant Facts** ............................................................................................................... 12

**Applicable law** ............................................................................................................... 34

**Principal Issues in Dispute** ........................................................................................... 35

    A.  Does the tribunal have jurisdiction to hear and determine this dispute? ............................................. 36

    B.  Was Antrix entitled to terminate the Devas Agreement pursuant to Article 7(c)? ............................. 41

    C.  Was there any "Force Majeure Event" as defined in Article 11 of the Devas Agreement? If so, to what consequence? ............................................................................................................... 46

    D.  Is Antrix entitled to rely on Section 56 of the Indian Contract Act, 1872 and if so, can it claim impossibility of the Devas Agreement based on the CCS decision? ........................................................ 58

    E.  Did Antrix's conduct amount to a repudiation/renunciation of the Devas Agreement or was the Devas Agreement validly terminated by Antrix's letter of 25 February 2011? ............................................ 61

    F.  Was Antrix's repudiation of the Devas Agreement a material breach of the Devas Agreement within the meaning of Article 7(b), and did Devas terminate the Agreement within the meaning of Article 7(b) when it accepted the repudiation? ........................................................................................... 61

    G.  Damages ............................................................................................................................... 75

    H.  What is the rate of pre-award and post-award interest that should be applied to an award of compensation/damages? ................................................................................................................. 93

    I.  Which party should bear the legal and arbitration costs of this matter, and in what amount? ........... 94

**Operative Part** ............................................................................................................... 95

**Annexure A – Table of Abbreviations** ........................................................................... 97

3

## Introduction

1.      The Claimant in this arbitration is Devas Multimedia Private Limited (**Devas**), a company incorporated under the laws of India with its principal place of business at Preema Gardenia, 357/6 1st Cross, 1 Block, Jayanagar, Bangalore 560 011, India.  The majority of Devas' shares are owned by Deutsche Telekom Asia Pte Ltd (**DT Asia**), Telcom Devas Mauritius Ltd (**Telcom Devas**) and CC/Devas (Mauritius) Ltd (**CC/Devas**).[1]

2.      The Respondent is Antrix Corporation Limited (**Antrix**), a company incorporated in India with its principal place of business at Antariksh Bhavan, Near New BEL Road, Bangalore 560 231, India. Antrix is wholly owned by the Government of India (**GOI**).

3.      Devas is represented in this arbitration by:

   a.      Skadden, Arps, Slate, Meagher & Flom (UK) LLP of 40 Bank Street, London E14 5DS, United Kingdom (**UK**);

   b.      Skadden, Arps, Slate, Meagher & Flom LLP of Four Times Square, New York, NY 10036, United States of America (**USA**);

   c.      Amarchand & Mangaldas & Suresh A. Shroff & Co of 216 Okhla Industrial Estate Phase III, New Delhi 110 020, India;[2] and

   d.      Senior Advocates in India Messrs Harish Salve and Ciccu Mukhopadhaya.

4.      Antrix is represented by Curtis, Mallet-Prevost, Colt & Mosle LLP of 101 Park Avenue, New York, NY 10178, USA.

5.      The tribunal is comprised of Mr V.V. Veeder QC (of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG, UK), Dr Adarsh Sein Anand (of "Gurukripa" C-49, Sector 14, 201301 Noida (U.P.), India) and Dr Michael Pryles (of Level 26, 530 Collins Street, Melbourne, Victoria 3000, Australia).

6.      This arbitration arises out of a written agreement between Antrix and Devas for the lease of space segment capacity on two satellites (**the Devas Agreement**).  Relevant facts are set out below.[3]  In summary, Antrix agreed to build, launch and operate two satellites[4] and lease spectrum capacity on those satellites to Devas,[5] which Devas planned to use to provide digital

---

[1] Defined terms are also set out Annexure A.

[2] The tribunal understands that this law firm may have recently split into two different law firms: Cyril Amarchand Mangaldas and Shardul Amarchand Mangaldas.

[3] See [48] to [132] below.

[4] Namely, a primary satellite system known variously as PS1, GSAT-6 and INSAT-4E, and at the option of Devas, a secondary satellite system known variously as PS2 or GSAT-6A: see Articles 2 and 12(a)(iii), and [66] below.

[5] Antrix was required to build, launch and operate a primary satellite system (known variously as PS1, GSAT-6 and INSAT-4E) and, at the option of Devas, a secondary satellite system (known as PS1 and GSAT-6A): see Articles 2 and 12(a)(iii) and [66] below.

4

multimedia broadcasting services across India.[6]  In return, Devas agreed to pay to Antrix Upfront Capacity Reservation Fees (**UCRF**) of USD 20 million per satellite, and lease fees of USD 9 million to USD 11.25 million per annum.[7]  The lease term was twelve years, with a right of renewal at reasonable lease fees for a further twelve years.[8]

7.     The agreement was executed on 28 January 2005.  From then until 2010 the parties' relationship progressed smoothly.  Among other things, necessary licences and approvals were obtained,[9] work on the satellites progressed,[10] Devas obtained funding from investors[11] and trials relating to Devas' operating system were conducted successfully.[12]

8.     In June 2010, however, Dr K. R. Radhakrishnan – the Chairman of Antrix as well as the Secretary of India's Department of Space (**DOS**) and Chairman of the Indian Space Research Organisation (**ISRO**) (an entity that sits under the DOS) and India's Space Commission[13] – sought and obtained legal advice about annulling the agreement.[14]  Devas says he did so in response to political pressure that had been created by media criticism of the Devas Agreement;[15] Antrix says he did so because India's military needed to use the spectrum that had been leased to Devas.[16]  As will become apparent, Dr Radhakrishnan's motivation is not necessary to determine.  The ultimate result of his conduct, however, was a decision by India's Cabinet Committee on Security (**CCS**) to annul the agreement.[17]  Devas was notified of the CCS' decision on 25 February 2011.[18]

9.     Devas subsequently commenced this arbitration.  Devas alleges that Antrix was not entitled to terminate the Devas Agreement and repudiated its obligations by purporting to do so.  Devas

---

[6] Witness statement of Ramachand Viswanathan dated 20 February 2012, [34] – [49].

[7] See Article 4 and Exhibit B. USD 9 million per annum was payable initially; USD 11.25 million per annum was payable when Devas became cash flow positive.

[8] See Article 3(l).  That provision states that the fees for the second term of the lease were "to be mutually agreed upon", but on 27 July 2006 the parties agreed to an amendment that provided that the fees under any renewed lease were to be "reasonable": see Exhibit 38.

[9] Among other things, the Union Cabinet approved the design, development and launch of PS1/GSAT-6 (see [72] below), a modified co-ordination request was filed with the International Telecommunications Union for use of the 83°E orbital slot (see [73] below) and Devas obtained internet service provider and internet protocol television licences (see [84] below)

[10] Witness statement of Gary Parsons dated 20 February 2012, [25].

[11] The investors were DT Asia, Telcom Devas and CC/Devas: see [74] to [79] below.

[12] Witness statement of Ramachand Viswanathan dated 20 February 2012, [110] – [123]; witness statement of Gary Parsons dated 18 February 2012, [21]; witness statement of Dr Rajendra Singh dated 19 February 2012, [51] - [55]; see also [85] to [87] below.

[13] ISRO, DOS and Space Commission, and Dr Radhakrishnan's position within each entity, are discussed below: see [49] and [50].

[14] See CB159 and [102] and [103] below.

[15] See, e.g., Devas' post-hearing memorial, [16].

[16] See, e.g., Antrix's Statement of Defence (at [30], [36]), Rejoinder (at [26]) Skeleton Submission (at [34]) and post-hearing memorial (at [67]).

[17] See CB228 and [125] below.

[18] See [126] below.

says that it has accepted that repudiation and is entitled to damages equal to the value of its business (which it claims is USD 1.41 billion), plus interest and costs.[19]

10.     Initially Antrix did not participate in this arbitration.  It denied that the tribunal had jurisdiction, commenced a separate arbitration concerning the Devas Agreement under the UNCITRAL Arbitration Rules and applied to the Supreme Court of India for an order that an arbitrator be appointed on behalf of Devas for that arbitration.  The Supreme Court rejected its application.[20]

11.     Since then Antrix has participated in this arbitration, although it maintains that the tribunal does not have jurisdiction.  It also denies that it breached the Devas Agreement.  It says that it was required and, under the agreement, permitted to terminate the agreement in light of the CCS' decision.  It says further that even if it did breach its obligations, the agreement contains a limitation of liability clause that precludes Devas from receiving any award of damages.

12.     Before considering the parties' claims, the tribunal will set out the relevant procedural background, relevant facts and the applicable law(s).  It will then turn to the issues of jurisdiction, liability, damages and interest.  Finally, it will address the matter of the costs of this arbitration.

### Procedural Background

13.     On 1 July 2011 Devas filed a Request for Arbitration dated 29 June 2011 in respect of this matter with the International Court of Arbitration of the International Chamber of Commerce (*ICC Court*), and nominated Mr Veeder QC as an arbitrator.

14.     In its Request, Devas relied on Article 20 of the Devas Agreement.  Article 20 states:

"**Article 20.  Arbitration**

a.      In the event of there being any dispute or difference between the Parties hereto as to any clause or provision of this Agreement or as to the interpretation thereof or as to any account or valuation or as to the rights, liabilities, acts, omissions of any Party hereto arising under or by virtue of these presents or otherwise in any way relating to this Agreement such dispute or difference shall be referred to the senior management of both Parties to resolve within three (3) weeks failing which it will be referred to an Arbital [sic] Tribunal comprising of three arbitrators, one to be appointed by each party (i.e. DEVAS and ANTRIX) and the arbitrators so appointed will appoint the third arbitrator.

b.      The seat of Arbitration shall be at NEW DELHI in India.

c.      The Arbitration proceedings shall be held in accordance with the rules and procedures of the ICC (International Chamber of Commerce) or UNCITRAL.

d.      The Arbitration Tribunal shall reach and render a decision or award in writing (concurred in by a majority of the members of the Arbital [sic] Tribunal with respect to the appropriate

---

[19] Devas' post-hearing reply memorial, [93].

[20] See [16], [34], [35] below.

award to be rendered or remedy to be granted pursuant to the dispute, (including the amount that any indemnifying Party is required to pay to the indemnified Party in respect of a claim filed by the indemnified Party).

e.      To the extent practicable all decisions of the board of Arbitration shall be rendered no more than 30 (thirty) days following commencement of proceedings with respect thereto. The Arbital [sic] Tribunal shall realize its decision on award into writing and cause the same to be delivered to the Parties.

f.      Any decision or award made by the board of Arbitration shall be final, binding and conclusive on the Parties and entitled to be enforced to the fullest extent permitted by Laws and entered in any court of competent jurisdiction.

g.      Each Party to any Arbitration shall bear its own costs or expenses in relation thereto, including but not limited to such Party's attorneys' fees, if any, and the expenses and fees of the member of the Arbital [sic] Tribunal appointed by such party, provided, however, that the expenses and fees of the third member of the Arbital [sic] Tribunal and any other expenses of the Arbital [sic] Tribunal not capable of being attributed to any one member shall be borne in equal parts by the Parties."

15.     Antrix did not file an Answer to Devas' Request for Arbitration or nominate an arbitrator for this arbitration, but the tribunal understands that it informed the Secretariat of the ICC Court (**Secretariat**), on numerous occasions, that it denied that any arbitral tribunal constituted under the 1998 ICC Rules of Arbitration (**ICC Rules**) would have jurisdiction to decide Devas' claims; and that the ICC Court should not proceed with this arbitration.

16.     As noted above, Antrix also sought to commence a separate arbitration against Devas pursuant to the UNCITRAL Arbitration Rules, and applied to the Supreme Court of India for:

"a direction upon Devas to nominate its Arbitrator in accordance with the Agreement dated 28th January, 2005, and the UNCITRAL Rules, to adjudicate the disputes, which had arisen between the parties and to constitute the Arbitral Tribunal and to proceed with the Arbitration".[21]

17.     On 19 August 2011 the Secretariat informed the parties that at its session of 18 August 2011 the ICC Court had decided that this arbitration shall proceed pursuant to Article 6(2) of the ICC Rules.

18.     On 14 September 2011 the Secretariat informed the parties that the ICC Court will appoint an arbitrator on Antrix's behalf pursuant to Article 8(4) of the ICC Rules and fix the time limit for the co-arbitrators to select the chairman of the arbitral tribunal.  On 3 October 2011 the Secretariat sent a reminder to the parties and informed them that the ICC Court will proceed to appoint an arbitrator on Antrix's behalf, but that any nomination received from Antrix before the ICC Court

---

[21] *Antrix Corp. Ltd. V Devas Multimedia P. Ltd*, Judgment on Arbitration Petition No. 20 of 2011 (**Antrix v Devas, Supreme Court Judgment**), [10].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 19 (USDC NO. 2:18-cv-01360)**

makes the appointment will be communicated to the ICC Court. No nomination was received from Antrix.

19. On 13 October 2011 the Secretariat informed the parties that at its session of the same date the ICC Court had: confirmed Mr Veeder QC as co-arbitrator nominated by Devas pursuant to Article 9(1) of the ICC Rules; appointed Dr Anand as co-arbitrator on Antrix's behalf pursuant to Article 9(6) of the ICC Rules; and granted Mr Veeder QC and Dr Anand 20 days to jointly nominate a Chairman.

20. On 26 October 2011 the Secretariat informed the parties that Mr Veeder QC and Dr Anand had advised that they would be unable to jointly nominate a Chairman within those 20 days due to Antrix's pending application in the Supreme Court of India. The Secretariat asked the parties to indicate whether they agreed to the co-arbitrators being given until the conclusion of that proceeding to nominate a Chairman, failing which the ICC Court would be invited to appoint the Chairman pursuant to Article 8(4) of the ICC Rules. The next day, Devas requested that the ICC Court appoint the Chairman. Antrix raised objections to the arbitral tribunal moving forward and to the constitution of the tribunal.

21. On 10 November 2011 the ICC Court appointed Dr Pryles as the Chairman of the tribunal upon the Australian National Committee's proposal, pursuant to Article 9(3) of the ICC Rules.

22. On 14 November 2011, Dr Pryles wrote to the parties and made the following disclosure:

> "I note that counsel from three firms are representing the Claimant, including Ciccu Mukhopadhaya of Amarchand & Mangaldas & Suresh A. Shroff & Co. I wish to point out, although I believe it is unnecessary to do so under the IBA Guidelines on Conflict of Interest in International Arbitration nor the ICC Rules of Arbitration, that Mrs Pallavi S Shroff of that firm is a member of the Board of Directors of the Singapore International Arbitration Centre (SIAC) of which I Chair. Members of the Board of Directors are not renumerated and SIAC is a not-for-profit company limited by guarantee. Mrs Shroff does not appear to be involved in this arbitration."

23. On 24 November 2011 Antrix wrote to the Secretariat and stated (inter alia) that "there is definitely a conflict of interest involved" on the part of Dr Pryles. On 29 November 2011 the Secretariat informed Antrix that any challenge to an arbitrator must be made in accordance with Article 11 of the ICC Rules, and invited Antrix to state whether it wished to make a challenge concerning Dr Pryles. No challenge was made.

24. Also on 29 November 2011, the tribunal sought submissions from the parties on what the language of this arbitration should be. Devas submitted that the language should be English. Antrix did not respond.

25. On 16 December 2011 the Secretariat informed the parties that it had not heard from Antrix regarding any challenge to Dr Pryles and that unless otherwise advised, it understood that Antrix did not challenge Dr Pryles.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 20 (USDC NO. 2:18-cv-01360)**

26.    On 30 December 2011 Antrix informed the Secretariat that it had filed an application before an Additional City Civil Judge in Bangalore for an "injunction restraining Devas from proceeding in any manner with the purported arbitration before the ICC". The tribunal understands that the application was made under section 9 of the Indian Arbitration and Conciliation Act 1996, seeking an order permanently restraining this arbitration from proceeding.

27.    Also on 30 December 2011, the Secretariat informed the arbitral tribunal and the parties that at its session of 8 December 2011, the ICC Court extended the time limit for the terms of reference until 29 February 2012, pursuant to Article 18(2) of the ICC Rules.

28.    On 10 January 2012 a preliminary conference was held to discuss draft terms of reference, the language of the arbitration, the appointment of a tribunal secretary and the procedural timetable. The conference was held by telephone and was attended by each member of the tribunal and representatives of Devas. Antrix was invited to attend but declined to do so.

29.    On 13 January 2012 the tribunal issued Procedural Order 1 (which specified that the language of the arbitration shall be English) and a provisional procedural timetable (which provided for an oral hearing on 12 and 13 April 2012). The tribunal had previously invited the parties to comment on both Procedural Order 1 and the procedural timetable. The tribunal also advised the parties that Devas had agreed, and Antrix had not objected, to the appointment of Mr Robert Kovacs as tribunal secretary.

30.    On 19 January 2012 Mr Kovacs was appointed as the tribunal's secretary.

31.    On 9 February 2012 the ICC Court extended the time limit for the terms of reference until 31 March 2012.

32.    On 8 March 2012 the terms of reference were approved by the ICC Court pursuant to Article 18(3) of the ICC Rules.[22]

33.    On 9 March 2012 the Secretariat sent the terms of reference (as approved by the ICC Court) to Antrix and invited Antrix to sign the terms of reference. Antrix did not respond.

34.    On 9 April 2012 the Supreme Court of India ordered that:

> "the arbitral proceedings before the learned Arbitrator, appointed under the ICC Rules, shall remain stayed".

35.    In light of this order, the hearing scheduled for 12 and 13 April 2012 did not proceed and the conduct of this arbitration was suspended. The Supreme Court's order remained in place until 10 May 2013, when it dismissed Antrix's application. Antrix filed a Review Petition but, on 29 August 2013, that too was dismissed.

36.    On 13 May 2013 Devas asked that the tribunal proceed with this arbitration, and on 24 June 2013 the tribunal directed that the arbitration would proceed.

---

[22] In light of the parties' agreement on the issues that are to be resolved by the tribunal (see [137] below) it has not been necessary for the tribunal to address all of Devas' claims in [20] of the terms of reference.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 21 (USDC NO. 2:18-cv-01360)**

37.     On 8 August 2013 Antrix advised that it would be participating in this arbitration and represented by Curtis, Mallet-Provost, Colt & Mosle LLP (**Curtis**).  Curtis then advised the tribunal that Antrix wished to file a statement of defence together with supporting factual and expert evidence, without prejudice to its jurisdictional objections.

38.     On 9 August 2013 the tribunal proposed that Mr Andrew Barraclough replace Mr Robert Kovacs as the tribunal's secretary.  Both parties consented to the appointment of Mr Barraclough and, on 15 August 2013, the tribunal confirmed his appointment.

39.     On 3 September 2013 the tribunal held a case management conference.  Matters that were addressed during the conference included the procedural timetable, preparation for the final hearing and potential dates and locations for that hearing.

40.     On 11 September 2013 Antrix applied for certain legal issues to be resolved as preliminary questions – namely, whether the tribunal has jurisdiction to decide Devas' claims and, if it does, whether the available remedies for any breach of the agreement are limited to a refund of the UCRF.  After receiving further submissions from both parties in respect of the application, on 2 October 2013 the tribunal notified the parties that it did not consider that the issues raised by Antrix should be decided as preliminary questions.

41.     On 11 October 2013, after consulting with the parties, the tribunal directed that the hearing would be held in the week beginning 15 December 2014 in New Delhi.  It later transpired that, for serious medical reasons, one of the tribunal members, based in London, may have been unable to attend the hearing if it took place in New Delhi at that time.  In light of this, and the long delay in the arbitration (as noted above the hearing was originally scheduled to take place in April 2012), the geographical venue of the hearing was moved to London (without howsoever affecting the place or seat of this arbitration).

42.     On 8 November 2013 the tribunal issued Procedural Order 2 after consulting with the parties.  Both parties agreed to the inclusion of the following provision in Procedural Order 2:

> "[t]he IBA Rules on the Taking of Evidence in International Arbitration (2010) ("IBA Rules") shall serve as a guide in the determination of evidentiary issues."

43.     The oral hearing of this arbitration was held in London from 15 to 20 December 2014.

44.     By the time of the hearing, the parties had submitted the following materials to the tribunal:

   a.     Pleadings / submissions

      i.     Devas' Statement of Claim dated 20 February 2012 (**Statement of Claim**)

      ii.    Antrix's Statement of Defence dated 15 November 2013 (**Statement of Defence**)

      iii.   Devas' Reply dated 24 March 2014 (**Reply**)

      iv.    Antrix's Rejoinder dated 1 August 2014 (**Rejoinder**)

      v.     Devas' Skeleton Argument dated 1 December 2014 (**Devas' Skeleton**)

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 22 (USDC NO. 2:18-cv-01360)**

      vi.    Antrix's Skeleton Argument dated 1 December 2014 (***Antrix's Skeleton***)

b.    Witness statements – Devas

      i.    Statement of Gary Parsons dated 18 February 2012 (***Parsons 1***)

      ii.    Statement of Arun Gupta dated 19 February 2012 (***Gupta 1***)

      iii.    Statement of Lawrence T. Babbio Jr dated 19 February 2012 (***Babbio 1***)

      iv.    Statement of Dr Rajendra Singh dated 19 February 2012 (***Singh 1***)

      v.    Statement of Ramachandran Viswanathan dated 20 February 2012 (***Viswanathan 1***)

      vi.    Reply Statement of D. Venugopal dated 15 March 2014 (***Venugopal***)

      vii.    Reply statement of M. G. Chandrasekhar dated 15 March 2014 (***Chandrasekhar***)

      viii.    Reply statement of Dr Kim Larsen dated 19 March 2014 (***Larsen***)

      ix.    Reply statement of Gary Parsons dated 21 March 2014 (***Parsons 2***)

      x.    Reply statement of Lawrence T. Babbio Jr dated 23 March 2014 (***Babbio 2***)

      xi.    Reply statement of Ramachandran Viswanathan dated 24 March 2014 (***Viswanathan 2***)

      xii.    Reply statement of Rajendra Singh dated 24 March 2014 (***Singh 2***)

      xiii.    Reply statement of Arun Gupta dated 24 March 2014 (***Gupta 2***)

c.    Witness statements – Antrix

      i.    Statement of Vijay Anand dated 15 November 2013 (***Anand***)

      ii.    Statement of K. Sethuraman dated 15 November 2013 (***Sethuraman 1***)

      iii.    Statement of Dr V. S. Hegde dated 30 July 2014 (***Hegde***)

      iv.    Supplemental statement of K. Sethuraman dated 31 July 2014 (***Sethuraman 2***)

d.    Expert reports – Devas

      i.    Report of John Lewis dated 17 February 2012 (***Lewis 1***)

      ii.    Report of Brent Kaczmarek dated 20 February 2012 (***Kaczmarek 1***)

      iii.    Reply report of John Lewis dated 14 March 2014  (***Lewis 2***)

      iv.    Reply report of Brent Kaczmarek dated 24 March 2014 (***Kaczmarek 2***)

      v.    Report by Brent Kaczmarek on the areas of disagreement with Vladimir Brailovsky and Daniel Flores dated 30 September 2014 (***Kaczmarek 3***)

      vi.    Supplemental report of Brent Kaczmarek dated 17 October 2014 (***Kaczmarek 4***)

e.  Expert reports – Antrix

    i.  Report of Vladimir Brailovsky & Daniel Flores dated 15 November 2013 (***Brailovsky/Flores 1***)

    ii.  Second report of Vladimir Brailovsky & Daniel Flores dated 1 August 2014 (***Brailovsky/Flores 2***)

    iii.  Report by Vladimir Brailovsky and Daniel Flores on the areas of disagreement with Mr Kaczmarek dated 30 September 2014 (***Brailovsky/Flores 3***)

    iv.  Supplemental Report by Vladimir Brailovsky and Daniel Flores dated 11 December 2014 (***Brailovsky/Flores 4***)

f.  Other

    i.  An agreed "dramatis personae"

    ii.  An agreed list of abbreviations

    iii.  Separate chronologies of relevant events

    iv.  A transcript of the hearing in another arbitration concerning the Devas Agreement, *CC/Devas (Mauritius) Ltd et al v Republic of India*, PCA No. 2013-09. The parties agreed that this transcript, which records testimony of a number of Devas' and Antrix's witnesses, would be admitted as evidence in this arbitration.

45. Following the hearing, the parties submitted the following materials to the tribunal:

a.  Devas' post-hearing memorial dated 17 February 2015 (***Devas' PHM***)

b.  Antrix's post-hearing memorial dated 17 February 2015 (***Antrix's PHM***)

c.  Devas' post-hearing reply memorial dated 23 March 2015 (***Devas' PHRM***)

d.  Antrix's post-hearing reply memorial dated 23 March 2015 (***Antrix's PHRM***)

e.  Devas' submission on costs dated 10 April 2015

f.  Antrix's submission on costs dated 10 April 2015

46. On 14 August 2015 the tribunal declared this proceeding closed pursuant to Article 27 of the ICC Rules.

47. The initial time limit for rendering the final award was 9 September 2012 pursuant to Article 24(1) of the ICC Rules.  Pursuant to Article 24(2) of the ICC Rules, the following extensions of time were granted by the ICC Court for the final award:

a.  on 9 August 2012, until 31 January 2013;

b.  on 10 January 2013, until 30 April 2013;

c.  on 11 April 2013, until 31 July 2013;

d.      on 11 July 2013, until 31 October 2013;

e.      on 10 October 2013, until 31 October 2014;

f.      on 16 October 2014, until 31 March 2015;

g.      on 12 June 2015, until 30 June 2015; and

h.      on 11 June 2015, until 30 September 2015.

### Relevant Facts

48.     The following section contains facts that are either not disputed or agreed, as well as findings of fact by the tribunal.

Relevant GOI entities

49.     As will become apparent, a number of GOI entities are relevant to this arbitration.  They are:

a.      the Department of Telecommunications (**DOT**), which is responsible for the provision of telecommunication services;

b.      the Wireless Planning and Coordination wing (**WPC**) of the DOT, which is responsible for (inter alia) issuing radio licenses and allocating and monitoring radio frequency spectrum;[23]

c.      the DOS, which is responsible for space policy development and implementation of the Indian space programme.  The DOS sits directly under the Prime Minister's office and its Secretary reports directly to the Prime Minister.  Antrix is described in the Devas Agreement as "a marketing arm" of the DOS;[24]

d.      ISRO, which is responsible for developing space technology and its applications.  ISRO sits under the DOS.  Its primary responsibility is to build, launch, operate and lease satellites for national uses, including telecommunications, for both the public and private sectors.  Antrix is described in the Devas Agreement as the "entity through which ISRO engages in commercial activities";[25]

e.      the Space Commission, which includes the Minister of State, the National Security Advisor, the Cabinet Secretary, the Principal Secretary to the Prime Minister and the Secretary for GOI Economic Affairs in the Ministry of Finance, as well as senior directors of ISRO centres, with its secretary being the Additional Secretary DOS.[26]  The scope of the Space Commission's responsibilities was not entirely clear from the evidence, but it

---

[23] See, e.g., Brailovsky/Flores 1, [31]; Kaczmarek 1, [101].

[24] Recitals, [2].

[25] Recitals, [2].

[26] Devas' PHM, [39.3]; Statement of Claim, [2(a)].

appears to report directly to the Prime Minister[27] and, as discussed below, it was involved in key decisions in relation to this arbitration, including the decision to annul (terminate) the Devas Agreement; and

f.    the CCS, which is the ultimate authority within India on matters of internal and external security and defence.[28] It is comprised of the Prime Minister, the Minister of Defence, the Minister of Home Affairs, the Minister of External Affairs and the Minister of Finance. The functions of the CCS include dealing with, inter alia, defence related issues, issues relating to law and order and internal security, policy matters concerning foreign affairs that have internal or external security implications (including cases relating to agreements with other countries on security related issues) and economic and political issues impinging on national security.[29]

50.    At all relevant times, the Secretary of the DOS, the Chairman of ISRO, Chairman of the Space Commission and the Chairman of Antrix were the same person, namely:

a.    Dr Kasturirangan until August 2003;

b.    Dr Nair from September 2003 to October 2009; and

c.    Dr Radhakrishnan from November 2009.

International regulation of radio frequencies

51.    It is also necessary to provide a brief overview of the international regulation of radio frequencies. There are a limited number of available radio frequencies in the world, which are known by names such as C, extended C band, Ku, and S-band.[30] As radio frequencies do not stop at national boundaries, governments have sought to regulate their allocation through the International Telecommunications Union (*ITU*), an agency of the United Nations.[31]

52.    The ITU is responsible for allocating available spectrum amongst its member States.[32] Once it has allocated spectrum to a State, that State is then free to distribute the spectrum in accordance with its national laws.[33]

53.    By the early 1970s, the ITU had allocated the use of the S-band radio frequency in India to the GOI, and the GOI had allocated the right to use S-band in India to the DOS.[34] The S-band

---

[27] CB295.

[28] Anand, [22].

[29] Anand, footnote 46.

[30] Statement of Claim, [3].

[31] Lewis 1, [25].

[32] Lewis 1, [26].

[33] Viswanathan 1; Lewis 1, [27].

[34] Viswanathan 1, [21], [22].

frequency consists of several radio frequencies, including the 2.5 gigahertz (**Ghz**) band (i.e. frequencies from 2.5 Ghz to 2.69 Ghz).[35]

54.     Once an entity has been allocated a particular frequency ,it typically seeks to launch a satellite into the earth's orbit (or an "orbital slot") so that it can use that frequency to provide radio communication services.[36]

55.     Orbital slots are also regulated by the ITU.[37] If a member State wishes to use a particular slot it must file a "co-ordination request" with the ITU.[38] Slots are then allocated on a "first come, first served" basis, although member States must co-ordinate with other countries whose satellite networks might be affected by the orbital slots that they use.[39]

56.     To ensure that member States do not file co-ordination requests in respect of slots that they have no present intention of using, there is also a "use it or lose it" policy.[40] Member States have seven years from the date of the initial coordination request to build and bring into operation the satellite in the designated orbital slot.[41] Further, if a member State wishes to modify an existing coordination request, it has five years from the date of the modification filing to bring the modified or new satellite into use.[42]

57.     As discussed further below, the orbital slot that is relevant to this proceeding is the 83°E slot. The GOI submitted a coordination request in respect of that slot in 1994 (for a satellite named INSAT-2(83)), which it modified in December 2005.[43]

India's SATCOM policy

58.     In early 2003, India's Satellite Communication (**SATCOM**) policy provided for satellite capacity "to be leased to non-government (Indian and foreign) parties".[44] It also stated that "[e]ncouraging the private sector investment in the space industry in India and attracting foreign investments in this area are other specific goals".[45]

---

[35] Viswanathan 1, [21].

[36] Lewis 1, [28]. Communications satellites are often launched into a "geostationary-satellite orbit" – that is, an orbit (or orbital slot) that appears to be in a fixed position to an earth based observer and allows ground antennas to point permanently at the point in the sky where the satellite is located. In other words, the satellite revolves around the earth at the same angular velocity of the earth itself, 360 degrees every 24 hours.

[37] Lewis 1, [30]. Satellites in a geostationary orbit must be placed sufficiently apart to avoid interference with their radio transmissions so there are a limited number of slots available: Lewis 1, [24]-[25].

[38] Lewis 1, [28].

[39] See generally, Lewis 1, [28] – [40].

[40] Lewis 1, [38].

[41] Lewis 1, [35].

[42] Lewis 1, [36].

[43] Lewis 1, [45], [46].

[44] Government of India's SATCOM Policy, 1999, CB006.

[45] Government of India's SATCOM Policy, 1999, CB006.

59.     At the time, Dr Kasturirangan (the Secretary of DOS and the Chairman of ISRO, the Space
        Commission and Antrix) began speaking with Mr Viswanathan of Forge Advisors LLC (**Forge
        Advisors**), a consultancy firm with expertise in telecommunications.[46] Mr Viswanathan was
        informed that the GOI had previously re-allocated 40 MHz of S-band spectrum from the DOS to
        the DOT, because the DOS had not used the spectrum efficiently and did not have plans to do
        so.[47] Accordingly, the DOS needed to use its remaining satellite S-Band spectrum or face the
        possibility that the GOI would re-allocate it.[48]

60.     A briefing note from DOS to the Space Commission states that:

            "ISRO initiated serious discussions in early 2003 for introduction of Satellite-based Digital
            Multimedia in the country, especially taking note of the fact that the allocation of the S-
            Band spectrum for ISRO/DOS . . . would expire by September 2010 unless [DOS/ISRO]
            place[d] S-Band Satellites in the orbit and demonstrate that necessary advance actions
            to build the Satellites have been taken".[49]

61.     The discussions between Dr Kastuurirangan and Mr Viswanathan led to Forge Advisors and
        Antrix signing, on 28 July 2003, a Memorandum of Understanding (**MOU**) with:

        a.      a "near-term objective" of Forge Advisors "supporting Antrix by undertaking a series of
                discrete tactical projects in the area of sales, marketing, business development, and
                other related arenas"; and

        b.      a "long-term objective" of building "a strategic partnership that leverages Antrix' s satellite
                & space capabilities to enable new social & commercial applications".[50]

        Forge Advisors' proposal for a hybrid satellite-terrestrial communications system

62.     In March 2004 Forge Advisors proposed a joint venture between Forge Advisors and ISRO/Antrix
        that involved the provision of satellite derived video, audio, information and telematics services.[51]
        In a letter to representatives of Antrix and ISRO dated 15 April 2004, Mr Viswanathan described
        the proposed joint venture as a "partnership to launch DEVAS, a new service that delivers video,
        multimedia and information services via satellite to mobile receivers ... across India."[52]

---

[46] Viswanathan 1, [31]-[33].

[47] Viswanathan 1, [22], [23].

[48] Viswanathan 1, [23], [31].

[49] CB 159, p. 4.

[50] Exhibit 12, p. 1

[51] Viswanathan 1, [34]; CB13.

[52] Exhibit 9.  During May 2004 Mr Viswanathan also attended a series of meetings with representatives of DOS,
ISRO and Antrix, including Dr Nair, who by this time had replaced Dr Kasturirangan as the Secretary of DOS and
Chairman of ISRO, the Space Commission and Antrix: Viswanathan 1, [37], [38]. On 18 June 2004 Forge Advisors
also wrote to Antrix proposing "revised set of financial structure and terms for the DEVAS project": Viswanathan 1,
[40]; CB17.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 28
(USDC NO. 2:18-cv-01360)**

63.　　The proposal was for a hybrid satellite-terrestrial communications system that combined a satellite and a series of ground-based towers.[53]　Services would be provided to rural communities via the satellite signal alone and to consumers in urban areas by incorporating a network of towers.　The towers would essentially re-use the frequencies used by the satellites.　This would permit urban consumers whose line of sight to the satellite was blocked (e.g. by buildings) to still receive a signal.[54]

64.　　Forge Advisors proposed that ISRO and Antrix would construct, launch and operate the required satellite network (as well as procure the required regulatory permits) and that Devas would develop services for the consumer and commercial market segments, operate the broadcast and ground network, market and sell to customers, and provide customer support.[55]

　　　　The Devas Agreement

65.　　Ultimately, Forge Advisors was informed that ISRO and Antrix were not interested in a joint venture arrangement and preferred a straight lease agreement with a higher UCRF.[56]　Forge Advisors ultimately agreed to this.　Accordingly, on 28 January 2005 Devas and Antrix executed the Devas Agreement.[57]

66.　　Antrix's obligations under the Devas Agreement included the following:

　　a.　　Antrix was required to build, launch and operate a primary satellite system (**PS1**)[58] and, at the option of Devas, a secondary satellite system (**PS2**),[59] and to lease transponder capacity in the S-band on those satellites to Devas;[60]

　　b.　　the leased capacity was for 12 years.[61]　At the time the agreement was executed, it provided that it would be "put up for renewal … for another twelve (12) years … at Lease Fees to be mutually agreed upon".[62]　The parties later agreed to a variation which required the fees under any renewed lease to be "reasonable";[63]

---

[53] Viswanathan 1, [35], [39].

[54] Viswanathan 1, [25] – [28].

[55] CB15, p. 28.

[56] Viswanathan 1, [41].

[57] Exhibit 19.　The agreement bears the number ANTX/203/DEVAS/2005.

[58] PS1 is also known as GSAT-6 and INSAT-4E.

[59] PS1 is also known as GSAT-6A.

[60] Articles 2 and 12(a)(iii).

[61] Article 3(a).

[62] Article 3(l).

[63] This occurred by agreement on 27 July 2006: see Exhibit 38.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 29 (USDC NO. 2:18-cv-01360)**

c.  the leased capacity was "Non-Preemptible", meaning that it could not be utilised or repurposed for use by another party during the life of the satellite unless Devas was in default of its obligations or payments;[64]

d.  PS1 was to be fully operational and ready within 36 months[65] of the payment of the first instalment of the UCRF.[66]  It was to be launched into the 83°E orbital slot,[67] and delivery was deemed to have taken place once in-orbit testing was completed by Antrix and accepted (in writing) by Devas;[68] and

e.  Antrix was responsible for obtaining "all necessary Governmental and Regulatory Approvals relating to orbital slot and frequency clearances, and funding for the satellite to facilitate DEVAS services".[69]  Antrix was also required "through ISRO/DOS" to obtain "clearances from National and international agencies (WPC, ITU, etc.) for use of the orbital slot and frequency resources" necessary to provide the leased capacity.[70]

67.  In return, Devas was required to pay to Antrix:

a.  UCRF of USD 20 million per satellite in three equal instalments;[71] and

b.  a lease fee of USD 9 million (initially), and USD 11.25 million per annum when Devas became cash flow positive.[72]

68.  Accordingly, Antrix could expect to receive approximately USD 256 - 310 million in fees if both satellites were launched and the lease was renewed on similar terms.  The GOI calculated that the "Internal Rate of Return (IRR) for the two satellites was 13.8%."[73]

69.  The parties agreed that they "intend to discharge their obligations in utmost good faith" and "will, at all times, act in good faith, and make all attempts to resolve all differences howsoever arising out of or in connection with this Agreement by discussion".[74]

---

[64] See article 2 and Annexure I, [31].

[65] This included a "Grace Period" of six months.  "Grace Period" is defined as a "period where penalties or breach is not applicable: Devas Agreement, Annexure I, [17].

[66] Article 3(b).  As noted above and in Appendix A, "UCRF" means Upfront Capacity Reservation Fee.

[67] Exhibit A, [1.4].

[68] Article 3(b).

[69] Article 3(c).  Article 3(c) also required Antrix to "provide appropriate technical assistance to DEVAS on a best effort basis for obtaining required operating licenses and Regulatory Approvals from various ministries so as to deliver DEVAS services via satellite and terrestrial networks".

[70] Article 12(a)(ii).

[71] Exhibit B, Article 2.1.1.

[72] Exhibit B, Articles 2.1.2.B and 2.1.2.1

[73] CB-235 at [3.5.5]

[74] Article 21.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 30 (USDC NO. 2:18-cv-01360)**

70. As discussed below, the agreement also specifies that its governing law is Indian law;[75] it provides that any disputes that arise between the parties are to be resolved by arbitration;[76] and it contains detailed provisions concerning "force majeure",[77] termination[78] and indemnities.[79]

71. The agreement was to become "effective on the date that ANTRIX is in receipt of all required approvals and communicates to DEVAS in writing regarding the same".[80] As discussed below, that occurred on 2 February 2006.

Cabinet approval and further ITU filings

72. On 1 December 2005 the GOI's Press Information Bureau formally announced that the Union Cabinet had given its approval to undertake the design, development and launch of PS1. The press release described the benefits that the GOI anticipated receiving from the Devas Agreement as including "[a] state-of-the art National Satellite System with coverage exclusively devoted to entire population of India" and "[c]apacity to deliver over ten video channels and over ten audio channels in each beam (which will grow over time through better digital transmission, encoding and compression technologies)".[81]

73. Soon after Cabinet approval was obtained, the GOI submitted a modified filing at the ITU in respect of the 83°E slot.[82] Although the GOI had previously made a coordination request in respect of the 83°E slot (for the INSAT-2(83) satellite),[83] the Devas Agreement specified that PS1 was to use five "spot beams" in specific S-band frequencies[84] from that slot.[85] The GOI had not previously coordinated the use of a satellite using a five spot beam configuration. The modified filing sought to do so, and was capable of being used for PS1.[86]

Commencement of the Devas Agreement and Devas' procurement of funding

74. As noted above, the Devas Agreement was to become "effective on the date that ANTRIX is in receipt of all required approvals and communicates to DEVAS in writing regarding the same".[87] That occurred on 2 February 2006, when Antrix notified Devas that it had obtained the

---

[75] Article 19.

[76] Article 20.

[77] Article 11.

[78] Article 7.

[79] Article 13.

[80] Article 27.

[81] Exhibit 21. The press release also referred to the ability for "ISRO/DOS to become a leader in this growing worldwide satellite digital multimedia broadcasting (S-DMB) services to mobile vehicles and cellular phones and thus provide India access to these markets globally".

[82] Lewis 1, [46].

[83] Lewis 1, [45], [46]; see also [57] above.

[84] Devas Agreement, Exhibit A, [2.2.2], figure 2.2.2.

[85] Devas Agreement, Exhibit A, [1.4].

[86] Lewis 1, [45]; Lewis 2, [4(a)], [6].

[87] Article 27.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 31 (USDC NO. 2:18-cv-01360)**

"necessary approval for building, launching and leasing the capacity of S-band satellite," and was "in a position to go ahead with the building and launch" of PS1.[88]

75.     Soon after, a number of venture capital firms agreed to invest in Devas' business.  On 16 March 2006 Telcom Devas and CC/Devas each agreed to invest USD 7.5 million in return for 15,730 Series A Preference Shares (which amounted to 19.001% of all Devas shares), as well as one equity share.[89]  The GOI's Foreign Investment Promotion Board approved the investments and, in May 2006, Telcom Devas and CC/Devas each received 19% of the shares in Devas.

76.     According to Devas' expert witness, Mr Brent Kaczmarek, the investment by Telcom Devas and CC/Devas gave Devas an implied value of about USD 40 million.[90]  It also provided Devas with the capital necessary to make the first payment of the UCRF for PS1.  On 21 June 2006 Devas made that payment, which totalled approximately USD 7 million.[91]  This meant that, under the Devas Agreement, Antrix was required to deliver leased capacity from a fully operational and ready PS1 within 36 months.[92]

77.     On 11 June 2007 CC/Devas and Telcom Devas agreed to make a further investment in Devas, and entered into a Series B Share Subscription Agreement.[93]  Pursuant to that agreement they each invested a further USD 7,499,715.67 in exchange for 11,978 Series B Preference Shares.

78.     This additional capital permitted Devas to pay to Antrix the UCRF for PS2.  On 18 June 2007 Devas paid that fee (again for approximately USD 7 million), thus exercising its right to secure Leased Capacity on the second satellite, and requiring Antrix to have PS2 launched and fully operational within 30 months.[94]

79.     Devas next began to look for a strategic partner that could assist in the roll-out of Devas' services throughout India.[95]  It approached a subsidiary of Deutsche Telekom (**DT**).  After examining Devas' business plan (including its model of the cost of building, operating and maintaining an appropriate terrestrial network), travelling to India and meeting with representatives of Antrix and ISRO (including Dr Nair), DT decided to invest in Devas.[96]  On 19 March 2008 Devas and an investment vehicle named DT Asia executed a Class C Share Subscription Agreement,[97]

---

[88] Exhibit 26.

[89] Viswanathan 1, [77].

[90] Kaczmarek 1, [89].

[91] Viswanathan 1, [81].

[92] Article 3(b). "Delivery" meant Antrix completing in-orbit testing and Devas accepting that completion in writing.

[93] Viswanathan 1, [90]; Exhibit 43.

[94] See Exhibit B, [4.2] ("[i]f DEVAS places an order for PS2 at any time after the order for PS1, the schedule for PS2 will be 30 (thirty) months from the payment of the First Installment for PS2.  No grace period is applicable for PS2").

[95] Viswanathan 1, [92].

[96] Viswanathan 1, [96] - [100].

[97] Larson, [33], [35]; Viswanathan 1, [102]; Exhibit 75.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 32 (USDC NO. 2:18-cv-01360)**

pursuant to which DT Asia received 28,349 Class C Shares in return for an investment of approximately USD 75 million.

80.    The parties' expert witnesses agree that DT Asia's investment in Devas is indicative of the fair market value of the business as of this point in time.  Mr Kaczmarek (Devas' expert witness) considers that it implies that the fair market value of Devas in March 2008 is *at least* USD 375 million on the basis that DT provided various "in kind" contributions to Devas.[98]  Mr Brailovsky (one of Antrix's expert witnesses) considers that it implies that the fair market value of Devas in March 2008 is *no more* than US$ 375 million,[99] because the Class C shares that DT acquired "included rights not held by other shareholders, such as a right of first refusal, the right to name more directors than in proportion to the subscription, and some veto rights".[100]

81.    The tribunal does not agree with Mr Brailovsky. The evidence of Mr Larsen demonstrates that DT made a considerable contribution to Devas in addition to the price it paid for Devas' shares. Among other things it provided 20 to 25 senior DT engineers and other technical specialists to plan Devas' terrestrial network, [101] as well as purchasing power for network, transport infrastructure, IT systems and IP equipment.[102]  Mr Brailovsky's suggestion that DT Asia received "special rights" is an unsupported assertion, and is not borne out by the tribunal's examination of the shareholder agreement.[103]  When cross-examined he admitted that DT "brought a lot into the project."[104]

82.    However, there is also no evidence that would permit the tribunal to place a value on the "in kind" contribution that DT provided.  Accordingly, the tribunal is not in a position to find that DT Asia's investment in Devas valued the company at any more than USD 375 million.   The tribunal therefore finds that the investment valued Devas at USD 375 million.

Delays in the launch of PS1

83.    On 11 April 2009 members of the Devas team met with senior Antrix and ISRO officials and were informed that there would be a delay in the launch of PS1.  They were told that, despite the June 2009 deadline for launching PS1,[105] the satellite would not be launched until "early 2010".[106] According to Devas, this delay entitled it to damages under the Devas Agreement, but it elected

---

[98] Report by Mr Kaczmarek on the areas of disagreement with Messrs Brailovsky and Flores dated 30 September 2014 at [5] and footnote 4.

[99] Transcript, p. 698, line 21.

[100] Brailovsky/Flores 1, [21].

[101] Larsen, [36].

[102] Larsen, [37].

[103]  For example, DT was only entitled to appoint 2 of 13 directors, which is 15%, and therefore less than the percentage of Devas' shares that it acquired: see Exhibit C-75, [2.1(a)].

[104] Haig Transcript at 554:22-23.

[105] This includes the six month "grace period".

[106] Viswanathan 1, [139].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 33 (USDC NO. 2:18-cv-01360)**

not to seek damages because it expected (at that time) the delay to be for a relatively short period of time.[107]

ISP licence

84.     Devas was required to obtain a number of licences in order to provide the telecommunications services that it planned to provide.  One of those licences was an internet service provider (*ISP*) licence, which it received on 2 May 2008.[108]  It later received approval from the DOT to provide Internet Protocol Television (*IPTV*) services.[109]  With the ISP and IPTV licences, Devas had permission to provide a portfolio of services that included digital television, video on demand and other types of entertainment to users in urban and rural areas.

Experimental trials

85.     On 20 August 2008 Devas submitted an application to the WPC for an experimental licence to test the wireless apparatus that underscored the Devas system.[110]  On 7 May 2009 the WPC issued the experimental licence, which permitted Devas to conduct an "Experimental/Trial of wireless equipment at Bangalore".  With the licence, Devas was able to use the frequencies in the 2.5-2.69 GHz band to test run the entire Devas system, including terrestrial reuse of spectrum.[111]

86.     The trials were performed in Bangalore between June and September 2009.  They involved trials and demonstrations of the capabilities of the Devas system, including mobile multimedia and broadband wireless services.[112]  As PS1 had not been launched, the satellite that was used for the trials was an "INSAT-3C" satellite that was owned (and operated during the trials) by the DOS/ISRO.[113]

87.     Devas considered that the trials were "extremely successful".[114]  Towards the end of the trials, it had a ceremony at its new office in Bangalore that was attended by (inter alia) Dr Nair and Dr Radhakrishnan.[115]   During the ceremony, Dr Radhakrishnan said that the Devas-Antrix partnership was "great" and that he was looking forward to the launch of PS1.[116]

---

[107] Viswanathan 1, [140].

[108] Exhibit 66.

[109] Exhibit 36.

[110] Viswanathan 1, [111].  As noted above, the WPC was the Wireless Planning and Coordination Wing of the DOT.

[111] Viswanathan 1, [114].  On 15 July 2009 that licence was extended.  This licence that allowed Devas to import certain equipment for the trials and obtain approval to use terrestrial mobile towers for mounting certain equipment for the trials: Viswanathan 1, [114], [115].

[112] Parsons 1, [21].

[113] Parsons 1, [21].

[114] Viswanathan 1, [120].  See also Singh 1 at [52] and Singh 2 at [11].

[115] At the time Dr Nair was still the Secretary of the DOS and the Chairman of ISRO, the Space Commission and Devas. Dr Radihakrishnan took over those roles a few months later.

[116] Singh 1, [54].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 34 (USDC NO. 2:18-cv-01360)**

Further financing

88.     After being notified that there would be delays in the launch of PS1, Devas elected to seek further capital from its investors.  It asked investors for a "cash-cushion so that services could be ramped up quickly once the satellite was launched."[117]

89.     Each of Telcom Devas, CC/Devas and DT Asia agreed to provide further funding.  Accordingly, on 14 September 2009 Devas sought approval for a new round of investment from the Foreign Investment Promotion Board and, on 29 September 2009, it received that approval.  On the same day, Devas entered into a Share Subscription Agreement with each of Telcom Devas, CC/Devas and DT Asia pursuant to which Telcom Devas and CC/Devas each invested an additional USD 1,388,951.24 (for a further 525 Class C shares) and DT Asia invested USD 22,223,219.76 (for a further 8,400 Class C shares).[118]

Dr Radhakrishnan becomes Chairman of Antrix

90.     On 29 October 2009 Dr Radhakrishnan was appointed as the Chairman of Antrix, as well as the Secretary of the DOS and Chairman of ISRO and the Space Commission.[119]

91.     Soon after, the DOS received a complaint about "irregularities in connection with the [Devas] Contract".[120]  Dr Radhakrishnan commissioned Dr B. N. Suresh, Director of the Indian Institute of Space and Technology, to undertake "comprehensive review of all aspects" of the Devas Agreement.[121]

92.     At around this time, Devas started being informed of further delays to the launch of the satellites.  On 11 or 12 November 2009, during "joint status review" meetings with Antrix, Devas was informed that the launch of the satellites had been delayed, and was now planned for 19 June 2010.[122]  However, PS1 was nearing the final stages of its construction; there were only "a few defined areas that needed focused attention" in order to be prepared for that launch date.[123]

Military needs for S-band

93.     On 15 December 2009, during a meeting with members of (inter alia) the Ministry of Defence "to discuss the Bandwidth requirements of services for satellite communication", [124]  ISRO was

---

[117] Singh 1, [55].

[118] Viswanathan 1, [126], [127].

[119] Viswanathan 1, [13].

[120] Anand 1, [8].

[121] CB210; CB145 (Enclosure 1); Anand 1, [12].

[122] Viswanathan 1, [141]; CB124.

[123] Parsons 1, [25].  According to Parsons those areas included the propulsion integration system, testing related to the integrated power system, completion of the panel integration with the structure, integrating the unfurlable antenna into the structure, structural completion (including that of the battery deck, feed support structure, east west decks, propulsion brackets, AOCS brackets, and UFA brackets), the integrated spacecraft test, and minor thermal work along with testing the composites Yoke and SADA cone.

[124] Anand, App. VA-10.

informed that India's Armed Forces required the ability to use the S-band.  The Armed Forces' requirements were stated to be as follows:

"[t]o cater for requirements up to 2012 – 120 Carriers, 17.5 MHz. Out of which 50 Carriers are being used by the Armed Forces.  (ii) Additional in 12th Plan – 40 MHz.  (iii) Additional in 13th Plan – 50 MHz".[125]

94.   According to Antrix, this was the "crystallisation" of demands that the Armed Forces had been making on S-band since 2005.[126]

95.   Soon after, Devas was informed of further delays to the launch of PS1.  On 30 December 2009, Devas was told that "Antrix/ISRO is putting all efforts to meet the launch schedule of July 2010",[127] and on about 4 February 2010, Dr Radhakrishnan informed Devas that there was now a new deadline for launching the satellites of 1 September 2010.[128]

96.   Dr Suresh completed his review of the Devas Agreement in May 2010.[129]  His report did not find any wrongdoing in connection with the execution of the Devas Agreement.  He found (inter alia) that:

a.   the Devas Agreement was only executed after "technical feasibility, financial and market aspects, time schedule, risk mitigation" and "pricing" had been scrutinised by a "High Power Committee" comprised of specialist "ISRO Centres and also Additional Secretary and Joint Secretary of DOS";

b.   Antrix entered into the agreement "in close coordination & participation of SCPO, ISRO HQ and other concerned agencies";

c.   Antrix followed "guidelines for leasing the transponder services to private service providers as per the Satcom policy";

d.   "[t]here is absolutely no doubt on the technical soundness of the digital multimedia services as proposed in this hybrid satellite and terrestrial system";

e.   "[o]nly 10% of the capacity is available for use by ISRO" which would "bring in limitations on spectrum availability for essential strategic and social sectors applications in future"; and

f.   "[t]he utilization of the S-band frequency spectrum allotted for satellite bases services to ISRO/DOS for satellite communications is extremely important.  Therefore this aspect has to be critically examined considering all usages including GSAT-6 and GSAT-GA by

---

[125] Anand, App. VA-10.

[126] See, e.g., Devas' PHM, [67].

[127] Exhibit 115.

128 Viswanathan 1, [145].

[129] CB145.  The report was delivered to Dr Radhakrishnan on 7 June 2010: CB-144.

a competent technical team on high priority. The strategic and other essential needs of the country should also be considered".[130]

Articles: The Hindu Business Line

97.     On 30 May 2010 an article concerning the Devas Agreement was published in The Hindu Business Line.[131]  Among other things, the article states that "[a]t a time when telecom operators are aggressively bidding in crores of rupees for acquiring spectrum, a little-known company in Bangalore, Devas Multimedia Pvt Ltd, has got preferential allocation of air waves controlled by the Indian Space Research Organisation by virtue of an agreement the two signed five years ago".  It states that neither the amount of S-band spectrum allocated to Devas nor the price that Devas paid for that spectrum had been disclosed, but S-band was "a golden band that broadband wireless access operators covet worldwide" and that "Telecom industry players, who are scrounging for bandwidth, are raising eyebrows over the contract between Antrix and Devas".

98.     On 1 June 2010 a second article concerning the Devas Agreement was published in The Hindu Business Line.  Its title was "[a]nother spectrum sold on the quiet".[132]  Among other things, it stated:

        "[i]t is time the Government realised that a transparent mechanism is needed to supervise the sale of scarce assets … There is a simple principle in economics: if it is scarce, charge for it. And if there is one thing that is scarce today in relation to the demand for it, it is spectrum. But the cruel will say that it is perhaps too much to expect space scientists at the Indian Space Research Organisation (ISRO) to be aware of this sine qua non of economics and commerce. That is probably why that organisation has, in a rather mysterious way, allocated spectrum for an undisclosed sum to Devas Multimedia Private Limited, a company formed by some ex-ISRO employees."

99.     The article goes on to say that "[p]ast experience has shown that smart footwork by the sellers — who only have a fiduciary role — comes to public notice only after the deed is done. Then, as we have seen in the case of the 2G scandal, the Government is forced to hide behind technicalities and half-truths."  This was a reference to an allegation (discussed below but not otherwise related to the parties' dispute in this arbitration) that the GOI had previously undervalued the 2G spectrum and sold it to favoured companies.  The article also states: "there really isn't much to think about: the 2005 agreement should be annulled and the ISRO quota should be auctioned so that the Government can raise some more much-needed money".

100.    On 4 June 2010 the DOT wrote to Mr G. Balachandran of ISRO enclosing the two articles and asking for a comment "immediately".[133]

---

[130] CB145, p. 15.

[131] CB140.

[132] CB141.

[133] Letter dated 4 June 2010, CB-143.

Response from Dr Radhakrishnan to the articles in The Hindu Business Line

101.    On 14 June 2010 the DOT wrote to Dr Radhakrishnan enclosing the two articles, noting that Mr
        G. Balachandran had not responded to its 4 June 2010 letter and asking Dr Radhakrishnan to
        "look into the matter personally and expedite [his] comments."[134]

102.    On the same day the DOS sought[135] and received[136] six copies of the Devas Agreement, and two
        days later (on 16 June 2010), Dr Radhakrishnan sent a note to the Ministry of Law and Justice
        seeking advice concerning the annulment (termination) of the Devas Agreement. [137] The note
        stated:

                "we seek your legal opinion on whether ANTRIX-Devas contract need be annulled
                invoking any of the provisions of the contract in order to (i) to preserve the precious S
                band spectrum for the strategic requirements of the nation and, (ii) to ensure a level
                playing field for the other service providers using terrestrial spectrum".[138]

103.    On the same day, Dr Radhakrishanan also met with Mr. T.K. Viswanathan of the Ministry of Law
        and Justice.[139]  According to Devas, Dr Radhakrishnan explained that what he was seeking was
        advice about "*how* to annul the contract" (cf. "whether" it "need be annulled", as his note
        stated).[140] Devas also says that Dr Radhakrishnan "was simply looking for an excuse for Antrix to
        get out of the contract".[141]

104.    The tribunal accepts that the reason why Dr Radhakrishnan sought advice from the Ministry of
        Law and Justice was that he wanted advice about how to annul the Devas Agreement (i.e. he
        wanted to identify a legally permissible basis for terminating the agreement), and that he made
        this desire clear when he met with Mr Viswanathan on 16 June 2010. This is because:

        a.      as Devas submits, a note that was later provided to the Space Commission (see [109]
                below) states that the DOS had, prior to seeking advice from the Ministry of Law and
                Justice, "decided to request Ministry of Law and justice to give its opinion as to *how* to
                annul the contract";[142]

        b.      it is inherently implausible that Dr Radhakrishnan wanted advice about whether Antrix
                "needed" to annul the agreement.  There is nothing in the agreement to suggest that its

---

[134] CB149.

[135] CB-150.

[136] CB-151.

[137] CB159, Annexure XII.

[138] CB159, Annexure XII.

[139] CB 159, Annexure XIII, [2].  Mr. T.K. Viswanathan was the Advisor to the Law Minister and is not related to Mr.
Ramachandran Viswanathan of Devas.

[140] Devas' PHM, [84].

[141] Statement of Claim, [233].

[142] CB159, [14.1] (emphasis added).

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 38
(USDC NO. 2:18-cv-01360)**

termination might ever be *required*; the Devas Agreement (like most, if not all agreements) provides only that it "may" be terminated in certain circumstances;

c.     the advice that the Ministry of Law and Justice in fact gave was not whether Antrix "need annul" the agreement, but rather whether it was permitted to annul the agreement and how it could do so.  The advice was provided to Dr Radhakrishnan on 18 June 2010.  It stated:

> "the Central Government (Department of Space) in exercise of its sovereign power and function, if so desire and feel appropriate, may take a policy decision to the effect that due to the needs of strategic requirements, the Central Govt/ISRO would not be able to provide orbit slot in S band for operating PS1 to the ANTRIX for commercial activities. In that event, ANTRIX in terms of Article 7(c) read with Article 11, of the agreement may terminate the agreement and inform M/s DEVAS accordingly.  However on such termination ANTRIX shall be required to reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding service taxes received by ANTRIX till that date."[143]

105.   The tribunal does not, however, make any finding about whether or not Dr Radhakrishnan "was simply looking for an excuse for Antrix to get out of the contract", acting in bad faith in seeking advice about how to annul the agreement (as Devas alleges[144]) or responding to crystallised national security needs (as Antrix alleges[145]).  As will become apparent below, it is not necessary for the tribunal to make specific findings about these matters in order to resolve the parties' dispute.

106.   The tribunal also declines to draw any adverse inference from Antrix's failure to call Dr Radhakrishnan.[146]  While it is certainly surprising that he was not called to give evidence (given his central role in events that are relevant to this arbitration), the parties have agreed that IBA Rules shall serve as a guide in the determination of evidentiary issues, and those rules provide for adverse inferences to be drawn in very limited circumstances.  In relation to a failure to call a witness they state:

> "[i]f a Party fails without satisfactory explanation to make available any other relevant evidence, including testimony, sought by one Party to which the Party to whom the request was addressed has not objected in due time or fails to make available any evidence, including testimony, ordered by the Arbitral Tribunal to be produced, the

---

[143] CB159, Annexure XIII. See also CB159 at [14.2] in which the DOS stated that the "Ministry of Law and Justice have given their opinion as to *how* to annul this contract and take further follow up action to face issues that will arise out of annulment of the contract" (emphasis added).

[144] See, eg., Reply, [96], [103]; Skeleton, [36]; Devas' PHM, [122].

[145] See, e.g., Statement of Defence, [30], [36]; Rejoinder, [26]; Antrix's Skeleton, [34]; Antrix's PHM, [67].

[146] Cf. Devas' submission that the failure to call Dr Radhakrishnan "must lead to adverse inferences being drawn against Antrix": Devas' PHM, [22].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 39 (USDC NO. 2:18-cv-01360)**

Arbitral Tribunal may infer that such evidence would be adverse to the interests of that Party".[147]

107.   Since Devas has not suggested that these circumstances apply, the tribunal does not consider that any adverse inference should be drawn from Antrix's failure to call Dr Radhakrishnan (or any other witness).   As noted above, however, the tribunal is certainly surprised that he was not called by Antrix as a factual witness to assist the tribunal.   Dr Radhakrishnan was undoubtedly the central person in the events that gave rise to this arbitration.   He was in an unparalleled position to give direct evidence concerning them.

Phase II Experimental trials

108.   In mid 2010 Devas conducted "Phase II trials" in China (Chengdu and Beijing) and Germany (Stuttgart).   The purpose of the trials included ensuring that the DVB-SH technology[148] and TD-LTE technology[149] could co-exist in the 2.6gHz band.[150]   The trials were highly successful.[151]

Space Commission decides to annul the Devas Agreement

109.   On 30 June 2010 the DOS provided a note to the Space Commission concerning the termination of the Devas Agreement.[152] The note stated that its purpose was to "apprise Space Commission on certain concerns that have arisen" in relation to the Devas Agreement, to "apprise on the imperative demand for S-band transponders for strategic and societal applications that have emerged" since the agreement was signed, and to "seek guidance on the prudent utilization of the S-band spectrum of 150 MHz allocated to ISRO" and "further course of actions to be followed by DOS".[153]

110.   The note provided the background to the Devas Agreement, including: an overview of India's SATCOM policy; Forge Advisors' proposed joint venture with Antrix; the entry into the Devas Agreement; Antrix's approval of the Devas Agreement; the key terms of the agreement; India's competing "strategic" and "societal" needs for S-band; Dr Suresh's report on the agreement; and the DOS' decision to "request Ministry of Law and justice to give its opinion as to how to annul the contract".[154]

111.   It then states, under the heading "Further Courses of Action and Implications":

"15.1 **Annulling the Contract**: Considering the need (i) to preserve S-band spectrum for national requirements in strategic sector and for societal applications, (ii) certain

---

[147] Article 9(6).

[148] The DVB-SH platform was to be used for the provision of Devas' audio-visual (**AV**) services.

[149] The TD-LTD platform was to be used for the provision of Devas' broadband wireless access (**BWA**) services.

[150] Larsen, [48].

[151] Larsen, [48].  Mr Brailovsky, Antrix's expert, does not dispute this: Haig Trascript at 663:20-24.

[152] CB159.

[153] CB159.

[154] CB159.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 40 (USDC NO. 2:18-cv-01360)**

concerns on technical, managerial, financial and contractual aspects of ANTRIX-DEVAS contract, and (iii) issues involved in DEVAS obtaining the Spectrum License for the proposed services ... it would be inevitable to annul the ANTRIX-DEVAS contract.

The ANTRIX-DEVAS contract has specific clauses for termination of the contract. Ministry of Law and Justice have given their views on feasibility of terminating the contract. The Department, in consultation with Law Ministry, may invoke appropriate clause, and terminate the contract.

In the event of termination of the contract, M/s ANTRIX will have to refund the Capacity Reservation Fee received from M/s DEVAS.

The Department will evolve a revised utilization plan for GSAT-6 and GSAT-6A satellites."

112.    The course of action proposed by the note (which was described as being the "inevitable" course) was therefore to annul the agreement.   When the Space Commission met on 2 July 2010 it agreed to that course.  It resolved that:

> "[the] Department, in view of priority to be given to nation's strategic requirements including societal ones may take actions necessary and instruct Antrix to annul the Antrix-Devas contract".[155]

Advice from India's Additional Solicitor General (or "**ASG**")

113.    The Space Commission also instructed the DOS to seek legal advice on the resolution that the Space Commission had passed at its meeting of 2 July 2010 concerning the annulment of the Devas Agreement, and the form of letters to be issued in order to give effect to that resolution.[156]

114.    Accordingly, on 8 July 2010, Dr Radhakrishnan wrote to the ASG enclosing (inter alia):

a.      the Space Commission's resolution (see [112] above);

b.      a draft letter from the DOS to Antrix stating that Antrix may inform Devas that the Devas Agreement is terminated in accordance with "Article 7(c)(i) read with Article 11"; and

c.      a draft letter from Antrix to Devas terminating the agreement in accordance with the "Article 7(c) read with Article 11".[157]

115.    The ASG issued his advice on 12 July 2010.  He disagreed with the Ministry of Law and Justice's advice that the agreement may be terminated pursuant to Article 7(c) read with Article 11, and advised to instead rely solely on Article 11.  He stated that:

> "[t]he modus of termination has been specified in the agreement in clause 7. But I am afraid that the conditions stipulated in this clause cannot be invoked at this stage for the

---

[155] CB160, p. 15

[156] CB163.

[157] CB163.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 41 (USDC NO. 2:18-cv-01360)**

purpose of terminating the contract. The only other relevant provision for seeking recourse to terminate the contract under the given factual scenario viz., national needs and change in governmental policies, would be Article 11 of the contract, relating to 'Force Majeure'".

...

There can be no dispute whatsoever that the Government of India is the owner of satellite spectrum space and any policy taken by the Government of India with regard to allocation and use of S bandwith, including those which are subject matter of contractual obligations, would fall within the doctrine of force majeure, as envisaged in the very agreement between Antrix and Devas."[158]

116.   He also disagreed with the Space Commission's resolution that the DOS be responsible for instructing Antrix to Annul the agreement. He stated:

"[i]t is always advisable that in the present case, instead of the Department of Space taking a decision to terminate, it would be more prudent that a decision is taken by the Government of India, as a matter of policy, in exercise of its executive power or in other words, a policy decision having the seal and approval of the Cabinet and duly gazetted as per the Business Rules of the Government of India. That would give a greater legal sanctity to the decision to terminate the contract in as much as the contractual provisions expressly stipulate that for the force majeure event, to disable one of the parties to perform its obligations under the contract, the act must be an act by the governmental authority acting in its sovereign capacity."[159]

Further delays to the launch of the satellites

117.   Soon after the ASG issued his advice, Devas was informed of further delays to the launch of PS1 and PS2:

a.      during a "status review" on 5 August 2010 Devas was informed that "shipment and delivery date" for GSAT-6 was now 10 December 2010;[160]

b.      on 20 August 2010 Devas requested an urgent meeting with Dr Radhakrishnan, noting that Antrix had stopped even referring to the potential launch date (cf. the "shipment and delivery" date).[161] Devas was told to seek a meeting with Mr Murthi (Executive Director of Antrix), rather than Dr Radhakrishnan.[162] On 14 September 2010 Mr Murthi told

---

[158] CB165.

[159] CB165.

[160] Viswanathan 1, [156].

[161] Viswanathan 1, [157].

[162] Viswanathan 1, [158].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 42 (USDC NO. 2:18-cv-01360)**

Devas that PS1 would be finished in one to two months, but did not provide a launch date;[163] and

c.     on 27 October 2010 Devas met with Antrix's new Executive Director, Mr Madhusudhan, who said that he would "apply his energies in getting ISRO to meet stated milestones and assist in exploring launch solutions".[164] On 10 January 2011 Mr Madhusadhan said that PS1 was still three to four months away from completion.

118.    On 24 January 2011 Devas wrote to Dr Radhakrishnan and asked him to recommit to the launch of the PS1 satellite.[165] Dr Radhakrishnan did not reply.[166]

Further media articles concerning the Devas Agreement

119.    In early February 2011 a series of further press articles concerning the Devas Agreement were published, after the former Minister for Telecommunications and two of his officers were arrested in respect of the 2G scandal (referred to in [99] above).  It was alleged that they undervalued the 2G spectrum and sold it to favoured companies.

120.    One of the articles, published on 8 February 2011, states that "[a]nother spectrum scam has hit the UPA government which is already reeling from the fallout of allegations of corruption in the underpricing of 2G airwaves sold to telecom operators."  It also states that:

"[s]ources said ISRO chief K Radhakrishnan had written to the PMO demanding cancellation of the agreement on the ground that it favoured Devas Multimedia.  No urgency was, however, shown to revoke the deal even after the law ministry raised serious concerns about the proposal, terming it "illegal".[167]

121.    On 8 February 2011 Dr Radhakrishnan gave a press conference in New Dehli in which he explained what action had been taken in respect of the Devas Agreement.  He stated that:

"we took up the matter to the Space Commission, which in July 2010 made a few decisions. One of the decision was there is high priority for the country's strategic requirements and the societal applications which have be to met using the S-band spectrum that is in the possession of ISRO and we also decided to take actions to annul the contract …

Subsequent to the decisions taken by the Space Commission, of which the Secretary Space is the Chairman and we have very senior members in the commission, we started necessary actions for terminating the contract which required extensive consultations

---

[163] Viswanathan 1, [163], [164].

[164] Viswanathan 1, [167].

[165] Viswanathan 1, [173].

[166] Viswanathan 1, [174].

[167] Pradeep Thakur, Another spectrum scam hits govt, this time from ISRO, Times of India, 8 February 2011, CB-211. According to another article, published on 9 February 2011, "[t]errestrial mobile phone operators have been insisting that the"2.5 -2.69 GHz band (S-Band) be fully preserved as an extension band for 3G services": T. A. Johnson, Why S-Band is so valuable, The Indian Express, 9 February 2011 (citation omitted)), CB-213.

with the concerned agencies in the government. Department of Telecommunication, Department of Law and Justice, all included. The idea is to ensure that a _____ contract that has been entered into has to be now terminated without causing much of embarrassment and damage and financial loss to the government. We had to go through that process and we have been going through that process and soon we expect to complete that process."[168]

Devas' response to Dr Radhakrishnan's announcement

122.  Until this point, Devas appears to have been unaware of the proposed annulment (termination) of the Devas Agreement.   It responded by sending a series of letters to Dr Radhakrishnan and Antrix:

a.      on 11 February 2011 it wrote to Dr Radhakrishnan and stated (inter alia) that any decision to review the Devas Agreement without informing Devas was contrary to the parties' obligation to act in "utmost good faith".   Devas asked that any issues relating to the Devas Agreement that may further adversely impact the ability of Antrix to perform the Devas Agreement be disclosed.[169]  Dr Radhakrishnan did not respond;

b.      also on 11 February 2011 Devas wrote to Antrix in respect of (inter alia) its delay in delivering space segment capacity for the period from 22 June 2009 to 21 June 2010. Devas demanded that Antrix pay (the Indian Rupees equivalent to) USD 5 million as a Late Delivery Penalty.[170]  Antrix did not respond; and

c.      on 14 February 2011 Devas wrote to Antrix and asked Antrix to confirm that it intended to honour the terms of the agreement.   It said that if it did not receive a response within one week it would assume that there were disputes or differences arising under the agreement and would be referring the matter to the senior management of Antrix and Devas for resolution in accordance with the agreement's dispute resolution provisions.[171] Antrix did not respond.

Involvement of the Prime Minister

123.  On 16 February 2011, the Prime Minister of India spoke to reporters regarding the annulment of the Devas Agreement.  He said that:

"[t]here have been no backroom talks. I think I have not met anybody myself and the decision of the Space Commission to annul the deal was taken on 2nd July, 2010. Space Commission took a number of decision [sic] of which annulment of the contract was one of them. The Dept of Space was asked to take action on all the five decision points that

---

[168] CB210.  On 10 February 2011 ISRO also issued a "Background Note" concerning the annulment of the Devas Agreement which stated (inter alia) that the ASG had opined that the annulment should be done through a policy decision of the GOI and that the DOS had prepared a Draft Note for the CCS: CB216, pp. 5, 6.

[169] Exhibit 174.

[170] Exhibit 172.

[171] Exhibit 175.

emerged from the Space Commission meeting. The issue of how to annul the contract required consideration by legal experts and the Law Ministry was consulted. A decision had to be taken on whether to annul the contract using article 7(c) or Article 11 or both read together. Eventually it has been decided that the Government should take a sovereign policy decision regarding the utilization of Space Band capacity which uses S Band spectrum having regard to the country's strategic requirements."[172]

Note to the CCS

124.   On the same day (16 February 2011) Dr Radhakrishnan submitted a note to the CCS. The note stated that its purpose was to seek the CCS' approval to annul the Devas Agreement "in view of priority to be given to nation's strategic requirements including societal ones".[173] It also referred to the need to "level the playing field" for other providers of telecommunications services.[174] It went on to request approval to annul the agreement, as follows:

"45.1) Taking note of the fact that government policies with regard to allocation of spectrum have undergone a change in the last few years and there has been a increased demand for allocation of spectrum for national needs, including for the needs of defence, para-military forces, railways and other public utility services as well as for societal needs, and having regard to the needs of the country's strategic requirements, the Government will not be able to provide orbit slot in S band to Antrix for commercial activities, including for those which are the subject matter of existing contractual obligations for S Band.

45.2) In the light of this policy of not providing orbit slot in S Band to Antrix for commercial activities, the "Agreement for the lease of space segment capacity on ISRO/Antrix S-Band spacecraft by Devas Multimedia Pvt. Ltd." entered into between Antrix Corporation and Devas Multimedia Pvt. Ltd. on 28th January, 2005 shall be annulled forthwith."

---

[172] CB-255.

[173] CB226.  It explained those strategic and social requirements as follows:

"19) The GSAT-7 Satellite being built by ISRO for Indian Navy with launch targeted in mid-2011 has S-band transponders for MSS applications with 15 MHz band width each for up-linking and down-linking. Further, Armed Forces and ISRO are finalising configuration of a S-band multi-beam Satellite GSAT-7S, for national security related mobile communications.

20) The Integrated Space Cell of Integrated Defence Staff, Ministry of Defence have projected, in December 2009, need for a bandwidth of 17.5 MHz in S- band for meeting the immediate requirements of Armed Forces; another 40 MHz during the 12th plan period; and an additional 50 MHz during the 13th plan period.

21) There are further demands for S-band transponders from internal security agencies viz., Border Security Force, Central Industrial Security Force, Central Reserve Police Force, Coast Guard and Police for meeting their secured communication needs.

22) Indian Railways have also projected S band requirements for traintracking. In view of these emerging requirements, there is an imminent need to preserve the S band spectrum for vital strategic and societal applications."

[174] It stated (at [24]): "[f]urther, DEVAS multimedia services also call for terrestrial supplementation where there are high-rising buildings (that means all major urban areas). However, such a dispensation might not ensure a level-playing field for the other service providers using terrestrial spectrum, especially considering the significant demand for terrestrial S-band spectrum and the current trends on its price."

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 45 (USDC NO. 2:18-cv-01360)**

125.    On 17 February 2011 the CCS met and approved the annulment of the Devas Agreement.  The decision was announced later that day.[175]

   Notification of the annulment of the Devas Agreement

126.    On 25 February 2011 Antrix wrote to Devas informing it that the agreement was terminated.[176] The letter stated:

   "[t]he Central Government has communicated that it has taken a policy decision not to provide orbital slot in S-Band to our Company for commercial activities including those which are the subject matter of the existing agreements.

   In accordance with Article 7(c) of the Agreement, it is declared that Antrix is unable to obtain the necessary frequency and orbital slot coordination as stipulated in the Agreement.

   Without prejudice to the inability expressed under Article 7(c), notice of force majeure as defined in Article 11, is expressed. The policy decision of the Central Government acting in its sovereign capacity is the event of force majeure which has occurred on 23rd February 2011. The force majeure commenced on 23rd February 2011. The scope and duration of the said decision cannot be anticipated. It is likely to be indefinite. It is not possible for Antrix to take any effective step to resume the obligations under the Agreement. The event of force majeure is beyond the reasonable control of Antrix and is clearly covered by Article 11(b) of the Agreement and, in particular, 11(b)(v) "... act of governmental authority in its sovereign capacity ... ". Any possibility of resumption of obligations by Antrix under the Agreement stands excluded. The subject Agreement, No. ANTX/203/DEVAS/2005 dated 28th January 2005, therefore, is terminated with immediate effect."

127.    It is not entirely clear from the evidence adduced before this tribunal when or why a decision was made to rely on Article 7(c) to terminate the Devas Agreement (given that this involved a departure from the ASG's advice, referred to in [115] above).

128.    On 28 February 2011 Devas wrote to Antrix, denying that the Devas Agreement was terminated and stating that, pursuant to Article 20(a) of the Devas Agreement, it was "referring all disputes arising from or under the Agreement ... to senior management of both parties."[177]

129.    On 15 April 2011 Antrix wrote to Devas that referred to its letter of 25 February 2011 and enclosed a cheque for the amount of INR 58,37,34,000 (approximately USD 13 million) as a "reimbursement" of the UCRF.[178]

---

[175] See CB228.

[176] CB231.

[177] Exhibit 179.  Antrix did not respond to that letter within the time period specified in Article 20 for the negotiations between senior management to take place.

[178] Exhibit 183.

130.   On 18 April 2011 Devas wrote to Antrix, returned Antrix's cheque and stated (inter alia) that Antrix had failed to state a proper basis for terminating the Devas Agreement pursuant to Article 7(c) of the agreement, and that it was not entitled to rely on the *force majeure* clause in the agreement because the events said to give rise to the *force majeure* were self-induced.[179]

Devas' commencement of this arbitration and claim for damages

131.   As noted above, Devas commenced this arbitration on 1 July 2011.  Initially, Devas alleged that Antrix had repudiated its obligations under the agreement, but that it had not accepted the repudiation, and sought specific performance of the agreement.  However, Devas later changed its position.  On 13 June 2013 Devas wrote to Antrix and stated:

"[w]e refer to your letter of 25 February 2011 in which you purported to terminate the above-referenced Agreement.

There clearly was no basis for you to terminate the Agreement and, accordingly, the purported termination of the Agreement by your 25 February 2011 letter was wrongful and in repudiatory breach of the Agreement. Devas was entitled to accept Antrix's repudiatory breach of contract and to bring the Agreement to an end, whilst claiming damages.

Since then Antrix also has obstructed the expeditious determination of the arbitration proceedings commenced by Devas.

Antrix continues to be in repudiatory breach of the Agreement even today and has clearly evinced its intention not to perform the Agreement. Devas has elected to, and does hereby, accept Antrix's repudiatory breach of the Agreement, bringing the Agreement to an end as a result of Antrix's wrongful actions.

Devas will be amending its claim in the ICC arbitration to reflect the withdrawal of its claim for specific performance whilst maintaining its claim for damages as a result of Antrix's breaches of contract.

Devas reserves all of its rights including under Indian law and international law."

132.   As noted above, Devas now claims damages equal to the value of its business (which it claims is USD 1.41 billion), plus interest and costs.

**Applicable law**

133.   The Devas Agreement states that "[t]his Agreement and the rights and responsibilities of the Parties hereunder, shall be subject to and construed in accordance with the Laws of India".[180]

---

[179] Exhibit 184.

[180] Article 19.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 47 (USDC NO. 2:18-cv-01360)**

Both parties agree that, in light of this provision, the tribunal is required to apply the laws of India when determining the parties' rights and obligations under the agreement.[181]

134.  Devas has also submitted that English and other common law decisions have important persuasive value which influence the courts in India.[182]  The tribunal agrees.  In *Bhagwandas Goverdhandas Kedia v Girdharlal Parshottamadas*,[183] the Supreme Court of India stated:

> "[i]n the administration of the law of contracts, the Courts in India have generally been guided by the rules of the English common law applicable to contracts where no statutory provision to the contrary is in force".[184]

135.  Similarly, in *Forasol v Oil And Natural Gas Commission*,[185] the Supreme Court stated that English authorities are "of high persuasive value to which [Indian courts] may legitimately turn for assistance".[186]

136.  The tribunal has therefore treated English and other common law authorities as persuasive, unless they are contrary to any Indian statutes.  In addition, where there has been any conflict or inconsistency between Indian and other common law authorities, the tribunal has followed Indian authorities.

**Principal Issues in Dispute**

137.  During the course of the hearing the parties agreed that the following principal issues are to be determined by the tribunal:

a.  Does the tribunal have jurisdiction to hear and determine this dispute?

b.  Did Antrix have any right to terminate the Devas Agreement pursuant to Article 7(c) thereof?

c.  Was there any "Force Majeure Event" as defined in Article 11 of the Devas Agreement? If so, to what consequence?

d.  Is Antrix entitled to rely on Section 56 of the Indian Contract Act, 1872 and if so, can it claim impossibility of the Devas Agreement based on the CCS decision?

e.  Did Antrix's conduct amount to a repudiation/renunciation of the Devas Agreement or was the Devas Agreement validly terminated by Antrix's letter of 25 February 2011?

f.  If Antrix's conduct amounted to a repudiation/renunciation of the Devas Agreement, was that a material breach of the Devas Agreement within the meaning of Article 7(b), and did

---

[181] Statement of Claim, [192]; Statement of Defence, [23].

[182] Statement of Claim, [193].

[183] AIR 1966 SC 543.

[184] At [11].

[185] (1984) Supp. SCC 263.

[186] At [46].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 48 (USDC NO. 2:18-cv-01360)**

Devas terminate the agreement within the meaning of Article 7(b) when it accepted the repudiation?

g.      In the event the tribunal finds jurisdiction and concludes that Antrix is liable, would it be appropriate to use a discounted cash flow (*DCF*) analysis to determine damages and, if so, what compensation/damages should be awarded?

h.      What is the rate of pre-award and post-award interest that should be applied to an award of compensation/damages?

i.      Which party should bear the legal and arbitration costs of this matter, and in what amount?

138.    The approach that the tribunal has taken is to decide only those issues that are necessary to decide in order to resolve Devas' claims.  In other words, if the tribunal decides that it does not have jurisdiction, it will not consider issues relating to liability and quantum, and if it decides that it has jurisdiction but that Antrix is not liable to pay any damages, it will not consider issues relating to the quantum of damages.  To do otherwise would, in the tribunal's view, provide no practical benefit and would add unnecessarily to the already significant costs of this arbitration.

### A. Does the tribunal have jurisdiction to hear and determine this dispute?

139.    The first issue that is in dispute is whether the tribunal has jurisdiction to decide Devas' claims.

140.    Antrix's basis for challenging the tribunal's jurisdiction is that the arbitration clause "does not provide for ICC arbitration, but rather specifies two possible sets of arbitration rules", being the ICC and UNCITRAL rules.  According to Antrix the clause is therefore pathological and "cannot be enforced without agreement of the parties as to which of the two sets of rules applies".[187]

141.    In response, Devas says:

a.      the Supreme Court of India has held that Devas was entitled to commence this arbitration, which "forecloses" Antrix from now challenging the tribunal's jurisdiction;

b.      in any event, the arbitration agreement is not pathological; and

c.      further, Antrix ought to be estopped from arguing that the clause is pathological, because when it purported to start an arbitration under the UNCITRAL Arbitration Rules it accepted that the arbitration clause in the Devas Agreement was "fully workable" and "not at all pathological".[188]

142.    The tribunal will consider each of these issues in turn.

---

[187] Antrix's Skeleton, [45].  Before Antrix started participating in this arbitration it made other jurisdictional arguments, which are referred to in [22] of the terms of reference.  None of those arguments have been made in this arbitration. As stated in Antrix's Skeleton (at [44]), "[t]he jurisdictional issue in this case turns upon whether the arbitration clause is an ICC arbitration clause".  See also the Statement of Defence at [71] to [77], Rejoinder at [47] to [58], Antrix's PHM at [6] to [16] and Antrix's PHRM at [31] to [44].  Further, the tribunal notes that it is relevant that Antrix itself sought to institute arbitration proceedings in reliance on Article 20 of the Devas Agreement.

[188] Devas' PHM, [142].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 49 (USDC NO. 2:18-cv-01360)**

<u>Has the Supreme Court of India "foreclosed" Antrix from challenging the tribunal's jurisdiction?</u>

143.   As noted above, after Devas commenced this arbitration Antrix commenced an arbitration under the UNICTRAL Arbitration Rules.  It then applied to the Supreme Court for an order under section 11 of the Indian Arbitration and Conciliation Act 1996 (***1996 Act***) that the Chief Justice direct Devas to nominate its arbitrator in accordance with the UNCITRAL Rules.[189]  It submitted that such an order should be made because (inter alia):

> "the Arbitration Agreement contemplates the constitution of an Arbitral Tribunal without any reference to the ICC Rules or the ICC Court, [so] the recourse taken by Devas to approach the ICC Court was without any basis and was contrary to the express agreement between the parties".[190]

144.   The Supreme Court rejected Antrix's application.  It held that:

> "[t]he matter is not as complex as it seems and in our view, once the Arbitration Agreement had been invoked by Devas and a nominee Arbitrator had also been appointed by it, the Arbitration Agreement could not have been invoked for a second time by the Petitioner, which was fully aware of the appointment made by the Respondent".[191]

145.   The Court also stated that:

> "[i]n view of the language of Article 20 of the Arbitration Agreement which provided that the arbitration proceedings would be held in accordance with the rules and procedures of the International Chamber of Commerce or UNCITRAL, Devas was entitled to invoke the Rules of arbitration of the ICC for the conduct of the arbitration proceedings".[192]

146.   According to Devas, this is a clear finding that it was entitled to commence this ICC arbitration, and "conclusively adjudicates this issue of jurisdiction".[193]

---

[189] *Antrix v Devas, Supreme Court Judgment,* [10].

[190] *Antrix v Devas, Supreme Court Judgment,* [16].  Antrix's submission appears to have been based on the structure of Article 20.  As noted above, Article 20 first provides that disputes that have not been resolved by the senior management of the parties may be referred to arbitration (see Article 20(a)), then it provides that "[t]he seat of Arbitration shall be at NEW DELHI in India", and only then it states that "[t]he Arbitration proceedings shall be held in accordance with the rules and procedures of the ICC ... or UNCITRAL".  It appears that, in light of this, Antrix submitted that the parties intended that the procedural rules that govern the arbitration would only be determined after the tribunal had been appointed.

[191] At [31].

[192] At [34].

[193] Devas' PHM, [134].  Devas notes that, in reaching this conclusion, the Supreme Court "proceeded on the basis that Article 20(c) gave the first mover the right to choose the institutional rules that would apply to the arbitration, and because Devas was the first mover and chose the ICC Rules, Antrix could not then invoke the UNCITRAL Rules": Devas' PHM, [133].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 50 (USDC NO. 2:18-cv-01360)**

147.   Antrix, on the other hand, notes that Supreme Court also stated that Devas invoked ICC arbitration "[r]ightly or wrongly",[194] and that:

> "[o]nce the provisions of the ICC Rules of Arbitration had been invoked by Devas, the proceedings initiated thereunder could not be interfered with in a proceeding under Section 11 of the 1996 Act. *The invocation of the ICC Rules would, of course, be subject to challenge in appropriate proceedings* but not by way of an application under Section 11(6) of the 1996 Act.   Where the parties had agreed that the procedure for the arbitration would be governed by the ICC Rules, the same would necessarily include the appointment of an Arbitral Tribunal in terms of the Arbitration Agreement and the said Rules".[195]

148.   Antrix submits that the reference to the "invocation of the ICC Rules" being "subject to challenge in *appropriate proceedings*" means that it is entitled to challenge the tribunal's jurisdiction in this arbitration.[196]

149.   Devas, on the other hand, says that the Supreme Court's reference to Devas' invocation of the ICC Rules being open to challenge was not a reference to a jurisdictional challenge, but rather to a challenge under section 13 of the 1996 Act.[197]   Section 13 concerns the procedure for challenges to arbitrators.

150.   The tribunal has carefully considered the parties' submissions but has formed the view that it is not necessary to decide which of them is correct.  This is because, for the reasons set out below, even if the Supreme Court intended that Antrix would be able to challenge the tribunal's jurisdiction in this arbitration on the basis that Article 20 is pathological, the tribunal considers that that challenge must fail.

Is Article 20 pathological?

151.   Antrix submits that the Article 20 of the Devas Agreement is pathological because it refers to both ICC and UNCITRAL arbitration, and therefore requires the parties to agree on which of those two sets of rules should apply.[198]  Antrix also says that:

> "the only precedents in the world on the question of the effectiveness of an arbitration clause naming two different institutions or sets of arbitration rules without agreement of the parties on which would apply have made clear that the clause would be inoperative to confer jurisdiction without such agreement."[199]

---

[194] At [30].

[195] At [34] (emphasis added).

[196] Antrix's PHM, [7].

[197] Devas' PHM, [137].

[198] Antrix's PHM, [5(i)].

[199] Post-hearing memorial, [9].

152.   The precedents that Antrix relies on are decisions of the Supreme Court of Lebanon[200] and the courts of the People's Republic of China,[201] in which it was found that arbitration clauses that referred to two sets of arbitral rules were ineffective or inoperative.

153.   Contrary to Antrix's submission, however, these are not the only cases in which the effectiveness of an arbitration clause naming two sets of arbitral rules has been considered.  First, as Devas notes, the arbitral tribunal in *Millicom International Operations B.V. and Sentel GSM SA v The Republic of Senegal*[202] did so when it considered an arbitration clause that stated:

> "[i]f the dispute continues, the Parties can submit to binding arbitration before international bodies such as the arbitration court of OHADA, the Centre for the Settlement of International Disputes (ICSID) or the International Chamber of Commerce in Paris."[203]

154.   The case involved claims against the Republic of Senegal pursuant to an investment treaty.  The tribunal rejected a submission that the arbitration clause was not binding because it required a further agreement between it and the claimant concerning the choice of arbitration rules.  The tribunal found that "[n]othing . . . prevents an arbitration clause from affording several options [of arbitration rules], from amongst which the party initiating the proceeding has the right to choose."[204]

155.   Indeed, investment treaties commonly refer to more than one set of arbitration rules.  Where they do so, it is well accepted that investors may commence arbitral proceedings against the relevant State pursuant to whichever of those rules it prefers.

156.   Second, in *Panamanian Owner X v. Korean Charterer Y*,[205] an ICC arbitral tribunal considered an arbitration clause that stated that:

> "[a]ny dispute arising under this charter party to be referred to 'The Korean Commercial Arbitration Association, Seoul, Korea' and 'The Japan Shipping Exchange, Inc. Japan' and the award of which to be final and binding upon both parties."

---

[200] *Not indicated v. Not indicated*, Lebanese Supreme Court (1st Civil Chamber), Judgment, 27 April 1987, 4 Revue de L'Arbitrage 723 (1988), Exhibit R-53.

[201] *Rent Corp v Jianhua Machinery et al* (2008), summarised in Chinese Court Decision Summaries on Arbitration (Kluwer Law International), Exhibit R-127; *HK ACE v Weihong Plastic et al* (2007), summarised in Chinese Court Decision Summaries on Arbitration (Kluwer Law International), Exhibit R-128.

[202] ICSID Case ARB/08/20, CB 365.

[203] At [97].  The clause was drafted in French.  The above translation was provided by Devas.  The French version states: "[s]i le litige persiste, les parties pourront en définitive recourir à l'arbitrage d'organismes internationaux tels que la cour d'arbitrage de l'OHADA, le Centre international de règlement des différends sur les investissements (CIRDI) ou la Chambre de Commerce international de Paris (CCPI) etc".  Antrix has not objected to Devas' translation.

[204] At [97].

[205] Interlocutory Award (ICC 1981), reprinted in XI Y.B. Comm. Arb. 193 (1986).

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 52 (USDC NO. 2:18-cv-01360)**

157.  The tribunal in that case found the clause to be effective.  It said: "if arbitration procedure is initiated by either party in one of the places, then the other party must file its plea and/or counterclaim in that place."[206]

158.  Further, according to Indian law, arbitration clauses must be construed in a pragmatic, common sense way by reference to the perspective of a reasonable business person.  As the Supreme Court of India stated in *Enercon (India) Ltd v Enercon GmbH*:[207]

> "[i]n our opinion, the Courts have to adopt a pragmatic approach and not a pedantic or technical approach while interpreting or construing an arbitration agreement or arbitration clause. Therefore, when faced with a seemingly unworkable arbitration clause, it would be the duty of the Court to make the same workable within the permissible limits of the law, without stretching it beyond the boundaries of recognition.  In other words, a common sense approach has to be adopted to give effect to the intention of the parties to arbitrate. In such a case, the court ought to adopt the attitude of a reasonable business person, having business common sense as well as being equipped with the knowledge that may be peculiar to the business venture. The arbitration clause cannot be construed with a purely legalistic mindset, as if one is construing a provision in a statute."[208]

159.  Adopting that common sense approach, the tribunal considers that Article 20 is not pathological. It clearly provides for the arbitration of disputes relating to the Devas Agreement, and for the arbitral proceedings to be held in accordance with the ICC or UNCITRAL Rules.  The fact that it refers to two sets of arbitral rules does not necessarily mean that the parties had to agree on which set of rules would apply.  It simply means that whichever party started the arbitration was entitled to choose between ICC or UNCITRAL arbitration.

160.  Accordingly, the tribunal finds that it does have jurisdiction to decide Devas' claims.

Estoppel

161.  In light of this conclusion, it is unnecessary to address Devas' claim that Antrix is estopped from denying that Article 20 is operative.

---

[206] CB 404 at [5].

[207] (2014) 5 SCC 1.

[208] At [83].  This is consistent with the approach taken by English courts to the interpretation of arbitration agreements. See, for example, *Premium Nafta Products Limited and others v. Fili Shipping Company Limited and others* [2007] UKHL 40, in which the House of Lords held that:

> "the construction of an arbitration clause should start from the assumption that the parties, as rational businessmen, are likely to have intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded from the arbitrator's jurisdiction."

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 53 (USDC NO. 2:18-cv-01360)**

**B. Was Antrix entitled to terminate the Devas Agreement pursuant to Article 7(c)?**

162.   Under the Devas Agreement, Antrix was responsible for obtaining "Governmental and Regulatory Approvals relating to orbital slot and frequency clearances"[209] as well as "clearances from National and International agencies (WPU, ITU, etc) for use of the orbital slot and frequency resources".[210]

163.   If it failed to obtain "necessary frequency and orbital slot coordination" it was entitled to terminate the agreement pursuant to Article 7(c).  Article 7(c) states:

> "Termination for convenience by ANTRIX
>
> ANTRIX may terminate this Agreement in the event ANTRIX is unable to obtain the necessary frequency and orbital slot coordination required for operating PS1 on or before the completion of the Pre Shipment Review of the PS1.  In the event of such termination, ANTRIX shall immediately reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding service taxes received by ANTRIX till that date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called)."

164.   As noted above, on 25 February 2011 Antrix sent a letter to Devas purporting to terminate the Devas Agreement in accordance with Article 7(c).  Its letter stated (in relevant part):

> "[i]n accordance with Article 7(c) of the Agreement, it is declared that Antrix is unable to obtain the necessary frequency and orbital slot coordination as stipulated in the Agreement … The subject Agreement, No. ANTX/203/DEVAS/2005 dated 28th January 2005, therefore, is terminated with immediate effect."

165.   Antrix then sent a cheque to Devas for INR 58,37,34,000 (approximately USD 13 million) as reimbursement of the UCRF.[211]

166.   Devas says that Antrix was not entitled to terminate the agreement under Article 7(c).  It says that Antrix was able to – and did – obtain the necessary frequency and orbital slot coordination required for operating PS1, so Article 7(c) cannot apply.  It returned Antrix's cheque.[212]

167.   To determine whether Antrix was permitted to terminate the agreement pursuant to Article 7(c) the following issues need to be decided:

   a.   What weight, if any, is to be placed on the ASG's opinion that Antrix was unable to terminate the Devas Agreement in accordance with Article 7?

---

[209] See Article 3(c).

[210] See Article 12(a).

[211] See [129] above.

[212] See [130] above.

    b.      Does Article 7(c) concern frequency and orbital slot clearance from both international and national agencies?

    c.      If yes:

        i.      Was Antrix unable to obtain the necessary clearance from international agencies?

        ii.      Was Antrix unable to obtain the necessary clearance from domestic agencies?

168.    The tribunal will consider each of these issues in turn.

*What weight, if any, is to be placed on the ASG's opinion that Antrix was unable to terminate the Devas Agreement in accordance with Article 7?*

169.    The ASG's opinion of 12 July 2010 states (in relevant part):

"[t]he modus of termination has been specified in the agreement in clause 7. But I am afraid that the conditions stipulated in this clause cannot be invoked at this stage for the purpose of terminating the contract".

170.    Devas has referred to this opinion numerous times in support of its submission that Antrix was not entitled to terminate the agreement pursuant to Article 7.[213] It says that this opinion is significant because the reason why the ASG was "afraid" that Antrix could not rely on Article 7 was that "the frequency and orbital slot coordination 'required for operating PS1' already had been obtained".[214] It says that, in light of this opinion, the tribunal should also conclude the required frequency and orbital slot coordination had been obtained.

171.    It is not entirely clear why the ASG thought that Antrix could not rely on Article 7 – he did not give a reason for his view. But even if he did consider that the orbital slot coordination required for operating PS1 had already been obtained, there has been no suggestion that he is an expert in respect of that factual issue, so his view would be an opinion of a lay witness. It therefore has no probative value (particularly since it does not set out the facts on which it is based).[215] Accordingly, in the tribunal's view, it is not appropriate to place any weight on his opinion.

*Does Article 7(c) concern clearances from both international and national agencies?*

172.    Antrix says that it was entitled to terminate the Devas Agreement pursuant to Article 7(c) if it was unable to obtain frequency and orbital slot clearance from relevant international *or* national agencies.[216]

---

[213] See, e.g., Statement of Claim, [250]; Reply, [92]; Devas' Skeleton, [39(d)]; Devas' PHM, [19], [90], [169], [170]; Devas' PHRM, [1.2], [3], [7], [11], [13].

[214] Devas' PHM, [7].

[215] Opinion evidence can, of course, be helpful and probative of issues in dispute, but it must (inter alia) be based on specialised knowledge that the tribunal does not possess – e.g., knowledge about economic, engineering or (in some cases) legal issues – and set out the facts on which it is based. That is not the case with the ASG's opinion.

[216] Antrix's PHM, [49].

173.    Devas disagrees.  It says that Article 7(c) is concerned with clearance from international agencies only.  It says that if the parties intended Article 7(c) to embrace clearance from national agencies, Article 7(c) would have referred to "Regulatory Approval" (which incorporates GOI entities[217]), like Article 7(a).   Instead it refers to "frequency and orbital slot coordination",[218] which makes no (express) reference to GOI entities.

174.    The tribunal does not accept that submission.   By the same logic, one could also say that if the parties intended Article 7(c) to apply to clearance from international agencies only, it would have expressly stated that it applies to international agencies only.[219]

175.    In the tribunal's view, the fact that Article 7(c) does not refer to either "Regulatory Approval", domestic agencies or international agencies suggests that the parties intended that it apply to all relevant agencies.  In other words, since the parties did not introduce any words limiting the type of frequency and orbital slot clearance that was required, it is likely that they did not intend for there to be any such limit.[220]

176.    The tribunal therefore accepts Antrix's submission that Article 7(c) applies if it was unable to obtain frequency and orbital slot clearance from relevant international or national agencies.

        Was Antrix unable to obtain frequency or orbital clearance from any relevant international agency?

177.    The international agency responsible for providing clearance for use of S-band and the 83° East orbital slot was the ITU.  Antrix says that it was unable to obtain the required clearance from the ITU.[221]  It says that "Devas' own 2010 presentations reflect the fact that the coordination on the international level had not yet been completed".[222]

178.    Devas, on the other hand, says that Antrix was able to – and did – obtain the necessary clearance from the ITU.[223]  It says (inter alia) that the GOI co-ordinated the S-band frequencies at the ITU and allocated those frequencies to the DOS by the early 1970s, and that the GOI

---

[217] Regulatory approval is defined as "any and all approvals, licenses, or permissions from Governmental or Regulatory Authority (Devas Agreement, Annexure I, [37]).  Governmental or Regulatory Authority is defined as any Government state or Central municipality, local authority, town, village, court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of India (Devas Agreement, Annexure I, [16]).

[218] Devas' PHRM, [15].

[219] Where the parties wanted to refer to international agencies they did so: see, e.g. Article 12(a).

[220] The tribunal considered whether the reference in Article 7(c) to Antrix obtaining frequency and orbital slot "coordination" (c.f. "approval" or "clearance") is a reference to the ITU's "coordination" process (described in [55] to [57] above), and therefore evidence of an intention to limit Article 7(c) to clearance from the ITU only.  However, there is no evidence that the term "coordination" was used only in respect of the ITU clearance process (cf. any domestic approval process).  Accordingly, the tribunal has come to the view that the parties' most likely intention was that Article 7(c) was to apply to any type of (national or international) frequency and orbital slot clearance that Antrix was required to obtain.

[221] More specifically, it has stated that it was unable to obtain the required frequency "on the international level": see Antrix's PHM at [48], [49].  It has not, however, referred to any relevant clearance from any international agency other than the ITU.

[222] Antrix's PHM, [49].

[223] See, e.g., Devas' PHM, [166].

44

obtained clearance to use those frequencies at the 83° East orbital slot pursuant to a co-ordination request that was made in 1994 and modified in 2005.[224]

179.   Devas also says that Antrix confirmed that it had obtained the necessary clearance from the ITU when it wrote to Devas on 2 February 2006 and stated:

> "[a]s per the Agreement signed with Devas, Antrix is responsible for getting the national and international frequency coordination for the operation of INSAT-4E satellite at the designated orbital slot. In this connection it may please be noted that the S-band frequencies of the INSAT-4E satellite are within the spectrum in use for satellite applications in India by DOS/ISRO, for which we had completed the necessary ITU level co-ordination and registration. DOS/ISRO have taken necessary additional steps to enable registration of applicable parameters for INSAT-4E operation.
>
> Antrix is now in a position to go ahead with the building and launch of the INSAT-4E spacecraft and lease the capacity on the same to Devas Multimedia Pvt. Ltd., as per Agreement No. Antrix/2003/DEVAS/2005 dated 28 January 2005".[225]

180.   The tribunal accepts Devas' submissions, for the following reasons.  First, the presentation that Antrix relies on refers to "[p]reserving ITU coordinated priority orbit/spectrum tied to satellite launch".[226]  This did not mean that Antrix had yet to obtain the necessary frequency and orbital slot clearance from the ITU.  It meant that the ITU co-ordination (that had been obtained) had to be preserved.  As Devas submits, the presentation was referring to the ITU's "use it or lose it" policy (described in [56] above).[227]

181.   Second, as noted above, the GOI obtained clearance from the ITU to use S-band in India and to launch a satellite at the 83° East orbital, and that clearance was capable of being used for PS1.[228]  There does not appear to be any other clearance that Antrix was required to obtain from the ITU.

182.   Third, Antrix's letter of 2 February 2006 clearly notified Devas that the necessary ITU clearance had been obtained.  It was not, as Antrix submitted, concerned only with Cabinet's approval to build, launch and lease the satellite.[229]  It expressly stated that Antrix "had completed the necessary ITU level co-ordination and registration".

---

[224] Devas' PHRM, [8].

[225] Devas' PHM, [166].

[226] Exhibit C-118 (emphasis added), cited in Antrix's PHM, [48].

[227] Devas' RPHM, [12].

[228] See [57] and [73] above.

[229] Antrix's PHM, [49].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 57 (USDC NO. 2:18-cv-01360)**

<u>Was Antrix unable to obtain frequency or orbital clearance from any relevant national agency?</u>

183.   Antrix also submits that it was unable to obtain necessary clearances from relevant national agencies.  It has not identified any specific clearance that it was unable to obtain, but in its post-hearing memorial it stated that:

> "the Contract is clear that Antrix had to obtain the "necessary Governmental and Regulatory Approvals relating to orbital slot and frequency clearances," including from the WPC.  There is no dispute that such Governmental and Regulatory Approvals were not obtained and, after the decision of the Cabinet Committee on Security, could never be obtained".[230]

184.   Nor did Antrix refer to any specific clearance that it was unable to obtain in its post-hearing reply memorial.  It stated only that "on the national level, the only document addressing the use of the orbital slot by Antrix for the Devas Services is the decision of the CCS, which in no uncertain terms denied such use".[231]

185.   The tribunal therefore understands that, in so far as frequency and orbital slot clearance from national agencies is concerned, Antrix is relying on the CCS' decision.  In particular, the tribunal understands that Antrix is submitting that the CCS' decision to annul the Devas Agreement made it impossible for Antrix to provide services pursuant to the Devas Agreement from the 83° East orbital slot.

186.   Devas, on the other hand, says that "any internal approvals [that were] needed … were satisfied", and that this happened "*before* filings were made at the ITU".[232]  Devas says that "[t]he nodal agency for all submissions by the GOI to the ITU … was the WPC, which coordinated inputs from DOS, DOT, and all other relevant agencies",[233] and that once the WPC had completed coordination of the five spot beams at the 83° East orbital slot at the ITU, no further approvals were required.[234]

187.   Given that Antrix has not identified any specific clearances from national agencies that it was required and unable to obtain, it is necessary to determine whether Antrix is entitled to rely on the CCS' decision in order to terminate the agreement pursuant to Article 7(c).

188.   In the tribunal's view, it is not.  As noted above, Article 7(c) states that:

> "ANTRIX may terminate this Agreement in the event ANTRIX is *unable to obtain* the *necessary* frequency and orbital slot coordination required for operating PS1 on or before the completion of the Pre Shipment Review of the PS1" (emphasis added).

---

[230] Antrix's PHM, [49].

[231] Antrix's PHRM, [47].

[232] Devas' PHRM, [16] (emphasis in original).

[233] Devas' PHRM, [16].  Devas says further that "[i]t is absurd for Antrix to now suggest that the WPC (or any other entity) might need to give some further "approval" for coordination of the five spot beams at the 83° East orbital slot that the WPC completed on behalf of DOS/ISRO/Antrix at the ITU": Devas' PHRM, [16].

[234] Devas' PHRM, [16].

189.　The reference to Antrix being "unable to obtain" the "necessary" frequency and orbital slot coordination implies that there is a regulatory clearance that it was necessary for Antrix to obtain. In other words, it implies that for Article 7(c) to apply, there must be a national or international agency that was responsible for granting clearance or approval to use S-band at the 83° East orbital slot, and that Antrix was required to obtain that clearance or approval, and was unable to do so.

190.　Since Antrix was not required to apply for frequency and orbital slot clearance from the CCS, it is therefore not permitted to rely on the CCS' decision alone in order to terminate the agreement pursuant to Article 7(c).

191.　The tribunal also notes that, even if the CCS' decision had the effect of annulling any necessary clearance or approval that Antrix had obtained, that would not be sufficient to enliven Article 7(c). Article 7(c) refers to Antrix being unable to "*obtain* the necessary frequency and orbital slot coordination", unlike Article 7(a) which refers to Devas being unable to "*get and retain*" Regulatory Approvals.  As Devas has submitted,[235] this wording suggests that Article 7(c) was intended to apply only in the case of inability to *obtain* a relevant clearance, not inability to *retain* a clearance.

192.　Accordingly, the tribunal considers that the pre-conditions for the application of Article 7(c) have not been satisfied, and that Article 7(c) did not permit Antrix to terminate the Devas Agreement.

**C. Was there any "Force Majeure Event" as defined in Article 11 of the Devas Agreement? If so, to what consequence?**

193.　Antrix's letter of 25 February 2011 also purported to terminate the Devas Agreement on the basis that "Force Majeure Event" had occurred.  It stated (in relevant part):

> "[t]he policy decision of the Central Government acting in its sovereign capacity is the event of force majeure which has occurred on 23rd February 2011. The force majeure commenced on 23rd February 2011. The scope and duration of the said decision cannot be anticipated. It is likely to be indefinite. It is not possible for Antrix to take any effective step to resume the obligations under the Agreement. The event of force majeure is beyond the reasonable control of Antrix and is clearly covered by Article 11(b) of the Agreement and, in particular, 11(b)(v) '… act of governmental authority in its sovereign capacity…'".

194.　Article 11 of the Devas Agreement states as follows.

"Article 11.  Force Majeure

a.　　Neither of the Parties hereto shall be liable for any failure or delay in performance of its obligations hereunder if such failure or delay is due to Force Majeure as defined in this

---

[235] Devas' PHM, [165].

Article, provided that notice thereof is given to the other Party within seven (7) calendar days after such event has occurred.

b.    For the purposes of this Agreement, "Force Majeure Event" shall include any event, condition or circumstance that is beyond the reasonable control of the party affected (the "Affected Party") and that, despite all efforts of the Affected Party to prevent it or mitigate its effects (including the implementation of a business continuation plan), such event, condition or circumstance prevents the performance by such Affected Party of its obligations hereunder. The following events may be considered Force Majeure Events under the Agreement: (i) explosion and fire; (ii) flood, earthquake, storm, or other natural calamity or act of God; (iii) strike or other labor dispute; (iv) war, insurrection, civil commotion or riot; (v) acts of or failure to act by any governmental authority acting in its sovereign capacity; (vi) changes in law and regulation, (vii) National emergencies, (ix) Launch Failure.

c.    If an Affected Party Is rendered unable, wholly or in part, by a Force Majeure Event, to carry out some or all of its obligations under the Agreement, then, during the continuance of such Inability, the obligation of such Affected Party to perform the obligations so affected shall be suspended.

d.    The Affected Party shall give written notice of the Force Majeure Event to the other party (the "Unaffected Party") as soon as practicable after such event occurs, and not later than 7 days after such event, which notice shall include information with respect to the nature, cause and date of commencement of the occurrence(s), and the anticipated scope and duration of the delay. Upon the conclusion of a Force Majeure Event, the Affected Party shall, with all reasonable dispatch, take all necessary and effective steps to resume the obligation(s) previously suspended.

e.    Notwithstanding the foregoing, an Affected Party shall not be excused under this Article for (1) any non-performance of its obligations under the Agreement having a greater scope or longer period than is justified by the Force Majeure Event, or (2) the performance of obligations that arose prior to the Force Majeure Event. Nothing contained herein shall be construed as requiring an Affected Party to settle any strike, lockout or other labor dispute in which it may be involved.

f.    Notwithstanding anything contained herein, in the event of Launch Failure of PS1 or PS2, the articles related to re-launch guarantee in Article 3 (d), and termination under special circumstances in Article 7 shall apply and take precedence over the terms contained herein.

g.    In the event of failure or delay in the performance of this Agreement arising out of an event of Force Majeure which lasts longer than 90 (ninety) days, both parties shall discuss the further course of action on a mutually agreeable basis. However, such action could include termination at the option of Unaffected Party if total delays exceed 12 (twelve) months. It is hereby expressly agreed by the parties that no financial or other

liability shall arise on termination under this clause as far as the affected party is concerned."

195.   Devas says that Antrix was not entitled to rely on Article 11 for the following reasons:

a.   the decision of the CCS to annul the agreement was not an "act of or failure to act by any governmental authority acting in its sovereign capacity" within the meaning of Article 11(b);[236]

b.   the CCS' decision was "brought about by, or is otherwise attributable to" Antrix's "own or its parent's actions" (and therefore cannot, in law, be a *force majeure* event);[237] and

c.   Antrix "instigated" the alleged "Force Majeure Event", so it was not "beyond the reasonable control" of Antrix within the meaning of Article 11(b);[238]

d.   Antrix did not make "all efforts" to "prevent it or mitigate its effects" as required by Article 11(b);[239]

e.   Article 11 permits the "Unaffected Party" (Devas) to terminate the agreement in light of "Force Majeure Events", not the "Affected Party" (Antrix).[240]

196.   Before considering these submissions, it is necessary to return to the question of which party bears the burden of proof in respect of whether Antrix was entitled to terminate the agreement pursuant to Article 11.  Each party says that the other bears the burden of proof.[241]  As noted by the authors of *Redfern and Hunter on International Arbitration*, however:[242]

"[t]he practice of nearly all international arbitral tribunals is to require each party to prove the facts upon which it relies in support of its case ... The only exceptions relate to propositions that are so obvious, or notorious, that proof is not required".

197.   The tribunal has adopted this approach in respect of all issues that are in dispute in this arbitration.  That is to say, it has required each party to prove the facts and establish the principles on which that party relies.

Was there an act of or failure to act by any governmental authority acting in its sovereign capacity?

198.   As noted above, Article 11(b) of the Devas Agreement states (inter alia) that "[t]he following events may be considered Force Majeure Events under the Agreement: ... (v) acts of or failure to act by any governmental authority acting in its sovereign capacity".  Devas says that the decision

---

[236] Devas' PHM, [195]; Statement of Claim, [203(a)].

[237] Devas' PHM, [187].

[238] Devas' PHM, [182]; Devas' PHRM, [20]; Statement of Claim, [203(b)].

[239] Statement of Claim, [203(c)]; Devas' PHRM, [24].

[240] Devas' PHM, [213].

[241] Devas' PHM, [156.1]; Hearing Tr, p. 182; Antrix's PHM, [26].

[242] See the 5th Edition, by Blackaby and Partasides with Redfern and Hunter, [6.92].

of the CCS to annul the Devas Agreement does not fall within this definition, for the following reasons:

a.     it was not "a final policy 'decision' by a sovereign regulator" to use S-band for military purposes, but rather left "open for the government itself (whether ISRO or another entity) to use the S-band for commercial activity".[243]   The tribunal does not accept this submission.   There is nothing to suggest that Article 11(b) was intended to apply only to "final policy decisions".   It refers to "acts of or failure to act by any governmental authority acting in its sovereign capacity".   The CCS' decision was clearly an "act" of a "government authority" that was acting in its "sovereign capacity", so it falls within that definition.   In any event, it *was* a final policy decision (being that the Devas Agreement should be annulled);

b.     Article 11(b) "cannot be construed to allow a governmental entity to make unavailable the very thing that Antrix was unconditionally required under Article 3(c) to provide" (i.e. Governmental and Regulatory Approvals relating to orbital slot and frequency clearances).[244]   To the contrary, Devas contends that it is "well settled under Indian law that a contract should not be interpreted so as to render any term thereof redundant or futile".[245]   The tribunal does not accept this submission either.   Construing Article 11(b) to permit Antrix to terminate the agreement based on its failure to provide orbital slots and frequency does not render Article 3(c) redundant or futile; it simply means that the obligation in Article 3(c) is subject to Article 11;

c.     a "sovereign event must act upon the parties *ab extra*" (i.e. "from outside"), whereas "[h]ere, Antrix is leasing a property belonging to the Government acting not as an independent party but as the marketing arm".[246]   The tribunal also does not accept this submission.   Devas has not referred to any provision of the Devas Agreement, or any authority, to suggest that the term "sovereign event" must operate *ab extra*.   In any event, the CCS' decision *was* an *ab extra* event.   As discussed below (see [205] – [206]), Antrix has a legal personality that is separate and distinct to the GOI, so the CCS' decision operated on it "from outside"; and

---

[243] Devas' PHM, [196]; see also [203] (the decision "left the future status of the S-band undecided, to be discussed among the concerned ministries, through the "INSAT Co-ordination Committee" ("ICC") process, as to how the S-band would be used").

[244] Devas' PHM, [197].

[245] Devas' PHM, [199].   In support of this proposition Devas cites the following statement of the Supreme Court of India in *In Life Insurance Corporation of India v. Dharam Vir Anand* (1998) 7 SCC 348:

> "[i]n construing a particular clause of the contract, it is only reasonable to construe that the words and the terms used therein must be given effect to. In other words, one part of the contract cannot be made otiose by giving a meaning to the policy of the contract".

[246] Devas' PHM, [198].

d.      CCS' motivation for terminating the agreement was not military needs, but "political compulsions".[247]  Again, however, the relevant criteria are that there was an "act" of a "government authority" that was "acting in its sovereign capacity".  CCS' motivation for deciding to annul the Devas Agreement is therefore not relevant.[248]  Accordingly, the tribunal does not accept this submission either.

199.   The tribunal therefore finds that the CCS' decision to annul the agreement was an act of a governmental authority acting in its sovereign capacity for the purpose of Article 11(b).

Can *force majeure* events be brought about by a company's own or its parent's actions?

200.   Devas also submits that Antrix cannot rely on Article 11 because, at law, a *force majeure* event cannot be brought about by a company's own or its parent's actions.

201.   The tribunal accepts that Antrix cannot rely on Article 11 if the CCS' decision was brought about by Antrix's actions.  Article 11(b) clearly states that "Force Majeure Events" do not include events that were beyond the reasonable control of the party affected.  Whether the CCS' decision was beyond Antrix's control is discussed below (see [215] to [235]).

202.   In support of its submission that a party cannot rely upon a *force majeure* event that has been brought about by its parent's actions, Devas relies on the English Court of Appeal's decision in *Mamidoil–Jetoil Greek Petroleum Co. v. Okta Crude Oil Refinery AD No (2)*[249] (*Okta*) and the Court of Appeal's[250] and House of Lords'[251] dicta in *C. Czarnikow Ltd. v. Centrala Handlu Zagranicznego Rolimpex* (*Rolimpex*).

203.   *Okta* concerned a contract between a Greek company (*Jetoil*) and the owner of an oil refinery in Macedonia (*Okta*) pursuant to which Jetoil had (a) an exclusive right to "manipulate" (i.e. handle) non-heated crude oil for Okta at a terminal in Thessaloniki, Greece, that Okta bought for its own account; and (b) a right of first refusal to supply crude oil to Okta.  The contract contained a provision (clause 4) to the effect that:

> "[n]either party shall be responsible for damage caused by delay or failure to perform in whole or in part the stipulations of the present Agreement, when such delay of (sic) failure is attributable to earthquakes, acts of God, strikes, riots, rebellion, hostilities, fire, flood, acts or compliance with requests of any governmental or EC authority war conditions or other causes beyond the control of the party affected, whether or not similar to those enumerated.  The party invoking force majeur (sic), shall give prompt notice to the other party by fax, telex followed by registered letter stating the kind of Force

---

[247] Devas' PHM, [201] – [212].

[248]  Antrix's obligation to act in "good faith" (see Article 21 of the Devas Agreement) did not apply to the CCS.

[249] [2003] 2 All ER (Comm) 640.

[250] [1978] 1 Q.B. 176.

[251] [1978] 2 All ER 1043.

> Majeure.  The certificate issued by the respective Chamber of Commerce and Industry
> shall be considered as sufficient proof of such circumstances and the duration".

204.  The Government of the Former Yugoslav Republic of Macedonia issued letters to Okta containing
requests that Okta cease honouring its contract with Jetoil.  Okta claimed that those letters
constituted a *force majeure* event within the meaning of clause 4 of the agreement.

205.  The Court of Appeal rejected this claim on the basis that Okta had instigated or initiated the
requests that it received, so they were not "beyond its control".  The Court stated:

> "[f]or Okta to be able to rely on the clause they have to show that the failure to perform is
> attributable to a request which was beyond Okta's control ... The essential issue is
> whether, if it is the case that Okta instigated or initiated the requests contained in the
> November and May letters, they can rely on the letters as constituting 'requests ...
> beyond their control'.  Once the question is posed in that form, it is clear that they cannot,
> for the simple reason that they need not have set the process in motion at all. They
> could, instead, have decided to comply with their contractual obligations."[252]

206.  This case is therefore not, as Devas submits, authority for the proposition that a company cannot
rely upon a *force majeure* event that has been brought about by its parent's actions.  Rather, it is
authority for the proposition that a *force majeure* event is not beyond a party's reasonable control
if it instigates or initiates that event.  Whether Antrix instigated or initiated the CCS' decision is a
separate issue, which is discussed below (see [215] to [226]).

207.  *Rolimpex* concerned contracts between a Polish state-owned foreign trade organisation,
Rolimpex (having its own legal personality), and an English company, Czarnikow, pursuant to
which Rolimpex was to supply Czarnikow 17,000 metric tonnes of sugar.  The contracts included
a "force majeure" clause stating that if delivery was prevented "by Government intervention ... or
any [other] cause of force majeure ... beyond the Seller's control', the contracts would become
void.  In 1974 there was a poor sugar harvest and the Polish Government, concerned about a
potential lack of sugar for domestic consumption, placed a ban on the export of sugar.  The ban
(which Rolimpex opposed) applied to the contracts and, as a result, Rolimpex failed to deliver the
quantity of sugar to Czarnikow that it had agreed to supply.

208.  Czarnikow then commenced an arbitration seeking damages from Rolimpex for breach of
contract.  Rolimpex relied on the *force majeure* clause, stating that the government's ban on
sugar exports was beyond its control.  The tribunal agreed, but stated a case for the decision of
the court.  The trial judge, Court of Appeal and House of Lords upheld its decision, finding that
Rolimpex was entitled to rely on the *force majeure* clause.

209.  Devas relies on the judgment of by Lord Denning MR in the Court of Appeal – in particular, a
statement by his Lordship that "when the government itself is a party . . . [i]t cannot rely on a self-
induced 'intervention' any more than it could rely on a self-induced frustration."  Devas says that

---

[252] At [12] (emphasis in original).

Lord Denning thus accepted the view that "a government can bind itself to perform a contract with an implication that it will not do anything with or in connection with that particular contract so as to hinder or prevent the performance of its obligations thereunder". Devas notes that his Lordship also stated that "if Rolimpex [was] a department of the Government of Poland," it could not have relied upon "the clause about 'government intervention.'"[253]

210.   These comments by Lord Denning do not, however, support the proposition that a company is unable to rely on a *force majeure* clause if the relevant *force majeure* event is created by its parent. Lord Denning was considering whether a party can rely on *force majeure* events created by *that same party*. He was accepting that *if* Rolimpex was a department of the Polish Government, *then* the government would be party to the agreement, and Rolimpex would be unable to rely on *force majeure* events created by the government.

211.   Devas also relies on a passage of Lord Wilberforce's judgment in the House of Lords, in which his Lordship stated that there may be cases where the evidence shows that it was:

> "so clear that a foreign government is taking action purely in order to extricate a state enterprise from contractual liability, that it may be possible to deny to such action the character of government intervention, within the meaning of a particular contract."[254]

212.   That passage must be read in context. Lord Wilberforce was not suggesting that a state-owned company is unable to rely on a *force majeure* clause simply because the government took steps to extricate the company from contractual liability. Nor was he suggesting more broadly that a company is unable to rely on a *force majeure* event created by its parent.

213.   Rather, he was referring to Lord Denning MR's conclusion that "if Rolimpex was a department of the Government of Poland, it cannot rely on the clause about 'government intervention'". Lord Wilberforce expressed doubt about whether that doctrine, "which is very much one of English constitutional law, can viably be transplanted into the constitutional climate of foreign states, particularly such states as Poland", being a country which has "an entirely different constitutional structure" to the United Kingdom.[255] He then went on to say that despite that doubt, there may certain cases in which it may nevertheless be appropriate to deny that a government act is a *force majeure* event. He was therefore saying that *even if* an organisation is to be treated as part of the government, it is only in certain circumstances that it "may be possible" to conclude that the organisation cannot rely on acts of the government as *force majeure* events.

214.   Accordingly, neither *Okta* nor *Rolimpex* support Devas' submission that, at law, *force majeure* events cannot be brought about by the actions of a company's parent. The tribunal therefore does not accept that submission.

---

[253] Devas' PHM, [191].

[254] Devas' PHM, [193], citing [1978] 2 All ER 1043 at 1047 - 1048.

[255] [1978] 2 All ER 1043 at 1047 - 1048.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 65 (USDC NO. 2:18-cv-01360)**

Was the CCS' decision beyond Antrix's reasonable control?

215.    Devas also submits that Antrix is unable to rely on Article 11 of the Devas Agreement because
the CCS' decision was not beyond Antrix's reasonable control. It says that the decision was not
beyond Antrix's reasonable control because it was "instigated" by Antrix's Chairman, Dr
Radhakrishnan.[256] Devas says that:

> "[i]t was Dr. Radhakrishnan who in June 2010 obtained Law Ministry advice "as to how to
> annul the Contract"; it was he who proposed and secured the Space Commission's
> decision authorizing him to pursue this strategy; it was he who obtained confirmation
> from the Additional Solicitor-General as to the means of annulling the contract by
> contriving to deprive Antrix of the leased spectrum for commercial purposes; and it was
> he who, several months later, secured a CCS decision in precisely the form devised by
> the ASG – the supposed "Force Majeure Event".[257]

216.    Antrix, on the other hand, submits that "every document in the record relating to this issue shows
that Dr. Radhakrishnan took no action as Chairman of Antrix and always acted in his official
governmental capacity"[258] – that is, in his capacity as Secretary of the DOS and/or Chairman of
ISRO or the Space Commission. It says further that Devas has not identified any proper legal
basis for attributing Dr Radhakrishnan's conduct to Antrix.[259]

217.    Underlying Antrix's submission is the long-standing principle that companies have legal
personalities that are separate and distinct from their shareholders.[260] This principle applies to
government owned as well as private entities. As the Supreme Court of India stated in
*Electronics Corporation of India Ltd and Ors v Secretary, Revenue Department, Government of
Andhra Pradesh and Ors*:[261]

> "[a] clear distinction must be drawn between a company and its shareholder, even though
> that shareholder may be only one and that the Central or a State Government. In the eye
> of the law, a company registered under the Companies Act is a distinct legal entity other
> than the legal entity or entities that hold its shares".[262]

218.    In light of this principle, in order to prove that the conduct of Dr Radhakrishnan caused the
alleged "Force Majeure Event", and that his conduct should be treated as conduct of Antrix, it is
necessary to consider:

---

[256] Devas' PHM, [183]. See also Statement of Claim, [203(b)].

[257] Devas' PHM, [183] (references omitted); see also Devas' PHRM, [21].

[258] Antrix's PHRM, [54]. See also Devas' PHM, footnote 118.

[259] Devas' PHRM, [8].

[260]  See *Salomon v A Salomon & Co Ltd* [1897] AC 22.

[261] Judgment, 5 May 1999, AIR 1999 SC 1734.

[262] At [15].

a.  whether or not Dr Radhakrishnan was acting in his capacity as Chairman of Antrix when he engaged in the conduct that Devas relies on; or

b.  if he was acting in his capacity as an officer of DOS, ISRO or the Space Commission, his conduct should be attributed to Antrix.  For that to be the case, however, the tribunal must be satisfied that:

i.  the DOS, ISRO and/or the Space Commission were acting as the agent of Antrix at relevant times; or

ii.  there is some other legal basis for treating the conduct of DOS, ISRO and/or the Space Commission as the conduct of Antrix, such as "piercing the corporate veil".

219.  Devas has not alleged that Dr Radhakrishnan was acting in his capacity as Chairman of Antrix at any relevant time.

220.  Nor has Devas alleged that the GOI was acting as Devas' agent.[263]  Initially it alleged that Antrix was acting as the GOI's agent, but that allegation has been abandoned.[264]  Even if it had been pressed (and accepted), however, it would not have permitted the GOI's conduct to be attributed to Antrix: agency permits the agent's conduct to be attributed to the principal, not the other way around.

221.  Devas has, however, submitted that Antrix and the GOI should be treated as one and the same entity.  In its post-hearing memorial it stated that:

"[t]o the extent it seeks to claim Dr. Radhakrishnan's actions, in seeking to undermine the Devas Agreement and bring about the CCS decision, were done in a capacity other than as Antrix's Chairman (e.g., as Secretary of DOS or Chairman of ISRO), this notion should be rejected … The relationship between Antrix and GOI are dispositive of this issue. Antrix is the marketing arm of the Government (DOS)."[265]

222.  Similarly, in its post-hearing memorial Devas stated that:

"Devas does not assert that Antrix signed the contract as a pass-through "booking" agent, as Antrix now seeks to characterize Devas's case. Rather, Devas has alleged, and Antrix has admitted, that in signing the contract, Antrix expressly did so as the "marketing arm of [DOS]" and "the entity through which ISRO engages in commercial activities.""[266]

---

[263] In its Skeleton it stated (at [59]) that Devas was "acting for and on behalf of the Government of India".  It made the same submission during the hearing: Hearing Tr., pp. 50-51.

[264] In its post-hearing reply memorial it stated that it "does not assert that Antrix signed the contract as a pass-through "booking" agent": Devas' PHRM, [30].

[265] Devas' PHM, [184], [185].

[266] Devas' PHM, [30].

223.　Devas does not put this submission on the basis that the tribunal should "pierce the corporate veil", and it has not relied on any authorities that concern piercing the corporate veil.  Rather, its submission is that since the contract states that Antrix is the DOS' marketing arm and the entity through which ISRO engages in commercial activities, the tribunal is entitled to disregard Antrix's separate legal personality.  As Devas explained to the tribunal during the hearing:

> "[i]f you read the recitals [of the contract], sir … [t]he second recital then says: "Whereas Antrix is a marketing arm of the Department of Space and is the entity through which ISRO engages in commercial activities".  As far as this contract is concerned – and you do not need extraneous evidence, much less judgments of the Supreme Court which state the obvious, ie that a corporate entity is distinct from its shareholders for certain purposes – this is what the contract says.  "Antrix is".  It is sufficient for me, and we don't need to go beyond this".[267]

224.　The tribunal does not accept that submission.  To find that a company's distinct legal personality may be disregarded simply because it is a government's "marketing arm" and/or performs commercial activities for a government's benefit (but is not the government's agent) would, in the tribunal's view, be a significant departure from the long-standing approach of courts of India and England to a company's separate legal personality.  It is telling that Devas has not referred the tribunal to any authority in support of this submission.  The tribunal is not aware of any such authority.

225.　On the contrary, the tribunal agrees with Antrix that:

> "[w]hether dealing with state companies or private companies, including the myriad subsidiaries and special purpose companies organised by the world's major corporations, the formation of "marketing arms" does not abrogate or in any way compromise the separate legal personality of such entities."[268]

226.　Accordingly, the tribunal does not accept that Antrix itself "instigated" the alleged "Force Majeure Event".

227.　However, that is not determinative of whether the event was beyond Antrix's reasonable control.  For an event to be beyond Antrix's reasonable control Antrix must, in addition to not instigating the event, have been unable to prevent the event from taking place.  It is therefore also necessary to ask: was Antrix able to prevent the CCS from deciding to annul the Devas Agreement?

228.　Antrix submits that it "had nothing to do, and could not legally have had anything to do, with the decision of the CCS, the highest body in India entrusted with national security matters".[269]  The tribunal accepts that submission.  In addition to being the ultimate authority within India on

---

[267] Hearing Tr, pp. 48 – 49.

[268] Antrix's PHM, [39].

[269] Antrix's PHRM, [54].

matters of internal and external security and defence,[270] none of the CCS' members were officers of Antrix[271] and Devas has not led evidence to the effect that Antrix was able to seek judicial review of, or otherwise able to challenge, the CCS' decisions.[272] Nor has Devas submitted that Antrix was permitted at law to refuse to comply with the CCS' direction to annul the agreement.

229.    But that establishes only that the CCS' decision was beyond Antrix's reasonable control once it has been made.  It does not answer the question of whether Antrix could have prevented the CCS from receiving a proposal to annul the Devas Agreement.

230.    In the tribunal's view, it could have done so.  This is because, if Dr Radhakrishnan had, from the time that he was appointed Chairman of Antrix, and acting in his capacity as Chairman of Antrix, done everything in his power to ensure that the agreement remained on foot, in the tribunal's view he would not have taken any of the steps that led to the CCS being asked to approve the annulment of the agreement.  As a result, those steps would not have occurred.

231.    In particular, if Dr Radhakrishnan had been personally lobbying and making representations to the DOS, ISRO and the Space Commission to ensure the Devas Agreement remained on foot, he would not, at the same time, have:

   a.    obtained advice from the Ministry of Law and Justice about how to annul the agreement;[273]

   b.    permitted his department to inform the Space Commission that it was "inevitable" that the Devas Agreement be annulled;[274]

   c.    sat as Chair of the Space Commission when it resolved that the DOS may instruct Antrix to annul the agreement;[275]

   d.    sought advice from the ASG concerning the annulment of the Devas Agreement;[276] and/or

   e.    sought approval from the CCS to annul the Devas Agreement.[277]

---

[270] See paragraph [49(f)] above.

[271] Its members included the Prime Minister, the Minister of Defence, the Minister of Home Affairs, the Minister of External Affairs and the Minister of Finance.

[272] Devas does state, in footnote 235 of its Reply, that "[t]he allocation of spectrum is a statutory, governmental function under the Telegraphs Act 1885. The policy guiding the allocation of spectrum is decided by the executive government of India and is subject, inter alia, to judicial review, unlike truly sovereign functions". But it has not submitted that this applies to the CCS' decision. Devas also posits the question, in its PHRM (at [2]), "[w]hy did the supposedly independent Board of Antrix take absolutely no steps to protest the annulment decision, much less challenge it in court?" But it has not led any expert evidence to the effect that that there was any reasonable likelihood that any such challenge might be successful.

[273] See [104] above.

[274] See [111] above.  As noted above, Dr Radhakrishnan did not author this note, but he was the Secretary of the DOS at the time.

[275] See [50] and [112] above.

[276] See [114] above.

[277] See [124] above.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 69 (USDC NO. 2:18-cv-01360)**

232.   He would not have taken those steps because they would have required him to adopt diametrically opposed positions in respect of the Devas Agreement: on the one hand, that the agreement should remain on foot, and on the other, that it should be annulled.  This would have created a clear and irreconcilable conflict of interest.

233.   The difficulty that he would have faced becomes apparent when one considers the meeting of the Space Commission on 2 July 2010.  Before that meeting Dr Radhakrishnan's department advised the Space Commission that it was "inevitable" that the agreement be annulled.  If at the same time Dr Radhakrishnan was lobbying the Space Commission to ensure that the agreement remained on foot, the Space Commission would have been required to decide whether to annul the agreement in light of two diametrically opposed views, which would have both come (directly or indirectly) from the same person, who was also the Commission's Chairman.  In the tribunal's view, Dr Radhakrishnan would not have allowed either himself or the Space Commission to be put in such a position.

234.   Accordingly, the tribunal considers that, if Dr Radhakrishnan had done everything in his power (as Chairman of Antrix) to prevent the annulment of the Devas Agreement, he would not have taken the steps referred to in [231] above.  They are the steps that led directly to the CCS' decision to annul the agreement.  If they had not occurred, the CCS would not have been invited to annul the agreement.  Nor would the CCS have acted on what was Dr Radhakrishnan's clear recommendation to annul the agreement.  As a result, in all probability the agreement would not have been annulled.

235.   Further, since Dr Rhadakrishnan (acting in his capacity as Chairman of Antrix) could have prevented the CCS from being asked to annul the agreement, *Antrix* could have effectively prevented the CCS from making that decision, which means that the CCS' decision was not beyond Antrix's reasonable control.  Given that Article 11(b) limits "Force Majeure Events" to events that are beyond Antrix's reasonable control, the CCS' decision cannot be a "Force Majeure Event" for the purpose of Article 11(b).

236.   The tribunal therefore finds that Antrix was not permitted to terminate the Devas Agreement pursuant to Article 11.

Devas' other submission concerning Article 11

237.   In light of this conclusion, it is not strictly necessary to consider Devas' other grounds for alleging that Article 11 does not apply.  The tribunal notes, however, that if it had been necessary to consider Devas' other submissions, the tribunal would also have accepted the submission that Antrix did not make all efforts to prevent the effects of the alleged "Force Majeure Event", and therefore that Article 11(b) does not apply.[278]  This is because:

   a.    the definition of "Force Majeure Event" in Article 11(b) is limited to events that Antrix has made "all efforts … to prevent".  Therefore, in order for Article 11(b) to apply in respect of

---

[278] Statement of Claim, [203(c)]; Devas' PHRM, [24].

the CCS' decision to annul the Devas Agreement, Antrix must have made "all efforts" to prevent that decision from being made; and

b.     Antrix made *no* efforts to prevent that decision from being made.  There is no evidence of Dr Rhadakrishnan – or any other officer of Antrix – making any effort to prevent the CCS from annulling the Devas Agreement.  Nor is there any evidence of Dr Rhadakrishnan – or any other officer of Antrix – making any effort to prevent the conduct that led to CCS making that decision (such as the Law of Ministry and Justice providing advice about how to annul the Devas Agreement, the Space Commission being advised that annulment of the agreement was "inevitable" and the ASG's advice being sought concerning the annulment of the agreement).

238.    It is clear that in these circumstances Article 11 was not intended to apply.

### D.  Is Antrix entitled to rely on Section 56 of the Indian Contract Act, 1872 and if so, can it claim impossibility of the Devas Agreement based on the CCS decision?

239.    Antrix submits that, even if it was not entitled to terminate the agreement pursuant to Articles 7(c) or 11 of the Devas Agreement, the decision of the CCS rendered the agreement impossible to perform and therefore void under section 56 of the Indian Contracts Act.[279]

240.    Section 56 states:

"[a] contract to do an act which, after the contract is made, becomes impossible, or, by reason of some event which the Promisor could not prevent, unlawful, becomes void when the act becomes impossible or unlawful".

241.    Devas does not deny that the CCS' decision made performance of the agreement impossible. However, it denies that section 56 of the Indian Contracts Act applies.  According to Devas, "once the parties have expressly addressed the possibility of a supervening event in their contract through a *force majeure* clause, then Section 56 cannot apply".[280]  In support of that proposition Devas relies on decision of the Supreme Court of India in *Mary v State of Kerala (State of Kerala)*.[281]  In that case, the Supreme Court stated that:

"in a case in which the consequences of non-performance of contract is provided in the statutory contract itself, the parties shall be bound by that and cannot take shelter behind Section 56 of the Contract Act".[282]

242.    According to Antrix, however, *State of Kerala* is only authority for the proposition that "the parties to an agreement may allocate the risk of *force majeure* to one of the parties".[283]  Antrix says that the case therefore:

---

[279] Statement of Defence, [81].

[280] Devas' PHM, [216].

[281] 2013 (13) S.C.A.L.E. 151, C.A. No. 9466 of 2003.

[282] At [13].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 71 (USDC NO. 2:18-cv-01360)**

59

"has no applicability here, where the *force majeure* clause, far from purporting to allocate the risk of *force majeure* to Antrix, expressly acknowledges that governmental acts taken in a sovereign capacity do constitute *force majeure*".[284]

243.   To consider which party's view of *State of Kerala* is correct it is necessary to consider the facts and the Court's findings in that case.   The appellant (Mary) was a bidder in an auction for the right to sell Arak (an alcoholic drink) from a shop in Kalady (a town in the State of Kerala).   The auction was conducted pursuant to the Kerala Abkari Shops (Disposal in Auction) Rules, 1974. Rule 5(15) stated:

> "[o]n the failure of the auction purchaser to make such deposit referred to in sub-rule (10) or take out such licence or execute such agreement temporary or permanent or furnish such personal surety or additional cash security as aforesaid, the deposit already made by him towards earnest money and security shall be forfeited to Government".

244.   Mary's bid was successful and she paid an amount equal to 30% of her bid as a deposit. Subsequently, residents of a nearby Christian pilgrim centre objected to her opening an "abkari shop" (i.e. a liquor shop) and the State's law agencies said that they were "unable to assure smooth conduct of the business".   Mary believed that this made it impossible for her to operate the business, and sought a refund of her deposit.   The State refused.   It said that the sale had already been confirmed, and asked her to enter into the "permanent agreement" referred to in Rule 5(15).   Mary refused and court proceedings were commenced.

245.   During those proceedings, Mary sought to rely on section 56 of the Indian Contract Act.   The Supreme Court held that she was not entitled to do so.   The relevant passage of the Court's judgment is as follows:

> "[i]t is not the case of the State that appellant has purposely, or for any oblique motive, or as a device to avoid any loss, refused to execute the agreement. It appears to us that the State was helpless because of the public upsurge against the sale of arrack at Kaladi, the birth place of Adi Shankaracharya as, in their opinion, the same will render the soil unholy. Consequently, the State also found it impossible to re-sell or redispose of the arrack shops.  In view of second paragraph of Section 56 of the Contract Act, a contract to do an act which after the contract is made, by reason of some event which the promissory could not prevent becomes impossible, is rendered void.   Hence, the forfeiture of the security amount, may be illegal. But what would be the position in a case in which the consequence for non-performance of contract is provided in the statutory contract itself? The case in hand is one of such cases. The doctrine of frustration excludes ordinarily further performance where the contract is silent as to the position of the parties.  In the event of performance becoming literally impossible.  However, in our opinion, a statutory contract in which a party takes absolute responsibility cannot escape

---

[283] Antrix's PHRM, [63].

[284] Antrix's PHRM, [63].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 72 (USDC NO. 2:18-cv-01360)**

> liability whatever may be the reason.  In such a situation, events will not discharge the party from the consequence of non-performance of a contractual obligation.  Further, in a case in which the consequences of non-performance of a contract is provided in the statutory contract itself, the parties shall be bound by that and cannot take shelter behind Section 56 of the Contract Act."[285]

246.   In the tribunal's view, this passage makes clear that what the Supreme Court found was that Mary was not entitled to rely on section 56 because her agreement with the State specified the consequences of non-performance of her contractual obligations.

247.   That is precisely what the parties have done in the Devas Agreement.  The parties have set out the consequences of non-performance of their obligations.  For example, Article 13 provides that if one party breaches its obligations the other is to indemnify it against any loss or damage it suffers, unless that other party terminates the agreement; Article 7 sets out the consequences where the agreement is terminated; and Article 11 sets out the parties' obligations in the case of "Force Majeure Events".  Indeed, examination of the Devas Agreement reveals that the parties have set out the consequences of non-performance of their contractual obligations in considerable detail.

248.   Accordingly, the tribunal accepts Devas' submission that section 56 of the Indian Contract Act does not apply, so it does not render the Devas Agreement void.

249.   The tribunal notes that it has considered *Boothalinga Agencies v VTC Poriaswanmi Nadarm* (***Boothalinga***), an earlier decision of the Supreme Court. [286]   As Antrix has noted, [287] in *Boothalinga* the Court stated that section 56 "lays down a rule of positive law and does not leave the matter to be determined according to the intention of the parties". [288]  In the tribunal's view, however, this statement does not assist Antrix.  When the Supreme Court made that statement, it was not considering whether section 56 applies in cases where parties specify the consequences of non-performance of their contractual obligations.  Rather, it was explaining that the English doctrine of frustration is a contractual remedy, whereas section 56 is a statutory remedy. [289] Accordingly, after making that statement, the Court went on to discuss relevant English authorities concerning the theoretical foundation of the doctrine of frustration, before concluding that:

> "[i]n English law therefore the question of frustration of contract has been treated by courts as a question of construction depending upon the true intention of the parties.  In contrast, the statutory provisions contained in Section 56 of the Indian Contract Act lay

---

[285] At [13].

[286] (1969) 1 SCR 65.

[287] Antrix's PHRM, [64].

[288] See [9].  See also *Continental Enterprises Ltd v State Trading Corporation of India Ltd* High Court of Delhi, Judgment, 16 December 2009, MANU/DE/3425/2009, [22].

[289] See [10] and [11].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 73 (USDC NO. 2:18-cv-01360)**

down a positive rule of law and English authorities cannot therefore be of direct assistance, though they have persuasive value in showing how English courts have approached and decided cases under similar circumstances." [290]

250.     *Boothalinga* therefore does not address the question of whether section 56 applies in cases where parties specify the consequences of non-performance of their contractual obligations.

## E.  Did Antrix's conduct amount to a repudiation/renunciation of the Devas Agreement or was the Devas Agreement validly terminated by Antrix's letter of 25 February 2011?

251.     As noted above on 25 February 2011 Antrix wrote to Devas purporting to terminate the agreement.  The tribunal has found that it was not entitled to do so.  Since it was not entitled to do so, its letter plainly amounted to a wrongful repudiation of the agreement. [291]

## F.  Was Antrix's repudiation of the Devas Agreement a material breach of the Devas Agreement within the meaning of Article 7(b), and did Devas terminate the Agreement within the meaning of Article 7(b) when it accepted the repudiation?

252.     Antrix submits that even if it did wrongfully repudiate the Devas Agreement, according to Article 7(b) Devas' only remedy is a refund of the UCRF. [292]

253.     Article 7(b) states as follows:

> "DEVAS may terminate this Agreement at any time if ANTRIX is in material breach of any provisions of this Agreement and ANTRIX has failed to cure the breach within three months after receiving notice from DEVAS setting out the nature of breach and reasons for considering the same as material breach. In such event, ANTRIX shall immediately reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding taxes if applicable, received by ANTRIX till that date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called)."

254.     Devas denies that its entitlement to damages is limited by Article 7(b).  It says that Article 7(b) does not apply because:

a.        it only applies where Devas "terminates" the agreement, and Devas did not terminate the agreement but rather accepted Antrix's repudiation;

b.        it does not apply to repudiatory breaches; and

---

[290] At [11].

[291] As Devas has noted in its post-hearing memorial (at [227]), it is settled Indian law that "[a] renunciation may occur when one party refuses to perform his obligations . . . either by expressly so declaring it, or by words or conduct demonstrating an intention not to perform": citing Frederick Pollock & Dinshaw Fardunji Mulla, Pollock & Mulla: The Indian Contract and Specific Relief Acts 779 (Nilima Bhadbhade ed., 14th ed. 2013).

[292] Antrix's PHM, [87].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 74 (USDC NO. 2:18-cv-01360)**

c.      it does not apply unless Devas (a) put Antrix on written notice that Devas believed Antrix was in material breach and (b) gave Antrix the opportunity to cure that breach within three months, and Devas did not take either of those steps.[293]

Did Devas terminate the Devas Agreement?

255.    Antrix says that Devas terminated the agreement when it sent its letter of 13 June 2013.[294]  As noted above, that letter stated that Devas "accept[ed] Antrix's repudiatory breach of the Agreement, bringing the Agreement to an end".[295]

256.    Devas says that "[a]ccepting a repudiation is *not* the same thing as terminating a contract pursuant to a contractual right"[296] and that its 13 June 2013 letter therefore did not terminate the agreement.

257.    Certainly, repudiation and termination are not the same thing.  Repudiation involves refusing to perform, or disclosing an intention to not perform, contractual obligations.  A contract is not automatically brought to an end when it is repudiated.  It is only if the innocent party accepts the repudiation that the contract is brought to an end.  By contrast, when a contract is terminated it is automatically brought to an end.

258.    However, the tribunal does not agree that there is a relevant distinction between *accepting* repudiation and terminating an agreement.  The effect of both is exactly the same: the parties' obligations under the agreement are brought to an end.  Notably, Devas has not cited any authority that supports there being a relevant distinction between the two concepts.  On the other hand, Antrix has identified numerous authorities that presume that none exists.  For example, in *Newland Shipping and Forwarding Limited v Toba Trading* Leggatt J held that:

> "[u]nder the general law, a party has the right to terminate a contract if the other party commits a 'repudiatory breach' … When a repudiatory breach occurs, the other party has a choice whether to terminate the contract or to affirm it (and thereby lose the right to terminate the contract for the relevant breach)".[297]

259.    Similarly, in *Fercometal S.A.R.L. v. Mediterranean Shipping Co. S.A.* the House of Lords held that:

> "[w]hen one party wrongly refuses to perform obligations, this will not automatically bring the contract to an end. The innocent party has an option. He may either accept the

---

[293] Devas' PHRM, [50].

[294] Statement of Defence, [55]; Antrix's PHM, [111].  According to Antrix, this is "playing word games", that "arguing that the notice it gave to Antrix terminating the Contract was actually not a termination at all, defies common sense": Antrix's PHM, [70].

[295] See [131] above.

[296] Devas' PHM, [229] (emphasis in original).

[297] [2014] EWHC 661 (Comm) At [49], [50].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 75 (USDC NO. 2:18-cv-01360)**

wrongful repudiation as determining the contract and sue for damages, or he may ignore or reject the attempt to determine the contract and affirm its continued existence".[298]

260.   Chitty On Contracts also states:

"[a]n innocent party, faced by a repudiatory breach, is therefore given a choice: he can either treat the contract as continuing ("affirmation" of the contract) or he can bring it to an end ("acceptance of the repudiation"). He must "elect" or choose between these options … An act of acceptance of a repudiation requires no particular form. It is usually done by communicating the decision to terminate to the party in default … Unless and until the repudiation is accepted the contract continues in existence for "an unaccepted repudiation is a thing writ in water.[299]

261.   For these reasons, the tribunal finds that when Devas sent its letter of 13 June 2013 it accepted Antrix's repudiatory breach of the Agreement, thereby terminating the agreement.

Does Article 7(b) apply to repudiatory breaches?

262.   Devas' primary contention is that, as a matter of law, limitation of liability clauses do not apply to repudiatory breaches unless they refer to such breaches expressly.[300]  However, the way in which Devas developed that submission suggests that it also puts its case more broadly.[301]  It appears to also submit that, even if limitation of liability clauses can (as a matter of law) apply to repudiatory breaches without referring to them expressly, Article 7(b) does not, when properly construed, apply to such breaches.

263.   Antrix appears to have treated Devas as having made both of these (primary and alternative) submissions.   Accordingly, the tribunal considers that it is appropriate that they are both addressed.

264.   Both parties have referred the tribunal to numerous Indian and English authorities concerning the construction of limitation of liability clauses.  Those authorities are relevant to the assessment of Devas' primary and alternative submissions.  It is therefore convenient to consider those authorities before addressing its submissions.

Relevant authorities

265.   The first Indian authority, which is relied on by Antrix,[302] is *Sir Chunilal V Mehta and Sons, Ltd v The Century Spinning and Manufacturing Co Ltd*[303] (*Sir Chunilal*), a decision of the Supreme

---

[298] At 799.  See also at 805: "[w]hen A wrongfully repudiates his contractual obligations in anticipation of the time for their performance, he presents the innocent party B with two choices. He may either affirm the contract by treating it as still in force or he may treat it as finally and conclusively discharged."

[299] H. G. Beale (ed.), Chitty on Contracts, Vol. I: General Principles (31st ed., Sweet & Maxwell 2012), pp. 1694, 1706, 1707.

[300] Devas' PHM, [248].

[301] See, e.g., Devas' PHM at [241] – [267].

[302] Statement of Defence, [142]; Rejoinder, [128], [129]; Antrix's PHM, [95], [96]; Antrix's PHRM, [69], [73].

[303] AIR1962SC1314.

Court of India from 1962. This case concerns the wrongful termination of an agency contract that contained a limitation of liability clause. The Supreme Court was required to determine whether the clause limited the agent's entitlement to damages. In reaching its decision, the Court stated (inter alia):

a.      "[w]here the parties have deliberately specified the amount of liquidated damages there can be no presumption that they, at the same time, intended to allow the party who has suffered by the breach to give a go-by to the sum specified and claim instead a sum of money which was not ascertained or ascertainable at the date of the breach";[304] and

b.      the liquidated damages clause "does not expressly or by necessary implication keep alive the right to claim damages under the general law. By providing for compensation in express terms the right to claim damages under the general law is necessarily excluded and, therefore, in the face of that clause it is not open to the appellant to contend that that right is left unaffected."[305]

266.    The second authority, which is relied on by Devas, is the more recent decision of the Supreme Court of India in *Steel Authority of India Limited v Gupta* (**SAIL v Gupta**).[306] The appellant in this case failed to deliver goods in accordance with the parties' contract, and sought damages for breach of the contract. The Court was required to determine whether its claim for damages was limited by a liquidated damages clause. The Court stated that:

"[t]he question that needs to be determined by us is whether the breaches alleged by the respondent are covered by the stipulations contained in Clause 7.2 [(the liquidated damages clause)]. If the answer is in the affirmative, obviously compensation cannot be awarded beyond what is provided therein. On the other hand, if breaches are not covered by Clause 7.2, cap provided therein with regard to liquidated damages will not be applicable at all".[307]

267.    The Court answered that question by reference to the parties' intentions. It stated:

"[i]t is not a question of giving restrictive or wider meaning to Clause 7.2 but the question is what is intended by the parties by making a provision such as this and does such clause cover all situations of breaches by SAIL".[308]

---

[304] At [16].

[305] At [19].

[306] (2009) 10 SCC 63.

[307] At [20].

[308] At [25]. See also [22], where the Supreme Court asked, "[c]an it be said that SAIL intended to provide for liquidated damages in the contract even in a situation where they were unable to make supply of materials for the reasons beyond control or they declined to supply the materials on one ground or the other."

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 77 (USDC NO. 2:18-cv-01360)**

268.    In so far as identifying the parties' intentions was concerned, the Court stated:

> "[i]t is well known that intention of the parties to an instrument has to be gathered from the terms thereof and that the contract must be construed having regard to the terms and conditions as well as nature thereof."[309]

269.    The Court then performed that examination, and concluded:

> "[c]lause 7.2 cannot be said to extend to all situations and all types of breaches. In substance and in form, the claim of damages by the respondent for the breaches of contract by SAIL is essentially distinct from the breaches contemplated by Clause 7.2."[310]

270.    Significantly, the Supreme Court noted that the appellant (which sought to rely on the liquidated damages clause) "strongly relied on" *Sir Chunilal*.[311] However, having formed the view that the liquidated damages clause did not apply, the Court went on to state that *Sir Chunilal* had "no application to the fact situation of the present case".[312] It thus affirmed the lower court's finding that "[t]he authority of law in *Chunilal v. Mehta* would have been applicable only if it was held that Clause 7.2 of the contract was applicable".[313]

271.    Accordingly, the Court appears to have considered that *Sir Chunilal* is not relevant to *whether* a limitation of liability or liquidated damages clause applies in any given case, but rather to the availability of general law damages *if* such a clause applies.[314] This tribunal has therefore treated *Sir Chunilal* in the same way.

272.    The third Indian authority, also relied on by Devas, is *Pawan Alloys & Casting Pvt. Ltd., Meerut v. U.P. State Electricity Board and others*[315] (**Pawan Alloys**). This case concerned (inter alia) standard agreements for the supply of electricity by the U.P. Electricity Board (**the Board**) to industrial customers. The Board notified the customers that they would receive a 10% rebate on their electricity bills for three years from the date of commencement of supply. However, clause 7 of the contracts, which the Board subsequently required the customers to execute, stated:

> "(a) The consumer shall pay for the supply of electric energy at the rates enforced by the supplier from time to time as may be applicable to the consumer.
>
> (b) The rate schedule applicable to the consumer at the time of execution of this agreement is annexed hereto as Annexure 2.

---

[309] At [23].

[310] At [26].

[311] At [13].

[312] At [30].

[313] At [14].

[314] At [30]. It thus affirmed the lower court's finding, referred to at [14], that "[t]he authority of law in *Chunilal v. Mehta* would have been applicable only if it was held that Clause 7 .2 of the contract was applicable".

[315] (1997) 7 SCC 251.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 78 (USDC NO. 2:18-cv-01360)**

(c) The rate schedule above mentioned, may, at the discretion of the supplier, be revised by the supplier from time to time."

273.   After the contracts were executed, the Board refused to provide the 10% rebate on electricity bills.  The Supreme Court was required to consider (inter alia) whether clause 7 permitted it to do so.  The Court stated:

"[i]t would be totally absurd and incongruous to suggest on behalf of the Board that on the one hand it guaranteed to the new industrial units for a period of three years from the date of commencement of supply 10% development rebate on the total amount of the bill and on the other hand the moment such supply started pursuant to the written agreement the very incentive could be withdrawn by it from its inception as a new industrial unit had to sign a written agreement containing clause 7(a), (b) and (c). If that submission on behalf of the Board which appealed to the High Court is accepted a most incongruous, unreasonable and absurd result would follow."[316]

274.   The Court went on to state that:

"[i]t is also easy to visualize that a new industrial unit which spends large amounts for establishing its infrastructure and gets lured in the light of the representation held out by the Board and establishes its plant and machinery in the new unit, would not simultaneously and voluntarily agree by signing such an agreement with the Board to give up the very same benefit of incentive by permitting the latter to withdraw it at any time it likes. That would be doing violence to common sense and business approach of an ordinary prudent businessman. No businessman in his senses would ever agree voluntarily to such an absurd, incongruous and inconsistent predicament."[317]

275.   The first relevant English authority is *Stocznia Gdynia S.A. v. Gearbulk Holdings Ltd*[318] (*Gearbulk*), a decision of the English Court of Appeal from 2009 that is relied on by Devas.  This case concerned contracts for the construction and delivery of six vessels.  The respondent, a ship building yard, failed to deliver the vessels.   The Court of Appeal considered whether it was entitled to rely on a limitation of liability provision.  The Court held that it was not.  In reaching that conclusion, Moore Bick LJ (with whom Ward and Smith LLJ agreed) made the following statement, on which Devas relies:

"[t]he court is unlikely to be satisfied that a party to a contract has abandoned valuable rights arising by operation of law unless the terms of the contract make it sufficiently clear that that was intended. The more valuable the right, the clearer the language will need to be".[319]

---

[316] At [54].

[317] At [54].

[318] [2009] EWCA (Civ) 75.

[319] At [23].

276.     The second English case is *Internet Broadcasting Corporation Ltd (trading as NETTV) and another v MAR LLC (trading as MARHedge)* (**Internet Broadcasting**),[320] a decision of the High Court (Gabriel Moss QC sitting as a Deputy High Court Judge) in which the defendant was found to have committed a "deliberate, repudiatory breach".  The Court considered whether a limitation of liability clause applied in light of that breach, and set out a series of principles concerning whether limitation of liability clauses apply to repudiatory breaches.  It stated:

> "[t]he principles I deduce from the authorities which are relevant to the present type of case of deliberate, repudiatory breach involving personal wrongdoing are as follows. (1) There is no rule of law applicable and the question is one of construction. (2) There is a presumption, which appears to be a strong presumption, against the exemption clause being construed so as to cover deliberate, repudiatory breach. (3) The words needed to cover a deliberate, repudiatory breach need to be very 'clear' in the sense of using 'strong' language such as 'under no circumstances'. (4) There is a particular need to use 'clear', in the sense of 'strong', language where the exemption clause is intended to cover deliberate wrongdoing by a party in respect of a breach which cannot, or is unlikely to be, covered by insurance. Language such as 'including deliberate repudiatory acts by [the parties to the contract] themselves' would need to be used in such a case. (5) Words which, in a literal sense, cover a deliberate repudiatory breach will not be construed so as to do so if that would defeat the 'main object' of the contract. (6) The proper function between commercial parties at arm's length and with equal bargaining power of an exemption clause is to allocate insurable risk, so that an exemption clause should not normally be construed in such cases so as to cover an uninsurable risk or one very unlikely to be capable of being insured, in particular deliberate wrongdoing by a party to the contract itself (as opposed to vicarious liability for others). (7) Words which in a literal sense cover a deliberate repudiatory breach cannot be relied upon if they are 'repugnant' have not dealt with this in detail because it is not relevant to this case."[321]

277.     Devas places substantial weight on this decision.[322]  Antrix, on the other hand, submits that it is not good law and effectively (and erroneously) seeks to revive the doctrine of fundamental breach (i.e. the now overruled doctrine that limitation of liability clauses cannot be relied on by parties that repudiate their contractual obligations).[323]

278.     In support of this submission Antrix relies to two decisions of Flaux J in the High Court.  The first is *Astrazeneca UK Ltd v Albemarle International Corp & Anor.*[324] In this case, Flaux J stated:

---

[320] (2009) EWHC 844 (Ch).

[321] At [33].

[322] See, e.g., Statement of Claim, [276]; Reply, [165]; Devas' Skeleton, [122]; Devas' PHM, [246]; Devas' PHRM, footnote 104.

[323] See, e.g., Statement of Defence, [145] – [149]; Devas' Skeleton, [67]; Antrix's PHM, [89] – [91].

[324] [2011] EWHC 1574 (Comm).

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 80 (USDC NO. 2:18-cv-01360)**

"[w]ith the greatest respect to the learned Deputy Judge [*in Internet Broadcasting*], in my judgment, this conclusion is wrong on the modern authorities and effectively seeks to revive the doctrine of fundamental breach (which the House of Lords in both *Suisse Atlantique Societe d'Armement Maritime v NV Rotterdamsche Kolen Centrale* [1967] 1 AC 361 and *Photo Production v Securicor* [1980] 1 AC 827 concluded was no longer good law), albeit under the guise of 'deliberate repudiatory breach'

...

"In my judgment, the judgment in MARHedge [(i.e. *Internet Broadcasting*)] is heterodox and regressive and does not properly represent the current state of English law. If necessary, I would decline to follow it. Even if the breach ... had been a deliberate repudiatory breach ... the question whether any liability ... for that breach was limited by clause M would simply be one of construing the clause, albeit strictly, but without any presumption."[325]

279.   The second is *Shared Network Services Limited v Nextira One UK Limited*[326] (*Shared Network*). In this case, Flaux J rejected a submission that a limitation of liability clause did not apply to a repudiatory breach of the relevant contract.[327]   The decision does not add anything material to what Flaux J stated in *Shared Network*, save that leave to appeal was granted by Lord Justice Lewison who, in granting leave, stated that:

"I consider that Flaux J was right, and that the appeal does not have a real prospect of success, [but] the point is an important one and the conflict of authority should be resolved by the Court of Appeal."[328]

280.   Ultimately, however, security for costs was ordered[329] and not provided, so the appeal was dismissed.[330]

---

[325] At [289] and [301].

[326] [2011] EWHC 3845 (Comm).

[327] At [11], [12].

[328] This is noted in the decision on security for costs.  See *Shared Network Services Limited v Nextira One UK Limited* [2012] EWCA Civ 1171 at [2].

[329] *Shared Network Services Limited v Nextira One UK Limited* [2012] EWCA Civ 1171.

[330] *Shared Network Services Limited v Nextira One UK Limited*, Court of Appeal, Order, 11 September 2012.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 81 (USDC NO. 2:18-cv-01360)**

281.  The final case, also relied on by Devas and a more recent decision of the Court of Appeal, is *Kudos Catering (UK) Limited v Manchester Central Convention Complex Limited* [2012] EWHC 1192 (QB) (**Kudos Catering**).[331]  This case also concerns the question of whether damages were recoverable for a repudiatory breach in circumstances where there was a relevant limitation of liability clause.  The clause stated:

> "[t]he Contractor hereby acknowledges and agrees that the Company shall have no liability whatsoever in contract, tort (including negligence) or otherwise for any loss of goodwill, business, revenue or profits".

282.  Tomlinson LJ (with whose judgment McCombe and Laws LLJ agreed) conducted a helpful survey of authorities concerning the principles that apply to the construction of exclusion clauses.  The principles that his Lordship referred to include the following:

    a.    an exception clause must "reflect the contemplation of the parties that a breach of contract, or what apart from the clause would be a breach of contract, may be committed, otherwise the clause would not be there; but the question remains open in any case whether there is a limit to the type of breach which they have in mind";[332]

    b.    "[t]he exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would have reasonably been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant.  In doing so, the court must have regard to all the relevant surrounding circumstances.  If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other";[333] and

    c.    "one can[not] rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one chooses that which seems most likely to give effect to the commercial purpose of the agreement".[334]

283.  Tomlinson LJ also stated that:

> "[t]here also in my view comes into play the presumption that neither party to a contract intends to abandon any remedies for its breach arising by operation of law - see per Lord Diplock in *Modern Engineering v Gilbert-Ash* [1974] AC 689 at 717.  Lord Diplock went

---

[331] See Devas' PHM, [233].

[332] At [19], citing *Suisse Atlantique Société d'Armement Maritime S.A. v. N.V. Rotterdamsche Koren Centrale* [1967] 1 AC 361 per Lord Wilberforce.

[333] At [21], citing *Rainy Sky SA v Kookmin Bank* that [2011] 1 WLR 2900 at [21] (per Lord Clarke of Stone cum Ebony).

[334] At [21], citing *Antaios Compania Naviera SA v Salen Rederierna AB (The Antaios No 2)* [1985] AC 191 at 431 - 432 (per Hoffman LJ).

> on to say that clear words must be used to rebut this presumption and the judge plainly thought that the words here used were sufficiently clear for that purpose. The judge should not in my view have reached that conclusion without first examining the context."[335]

284. After examining the relevant context, Tomlinson LJ found that this clause did not prevent the "Contractor" from recovering damages for the "Company's" repudiatory breach.  His Lordship stated that:

> "if the judge's construction of Clause 18.6 is adopted, [it is] effectively devoid of contractual content since there is no sanction for non-performance by the Respondent. It is inherently unlikely that the parties intended the clause to have this effect."[336]

285. Importantly, Tomlinson LJ also stated that in his view, the trial judge "fell into error in thinking that the ascertainment of the meaning of apparently clear words is not itself a process of contractual construction."[337]  According to Tomlinson LJ, the trial judge:

> "thought that the only words relevant to his task of construction were those words from Clause 18.6 of the Agreement …  The judge did not, at any rate overtly, look at those words either in the context of the clause in which they appeared or in the context of the contract as a whole".[338]

<u>Is it necessary for limitation of liability clauses to refer to repudiatory breaches expressly?</u>

286. In light of these authorities, the tribunal does not accept Devas' submission that, as a matter of law, limitation of liability clauses do not apply to repudiatory breaches unless they refer to such breaches expressly.  None of the cases referred to above support that proposition, including *Internet Broadcasting*.  The Court in *Internet Broadcasting* went as far as saying that "[t]here is a particular need to use 'clear', in the sense of 'strong', language where the exemption clause is intended to cover deliberate wrongdoing", but it did not say that an express reference to repudiation was required.

287. In any event, *Internet Broadcasting* has been subject to considerable criticism in other decisions of the High Court and has not, to the tribunal's knowledge, been followed by any superior court.  In light of Lord Justice Lewison's comments in *Shared Network* the tribunal has serious doubts about whether it will be followed.  Further, it is not an Indian decision so can be no more than persuasive for the purpose of this arbitration.  Given the criticism it has received, the tribunal does not find it persuasive.

288. Accordingly, the tribunal considers that limitation of liability clauses can, as a matter of law, apply to repudiatory breaches even if they do not refer to repudiation expressly.

---

[335] At [21].

[336] At [19].

[337] At [22].

[338] At [14].

_Properly construed, does Article 7(b) apply to repudiatory breaches?_

289.   Of course whether a limitation of liability clause applies to repudiatory breaches is a different question, which depends on the proper construction of the relevant clause.  Before considering Devas' alternative submission it is therefore convenient to identify the key principles concerning the construction of limitation of liability clauses that emerge from the authorities referred to above. In the tribunal's view, they are as follows:

   a.   whether a limitation of liability clause applies is to be determined by reference to the parties' intentions;[339]

   b.   those intentions are to be determined by reference to the terms and conditions of the contract as a whole, as well as the nature of the contract, and not just the words used in the clause itself.[340]  The parties' intentions may also be determined by reference to the perspective of "a businessman in his senses";[341]

   c.   if there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense or the commercial purpose of the agreement. [342]   Constructions that would result in an absurd, incongruous and inconsistent predicament should be avoided;[343] and

   d.   it may be presumed that neither party to a contract intends to abandon any remedies for its breach arising by operation of law.   Clear words must be used to rebut this presumption.[344]

290.   Applying those principles to the construction of Article 7(b), the starting point is a presumption that Devas did not intend to abandon its common law right to damages.

291.   Next, it is necessary to examine relevant provisions of the Devas Agreement to determine whether the parties both intended for it to abandon that right.   The first provision to examine is Article 7(b) itself.  As noted above, Article 7(b) states that:

   "DEVAS may terminate this Agreement at any time if ANTRIX is in material breach of any provisions of this Agreement and ANTRIX has failed to cure the breach within three months after receiving notice from DEVAS setting out the nature of breach and reasons for considering the same as material breach.  In such event, ANTRIX shall immediately reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding taxes if applicable, received by ANTRIX till that date. Upon such termination, neither Party shall

---

[339] See _SAIL v Gupta,_ referred to at [266] – [270] above.

[340] See _SAIL v Gupta,_ referred to at [266] – [270] above.

[341] See _Pawan Alloys_, referred to at [272] – [274] above.

[342] See _Kudos Catering_, referred to at [281] – [285] above.

[343] See _Pawan Alloys_, referred to at [272] – [274] above.

[344] See _Kudos Catering_, referred to at [281] – [285] above.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 84 (USDC NO. 2:18-cv-01360)**

have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called)."

292.    Notably, Article 7(b) states that it applies to "material breaches" of the agreement.  In the tribunal's view, the plain meaning of the term "material breach" includes repudiatory breaches.  This suggests that Article 7(b) was intended to apply to repudiatory breaches.

293.    However, Article 7(b) also provides that, if Antrix does commit a material breach, Devas is not entitled to terminate the agreement unless or until it gives Antrix notice of and three months to cure the breach.  This is significant because it presumes that the breach is capable of being cured.  Accordingly, it suggests that the "material breaches" that the parties had in contemplation when they agreed to Article 7(b) were breaches that Antrix was capable of remedying.  Antrix has (in substance) acknowledged that it was not capable of remedying its repudiation of the Devas Agreement.[345]

294.    It is also relevant that repudiatory breaches are incapable of being "cured".  That is to say, once a repudiatory breach has been committed, the party in breach is not able to cure that breach so as to deny the innocent party the right to either elect to terminate or affirm that agreement.  The English Court of Appeal considered this issue in *Buckland v Bournemouth University Higher Education Corporation*.[346]  Sedley LJ (with whom Carnwath LJ agreed) stated that "no case holds that a repudiatory breach can be cured unilaterally by the party in default"[347] and that "[i]t is common ground that no decided case holds in terms that a repudiatory breach, once complete (that is, not a merely anticipatory breach), is capable of being remedied so as to preclude acceptance."[348]  In the tribunal's view, this also suggests that Article 7(b) was not intended to apply to repudiatory breaches.

295.    So too does Article 13 of the agreement – at least in so far as repudiatory breaches that render performance of the agreement impossible are concerned.  Article 13 contains a series of broad indemnities.  Article 13(a) states:

"[e]ither of the Parties (ANTRIX or DEVAS) shall indemnify, defend and hold harmless the other Party, its officers, directors, employees, agents, consultants from and against any loss, damages, liabilities, expenses, claims, actions, charges, costs, interests, and

---

[345] Antrix says that performance of its obligations became impossible once the CCS had decided to annul the agreement: see, e.g., Antrix's PHM, [51].

[346] [2010] 4 All ER 186.

[347] At [38].

[348] At [36].  His Lordship went on to state "the alternative courses which may be taken in response to a repudiatory breach leave no space for repentance by a party which has not simply threatened a fundamental breach or forewarned the other party of it but has crossed the Rubicon by committing it. From that point all the cards are in the hand of the wronged party: the defaulting party cannot choose to retreat. What it can do is invite affirmation by making amends": at [40].  Jacob LJ similarly held that "a repudiatory breach of contract, once it has happened, cannot be 'cured' by the contract breaker" (at [52]).  He also said (at [53]) that "[t]hat has been the common law rule for all kinds of contract for centuries. It works. It spells out clearly to parties to contracts that if they actually commit a repudiatory breach, then whether the contract continues is completely out of their hands. The rule itself discourages repudiatory breach".

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 85 (USDC NO. 2:18-cv-01360)**

penalties suffered by the indemnified Party together with the attorney's fees, arising from the fault of the indemnifying Party."

296.     There is, however, an important limitation on these indemnities.  Article 13(e) states:

"[t]he right of either Party under this clause shall be in addition to the right to damages or any other rights available at common law or equity in respect of any breach of the warranties, representations and undertakings of the other Party. Provided however, that no right or claim of any nature whatsoever shall arise by virtue of or under this clause, for matters specifically provided for elsewhere in this agreement including matters relating to termination of this agreement".

297.     Thus, the indemnities in Article 13(a) only apply in circumstances where Article 7 does not apply. Accordingly, if Antrix breaches the Devas Agreement, Devas is entitled to be indemnified against all loss and damage that it suffers due to that breach, but only so long as it does not terminate the agreement pursuant to Article 7.  If it does terminate the agreement pursuant to Article 7, it is only entitled to refund of the UCRF (being moneys that it had previously paid to Antrix).

298.     In other words, if Antrix commits a material breach of the agreement (that it fails to cure), Devas has two options:

a.      it can keep the agreement on foot and be completely compensated for any loss and damage that it suffers; or

b.      it can terminate the agreement, and forfeit its entitlement to compensation for any loss and damage that it suffers.

299.     In the tribunal's view, this is very important to the construction of Article 7(b).  It suggests that the parties intended to create a clear and strong incentive for Devas to keep the agreement on foot rather than terminating it.   There is obvious commercial logic to creating such an incentive: it means that both parties are more likely to enjoy the anticipated benefits of the contract for the full life of the contract, even if breaches occur from time to time.

300.     However, it also suggests that the parties intended that Devas would only forfeit its entitlement to full compensation if, when faced with the option of either keeping the agreement on foot or terminating the agreement, it chose to terminate the agreement.  This, in turn, suggests that Article 7(b) was only intended to apply if Devas genuinely had such an option – i.e. that it was not intended to apply if, as a result of Antrix's breach, the contract was incapable of being performed.

301.     Indeed, as Devas has submitted, "[w]ere Article 7 a comprehensive code capping liability for any manner of deliberate breach rising to the level of repudiation, then Article 13 would not make sense".[349]  There would be no commercial logic in the parties agreeing that:

a.      on the one hand, Antrix must indemnify Devas for any and all loss or damage that Devas suffers if it does not terminate the agreement; and

---

[349] Devas' PHM, [252].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 86 (USDC NO. 2:18-cv-01360)**

b.    on the other, Antrix has *carte blanche* to cease performing its obligations under the agreement, thereby depriving Devas of any meaningful choice about whether the contract should be brought to an end, and avoiding any obligation to compensate Devas for losses that it causes Devas to incur.

302.    In the words of the Supreme Court in *Pawan Alloys*, "[n]o businessman in his senses would ever agree voluntarily to such an absurd, incongruous and inconsistent predicament."

303.    The following example also highlights the absurdity of construing Article 7(b) so that it limits Devas' entitlement to damages in circumstances where the contract is incapable of being performed.  If Devas had not sent its letter of 13 June 2013, and had therefore not formally terminated the Devas Agreement, the agreement would remain on foot, and Article 7(b) could not apply.  Devas would therefore have retained a right to be compensated for all of its loss or damage.

304.    Such an outcome would, in the tribunal's view, be nonsensical.  It would mean that Devas' right to damages would be extinguished simply because Devas formally brought to an end a commercial relationship that had, for all practical purposes, ended more than two years earlier.

305.    Article 21 is also relevant.  As noted above, Article 21 of the agreement sets out the parties' "good faith" obligations.  It states not only that the parties "intend to discharge their obligations in utmost good faith" and "will, at all times, act in good faith", but also that they will "make all attempts to resolve all differences howsoever arising out of or in connection with this Agreement by discussion".[350]  It therefore obliges the parties to seek to resolve disputes and differences between them, in good faith, rather than terminating the agreement.

306.    This suggests that the parties' intention was to ensure that they did not terminate the agreement in the event of any breach of or disputes concerning the agreement.  Rather, the parties were to "make all attempts" to resolve their differences and ensure that the agreement remained on foot.  Construing Article 7(b) so that it permitted Antrix to refuse to perform the agreement at will, without discussion or negotiations with Devas, and without incurring any liability for Devas' loss or damage, would be entirely contrary to that intention.

Conclusion

307.    For the foregoing reasons, the tribunal considers that the parties cannot have intended Article 7(b) to apply to repudiatory breaches, at least in so far as they rendered future performance of the agreement impossible.  Accordingly, Article 7(b) does not limit Devas' entitlement to damages that it suffered by reason of Antrix's repudiation of the Devas Agreement.

Evidence concerning the parties' pre-contractual negotiations

308.    The tribunal notes that, in reaching this conclusion, it has not relied on any evidence of the parties' pre-contractual negotiations.  This is because Article 9.1 of the IBA Rules states that

---

[350] Article 21.

"[t]he Arbitral Tribunal shall determine the admissibility, relevance, materiality and weight of evidence", and in the tribunal's view, pre-contractual negotiations are generally an unreliable guide to the meaning of a contract and should not be given any weight. They tend to reflect parties' desires and negotiating positions, not their concluded agreement following necessary compromises. Where the meaning of the contract is sufficiently clear, evidence of pre-contractual negotiations should therefore be avoided. For the reasons set out above, the tribunal considers that the meaning of Article 7(b) is sufficiently clear.

309.   The tribunal notes, however, that even if it had placed weight on evidence of pre-contractual negotiations, it would have reached the same conclusion. The evidence that Antrix relies on suggests that, during negotiations, Devas:

    a.   first proposed provisions to the effect that, if Devas terminated the agreement "for cause", it would receive substantial liquidated damages;[351] and

    b.   later proposed a provision to the effect that, if Devas terminated the agreement (for any reason) it would be entitled to all remedies that were available at common law.[352]

310.   Evidently Antrix did not agree to either of these proposals. However, that is consistent with the tribunal's conclusion regarding the intended operation of Article 7(b). It suggests that Antrix persuaded Devas that, if Antrix committed a material breach, Devas should not be entitled to both an indemnity (if the agreement remained on foot) and substantial liquidated damages (if Devas chose to terminate rather than perform the agreement). It suggests that the comprise that was reached was that Devas would forfeit its right to compensation if, but only if, when faced with the option of either performing the agreement or terminating it, Devas elected to terminate it. It does not suggest that Devas agreed to forfeit its right to compensation in the event that Antrix's breach was such that future performance of the agreement would be impossible.

_Was it necessary for Devas to give notice of Antrix's breach and give Antrix the opportunity to cure that breach?_

311.   In light of this conclusion, the tribunal does not consider that it is necessary or desirable to address Devas' submission that Article 7(b) does not apply unless Devas (a) put Antrix on written notice that Devas believed Antrix was in material breach and (b) give Antrix the opportunity to cure that breach within three months.

## G.  Damages

312.   For the foregoing reasons the tribunal has concluded that Antrix wrongfully repudiated the Devas Agreement and that the limitation of liability provision in Article 7(b) of the Agreement does not apply. It is therefore necessary to consider what damages, if any, Devas is entitled to receive from Antrix as a result of Antrix's wrongful repudiation under Indian law as the applicable law.

---

[351] Exhibit R-10; Exhibit R-9

[352] Exhibit R-14.

313.   According to Devas it suffered substantial loss or damage.  Devas says that its entire business became unviable due to Antrix's repudiation[353] and that its business was, at the time of the repudiation (25 February 2011), worth USD 1.41 billion.[354] As a result, it says that it is entitled to that sum in damages, plus interest.

314.   Antrix, on the other hand, says that Devas should not receive any damages.  It does not dispute that Devas' business became unviable due to Devas' loss of the Devas Agreement, but (assuming Antrix's wrongful repudiation of the agreement) Antrix says that the quantum of Devas' loss or damage is wholly speculative and therefore not recoverable.[355] It also says that the DCF methodology is an inappropriate vehicle for assessing Devas' loss or damage given (inter alia) Devas' lack of earnings history, and that even if the tribunal does rely on the DCF methodology, Mr Kaczmarek's application of that methodology is erroneous and should not be relied on.  Antrix says that its experts, Mr Brailovsky and Dr Flores, have shown that when Mr Kaczmarek's errors are corrected the DCF methodology suggests that Devas had *negative* value.

315.   Before considering the parties' submissions the tribunal will identify the principles that govern the assessment of damages in this case.

Relevant principles

316.   Under Indian law, Devas is entitled to compensation for any losses that it suffered due to Antrix's wrongful repudiation of the Devas Agreement.   Section 74 of the Indian Contract Act 1872, codifying the common law, states:

> "[w]hen a contract has been broken, the party who suffers by such breach is entitled to receive, from the party who has broken the contract, compensation for any loss or damage caused to him thereby, which naturally arose in the usual course of things from such breach, or which the parties knew, when they made the contract, to be likely to result from the breach of it."

317.   Devas accepts that it bears the legal burden of proving its loss or damage.  However, it submits that the legal standard of proof required to discharge that burden is different for determining the *cause* of any loss or damage (on the one hand) and the *quantum* of any loss or damage (on the other). It relies on the following passage from *Lemire v Ukraine*:[356]

> "it is a commonly accepted standard for awarding forward looking compensation that damages must not be speculative or uncertain, but proved with reasonable certainty; the level of certainty is unlikely, however, to be the same with respect to the conclusion that damages have been caused, and the precise quantification of such damages. Once causation has been established, and it has been proven that the *in bonis* party has

---

[353] Devas' PHM, [274].

[354] Devas' PHRM, [93].

[355] Defence, [161].

[356] *Lemire v. Ukraine*, ARB/06/18 (ICSID 2011).

indeed suffered a loss, less certainty is required in proof of the actual amount of damages; for this latter determination Claimant only needs to provide a basis upon which the Tribunal can, with reasonable confidence, estimate the extent of the loss."[357]

318.   The tribunal does not accept that a different legal standard of proof can apply to the assessment of causation of damage (on the one hand) and the quantum of damage (on the other). For a civil claim under Indian law, as also at common law generally, whether loss or damage is caused by a particular breach of contract is always determined on the balance of probabilities. So too, in the tribunal's view, is the amount of quantum in this case.

319.   As was decided in regard to fraud, Lord Hoffmann stated in *Home Secretary v Rehman* [2003] 1 AC 153:

"[b]y way of preliminary I feel bound to say that I think that a 'high civil balance of probabilities' is an unfortunate mixed metaphor. The civil standard of proof always means more likely than not. The only higher degree of probability required by the law is the criminal standard. But, as Lord Nicholls of Birkenhead explained in *In Re H* [1996] AC 563, 586, some things are inherently more likely than others. It would need more cogent evidence to satisfy one that the creature seen walking in Regent's Park was more likely than not to have been a lioness than to be satisfied to the same standard of probability that it was an Alsatian. On this basis, cogent evidence is generally required to satisfy a civil tribunal that a person has been fraudulent or behaved in some other reprehensible manner. But the question is always whether the tribunal thinks it more probable than not."[358]

320.   Applied to the present case, the point is self-evident: the legal test for quantum, as for liability (including causation) is the balance of probabilities, tempered by common sense in regard to the relative cogency of the evidence.

321.   There are certain other related factors raised by the parties' respective cases which merit deciding here at the outset.  First, the quantum of a party's loss or damage often depends on what would have happened in a hypothetical counterfactual world where the relevant breach did not take place.  The nature of that hypothetical world is often uncertain, which can make determining the quantum of damage on the balance of probabilities extremely difficult.  This will be so when much of the hypothesis depends upon unknown or future events.  Where that is the case, the court or tribunal is not relieved of its mandate to ensure that the wrongdoer compensates the innocent party for the wrongful conduct.  As was long ago decided in *Chaplin v Hicks,* by the English Court of Appeal (under the common law and now forming part of Indian law): "[t]he fact that damages cannot be assessed with certainty does not relieve the wrongdoer

---

[357] At [246].

[358] At, [55], pp. 193-194.

of the necessity of paying damages".[359]  Rather, as was later confirmed in *Biggin v Permanite*, the court or tribunal must do the "best that it can" based on the available evidence.[360]  The Tribunal adopts this same approach in the present case.  However difficult, the tribunal must do "the best it can" in deciding upon a specific figure for damages on the evidence adduced in this arbitration, bearing in mind the legal standard of proof (the balance of probabilities), the legal burden of proof (resting on Devas as the claimant) and common-sense. The tribunal is not entitled to engage in mere guesswork; and it is not authorised to act "ex aequo et bono" or as an "amiable compositeur" under the ICC Rules. Nor does it.

322.   Second, as to common sense, the wrongdoer cannot take unfair advantage of the factual uncertainties for which its own wrong is responsible.  For example, at common law, under the rule in *Armory v Delamirie* (1722) 93 ER 664, the evidential burden of proof (but not the legal burden) may shift from the plaintiff to the defendant where the defendant's wrongdoing has made it impossible for the plaintiff to prove its case on quantum.  In that famous case, where the young chimney-sweep was claiming the value of his purloined jewel, it was decided that:

> "[a]s to the value of the jewel several of the trade were examined to prove what a jewel of the finest water that would fit the socket would be worth; and the Chief Justice directed the jury, that unless the defendant did produce the jewel, and shew it not to be of the finest water, they should presume the strongest against him, and make the value of the best jewels the measure of their damages: which they accordingly did".

323.   That was an extreme case; and the tribunal does not consider it necessary to go that far in the present case. However, as appears below, the tribunal does not hold against Devas the difficulties in proving the quantum of its claim with mathematical precision where those difficulties resulted directly from the wrongful repudiation committed by Antrix.

324.   Third, quantum is here essentially a question of fact, dependent upon factual evidence. Whilst expert evidence is often very useful in a complicated or difficult case, expert witnesses are not the triers of fact.  They bring an expertise in assessing the relevance and weight of factual evidence; but their expertise contributes nothing if their expert opinions depend upon facts or factual inferences unsupported by the evidence, as determined by the trier of fact.  As will become apparent below, the tribunal is constrained in this case to apply that approach as regards the expert evidence of the parties' quantum experts, Mr Kaczmarek (called by Devas) and Mr Brailovsky and Dr Flores (called by Antrix).

---

[359] *Chaplin v Hicks* [1911] 2 KB 786 per Vaughan Williams L.J.  See also Pollock & Mulla: The Indian Contract and Specific Relief Acts 779 (Nilima Bhadbhade ed., 14th ed. 2013) at p. 1169: "the mere fact that it is somewhat difficult to assess the damages, with certainty or precision, does not disentitle the plaintiff to compensation for the loss suffered"; and *SPP v Arab Republic of Egypt* ICSID award of 20 May 1992, Yearbook XIX (1994) at p. 84: "[i]t is well settled that the fact that damages cannot be settled with certainty is no reason not to award damages when a loss has been incurred", cited with approval in *Himpurna Califomia Energy Ltd v PT (Persero) Peruahaan Listruik Negera* Final Award, 4 May 1999, XXV Yearbook Commercial Arbitration 11 (A. Jan van den Berg ed., Kluwer Law International 2000 (*Himpurna*), [237].

[360] [1951] 2 KB 786 ("[w]here precise evidence is obtainable, the court naturally expects to have it, where it is not, the court must do the best that it can").

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 91 (USDC NO. 2:18-cv-01360)**

325. Lastly, these expert witnesses on quantum based their opinions on the value of Devas at the relevant time calculated by reference to the price that would be paid by a hypothetical "prospective investor" purchasing Devas under an arm's length transaction, assuming a willing buyer and a willing seller.  As explained below, the tribunal has in part followed their approach.  It is often used for claims addressed by investment arbitration tribunals under international law, as to which the relevant legal materials are now very extensive (cited here by both parties). However, the tribunal recognises that this is not a claim made by a foreign investor against a host state under international law; and that, accordingly, this approach, whilst useful, has certain limitations for the present case.

326. Accordingly, under Indian law, the first step is for the tribunal to determine whether Devas suffered any loss or damage due to Antrix's wrongful repudiation of the Devas Agreement.  That determination is made on the balance of probabilities.  If the tribunal is satisfied that Devas did suffer loss or damage, the next step is for the tribunal to quantify that loss or damage.  If precise evidence of its loss or damage is obtainable, it is required; if not, the tribunal must do the best that it can on the evidence that has been led.

<u>Did Devas suffer any loss or damage?</u>

327. Devas submits that, as a result of Antrix's repudiation of the Devas Agreement, any value that it had was destroyed.  Devas says that "without the promised Satellites and the associated satellite spectrum required to deliver the Devas Services to its customers in India, Devas had no business."[361]  Antrix does not dispute this.[362]

328. Accordingly, whether or not Devas suffered any loss or damage can be determined by asking whether, as at 25 February 2011, its business had any value.

329. In order to determine whether Devas had any value as at 25 February 2011 the tribunal considers that an appropriate starting point is DT's acquisition of a 20% interest in Devas in March 2008. As noted above, this investment gave Devas an implied valuation of USD 375 million.[363]

330. Mr Kaczmarek testifies that, following this investment the value of Devas increased (about four-fold), whereas Mr Brailovsky and Dr Flores testify that it decreased (to the point of having *negative* value).  If Mr Brailovsky and Dr Flores are correct, then Devas will not have discharged its burden of proof.

<u>Mr Brailovsky's and Dr Flores' reasons why the value of Devas decreased after March 2008</u>

331. Mr Brailovsky and Dr Flores testify that Devas' value decreased between March 2008 and 25 February 2011 for the following reasons:

   a.    PS1 and PS2 had not been launched as at 25 February 2011;

---

[361] Devas' PHM, [274].

[362] Further, as Devas notes, both parties' experts assessed approach the question of the quantum of Devas' loss or damage by reference to Devas' value as at 25 February 2011.

[363] See [82] above.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 92 (USDC NO. 2:18-cv-01360)**

b.      Devas had not received a Frequency Authorization and Operating Licence from the WPC;[364]

c.      the Ancillary Terrestrial Component (*ATC*) fee that the WPC would charge for that licence was unknown;

d.      there were technological changes in the telecommunications market which meant that Devas lost its "first mover" status; and

e.      there was increased competition in the telecommunications market that had eroded profits of telecommunications companies.[365]

332.    The tribunal will consider each of these reasons in turn.

*Delay in the launch of the satellites*

333.    Mr Brailovsky and Dr Flores testify that DT Asia expected PS1 and PS2 to be launched in March 2008 and December 2009 but that neither satellite was in orbit as at 25 February 2011.  They testify that the entire Devas business depended on the satellites being launched, and the fact that they had not been launched "would have cast serious doubt in the mind of any prospective investor evaluating the feasibility of the project on 25 February 2011".[366]

334.    The tribunal accepts that a "prospective investor" evaluating the feasibility of Devas' business on 25 February 2011 would have had some doubt about whether the satellites would have been launched.  However, such doubt would also have existed in March 2008, when DT acquired its 20% interest in Devas.  As Mr Brailovsky and Dr Flores acknowledge, "launching satellites *is* rocket science and liable to a host of uncertainties".[367]  Further, the uncertainty did not increase after March 2008; it decreased: by late 2009 there were only "a few defined areas that needed focused attention" in order to be prepared for the launch of PS1,[368] and by June / July 2010 the satellites were substantially completed.[369]  Accordingly, the risk of the satellites not being launched was lower as at 25 February 2011 than in March 2008.  This would have had a positive impact on a prospective investor's perception of Devas' value, not a negative impact.

*Frequency Authorization and Operating Licence from the WPC*

335.    Mr Brailovsky and Dr Flores also testify that Devas needed (but had not obtained) a Frequency Authorization and Operating Licence from the WPC[370] and that such a licence had not previously been granted for the terrestrial use of Devas' spectrum.  Accordingly, it would have required a

---

[364] Devas had a right under the Devas Agreement to use 70MHz of transponder capacity on PS1 and PS2, but not to re-use that capacity for the terrestrial component of its service, and needed a licence from the WPC to do so.

[365] Brailovsky/Flores 1, [29] – [42]; Brailovsky/Flores 2, [38] – [61].

[366] Brailovsky/Flores 1, [30].

[367] Brailovsky/Flores 1, [30] (emphasis in original).

[368] Parsons 1, [25].

[369] UNCITRAL Transcript. At 726:19-23.

[370] Brailovsky/Flores 1, [31].

change in policy from the WPC. They testify further that such a change in policy would likely have been challenged by terrestrial service providers who would have been competing with Devas' services.[371] Accordingly, they say that the need to obtain a licence from the WPC would have heightened concerns about the feasibility of the entire project for a potential purchaser.

336.   Whether granting such a licence would have in fact required the WPC to change its policy and given rise to challenges from terrestrial service providers is disputed by Devas,[372] but unnecessary to decide. This is because the risk of not receiving a WPC licence existed when DT made its investment in Devas in March 2008, and is likely to have been factored into DT's implied valuation of Devas. Accordingly, the fact that the licence had not yet been obtained does not increase the risk of obtaining the licence (causing Devas' value to decrease); it simply means that the risk of obtaining the licence had not diminished. Therefore, in the tribunal's view, the fact that the risk remained as at 25 February 2011 had no adverse effect on Devas' value.

*ATC Fee*

337.   Mr Brailovsky and Dr Flores further testify that Devas would have been required to pay a fee to the WPC of up to USD 10 billion for the ATC licence, which would have rendered Devas' business unviable.[373] This view is based on a recommendation issued by the Telecom Regulatory Authority of India (*TRAI*) in July 2008 that allocation of spectrum in the S-band should be allocated through an auction process.[374] Mr Brailovsky and Dr Flores testify that, in light of this policy:

> "one can look at India's BWA [Broadband Wireless Access] auctions to attain a proxy for the cost of Devas' 70MHz of nationwide spectrum. We can derive a cost per MHz from Infotel's US$2.855 billion outlay for 20 MHz in all 22 circles in India's May 2010 BWA auction … Infotel's payment amount implies a cost of US$142.8 million per MHz. Applying that ratio, Devas would have had to pay US $10 billion for its 70 MH."[375]

338.   Mr Brailovsky and Dr Flores testify that even if the amount that Devas had to pay was only USD 1.6 billion, Devas' business would have been unviable.[376] Devas does not (expressly) dispute this.

339.   The tribunal accepts that Devas was required to pay an ATC fee.[377] However, the tribunal does not accept that the BWA auctions provide a reliable proxy for the amount of the fee that Devas would have been required to pay, for the following reasons:

---

[371] Brailovsky/Flores 1, [31].

[372] Devas' PHM, [326]. See also Kaczmarek 1, [20].

[373] Brailovsky/Flores 1, [103] – [106].

[374] Telecom Regulatory Authority of India, Recommendations on Allocation and Pricing for 1.3-2.4 GHz, 2.5-2.69 GHz & 3.3-3.6 GHz Bands, 11 July 2008, [2.16], [2.34].

[375] Brailovsky/Flores 1, [105].

[376] Brailovsky/Flores 1, [106].

[377] Mr Kaczmarek does not dispute this: see Kaczmarek 1, [24].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 94 (USDC NO. 2:18-cv-01360)**

a.   the TRAI recommendations only apply to the S-band allocated to the DOT for terrestrial use. They do not apply to the *re-use* of existing satellite spectrum or the ATC component of the Devas system. Mr Brailovsky's and Dr Flores' calculations of the potential licence fees are therefore based on a false premise;[378]

b.   satellite and terrestrial services cannot be provided by different entities in the same spectrum.[379] Since Devas already had a right to use the relevant spectrum for satellite services[380] it was the only entity capable of using that spectrum terrestrially. Accordingly, an auction process in which Devas bid against other telecommunications companies was not feasible;

c.   the WPC had an interest in the spectrum being used to deliver services to Indian consumers at competitive prices.[381] Given that Devas was the only entity capable of using the 70MHz of spectrum it leased from Antrix, the WPC had an interest in setting the fee at a level that Devas could afford to pay. Devas would plainly have been unable to pay a fee in the amount suggested by Mr Brailovsky and Dr Flores; and

d.   after the TRAI recommendations were issued, each of DT Asia, CC/Devas and Telecom Devas acquired further shares in Devas (totaling around USD 25 million) in response to a capital call.[382] The fact that sophisticated investors made a substantial further investment in the company after the TRAI recommendation was issued is entirely inconsistent with – and renders unpersuasive – Mr Brailovsky's and Dr Flores' view that the recommendation destroyed all of Devas' value.[383]

---

[378] Chandrasekhar, [35]. This is effectively acknowledged by Mr Brailovsky and Dr Flores: see Brailovsky/Flores 1, footnote 43: "[t]his recommendation did not relate to spectrum in the frequency ranges at issue in this case, which had been allocated for satellite (not terrestrial) use".

[379] See Antrix's PHM at [67]: "[i]n August 2007, the Chief of Staff committee directed the appointment of an expert committee by the IDS to review spectrum uses by the various military services … The next month, the expert committee reported on the heavy lobbying by commercial operators to obtain permission to use S-band in India. It stated that "[s]atellite services (MSS and BSS) in [S-band] cannot coexist with the terrestrial services and hence the spectrum cannot be shared". See also UNCITRAL Transcript at 422:14-18 (Parsons): "[e]very administration has … looked at it and said … you can't co-exist within this band". See also CB289: "India would apply the band segmentation approach for use of the band 2500 – 2900 MHz for terrestrial and space services considering that the co-frequency, co-coverage sharing between space services and terrestrial services is not feasible")."

[380] Devas Agreement, Article 2.

[381] The *Telecom Regulatory Authority of India Act, 1997* states that the statutory goal of telecom regulation in India is "achieving the universal service, bringing the quality of telecom services to world standards, provisions of wide range of services to meet the customers demand at reasonable price, and participation of the companies registered in India in the area of basic as well as value added telecom services as also making arrangements for protection and promotion of consumer interest and ensuring fair competition": CB5.

[382] See [89] above.

[383] Antrix also relies on a note from the Secretary of the DOT dated 6 July 2010 that refers to Devas being charged a licence fee that was "commensurate" with auction prices: see Exhibit R-122. That reliance is misplaced for two reasons. First, the note was in response to Dr Radhakrishnan's note of 16 June 2010 seeking advice concerning the annulment the Devas Agreement: see [102] above. But for Antrix's breach of the Devas Agreement, Dr Radhakrishnan would not have sent that note. Second, in the tribunal's view, the WPC not have ultimately sought to charge a licence fee that was commensurate with the auction prices, because it would have rendered Devas' business unviable and therefore prevented any services being provided to Indian consumers by way of the 70mHz of S-band that had been allocated to Devas.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 95 (USDC NO. 2:18-cv-01360)**

340.    Mr Kaczmarek, on the other hand, estimates that the ATC fee would have been USD 31 million per annum. He acknowledges that "there is some uncertainty regarding the ultimate level of the ATC fee that would have been applied",[384] but has estimated this figure on the basis that "most countries charge a nominal fee for the use of ATC spectrum".[385] In the tribunal's view, this is a reasonable assessment based on a reasonable assumption.  Given the lack of any cogent alternative estimate, the tribunal accepts Mr Kaczmarek's evidence on this issue.

*Technological changes*

341.    Mr Brailovsky and Dr Flores also testify that the delay in the start of Devas' operations had implications for the "first-mover" status Devas was hoping to achieve given the technological changes that occurred between March 2008 and February 2011.  The example that they give is that Android technology allowed other providers to supply services and devices that Devas intended to offer on an exclusive basis.[386]

342.    Mr Kaczmarek, on the other hand, testifies that Devas' systems were compatible with Android devices, and that the development of the Android platform opened up a new segment of mobile users who could use Devas' AV and BWA services.  He testifies that, as a result, the development of Android technology was positive for Devas.[387]

343.    In the tribunal's view, the delay in the launch of Devas' business would have been relevant to a potential investor's assessment of the prospects of Devas' business.  Competition for 3G services increased significantly in the period from March 2008 to February 2011, as did competition for the provision of Devas' proposed 4G services.   For example, Reliance Industries Limited (**RIL**), Devas' main competitor,[388] was expecting to rollout 4G services nationwide by the middle of 2012.[389]  The tribunal accepts that a potential investor would have taken this into account when assessing Devas' value.

344.    However, that does not necessarily mean that Devas' value decreased after March 2008 (let alone diminished entirely).  First, as Devas submits,[390] its services were compatible with Android technology, so the popularity of Android technology and iPhones may have given investors comfort about the level of demand for Devas' services.  Second, potential investors may have been confident in Devas' ability to compete with RIL, given that RIL was not only a newcomer to telecommunications but would have been required to build a ground network in urban *and* rural areas, and it would have been burdened with greater debt than Devas.[391]  Further, as discussed

---

[384] Kaczmarek 1, [169].

[385] Kaczmarek 1, [166].

[386] Brailovsky/Flores 1, [36].

[387] Kaczarek 1, [29].

[388] Kaczmarek 2, [130].

[389] Brailovsky/Flores 2, [54].

[390] See, e.g., Devas' PHM, [322].

[391] Kaczmarek 2, [135]; see also Devas' PHM, [412].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 96 (USDC NO. 2:18-cv-01360)**

below,[392] a number of other significant risks that Devas had faced in March 2008 had reduced by February 2011.

*Low profitability of existing telecommunication service providers*

345.   Mr Brailovsky and Dr Flores also testify that the profitability of telecommunication service providers decreased in the period from March 2008 to February 2011.[393] While they do not say so explicitly, their view appears to be that, since the profitability of Devas' competitors decreased in that period, Devas' value also decreased.

346.   Mr Kaczmarek does not dispute that competition eroded other providers' profitability between March 2008 and February 2011.[394] However, he testifies (inter alia) that the increased competition was primarily for 2G and 3G services, not the 4G/BWA sector in which Devas would compete.  He notes that, unlike 2G and 3G segments, there were only two 4G/BWA licenses auctioned for each of the 22 telecommunications "circles"[395] in India, and RIL was the only company that had a nationwide 4G/BWA licence.[396]

347.   The tribunal accepts Mr Kaczmarek's evidence in relation to this issue.  Potential investors' assessment of Devas' value is unlikely to have been affected by the profitability of companies that faced different competitive constraints to Devas.  Accordingly, while potential investors are likely to have taken into account RIL's expecting rollout 4G/BWA services, the profitability of 2G and 3G providers is unlikely to have materially affected their assessment of Devas' value.

Mr Kaczmarek's reasons why the value of Devas increased after March 2008

348.   In contrast to Mr Brailovsky and Dr Flores, Mr Kaczmarek testifies that the value of Devas increased between March 2008 and 25 February 2011.  Among other things, Mr Kaczmarek testifies that, in this period:

a.      Devas obtained various important licences;

b.      Devas successfully conducted experimental trials;

c.      Devas established a network of suppliers and vendors;

d.      Devas procured further investment;

e.      work progressed successfully on the construction of PS1 and PS2.[397]

349.   The tribunal will consider each of these reasons in turn.

---

[392] See [348] – [360].

[393] Brailovsky/Flores 1, [37].

[394] Kaczmarek 2, [134].

[395] The Indian wireless telecom market is divided into 22 circles (roughly similar to the political demarcation of states). Licensing fees for various services and revenue sharing fees paid by providers to the government are based on this circle structure.  See Kaczmarek 1, [65].

[396] Kaczmarek 2, [130].

[397] Kaczmarek Presentation, slide 31.

*Devas obtained various important licences*

350. Mr Kaczmarek testifies that, between March 2008 and 25 February 2011, Devas obtained:

   a.  ISP and IPTV licences, which permitted Devas to supply services that included digital television, video on demand and other types of entertainment to users in urban and rural areas;[398] and

   b.  a licence to conduct experimental trials, which permitted Devas to conduct experimental trials of the wireless apparatus that underscored the Devas system.[399]

351. Mr Brailovsky and Dr Flores, on the other hand, testify that these licences did not reduce the risks that Devas faced because they were not "the main sources of uncertainty" for Devas.[400] According to Mr Brailovsky and Dr Flores, the main unknowns for Devas:

   "relate to economic and policy issues: consumer receptiveness to Devas' services, the behaviour of competition, the degree to which costs could have been kept under control, the attitude and criteria of regulators, and the competing demands for S-band capacity for non-commercial, security purposes."[401]

352. The tribunal accepts that obtaining these licences was not the "main" uncertainty that Devas faced. However, there is nothing to suggest that Devas had any legal right to the licences. It follows that there was at least some risk that they would not be issued and that, when they were issued, one of the risks that Devas faced diminished. That said, Devas has not led any evidence of what was involved in obtaining the licences or how difficult they were to obtain. Accordingly, while the tribunal accepts that obtaining the licences had a positive impact on Devas' value, the tribunal does not accept that the impact was substantial.

*Experimental trials*

353. Mr Kaczmarek also relies on the successful completion of the Phase I and Phase II experimental trials.[402] Mr Brailovsky and Dr Flores, on the other hand, say that the trials did not decrease Devas' risk because Devas' hybrid technology was "not experimental; it has been proven elsewhere over the last decade".[403]

---

[398] See [84] above.

[399] See [85] above.

[400] Brailovsky/Flores 1, [42].

[401] Brailovsky/Flores 1, [40].

[402] See [87] and [108] above.

[403] Brailovsky/Flores 1, [39].

354.    However, Mr Brailovsky's and Dr Flores' evidence on this issue is contradictory. They also testify
        that:

> "DVB-SH was not a mature technology, has never been successfully implemented for
> commercial use, and never attracted a market that would have led device makers to
> invest in the development of products to support the DVB-SH ecosystem".[404]

355.    In any event, Mr Brailovsky's and Dr Flores' views are not persuasive. The underlying reason for
        performing such experimental trials is to ensure that the relevant system functions properly and to
        reduce the risk of operational failure. Put another way, if Devas' proposed system was risk free
        the trials would have been unnecessary.

356.    Accordingly, the tribunal accepts that there were risks that the trials sought to reduce, and since
        the trials were performed successfully those risks did reduce, which in turn increased Devas'
        value.

*Procuring suppliers and vendors*

357.    Mr Kaczmarek testifies that Devas' value also increased between March 2008 and 25 February
        2011 because it established a network of suppliers and vendors for the ground component of its
        network.[405] This included entering into contracts to purchase "chipsets", "AccessPorts" and other
        components for handsets, as well as encryption and other services.[406] According to Mr Larsen:

> "[b]y the end of 2009, with the assistance of the DT team that developed the network
> rollout plan, Devas was in a position to deploy its terrestrial network. That is, we had
> developed and tested the network technology, and had put into place the purchase and
> procurement agreements to acquire the necessary components."[407]

358.    Devas' evidence of the network of suppliers and vendors that it had developed is not materially
        disputed. The tribunal accepts that developing the network involved considerable time and cost
        for Devas, and that with it, Devas was a step closer to being able to providing its proposed
        services. However, like with the licences that Devas obtained, there is no evidence to suggest
        that developing this network presented any significant difficulty or risk for Devas. The tribunal
        therefore accepts that it partially increased Devas' value, but not that its effect on Devas' value
        was substantial.

*Further investment in Devas*

359.    The tribunal does, however, accept that the further investment that Devas procured on 29
        September 2009 had a substantial positive impact on its value. Together, DT Asia, CC/Devas
        and Telcom Devas made a further investment of around USD 25 million, which demonstrated

---

[404] Brailovsky/Flores 2, [247].

[405] Kaczmarek Presentation, slide 31.

[406] See Viswanathan I, [130].

[407] Larsen, [47].

their continuing commitment to the business and confidence in its prospects of success.   Mr Brailovsky rightly accepted during cross-examination that this was "value enhancing".[408]

*Progress on satellites*

360.   Similarly, the tribunal accepts that progress on the satellites reduced the risks that Devas faced and positively affected its value.   The satellites were substantially closer to being ready to launch in February 2011 than they were in March 2008: by late 2009 there were only "a few defined areas that needed focused attention" in order for PS1 to be completed;[409] by 29 October 2009 the construction of PS2 had been approved; by June / July 2010 the satellites were substantially completed;[410] and by February 2011 geosynchronous launch vehicles necessary to launch both satellites had been approved.[411]   The tribunal accepts that these matters decreased the risks that Devas faced, and positively affected its value.

<u>Conclusion regarding whether Devas had value as at 25 February 2011</u>

361.   For these reasons, the tribunal does not accept that Devas had no value as at 25 February 2011. None of the factors relied on by Mr Brailovsky and Dr Flores suggest (either individually or cumulatively) that Devas' value had eroded between March 2008 and February 2011.   The tribunal finds their suggestion that Devas had a value of *negative* USD 887 million as at 25 February 2011 plainly unfounded and unpersuasive.   To the contrary, when the factors relied on by Mr Kaczmarek are taken into account, it is manifestly clear that Devas' value in fact increased.

362.   Accordingly, the tribunal accepts that Antrix's wrongful repudiation of the Devas Agreement caused Devas to suffer substantial loss or damage.

<u>Quantum of Devas' loss or damage</u>

363.   The next step is for the tribunal to determine the quantum of that loss or damage.   As noted above, Mr Kaczmarek's valuation of Devas relies on methodologies based on DCF, comparable companies and comparable transactions.   It is necessary to consider what weight, if any, the tribunal is able to place on these methodologies in the particular factual circumstances of this case.

*DCF methodology*

364.   According to Mr Kaczmarek, the DCF methodology:

"requires the valuation practitioner to develop pro-forma financial statements for the subject business, compute the relevant cash flow measure using those statements,

---

[408] UNCITRAL transcript, 669:23-24.

[409] Parsons 1, [25].

[410] UNCITRAL transcript, at 726:19-23.

[411] CB-226, [15].

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 100 (USDC NO. 2:18-cv-01360)**

determine an appropriate discount rate, and discount the estimated cash flows to present value as of the relevant date."[412]

365.    Devas obviously did not have any cash flow.   Antrix's wrongful repudiation of the Devas Agreement meant that it never generated any revenue.   Mr Kaczmarek sought to address this difficulty by relying on a financial model containing revenue and cost projections for Devas that was jointly developed by Devas and DT (when DT acquired its 20% interest in Devas in March 2008, which was later developed into a model to assist with the rollout of Devas' services called the "Darwin Model").[413]   Mr Kaczmarek (inter alia) adjusted the Darwin Model to reflect new information and updated inputs as of 25 February 2011, which provided an estimate of future cash flows for Devas as at 25 February 2011.   He then discounted those cash flows at a rate of 21.1%, to reflect the cost of an equity investment in Devas as at that date (without factoring in inflation).[414]   This valued Devas at USD 1,482,432,000.00.[415]

366.    Antrix says that it is not appropriate to rely on the DCF methodology at all in this case.   It says that according to the guidelines issued by the World Bank,[416] it is only reasonable to use the DCF methodology to determine the fair market value of a business if the business is "a going concern with a proven record of profitability".[417]   Antrix says that Devas was not a going concern, and did not have a proven track record of profitability.   It says that Devas had "no customers, no brand recognition, no revenue … [and] virtually no investments".[418]   Antrix has referred the tribunal to many legal materials in which tribunals have declined to rely on the DCF methodology because the relevant business had earned little or no revenue as at the valuation date.[419]

367.    Devas, on the other hand, says that if a foreign buyer were purchasing Devas at the time, it would have been required by the Reserve Bank of India to price those shares by using the DCF methodology, which (so it says) is an "endorsement" of the use of the DCF methodology in these

---

[412] Kaczmarek 1, [36].

[413] Kaczmarek 1, [10].

[414] Kaczmarek 1, [10] – [12].

[415] Kaczmarek 2, [272].   Initially, Mr Kaczmarek said that it valued Devas at USD 1,641,679,000.00 (see Kaczmarek 1, [10]), but he later adjusted this figure to correct errors and reflect updated information.

[416] Legal Framework for the Treatment of Foreign Investment: Volume II, Report to the Development Committee and Guidelines on the Treatment of Foreign Direct Investment, (World Bank Group 21 September 1992) (**World Bank Guidelines**).

[417] At p. 42.

[418] Antrix's PHM, [117].

[419] For example, *Metalclad Corporation v. The United Mexican States*, ICSID Case No. ARB(AF)/97/1, in which the tribunal stated "where the enterprise has not operated for a sufficiently long time to establish a performance record or where it has failed to make a profit, future profits cannot be used to determine going concern or fair market value. . . . The Tribunal agrees with Mexico that a discounted cash flow analysis is inappropriate in the present case because the landfill was never operative and any award based on future profits would be wholly speculative": at [120] – [121]; *Siemens A.G. v. The Argentine Republic*, ICSID Case No. ARB/02/8, in which the tribunal said, "the DCF method is applied to ongoing concerns based on the historical data of their revenues and profits; otherwise, it is considered that the data is too speculative to calculate future profits": at [355]; *National Grid p.l.c. v. Argentine Republic*, Ad Hoc/UNCITRAL, Award, 3 November 2008, in which the tribunal said "[i]n order to function properly, the DCF approach requires that the concern in question must have a history of profitable operation": at [276].   See also *Southern Pacific Properties (Middle East) Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/84/3, [188]; *Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt, ICSID* Case No. ARB/05/15, [570].

circumstances.[420]  It also says that even though some tribunals have expressed reluctance about using a DCF methodology to value businesses that do not have a trading history, there is no "*per se* rule*"* against doing so,[421] and tribunals have in fact done so in certain circumstances.[422] Devas has also referred the tribunal to economic texts which support use of the DCF methodology to value businesses with no earnings history in certain circumstances.[423]

368.    The tribunal has carefully considered whether it is appropriate to use any DCF methodology in this case, and has come to the view that it is not appropriate.  According to the World Bank Guidelines and the overwhelming majority of legal materials, it is not appropriate to rely on a DCF methodology to value companies that do not have any earnings history, such as Devas.  The tribunal accepts that an exception can be made in some cases, but only if there is a reliable, alternative guide to what the future earnings of the business are likely to be.  For example: the relevant contract may guarantee minimum payments; competitive constraints in the relevant market may be particularly low (e.g. due to regulations that apply to the industry or a market's natural monopoly characteristics); or there may be statutes or regulations that specify the prices that may be charged for the relevant goods or services.

369.    This is not one of those exceptional cases.  Among other things, the demand for Devas' services is unclear; the prices that it would be able to profitably charge is unclear; market(s) for multimedia broadcasting services can be highly innovative and cause (even very profitable) products and services to quickly become obsolete; and there is persuasive evidence, that the tribunal accepts, that Devas faced significant competition for the services that it proposed to provide.[424]  In other words, there is nothing that can give the tribunal sufficient confidence about the cash flows that Devas would have earned but for Antrix's wrongful repudiation of the Devas Agreement.

370.    It is true that DT's valuation of Devas in March 2008 was partly based on a DCF methodology. But DT is in a different position to this tribunal.  It is one of the world's major telecommunications service providers and its business includes investing in start-up telecommunications companies. The fact that it was comfortable speculating on Devas' future cash flows does not mean that this tribunal should be comfortable doing so.

---

[420] Devas' PHM, [331].   The term "going concern" is defined in the World Bank guidelines:

> "an enterprise consisting of income-producing assets which has been in operation for a sufficient period of time to generate the data required for the calculation of future income and which could have been expected with reasonable certainty, if the taking had not occurred, to continue producing legitimate income over the course of its economic life in the general circumstances following the taking by the State"

[421] Devas' PHM, [332].

[422] E.g., *Gul Bottlers (PVT) Limited v Nichols Plc* [2014] EWHC2173 (Comm), *Himpurna* and *ADC Affiliate Ltd. v. Hungary*, ARB/03/16 (ICSID 2006).

[423] See Devas' PHM, [343] – [345].

[424] See [343] above.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 102 (USDC NO. 2:18-cv-01360)**

371.   Further, an aspect of the DCF methodology that the tribunal finds particularly troubling in this case is that small variations in the assumptions used in the DCF methodology can dramatically and unrealistically change Devas' value.  For example:

   a.      delaying the launch date by a year decreases Devas' value by USD 352 million (or 22%);

   b.      having 10% higher costs decreases its value by USD 473 million (or 30%);

   c.      charging 10% lower prices decreases its value by USD 488 million (or 31%); and

   d.      increasing the discount rate from 26.3% to 21.1% decreases its value by about USD 1 billion (or 63%).[425]

372.   That is significant because it means that, if the tribunal is to be satisfied that the valuation produced by Devas' DCF methodology is reasonable, it would need to be satisfied that all of the assumptions are accurate.  For example, if the tribunal is not satisfied that the appropriate discount rate is accurate, Devas' value could be over or under stated by hundreds of millions of dollars.

373.   Such precision is impossible in this case.  Determination of an appropriate discount rate is not an exact science.  It involves taking into account a range of risks that the business would have faced and then making a value judgment about an appropriate discount rate based on the apparent severity of those risks.  Similarly, assumptions concerning Devas' prices and costs are not based on clearly established facts, but on what Devas might have been able to charge, and what its costs might have been, in a hypothetical, counterfactual world where it had started providing services.

374.   In other cases this difficulty may not arise.  The tribunal understands that the reason for the extreme sensitivity of the DCF methodology in this case is the length of the period that it would take for Devas to become cash flow positive (nine years).[426]  In this case, in the tribunal's view, it makes Devas' DCF methodology an unrealistic and unreliable vehicle for determining its damages.

375.   Accordingly, the tribunal considers that it is not appropriate to rely on the DCF methodology in this case.

   Are the comparable companies and comparable transactions methodologies appropriate?

376.   Nor does the tribunal consider that is appropriate to rely on Mr Kaczmarek's other methodologies, namely the comparable companies and comparable transactions methodologies.

377.   The "comparable" companies that Mr Kazcmarek relies on are Bharti Airtel and Sirius XM.  The tribunal does not consider either company to be comparable.  Bharti Airtel is India's largest

---

[425] Brailovsky/Flores 1, Table 3, p. 24.  The tribunal notes that this table was based on the cash flows assumed by Mr Kaczmarek in his first report, as "corrected" by Mr Brailovsky and Dr Flores in their first report, and that Mr Kaczmarek later updated his calculation of damages.  The tribunal also notes that it has used these figures for illustrative purposes only, and does not accept that the cash flow they assume is correct.

[426] See Bailovsky/Flores 1, [44].

cellular phone company (in terms of subscribers and market share) and in 2011 it had annual revenue of USD 13.3 billion and a presence in 19 countries.[427] By contrast, Devas was a start up company that had no subscribers and no revenue.

378.   Sirius XM operates in North America, not India, and in circumstances that are materially different to those that Devas would face.[428] It operates in the audio services industry only; and so it does not face some of the technological complexities that Devas would face in operating its broadband wireless services.[429] Further, unlike Devas, it also has an established sales channel that guarantees a given level of subscribers through the sale of new cars, approximately 70% of which have Sirius XM installed.[430]

379.   The "comparable" transactions that Mr Kazcmarek relies on are two acquisitions of 20 MHz of S-band spectrum by DISH Network in the United States of America in early 2011. The tribunal does not consider that it is appropriate to compare the value of bandwidth in the United States to the value of Devas' business. The value of bandwidth can differ across borders and industries as it depends on factors such as average revenue per user, subscriber base and income levels of the subscriber base.

380.   The tribunal's view of the comparable companies and transactions methodologies has been fortified by the fact that Mr Kaczmarek himself has little confidence in them. He testifies that they were "non-traditional in this case"[431] and gave them each a 10% weighting (compared to the DCF methodology's 80% weighting). The fact that he considers them less reliable than the DCF methodology, and the tribunal has no confidence in the DCF methodology, is telling.

The tribunal's assessment of the quantum of Devas' loss or damage

381.   That does not, however, mean that Devas is not entitled to an award of damages. As noted above, once the tribunal has accepted that Devas has suffered substantial loss or damage, the fact that the quantum of that loss or damage may be difficult to assess is not a valid reason for refusing to award any damages under Indian law (as the applicable law). Accordingly, as part of its arbitral mandate, the tribunal is required to do the best that it can to assess the quantum of Devas' loss or damage based on the available factual evidence adduced in this arbitration.

382.   The tribunal has the great benefit of being able to use DT's valuation of Devas in March 2008 as a starting point. As noted above, this implied a value of USD 375 million as at March 2008. The tribunal is also satisfied that Devas' value increased between March 2008 and 25 February 2011. As set out above, there were a number of events that significantly increased Devas' value in that period, including: the successful completion of the Phase I and Phase II trials; substantial

---

[427] Bailovsky/Flores 1, [181].

[428] Bailovsky/Flores 1, [187].

[429] Brailovsky/Flores 1, [185].

[430] Brailovsky/Flores 1, [186].

[431] Kazcmarek 1, [20].

completion of the satellites; approval of the geosynchronous launch vehicles; and the additional USD 25 million investment by DT Asia, CC/Devas and Telcom Devas in September 2009. There were also a number of less tangible factors that decreased the risks that Devas faced (and therefore increased its value), including Devas' procurement of ISP and IPTV licences and securing of a network of suppliers and vendors.

383.   The tribunal does not accept that Devas' value increased to the extent alleged by Devas, for two primary reasons.  First, a number of the delays to the launch of the satellite would still have occurred but for Antrix's wrongful repudiation of the Devas Agreement – namely, the delays that were notified to Devas in April 2009,[432] November 2009,[433] December 2009[434] and February 2010.[435] They all occurred before Dr Radhakrishnan took any of the key steps that would not have been taken but for the wrongful repudiation of the agreement.  This suggests that PS1 would not have been launched until at least September 2010 (and potentially significantly later),[436] which would in turn have delayed the commencement of Devas' services, and reduced the period of the lease in which Devas was able to generate revenue.

384.   Second, competition for 4G services also increased between March 2008 and February 2011, with Devas' main competitor developing plans to rollout nationwide 4G services.[437]  As noted above, the tribunal considers that this would have negatively affected an investor's assessment of Devas' business prospects as at 25 February 2011.[438]

385.   The tribunal is not in a position to calculate the amount by which Devas' business increased in value with exact precision.  With no income stream, comparable companies or comparable transactions to use as a guide to Devas' value, there are very limited materials on which to form a view about its precise value.  However, as noted above the tribunal is nevertheless required to decide upon a figure, without engaging in mere speculation.

386.   In determining the value of Devas as at 25 February 2011, the tribunal has started from the basis that it was valued at USD 375 million in March 2008 when DT placed its investment in the company. The value is based on an arm's length transaction when a substantial international investor acquired equity in the company. That price is used to determine the value of the total equity of Devas. The tribunal then finds that Devas increased in value up to 25 February 2011, primarily on account of the following developments: the successful completion of the Phase I and Phase II trials; substantial completion of the satellites; approval of the geosynchronous launch vehicles; additional USD 25 million investment by DT Asia, CC/Devas and Telcom Devas in

---

[432] See [83] above.

[433] See [92] above.

[434] See [95] above.

[435] See [95] above.

[436] September 2010 was the revised deadline that was specified for the launch of the satellites in February 2010: see [95] above.

[437] See [343] above.

[438] See [343] above.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 105 (USDC NO. 2:18-cv-01360)**

September 2009; and Devas' procurement ISP and IPTV licences and securing of a network of suppliers and vendors.  Next, the tribunal takes into account certain risk factors which Devas faced at the time, such as possible delays in launching the satellites and increased competition. These positive and negative factors have been evaluated by the tribunal, as best it can, in the light of all the evidence and submissions of the parties. The tribunal is in no doubt that the net result is a substantial increase in the value of Devas between March 2008 and 25 February 2011. However the tribunal does not agree with Devas that the value was as great as USD 1.4 billion. In the tribunal's judgment, having considered all the factors in light of the parties' evidence and submissions, between March 2008 and 25 February 2011 Devas' value increased by 50%, to USD 562.5 million; and the tribunal finds, as a fact, that Antrix's wrongful repudiation entitles Devas to damages in that same amount.

### H.  What is the rate of pre-award and post-award interest that should be applied to an award of compensation/damages?

Pre-award interest

387.   Section 31(7)(a) of the 1996 Act states as follows:

> "[u]nless otherwise agreed by the parties, where and in so far as an arbitral award is for the payment of money, the arbitral tribunal may include in the sum for which the award is made interest, at such rate as it deems reasonable, on the whole or any part of the money, for the whole or any part of the period between the date on which the cause of action arose and the date on which the award is made."

388.   Devas submits that pre-award interest should be at the rate of US Prime + 2%, compounded, or LIBOR + 4%, compounded.[439]  It says that a surcharge is needed on top of the US Prime or LIBOR rate because "customers usually do not receive loans at the interbank interest rate without a surcharge" and "interest on investment based on the interbank rate . . . usually contains a deduction of the interest rate."[440]

389.   Antrix submits that the tribunal should award simple interest calculated based on the yield of the three-month U.S. Treasury bill plus 1 percentage point (that is, 1.06% in total).[441]  According to Mr Brailovsky and Dr Flores, this is "based on the cost of borrowing of a company like those with which Devas intended to compete", such as Bharti Airtel.[442]

390.   The tribunal has considered the parties' submissions and formed the view that the appropriate rate of pre-award interest in this case is three month USD LIBOR + 4%, calculated on a simple

---

[439] Devas' PHM, [441].

[440] Devas' PHM, [441], citing *Irmgard Marboe, Calculation of Compensation & Damages in International Investment Law,* Oxford University Press, 2009, [6.148].

[441] See Antrix's PHM, [250]; Antrix's PHRM, [92]; Brailovsky/Flores 2, [338].

[442] Brailovsky/Flores 2, [341] (see generally [334] – [341]).

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 106 (USDC NO. 2:18-cv-01360)**

basis.  That rate of interest is to be paid on the amount of USD 562.5 million from the date of Antrix's repudiation of the Devas Agreement (25 February 2011) to the date of this award.

Post-award interest

391.    Section 31(7)(b) of the 1996 Act states that:

> "[a] sum directed to be paid by an arbitral award shall, unless the award otherwise directs, carry interest at the rate of eighteen per centum per annum from the date of the award to the date of payment."[443]

392.    Antrix has not (expressly) disputed that this provision ought to be applied.  Accordingly, the tribunal will order that post-hearing simple interest at the rate of 18% per annum from the date of this award until the date of full payment.

**I.  Which party should bear the legal and arbitration costs of this matter, and in what amount?**

393.    Article 20(g) of the Devas Agreement states as follows:

> "[e]ach Party to any Arbitration shall bear its own costs or expenses in relation thereto, including but not limited to such Party's attorneys' fees, if any, and the expenses and fees of the member of the Arbital [sic] Tribunal appointed by such party, provided, however, that the expenses and fees of the third member of the Arbital [sic] Tribunal and any other expenses of the Arbital [sic] Tribunal not capable of being attributed to anyone member shall be borne in equal parts by the Parties."

394.    Both parties agree that the tribunal is not bound to award costs in accordance with this provision.  They each say that costs are to be determined in accordance with the ICC Rules, which provides the tribunal with a discretion as to the award of costs, as regards both allocation and (in so far as the parties' legal costs are concerned) assessment.[444]  Article 31(3) of the ICC Rules states:

> "[t]he final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties."

395.    Each party also says that the legal and arbitration costs in this matter should be awarded in its favour.[445]

396.    In light of the parties' positions, the tribunal considers that it does have a discretion to order costs in accordance with Article 31(3) of the ICC Rules.  However, the tribunal considers that the most appropriate manner in which to exercise that discretion should be guided by the manner specified by Article 20(g), which is what the parties originally intended when they negotiated and executed

---

[443] The Indian Supreme Court has said that the purpose of this provision: "is clear, namely, viz. to encourage early payment of the awarded sum and to discourage the usual delay, which accompanies the execution of the Award in the same manner as if it were a decree of the court vide Section 36 of the Act": *Hyder Consulting (UK) Ltd. v. Governor, State of Orissa*, 2014 SCC Online SC 940, [2] and [9].

[444] Devas' PHM, [449]; Antrix's PHM, [251].

[445] Devas' PHM, [450]; Antrix's PHM, [252].

the Devas Agreement.  In the tribunal's opinion, Article 20(g) reflects the parties' intention that the rule commonly applied in international arbitration that the winning party recovers its costs is not in general intended to apply in this arbitration.

397.    There is one exception, however.  Article 20(g) provides that the parties are each to bear the costs of the arbitrator that it appointed.  Antrix did not nominate an arbitrator.  Dr Anand was appointed on its behalf by the ICC Court.[446]  Construed literally, Article 20(g) suggests that the parties would therefore pay Dr Anand's fees in equal shares.  In the tribunal's view, it was never the intention of the parties that Antrix would avoid paying the costs of an arbitrator appointed on its behalf in this way.  If a party fails to appoint an arbitrator as it is required to do under the arbitration agreement it should not therefore escape an obligation to pay for an arbitrator appointed on its behalf.

398.    Accordingly, the tribunal considers that each party should bear their own legal and other costs (including fees of their respective experts), and the parties should pay, in equal shares:

    a.      the fees of the arbitral tribunal;

    b.      the expenses of arbitral tribunal (including the fees and expenses of the tribunal secretary); and

    c.      the ICC administrative expenses.

399.    The fees and expenses of the arbitral tribunal and the ICC administrative expenses fixed by the ICC Court on 27 August 2015 are USD 1,564,000 in total, so each party is required to pay USD 782,000.

400.    The parties have each paid an advance on costs of USD 795,000.  Accordingly, USD 26,000 will be reimbursed to the parties in equal shares, i.e. USD 13,000 each.

### Operative Part

401.    For the foregoing reasons the tribunal unanimously finds and awards as follows:

    a.      the tribunal has jurisdiction to hear and decide the claims in this arbitration;

    b.      Antrix is to pay USD 562.5 million to Devas for damages caused by Antrix's wrongful repudiation of the Devas Agreement;

    c.      Antrix is to pay simple interest on USD 562.5 million from 25 February 2011 to the date of this award at the rate of three month USD LIBOR + 4%;

    d.      Antrix is to pay simple interest at the rate of 18% per annum of the amounts in paragraphs 401(b) and (c) from the date of this award to the date of full payment; and

---

[446] See [19] above.

96

    e.    each party is to bear its own legal costs of this arbitration, and the parties are to pay, in equal shares, the fees and expenses of the arbitrators and the ICC administrative expenses.

402.    All other claims and requests made by the parties in this arbitration have been rejected.

**Place of the arbitration: New Delhi, India**

**Date:** 14th September, 2015

Dr Adarsh Sein Anand        Dr Michael Pryles        Mr V.V. Veeder QC

**Annexure A – Table of Abbreviations**

| | |
|---|---|
| 1996 Act | Indian Arbitration and Conciliation Act 1996 |
| ASG | Additional Solicitor General |
| Anand | Statement of Vijay Anand dated 15 November 2013 |
| Antrix | Antrix Corporation Limited |
| Antrix's PHM | Antrix's post-hearing memorial dated 17 February 2015 |
| Antrix's RPHM | Antrix's reply post-hearing memorial dated 23 March 2015 |
| Antrix's Skeleton | Antrix's Skeleton Argument dated 1 December 2014 |
| Antrix v Devas, Supreme Court Judgment | *Antrix Corp. Ltd. v Devas Multimedia P. Ltd, Judgment on Arbitration Petition No. 20 of 2011* |
| AV | Audio-visual |
| Babbio 1 | Statement of Lawrence T. Babbio Jr dated 19 February 2012 |
| Babbio 2 | Reply statement of Lawrence T. Babbio Jr dated 23 March 2014 |
| Boothalinga | *Boothalinga Agencies v VTC Priaswanmi Nadarm* (1969) 1 SCF 65 |
| Brailovsky/Flores 1 | Report of Vladimir Brailovsky & Daniel Flores dated 15 November 2013 |
| Brailovsky/Flores 2 | Second report of Vladimir Brailovsky & Daniel Flores dated 1 August 2014 |
| Brailovsky/Flores 3 | Report by Vladimir Brailovsky and Daniel Flores on the areas of disagreement with Mr |

| | Kaczmarek dated 30 September 2014 |
|---|---|
| Brailovsky/Flores 4 | Supplemental Report by Vladimir Brailovsky and Daniel Flores dated 11 December 2014 |
| BWA | Broadband Wireless Access |
| CC/Devas | CC/Devas (Mauritius) Ltd |
| CCS | Cabinet Committee on Security |
| Devas | Devas Multimedia Private Limited |
| Devas Agreement | Agreement between Antrix and Devas for the lease of space segment capacity on two satellites, bearing the identification number ANTX/203/DEVAS/2005 |
| Devas' PHM | Devas' post-hearing memorial dated 17 February 2015 |
| Devas' RPHM | Devas' reply post-hearing memorial dated 23 March 2015 |
| Devas' Skeleton | Devas' Skeleton Argument dated 1 December 2014 |
| DCF | Discounted cash flow |
| DOS | Department of Space |
| DOT | Department of Telecommunications |
| DT | Deutsche Telekom |
| DT Asia | Deutsche Telekom Asia Pte Ltd |
| Forge Advisors | Forge Advisors LLC |
| Gearbulk | *Stocznia Gdynia S.A. v. Gearbulk Holdings Ltd* [2009] EWCA (Civ) 75 |
| GOI | Government of India |
| Gupta 1 | Statement of Arun Gupta dated 19 February |

| | 2012 |
|---|---|
| Gupta 2 | Reply statement of Arun Gupta dated 24 March 2014 |
| Hegde | Statement of Dr V. S. Hegde dated 30 July 2014 |
| Himpurna | *Himpurna California Energy Ltd v PT (Persero) Peruahaan Listruik Negera* Final Award, 4 May 1999, XXV Yearbook Commercial Arbitration 11 |
| ICC Court | International Court of Arbitration of the International Chamber of Commerce |
| ICC Rules | 1998 ICC Rules of Arbitration |
| Internet Broadcasting | *Internet Broadcasting Corporation (trading as NETTV) and another v MAR LLC (trading as MARHedge)* (2009) EWHC 844 (Ch) |
| IPTV | Internet Protocol Television |
| ISRO | Indian Space Research Organisation |
| Kaczmarek 1 | Report of Brent Kaczmarek dated 20 February 2012 |
| Kaczmarek 2 | Reply report of Brent Kaczmarek dated 24 March 2014 |
| Kaczmarek 3 | Report of Brent Kaczmarek on the areas of disagreement with Mr Brailovsky and Dr Flores dated 30 September 2014 |
| Kaczmarek 4 | Supplemental report of Brent Kaczmarek dated 17 October 2014 |
| Kudos Catering | *Kudos Catering (UK) limited v Manchester Central Convention Complex Limited* [2012] EWHC 1192 (QB) |
| Lewis 1 | Report of John Lewis dated 17 February 2012 |

| Lewis 2 | Reply report of John Lewis dated 14 March 2014 |
|---------|------------------------------------------------|
| MOU | Memorandum of Understanding between Forge Advisors and Antrix dated 28 July 2003 |
| Okta | *Mamidoil-Jetoil Greek Petroleum Co. v. Okta Crude Oil Refinery AD No (2)* [2003] 2 All ER (Comm) 640 |
| Parsons 1 | Statement of Gary Parsons dated 18 February 2012 |
| Parsons 2 | Reply statement of Gary Parsons dated 21 March 2014 |
| Pawan Alloys | *Pawan Alloys & Casting Pvt. Ltd., Meerut v. U.P. State Electricity Board and others* (1997) 7 SCC 251 |
| PS1 | Primary satellite system |
| PS2 | Secondary satellite system |
| Rejoinder | Antrix's Rejoinder dated 1 August 2014 |
| Reply | Devas' Reply dated 24 March 2014 |
| Rolimpex | *C. Czarnikow Ltd. v. Centrala Handlu Zagraniczneo Rolimpex* |
| SATCOM | India's Satellite Communication policy |
| Sethuraman 1 | Statement of K. Sethuraman dated 15 November 2013 |
| Sethuraman 2 | Statement of K. Sethuraman dated 31 July 2014 |
| Shared Network | *Shared Network Services Limited v Nextira One Limited* [2011] EWHC 1574 (Comm) |
| Singh 1 | Statement of Dr Rajendra Singh dated 19 February 2012 |

| Singh 2 | Reply statement of Rajendra Singh dated 24 March 2014 |
| Sir Chunillal | *Steel Authority of India Limited v Gupta* (2009) 10 SCC 63 |
| Statement of Claim | Devas' Statement of Claim dated 20 February 2012 |
| Statement of Defence | Antrix's Statement of Defence dated 15 November 2013 |
| Secretariat | Secretariat of the ICC Court |
| State of Kerala | *Mary v State of Kerala* 2013 (13) S.C.A.L.E. 151, C.A. No. 9466 of 2003 |
| Telcom Devas | Telcom Devas Mauritius Ltd |
| TRAI | Telecom Regulatory Authority of India |
| UCRF | Upfront Capacity Reservation Fees |
| UK | United Kingdom |
| USA | United States of America |
| Viswanathan 1 | Statement of Ramachandran Viswanathan dated 20 February 2012 |
| Viswanathan 2 | Statement of Ramachandran Viswanathan dated 20 February |
| WPC | Wireless Planning and Coordination wing of the DOT |

"

# GZJ KDKV'4'

" "

From: BRAR Manini [mailto:Manini.BRAR@iccwbo.org] On Behalf Of ica8
Sent: Thursday, September 17, 2015 8:06 AM
To: 'Kahale, III, George'; Hellmann, Betsy A (NYC); Kavanagh, David (LON); Gardiner, John L (NYC); Nelson, Timothy G. (NYC); 'Manu.Nair@AMSShardul.com'; 'omar.ahmad@amarchand.com'; Preziosi, Ben; Duggal, Kabir; Tupa, Fernando; 'legal@antrix.gov.in'; 'fzarbiyev@curtis.com'
Cc: 'mail@michaelpryles.com'; VEEDER V.V.; 'dr_asanand@hotmail.com'; KHONG Cheng Yee; abarraclough@vicbar.com.au; BRAR Manini; ica8
Subject: RE: Devas Multimedia Private Ltd. v. Antrix Corp. Ltd. (ICC Case 18051/CYK)- Final Award

Dear All,

We write in respect of ICC Case Number 18051/CYK.

Pursuant to the parties' agreement, we attach a courtesy soft copy of the Final Award dated 14 September 2015, received on 17 September 2015, rendered by the arbitral tribunal.

The parties will receive formal notification of the award shortly by courier.

Yours sincerely,
Manini Brar | Deputy Counsel
Secretariat of the ICC International Court of Arbitration - Asia Office Suite 2, 12/F Fairmont House, 8 Cotton Tree Drive, Central, Hong Kong
Tel: 852 3607 5602 | | Fax: 852 2523 1619 | Email: manini.BRAR@iccwbo.org<mailto:manini.BRAR@iccwbo.org>
Website: www.iccarbitration.org<http://www.iccarbitration.org/>


From: Kahale, III, George [mailto:gkahale@curtis.com]
Sent: jeudi 3 septembre 2015 00:28
To: ica8; 'Hellmann, Betsy A'; 'david.kavanagh@skadden.com'; 'john.gardiner@skadden.com'; NELSON Timothy G.; 'Manu.Nair@AMSShardul.com'; 'omar.ahmad@amarchand.com'; Preziosi, Ben; Duggal, Kabir; Tupa, Fernando; 'fzarbiyeu@curtis.com'; 'legal@antrix.gov.in'
Cc: 'mail@michaelpryles.com'; VEEDER V.V.; 'dr_asanand@hotmail.com'; BRAR Manini; KHONG Cheng Yee; abarraclough@vicbar.com.au<mailto:abarraclough@vicbar.com.au>
Subject: RE: Devas Multimedia Private Ltd. v. Antrix Corp. Ltd. (ICC Case 18051/CYK)

Dear Ms. Brar,
Respondent agrees to Claimant's proposal.
Kind regards,
George Kahale

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 116 (USDC NO. 2:18-cv-01360)**

From: BRAR Manini [mailto:Manini.BRAR@iccwbo.org] On Behalf Of ica8
Sent: Wednesday, September 02, 2015 8:02 AM
To: 'Hellmann, Betsy A'; 'david.kavanagh@skadden.com'; 'john.gardiner@skadden.com'; NELSON Timothy G.;
'Manu.Nair@AMSShardul.com'; 'omar.ahmad@amarchand.com'; Kahale, III, George; Preziosi, Ben; Duggal, Kabir; Tupa,
Fernando; 'fzarbiyeu@curtis.com'; 'legal@antrix.gov.in'
Cc: 'mail@michaelpryles.com'; VEEDER V.V.; 'dr_asanand@hotmail.com'; ica8; BRAR Manini; KHONG Cheng Yee;
abarraclough@vicbar.com.au<mailto:abarraclough@vicbar.com.au>
Subject: RE: Devas Multimedia Private Ltd. v. Antrix Corp. Ltd. (ICC Case 18051/CYK)

Dear Madams and Sirs,

The Secretariat writes in relation to ICC Case Number 18051/CYK.

We acknowledge receipt of Claimant's correspondence dated 28 August 2015 (below) in the above-referenced matter.

Claimants request that the parties be sent a courtesy electronic copy of the award. We invite Respondent to inform us
by 4 September 2015 whether it would agree to Claimants' proposal.

Yours sincerely,
Manini Brar | Deputy Counsel
Secretariat of the ICC International Court of Arbitration - Asia Office Suite 2, 12/F Fairmont House, 8 Cotton Tree Drive,
Central, Hong Kong
Tel: 852 3607 5602 |  | Fax: 852 2523 1619 | Email: manini.BRAR@iccwbo.org<mailto:manini.BRAR@iccwbo.org>
Website: www.iccarbitration.org<http://www.iccarbitration.org/>

From: Hellmann, Betsy A [mailto:Betsy.Hellmann@skadden.com]
Sent: vendredi 28 août 2015 00:16
To: BRAR Manini
Subject: FW: Devas Multimedia Private Ltd. v. Antrix Corp. Ltd. (ICC Case 18051/CYK)

Dear Ms. Brar,

I am re-sending this as the first email did not go through.  I would be grateful if you could copy all of the counsel listed
below with your response so that all counsel are included.

Kind regards,

Betsy

Betsy A. Hellmann
Skadden, Arps, Slate, Meagher & Flom LLP Four Times Square | New York | 10036-6522
T: 212.735.2590 | F: 917.777.2590
betsy.hellmann@skadden.com<mailto:betsy.hellmann@skadden.com>
Skadden

From: Hellmann, Betsy A (NYC)
Sent: Thursday, August 27, 2015 12:12 PM

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 117
(USDC NO. 2:18-cv-01360)**

To: 'manini.brar@iccwpo.org'
Cc: gkahale@curtis.com<mailto:gkahale@curtis.com>; bpreziosi@curtis.com<mailto:bpreziosi@curtis.com>; Gardiner, John L (NYC); Nelson, Timothy G. (NYC); Kavanagh, David (LON)
Subject: Devas Multimedia Private Ltd. v. Antrix Corp. Ltd. (ICC Case 18051/CYK)

Dear Ms. Brar,

Recently, the chairman of the tribunal in the above-referenced arbitration advised the parties that a draft award has been submitted to the ICC Court.

Given that counsel for the parties are geographically dispersed (London, Delhi, and New York), and also are distant from the Asia Office of the ICC Secretariat, receipt of the award, once issued by the Secretariat, may vary by several days.  See The Secretariat's Guide to ICC Arbitration, ¶ 3-1229 ("Given that different recipients will often be located at different distances from the office of the Secretariat effecting the notification, the time taken to deliver the award may vary. As a result, one party may receive an award one or several days before the other.").

To ensure that the parties are on equal footing and are in a position to receive the final award on the same day, we respectfully request that the Secretariat transmit the award to the parties by electronic mail at the same time that the award is dispatched by courier or registered post.  We understand that e-mail transmission will not constitute official notification of the award.  See id. ¶ 3-1230 (". . . the Secretariat may transmit the award to all parties by fax or email.  However, the Secretariat usually specifies in such instances that this electronic transmission does not constitute official notification of an award.  Official notification will generally occur when a party receives the original signed award in accordance with Article 34(1).").

Respectfully,

Betsy A. Hellmann

Betsy A. Hellmann
Skadden, Arps, Slate, Meagher & Flom LLP Four Times Square | New York | 10036-6522
T: 212.735.2590 | F: 917.777.2590
betsy.hellmann@skadden.com<mailto:betsy.hellmann@skadden.com>
Skadden


--------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

================================================================================


_____

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 118**
**(USDC NO. 2:18-cv-01360)**

This e-mail, including any attachments, may contain information that is protected by law as privileged and confidential, and is transmitted for the sole use of the intended recipient.  If you are not the intended recipient, you are hereby notified that any use, dissemination, copying or retention of this e-mail or the information contained herein is strictly prohibited.  If you have received this e-mail in error, please immediately notify the sender by telephone or reply e-mail, and permanently delete this e-mail from your computer system.  Your privacy is very important to our firm.  Therefore, if this message contains unsolicited commercial content, you may forward this e-mail to unsubscribe@curtis.com<mailto:unsubscribe@curtis.com> or click here (www.curtis.com/unsubscribe.htm<http://www.curtis.com/unsubscribe.htm>) if you do not want to receive further messages of this nature.  Thank you.

Curtis, Mallet-Prevost, Colt & Mosle LLP (101 Park Avenue, New York, NY 10178)

_____

---------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

=============================================================================
<18051 CYK FA singed 14 Sept 2015 with cover page.pdf>

# EXHIBIT 3

**AGREEMENT FOR THE LEASE OF SPACE SEGMENT CAPACITY ON**

**ISRO/ANTRIX S-BAND SPACECRAFT BY DEVAS MULTIMEDIA PVT. LTD.**

This Agreement No. ANTX/203/DEVAS/2005 is entered into on this twenty eighth day of January 2005 by and between ANTRIX CORPORATION LIMITED having its registered office at Antariksh Bhavan, near New BEL Road, Bangalore 560 094 acting through and represented by the Executive Director, hereinafter referred to as "ANTRIX" (which expression shall unless excluded by or repugnant to the context be deemed to include its legal representatives, successors in-interest and assigns) of the ONE PART

**AND**

DEVAS MULTIMEDIA PRIVATE LIMITED, INDIA, an Indian Company having its registered Office at 102, Eden Park, 20, Vittal Mallya Road, Bangalore 560 001, India hereinafter referred to as "DEVAS" (which expression shall unless excluded by or repugnant to the context be deemed to include its legal representatives, successors in-interest and assigns) of the OTHER PART;

Each of ANTRIX and DEVAS being referred to as a Party and collectively referred to as Parties

**Recitals**

WHEREAS Indian Space Research Organization (ISRO), under Department of Space, Government of India (DOS), is a pioneer in the satellite industry with a portfolio of satellite products and services, international experience in satellite manufacturing and launch program management expertise, and satellite network expertise.

WHEREAS ANTRIX is a marketing arm of Department of Space and is the entity through which ISRO engages in commercial activities.

WHEREAS, DEVAS is developing a platform capable of delivering multimedia and information services via satellite and terrestrial systems to mobile receivers, tailored to the needs of various market segments.

WHEREAS, DEVAS has requested from ANTRIX space segment capacity for the purpose of offering a S-DMB service, a new digital multimedia and information service, including but not limited to audio and video content and information and interactive services, across India that will be delivered via satellite and terrestrial systems via fixed, portable, and mobile receivers including mobile phones, mobile video/audio receivers for vehicles, etc. ("Devas Services").

WHEREAS, ANTRIX has agreed to the request of DEVAS and has decided to make available to DEVAS, on a lease basis, part of a space segment capacity on Primary Satellite 1 ("PS1") and an option to gain additional capacity on Primary Satellite 2 ("PS2") to be manufactured for similar services without any immediate backup (unless otherwise specified herein) in the S-Band, for such purpose under appropriate terms and conditions.

WHEREAS ANTRIX and DEVAS understand and accept that they will collaborate to build, launch and operate Satellite(s) and the Devas Services, and recognize that enabling the Devas Services and activities related thereto requires execution of interdependent technical and business activities.

NOW, THEREFORE, in consideration of these promises and of the mutual promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged the Parties hereto agree as follows:

Devas-Antrix Agreement

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 121 (USDC NO. 2:18-cv-01360)

**Article 1.   Definitions**

The capitalized terms used herein, shall unless expressly defined herein, bear the meaning set down in Annexure I hereto.

**Article 2.   The Leased Capacity**

In accordance with the terms and conditions of this Agreement, ANTRIX shall lease to DEVAS and DEVAS accepts such lease of 5 (five) C X S transponders each of 8.1 MHz capacity and 5 (five) S X C transponders, each of 2.7 MHz capacity on the Primary Satellite 1 (PS1) with technical performance and other specifications defined in Exhibit A, and/or any other available capacity as provided and/or mutually agreed to by the Parties in writing (hereinafter the "Leased Capacity"). DEVAS and ANTRIX agree that the Leased Capacity shall be utilized in accordance with this Agreement and its Exhibits. ANTRIX agrees that the Leased Capacity shall be a Non-Preemptible service, except as specifically provided for in Article 7.

**Article 3.   Period of Lease and Terms & Conditions**

a.   The Leased Capacity shall be made available by ANTRIX to DEVAS on a 24-hour, seven-day-per-week basis for the Lease Period which shall be twelve (12) years commencing as set forth in subparagraph (b) below, and extended as provided in Article 3 (l)below or as mutually agreed to in writing by the Parties ("Lease Period").

b.   ANTRIX shall deliver the Leased Capacity to DEVAS from a fully operational and ready PS1 within 30 months, with a further Grace Period of 6 months, (i.e. total of 36 months, the "Delivery Period") of the date of the first payment of an Upfront Capacity Reservation Fee as provided in Exhibit B, inclusive of in-orbit testing and verification by DEVAS ("Delivery"). Delivery shall be deemed to have taken place only after completion of all in-orbit acceptance testing by ANTRIX and DEVAS has formally accepted the same by way of a notice in writing to ANTRIX provided that DEVAS shall not unduly delay such acceptance. The Lease Period shall be deemed to commence upon Delivery ("Commencement Date"). In the event that ANTRIX determines that it will not be able to provide the Leased Capacity from a fully operational and ready PS1 within the Delivery Period, it shall by way of a notice at least 6 months prior to the end of such Delivery Period notify DEVAS of the proposed new Delivery date. Notwithstanding any extension of the Commencement Date, in the event that ANTRIX fails to deliver the Leased Capacity from a fully operational and ready PS1 within the Delivery Period, ANTRIX shall be liable to pay the Delayed Delivery Penalty set down in Exhibit B and in the event that ANTRIX delivers the Leased Capacity from a fully operational and ready PS1 prior to the Delivery Period, DEVAS shall be liable to pay the Early Delivery Incentive set down in Exhibit B.

c.   ANTRIX shall be responsible for obtaining all necessary Governmental and Regulatory Approvals relating to orbital slot and frequency clearances, and funding for the satellite to facilitate DEVAS services. Further, ANTRIX shall provide appropriate technical assistance to DEVAS on a best effort basis for obtaining required operating licenses and Regulatory Approvals from various ministries so as to deliver DEVAS services via satellite and terrestrial networks. However the cost of obtaining such approvals shall be borne by DEVAS.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 122 (USDC NO. 2:18-cv-01360)**

d.   ANTRIX shall insure PS1 and provide Re-launch Guarantee for the launch vehicle service for PS1. ANTRIX shall insure in-orbit operations of PS-1 as specified in Exhibit-B.

For PS2, DEVAS shall have option to insure risks of failure during launch and in-orbit operations and shall be responsible for meeting any cost of insurance both during launch and in-orbit operations. However, ANTRIX will provide Re-launch Guarantee for the launch vehicle service of PS2 only in case the launch of PS1 is successful. ANTRIX's obligation to provide lease service from any replacement satellite for PS2, in case of launch or total satellite failures, is contingent upon DEVAS having exercised the option to insure relevant risks and having met the costs of insurance for PS2.

e.   The Parties agree and confirm that a part of PS1, as mutually agreed in writing, such agreement by DEVAS not to be unreasonably withheld, shall be used by ISRO for its own purposes, provided such usage does not interfere or compete in any way with the DEVAS Services.

f.   The Parties agree that Leased Capacity on all spacecraft leased to DEVAS shall comply with technical and general requirements specified in Exhibit A, which shall be jointly reviewed and agreed in writing prior to the date on which this agreement becomes effective as per Article 27.

g.   ANTRIX shall maintain regular reports on progress, major milestones, delays, criticalities, and counter actions. ANTRIX shall provide DEVAS an opportunity to review these reports. Further, ANTRIX shall maintain technological visibility and involve DEVAS or its nominated personnel in design reviews of PS1, PS2, Replacement Satellite, and/or Additional Satellites to ensure compatibility between the satellite(s) and the ground system. DEVAS agrees to provide necessary information in order to assess and ensure necessary compatibility. ANTRIX and DEVAS shall mutually agree to the frequency and timing of such reviews.

h.   A team from DEVAS, nominated by DEVAS and agreed to by the Parties, shall be permitted to enter ANTRIX locations (except classified areas), for project monitoring and coordination and ANTRIX agrees that it shall provide project office space for 3-5 DEVAS employees and/or contractors. The operation cost of the usage of such office utilities as provided by ANTRIX and the living cost for the deputed personnel from DEVAS shall be borne by DEVAS.

i.   The Parties agree that post launch of the satellites in orbit, ANTRIX shall provide DEVAS monthly performance reports of the performance of the satellites for the first six months and quarterly reports thereafter.

j.   ANTRIX agrees that to the best possible extent, it will lease to DEVAS Additional Satellite Capacity above and beyond PS2, and spares and frequencies associated to the Additional Satellite Capacity to enhance Devas Services features based upon mutually agreed terms and conditions of a lease arrangement which will be negotiated and signed by the Parties at least three years prior to the actual requirement date of the fresh lease services, provided that ANTRIX shall obtain all necessary Governmental and Regulatory Approvals relating to orbital resources, frequency clearance, investment feasibility and funding for the satellite including but not limited to ITU (International Telecommunication Union) coordinated orbital slot, frequency allocation and related approvals for all matters covered in Article 3 (c). Further, if ANTRIX cannot fulfill the needs of DEVAS for Additional Satellite Capacity, DEVAS may seek the support of ANTRIX to procure the services from a third-party on such terms which are mutually agreeable to Parties and ANTRIX shall, either by itself or through ISRO, make best efforts to support DEVAS in this regard.

k.   The provisions related to the quality standards and specifications with regard to Additional Satellite Capacity, as enumerated in Exhibit A, shall remain the same as provided under the terms of this Agreement, unless specified otherwise and mutually agreed to by the Parties.

l.   The Leased Capacity for the satellite(s) shall be put up for renewal at least two (2) years before the end of the twelve (12) year period or the anticipated life of the satellite, for another twelve (12) years, at Lease Fees to be mutually agreed upon. ANTRIX shall be responsible for   obtaining necessary frequency or regulatory approvals relating to lease of capacity for the extended period.

m.   All specifications for the operations of the Leased Capacity and satellite(s) are as defined in Exhibit A. All Service Level Agreements (SLAs) and associated deviation protocols and escalation procedures related to technical matters are as defined in Exhibit A. Without affecting the generality of this Article or Exhibit A, the Parties agree on the following issues and failures on part of ANTRIX to meet the SLAs:

   (i)   In the event of any one (1) transponder  failing to meet the performance requirements as specified in Sections 2.17 and 3.17 of Exhibit A, there shall be a reduction in the prevailing Lease Fees paid to ANTRIX by DEVAS based on the following discount schedule:

   BCS3 and/or BSC3 – 30% discount to Lease Fees

   BCS5 and/or BSC5 – 30% discount to Lease Fees

   BCS1 and/or BSC1 – 20% discount to Lease Fees

   BCS4 and/or BSC4 – 10% discount to Lease Fees

   BCS2 and/or BSC2 – 10% discount to Lease Fees

   (ii)   DEVAS may, at any time before launch of satellite , modify in writing after giving written notice to ANTRIX, the above discount schedule and allocations made to each transponder provided the sum of all discounts specified equals 100%.

   (iii)   In the event that any two (2) transponders fail to meet the performance requirements as specified in Section 2.17 & 3.17 of Exhibit A, it is deemed as a Total Satellite Failure.

   (iv)   If there is an impairment to any parameters or specifications in Exhibit A which are not specified in Sections 2.17 and 3.17 of Exhibit A, DEVAS will determine the effect of such impairment on its ability to offer the Devas Services and the Parties will discuss and negotiate a mutual agreement and remedy, including but not limited to a reduction in Lease Fees.

**Article 4.   Charges**

a.   The charges comprise of an Upfront Capacity Reservation Fee and Lease Fees for 5 S X C and 5 C X S band transponders on each of PS1 and PS2, and other charges, fees and payments as provided in Exhibit B.

b.   The parties agree that the Lease Fees do not include the spectrum monitoring charges of NOCC of India, which shall  be borne by DEVAS separately throughout the term of the Agreement.

c.   All charges are payable in Indian Rupees, and shall be subject to such Taxes as applicable.

d.   Subject to the provisions of this Agreement, charges are to be paid by DEVAS for the full Lease Period.

e.   In the event of any transponder of the Leased Capacity   not meeting the minimum

performance specifications as described in Exhibit A but  meeting the service requirements of DEVAS, the parties shall discuss the usability of these transponders of the Leased Capacity along with the terms and conditions for its utilization by DEVAS.

## Article 5.   Interruption in the Provision of the Leased Capacity

a.    No allowances or credits will be made, for whatever reason, for any single interruption (including any planned outages by ANTRIX) in the availability of the Leased Capacity, which is less than one (1) hour duration.

b.    Any single interruption in the availability of the Leased Capacity not defined as a Satellite Failure per Exhibit A, for reasons other than those mentioned in sub-paragraph (f), below, which is of one (1) hour duration or more and which is attributable to the PS1 or PS2 space segment, shall be credited to DEVAS in an amount proportional to the applicable Lease Fees (as reflected in Exhibit B), attributable to the affected transponder of the Leased Capacity, in one-hour multiples for each hour, or major fraction thereof, of interruption.

c.    For a total duration of interruption of more than four (4) hours in a month DEVAS is eligible for a one day discount in the Lease Fees. If such cumulative four (4)-hours per month interruptions occur continuously for three successive months, then the satellite is declared as a Total Satellite Failure, provided that such interruptions are not attributable to any abnormal solar activity or due to interference from ground or external systems, which are beyond the control of ANTRIX.

d.    If the number of interruptions of half an hour duration in a month not-attributable to abnormal solar activity or interference from ground or external systems, which are beyond control of ANTRIX, exceeds eight (8), then the satellite is declared as a Total Satellite Failure.

e.    For prolonged and recurring interruptions ANTRIX shall provide detailed analysis and the remedial measures taken to stop such interruptions which remedy measures shall be acceptable to DEVAS in its sole discretion. Both Parties shall discuss and mutually agree upon the future course of action.

f.    No allowances or credits will be made for any interruption caused by a negligent act or omission of DEVAS, its, contractors, lessees, agents, assignees, customers or employees in the ordinary course of business.

## Article 6.   Taxes and Duties

a.    All charges and payments due and payable by DEVAS to ANTRIX under the Agreement shall be the amounts due to ANTRIX net of any present or future Taxes.

b.    All payments and charges payable by DEVAS to ANTRIX under this Agreement shall, without prejudice to section (a) above, be subject to applicable Taxes/Duties under the direct and indirect tax laws prevalent and in force in India. . DEVAS shall provide to ANTRIX the original TDS certificate with respect to Taxes, if any. Those Commercial or Service Taxes applicable and required to be paid on lease rentals as contemplated under this Agreement leviable on ANTRIX in India, for providing the lease capacity shall be bone by DEVAS and ANTRIX shall invoice the same along with Lease Fees.

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 125 (USDC NO. 2:18-cv-01360)

**Article 7.   Termination**

a.      Termination for convenience by DEVAS

DEVAS may terminate this Agreement in the event DEVAS is unable to get and retain the Regulatory Approvals required to provide the Devas Services on or before the completion of the Pre Shipment Review of PS1. In the event of such termination, DEVAS shall forfeit the Upfront Capacity Reservation Fees made to ANTRIX and any service or other taxes paid by DEVAS and those outstanding to be paid to ANTRIX till such date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement.

b.      Termination by DEVAS for fault of ANTRIX

DEVAS may terminate this Agreement at any time if ANTRIX is in material breach of any provisions of this Agreement and ANTRIX has failed to cure the breach within three months after receiving notice from DEVAS setting out the nature of breach and reasons for considering the same as material breach. In such event, ANTRIX shall immediately reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding taxes if applicable, received by ANTRIX till that date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called).

c.      Termination for convenience by ANTRIX

ANTRIX may terminate this Agreement in the event ANTRIX is unable to obtain the necessary frequency and orbital slot coordination required for operating PS1 on or before the completion of the Pre Shipment Review of the PS1. In the event of such termination, ANTRIX shall immediately reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding service taxes received by ANTRIX till that date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called).

d.      Termination by ANTRIX for fault of DEVAS

ANTRIX may terminate this Agreement at any time if:

i.    DEVAS is in material breach of any provisions of this Agreement and DEVAS has failed to cure the breach within three months after receiving notice from ANTRIX regarding such breach or,

ii.   Non payment of (a) the Lease Fees and other charges (such as spectrum monitoring charges) by DEVAS for a continued period of twelve (12) months, or if such accumulated delays from recurrent non payments exceed 60 (sixty) months, whichever occurs earlier or, (b) Upfront Capacity Reservation Fees, already due

iii.  In the event that:

a.   A liquidator trustee or a bankruptcy receiver or the like is appointed by a competent court and such appointment remains un-stayed or un-vacated for a period of 90 (ninety) days after the date of such order by a competent court in respect of DEVAS, or

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 126 (USDC NO. 2:18-cv-01360)

b.  If a receiver or manager is appointed by a competent court in respect of all or a substantial part of the assets of DEVAS and such appointment remains un-stayed or un-vacated for a period of 90 (ninety)days after the date of such appointment, or

c.  If all or a substantial part of the assets of DEVAS have been finally confiscated by action of any Governmental Authority, against which no appeal or judicial redress lies.

It is expressly agreed that ANTRIX shall have no right to terminate this Agreement if DEVAS enters into any scheme or arrangement with its creditors, a corporate re-organization or restructuring of its debt and liabilities as long as DEVAS continues to make the Annual Lease Payments to ANTRIX.

In the event of such termination, DEVAS shall forfeit the Upfront Capacity Reservation Fees made to ANTRIX and DEVAS shall be liable to pay any outstanding dues to be paid to ANTRIX by DEVAS. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called).

e.  Termination under Special Circumstances

In the event of two successive Launch Failures of PS1 by ANTRIX, DEVAS shall have the option, exercisable in its sole discretion, to (a) either terminate this Agreement, in which event ANTRIX agrees to immediately reimburse DEVAS all the Upfront Capacity Reservation Fees for PS1 received by ANTRIX till that date, and after that, neither Party shall have any further obligation to the other Party under this Agreement, or (b) forego the refund of the Upfront Capacity Reservation Fees and service taxes and request ANTRIX to launch a satellite within 24 months of the exercise of this option, based on mutually agreed-upon terms.

f.  General Provisions

Termination of this Agreement for any reason whatsoever, shall not extinguish the rights and obligations of Parties under clauses related to Arbitration (Article 20), Confidentiality (Article 18) and obligations related to refund/payment of monies that have accrued before termination, and they shall survive termination and or expiry of this Agreement for a further period of 5 (five) years or fulfillment of these terms whichever is later.

**Article 8.   Vacation of Leased Capacity**

Upon termination of this Agreement (in part or in full) either by DEVAS or by ANTRIX or at the end of the Lease Period, the use of the Leased Capacity so terminated shall revert to ANTRIX unconditionally.

**Article 9.   Payment**

a.  All sums payable by DEVAS for Leased Capacity under this Agreement shall be due and payable in advance quarterly, and shall be invoiced by ANTRIX within 15 days prior to the quarter for which they are payable. However, the first payment shall be from the Commencement Date to the end of the relevant quarter. Such payments shall be made by

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 127 (USDC NO. 2:18-cv-01360)

DEVAS to ANTRIX within a period of thirty (30) days ("Grace Period") from receipt of an invoice by DEVAS, the last date on which the invoice is payable hereunder being the "Due Date".

b.    An additional charge shall be imposed, at a rate of ten (10) percent per annum, on any due amounts not received by ANTRIX by the end of the Grace Period, such charge to be computed from the day commencing on the first day after the Due Date, until the date of receipt of payment. This facility is available only for twelve months after the Due Date beyond which the agreement could be terminated by ANTRIX at its sole discretion.

c.    All invoices for payments due to ANTRIX under this Agreement shall be sent to DEVAS at the following address:

    Devas Multimedia Pvt. Ltd

    102 Eden Park

    20 Vittal Mallya Road

    Bangalore 560 001 India

    Tel.: +91-80-2663-4580

    Fax: +91-80-2224-3863

d.    All sums payable to ANTRIX by DEVAS under this Agreement shall be drawn in favor of "Accounts Officer, Antrix Corporation Limited" and shall be sent to:

    ANTRIX Corporation Limited

    (A Govt. of India Company under Department of Space)

    Antariksh Bhavan

    Near new BEL Road

    Bangalore 560 094 India

    Tel: +91-80-2341-6273 or 6274

    Fax: + 91-80-2341-8981

## Article 10.  Board Participations

a.    DEVAS shall offer ANTRIX the option to appoint a senior officer to the Board of DEVAS ("Officer").

b.    The Officer so appointed shall act as an observer and shall not have any voting rights.

## Article 11.  Force Majeure

a.    Neither of the Parties hereto shall be liable for any failure or delay in performance of its obligations hereunder if such failure or delay is due to Force Majeure as defined in this Article, provided that notice thereof is given to the other Party within seven (7) calendar days after such event has occurred.

b.    For the purposes of this Agreement, "Force Majeure Event" shall include any event, condition or circumstance that is beyond the reasonable control of the party affected (the "Affected Party") and that, despite all efforts of the Affected Party to prevent it or mitigate its effects

(including the implementation of a business continuation plan), such event, condition or circumstance prevents the performance by such Affected Party of its obligations hereunder. The following events may be considered Force Majeure Events under the Agreement: (i) explosion and fire; (ii) flood, earthquake, storm, or other natural calamity or act of God; (iii) strike or other labor dispute; (iv) war, insurrection, civil commotion or riot; (v) acts of or failure to act by any governmental authority acting in its sovereign capacity; (vi) changes in law and regulation, (vii) National emergencies, (ix) Launch Failure.

c.     If an Affected Party is rendered unable, wholly or in part, by a Force Majeure Event, to carry out some or all of its obligations under the Agreement, then, during the continuance of such inability, the obligation of such Affected Party to perform the obligations so affected shall be suspended.

d.     The Affected Party shall give written notice of the Force Majeure Event to the other party (the "Unaffected Party") as soon as practicable after such event occurs, and not later than 7 days after such event, which notice shall include information with respect to the nature, cause and date of commencement of the occurrence(s), and the anticipated scope and duration of the delay. Upon the conclusion of a Force Majeure Event, the Affected Party shall, with all reasonable dispatch, take all necessary and effective steps to resume the obligation(s) previously suspended.

e.     Notwithstanding the foregoing, an Affected Party shall not be excused under this Article for (1) any non-performance of its obligations under the Agreement having a greater scope or longer period than is justified by the Force Majeure Event, or (2) the performance of obligations that arose prior to the Force Majeure Event. Nothing contained herein shall be construed as requiring an Affected Party to settle any strike, lockout or other labor dispute in which it may be involved.

f.     Notwithstanding anything contained herein, in the event of Launch Failure of PS1 or PS2, the articles related to re-launch guarantee in Article 3 (d), and termination under special circumstances in Article 7 shall apply and take precedence over the terms contained herein.

g.     In the event of failure or delay in the performance of this Agreement arising out of an event of Force Majeure which lasts longer than 90 (ninety) days, both parties  shall discuss the further course of action on a mutually agreeable basis. However, such action could include termination at the option of Unaffected Party if total delays exceed 12 (twelve) months. It is hereby expressly agreed by the parties that no financial or other liability shall arise on termination under this clause as far as the affected party is concerned.

### Article 12.   Representations and Warranties

a.     ANTRIX hereby represents and warrants to DEVAS as under:

i)     ANTRIX has the capacity and power to enter into and perform this Agreement in terms thereof;

ii)    ANTRIX, through ISRO/DOS, will be responsible for obtaining clearances from National and International agencies (WPC, ITU, etc.) for use of the orbital slot and frequency resources so as to ensure that the spacecraft is operated meeting its technical characteristics and provide the Leased Capacity as specified;

iii)   ANTRIX through ISRO has the ability to  make/build, manufacture, launch and operate

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 129 (USDC NO. 2:18-cv-01360)

the Satellites, and provide the Leased Capacity as provided in this Agreement;

iv)  ANTRIX will fulfill its obligations under this Agreement according to any applicable Law;

v)  ANTRIX, through ISRO, has the ownership and right to use the Intellectual Property used in the manufacture and launch of the satellites and provision of Leased Capacity under this Agreement; and

vi)  ANTRIX may offer another satellite to other parties provided, in due recognition of DEVAS seniority, it:

(1)  Provides DEVAS with prior intimation in case it does not infringe upon any confidentiality agreements

(2)  Does not affect any DEVAS schedules or deliverables

b.  DEVAS hereby represents and warrants ANTRIX as under:

i)  DEVAS has the capacity and power to enter into and perform this Agreement in terms thereof;

ii)  DEVAS has the ability to design Digital Multimedia Receivers ("DMR");

iii)  DEVAS has the ability to design Commercial Information Devices ("CID");

iv)  DEVAS has the ownership and right to use the Intellectual Property used in the design of DMR and CID;

v)  The fulfillment of DEVAS' obligations under this Agreement by DEVAS will not violate any Laws;

vi)  DEVAS shall assign, transfer and/or sub-let its rights and obligations hereunder in accordance with Law.

vii)  DEVAS shall be solely responsible for securing and obtaining all licenses and approval (Statutory or otherwise) for the delivery of Devas Services via satellite and terrestrial network.

## Article 13.  Indemnities

a.  Either of the Parties (ANTRIX or DEVAS) shall indemnify, defend and hold harmless the other Party, its officers, directors, employees, agents, consultants from and against any loss, damages, liabilities, expenses, claims, actions, charges, costs, interests, and penalties suffered by the indemnified Party together with the attorney's fees, arising from the fault of the indemnifying Party.

b.  It is further agreed that DEVAS shall indemnify ANTRIX for the following

i.  Libel, slander, invasion of privacy, or infringement of copyright or cyber law arising from the use of the leased capacity;

ii.  Infringements of third-party patents or Intellectual Property rights arising from a) combining with, or used in connection with the Leased Capacity, apparatus, satellite, systems of the DEVAS, its users, customers, contractors, lessees, agents or assignees where ANTRIX exercises no control; b) use of the Leased Capacity in a manner not contemplated by ANTRIX and over which the ANTRIX exercises no control;

iii.  Violation of any applicable laws or regulations of any country or damage to any third party arising from the use of the Leased Capacity.;

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 130 (USDC NO. 2:18-cv-01360)

      iv. Any act or omission of DEVAS, its users, customers, contractors, lessees, agents, assignees or employees in connection with the Leased Capacity.

c.    ANTRIX shall indemnify DEVAS and hold harmless from any loss, damage, liability or expenses arising from the following:

    i.    ANTRIX's exercising use, control or operation of the PS1 and PS2 spacecrafts or from any use by ANTRIX's users, customers, contractors, agents, assignees, employees, or lessees other than DEVAS;

    ii.    Infringements of third-party patents or Intellectual Property rights arising from, combining with, or used in connection with ANTRIX's design, manufacture, launch and operations of the PS1 or PS2 satellites where DEVAS exercises no control.

d.    Each Party undertakes to notify the other Party in writing of any matter or thing of which it becomes aware which is or may be a material breach of, or materially inconsistent with, any of its warranties and representations.

e.    The right of either Party under this clause shall be in addition to the right to damages or any other rights available at common law or equity in respect of any breach of the warranties, representations and undertakings of the other Party. Provided however, that no right or claim of any nature whatsoever shall arise by virtue of or under this clause, for matters specifically provided for elsewhere in this agreement including matters relating to termination of this agreement.

## Article 14. Operational Arrangements

a.    (i)    DEVAS shall develop frequency and transmission plans for the use of the Leased Capacity on the satellites and the same shall be made available to ANTRIX for prior review and approval. For those particular transponders where there is potential for adjacent transponder interference between INSAT series of spacecraft and PS1, DEVAS and ANTRIX shall develop mutually agreeable technical operating parameters for operation in the said transponders. However, such parameters shall have no effect on DEVAS Services as set forth in Exhibit A. In case of demands from other entities for similar services, ANTRIX shall take reasonable steps to accommodate such request without disrupting or putting limitations on DEVAS Services.

    (ii)    In the event of ANTRIX operating a co-located satellite next to DEVAS Leased Capacity on PS1 and if applicable PS2, DEVAS and ANTRIX shall develop mutually agreeable technical operating constraints for all co-frequency transponders that have the potential for interference. Transmission and frequency plans developed for co-frequency transponders shall be exchanged and coordinated in the manner described in subparagraph (i).

    (iii)    ANTRIX shall be responsible for inter-system coordination as per ITU Radio Regulations to obtain all clearances so as to use the orbital slot and frequency resources for DEVAS Services. All coordination efforts by ANTRIX referred to in this Article shall be performed at no additional cost to DEVAS. DEVAS shall provide assistance to ANTRIX in connection with the inter-system coordination efforts. ANTRIX shall make the best efforts, with the help of DEVAS, to coordinate the types of services required by DEVAS.

(iv)   ISRO shall remain the registered owner of the orbital location on which the Leased Capacity is being made available to DEVAS.

(v)    Interference to other satellite systems, with which ANTRIX or ISRO or associated entities are in the process of coordinating arrangements, shall be kept at an acceptable level by utilizing operating parameters within the limits prescribed and agreed to by ANTRIX and DEVAS in Exhibit A, and shall remain in conformity with such arrangements without affecting DEVAS services.

(vi)   ANTRIX agrees that the PS1 spacecraft will be located at the 83 deg. E orbital location during the term of the lease. The spacecraft location may be changed to a different location with the written concurrence of DEVAS. ANTRIX believes that the proposed use of the Leased Capacity by DEVAS will not present any coordination problems.

(vii)  In the event similar services are supported by ANTRIX or ISRO (through other satellites leased to commercial or government entities), DEVAS Services will be ensured to be protected for Inter-system interference.

b.   (i)   DEVAS shall establish, formal procedures for systems discipline, operations, access approval, maintenance and control of earth station access to space segment capacity. These procedures are considered expedient and necessary to ensure that DEVAS, its users, customers, contractors, lessees, agents and assignees derive the use of satellite resources covered by this Agreement, to prevent interference to other users of the system. The Earth Station Standards (ESS) and Satellite System Operation guide (SSOG) Modules for the spacecraft shall be prepared by DEVAS based on the spacecraft technical data provided by ANTRIX and shall be made available to ANTRIX for review and comment and the same shall become a part of this Agreement after its finalization.

(ii)   DEVAS shall implement appropriate operational procedures required for the compliance with the technical and operational conditions specified in this Agreement.

c.   Each earth station, which shall utilize the Leased Capacity, shall:

(i)    satisfactorily complete or have completed earth station testing to verify compliance with the performance characteristics as defined in the documents in paragraph (b) above;

(ii)   be operated and maintained in accordance with the applicable provisions as defined in the documents referred in paragraph (b) above

d.   For purposes of ensuring that the transmission by DEVAS are within the acceptable levels of operating parameters, ANTRIX may monitor the transmission of the Leased Capacity of the satellite(s).

e.   The Leased Capacity under this Agreement does not include the provision of any uplink, downlink or terrestrial transmission services. ANTRIX shall be solely responsible for the operation of the satellite(s).

f.   ANTRIX agrees to provide to DEVAS quarterly reports on the development and the work-in-progress of the satellite(s). ANTRIX agrees to hold for DEVAS at the ANTRIX facilities formal progress meetings on quarterly basis until the launch of the satellite(s). In addition, ANTRIX will invite DEVAS to attend at Bangalore major review meetings (PDR, CDR, & PSR).

g.   DEVAS agrees to provide ANTRIX quarterly reviews of the progress on the development of

the DEVAS system. DEVAS shall provide within three months from the Date of signature of this agreement, its plan for the development, testing, validation and production of receivers as well as the implementation of the ground segment facilities for operating DEVAS Services. DEVAS shall further provide progress or update information on this once in three months. DEVAS shall take necessary action to ensure readiness of the ground segment prior to the launch and operation of PS1.

h.   The Parties hereby agree that post launch of the satellites in orbit, ANTRIX shall provide DEVAS monthly performance reports of the performance of the satellites for the first six months and then on quarterly basis thereafter. The Parties expressly agree that DEVAS shall have the right to inspect ANTRIX's facilities, and ANTRIX shall facilitate all visits by Persons nominated by DEVAS for the purpose of determining the basis of preparation of all reports provided by ANTRIX to DEVAS. The schedule and frequency of such visits will be mutually agreed to and subject to safety and security procedures followed in the facility.

i.   ANTRIX agrees that within six (6) months after the date of execution of this Agreement, it shall arrange and conclude with DEVAS the procedures for implementing the operational interfaces as outlined in Exhibit D and as provided herein.

j.   For a period of 24 (twenty four) months from the date of execution of this Agreement, provided the Agreement is in effect during the said period of 24 months, DEVAS shall not negotiate with any other person or entity to provide similar services.

k.   ANTRIX shall take reasonable care to inform as long as such information is within its knowledge, DEVAS of any customer, company or organization contemplating a similar service or multimedia service on any ANTRIX satellite, subject to any confidentiality agreements which ANTRIX has to honor.

## Article 15.  Use of Leased Capacity

DEVAS shall ensure that the use of the Leased Capacity is strictly in accordance with the letter and spirit of this Agreement, and in accordance with Laws.

## Article 16.  Assessment of Technical Performance of the Leased Capacity

Both Parties hereby agree to conduct in-orbit tests from INSAT-Master Control Facility, Hassan, India to verify and accept the in-orbit performance specifications and deviations, if any, of the Leased Capacity, as per Exhibit C and as per procedures to be jointly agreed upon. These procedures shall be generated within 12 (twelve) months following the execution of this Agreement and these shall become a part of this Agreement. These tests shall be conducted within 60 (sixty) days following the positioning of the PS1 spacecraft in its designated orbital slot. Such tests may also be conducted periodically afterwards to assess the in-orbit performance specifications of the Leased Capacity as and when considered to be necessary by both parties.

**Article 17.  Assignment**

ANTRIX may sub-license, assign or sell any or all of its rights under this Agreement without any approvals from DEVAS, provided ANTRIX provides DEVAS with at least 60 (sixty) days prior notice of the same and provided further that ANTRIX undertakes, and shall cause its assignee to undertake that the terms of this Agreement and all related Agreements are enforceable in terms thereof and will continue to be upheld in accordance with the laws and regulations of India. DEVAS may sub-license, assign or sell any and all of its rights under this Agreement without any approvals from ANTRIX provided DEVAS provides ANTRIX with at least 60 (sixty) days prior notice of the same and provided further that DEVAS undertakes and shall cause its assignee to undertake that the terms of this Agreement and all related Agreements are enforceable in terms thereof and will continue to be upheld in accordance with the laws and regulations of India.

**Article 18.  Confidentiality**

a.      Any confidential information that is generated, in the process of implementing this Agreement and any related agreements, shall not be disclosed by either Party to any third party without the prior written consent of the other Party, or in the case of proprietary information consent of the disclosing Party. Such confidential information includes, but is not limited to, the technology used, schedules, progress reports, funding for the proposed transaction, details of employees, and financial status of the Parties, strategies and partnerships. However, this requirement with respect to confidentiality shall not apply to any information:

     i.    Available in the public domain;

     ii.   Which was previously known by the Party receiving such information

     iii.  Required to be disclosed under applicable law or due to compliance with any regulatory or statutory requirements. Provided that if either Party is obliged to make such disclosure, it shall notify the other Party sufficiently prior to making the disclosure so as to enable the other Party to seek protection of the information required to be disclosed.

b.      The Parties also agree to maintain as confidential the existence and details of this Agreement. Upon Termination or expiry of this Agreement each Party shall either destroy or return (as may be indicated by the disclosing Party) the information / documents which the receiving Party may have under its control to the disclosing Party.

**Article 19.  Governing Law**

This Agreement and the rights and responsibilities of the Parties hereunder, shall be subject to and construed in accordance with the Laws of India.

**Article 20.  Arbitration**

a.      In the event of there being any dispute or difference between the Parties hereto as to any

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 134
(USDC NO. 2:18-cv-01360)

clause or provision of this Agreement or as to the interpretation thereof or as to any account or valuation or as to the rights, liabilities, acts, omissions of any Party hereto arising under or by virtue of these presents or otherwise in any way relating to this Agreement such dispute or difference shall be referred to the senior management of both Parties to resolve within three (3) weeks failing which it will be referred to an Arbital Tribunal comprising of three arbitrators, one to be appointed by each party (i.e. DEVAS and ANTRIX) and the arbitrators so appointed will appoint the third arbitrator.

b.    The seat of Arbitration shall be at NEW DELHI in India.

c.    The Arbitration proceedings shall be held in accordance with the rules and procedures of the ICC (International Chamber of Commerce) or UNCITRAL.

d.    The Arbitration Tribunal shall reach and render a decision or award in writing (concurred in by a majority of the members of the Arbital Tribunal with respect to the appropriate award to be rendered or remedy to be granted pursuant to the dispute, (including the amount that any indemnifying Party is required to pay to the indemnified Party in respect of a claim filed by the indemnified Party).

e.    To the extent practicable all decisions of the board of Arbitration shall be rendered no more than 30 (thirty) days following commencement of proceedings with respect thereto. The Arbital Tribunal shall realize its decision on award into writing and cause the same to be delivered to the Parties.

f.    Any decision or award made by the board of Arbitration shall be final, binding and conclusive on the Parties and entitled to be enforced to the fullest extent permitted by Laws and entered in any court of competent jurisdiction.

g.    Each Party to any Arbitration shall bear its own costs or expenses in relation thereto, including but not limited to such Party's attorneys' fees, if any, and the expenses and fees of the member of the Arbital Tribunal appointed by such party, provided, however, that the expenses and fees of the third member of the Arbital Tribunal and any other expenses of the Arbital Tribunal not capable of being attributed to any one member shall be borne in equal parts by the Parties.

**Article 21.  Good Faith**

The Parties hereby agree that they intend to discharge their obligations in utmost good faith. They, therefore, agree that they will, at all times, act in good faith, and make all attempts to resolve all differences howsoever arising out of or in connection with this Agreement by discussion.

**Article 22.  Authority to sign**

ANTRIX and DEVAS represent that each has the authority to execute this Agreement.

**Article 23.  Notices**

For the purpose of providing or notices giving or other communications pursuant to this Agreement

and for contractual and technical coordination, as well as any and all communication the following addresses shall be utilized:

| DEVAS | ANTRIX |
|---|---|
| Devas Multimedia Pvt. Ltd | Antrix Corporation Limited |
| 102 Eden Park | (a Govt. of India Company under Department of Space) |
| 20 Vittal Mallya Road | |
| Bangalore 560 001 India | Antariksh Bhavan |
| Tel: +91-80-2663-4580 | Near new BEL Road |
| Fax: +91-80-2224-3863 | Bangalore 560 094 India |
| | Tel: +91-80-2341-6273 or 6274 |
| | Fax: + 91-80-2341-8981 |

All such notices, requests and other communications shall (i) if delivered personally to the address as provided above, be deemed given upon delivery, (ii) if delivered by facsimile transmission to the facsimile number as provided above, be deemed given upon receipt, and (iii) if delivered by registered mail or courier to the address as provided above, be deemed given upon receipt. Any Party from time to time may change its address, facsimile number or other information for the purpose of notices to that Party by giving notice specifying such change to the other party hereto.

## Article 24.  Miscellaneous Clauses

a.    In the event of a conflict between the Agreement and any Annexure, Exhibit or Schedule hereto, the Agreement and the conflicting Annexure, Exhibit or Schedule shall be interpreted harmoniously. In the event a harmonious interpretation is not possible, then the   specific provision shall prevail over the general provision

b.    At all times the Parties shall not issue or make or cause to be issued or made any reports, statements or releases to the public with respect to this Agreement or the transactions contemplated hereby without the consent of the other, which consent shall not be unreasonably withheld. If either Party is unable to obtain the approval of its public report, statement or release from the other Party and such report, statement or release is, in the opinion of legal counsel to such Party, required by Law in order to discharge such party's disclosure obligations, then such Party may make or issue the legally required report, statement or release and promptly furnish the other Party with a copy thereof. Notwithstanding anything contained herein, DEVAS may publicize service, plans, and ANTRIX may provide support as it deems fit in any press releases, conferences etc.

c.    Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by Laws or otherwise afforded, will be cumulative and not alternative.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 136 (USDC NO. 2:18-cv-01360)**

d.   If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Laws, and   the rights or obligations of any Party hereto under this Agreement are not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement  shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the Parties shall negotiate in good faith to replace the unenforceable provisions with an enforceable provision speaking to the same matter, and (d) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

### Article 25.  Full Agreement

This Agreement constitutes the full understanding and agreement of the Parties concerning the subject matter hereof, and any prior oral or written agreements and understandings of the Parties concerning the subject matter of this Agreement are hereby superseded and terminated by this agreement. However it is made clear here by ANTRIX and agreed by the Parties that the Agreement shall not be binding on DEVAS or ANTRIX until and unless ANTRIX receives all the requisite governmental and other regulatory approvals, including those referred to in this Agreement.

### Article 26.  Amendment

The terms and conditions of this Agreement shall not be varied except by mutual agreement of the Parties in writing.

### Article 27.  Effective Date of the Contract

The contract becomes effective on the date that ANTRIX is in receipt of all required approvals and communicates to DEVAS in writing regarding the same.

In witness whereof, the undersigned, duly authorized, have signed this agreement.

For and on behalf of

**Antrix Corporation Limited**                          **Devas Multimedia Private Limited, India**

Signature:                                              Signature :

Name    : K. R. Sridhara Murthi                        Name    :  LUROURAS C.R

Title    : Executive Director                           Title    : Authorized representative

Date    : 28 Jan 2005                                   Date    :  28|1|2005

**Annexure I**

**DEFINITIONS**

In this Agreement, the following terms have the meanings indicated below:

1.      "5 C x S and 5 S X C transponders" means S band and C band transponders respectively.

2.      "Accounting Terms" unless the context of this Agreement otherwise requires, or admits shall mean:

      (i)      All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP (Generally Accepted Accounting Principles)

      (ii)     Headings are used for convenience only and shall not affect the interpretation of this Agreement; and,

      (iii)    References to the Recitals, Clauses, Schedules and Appendices shall be deemed to be a reference to the recitals, clauses, schedules and appendices of this Agreement.

3.      "Action or Proceeding" means any action, suit, proceeding, arbitration or investigation or audit any Governmental or Regulatory authority.

4.      "Additional Satellite Capacity" means any capacity provided to DEVAS by ANTRIX in addition to PS1 and PS2 but whose specific terms are not enumerated in this Agreement.

5.      "Affiliate" means any Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under the common control of the Person specified.

For purposes of this definition, "control" of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by Contract or otherwise. In any event, and without limitation of the previous sentence, for purposes of this Agreement any Person owning 25% (twenty five percent) or more of the voting securities of another Person shall be deemed to control that Person.

6.      "Agreement" means this Agreement and the Annexures, Schedules, Exhibits, if any and as applicable hereto, and the certificates and documents delivered or to be delivered hereunder, as the same shall be amended from time to time.

7.      Cash flow positive means net cash in flows from operative activities (i.e. net income duly adjusted with flows due to depreciation, amortization and due to changes in current liabilities and assets) exceeding net cash out flows from all investing activities such as capital expenditures as at relevant date of determination of cash flow.

8.      "Commencement Date" means the date of Delivery of service from PS1 and/or PS2 to DEVAS as relevant.

9.      "Commercial or Service Taxes" means Indian taxes on applicable goods or services as per the applicable Indian tax law.

10.     "Critical Component Acquisition Fee" means monies paid by DEVAS to ANTRIX to acquire Critical Components.

11.     "Critical Components" means components that ANTRIX will purchase in return for monies paid by DEVAS, in accordance with this or under agreement, which are procured by ANTRIX in order to decrease the Delivery Period of either a Replacement Satellite or PS2.

12.     "Delivery" means the successfully placing in orbit Leased Capacity of either PS1 or PS2 which is fully tested and meeting the specifications in Exhibit A and ready for use by DEVAS.

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 138 (USDC NO. 2:18-cv-01360)

13. "Delivery Period" means the period of time from the First Reservation Fee Installment Payment Date to the date of "Delivery" as defined in item 12 above.

14. "Devas Services" means S-DMB services that include subscription multimedia packages with digital audio, visual, and textual data, delivered via satellite and terrestrial systems via fixed, portable, and mobile receivers including mobile phones, mobile video/audio receivers for vehicles, etc. to subscribers' receivers, having capability to send back textual and audio visual data, with additional related activities such as service design, production, packaging and encoding, providing multimedia content that consist of channels of audio, video, internet and text content in various packages, sourced and customized as required by the audio, video and internet content producers and service providers with additional content related activities such as content selection, sourcing, editing, production and programming.

15. "First Reservation Fee Installment Payment Date" means the date of the initial payment on the Upfront Capacity Reservation Fee paid by DEVAS to ANTRIX

16. "Governmental or Regulatory Authority" means any Government state or Central, municipality, local authority, town, village, court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of India.

17. "Grace Period" means a defined period where penalties or breach is not applicable.

18. "IAS" means Indian Accounting Standards.

19. "Indemnified Party" means any Person claiming indemnification under any provision of the indemnity Clause.

20. "Indemnifying Party" means any Person against whom a claim for indemnification is being asserted under any provision of the indemnity Clause.

21. "Intellectual Property" includes, without limitation business processes, domain names, inventions, discoveries and ideas, databases, programs, codes, software, algorithms, trade secrets, know-how, concepts, creations, improvements upon, additions or any research effort relating to any of the foregoing; and, all inventions, patents, patent rights, registered or unregistered designs, utility models, including design copyrights, licenses, trademark rights, licenses, trademarks, registrations (including internet domain and applications, service marks, registrations) trade secret rights, and other rights, including moral rights and any similar rights, applications for any of the foregoing and the right to apply for them in any part of the world in connection with the foregoing, whether negotiable or not.

22. "Launch Failure" means a failure of the launch vehicle to deliver PS1 or PS2 into orbit for use by DEVAS in accordance with the specifications in Exhibit-A.

23. "Laws" means all laws, statutes, rules, regulations, ordinances, by-laws and other pronouncements having the effect of law of India.

24. "Lease Fees" means the amount paid each year by DEVAS to ANTRIX for the Leased Capacity in four quarterly payments, including any additional payments with respect to any additional capacity that DEVAS may request and ANTRIX provides to DEVAS under the terms of this Agreement or any other agreement in this regard.

25. Leased Capacity" means any satellite capacity provided to DEVAS from ANTRIX on either PS1 or PS2 in accordance with this agreement.

26. "Lease Period" means the period of time from the Commencement Date to the End of Lease as per the provisions of Article 3 (a) of the Agreement.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 139 (USAO NO. 2:18-cv-01360)**

27. "Liabilities" means all debts, obligations and other liabilities of a Person (whether absolute, accrued, contingent, fixed or otherwise, or whether due or to become due).

28. "Licenses" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

29. "Liens" means any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind.

30. "Loss" means any and all damages, fines, fees, penalties, deficiencies, losses and expenses (including without limitation interest, court costs, fees of legal counsel, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment).

31. "Non-Preemptible" means that the Leased Capacity provided to DEVAS by ANTRIX cannot be utilized or repurposed for use by another party during life of satellite and when this Agreement is effective and when DEVAS is not in default of its obligations or payments.

32. "Order" means any writ, judgment, decree, injunction or similar order of any Governmental or Regulatory Authority (in each such case whether preliminary or final).

33. "Person" means any natural person, and includes any corporation, limited liability company, general partnership, limited partnership, proprietorship, other business organization, trust, union, association or Governmental or Regulatory Authority, association of persons or body of individuals whether incorporated or not.

34. "PS1" means the initial satellite which will be launched and put into orbit by ANTRIX under this Agreement, and from which it is intended to offer the Devas Services.

35. "PS2" means the second satellite to be launched and put into orbit at DEVAS' option (as per the terms of the agreement) by ANTRIX under this Agreement, and from which it is intended to offer additional capacity for the Devas Services.

36. "PSR" (Pre Shipment Review) means a review that is held on the performance of the integrated flight satellite after completion of all its environmental tests to ensure its conformance to all the necessary specifications and to authorize the shipment of this satellite to the launch site for pre-launch operations and launch.

37. "Regulatory Approval" means any and all approvals, licenses, or permissions from Governmental or Regulatory Authorities.

38. "Re-launch Guarantee" means an obligation to provide launch service without further payment by DEVAS for a replacement satellite in case the launch mission results in launch failure. The re-launch guarantee is relevant for launch service only and does not include provision of replacement satellite.

39. "Replacement Satellite" means a satellite that is manufactured, launched and Delivered by ANTRIX because of Launch Failure or Satellite Failure of PS1 or PS2. Terms for replacement satellite vary depending on whether it is PS1 or PS2, according to this agreement.

40. "Representatives" of a Person mean the officers, directors, employees, agents, counsel, accountants, financial advisors, consultants and other representatives of such Person.

41. "Total Satellite Failure" means the failure of satellites as described in Article 3 (m), Article 5 (c), and 5 (d).

42. "SLA" means the Service Level Agreements as set down in Exhibit A.

43.   "Subsidiary" means any Person or entity (whether incorporated or not) in which the Company, directly or indirectly through Subsidiaries or otherwise, beneficially owns more than fifty percent (50%) of either the equity interests in, or the voting control of, such Person.

44.   "Taxes" means all taxes, levies, social security contributions, duties, imposts, charges and withholding of any nature whatsoever, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any governmental body, which taxes shall include, without limiting the generality of the foregoing, all income taxes, payroll and employee withholding taxes, sales and use taxes, excise taxes, gross receipts taxes, occupation taxes, real and personal property taxes, stamp taxes, transfer taxes, workmen's compensation taxes and other obligations of the same or a similar nature now or in the future, under applicable Law.

45.   "Transponder Characteristics" means the characteristics for the transponders on a satellite provided in Exhibit A.

46.   "Upfront Capacity Reservation Fee" means upfront monies paid by DEVAS to ANTRIX at the start or during the Delivery Period to reserve future capacity on either PS1 or PS2.

**Devas-Antrix Agreement**

21 of 21

**EXHIBIT A**
**TO**
**AGREEMENT NO. ANTX/203/DEVAS/2005**


**TECHNICAL PERFORMANCE AND OTHER SPECIFICATIONS FOR THE LEASED SPACE**
**SEGMENT CAPACITY ON DEVAS SPACECRAFT**


1. GENERAL REQUIREMENTS

2. C x S PAYLOAD PERFORMANCE REQUIREMENTS

3. S x C PAYLOAD PERFORMANCE REQUIREMENTS

4. SERVICE LEVEL AGREEMENTS (SLAs)

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 142
(USDC NO. 2:18-cv-01360)

## 1.0    GENERAL REQUIREMENTS

### 1.1    APPLICABILITY

All performance requirements specified in Exhibit A shall be met at all times for the duration of the DEVAS' utilization of PS-1 and PS-2 as specified in the Agreement. It shall be possible to operate all transponders at all times, including during eclipse and during station keeping and/or attitude control maneuvers.

### 1.2    Spacecraft Design

The design and manufacture of the PS-1, shall take into account. With adequate margins, the operations of the satellite in the space environment, the redundancy and high reliability requirements, safe modes operations, etc over the satellite design life.

### 1.3    RELIABILITY

The satellite shall be designed and fabricated so that the estimated probability of meeting the payload functional requirements shall be greater than 0.97 after initial period of 180 days and greater than 0.75 over the orbital maneuver life.

### 1.4    STATIONKEEPING

The PS-1 shall be maintained on an equatorial orbit at the nominal longitude of 83 degree E. ANTRIX shall perform all necessary station keeping maneuvers so that the latitude and longitude of the satellite shall be maintained during its orbital maneuver life and at the nominal position of 83 degree E to within the following values:
-       Latitude error (orbit inclination; North/South Station keeping): +/- 0.1 degree maximum of the equatorial plane
-       Longitude error (East/West Station keeping): +/- 0.1 degree maximum of the longitude

Performance of the station keeping maneuvers shall not cause any degradation of the specified communications payload performance.

### 1.5    DEFINITION OF SPACECRAFT AXES

For the purpose of these specifications, the satellite axes are defined as fixed within the satellite. When the satellite is in the operational configuration in the geosynchronous orbit, the positive yaw axis is nominally in the orbital plane and directed towards the center of the Earth; the positive roll axis is nominally in the orbital plane in the direction of orbital motion; and the positive pitch axis in nominally normal to the orbital plane and directed towards the South.

### 1.6    ANTENNA POINTING ERROR

The design of the spacecraft shall provide for controlling the maximum (3 sigma) antenna pointing errors to within the limits shown in Table 1.5 below:

Table 1.5

ANTENNA POINTING ERROR LIMITS

| AXIS | SYNCHRONOUS ORBIT | |
|------|-------------|---------------------|
|      | NORMAL MODE | STATION KEEPING MODE |
| Pitch (East/West) | +/- 0.15 deg. | +/- 0.20 deg. |
| Roll (North/South) | +/- 0.15 deg. | +/- 0.20 |
| Yaw (referred to the equator) | +/- 0.20 deg | +/- 0.25 |

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 143 (USDC NO. 2:18-cv-01360)

The above indicated values shall be used in conjunction with the coverage requirements of Sections 2 and 3 of this specification to establish the necessary antenna coverage.

## 1.7   ECLIPSE OPERATIONS

All of the PS-1 transponder capacity shall be capable of operating within its specified characteristics and performance during the eclipse period over the orbital design life time.

## 1.8   ORBITAL DESIGN LIFE

All spacecraft components/units, sub-system and systems shall be designed with adequate margin for a minimum design life of 15 years.

## 1.9   ORBITAL MANEUVER LIFE (OML)

The orbital maneuver life (OML) shall be for a minimum of 12 years.

## 2.0   C x S COMMUNICATION PAYLOAD PERFORMANCE

The communication payload performance specifications given in this Section are applicable to the CxS1 to CxS5 transponders of PS-1. Except for frequency and channelization plan as given in section 2.1, all the other specifications in Section 2 are applicable to both PS1 and PS2 satellites.

## 2.1   FREQUENCY AND CHANNELIZATION PLAN

The communication payload shall be in the frequency bands given below:

Uplink: 5850 – 5930 MHz (Feeder Links)
Downlink: 2550 – 2630 MHz

The transmission channels and their center frequencies shall be as given in Table 2.1.1 (a) and (b) for the Primary satellite and Spare satellite respectively. The channels shall have usable bandwidth of 8.1 MHz for DEVAS

Table 2.1.1 (a)

COMMUNICATION PAYLOAD FREQUENCY PLAN
(CHANNEL CENTER FREQUENCIES)
PS1 SATELLITE

| CHANNEL NO. | UPLINK/DOWNLINK (MHz) | MINIMUM USABLE BANDWIDTH FOR DEVAS(MHz) (Note) |
|---|---|---|
| CxS1 | 5865/2565 | 8.1 |
| CxS2 | 5875/2575 | 8.1 |
| CxS3 | 5875/2575 | 8.1 |
| CxS4 | 5885/2585 | 8.1 |
| CxS5 | 5865/2565 | 8.1 |

Table 2.1.1 (b)
COMMUNICATION PAYLOAD FREQUENCY PLAN
(CHANNEL CENTER FREQUENCIES)
PS2 SATELLITE

| CHANNEL NO. | UPLINK/DOWNLINK (MHz) | MINIMUM USABLE BANDWIDTH FOR DEVAS(MHz) (Note) |
|---|---|---|
| CxS1 | 5905/2605 | 8.1 |
| CxS2 | 5915/2615 | 8.1 |
| CxS3 | 5915/2615 | 8.1 |
| CxS4 | 5925/2625 | 8.1 |
| CxS5 | 5905/2605 | 8.1 |

The optimization of spot beam coverage given in section 2.2 and down link center frequencies in S-band for each spot beam will be finalized in coordination with ISRO/Antrix.

Note: Reference Article 3.e of the Agreement, the additional usable bandwidth  for ISRO purposes in each of the ten channels given in Tables 2.1.1 (a) and (b) is 0.9 MHz. This additional usable bandwidth for ISRO is over and above the minimum usable bandwidth assigned for DEVAS.

2.2    COVERAGE

The coverage requirements shall be met for all the antenna beam pointing and satellite position errors.

2.2.1    Satellite Receive Coverage

For all the transponder (CxS1 to CxS5), the satellite receive coverage shall be all India beam (main land India).

2.2.2    Transmit Coverage

The transmit coverage shall be through five spot beams BCS1 to BCS5 as given in Fig. 2.2.2 and Table 2.2.2. The spot beam edge of coverage corresponds to 36 dB gain contour shown in Fig 2.2.2.

Figure 2.2.2
**S-Band Unfurlable Reflector Tx. /Rx. Antenna:**



S-BAND MBA ANTENNA PREDICTED PERFORMANCES
Tx-BAND

## S-band  EIRP

**Inner  Contour :  58 dBW**
**Outer Contour :  57 dBW**

**TABLE 2.2**

**C x S Transponder Transmit S-Band Spot Beam Coordinates**

| Spot Beam Designation | Approximate Beam Center Coordinates | |
|---|---|---|
| | Longitude Deg E | Latitude Deg N |
| BCS 1 | 78 | 31 |
| BCS2 | 92 | 25 |
| BCS3 | 73 | 21 |
| BCS4 | 83 | 21 |
| BCS5 | 78 | 13 |

NOTE: The optimization of spot beam coverage given in sections 2.2 and 3.2 and down link center frequencies in S-band for each spot beam will be finalized in coordination with ISRO/Antrix.

### 2.2.3    Beam Spatial Isolation

The edge of coverage to edge of coverage spatial isolation between the beams BCS1 and BCS5 and between beams BCS2 and BCS3 shall be a minimum of 18 dB.

### 2.3    POLARIZATION

The feeder up-link signals at C-band shall operate in the linear polarization as defined below:

Receive E field vector shall be linear vertical defined as being parallel to the spacecraft's nominal pitch axis.

The polarization alignment performance of the antennas for any and all points within the polarization ellipse shall not deviate from the direction parallel (horizontal) or orthogonal (vertical) to the Earth's equatorial plane, as applicable, by more than 0.6 degree in the presence of all pointing errors and maneuvers.

The transmit E-field vector for the downlink signals in S-band shall be in Right Hand Circular Polarization (RHCP).

The sense of circular polarization is as per the ITU Radio Regulation (1990), Article 1, RR 148.

The polarization axial ratio over each of the spot beams BCS1 to BCS5 shall be less than 2.5 dB.

The polarization isolation of feeder links will be a minimum of 26 dB over Indian main land.

### 2.4    GAIN

### 2.4.1    Saturation Flux Density and Channel Gain Settings

When any and all channels are set to the maximum gain and the spacecraft is illuminated with a flux density of −92+/- 2 dBW/m2 at the center frequency of that channel, by a single carrier of appropriate polarization in the direction of minimum antenna gain anywhere in the uplink coverage area, the output power amplifier in that channel shall be driven to saturation.

Provision shall be made to permit setting of channel gain for each channel by ground command, by inserting a variable attenuator into the transmission path. For each of the channels CxS1 to CxS5 the variable attenuator may be in two units having variations between

0 and 12 dB in one step of 5 db and in seven steps of 1 dB each. . For any setting of the attenuator the tolerance shall be within +/- 1 dB of its nominal value.

### 2.4.2.   Small Signal Gain Stability

The change in small signal gain at the center frequency of each transmission channel due to all causes, excluding antenna pointing stability, shall not exceed 2 dB peak to peak over any operating day, and +/-2 db over the lease period.

### 2.5   RECEIVE SYSTEM GAIN-TO-NOISE TEMPERATURE (G/T) RATIO

The receiver G/T of any channel, measured at any frequency within the receive band and anywhere within the uplink coverage area shall not be lower than – 5 dB/K for channels CxS1 to CxS5 under all channel loading and gain setting conditions.

The above value of the G/T ratio is referred to the interface between receive antenna and the pre-amplifiers.   The noise temperature involved in this ratio is the total system noise temperature, which includes the noise received by the antenna when properly oriented in orbit which shall be taken as 300 deg. K, the noise of the pre-amplifier, and the noise of all preceding and succeeding elements in the transmission channel.

### 2.6   TRANSMIT EIRP

The following minimum transmit EIRP levels per channel over the respective coverage areas shall be provided over the orbital maneuver life for DEVAS use.

> EIRP for channels CxS1 to CxS5: 56 dBW (min.)

The above EIRP values include variations due to all antenna pointing errors defined in Section 1.5 and position errors. .

### 2.7   GAIN FLATNESS

### 2.7.1   In-Band Frequency Response

The EIRP of any of the transmission channels at any specific point within the antenna coverage beam shall not vary by more than 1.5 dB peak to peak over the entire usable bandwidth when illuminated with a signal at saturation flux density level and shall not vary by more than 2 dB peak to peak when illuminated by a signal at a flux density 10 dB below saturation level. This frequency response shall include the transmit and receive antennas.

### 2.7.2   Gain Flatness Stability

The change in the gain flatness is defined as the residual change in frequency response after subtracting the gain change at the center frequency of the transmission channel.   The residual change shall not exceed 0.5 dB peak to peak over the usable bandwidth of the channels.  This specification applies over the leased period, as well as over any operating day including eclipse operations, measured at any fixed point within the coverage area.

### 2.7.3   Gain Slope Total

The maximum gain slope within the usable bandwidth of any transmission channel shall not exceed 0.5 dB/100 KHz over the usable bandwidth when the corresponding channel is illuminated at the saturation flux density.   The total gain slope is the performance of the complete channel including the receive and transmit antennas.

2.8    AM-PM TRANSFER COEFFICIENT

The AM-PM transfer coefficient measured with two carriers having an amplitude difference of up to 20 dB, with the larger carrier amplitude modulated to a depth of 1 dB shall meet the requirements given in Table- 2.8.1 under the following conditions:

a.    With any frequency separation between carriers within the channel bandwidth to a minimum of 0.3 MHz.
b.    At any frequency within the transmission channel.
c.    With any modulating frequency up to 2 MHz, but not more than one third of the frequency separation between the two carriers.

Table 2.8.1

AM-PM TRANSFER COEFFICIENT SPECIFICATIONS

| Total Flux Density of two carriers below the single carrier saturation flux density | AM-PM Transfer Coefficient (Deg./dB) |
|---|---|
| 0 dB | 7.5 |
| 3 dB | 8.5 |
| 6 dB | 8.5 |
| 9 dB | 7.5 |
| 12 dB | 5.0 |
| 14 dB | 3.0 |

The AM-PM transfer coefficient in the condition of a single carrier saturation shall not exceed 10 deg / dB.

2.9    LINEARITY

2.9.1    Linearity of the Receive Section

The ratio of carrier to each third order intermodulation product in the receiver section shall be as given in Table 2.10.1 when the spacecraft is illuminated with two equal amplitude carriers.

Table 2.9.1

THIRD ORDER INTERMODULATION PERFORMANCE OF COMMON INPUT SECTION

| Flux density at the spacecraft for each of two carriers (dBW/m2) | Third order intermodulation level (dBc) |
|---|---|
| -75 | - 50 |

2.9.2    Linearity of the Complete Transmission Channel

When any channel of the spacecraft is illuminated by two equal amplitude RF carriers, the level of the intermodulation product shall be as given in Table 2.9.2. The performance shall be met with any separation of the carriers with a minimum of 100 KHz, but within the usable bandwidth of the channels.

Table 2.9.2

THIRD ORDER INTERMODULATION LEVELS

| Flux density of each of two carriers, below the single carrier saturation flux density | Third Order Intermodulation Level (dBc) |
|---|---|
| 3 dB | -10 dB |
| 6 dB | -12 dB |
| 10 dB | - 16 dB |
| 17 dB | - 26 dB |

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 149
(USDC NO. 2:18-cv-01360)

## 2.10    OVER-DRIVE CAPABILITY

All the channels shall be designed to withstand for a maximum period of two hours, without subsequent degradation of performance over specified life time, single or multi carrier illumination flux densities up to 10 dB in excess of those required for transmission channel saturation at the lowest gain setting. Affected channel performance specifications need not be met during condition of over-drive.

## 2.11    GROUP DELAY

The following group delay specifications shall be met over the usable bandwidth of the channels when the spacecraft is illuminated with flux densities equal to or less than that required to produce saturation.  With the adjacent channels turned ON, the group delay specifications shall be met over the middle 60% of the usable bandwidth of each channel.  All the group delay values are relative with respect to the value at the center of the channel.

### 2.11.1  Input Group Delay

The input group delay measured between the input to the transmission channel including the receive antenna, and the output of the demultiplexer shall fall below the curves shown in values shown in Table 2.11.1 for channels CxS1 to CxS5.

Table 2.11.1

INPUT GROUP DELAY

| Frequency from Band Center (MHz) | Relative Group Delay in Nanoseconds |
|---|---|
| 0 | 0 |
| 4.5 | 80 |

### 2.11.2  Total Group Delay

The total channel group delay including contribution from the transmit and receive antennas shall fall below the values shown in Table 2.11.2 for Channels CxS1 to CxS5.

Table 2.112

TOTAL GROUP DELAY

| Frequency from Band Center (MHz) | Relative Group Delay in Nanoseconds |
|---|---|
| 0 | 0 |
| 4.5 | 125 |

### 2.11.3  Total Group Delay Ripple

The total group delay ripple over each transmission channel including receive and transmit antennas shall not exceed 3 nsec peak to peak over the usable bandwidth, under all gain settings.

### 2.11.4  Group Delay Stability

Long and short term variation in group delay normal operations including eclipse shall not exceed +/- 5 nsec over the usable bandwidth.

## 2.12    FREQUENCY CONVERSION

The CxS1 to CxS5 channels shall receive the signals in the 6 GHz frequency band and translate them to the 2.5 GHz band by a net frequency translation of 3300 MHz.

There shall be no frequency inversions during these frequency translations.  The net translation error including initial tolerance shall not exceed +/- 25 KHz over the lease period of the spacecraft.  The net translation error over one month, over the daily temperature variation excluding eclipse effect, shall not exceed +/- 2.5 KHz and +/- 5 KHz over design life.  The net translation error over a thirty day period during the eclipse season shall not exceed +/- 6 KHz.

The single sideband phase noise level induced on a carrier at he following separations from the carrier shall not exceed the values given below:

|  |  |
|---|---|
| 100 Hz: | - 62 dBc |
| 1 KHz: | - 80 dBc |
| 100 KHz: | - 94 dBc |

The composite frequency modulation caused by the sum of all discrete and continuous spectral components shall not exceed a value of 40 Hz rms when integrated over the bandwidth of 100 Hz to 10 KHz.

2.13    NARROW-BAND OUT-OF-BAND RESPONSE

2.13.1  Narrow-Band Receive Out-of-Band Response.

This parameter is measured between the input to the transmission channel including the receive antenna and the output of the Demultiplexer filter, and shall not exceed the values given in Table 2.13.1.

Table 2.13.1

| TRANSPONDER | FREQUENCY FROM THE BAND CATER | MAXIMUM OUT OF BAND RESPONSE |
|---|---|---|
| CxS1 to CxS5 | +/- 6 MHz<br>+/- 9 MHz<br>+/- 12 MHz and beyond | - 20 dB<br>-55 dB<br>-65 dB |

2.13.2  Narrow-Band Transmit Out-of-Band Response

This parameter is measured between the input to the driver/power amplifier and the output of the transmit channel, including the transmit antenna, and shall not exceed the values given in Table 2.13.2.

Table 2.13.2

NARROW-BAND TRANSMIT OUT-OF-BAND RESPONSE

| TRANSPONDER | FREQUENCY FROM THE BAND CATER | MAXIMUM OUT OF BAND RESPONSE |
|---|---|---|
| CxS1 TO CxS5 | +/- 9 MHz<br>+/- 12 MHz & Beyond | - 15 dB<br>- 30 dB |

2.13.3  Wide Band Receive Out-of –Band Response

Band pass pre-select filters shall be provided prior to the switch at the input to the C-Band receivers and shall have responses as given in Table 2.14.3, beyond the range of usable bandwidth.

Table 2.13.3

WIDE BAND RECEIVE OUT-OF-BAND RESPONSE

| Rx. FREQUENCY BAND | MAXIMUM OUT OF BAND RESPONSE |
|---|---|
| 5800 MHz | - 20 dB |
| 5980  MHz | - 20 db |
| 5860-5890 MHz | Pass Band (PS1) |
| 5900-5930 MHz | Pass Band (PS2) |
| 5750MHz | - 30 dB |
| 6050 MHz | - 30 dB |
| | |
| 2550 MHz | - 130 dB |
| 3680 MHz | - 100 dB |

## 2.14    SPURIOUS OUTPUTS

The spurious outputs include all unwanted products, both passive as well as those resulting from frequency conversion stages, image frequencies and leakages.   The total power resulting from the sum of all spurious signals measured at the input to the transmit antenna shall not exceed –55 dBW in any 1.0 MHz band and –60 dBW in any 4 KHz band, over the usable frequency bands of  2550-2655 MHz.

The total power sum of all harmonics of the communication signals resulting from the operation of any of the transmission channels at the input to the transmit antenna shall be less than – 40dBc.

The intermodulation product from a single carrier with any harmonic of the receiver conversion frequency shall be at least 60 dB below the single carrier, which is saturating the channel.  The above shall be met with the variable attenuator being set at the maximum value in the channel in which the test carrier is present as well as the channels in which the spurious products are being observed.  The channel in which the spurious product appears shall not be loaded.

## 2.15    REDUNDANCY AND SWITCHING CHARACTERISTICS

The redundancy for the DEVAS payload equipment shall be as shown in Table 2.15.

TABLE 2.15

REDUNDANCY FOR THE COMMUNICATIONS PAYLOAD EQUIPMENT

| C-band Receivers | 2 for 1 |
|---|---|
| S-band TWTAs | 3 for 2 and 4 for 3I |

Switching off the active unit and switching on the redundant unit shall be performed by ground command. The maximum duration of traffic interruption for the unaffected transponders shall not exceed four minutes.  A telemetry signal shall confirm that the switching-off and switching-on commands have been executed. All TWTAs shall have auto restart function.

## 2.16    CESSATION OF EMISSIONS

It shall be possible to turn each individual Transponder channel ON or OFF by ground command.

2.17    PERFORMANCE SHORTAGE

The CxS payload together with the spacecraft bus shall provide uninterrupted performance over the duration of the lease as per the specifications given in the preceding sections.

In the event of performance of the payload being below the specified levels, DEVAS will examine the impact of the same on DEVAS services and will determine the usability or otherwise of the payload for DEVAS services. Amongst several critical parameters of the CXS transponders, the transmit EIRP  values and the bandwidth per CxS transponder at the specified frequencies over specified coverage areas are of special nature and any shortage in performance of these parameters, in particular,  will severely effect DEVAS services.

2.18    INTERRUPTIONS

There shall be no prolonged and/or recurring degradation in any of the CxS transponder performance leading to interruptions to DEVAS services. . In the event of any interruption to DEVAS services lasting longer than one minute and any recurring interruptions of even smaller durations and attributable to PS-1, ANTRIX shall provide within fifteen days, detailed analysis of the reasons for the occurrences of such interruptions together with the remedial action taken to prevent such interruptions.

3.0    S x C COMMUNICATION PAYLOAD PERFORMANCE

The communication payload performance specifications given in this Section are applicable to the SxC1 to SxC5 transponders of PS-1. All the specifications in Section 3 are applicable to both Primary and spare satellite.

3.1    FREQUENCY AND CHANNELIZATION PLAN

The communication payload shall be in the frequency bands given below:

> Uplink band: 2670-2680 MHz
> Downlink band: 3680 – 3690 MHz (feeder links)

The transmission channels and their center frequencies shall be as given in Table 3.1. The channels shall have minimum usable bandwidth of 2.7 MHz.

Table 3.1
COMMUNICATION PAYLOAD FREQUENCY PLAN
(CHANNEL CENTER FREQUENCIES)

| CHANNEL NO. | UPLINK/DOWNLINK (MHz) | MINIMUM USABLE BANDWIDTH (MHz) |
|---|---|---|
| SxC1 | 2671.6/3681.6 | 2.7 |
| SxC2 | 2674.9/3684.9 | 2.7 |
| SxC3 | 2674.9/3694.8 | 2.7 |
| SxC4 | 2678.2/3688.2 | 2.7 |
| SxC5 | 2671.6/3691.5 | 2.7 |

The optimization of spot beam coverage given in section 3.2 and uplink center frequencies in S-band for each spot beam will be finalized in coordination with ISRO/ANTRIX.

Note: Reference Article 3.e of the Agreement the specific transmission parameters for sharing the SxC tranponders bandwidth for INSAT utilization will be worked out between DEVAS and ANTRIX.

3.2    COVERAGE

The coverage requirements shall be met for all the antenna beam pointing and satellite position errors.

3.2.1    Satellite Receive Coverage

The receive coverage shall be through five spot beams BSC1 to BSC5 as given in Figure 3.2.1 The spot beam edge of coverage corresponds to the 36 dB gain contour shown in Fig 3.2.1.

### TABLE 3.2

**SxC Transponder Receive S-Band Spot Beam Coordinates**

| Spot Beam Designation | Approximate Beam Center Coordinates | |
| --- | --- | --- |
| | Longitude Deg E | Latitude Deg N |
| BSC1 | 78 | 31 |
| BSC2 | 92 | 25 |
| BSC3 | 73 | 21 |
| BSC4 | 83 | 21 |
| BSC5 | 78 | 13 |

NOTE: The optimization of spot beam coverage given in sections 2.2 and 3.2 and down link center frequencies in S-band for each spot beam will be finalized in coordination with ISRO/Antrix.

Figure 3.2.1



**S-band G/T : 6 to 7 dB/K**

3.2.2   Transmit Coverage

For all the transponder (SxC1 to SxC5), the satellite transmit coverage shall be all India beam (main land India).

3.2.3   Beam Spatial Isolation

The edge of coverage to edge of coverage spatial isolation between the beams BSC1 and BSC5 and between beams BSC2 and BSC3 shall be a minimum of 18 dB.

3.3    POLARIZATION

The receive E field vector of the uplink signals in S-band shall be in Right Hand Circular Polarization (RHCP).

The sense of circular polarization is as per the ITU Radio Regulation (1990), Article 1, RR 148.

The polarization axial ratio over each of the spot beams BSC 1 to BSC 5 shall be less than 2.5 dB.

The feeder downlink signals at C-band shall operate in the linear polarization as defined below:

The transmit E field vector shall be horizontal, defined as being parallel to the spacecraft's nominal roll axis.

The polarization alignment performance of the antennas for any and all points within the polarization ellipse shall not deviate from the direction parallel (horizontal) or orthogonal (vertical) to the Earth's equatorial plane, as applicable, by more than 0.6 degree in the presence of all pointing errors and maneuvers.

The polarization isolation of the feeder links shall be a minimum of 26 dB over Indian main land.

3.4    GAIN

3.4.1    Saturation Flux Density and Channel Gain Settings

When any and all channels are set to the maximum gain and the spacecraft is illuminated with a flux density of −108 +/- 2 dBW/m2 at the center frequency of that channel, by a single carrier of appropriate polarization in the direction of minimum antenna gain anywhere in the primary coverage area, the output power amplifier in that channel shall be driven to saturation.

Provision shall be made to permit setting of channel gain for each channel by ground command, by inserting a variable attenuator into the transmission path.

For each of the channels SxC1 to SxC5  the variable attenuator may be in two units having variations between 0 and 22 dB, with the first unit having a single step of 9.5 dB and the second unit having five  steps, each of 2.5 dB.  For any setting of the attenuator the tolerance shall be within +/- 1 dB of its nominal value.

3.4.2    Small Signal Gain Stability

The change in small signal gain at the center frequency of each transmission channel due to all causes, excluding antenna pointing stability, shall not exceed 2 dB peak to peak over any operating day, and over the lease period.

3.5    RECEIVE SYSTEM GAIN-TO-NOISE TEMPERATURE (G/T) RATIO

The receiver G/T of any channel, measured at any frequency within the receive band and anywhere within edger of coverage area shall not be lower than + 6 dB/K for channels SxC1 to SxC5 under all channel loading and gain setting conditions.

The above value of the G/T ratio is referred to the interface between receive antenna and the pre-amplifiers.  The noise temperature involved in this ratio is the total system noise temperature, which includes the noise received by the antenna when properly oriented in orbit which shall be taken as 300 deg. K, the noise of the pre-amplifier, and the noise of all preceding and succeeding elements in the transmission channel.

3.6   TRANSMIT EIRP

The following EIRP levels per channel over the respective coverage areas under single carrier saturation" shall be achieved over the orbital maneuver life.

EIRP for channels SxC1 to SxC5: 36 dBW (min.) over Bangalore, Chennai, Delhi, and Mumbai.

Saturation level in the case of SSPA is defined as the rated output power at 2 dB gain compression point.

3.7   GAIN FLATNESS

3.7.1   In-Band Frequency Response

The EIRP of any of the transmission channels at any specific point within the antenna coverage beam shall not vary by more than .1.5 dB peak to peak over the usable bandwidth when illuminated with a signal at saturation flux density level and shall not vary by more than 2 dB peak to peak when illuminated by a signal at a flux density 10 dB below saturation level.

3.7.2   Gain Flatness Stability

The change in the gain flatness is defined as the residual change in frequency response after subtracting the gain change at the center frequency of the transmission channel.  The residual change shall not exceed 0.5 dB peak to peak over the usable bandwidth of the channels.  This specification applies over the leased period, as well as over any operating day including eclipse operations, measured at any fixed point within the coverage area.

3.7.3   Gain Slope Total

The maximum gain slope within the usable bandwidth of any transmission channel shall not exceed 0.5 dB/100KHz over the usable bandwidth when the corresponding channel is illuminated at the saturation flux density.  The total gain slope is the performance of the complete channel including the receive and transmit antennas.

3.8   AM-PM TRANSFER COEFFICIENT

The AM-PM transfer coefficient measured with two carriers having an amplitude difference of up to 20 dB, with the larger carrier amplitude modulated to a depth of 1 dB shall meet the requirements given in Table- 3.8.1 under the following conditions:

a.   With any frequency separation between carriers within the channel bandwidth to a minimum of 0.3 MHz.
b.   At any frequency within the transmission channel.
c.   With any modulating frequency up to 1 MHz, but not more than one third of the frequency separation between the two carriers.

Table 3.8.1

AM-PM TRANSFER COEFFICIENT SPECIFICATIONS

| Total Flux Density of two carriers below the single carrier saturation flux density | AM-PM Transfer Coefficient (Deg./dB) |
|---|---|
| 0 dB | 7.5 |
| 3 dB | 8.5 |
| 6 dB | 8.5 |
| 9 dB | 7.5 |
| 12 dB | 5.0 |
| 14 dB | 3.0 |

The AM-PM transfer coefficient in the condition of a single carrier saturation shall not exceed 10 deg / dB.

## 3.9 LINEARITY

### 3.9.1   Linearity of the Receive Section

The ratio of carrier to each third order intermodulation product in the receiver section shall be at least 50 dB, when the spacecraft is illuminated with two equal amplitude carriers within the usable bandwidth of the channels, each at saturation flux density level. The gain of the channels shall be set at the lowest value while testing this parameter.

### 3.9.2   Linearity of the Complete Transmission Channel

When any channel of the spacecraft is illuminated by two equal amplitude RF carriers, the level of the intermodulation product shall be as given in Table 3.9.2. The performance shall be met with any separation of the carriers with a minimum of 100 KHz, but within the usable bandwidth of the channels.

Table 3.9.2

THIRD ORDER INTERMODULATION LEVELS

| Flux density of each of two carriers, below the single carrier saturation flux density | Third Order Intermodulation Level (dBc) |
|---|---|
| 3 dB | -13 dB |
| 6 dB | -16 dB |
| 10 dB | - 20 dB |
| 17 dB | - 30dB |

## 3.10   OVER-DRIVE CAPABILITY

All the channels shall be designed to withstand for a maximum period of two hours, without subsequent degradation of performance over specified life time, single or multi carrier illumination flux densities up to 10 dB in excess of those required for transmission channel saturation at the lowest gain setting. Affected channel performance specifications need not be met during condition of over-drive.

## 3.11   GROUP DELAY

The following group delay specifications shall be met over the usable bandwidth of the channels when the spacecraft is illuminated with flux densities equal to or less than that required to produce saturation.  With the adjacent channels turned ON, the group delay specifications shall be met over the middle 60% of the usable bandwidth of each channel.  All the group delay values are relative with respect to the value at the center of the channel.

### 3.11.1  Input Group Delay

The input group delay measured between the input to the transmission channel including the receive antenna, and the output of the demultiplexer shall be lower than the values given in Table 3.11.1

Table 3.11.1

INPUT GROUP DELAY

| Frequency from Band Center (MHz) | Relative Group Delay in Nanoseconds |
|---|---|
| 0 | 0 |
| 1.35 | 65 |

### 3.11.2  Total Group Delay

The total channel group delay including contribution from the transmit and receive antennas shall be lower than the values given in Table 3.12.2 for Channels SxC1 to SxC5.

Table 3.11.2

INPUT GROUP DELAY

| Frequency from Band Center (MHz) | Relative Group Delay in Nanoseconds |
|---|---|
| 0 | 0 |
| 1.35 | 65 |

### 3.11.3  Total Group Delay Ripple

The total group delay ripple over each transmission channel including receive and transmit antennas shall not exceed 3 nsec peak to peak over the usable bandwidth, under all gain settings.

### 3.11.4  Group Delay Stability

Long and short term variation in group delay normal operations including eclipse shall not exceed +/- 5 nsec over the usable bandwidth.

### 3.12     FREQUENCY CONVERSION

The SxC1 to SxC5 channels shall receive the signals in the 2.6 GHz frequency band and translate them to the 4 GHz band by a net frequency translation of 1100 MHz.

There shall be no frequency inversions during these frequency translations.   The net translation error including initial tolerance shall not exceed +/- 25 KHz over the design life of the spacecraft.  The net translation error over one month, over the daily temperature variation excluding the eclipse effect, shall not exceed +/- 2.5 KHz.

The single sideband phase noise level induced on a carrier at he following separations from the carrier shall not exceed the values given below:

> 100 Hz:        - 62 dBc
> 1 KHz:         - 80 dBc
> 100 KHz:       - 90 dBc

The composite frequency modulation caused by the sum of all discrete and continuous spectral components shall not exceed a value of 40 Hz rms when integrated over the bandwidth of 100 Hz to 10 KHz.

### 3.13     NARROW-BAND OUT-OF-BAND RESPONSE

### 3.13.1  Narrow-Band Receive Out-of-Band Response.

This parameter is measured between the input to the transmission channel including the receive antenna and the output of the Demultiplexer filter, and shall not exceed the values given in Table 3.13.1.

Table 3.13.1

| TRANSPONDER | FREQUENCY FROM THE BAND CATER | MAXIMUM OUT OF BAND RESPONSE |
|---|---|---|
| SxC1 to SxC5 | +/-  2.6 MHz | - 30 dB |
| | +/-  3.5 MHz & Beyond | -45 dB |

### 3.13.2   Narrow-Band Transmit Out-of-Band Response

This parameter is measured between the input to the driver/power amplifier and the output of the transmit channel, including the transmit antenna, and shall not exceed the values given in Table 3.13.2.

Table 3.13.2

NARROW-BAND TRANSMIT OUT-OF-BAND RESPONSE

| TRANSPONDER | FREQUENCY FROM THE BAND CATER | MAXIMUM OUT OF BAND RESPONSE |
|---|---|---|
| SxC1 TO SxC5 | 3688.2+/-12 MHz<br>3688.2+/- 14 MHz | - 25 dB<br>- 30 dB |

### 3.13.3   Wide Band Receive Out-of –Band Response

Band pass pre-select filters shall be provided prior to the switch at the input to the S-Band receivers and shall have responses as given in Table 3.13.3, beyond the range of usable bandwidth.

Table 3.13.3

WIDE BAND RECEIVE OUT-OF-BAND RESPONSE

| Rx. FREQUENCY BAND | MAXIMUM OUT OF BAND RESPONSE |
|---|---|
| 2700 MHz | - 10 dB |
| 2710 MHz | - 30  dB |
| 3680 MHz | - 80dB |
| 5850 MHz | - 80 dB |
| 2550 MHz | - 130 dB |

### 3.14   SPURIOUS OUTPUTS (TBD)

The spurious outputs include all unwanted products, both passive as well as those resulting from frequency conversion stages, image frequencies and leakages.   The total power resulting from the sum of all spurious signals measured at the input to the transmit antenna shall not exceed – 55 dBW in any 1.0 MHz band and –50 dBW in any 4 KHz band, over the usable frequency bands of 2.5-2.7 GHz and 3.68-3.70 GHz.

The total power sum of all harmonics of the communication signals resulting from the operation of any of the transmission channels at the input to the transmit antenna shall be less than -40 dBc.

The intermodulation product from a single carrier with any harmonic of the receiver conversion frequency shall be at least 60 dB below the single carrier, which is saturating the channel.  The above shall be met with the variable attenuator being set at the maximum value in the channel in which the test carrier is present as well as the channels in which the spurious products are being observed.  The channel in which the spurious product appears shall not be loaded.

### 3.15   REDUNDANCY AND SWITCHING CHARACTERISTICS

The redundancy for the DEVAS payload equipment shall be as shown in Table 3.15.

TABLE 3.15

REDUNDANCY FOR THE COMMUNICATIONS PAYLOAD EQUIPMENT

| S-band Receivers per beam | 2 for 1 |
| TWTAs/SSPAs in C-band | 2 for 1 |

Switching off the active unit and switching on the redundant unit shall be performed by ground command.  The maximum duration of traffic interruption for the unaffected transponders shall not exceed 1.5 seconds. A telemetry signal shall confirm that the switching-off and switching-on commands have been executed.

3.16   CESSATION OF EMISSIONS

It shall be possible to turn each individual Transponder ON or OFF by ground command.

3.17   PERFORMANCE SHORTAGE

The SxC payload together with the spacecraft bus shall provide uninterrupted performance over the duration of the lease as per the specifications given in the preceding sections.

In the event of performance of the payload being below the specified levels, DEVAS will examine the impact of the same on DEVAS services and will determine the usability or otherwise of the payload for DEVAS services. Amongst several critical parameters of the SxC transponders, the receive G/T values, gain  and the bandwidth per SxC transponder at the specified frequencies over specified coverage areas are of special significance for DEVAS services and any shortage in performance of these parameters, in particular,  will severely effect the DEVAS services.

3.18   INTERRUPTIONS

There shall be no prolonged and/or recurring degradation in any of the SxC transponder performance leading to interruptions to DEVAS services. In the event of any interruption to DEVAS services lasting longer than one minute and any recurring interruptions of even smaller durations  and attributable to  PS-1, ANTRIX shall provide within fifteen days, detailed analysis of the reasons for the occurrences of such interruptions together with the remedial action taken to prevent such interruptions.

4.0     **Service Level Agreements (SLAs)**

SLAs, which include procedures and protocols for any deviations, waivers with respect to the specifications and escalation procedures, will be evolved and mutually agreed upon by ANTRIX and DEVAS.

**EXHIBIT B**
**TO**
**AGREEMENT NO. ANTX/203/DEVAS/2005**


**CHARGES AS PER ARTICLE 4 OF AGREEMENT**

**EXHIBIT B**

**1.0 Overview**

This exhibit describes any and all payments to be made by DEVAS to ANTRIX as per the terms and conditions described in this Agreement.

**1.1 Payment Currency**

ALL PAYMENTS WILL BE MADE IN INDIAN RUPEES (INR). AMOUNTS LISTED IN US DOLLARS (US$) WILL BE PAID IN THE EQUIVALENT INR AT THE PREVAILING EXCHANGE RATE EFFECTIVE ON THE DATE OF THE SIGNING OF THIS AGREEMENT; NAMELY **$1 = XX RUPEES**).

**1.2 Payment Types and Schedules**

Payments consist of 3 types, Upfront Reservation Fees, Lease Fees, and Critical Component Acquisition Fees.

***1.2.1 Upfront Capacity Reservation Fees***

These are amounts paid in advance of satellite service Delivery. The schedule for these payments is in accordance with the type of the satellite and is described in detail later in this document.

***1.2.2 Lease Fees***

These are amounts paid for the Leased Capacity. These amounts are paid quarterly, in advance, for the Lease Period.

***1.2.3 Critical Component Acquisition Fees***

These are amounts paid to acquire Critical Components.

**1.3 Payment Terms**

All Payments will be made within 30 (thirty) days from the date of receipt of invoice. If DEVAS is late in paying, an interest of 10% per annum will be added. DEVAS will have 12 (twelve) months to make lease fee payments in full (including interest), beyond which DEVAS will be considered to be in material breach of this Agreement.  Any delays in payment of Upfront Capacity Reservation Fees shall constitute material breach of this Agreement.

**2.0 Primary Satellite 1 (PS1)**

**2.1 Payments**

Payments for lease service from PS1 consist of Upfront Capacity Reservation Fees and Lease Fees.

***2.1.1 Upfront Capacity Reservation Fees***

The Upfront Capacity Reservation Fees for PS1 will be US$ 20 Million (twenty Million) to be paid in 3 (three) equal installments according to the following schedule:

- The first installment will be due after ANTRIX has provided written notification to DEVAS of having received all necessary approvals (as described below) for the capacity lease  service from PS1 and DEVAS has provided written acceptance of the same to ANTRIX. DEVAS is required to make the first installment within 12 (twelve)  months of receipt of notification from ANTRIX indicating that it has received all requisite governmental and other regulatory approvals for its part of responsibilities under this Agreement and written acceptance of the same from DEVAS to ANTRIX. It is explicitly understood that ANTRIX will not begin building PS1 until 100% of the first installment has been paid by DEVAS.
- The second installment will be due after ANTRIX has provided written notification to DEVAS and DEVAS has provided written acceptance to ANTRIX of the completion of the Critical Design Review (CDR) for PS1 by ISRO.
- The third installment will be due after ANTRIX has provided written notification to DEVAS of completion of Pre Shipment Review of PS1 and DEVAS has provided written acceptance to

ANTRIX of same at the conclusion of PSR. DEVAS shall not unduly delay its written acceptance of the notifications provided by Antrix of the completion of above milestones and is expected to provide its response within a week after receipt of any such notifications.

### 2.1.2.A Lease Fees Variation Provision

All the lease payments, which are specified in this contract are subject to adjustment for price variation as per the following formula, depending on the year for which the lease payment is applicable.

$$P_n = P_o \left[ 0.5 + 0.5 \left\{ \frac{I_{n-1}}{I_o} \right\} \right]$$

$P_o$ = Annual Lease Fees with any applicable lease incentive as defined in articles 2.1.2 and 2.1.2.1.

$I_o$ = Wholesale Price Index for the immediate past year to the fiscal year in which the lease starts.

$I_{n-1}$ = Wholesale Price Index for $(n-1)^{th}$ fiscal year, counting from the fiscal year in which the least starts.

$P_n$ = Annual Lease price applicable for $n^{th}$ fiscal year, counting from the fiscal year in which the lease starts.

The Wholesale Price Index refers to the General Index of Wholesale Prices (Base 1993-94 = 100) published by Centre for Monitoring Indian Economy Pvt. Ltd., and whose value for the year 2003-04 is 175.9.

### 2.1.2.B Lease Fees

Lease Fees for PS1 will be US$ 9 (nine) Million per annum, payable quarterly in advance, for the duration of the Lease Period. Payments will start on the Commencement Date with the first payment being pro-rated based on the number of days in the quarter from the Commencement Date.

### 2.1.2.1 Lease Incentive

Lease Fees for PS1 will increase to US$ 11.25 per annum, payable quarterly in advance, for the duration of the Lease Period starting with the quarter following the quarter in which DEVAS becomes Cash-Flow Positive and till the end of the Lease Period.

### 2.1.2.2 Delayed Delivery Penalty

If the Delivery of lease service from PS1 is delayed beyond the schedule described in Section 2.2, a penalty of US$416,666 will apply to ANTRIX for every month (or part thereof) of delay. The penalty will be capped at $5M (five) which equates to a delay of 12 (twelve) months. If the delay exceeds 12 (twelve) months, ANTRIX will be considered to be in material breach of this agreement.

The penalty applicable under this clause will be deducted in equal parts from the first 3 (three) years of the annual Lease Fees.

### 2.1.2.3 Early Delivery Incentive

If the Delivery of lease service from PS1 is earlier than the schedule described in Section 2.2, DEVAS will pay an incentive of US$416,666 for each month (or part thereof) of early Delivery. The incentive will be capped at $5 (five)M which equates to 12 (twelve) months of early Delivery.

The incentive applicable under this clause will be paid in equal parts as an addition to the first 3 (three) years of the annual Lease Fees.

## 2.2 Schedule

ANTRIX is required to deliver the lease service from PS1 within 30 (thirty) months from the payment date of First Installment.  An additional 6 (six) month grace period is provided before the application of penalties described in Section 2.1.2.2. . For further details regarding the Schedule, please refer to Article 3.b of the Agreement.

## 3.0 Critical Components

DEVAS has the option to order Critical Components that will be used in the manufacture of either a Replacement Satellite or a satellite used for additional lease capacity (PS2).

3.1 Replacement Satellite in case of either launch or total satellite failure of PS1
As per provisions of Article 3.d, ANTRIX is responsible for providing services from a Replacement Satellite which will be designed, manufactured and launched at its costs in case of either launch or total satellite failure of PS1.

### 3.1.1. Standard Schedule (24 (twenty four) months)

ANTRIX will be required to Deliver lease service from a Replacement Satellite within a maximum of 24 (twenty four) months from the Satellite Failure of PS1. DEVAS shall make no payments over and above those already made for the corresponding satellite. Once Delivered, the Lease Fees, Lease Incentives and related terms will be identical to those of the original satellite.

Any delays beyond the 24 (twenty four) month time limit will result in ANTRIX being in material breach of the Agreement after a grace period of 3 (three) months.

### 3.1.1.1 Accelerated Schedule 1 (18 (eighteen) months)

ANTRIX will be required to Deliver lease service from a Replacement Satellite within a maximum of 18 (eighteen) months with an additional grace period of 3 (three) months from the Satellite Failure of PS1 if DEVAS has already paid a Critical Component Acquisition Fee of US$ 5 (five)  Million within twelve months from the date of payment of first installment of Upfront Capacity Reservation Fee. DEVAS must notify ANTRIX in writing regarding its intent to accelerate the deployment schedule of the Replacement Satellite to 18 (eighteen) months within a maximum of 12 (twelve) months from the First Installment Date for the original PS1. The additional US$ 5 (five) Million required for this accelerated schedule is considered an advance on the Lease Fees and must be paid in full at the time of notification by DEVAS. Once Delivered, the Lease Fees for the first full year of operation will be US$ 4 (four) Million. From the start of the second year through the Lease Period, the Lease Fees will be US$ 9 (nine) Million. until DEVAS becomes Cash Flow Positive. Thereafter Lease Incentive will apply as per Section 2.1.2.1. In case DEVAS has already become cash flow positive as on the date of commencement of service from a replacement satellite, the lease fees for the first full year of operation will be US $6.25m. From the start of 2nd year through the lease period, lease incentive will apply as per section 2.1.2,1.

If the Delivery of the Replacement Satellite is delayed by up to 6 (six) months beyond the grace period of 3 (three) months, a penalty of US$ 416,666 will apply for each month) of delay. If the delay is greater than 6 (six) months beyond the grace period of 3 (three) months, ANTRIX will be considered to be in material breach of this Agreement. The penalty applicable under this clause will be deducted in equal parts from the first three years annual Lease Fees.
However, immediately following the launch failure or total satellite failure, if ANTRIX has sufficient reasons to believe that implementation of accelerated schedule is not feasible, both parties will discuss in good faith to arrive at a mutually acceptable solution.

### 3.1.1.2 Accelerated Schedule 2 (12 months)

ANTRIX will be required to Deliver service from  a Replacement Satellite within a maximum of 12 (twelve) months with an additional  grace period of 3 (three) months  from the Satellite Failure of PS1 if DEVAS  has already paid a Critical Component Acquisition Fee of US$ 10 Million within twelve months from the date of payment of the first installment of Upfront Capacity Reservation Fee. DEVAS must notify ANTRIX in writing regarding its intent to accelerate the deployment schedule of the Replacement Satellite to 12 (twelve)  months within a maximum of 12 (twelve) months from the First Installment Date for the original PS1. The additional US$ 10 (ten) Million required for this accelerated

schedule is considered an advance on the Lease Fees and must be paid in full at the time of notification by DEVAS. Once Delivered, the Lease Fees will be waived for the first full year of operation. The Lease Fees for the second year will be US$ 8 (eight) Million. From the start of the third year through the Lease Period, the Lease Fees will be US$ 9 (nine) Million until DEVAS becomes Cash Flow Positive. Thereafter Lease Incentive will apply as per Section 2.1.2.1.

In case DEVAS has already become cash flow positive as on the date of commencement of service from a replacement satellite, the lease fee for the first full year of operation will be US$ 1.25m. From the start of the 2nd year through the lease period, the lease incentive will apply as per section 2.1.2.1.

If the Delivery of the service from Replacement Satellite is delayed beyond the grace period of 3 (three) months by up to 12 (twelve) months, a penalty of US$ 416,666 will apply for each month of delay. If the delay beyond grace period of 3 (three) months is greater than 12 (twelve) months, ANTRIX will be considered to be in material breach of this Agreement. The penalty applicable under this clause will be deducted in equal parts from the first three years annual Lease Fees.

However, immediately following the launch failure or total satellite failure, if ANTRIX has sufficient reasons to believe that implementation of accelerated schedule is not feasible, both parties will discuss in good faith to arrive at a mutually acceptable solution.

### 3.1.2 Satellite Failure of the Replacement Satellite

Since the Replacement Satellite is being launched because of the Launch or total Satellite Failure of PS1, in case of Launch or total Satellite Failure of the Replacement Satellite, ANTRIX will be in material breach of this Agreement.

### 3.2 Critical Components Used in PS2

In case of a successful Delivery of PS1, DEVAS has the option to use Critical Components in PS2. This assumes that DEVAS has already placed an order for Critical Components by paying the Critical Component Acquisition Fee within twelve months of the date of payment of first installment of Upfront Capacity Reservation Fee for PS1. If DEVAS has not already placed an order for Critical Components, it can order a new PS2 under the terms and conditions described in Section 4 below.

### 3.2.1 Payments & Schedule

If DEVAS has paid a Critical Component Acquisition Fee of US$ 5 (five) Million when the order was placed for Critical Components, it will have to pay an additional US$ 15 (fifteen) Million when placing the order for PS2. This additional US$ 15 (fifteen) Million will be paid in one single installment. The total amount of US$ 20 (twenty) Million will be the Upfront Capacity Reservation Fee and will be over and above annual Lease Fees for PS2. ANTRIX is required to Deliver service from PS2 within 18 (eighteen) months with an additional grace period of 3 (three) months of making the US$ 15 Million payment. If the Delivery of PS2 is delayed up to 6 (six) months beyond the grace period of 3 (three) months a penalty of US$ 416,666 will apply per month to ANTRIX. If the delay is greater than 6 (six) months beyond the grace period of 3 (three) months, ANTRIX will be considered to be in material breach of this Agreement. The penalty applicable under this clause will be deducted in equal parts from the first 3 (three) year's annual Lease Fees.

If DEVAS has paid a Critical Component Acquisition Fee of US$ 10 (ten) Million when the order was placed for Critical Components, it will have to pay an additional US$ 10 (ten) Million when placing the order for PS2. This additional US$ 10 (ten) Million will be paid in one single installment. The total amount of US$ 20 (twenty) Million will be the Upfront Capacity Reservation Fee and will be over and above annual Lease Fees for PS2. ANTRIX is required to Deliver PS2 within 12 (twelve) months (with a further grace period of 3 (three) months) of making the US$ 10 (ten) Million payment. If the Delivery of PS2 is delayed by up to 15 (fifteen) months, a penalty of US$ 416,666 will apply for each month (or part thereof) of delay. If the delay is greater than 15 (fifteen) months, ANTRIX will be considered to be in material breach of this Agreement. The penalty applicable under this clause will be deducted in equal parts from the first three years annual Lease Fees.

If DEVAS has become Cash Flow Positive, a Lease Fees of US$ 11.25 Million per annum will apply. Otherwise Lease Fee of US$ 9 (nine) Million per annum will apply until DEVAS becomes Cash Flow Positive.

### 3.2.2 Satellite Failure of PS2

In case of Total Satellite Failure of PS2, provision of Article 3.d will apply

### 3.3 Critical Component Storage

Once Critical Components have been procured on behalf of DEVAS, ANTRIX agrees to store those components for a maximum of 5 (five) years. After the end of the 5-year period ANTRIX shall have the right to use those components for its own purposes.

### 4.0 Primary Satellite 2 (PS2)

DEVAS has the option to order service from an additional satellite to provide incremental Lease Capacity. This satellite can be ordered at any time during the term of this Lease Period.

### 4.1 Payments

If DEVAS places an order for PS2 within 3 (three) years of the First Installment Date, all payment terms for PS2 will be identical to that for PS1 except for the specific provisions relating to replacement satellite services for PS2 in this agreement. For the sake of clarity, it is agreed here that lease incentive terms as per para 2.1.2.1 above, will be applicable in case of PS2 or any additional capacity as well, any time after lease incentive payable for PS1. If the order is placed after 3 (three) years of the First Installment Date, both parties will negotiate new terms for PS2.

### 4.2 Schedule

If DEVAS places an order for PS2 at the same time that it places an order for PS1, ANTRIX will Deliver PS2 within 6 (six) months of the Delivery of PS1, assuming PS1 was successful.

If PS1 and PS2 were ordered at the same time and there is Satellite Failure of PS1, PS2 will become the new PS1. The Upfront Capacity Reservation Fee of US$ 20 (twenty) Million paid for PS2 will be considered an advance on the Lease Fees for PS1 and applied as follows: the Lease Fees will be waived for the first 2 (two) years. The Lease Fee for the third year will be US$ 7(seven) Million. The Lease Fees for the fourth year through the Lease Period will be US$ 9 (nine) Million with applicable Lease Incentives upon DEVAS becoming Cash Flow Positive. The new PS1 will be Delivered within 9 (nine) months of the original Delivery date of PS1.

Services from the replacement satellite will be provided in case DEVAS had exercised its option for meeting the insurance to cover such risks.

If DEVAS places an order for PS2 at any time after the order for PS1, the schedule for PS2 will be 30 (thirty) months from the payment of the First Installment for PS2. No grace period is applicable for PS2. If there is a Satellite Failure of PS2, the terms and conditions described in Section 3.d will apply. Services from the replacement satellite will be provided in case DEVAS had exercised its option for meeting the costs of insurance to cover such risks.

### 5.0 Bank Guarantee/Irrevocable Letter of Credit

From the commencement and throughout the entire Lease Period, ANTRIX requires DEVAS to provide and maintain a renewable bank guarantee for one (1) year of the annual lease payments which shall be renewed for every year.    ANTRIX shall be eligible to invoke the Bank Guarantee/Irrevocable Letter of Credit should DEVAS be in default more than 9 (nine) months as prescribed in Agreement.

**EXHIBIT C**
**TO**
**AGREEMENT NO. ANTX/203/DEVAS/2005**

**PRIMARY SATELLITE IN-ORBIT TEST REQUIREMENTS**

1.  GENERAL REQUIREMENTS

2.  IN-ORBIT TEST TO BE PERFORMED

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 168 (USDC NO. 2:18-cv-01360)

**EXHIBIT C**

**1.0     GENERAL REQUIREMENTS**

The purpose of the In-orbit Tests is to verify that the on ground measured spacecraft performance and characteristics have remained unaltered as a result of launch and deep space environment. Therefore the pre-launch performance data of the spacecraft shall be utilized as a baseline reference to which all the in-orbit measured data is compared and based on this comparison the in-orbit health status of the spacecraft is determined.

All the pre-launch data on the spacecraft units, sub-systems and systems related to the payload shall be delivered to DEVAS when these data become available on a regular and routine basis for a timely review and evaluation by DEVAS.     To the extent possible, all the bus and communications payload performance and characteristics of the spacecraft shall be determined by in-orbit tests.  For those performances and characteristics which cannot be measured and / or tested in-orbit, the pre-launch data shall be used as a performance acceptance data.
All the in-orbit tests shall be carried out by ANTRIX using their own test facilities.  DEVAS shall have the right to review the test procedures and methodology, the test facility capabilities and active participation in planning and carrying out the in-orbit tests in coordination with ANTRIX. Prior to the in-orbit test, ANTRIX will deliver to DEVAS the pre-launch data and the in-orbit test plan and schedule for coordination with DEVAS.

After the in-orbit test, ANTRIX will deliver to DEVAS the in-orbit test report.  All documentation shall be in English and will be delivered to DEVAS in Two (2) copies.

**2.0     IN-ORBIT TEST PERFORMED BY ANTRIX**

**2.1     SCOPE**

Section 2.0 specifies the in-orbit test and related ANTRIX pre-launch test activities to be performed by using ANTRIX facilities, under the sole responsibility of ANTRIX, to demonstrate that the satellite capacity to be leased to DEVAS meets and will continue to meet all of its performance requirements for the duration of the lease specified in the contract.

**2.2     SPACECRAFT BUS IN-ORBIT TEST**

ANTRIX shall perform an In-orbit test of the spacecraft bus consistent with the testing philosophy agreed between ANTRIX and DEVAS for testing communications satellites.  This test shall demonstrate the proper operation of all functions of the spacecraft bus related to pay load, and shall verify that the actual spacecraft power, temperature, attitude control, etc. is consistent with the design and predicted values.

**2.3     SPACECRAFT COMMUNICATIONS PAYLOAD IN-ORBIT TEST**

ANTRIX shall perform an In-orbit Test of the payload on-board the Primary/ spacecraft consistent with the testing philosophy and methodology agreed between ANTRIX and DEVAS for testing communications payload on-board satellites.  This test shall demonstrate that the payload in-orbit performance is consistent with the performance and characteristics requirements specified in Exhibit A (for all primary and redundant paths).

**EXHIBIT D**
**TO**
**AGREEMENT NO. ANTX/203/DEVAS/2005**

**OPERATIONAL INTERFACES**

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 170**
**(USDC NO. 2:18-cv-01360)**

**EXHIBIT D**

**OPERATIONAL INTERFACES AND ASSISTANCE TO DEVAS**

### 1.0 Approvals and Reviews

1.1 ANTRIX shall provide appropriate Technical assistance to DEVAS for obtaining operating license and approvals from various ministries so as to deliver DEVAS services and use ground/Terrestrial Equipments required to offer the Service. However the cost of obtaining & maintaining such approvals & authorizations to be borne by DEVAS.

1.2 ANTRIX shall maintain reasonable technological visibility and involve DEVAS or its nominated personnel in design reviews to ensure compatibility between the spacecraft and the ground system. DEVAS shall maintain reasonable technological visibility and involve ANTRIX or its nominated personnel in design reviews to ensure compatibility between the spacecraft and the ground system. ANTRIX shall maintain regular reports on progress, major milestones, delays, criticalities, and counter actions. ANTRIX shall provide DEVAS an opportunity to review these reports to the extent necessary for ensuring compatibility between the spacecraft and the ground system. DEVAS shall maintain regular reports on progress, major milestones, delays, criticalities, and counter actions. DEVAS shall provide ANTRIX an opportunity to review these reports to the extent necessary for ensuring compatibility between the spacecraft and the ground system.  However DEVAS shall provide 7 days prior notice to ANTRIX for review of the reports and ANTRIX shall provide DEVAS 7 days prior notice for review of the reports.  DEVAS and ANTRIX can mutually agree to the frequency and timing of such reviews.

1.3 The Parties agree that a team from DEVAS, as identified by the Parties, shall be permitted to enter ANTRIX locations, as decided by the Parties, for regular project monitoring and coordination till Launch of the Spacecraft. Such access will only be to office areas and not to secure facilities.  Further, DEVAS will permit ANTRIX to approve each DEVAS individual with access, such approval not to be unreasonably withheld.  ANTRIX will provide project office space initially for 3-5 DEVAS employees and/or contractors. The operation cost of the usage of  such office  utilities as   provided by Antrix (Telecommunication, fax, Printer Cartridges, Xerox Charges) and the living cost( Boarding/Travel/Lodging) for the deputed personnel from DEVAS to be borne by DEVAS.

1.4 Unless specifically stated otherwise the information, data and assistance provided to DEVAS pursuant to this Exhibit D shall be at no additional cost to DEVAS.

### 2.0 Facilities

- English speaking operations staff for DEVAS satellite on a 24 hour basis.

- Name of the designated English speaking person (s) available for discussion related to transmission performance and orbit parameters.

### 3.0 Procedures

- Prior coordination with DEVAS of any DEVAS satellite operations activities which are expected to affect:

    o  The payload performance, configuration, Or antenna pointing

    o  The satellite orbit (station keeping maneuvers)

- Delivery to DEVAS of the satellite station keeping maneuver schedule prior to performing the maneuver.

- Immediate notification to DEVAS of any satellite anomalies with potential to affect the DEVAS traffic.

## 4.0 Periodical Report on Satellite Health

Post launch of the satellite in orbit, ANTRIX shall provide DEVAS monthly performance reports of the performance of the satellites for the first six months and then quarterly thereafter.

## 5.0 Payload Reconfigurations Requested by DEVAS

To accommodate possible changes in traffic requirements DEVAS may, as needed during the lease period, request ANTRIX to perform some payload configuration changes such as gain step changes.

DEVAS will generally need that a reconfiguration be scheduled for a precise time.  ANTRIX will notify DEVAS the lead time it requires to perform such changes after receiving a request from DEVAS.

## 6.0 Switching to a Redundant Repeater

The primary and secondary satellites will have back-up transponders and will be brought into operation in case the main transponders do not meet the SLAs.

In the event of malfunction in the payload system, ANTRIX shall get the required redundancy units in service within half an hour of the payload malfunction.
Should for any reason change from an active unit to a redundant unit be necessary, the switching change shall be, if possible, coordinated between DEVAS and ANTRIX ahead of the switch over.  In case of emergency such as interruption of traffic due to a failure, ANTRIX may switch to a redundant transponder as soon as the failure is detected and will inform DEVAS.

## 7.0 Loss of Earth Lock
In the event of loss of earth lock, ANTRIX shall recover the satellite within six hours.

# EXHIBIT 4

**Amendment No. 1 dated July 27,2006 to**
**Agreement No. ANTX/203/DEVAS/2005**
**Dated 28th January 2005**

1. The existing Article 3(l) of the of the above indicated agreement is replaced with the following:

   **Article 3 (l)**

   The Leased Capacity for the satellite(s) shall be put up for renewal at least two (2) years before the end of the twelve (12) year period or the anticipated life of the satellite, for another twelve (12) years, at **a reasonable** Lease Fees to be mutually agreed upon. Antrix shall be responsible for obtaining necessary frequency or regulatory approvals relating to lease of capacity for the extended period.

   All other terms & conditions of the Agreement (ANTX/203/DEVAS/2005, dated January 28, 2005) remain unaltered.

For and on behalf of
**ANTRIX CORPORATION LTD**

K.R.Sridhara Murthi
Executive Director

Date: 27/7/2006

For and on behalf of
**DEVAS MULTIMEDIA Pvt. Ltd.**

M.G.Chandrasekhar
Chairman

Date: 27/7/2006

# EXHIBIT 5

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522

TELEPHONE No.: (212) 735-3000
FACSIMILE No.: (212) 735-2000

EMAIL:

---

### FACSIMILE TRANSMITTAL SHEET

FROM: John Gardiner                          DATE: June 13, 2013

DIRECT DIAL: (212) 735-2442                  FLOOR/OFFICE NO.:

DIRECT FACSIMILE: (917) 777-2442

THIS FACSIMILE IS INTENDED ONLY FOR USE OF THE ADDRESSEE(S) NAMED HEREIN AND MAY CONTAIN LEGALLY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION.   IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS FACSIMILE, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED.   IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL FACSIMILE TO US AT THE ADDRESS ABOVE VIA THE LOCAL POSTAL SERVICE.   WE WILL REIMBURSE ANY COSTS YOU INCUR IN NOTIFYING US AND RETURNING THE FACSIMILE TO US.

TOTAL NUMBER OF PAGES INCLUDING COVER(S):   3

PLEASE DELIVER THE FOLLOWING PAGE(S) TO:

1.  NAME: Antrix Corporation Limited          FIRM:
    CITY: Bangalore                           TELEPHONE NO.:
    FACSIMILE NO.: 011-91-80-2341-8981

2.  NAME: V.S. Hegde                          FIRM:
    CITY:                                     TELEPHONE NO.:
    FACSIMILE NO.: 011-91-80-2217-8341

MESSAGE:

---

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 176**
**(USDC NO. 2:18-cv-01360)**
06/14/2013 05:57          08023418981          #627  Page 01/03

R-36



**DEVAS MULTIMEDIA PRIVATE LIMITED**
Unit 502, Prestige Meridian - I
No. 29, M G Road
Bangalore 560 001, India
Ph: +91-80-4113 4934
Fax : +91-80-4113 4935

13 June 2013

<u>By Facsimile (+91-80-2341-8981) & Courier</u>
Antrix Corporation Limited
(a Government of India Company under the Department of Space)
Antariksh Bhavan
Near new BEL Road
Bangalore 560 094
INDIA

Re:     *28 January 2005 Agreement for the Lease of Space Segment Capacity on*
        *ISRO/ANTRIX S-Band Spacecraft between Devas and Antrix (Agreement No.*
        *ANTX/203/DEVAS/2005) (the "Agreement")*

Dear Sir,

We refer to your letter of 25 February 2011 in which you purported to terminate the above-referenced Agreement.

There clearly was no basis for you to terminate the Agreement and, accordingly, the purported termination of the Agreement by your 25 February 2011 letter was wrongful and in repudiatory breach of the Agreement. Devas was entitled to accept Antrix's repudiatory breach of contract and to bring the Agreement to an end, whilst claiming damages.

Since then Antrix also has obstructed the expeditious determination of the arbitration proceedings commenced by Devas.

Antrix continues to be in repudiatory breach of the Agreement even today and has clearly evinced its intention not to perform the Agreement. Devas has elected to, and does hereby, accept Antrix's repudiatory breach of the Agreement, bringing the Agreement to an end as a result of Antrix's wrongful actions.

Devas will be amending its claim in the ICC arbitration to reflect the withdrawal of its claim for specific performance whilst maintaining its claim for damages as a result of Antrix's breaches of contract.

Devas reserves all of its rights including under Indian law and International law.

Yours faithfully,

*R. Viswanathan*

Ramachandran Viswanathan
For Devas Multimedia Pvt Ltd.

06/14/2013 05:57          08023418981          #627   Page 02/03



cc:   <u>By Facsimile (+91-80-2217-8341) & Courier</u>
      V.S. Hegde
      Chairman & Managing Director
      Antrix Corporation Limited
      (a Government of India Company under the Department of Space)
      Antariksh Bhavan
      New BEL Road
      Bangalore 560 231
      INDIA

Page 2 of 2

06/14/2013 05:57                08023418981                    #627   Page 03/03

# EXHIBIT 6



एन्ट्रिक्स कार्पोरेशन लिमिटेड
(अन्तरिक्ष विभाग के अधीन भारत सरकार की कंपनी)

**ANTRIX CORPORATION LIMITED**
(A Government of India Company Under Department of Space)

एन्ट्रिक्स कार्पोरेट कार्यालय, अन्तरिक्ष भवन कैम्पस,
न्यू बी. ई. एल. रोड, बेंगलूर – 560 231. भारत
Antrix Corporate Office, Antariksh Bhavan Campus,
New BEL Road, Bangalore - 560 231. INDIA
दूरभाष / Phone : + 91 80 2217 8302 / 2217 8331
फैक्स / Fax     : + 91 80 2217 8339
वेब / Web      : www.antrix.gov.in

June 20, 2013

To

M/s Skadden, Arps, Slate, Meagher & Flom (UK) LLP,
40 Bank Street, London E 14 5DS
United Kingdom.
Fax: +44 20 7519 7070.

Sir,

With reference to your letter of 13 June 2013, Antrix categorically rejects your characterization that it is in "repudiatory breach" of the agreement referred to therein. This is a matter of which you undoubtedly have been aware all along.

Yours truly,

(M.S.Krishnan)
Legal officer

Copy to:

1. M/s Devas Multimedia Private Limited
   II floor, Prema Gardenia
   357/6, 1st cross, 1st Block
   Jayanagar, Bangalore 560 011
   Fax.No.+91 80 6651 1042

# EXHIBIT 7



**DEVAS MULTIMEDIA PRIVATE LIMITED**

Unit 502, Prestige Meridian - I
No. 29, M G Road
Bangalore 560 001, India
Ph: +91-80-4113 4934
Fax : +91-80-4113 4935

22 September 2015

By Email, with physical copy to follow via Registered Post
Antrix Corporation Limited
(a Government of India Company under the Department of Space)
Antariksh Bhavan
Near new BEL Road
Bangalore 560 094
INDIA
Email: legal@antrix.gov.in; cmd@antrix.gov.in; mail@antrix.gov.in

**Attn:   Dr. V.S. Hegde, Chairman cum Managing Director**
**Mr. M.S. Krishnan, Legal Officer**

Re:    *Devas Multimedia Private Limited vs. Antrix Corporation Limited*, ICC Case 18051/CYK

Dear Sirs,

Devas has now received the final award, dated 14 September 2015, in the above-referenced arbitration, a copy of which is enclosed for your convenience ("Award"). In the Award, the Arbitral Tribunal unanimously (a) determined that Antrix unlawfully repudiated its contract with Devas, and (b) directed that:

- Antrix pay USD 562.5 million to Devas for damages caused by Antrix's wrongful repudiation of the Devas Agreement;
- Antrix pay simple interest on USD 562.5 million from 25 February 2011 to the date of the Award (14 September 2015) at the rate of three months USD LIBOR + 4%; and
- Antrix pay simple interest at the rate of 18% per annum on the amounts above from the date of the Award to the date of full payment.[1]

Devas hereby demands payment, in full, of the Award within 5 business days of the date of this letter, *i.e.* by 29 September 2015. On that date, the amount due to be paid in USD is $677,837,530. Additional interest is accruing on the amount due at the rate of 18% per annum, or over USD 336,000 per day. Devas's wiring instructions are enclosed.

Yours faithfully,

R. Visvanathan

Ramachandran Viswanathan
For Devas Multimedia Pvt Ltd.

Enclosures (wiring instructions – 1 page; copy of Award – 101 pages)

---

[1]      Award ¶ 401.

# EXHIBIT 8

**The Indian EXPRESS**                                    Print

# Antrix-Devas deal: Government to field top lawyers in Delhi High Court

Written by Maneesh Chhibber | New Delhi | Published:October 9, 2015 12:54 am



The lack of proper legal representation and failure of the government to intervene in the arbitration proactively and neglect of the established standard operation procedures are being cited as reason for the adverse award. (Source: Express photo)

Worried over the negative impact of the US $672 million arbitration award in favour of Devas Multimedia and its shareholders and against ISRO's marketing arm Antrix Corporation, the NDA government is learnt to have decided to rope in senior advocates K K Venugopal and Gourab Banerjee to represent the Department of Space and ISRO before Delhi High Court.

Simultaneously, the government has also decided to nudge the Central Bureau of Investigation (CBI) to speed up the ongoing criminal investigation in connection with the Antrix-Devas S-band deal. The government is of the view that the investigation will help it to counter any claims that Devas makes before the Delhi High Court, where its matter is listed for hearing on Friday. Devas is likely to seek a high court order for execution of the multi-million dollar award secured by it from the three-member ICC Tribunal.

The government hopes to prove in court that the deal was scrapped by the previous UPA government due to illegalities and irregularities in the contract between Antrix and Devas. It is also likely to involve senior lawyers in the two other international arbitrations — under Bilateral Investment Treaties — filed against ISRO and Antrix.

In March, the CBI had registered a case against K R Sridhara Murthi, the then executive director of Antrix Corporation Limited; R Vishwanathan and M G Chandrasekhar, both of Forge Advisors LLC, USA and M/s Devas Multimedia Pvt Ltd, Bengaluru and other unknown officials of Antrix Corporation for criminal conspiracy.

The CBI is also investigating whether information regarding the agreement between Antrix and Devas was suppressed from the Cabinet and "wrong information" regarding utilisation of satellite capacity was given to the Cabinet. The January 28, 2005 agreement was annulled by Antrix, as per a decision dated February 17, 2011 of the Cabinet Committee on Security.

However, perusal of the official record by The Indian Express and interactions with officials associated with the matter shows the shoddy and lackadaisical manner in which it was handled.

The lack of proper legal representation and failure of the government to intervene in the arbitration proactively and neglect of the established standard operation procedures are being cited as reason for the adverse award. Senior government officials also admitted that, to be begin with, the response of Antrix was "very weak" and that there was "never any hope for a different order". Lawyers are learnt to have told the Prime Minister's Office that unless a "clear case of malafide" can be made out against Devas, the Antrix case for annulment of arbitration award will be weak.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 184 (USDC NO. 2:18-cv-01360)**

A senior government functionary also pointed to the legal opinion given by then Law Secretary T K Viswanathan in 2010 to the Department of Space on whether the Antrix-Devas contract could be annulled invoking any of the provisions of the contract. In his opinion, Viswanathan had categorically said that since the government was not a party to the agreement, it "would not be advisable to terminate the agreement directly by it".

"Action for annulling or termination of the agreement, if any, has to be taken by the parties to the agreement and in this case it is Antrix Corporation," the opinion said. Viswanathan had also suggested a way out: "The Central Government/ISRO is not duty bound to provide orbit slot to Antrix for commercial activities, when there is strategic requirements. When the Central Government/ISRO deny the orbit slot to Antrix in exercise of its sovereign power and function, such event may fall under the category of 'Force Measure' as contemplated in Article 11 (of the contract)."

"It seems either nobody in the previous government read the opinion or they ignored it," said a government functionary.

Copyright © 2015 - The Indian Express [P] Ltd. All Rights Reserved

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 185 (USDC NO. 2:18-cv-01360)**

# EXHIBIT 9

Printed from

# THE TIMES OF INDIA

9/7/2018 ED moves to prosecute Devas under PMLA for Fema violation - Times of India
https://timesofindia.indiatimes.com/india/ED-moves-to-prosecute-Devas-under-Fema-violation/articleshowprint/53407579.cms

# ED moves to prosecute Devas under PMLA for Fema violation

TNN | Jul 27, 2016, 06.02 AM IST



**HIGHLIGHTS**

- ED investigation against Devas and its directors and foreign subsidiaries under PMLA and FEMA is underway

- Only last month ED issued a showcause notice to the directors of Devas for over Rs 1,200 crore

NEW DELHI: While Devas Multimedia, the former joint venture partner of Isro's commercial arm Antrix, may be celebrating a hefty compensation it has won from an international tribunal, the Bengaluru-based company still has to contend with an ED move to prosecute it under the Prevention of Money Laundering Act (PMLA) for violating Foreign Exchange Management Act (FEMA) norms.

An ED investigation against Devas and its directors and foreign subsidiaries under PMLA and FEMA is underway, with the agency only last month issuing a showcause notice to the directors of Devas for over Rs 1,200 crore, twice the amount the company had invested in its joint venture with Antrix. The idea is to recover from Devas the amount it hopes to earn through international arbitration. The possible course of action may include imposition of penalty on Devas, and prosecution of the company and all its directors under PMLA, a top source said.

A showcause notice is a precursor to attachment of assets of the company for an amount equivalent to the FDI violations. Besides, the government said on Tuesday it was liable to pay as compensation only up to 40 per cent of the value of the investment Devas had made in the JV. FDI of $131.44 million (Rs 578.54 crore) was received between 2006 and 2010 by Devas Multimedia Pvt Ltd from various overseas investors. The foreign firms are also being investigated under PMLA.

The ED's FEMA case is based on the premise that FIPB approval to Devas for FDI was subject to the conditions that the agreement between the Indian company and the foreign investors were subject to Indian laws.

While the compensation may discomfit the Centre because of the financial implication, sources in the government said they were not surprised by the outcome of the row. For, they realise, and this is one of the subjects of investigation, that the terms of the contract were loaded in favour of Devas.

# EXHIBIT 10

You are here:    Latest News    Business News

# Isro's Antrix vs Devas: Countering ED probe on FEMA, multimedia firm moves Karnataka HC

Business    **FP Staff**    Jul 28, 2016 11:05:33 IST

      Tweet    
Comment 0

In an arbitration case involving Indian Space Research Organisation (Isro) and Devas Multimedia, the Government of India has lost the case in the international tribunal. This would mean the government's space arm Isro may have to pay $1 billion in damages to Devas for cancelling a deal in 2010, the tribunal ruled at The Hague.

Even as the international court ruled in favour of the multi media firm, the Enforcement Directorate (ED) launched an investigation against Devas and its directors and foreign subsidiaries under Prevention of Money Laundering Act (PMLA) and Foreign Exchange Management Act (Fema). According to *The Times of India*, this will allow the government to recover from Devas, "the amount it hopes to earn through international arbitration."

The ED's case rests on the basis that approval for foreign direct investment (FDI) to Devas was based on conditions that foreign investors would be subject to Indian laws.

In a swift action to the ED probe, Devas moved the Karnataka High court against the ED notice on FEMA violation, and the High court has stayed the notice issued by ED for 8 weeks (2 months) vide its order dated 28 June 2016.

In a writ petition filed filed before the Karnataka High Court, Devas Multimedia Private Limited has challenged the Show Cause Notice dated

**HELLMANN DECL. IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 190
(USDC NO. 2:18-cv-01360)**

9/7/2018
Case 2:18-cv-01360-TSZ Document 2-1 Filed 09/13/18 Page 181 of 550
Isro's Antrix-Devas Countersuit Probe on | FEMA | Bullional Law | Inloves Against HC - Firstpost



PTI

6 June 2016 issued by an Adjudicating Authority being a Special Director of the Enforcement Directorate under the Foreign Exchange Management Act, 1999.

Further, Devas has also challenged a complaint dated 31 May 2016 issued by the Assistant Director, Enforcement Directorate, Bangalore before the High Court.

Devas has argued that the Show Cause Notice and Complaint are wholly without jurisdiction, and in any event vitiated by malice in law and fact and hence void, invalid and non-est.

The High Court on 28 June 2016 stayed the operation of the Show Cause Notice and the Complaint and all proceedings initiated there under for a period of 8 weeks. (2 months).

According to a report by *News18.com*, Isro's commercial arm Antrix had cancelled a deal involving use of two satellites and a spectrum after which Devas Multimedia filed the case against the former.

The deal between Antrix and Devas was signed in 2005 when G Madhavan Nair was at the helm of affairs in the Department of Space. As per the agreement, Antrix was to provide 70 MHz of the scarce S-Band space segment to Devas for its digital multimedia services.

This was to be done by leasing 90 percent of the transponders in satellites GSAT-6 and GSAT-6A that are proposed to be launched by Isro. Devas, in turn, was to pay Antrix a total of $300 million over 12 years.

HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 191
(USDC NO. 2:18-cv-01360)

However, the deal failed to take off, as the then Manmohan Singh-led government in 2011 said the project was already under review and action has been initiated for termination of the contract.

The government finally cancelled the deal on 17 February, 2011. Devas then took Antrix and the Government to International Court for cancelling its contract by the Cabinet Committee on Security in 2011.

After arbitration proceeding began in June 2013, Devas claimed $1.6 billion in damages.

In 2015, Antrix was slapped a fine of about Rs 4,400 crore ($672 million) by International Arbitration Court for unilaterally terminating the contract with Devas, the *News18.com* report said.

Updated Date: Jul 28, 2016 11:05 AM

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 192 (USDC NO. 2:18-cv-01360)**

# EXHIBIT 11

## IN THE COURT OF O. P. SAINI: SPL. JUDGE, CBI (04)

## (2G SPECTRUM CASES), NEW DELHI.

RC No. 24(A)-2011-CBI-ACB

CC No. 01/12

**CBI Vs. Shyamal Ghosh and other**

15.10.2015

Present: Sh. Anand Grover Sr. Advocate / Spl. PP with Sh. K. K. Goel
         & Sh. A. K. Rao Sr. PPs for CBI.

Sh. Sukumar Pattjoshi Sr. Advocate with Sh. Atiar Singh, Sh. K. K.
         Patra and Sh. Arun Kumar Advocates for accused
         Shyamal Ghosh.

         Sh. Harish Salve and Sh. S. V. Raju Sr. Advocates with
         Sh. Sidharath Aggarwal, Sh. Kamal Shankar, Mohd. Faraz
         Maqbool, Sh. Atul and Sh. Ambar Bhushan Advocates for
         accused M/s Bharti Cellular Limited with authorized
         representative Sh. Sunil Sarin;

         Sh. Sidharth Luthra Sr. Advocate with Sh. Balaji
         Subramanian Advocate for accused M/s Hutchison Max
         (P) Limited with authorized representative Sh. Yudhvir
         Singh; and

Sh. Ramesh Gupta Sr. Advocate with Sh. Neeraj Chaudhari & Sh.
         Ravjyot Singh Advocates for accused M/s Sterling
         Cellular Limited with authorized representative Sh.
         Rajeev Narula.

**ORDER**

This order shall dispose of an issue as to whether accused are to be discharged under Section 227 alongwith an application filed by A-2 for discharge or charge is required to be framed against them under Section 228 CrPC.

**2.**The instant case was registered on 17.11.2011 for the offences punishable under Section 120-B IPC read with Section 13(2) read with 13(1)(d) of Prevention of Corruption Act (PC Act), 1988 against Sh. Shyamal Ghosh (A-1), the then Chairman, Telecom Commission & Secretary (Telecom), Department of Telecommunications (DoT), Sh. J. R. Gupta, the then Deputy Director General (Value Added Service)/ DoT, New Delhi, M/s Bharti Cellular Limited, New Delhi (now known as M/s Bharti Airtel Limited), M/s Hutchison Max (P) Limited, Mumbai, (now known as M/s Vodafone India Limited), M/s Sterling Cellular Limited, New Delhi (now known as M/s Vodafone Mobile Services Limited) and unknown officials of DoT and others, on the allegations that vide decision dated 31.01.2002 of the then MOC&IT, on the recommendation of certain DoT officers, the allocation of additional spectrum beyond 6.2 MHz up to 10 MHz (paired) was approved wherein only 1% additional revenue share was charged thereby causing revenue loss to Government exchequer.

**3.**It is alleged that the representatives of Cellular Operators Association of India (COAI) made requests to DoT in 2001 for allocating additional spectrum particularly in Delhi and Mumbai service areas. The Technical Committee, constituted as per the orders of Sh. Shyamal Ghosh (A-1), the

then Secretary (Telecom), gave its report on 21.11.2001 recommending therein that 6.2 MHz spectrum was sufficient for a subscriber base of about 9 lac per operator in service areas like Delhi and Mumbai for another 24-30 months. The Committee also recommended to levy incremental charges for additional spectrum.

**4.** It was further alleged that Sh. J. R. Gupta, the then DDG (VAS), put up a note dated 31.01.2002 by falsely mentioning therein that a consensus had emerged after discussions that additional spectrum to the extent of 1.8 MHz (paired) beyond 6.2 MHz in 1800 MHz band might be released on case to case co-ordination basis to the operators by charging additional 1% of revenue after customer base of 4-5 lac was reached. On the said note, Sh. Shyamal Ghosh dishonestly agreed to the reduced subscriber base from 9 lac to 4/5 lac for allocation of additional spectrum and recommended to allocate additional spectrum beyond 6.2 MHz up to 10 MHz by charging only additional 1% of AGR. On the analogy existing before, wherein the spectrum charges were incremented from 2% of AGR to 3% of AGR on allocation of 1.8 MHz beyond 4.4 MHz, the allocation of additional spectrum would have implied 5% of AGR beyond 8 MHz up to 9.8/10 MHz. On the aforesaid note, concurring with the recommendation of Sh. Shyamal Ghosh, as a part of preconceived design, the final approval was accorded by Sh. (late) Pramod Mahajan, the then MOC&IT, on 31.01.2002 itself. Accordingly, a general order was issued and circulated on 01.02.2002 to all the Cellular Mobile Telecom Service (CMTS) operators and the instant allotment of additional spectrum was given to the aforesaid accused telecom companies

for Delhi and Mumbai Metro circles. Further, the then MOC&IT, <u>by taking contradictory stand of his earlier order dated 31.01.2002, in which additional spectrum was to be made in 1800 MHz band, accorded approval on 14.07.2002 for allotting additional spectrum beyond 6.2 MHz in most efficient and effective GSM spectrum band in 900 MHz band</u>.

**5.**It was, thereby, alleged in the FIR that the accused public servants entered into a criminal conspiracy with accused beneficiary companies, and by abusing their official position as public servants, showed undue favour to accused companies, and caused undue cumulative pecuniary advantage of Rs. 508.22 crore approximately to the beneficiary companies, and corresponding loss to the Government exchequer, by only charging additional 1% AGR for allotting additional spectrum from 6.2 MHz up to 10 MHz (paired) instead of charging additional 2% AGR, as per existing norms.

**6.**<u>Investigation into the aforesaid allegations was conducted by the CBI and on completion of the investigation, the instant charge sheet was filed against the accused in this Court on 21.12.2012.</u>

## BACKGROUND FACTS

**Public Servants:**

**7.**It is stated that Sh. Shyamal Ghosh was working as Chairman, Telecom Commission and Secretary, DoT, during the period from 07.02.2000 till his retirement on 31.05.2002 on superannuation. Sh. J. R. Gupta was working as DDG (Value Added Service), DoT, New Delhi, during the period from

16.09.1996 to 31.10.2002. Late Sh. Pramod Mahajan was Minister of Communication & Information Technology from 01.09.2001 to 28.01.2003.

**Incorporation of accused companies:**

**8.**It is further stated that Cellular Operators Association of India (COAI) was established in 1996, which is a registered Association with the Registrar of Societies, Government of NCT, Delhi, with the main objective to protect, promote and upgrade Cellular Mobile Telephone Service (CMTS) operations and also to look after the common and collective interests of its members. The accused telecom companies including certain other telecom companies have been members of COAI.

**9.**It is further stated that M/s Bharti Cellular Limited was incorporated on 20.03.1992 as registered with Registrar of Companies (ROC), NCT of Delhi and Haryana and its main objective was to run the telecom services. M/s Bharti Tele-Ventures Limited, the other company of Bharti Group was incorporated and registered on 07.07.1995 with ROC, NCT of Delhi and Haryana. The main objectives of this company included to promote the business for providing telecom services and cellular/ mobile services etc. Later M/s Bharti Cellular Limited was amalgamated into M/s Bharti Tele-Ventures Limited with effect from 09.06.2005, as per the order dated 21.05.2005 of the Hon'ble Court of Delhi passed in CP No. 289/2004 which was accordingly filed with the Registrar of Companies, NCT of Delhi and Haryana. As such, upon amalgamation, the name of M/s Bharti Cellular Limited changed to M/s Bharti Tele-Ventures Limited with effect from

09.06.2005. Further, the name of M/s Bharti Tele-Ventures Limited was changed to M/s Bharti Airtel Limited as incorporated and registered on 24.04.2006 with ROC, NCT of Delhi and Haryana. This telecom company has been rendering GSM mobile services in Delhi metro circle besides other circles.

**10.**It is further stated that M/s Hutchison Max Telecom (P) Limited was registered and incorporated with ROC, Punjab, Himachal and Chandigarh on 21.02.1992. The objective of this company was also to provide telecom services including cellular mobile services. The name of the company was changed to M/s Hutchison Max Telecom Limited on 08.03.1996. Then, the registered office of this company was shifted from the state of Punjab to Mumbai in Maharashtra which was accordingly registered with ROC, Maharashtra in Mumbai on 25.03.1999. Then the name of M/s Hutchison Max Telecom Limited was again changed to M/s Hutchison Max Telecom (P) Limited on 11.06.2001. Then, M/s Hutchison Max Telecom (P) Limited was converted into a public limited company pursuant to a special resolution adopted by its shareholders on 28.07.2004 and consequently, on 01.12.2004 its name was changed to M/s Hutchison Max Telecom Limited. Again, the name of this company was changed to M/s Hutchison Essar Limited which was registered with ROC, Mumbai, on 26.08.2005. Then again, the name of M/s Hutchison Essar Limited was changed to M/s Vodafone Essar Limited on 12.07.2007. Then, on 11.10.2011, the name of M/s Vodafone Essar Limited changed to the present name, that is, M/s Vodafone India Limited. This telecom company has been rendering GSM mobile services in Mumbai

metro circle besides other circles. The promoters/ shareholders of M/s Hutchison Max Telecom (P) Limited subsequently changed and the control of this company was taken over by other promoters/ shareholders of Vodafone group etc., a foreign company.

**11.**It is further alleged that M/s Sterling Cellular Limited was incorporated and registered on 27.03.1992 with ROC, Tamil Nadu, having its registered office in Tamil Nadu. The objective of this company was to provide telecommunication services inclusive of mobile phone services. Thereafter, the registered office of this company was shifted from Tamil Nadu to Delhi and accordingly, it was registered with ROC, NCT of Delhi and Haryana, on 20.06.1997. Subsequently, the name of M/s Sterling Cellular Limited was changed to M/s Hutchison Essar Telecom Limited on 12.08.2002. Further, the name of this company was again changed to M/s Hutchison Essar Mobile Services Limited on 01.03.2005 and then changed to M/s Vodafone Essar Mobile Services Limited w.e.f 03.07.2007. Its name was again changed from M/s Vodafone Essar Mobile Services Limited to M/s Vodafone Mobile Services Limited on 03.10.2011 which is continuing till date. This telecom company has been rendering GSM mobile services in Delhi metro circle besides other circles. The promoters/ shareholders of M/s Sterling Cellular Limited subsequently changed and the control of this company was taken over by other promoters/ shareholders of Vodafone group etc., a foreign company.

**Allotment of spectrum, charges thereof and demand for additional**

**spectrum:**

**12.**It is further stated that the telecom sector for mobile services was opened in the year 1994 by DoT with grant of two Cellular Mobile Telephone Service (CMTS) licences each in four metros, that is, Delhi, Mumbai, Kolkata and Chennai. Subsequently, during 1996, two CMTS licences for 17 other telecom service areas in the country besides metro circles were allotted by DoT. It was decided to allot start-up 4.4 MHz + 4.4 MHz spectrum to each of the service providers initially as per the terms and conditions as stipulated in the respective licence agreements. M/s Bharti Cellular Limited was allotted start-up 4.4 MHz + 4.4 MHz for Delhi metro area on 31.05.1995 and further allotted additional spectrum of 1.8 MHz + 1.8 MHz both in 900 band on 31.12.1996 in order to meet the additional requirements for the growth of telecom services. Likewise M/s Hutchison Max Telecom (P) Limited was also allotted start-up  4.4 MHz + 4.4 MHz for Mumbai metro area on 31.05.1995 and further allotted additional spectrum of 1.8 MHz both in 900 band on 04.02.1997. M/s Sterling Cellular Limited was allotted start-up spectrum of 4.4 MHz for Delhi metro area on 05.07.1995 and further allotted additional spectrum of 1.8 MHz + 1.8 MHz both in 900 band on 31.12.1996. Annual spectrum usage charges at the rate of 2% of Adjusted Gross Revenue (AGR) were levied for start-up/ initial spectrum allotted up to  4.4 MHz + 4.4 MHz. The royalty and spectrum charges were levied in the light of formula base prescribed by DoT. Then consequent to change over to revenue sharing regime in view of National Telecom Policy-99, a total of 3%

of Adjusted Gross Revenue for allotment of spectrum up to 6.2 MHz + 6.2 MHz (2% of AGR for start-up  4.4 MHz + 4.4 MHz and additional 1% of AGR for additional 1.8 MHz + 1.8 MHz) was charged in compliance to the order dated 22.09.2001 issued by Wireless Planning Co-ordination (WPC) Wing which was applied retrospectively  to be effective from 01.08.1999.

**13.**It is further stated that the order dated 22.09.2001 was issued by Sh. Sukhpal Singh, the then Assistant Wireless Advisor, WPC Wing, New Delhi, for levying additional 1% of AGR for allocating additional 1.8 MHz + 1.8 MHz spectrum beyond the start-up  4.4 MHz + 4.4 MHz spectrum after it was cleared by the Full Telecom Commission headed by Sh. Shyamal Ghosh himself on 18.12.2000 and had the approval of the then MOC&IT also. The note dated 18.12.2000 placed before Full Telecom Commission gave detailed reasons for levying charges for additional spectrum and the relevant contents of the said note placed for approval are reproduced herein below:-

"*Considering the commitment already made in the licence agreement to permit a cumulative maximum of up to 4.4 MHz in the GSM bands, and the decision of SMG, 2% of AGR as revenue share for spectrum usage should be a part of the overall revenue share of 10% for J&K and A&N circles and 17% for all other circles and metros, per annum for spectrum assignment up to 4.4 MHz + 4.4 Mhz.*

*In this context it is to be noted that spectrum charges are fundamentally bandwidth dependent and it may not be appropriate to make these totally independent of spectrum bandwidth. Anything to the contrary would result in inefficient use of spectrum as well as complications and undue demands on*

*the spectrum which is a scarce limited resource. Therefore, any additional spectrum beyond 4.4 MHz + 4.4 MHz, up to a total of 6.2 MHz + 6.2 MHz, if assigned, should attract additional percentage of revenue share @ 1% p.a.*"

**14.**It is further stated that as per <u>National Frequency Allocation Plan (NFAP-81)</u>, the Defence Sector was major user in some of the frequencies/ spectrum bands and therefore, the Defence Sector was permitted to develop its equipments in the earmarked frequency bands wherein it was a major user. When the Global Service Mobile (GSM) services were launched in India sometime in 1994, two frequency bands, that is, in 900 MHz band (890-915 MHz paired with 935-960 MHz) and 1800 MHz band (1710-1785 MHz paired with 1805-1880 MHz) were  earmarked by the National Frequency Allocation Plan (NFAP) for GSM services. Subsequent to National Telecom Policy (NTP-99) and Group on Telecom (GoT) report of December, 1998, certain spectrum in 1800 MHz band which was already being used by the Defence services, was required to be coordinated by the Defence for WPC for further allocation to cellular operators. In India GSM spectrum in 900 MHz band is available only to the extent 25+25 MHz and in 1800 MHz band, it is available to the extent 75+75 MHz. The WPC is the custodian of the spectrum. However, after retaining the required spectrum for the use of three Wings of Defence Services, the remaining spectrum could be coordinated by Joint Communication and Electronic Staff (JCES) of Ministry of Defence with WPC.

**15.**It is further stated that <u>COAI had been seeking additional spectrum during 2001-2003 for its members for their mobile services claiming that the</u>

<u>6.2 MHz + 6.2 MHz  allocated earlier per service area was inadequate for meeting the grade of services and coverage needs in high density areas</u>. The COAI requested for allocation of additional spectrum in 900 MHz band, and if adequate additional spectrum was not available in 900 MHz band, then existing Cellular Mobile Service Providers (CMSPs) be allocated additional spectrum in 1800 MHz band. <u>The COAI representatives made a presentation before Sh. Shyamal Ghosh, then Secretary (Telecom), and other concerned DoT officials on 04.10.2001 on the issue of spectrum allotment, WPC charges and other related issues</u>. It represented that initially all CMSPs were allocated 4.4 MHz + 4.4 MHz spectrum. Subsequently, an additional spectrum of 1.8 MHz + 1.8 MHz was allocated in metros and some other circles. It claimed that even this spectrum was inadequate, especially in Delhi and Mumbai metro areas, resulting into complaints of weak signals, call drops, network congestion etc. The  representatives of the said accused telecom companies had attended the said presentation for Delhi and Mumbai service areas.

**16.**It is further stated that in the aforesaid meeting it was decided by Sh. Shyamal Ghosh to form a Technical Committee <u>in order to assess the optimal utilization of bandwidth and a transparent basis for need based allocation of additional spectrum</u>. Accordingly, on 23.10.2001 a Technical Committee headed by Sh. N. K. Mangla, Sr. DDG, Technical Engineering Centre (TEC), was constituted. The said Technical Committee held several meetings and submitted following recommendations in its report dated 21.11.2001:-

*(i)Presently allotted 6.2 MHz + 6.2 MHz spectrum is sufficient for a subscriber base of about 9 lakhs per operator in service areas of high penetration like Delhi and Mumbai by use of tighter use pattern (3/9) and advanced radio frequency features like synthesized frequency hopping and antenna diversity etc. The spectrum can support much higher subscriber base in Telecom Circles.*

*(ii)The present allocated 6.2 MHz + 6.2 MHz in Delhi and Mumbai metros will be sufficient for another 24 to 30 months, if the networks are planned optimally.*

*(iii)Metro Cellular Operator reported some congested pockets where the subscriber base was heavy. No reliable data could be obtained from any source about number of subscribers and traffic in such congested areas. However, the committee felt that subscriber capacity could be further enhanced if Micro and Pico cells are used, etc.*

*(iv)Additional frequency spectrum of 2 MHz may be allotted after one year to each Delhi and Mumbai Service Area operators either in 900 MHz or 1800 MHz band based on requirement so that operators may plan their networks optimally in advance. This additional spectrum should be sufficient for three years at the present rate of growth.*

*(v)Allotment of additional frequency spectrum of 2 MHz is not recommended for Telecom Circles and other Metro Operators for at least two to three years.*

*(vi)TEC may further study the relationship between spectrum traffic and subscriber base and submit its recommendation in another six months time*

*forecasting spectrum requirement in the next 5, 10 and 15 years.*

*(vii)To encourage optimal and efficient use of spectrum, suitable incremental spectrum charges at a higher rate should be levied.*

## ALLEGATIONS

## Approval of Additional Spectrum:

**17.**With regard to suitable incremental spectrum charges at a higher rate as recommended by the Technical Committee, it is alleged that spectrum charge of 2% of AGR was levied for start-up spectrum of 4.4 MHz + 4.4 MHz and 3% of AGR spectrum charge for 6.2 MHz + 6.2 MHz of spectrum as per the order dated 22.09.2001 earlier issued by DoT. On the same analogy, spectrum charge for the spectrum beyond 6.2 MHz + 6.2 MHz up to 8.0 MHz + 8.0 MHz – 4% of AGR, and for spectrum beyond 8.0 MHz + 8.0 MHz up to 9.8/10 MHz – 5% of AGR was required to be charged as spectrum charges in order to encourage optimal and efficient use of available spectrum without any hoarding of the same.

**18.**It is further alleged that the report dated  21.11.2001 of the aforesaid Technical Committee was put up to Sh. Shyamal Ghosh, whereupon he raised a query regarding the current status of availability of spectrum for GSM operators. On this Dr. Ashok Chandra, the then Deputy Wireless Advisor, put up a note dated 05.12.2001 mentioning therein that no further spectrum, besides already earmarked, that is, 18.6 + 18.6 MHz in GSM 900 band, was available for GSM operators. Having gone through the said note,

<u>Sh. Shyamal Ghosh on 06.12.2001 ordered that the issue of spectrum should be discussed in a meeting of the Empowered Committee of Telecom Commission quickly</u>. The Empowered Committee comprised of the Secretary (DoT) and the four regular members of the Telecom Commission, that is, Member (Finance), Member (Technology), Member (Production) and Member (Services). <u>It is, however, alleged that instead of placing the said additional spectrum issue before the Empowered Committee/ Telecom Commission, Sh. Shyamal Ghosh put up a note dated 10.01.2002, as desired by the then MOC&IT late Sh. Pramod Mahajan, to examine the issue of giving additional frequency to the Cellular Operators, particularly those facing problems in Delhi and Mumbai</u>. Vide this note, Sh. Shyamal Ghosh proposed to impose an additional spectrum allocation fee rather than increasing revenue share for such additional spectrum allocation. He also proposed that the benchmark for additional spectrum allocation fee could be the entry fee in respect of 4th Cellular Operator for Delhi and Mumbai prorated for the frequency allotted. <u>It is further alleged that Sh. Shyamal Ghosh later, in conspiracy with late Sh. Pramod Mahajan and the said telecom companies, instead of ordering/ recommending levy of one-time fee for additional spectrum, recommended spectrum charges on AGR basis, that too omitting one slab for allocations of incremental spectrum charge and thereby showed undue favour to the said telecom companies</u>. He intentionally did not place the said matter before the Empowered Committee and instead, deliberately took a reverse stand against his own order dated 06.12.2001 to place the said issue of additional spectrum before the

Empowered Committee.

**19.**It is further alleged that on 31.01.2002, Sh. J. R. Gupta, the then DDG (VAS), submitted a note in context of discussions held on 31.01.2002, regarding allotment of additional spectrum beyond 6.2 MHz + 6.2 MHz in 900 MHz band to the existing cellular operators. In this note, he highlighted the need to allot additional spectrum in Mumbai and Delhi areas soon, where congestion as well as drop in quality had been reported by the CMSPs. He further mentioned therein that one operator had reached 5 lac subscribers in Delhi and other operators in Delhi and Mumbai were expected to reach the said level of 5 lac subscribers in a few months. He further mentioned therein that a consensus had emerged after discussions that additional spectrum to the extent of 1.8 MHz (paired) in 1800 MHz band may be allocated on case to case coordination basis to the operators after they reach the level of 4 lac customers, which could be released after customer base of 5 lac was reached. He further noted that 2% of AGR was charged for spectrum for 4.4 MHz + 4.4 MHz and additional 1% of AGR for additional spectrum of 1.8 MHz + 1.8 MHz. On the same analogy and on basis of consensus emerged during discussions, he recommended that further additional spectrum charge of 1% of AGR may be levied for additional 1.8 MHz + 1.8 MHz spectrum beyond 6.2 MHz + 6.2 MHz.

**20.**On the aforesaid note of Sh. J. R. Gupta, the then DDG  (VAS), Sh. Shyamal Ghosh acting in conspiracy with late Sh. Pramod Mahajan and the said telecom companies, recommended that for allocation of spectrum beyond 6.2 MHz up to 10 MHz,  additional 1% revenue sharing would imply

and thereby total spectrum charge of 4% of AGR would be required to be paid for spectrum up to 10 MHz by such cellular operators. Whereas, on the same analogy, spectrum charge for the spectrum beyond 6.2 MHz + 6.2 MHz up to 8.0 MHz + 8.0 MHz- 4% of AGR, and for spectrum beyond 8.0 MHz + 8.0 MHz up to 9.8/10 MHz (paired)- 5% of AGR was required to be charged. In the said note Sh. Shyamal Ghosh also endorsed the recommendation that requirement of subscriber base be reduced from 9 lac to 4-5 lac.

It is also alleged that on the margin of the aforesaid note dated 31.01.2002, Sh. J. R. Gupta had also highlighted and thereby brought to the notice of Sh. Shyamal Ghosh that the report of the committee regarding joint testing about congestion of network etc., would be received shortly. However, Sh. Shyamal Ghosh, in conspiracy with late Sh. Pramod Mahajan and said telecom companies, went ahead to recommend/ decide allocations of additional spectrum beyond 6.2 MHz up to 10 MHz (paired) on additional incremental spectrum charge of 1% of AGR only, despite the fact that report of the Joint Testing Team constituted by DoT in the matter was still awaited and was expected to be received shortly.

**21.** It is further alleged that in his note dated 31.01.2002, Sh. J. R. Gupta, the then DDG (VAS), mentioned to allocate additional spectrum of 1.8 MHz + 1.8 MHz beyond 6.2 MHz + 6.2 MHz by charging additional 1% of AGR. It was discussed in a meeting chaired by Sh. Ramanathan R., the then Member (Finance and Production), in the forenoon of 31.01.2002 in which Sh. J. R. Gupta was also present. In the afternoon of 31.01.2002, Sh. Shyamal Ghosh orally conveyed to Sh. J. R. Gupta that Sh. (late) Pramod Mahajan, the then

MOC&IT, had called for the file in respect of allocation of additional spectrum beyond 6.2 MHz on that very day itself, that is, on 31.01.2002, for his approval. On this Sh. J. R. Gupta reported to Sh. Shyamal Ghosh that the signatures of Member (Finance) and Wireless Advisor <u>in the file in token of their concurrence</u> could not be obtained as the Member (Finance) had gone out of station in the afternoon and the Wireless Advisor was retiring that very day itself. Then, Sh. Shyamal Ghosh orally directed him to submit the said file directly to him without the signatures of Wireless Advisor and the Member (F/P) by marking their non-availability. As directed, Sh. J. R. Gupta marked the file to Sh. Shyamal Ghosh in the same evening of 31.01.2002 and while putting up the said file Sh. J. R. Gupta also orally pointed out to Sh. Shyamal Ghosh that the said proposal was also required to be cleared by Full Telecom Commission, being a policy matter.

**22.** It is further alleged that Sh. Shyamal Ghosh deliberately with malafide intention did not obtain the comments of the then Member (Finance), who was the representative of Ministry of Finance, despite the matter having huge financial implications. The Wireless Advisor, who was the custodian of the entire spectrum, was also intentionally by-passed on flimsy ground that he was retiring on that very day, that is, on 31.01.2002, in spite of the fact that he had cleared many other files on the very day of his retirement. It is also alleged that financial concurrence of the Member (Finance) was mandatorily required on the issues/ proposals involving financial implications before taking of any decision by the competent authority. It is further alleged that the said Member (Finance) had proceeded on office-cum-

personal tour in the afternoon of 31.01.2002 and he had reported back to New Delhi on 04.02.2002. In pursuance of the said criminal conspiracy hatched amongst Sh. Shyamal Ghosh, late Sh. Pramod Mahajan, the then MOC&IT and the said telecom companies, Sh. Shyamal Ghosh also did not place this matter before Full Telecom Commission, which being a policy matter was required to be placed as per the Resolution dated 11.04.1989 issued by the Government of India and the Rules of Business for Telecom Commission. It is further alleged that there is no plausible reason for urgency for taking the said decision in a day in such undue haste without waiting for the concurrence of Member (Finance) and without clearance from Full Telecom Commission and Wireless Advisor. Furthermore, the recommendations of TRAI were required to be sought by Sh. Shyamal Ghosh under Section 11 (1)(a) of the TRAI Act, 1997, before the decision dated 31.01.2002 of the then MOC&IT for allocating additional spectrum beyond 6.2 MHz + 6.2 MHz up to 10 MHz + 10 MHz by charging only additional 1% of AGR, as the matter was a part of a licence condition. Whereas, in fact, no such recommendations were taken from TRAI before the said decision dated 31.01.2002 by Sh. Shyamal Ghosh and the then MOC&IT.

**23.**It is further alleged that on the recommendation of Sh. Shyamal Ghosh, the final approval was accorded by the then MOC&IT late Sh. Pramod Mahajan on 31.01.2002 itself. After Minister's approval, on 01.02.2002 a general order was issued by WPC wing and circulated to all the CMTS operators whereby the criteria formulated in the terms of approval dated

31.01.2002 was conveyed. As per this order, the additional spectrum beyond 6.2 MHz + 6.2 MHz up to 8.0 MHz + 8.0 MHz and subsequently up to 10 MHz + 10 MHz was to be allocated to the said accused beneficiary companies initially. 1% of AGR was levied for allotting spectrum beyond 6.2 MHz + 6.2 MHz up to 8.0 MHz + 8.0 MHz and the spectrum beyond 8.0 MHz + 8.0 MHz up to 10 MHz + 10 MHz was allotted without taking any additional charges from the accused beneficiary companies in view of the aforesaid order dated 01.02.2002. Thereby a spectrum beyond 8 MHz + 8 MHz to 10 MHz (paired) was allocated free of cost to accused telecom companies and subsequently was also issued to other service providers which resulted in undue financial loss to the Government exchequer.

**Coordination / Release of Spectrum:**

**24.**It is further alleged that pursuant to the aforesaid criteria formulated on 01.02.2002, the DoT, through WPC wing, coordinated spectrum for all the said three accused telecom companies and the additional spectrum was allotted on 17.07.2002 to M/s Bharti Cellular Limited and M/s Sterling Cellular Limited for Delhi metro area and M/s Hutchison Max Telecom Limited for Mumbai metro area. It has also been alleged that the said allotment of additional spectrum beyond 6.2 MHz up to 8.0 MHz (paired) was given in most efficient and effective 900 MHz band on approval dated 14.07.2002 of late Sh. Pramod Mahajan, the then MOC&IT, in disregard to the earlier approval dated 31.01.2002 wherein the allotment of additional

spectrum was approved in 1800 MHz band. By this time Sh. Shyamal Ghosh had retired on 31.05.2002.

**25.** It is further alleged that Telecom Commission memo dated 18.12.2000 for additional spectrum charges of 1% AGR for 1.8 MHz + 1.8 MHz spectrum beyond 4.4 MHz + 4.4 MHz was processed and approved as per the orders of Sh. Shyamal Ghosh himself and thereby, he had conspicuous knowledge that this being a policy matter involving financial implications was required to be placed before the full Telecom Commission. However, in this instance he, with a dishonest intention and deliberately and in conspiracy with the then MOC&IT and the aforesaid accused telecom companies, by abusing his official position, recommended so and did not refer the matter to the Telecom Commission nor the concurrence of the Member (Finance) and the Wireless Advisor was sought.

A comparative position of the rates of spectrum charges as percentage of AGR actually imposed as per the approval of accused public servants, as compared to the charges which were required to be imposed as per the existing norms as discernible from an analogy drawn from the earlier order dated 22.09.2001, is tabulated below:-

| Sl. No. | Quantum of Spectrum (paired) up to | Revenue Charges as % of AGR imposed by DoT | Revenue Charges as % of AGR ought to have been imposed by DoT. |
|---|---|---|---|
| 1 | Start-up 4.4 MHz | 2% | 2% |
| 2 | 6.2 MHz | 3% | 3% |
| 3 | 8.0 MHz | 4% | 4% |
| 4 | 10 MHz | 4% | 5% |

**26.** It is further alleged that Sh. Shyamal Ghosh did not even wait for the

joint testing report in respect of congestion/ service quality in the network of Airtel at New Delhi, whereas, this very fact has been mentioned by Sh. J. R. Gupta on the margin of his aforesaid note dated 31.01.2002 that the joint inspection was being carried out and the report was expected shortly. It is further alleged that in fact, the joint testing was conducted during the period 17.01.2002 to 23.01.2002 but the Joint Testing Report was submitted on 01.02.2002, by which time the said decision had been taken by late Sh. Pramod Mahajan in connivance with Sh. Shyamal Ghosh and the said accused telecom companies, as is evident from the remarks on the margin of the said note dated 31.01.2002 of Sh. J. R. Gupta, it was in the very knowledge of Sh. Shyamal Ghosh that the report in respect of joint testing was in the offing for which he was required to wait before recommending on 31.01.2002 for allocation of such additional spectrum. The said joint testing report dated 01.02.2002 indicated that Airtel in Delhi metro area had a registered subscriber base of 5.05 lac out of which 3.88 lac were active. The outcome of the joint testing team has further indicated that congestion and call drops observed by the joint testing team at the aforesaid sites could have been removed by M/s Bharti Cellular Limited by taking the technical measures as observed by the testing team which were conveyed by DoT to M/s Bharti Cellular Limited on 11.02.2002. Thus, Sh. Shyamal Ghosh deliberately did not wait for the said joint testing report before recommending for allocation of additional spectrum beyond 6.2 MHz up to 10 MHz (paired), as the findings of the said testing report would have thwarted the conspiracy hatched by the said accused persons/ companies,

and thereby caused undue pecuniary advantage to the said accused telecom companies at the cost of Government exchequer.

**27.** It is thus established that the aforesaid decision dated 31.01.2002 was taken in undue haste pursuant to the criminal conspiracy hatched amongst the accused public servants, that is, late Sh. Pramod Mahajan, the then MOC&IT, Sh. Shyamal Ghosh, the then Secretary (DoT) and the said accused telecom companies.

**28.** It is further alleged that the then Defence Minister issued a DO letter dated 04.07.2002 to late Sh. Pramod Mahajan, the then MOC&IT, regarding coordination of frequency spectrum with the Defence services. This letter was purportedly received by the office of MOC&IT on 19.07.2002 and by that time the additional spectrum had been allocated to M/s Bharti Cellular Limited and M/s Sterling Cellular Limited in Delhi and M/s Hutchison Max (P) Limited in Mumbai. In the aforesaid DO letter dated 04.07.2002, the then Defence Minister mentioned that he had been apprised that the Ministry of Communication had gone ahead by receiving spectrum fees/ charges from the new cellular operators without prior coordination on a case to case and place to place basis at many locations. The then MOC&IT vide his DO letter dated 30.07.2002 to the then Defence Minister replied that frequencies had been assigned to the cellular operators only after coordination with Defence. In fact, the DoT had written to JCES that it was going to allocate spectrum on trial basis in a few days and if no response was received from JCES the said spectrum would be allocated to respective companies. This was approved by late Sh. Pramod Mahajan on 14.07.2002. It is further alleged

<u>that the additional spectrum beyond 6.2 MHz up to 8 MHz (paired) was allotted to all the said three accused companies on trial basis in efficient band of 900 MHz even without due coordination with JCES.</u>

**29.**It is further alleged that the frequency assignments made beyond 6.2 MHz upto 10 MHz (paired) to M/s Bharti Cellular Limited (A-2) (now known as M/s Bharti Airtel Limited), M/s Hutchison Max (P) Limited (A-3) (now known as M/s Vodafone India Limited) and M/s Sterling Celluar Limited (A-4) (now known as M/s Vodafone Mobile Services Limited), and on the said precedents, to other licensees as well as per following details:-

| Sl. No. | Service Area | Name of the Operators | Date of allocation of spectrum | Allotment in 900 MHz band | Allotment in 1800 MHz band | Total allotments beyond 6.2 MHz |
|---|---|---|---|---|---|---|
| 1 | Delhi | Bharti | 17.07.2002 | 1.8 MHz | -- | 3.8 MHz |
| 2 | Delhi | Bharti | 17.07.2003 | -- | | 2 MHz |
| 3 | Delhi | Vodafone | 17.07.2002 | 1.8 MHz | -- | 3.8 MHz |
| 4 | Delhi | Vodafone | 15.10.2003 | -- | | 2 MHz |
| 5 | Mumbai | Bharti | 21.04.2004 | -- | 1.8 MHz | 3 MHz |
| 6 | Mumbai | Bharti | 20.01.2006 | -- | | 1.2 MHz |
| 7 | Mumbai | Vodafone | 17.07.2002 | 1.8 MHz | -- | 3.8 MHz |
| 8 | Mumbai | Vodafone | 15.10.2003 | - | | 2 MHz |
| 9 | Mumbai | BPL | 13.01.2003 | 1.8 MHz | -- | 3.8 MHz |
| 10 | Mumbai | BPL | 06.09.2004 | -- | | 2 MHz |
| 11 | Chennai circle | Aircel | 20.01.2006 15.11.2006 | -- | 1.8 MHz .06 MHz | 2.4 MHz |
| 12 | MH Circle | IDEA | 31.12.2003 01.04.2005 | -- | 1.6 MHz 2.0 MHz | 3.6 MHz |

**30.**In addition to above, the spectrum beyond 6.2 MHz upto 10 MHz (paired) was also allotted to MTNL and BSNL in different circles pursuant to the precedent of aforesaid questioned Order dated 01.02.2002, treating the same

to be a policy decision.

**31.** It is alleged that while allotting the above additional spectrum beyond 8.0 MHz (paired) to the aforesaid Telecom Operators, no additional revenue share was taken by DoT in compliance of the order No. L-14041/06/2000-NTG dated 01.02.2002 issued by Sh. R. K. Srivastava, the then Engineer, WPC Wing, DoT on the basis of the decision taken on 31.01.2002 by Late Sh. Pramod Mahajan, the then MOC&IT on recommendation of accused Shyamal Ghosh and in conspiracy with the said accused telecom companies. The existing 4% of AGR upto 8 MHz continued upto 10 MHz (paired) in view of the said order dated 01.02.2002 without paying any additional revenue share.  It is alleged that the immediate beneficiaries of the said order in getting earmarked the spectrum beyond 6.2 MHz + 6.2 MHz were accused companies namely M/s Bharti Cellular Limited (A-2) for Delhi Service Area, M/s Hutchison Max (P) Limited (A-3) for Mumbai Service Area and M/s Sterling Cellular Limited (A-4) for Delhi Service Area.

**Loss to Exchequer:**

**32.** It is further alleged that if an additional 1% of AGR spectrum charges for spectrum beyond 8 MHz upto 10 MHz (paired) would have been imposed, as required to be done as per the analogy, the DoT would have earned an additional amount of Rs. 846.44 crore till 31.03.2010, when the new order dated 25.02.2010 revising/ increasing the spectrum charges was notified by the Government. It is alleged that this amount, is, therefore, cumulative

wrongful loss, which occurred to the Government exchequer and the beneficiaries of this were the said three accused beneficiary companies and few incidental beneficiaries consequently, as detailed below:-

| Year | M/s Bharti Cellular Ltd. (now Bharti Airtel Ltd.) (Rs. in crore) | M/s Hutchison Max Pvt. Ltd. & Sterling Cellular Ltd. (now Vodafone) (Rs. in crore) | M/s BPL (Rs. in crore) | M/s Idea (Rs. in crore) | M/s Aircel (Rs. in crore) |
|---|---|---|---|---|---|
| 2003-04 | 5.95 | 6.62 | -- | -- | -- |
| 2004-05 | 13.93 | 18.4 | 1.55 | -- | 1.17 |
| 2005-06 | 25.60 | 27.91 | 4.45 | 6.99 | 4.63 |
| 2006-07 | 39.85 | 41.09 | 4.57 | 9.04 | 8.11 |
| 2007-08 | 64.96 | 52.03 | 4.42 | 12.04 | 13.98 |
| 2008-09 | 107.46 | 60.12 | 4.74 | 16.77 | 15.89 |
| 2009-10 | 160.75 | 73.19 | 4.68 | 18.62 | 16.93 |
| **Total** | **418.50** | **279.36** | **24.41** | **63.46** | **60.71** |

**33.**It is further alleged that Sh. N. Parameswaran, the then DDG (Access Services), DoT, New Delhi vide his letter dated 13.04.2007 addressed to the Secretary, TRAI, New Delhi requested TRAI to give its recommendations on certain terms and conditions in the Access Provider license as the Government was contemplating to review such terms and conditions. However, the TRAI also gave recommendations dated 28.08.2007 on its own in respect of increasing the spectrum charges. While recommending to increase the spectrum charges, the TRAI also gave one of the grounds which is reproduced herein below:

*"Keeping in view the scarcity of the spectrum, there is a need to deploy spectral efficient technologies, if necessary through capital infusion, and to*

*curtail the hoarding of spectrum. Tightening the norms for spectrum allocation, linking it with roll out obligations and a marginal rate revision; it is felt, would make the service providers look for technical solutions and affective utilization of this very scarce resource. The Authority in its recommendations on "Allocation and Pricing of Spectrum for 3G and broadband wireless access service" had recommended an additional 1% of the operator's total AGR after examining various options for rationalizing the spectrum charges."*

**34.** After examining various options for rationalizing the spectrum charges, the TRAI recommended adoption of revenue share spectrum charges in respect of GSM which is described herein below:

| Quantum of spectrum | Current % of AGR | Proposed % of AGR |
|---|---|---|
| Upto 2x4.4 MHz | 2% | No change |
| Upto 2x6.2 MHz | 3% | No change |
| Upto 2x8 MHz | 4% | No change |
| Upto 2x10 MHz | 4% | 5% |
| Upto 2x12 MHz | 5% | 6% |
| Upto 2x15 MHz | 6% | 7% |
| Beyond 2x15 MHz | -- | 8% |

**35.** It is further alleged that after receiving the recommendation dated 28.08.2007 of TRAI, the DoT, New Delhi issued a letter dated 09.07.2008 to the Secretary, TRAI, New Delhi clarifying therein that the DoT had proposed an increase of 1% AGR across the Board (i.e. from start-up 4.4 MHz + 4.4 MHz and for every additional slab as proposed), in addition to the incremental 1% AGR suggested by TRAI for additional spectrum beyond 8.0 MHz for every 1.8 MHz / 2 MHz / 3 MHz (paired) as per details mentioned below:-

| TRAI Recommendations | | DOT Proposal | |
|---|---|---|---|
| Amount of Spectrum | AGR | Amount of Spectrum | AGR Proposed |
| Upto 2x4.4 MHz | 2% | Upto 2x4.4 MHz | 3% |
| Upto 2x6.2 MHz | 3% | Upto 2x6.2 MHz | 4% |
| Upto 2x8 MHz | 4% | Upto 2x8.2 MHz | 5% |
| Upto 2x10 MHz | 5% | Upto 2x10.2 MHz | 6% |
| Upto 2x12.5 MHz | 6% | Upto 2x12.5 MHz | 7% |
| Upto 2x15 MHz | 7% | Upto 2x15 MHz | 8% |
| Beyond 15 MHz | 8% | Beyond 15 MHz | 9% |

**36.**The aforesaid letter dated 09.07.2008 of DoT explained the reasons for such revision that the rate revision in the past did not address the spectrum range of 4.4 MHz – 8.0 MHz which contributes to the bulk of the customer revenue.  Hence, there was a need to rationalize the tariff in this range.  The TRAI was thereby, requested to provide their considered views / comments on the above proposal of DoT as per the provisions of section 11(1) of TRAI Act, 1997.  In response to the said letter, Chairman, TRAI sent a letter dated 17.07.2008 to Secretary, DoT with specific reference to GSM Spectrum beyond 6.2 MHz upto 10 MHz (paired).   In the said letter TRAI recommended to levy 5% of AGR upto 10 MHz (paired) with a view to rationalize the spectrum charges and for correcting the anomaly that arose because of the Questioned order dated 01.02.2002 as no charges were levied between 8.0 MHz + 8.0 MHz upto 10 MHz + 10 MHz in the said order dated 01.02.2002.  The relevant contents of the said letter dated 17.07.2008 of the then Chairman, TRAI to DoT are extracted herein below:-

*"The rationale behind Authority's recommendation to revise, spectrum charges beyond 2x8 MHz was that in the spectrum slab of 2x4.4 MHz to 2x8 MHz, the spectrum usage charges are increasing in the steps of 1%, that is,*

*from 2% - 4%.  However, the upward slab from 2x8 MHz to 2x10 MHz, the prevailing spectrum usage charges, remains same as 4%.  With a view to rationalize the spectrum usage charges across all slabs, the Authority while correcting this anomaly, recommended levying 5% of AGR as spectrum usage charges for 2x10 MHz.  For further spectrum slabs, it accordingly revised the charges with an increment of 1% per slab."*

**37.**Further, the TRAI also concurred with the proposal of enhancement of spectrum charges across the board in spectrum slabs as proposed by DoT vide letter dated 09.07.2008 as referred herein above.  Then, the DoT decided to consider the agenda of increase of annual spectrum charges for 2G Spectrum in the meeting of Full Telecom Commission.  While placing the memo dated 07.11.2008 in respect of increase of annual spectrum charges before Telecom Commission, Jt. Wireless Advisor mentioned that the prevailing rates of spectrum charges (i.e. as stipulated in the aforesaid questioned order dated 01.02.2002) did not provide for any incremental charge between 8 MHz and 10 MHz of spectrum allotment.  The TRAI had, therefore, recommended increase of spectrum charges by 1% for spectrum allotment above 8 MHz.  This would provide incremental charging rate. Therefore, it was proposed to introduce a new slab for allotment of spectrum (between 6.2 & 10 MHz) with an increment of 1% of AGR above the slab for spectrum from 8.0 MHz upto 10 MHz (paired).  It was additionally proposed to increase spectrum charges by 1% of AGR across the entire range of spectrum allocation in the existing charges / revenue share regime.  After the approval of Full Telecom Commission and the then MOC&IT, an order

dated 25.02.2010 was issued by WPC Wing of DoT.  Vide this order the following revised rates were to be effective from 01.04.2010:-

| Amount of GSM Spectrum | Amount of CDMA Spectrum | Revised Spectrum charges as % of AGR |
|---|---|---|
| Upto 2x4.4 MHz | Upto 2x5.0 MHz | 3 |
| Upto 2x6.2 MHz | Upto 2x6.25 MHz | 4 |
| Upto 2x8.2 MHz | Upto 2x7.5 MHz | 5 |
| Upto 2x10.2 MHz | Upto 2x10.0 MHz | 6 |
| Upto 2x12.2 MHz | Upto 2x12.5 MHz | 7 |
| Upto 2x15.2 MHz | Upto 2x15.0 MHz | 8 |

**38.**However, certain Telecom Operators including accused Telecom Companies filed petition No. 68/2010 challenging the above mentioned order dated 25.02.2010 before Hon'ble Telecom Disputes Settlement & Appellate Tribunal (TDSAT), New Delhi.  After hearing the arguments, the Hon'ble TDSAT dismissed the said petition and upheld the aforesaid order dated 25.02.2010.   Then, the Telecom Operators filed Civil Appeal in Hon'ble Supreme Court of India in the year 2010 against the said order of TDSAT.  On the prayer of the operators, the Hon'ble Supreme Court of India passed an interim order dated 22.10.2010 staying the order of TDSAT citing the grounds that the said Appeal contained complex questions of law and facts, having arisen for determination under TRAI Act, 1997.   The companies were directed to deposit 50% of the outstanding principle amount net of interest in the Supreme Court Registry within a period of two weeks and the balance 50% to be secured by way of bank guarantee of nationalized bank.  The Hon'ble Supreme Court also directed that the MD of the Operator Company to give an affidavit to the effect that in the event of civil appeal being dismissed, the Operator Company will pay the balance amount with

interest at the rate which may be fixed by the court at the appropriate stage. The matter is pending before the Hon'ble Supreme Court of India.

**39.**It is further alleged that while the decision was taken for additional spectrum beyond 6.2 MHz upto 10 MHz on 31.01.2002 by charging only additional 1% of AGR, the subscriber base of M/s Bharti Cellular Limited (A-2) (now known as M/s Bharti Airtel Limited) & M/s Sterling Cellular Limited (A-4) (now known as M/s Vodafone Mobile Services Limited) in Delhi Metro area and of M/s Hutchison Max (P) LImited (A-3) (now known as M/s Vodafone India Limited) in Mumbai Metro area was approaching the reduced subscriber base of 4-5 lacs. The representatives of these accused companies from these Metro circles attended the presentation given on 04.10.2001 to Sh. Shyamal Ghosh (A-1) and other DoT officials seeking additional spectrum through COAI.  Having taken the said decision on 31.01.2002 by the then MOC&IT for additional spectrum beyond 6.2 MHz, in conspiracy with the three said accused telecom companies acting through unknown representatives, these accused telecom companies were first of all allocated additional spectrum beyond 6.2 upto 8 MHz (paired) simultaneously on 17.07.2002 and subsequently upto 10 MHz (paired) in 2003 for which they paid only additional 1% of AGR instead of additional 2% of AGR. As such, these accused companies were the immediate and contemporary beneficiaries of the said illegal order, issued in pursuance of the conspiracy.

**40.**It is further alleged that while the Technical Committee of DoT had recommended to allot additional spectrum beyond 6.2 MHz + 6.2 MHz only

after the Operator reached subscribers base of 9 lacs, <u>the requirement of subscribers base was intentionally reduced by accused public servants to 4 lacs for applying additional spectrum & 5 lacs for actual allocation of spectrum, in order to extend wrongful benefit to M/s Bharti Cellular Limited, M/s Hutchison Max (P) Limited, and M/s Sterling Cellular Limited, as M/s Bharti Cellular Limited had reached the subscribers base of 4 lacs as on 31.12.2001 and of 5 lacs on 31.01.2002,</u> that is, on the day the said decision was taken and the aforesaid two other companies had also already crossed the subscriber base of 4 lacs before the said decision, which had been pursuing to allocate additional spectrum in their respective metro circles.

**<u>IPO of Bharti</u>:**

**41.** It is alleged that during the same period while the said decision was taken on 31.01.2002 in an illegal manner by the then MOC&IT in conspiracy with accused Sh. Shyamal Ghosh (A-1) & the said three accused telecom companies, <u>M/s Bharti Tele-Ventures Limited, a Company of Bharti Group had also issued an Initial Public Offer (IPO) on 28.01.2002 for issuance of 18,53,36,700 shares at the floor price of Rs. 45 per share which was to close on 2nd February 2002.  While seeking approvals for IPO, the said company had filed Draft Red Herring prospectus with Securities and Exchange Board of India (SEBI) and different Stock Exchanges through their Lead Manager JM Morgan Stanley for listing of equity shares of the company through IPO.</u> The Registrar to the said issue was M/s Karvy Consultants Limited (now

known as Karvy Computershare Limited) who processed the listing applications on behalf of the said company. The said prospectus contained various information such as offering size, risk factors to the company, objectives of the issue, etc. In this Draft prospectus the company had mentioned that the expansion and development of their network might be impacted by the limited availability of frequency spectrum which was mentioned as one of the risk factors. The relevant contents of this risk factor as mentioned in the prospectus are reproduced herein below:-

*"While we are implementing techniques to optimize utilization of available spectrum such as frequency reuse plans and frequency hopping plans, there can be no assurance that we will be successful in increasing our network capacity to meet our future requirements if we are unable to obtain additional spectrum."*

**42.** It is further alleged that during the pendency of the aforesaid period of said IPO of M/s Bharti Tele-Ventures Limited, Late Sh. Pramod Mahajan, the then MOC&IT took decision on 31.01.2002 for allocating additional spectrum between 6.2 MHz upto 10 MHz (paired) in conspiracy with accused Sh. Shyamal Ghosh (A-1) and the said three accused telecom companies and on the basis of recommendation of Sh. Shyamal Ghosh (A-1). The decision was taken in the evening of 31.01.2002 and an order to that effect was issued on the very next day, that is, on 01.02.2002 during office hours. Whereas, this news was passed on in the intervening night of 31.01.2002/ 01.02.2002 which was published at Business News page in Hindustan Times dated 01.02.2002. The title of the news so published was:

"Mobile gridlock: Govt. releases 4 MHz additional spectrum."  It was further mentioned that the said landmark decision taken by the Government would provide a huge boost to the Indian Cellular Industry, companies will have to pay an additional 1% of their AGR of the said additional spectrum beyond 6.2 MHz upto 10 MHz (paired). Sources told the Hindustan Times that the decision was taken by Ministry of Communication Sh. (Late) Pramod Mahajan that day, that is, 31.01.2002 which was likely to be announced on the next day, that is, 01.02.2002.

**43.**It is further alleged that the IPO of the said company was closed on 02.02.2002 and therefore, by getting the said approval for additional spectrum and by getting such news published in the newspaper, the risk factor of additional spectrum as mentioned in the draft prospectus had been mitigated and brightened the outcome of the said IPO. It thereby proved to boost and encouraging factor for the investors to invest in the shares of the said company through said IPO.  The details comprising offering size, shares applied and shares allotted through the said IPO in different categories are as under:

| Offering size | 185,336,700 Equity Shares | Shares applied | Shares allotted |
|---|---|---|---|
| QIB Portion | (i) 11,12,02020 Equity Shares | 33,60,99,400 | 14,78,95,600 |
| Non Institutional Portion | (ii) 2,78,00505 Equity Shares | 3,88,48,000 | 2,94,62,400 |
| Retail Portion | (iii) 4,63,34,175 Equity Shares | 79,78,700 | 79,78,700 |
|  | **Total** | **382926100** | **185336700** |

**44.**It is further alleged that the said IPO became oversubscribed more than two times as a whole but it remained under subscribed in retail category and

therefore the shares under this category were allotted to the investors in other categories. It is alleged that substantial number of shares applications were received on 01.02.2002 and 02.02.2002 immediately after the said decision dated 31.01.2002 taken for allotment of additional spectrum as indicated from the date wise applications received for shares and allotment of shares made, which is mentioned as under:-

| Date wise applications from opening date to closing date of IPO | Total number of applications received for allotment of shares | Total number of shares applied | Total number of shares allotted |
|---|---|---|---|
| 28.01.2002 | 147 | 81175100 | 40284321 |
| 29.01.2002 | 438 | 64379200 | 30920400 |
| 30.01.2002 | 1003 | 40306100 | 21994400 |
| 31.01.2002 | 2011 | 51810000 | 16290439 |
| 01.02.2002 | 4759 | 123727300 | 59595540 |
| 02.02.2002 | 15988 | 21528400 | 16251600 |
| **Total** | **14346** | **382926100** | **185336700** |

**45.**It is further alleged that after closing of the said IPO on 02.02.2002, the said company filed the prospectus dated 07.02.2002 with Registrar of Companies and the Stock Exchanges. In the said prospectus, the company has mentioned that the DoT had issued order dated February 01, 2002 to assign additional spectrum. Pursuant to the said order, the said company had applied for additional spectrum allocation for their Delhi Cellular Operations. M/s Bharti Cellular Limited had applied on 04.02.2002 for allocating additional spectrum beyond 6.2 MHz upto 10 MHz, of which spectrum upto 8 MHz (paired) was allotted on 17.07.2002 as per the letter issued by Sh. K. R. Mahender Kumar, AWA, WPC Wing, DoT, New Delhi. Pursuant to the said order dated 01.02.2002, the officials of M/s Bharti Cellular Limited, M/s Hutchison Max Limited and M/s Sterling Cellular

Limited had made several requests during 2002-03 to DoT for allocating additional spectrum beyond 6.2 MHz upto 8 MHz and beyond 8 MHz upto 10 MHz (paired).

**Post Retirement benefit to Sh. Shyamal Ghosh:**

**46.**It is further alleged that Late Sh. Pramod Mahajan, the then MOC&IT initiated a note dated 30.05.2002 on his own for creating a post of Administrator, Universal Service Obligation Fund (USOF) and for re-employment of Sh. Shyamal Ghosh (A-1) for the said post w.e.f. 01.06.2002, that is, from the very next day of his retirement till further orders which was proposed to be a Secretary level post. Late Sh. Pramod Mahajan, the then MOC&IT directly put up this note before the then Hon'ble Prime Minister on the same day, that is, on 30.05.2002 for approval and got the same approved on the same day. Accordingly, the Appointments Committee of the Cabinet approved the creation of the said post and appointment of Sh. Shyamal Ghosh (A-1) for the said post. Sh. Shyamal Ghosh (A-1) retired as Secretary, DoT on 31.05.2002 and joined as Administrator, Universal Service Fund on 01.06.2002 until further orders. However, the ACC granted approval for three years in respect of Sh. Shyamal Ghosh (A-1) from 01.06.2002 till 31.05.2005 after much reservations/ deliberations and conveyed to DoT vide letter dated 06.10.2004. In the said letter, the ACC further directed to the MOC&IT to initiate fresh recruitment/ selection procedure within time.

**47.**It is alleged that subsequently, the post for appointment of Administrator

in USO Fund was downgraded from the post of Secretary to Addl. Secretary under the Central Staffing Scheme after the tenure of Sh. Shyamal Ghosh. Since then the Addl. Secretary rank officers are being appointed as Administrator, USOF under the Central Staffing Scheme.  No retired officer can be appointed as Administrator, USOF.

**48.** It is further alleged that in the case of appointment of Sh. Shyamal Ghosh (A-1) as Administrator, USOF, the proposal was accepted by the then Hon'ble PM on strong recommendation of Late Sh. Pramod Mahajan, the then MOC&IT. The post was created on 30.05.2002 with the appointment of Sh. Shyamal Ghosh (A-1) as an Administrator, USO Fund, as a result of special efforts on the part of Late Sh. Pramod Mahajan.

**49.** It is further alleged that various directors/ promotes/ representatives of the said three accused Telecom Companies had been meeting the accused public servants in connection with getting allocation of additional spectrum, for which said accused companies had not yet achieved the subscribers base as recommended by the Technical Committee of DoT.

**50.** It is thus, alleged that the aforesaid decision dated 31.01.2002 was taken in undue haste pursuant to the criminal conspiracy hatched amongst the accused public servants, that is, late Sh. Pramod Mahajan, the then MOC&IT, Sh. Shyamal Ghosh, the then Secretary (DoT) and the said accused telecom companies and Sh. Shyamal Ghosh (A-1), the then Chairman, Telecom Commission & Secretary, DoT in conspiracy with Late Sh. Pramod Mahajan, the then MOC&IT and the accused beneficiary Companies namely M/s Bharti Cellular Limited, New Delhi (A-2) (now

known as M/s Bharti Airtel Limited), M/s Hutchison Max (P) Limited, Mumbai (A-3) (known as M/s Vodafone India Limited), M/s Sterling Cellular Limited, New Delhi (A-4) (known as M/s Vodafone Mobile Services Limited) through their representatives, abused his official position as public servant and showed undue favour which caused loss of Rs. 846.44 crore to the Government exchequer and corresponding undue gain to the aforesaid accused telecom companies including incidental gain to other telecom companies by charging additional 1% of AGR instead of charging the required additional 2% of AGR for allocation of additional spectrum from 6.2 MHz upto 10 MHz (paired).

**51.** It is thus, alleged that the aforesaid facts and circumstances of the case constitute offence punishable under Section 120-B of IPC read with Section 13 (2) read with 13 (1) (d) of PC Act, 1988 and substantive offences thereof against Sh. Shyamal Ghosh (A-1), the then Secretary, DoT & Chairman, Telecom Commission and the accused Telecom Companies namely M/s Bharti Cellular Limited, New Delhi (A-2) (now known as M/s Bharti Airtel Limited), M/s Hutchison Max (P) Limited, Mumbai (A-3) (known as M/s Vodafone India Limited) and M/s Sterling Cellular Limited, New Delhi (A-4) (known as M/s Vodafone Mobile Services Limited).

**52.** Hence this case.

**53.** I have heard extensive arguments at the bar for about two weeks and have carefully gone through the record.

**54.** For the prosecution, it is submitted by Sh. Anand Grover, learned Sr. Advocate/ Spl. PP, that allegations contained in the charge sheet as well as

the documents attached therewith make out a prima facie case against the accused persons for framing charges against them.  He has read out the relevant parts of the charge sheet.  It is submitted by him that for framing charges, the allegations contained in the charge sheet are to be taken as true. It is further submitted by him that at this stage the charge sheet as well as the accompanied documents only are to be considered.  It is further submitted by him that if the allegations contained in the charge sheet, documents attached thereto as well as statements of witnesses are read, a prima facie case against the accused is clearly made out.  It is repeatedly submitted by him that at this stage the nature of the inquiry is very limited and truth or falsehood of allegations is not required to be gone into.  It is submitted by him that the public servants, in conspiracy with the companies, allocated spectrum beyond 6.2 MHz upto 10 MHz to the accused companies by charging only 1% of AGR, whereas as per past analogy it should have been 2%, that is, 1% each for two tranches of 1.8 MHz.  It is submitted by him that at that time there was no need for allocation of additional spectrum and the technical committee appointed by Sh. Shyamal Ghosh himself had not recommended allocation of additional spectrum and accused ignored its recommendations. It is further submitted by him that the report of joint testing team was also not awaited.  It is further submitted by him that neither the Wireless Advisor nor Member (F) of Telecom Commission were consulted. It is further submitted by him that the matter should have been considered by the Full Telecom Commission.  It is further submitted by him that the order dated 31.01.2002 passed by the then Minister late Sh. Pramod Mahajan, on the

recommendation of even date of Sh. Shyamal Ghosh, consequent to which a formal order was passed on 01.02.2002 is illegal, being contrary to established procedure, practice and past analogy of enhancing percentage of AGR by one percentage point for allocation of each tranche of 1.8 MHz of spectrum.  It is further submitted that this was done to boost the chances of success of pending IPO of Bharti Cellular as factum of inadequacy of spectrum was shown as a risk factor in the red herring prospectus.

**55.** It is further submitted by him that this was done by Sh. Pramod Mahajan and Sh. Shyamal Ghosh, both public servants in conspiracy with the companies and for recommending such an illegal thing, accused Shyamal Ghosh was appointed as Chairman of Universal Obligation Fund, on the recommendation of late Sh. Pramod Mahajan.  It is further submitted by him that the accused companies fully knew that they did not need spectrum, if they utilized the necessary technologies for enhancing the capacity of their network.  It is further submitted by him that spectrum was allocated in the most efficient band of 900 MHz instead of 1800 MHz, for which order was issued on 01.02.2002.

**56.** He has read out relevant documents and statements in brief to emphasize that the aforesaid illegal act of the accused persons caused huge financial loss to the public exchequer as it continued till 25.02.2010.  It is submitted by him that there is enough incriminating material on record warranting framing of charge against the accused.

**57.** He has invited my attention to Section 13(1)(d) of PC Act submitting that violation of the Section is clearly made out as the public servants by misuse/

abuse of their official position gave away spectrum to the accused companies at a much lesser rate than was required to be charged.

**58.**On the other hand, it is submitted by Sh. Sukumar Pattajoshi, learned Sr. Advocate and Sh. Atiar Singh for accused Shyamal Ghosh that the allegations of the prosecution that spectrum beyond 6.2 MHz upto 10 MHz was given away by charging only 1% of AGR instead of 2% or that the last tranche of 1.8 MHz beyond 8 MHz was given away for free are baseless. It is submitted that recommendations of TRAI were already there and concurrence of Member (F) was also sought. It is further submitted that as far as appointment of Shyamal Ghosh to the post of Administrator of USO Fund is concerned, the same was also legal as he was a natural person for the post. It is submitted that order dated 01.02.2002 has not been touched by any authority till today. It is further submitted that NTP 1994 had failed to achieve its objective so NTP 1999 was announced and its objective was not revenue generation but availability of telecom services to subscribers at affordable prices. It is further submitted that BSO operators, who were permitted to provide WLL services were encroaching upon the field of mobile operators and they were given spectrum at rates cheaper than the rate at which it was given to mobile operators and this was disturbing level playing field. It is further submitted that WLL operators were given spectrum of 5.5 MHz + 5.5 MHz by charging 2% of AGR whereas mobile operators were being charged 2% only for 4.4 MHz + 4.4 MHz and this disturbed the level playing field. To maintain level playing field, the mobile operators deserved to be allocated spectrum of 10 MHz + 10 MHz with revenue share

pegged at 4% and order dated 01.02.2002 does the same and as such there is nothing wrong with this order.

**59.**It is repeatedly emphasized that TRAI had repeatedly asked for allocation of more spectrum to the existing operators. In this regard, representations made by the mobile operators and COAI have been highlighted.  It is also submitted that the allegations that the spectrum was allocated in a more efficient band of 900 are also incorrect as this was done due to technical reasons and not for favouring anyone.  It is further submitted that reduced subscriber base was also correctly taken note of as there were some mistakes about that in the report of Mangla Committee.

**60.**It is repeatedly submitted that the recommendation/ note sheet, dated 31.01.2002 recorded by Sh. Shyamal Ghosh, which was approved by the then Minister late Sh. Pramod Mahajan on the same day, was correctly recorded, based on the principles of objectivity and fairness for maintaining level playing field between WLL operators and mobile operators.  It is further submitted that since the order dated 01.02.2002, which was issued consequent to the approval of the Minister, has been validly issued, no loss to the exchequer has been caused.  It is repeatedly emphasized that spectrum was to be allocated not only as per subscriber base but also considering the quality of service.  It is further submitted that the allocation order approved by the Minister on 31.01.2002 had nothing to do with the IPO of Bharti, as it was already oversubscribed.

**61.**It is also submitted that allocation of additional spectrum is not a policy matter, which was required to be placed before the Telecom Commission.  It

is repeatedly submitted that post-retirement appointment of Sh. Shyamal Ghosh was due to his expertise and not for any other extraneous reason. It is further submitted that no quid pro quo was involved in the case.

**62.**It is repeatedly submitted that if the charge sheet, documents and statements are read in correct perspective, no prima facie case is made out against the accused. He has read out the relevant portion of the charge sheet, statements of witnesses and lot of documents for close to three days, emphasizing that there was consensus in the department for allocating spectrum beyond 6.2 MHz upto 10 MHz and Member (F) was always in the loop and agreeable to the same. It is submitted that all these acts were done by the accused legally in the exercise of his official duties and as such for his prosecution, sanction under Section 197 CrPC is required. It is submitted by him that there is no prima facie case against the accused and he may be discharged.

**63.**He has read out the relevant provisions of PC Act, IPC and CrPC to emphasize that no case against the accused is made out.

**64.**Sh. Sukumar Pattajoshi, learned Sr. Advocate has also placed on record a volume of documents, consisting of photocopies of relevant documents, submitting that these documents contain the necessary material to disprove the allegations of prosecution and these are part of the prosecution record itself.

My attention has also been invited to the following case law:
**State of M. P. Vs. Sheetla Sahai & Ors., 2009 (8) SCC 617;**
**Dr. CP Thakur Vs. CBI dated 08.04.2009 in CRI.M.C. 2684/2008 DHC;**
**R. Venkatkrishnan Vs. CBI, 2009 (11) SCC 737;**

**K. R. Purushothaman Vs. State of Kerala, 2005 (12) SCC 631;**

**Sunil Bharti Mittal Vs. CBI, (2015) 4 SCC 609;**

**Subramanian Swamy Vs. A. Raja, (2012) 9 SCC 257;**

**Dr. Subramanian Swamy Vs. A. Raja, Judgment dated 04.02.2012 in CRI.M.C. 2684/2008 SC;**

**C. K. Jaffer Sharief Vs. State (Through CBI), 2013 (1) SCC 205;**

**Subash Parbat Sonvane Vs. State of Gujarat, 2002 (5) SCC 86;**

**Inspector Prem Chand Vs. Govt. of NCT of Delhi and Ors., 2007 (4) SCC 566;**

**Abdullah Mohammed Pagarkar etc. Vs. State (Union Territory of Goa, Daman and Diu), 1980 CriLJ 220;**

**R. Sai Bharathi Vs. J. Jayalalitha & Ors., 2004 (2) SCC 9;**

**Bihar Public Service Commission Vs. Saiyed Hussain Abbas Rizvi and anr., [2012] 11 SCR 1032;**

**Dr. Manmohan Singh Vs. CBI, CRLMP No(s) 5056-5057/2015 Order dated 01.04.2015 – Notice issued on Constitutional validity of S. 13(i)(d)(iii) of PC Act.**

**Dilawar Balu Kurane Vs. State of Maharashtra, (2002) 2 SCC 135; and Niranjan Singh Karam Singh Punjabi, Advocate Vs. Jitendra Bhimraj Bijjaya and others, (1990) 4 SCC 76.**

**65.** For accused Bharti Cellular Limited, Sh. Harish Salve and Sh. S. V. Raju, both learned Sr. Advocates, have submitted that there is no case at all against the accused persons, what to talk of a prima facie case.

**66.** It is submitted by Sh. Harish Salve, learned Sr. Advocate for accused Bharti Cellular Limited that in this case events are required to be classified into two segments. One segment consists of events, which led to the passing of order dated 01.02.2002 and the other segment consists of events, which occurred after passing of this order and events of both segments are required to be considered in the light of material available on record and the law applicable to them.

**67.** It is submitted by the learned Sr. Advocate that there is no material on record to indicate as to when did the conspiracy begin, what was it all about and who were party to it.  It is further submitted that there is no material on record indicating the malafide intention of the public servants.   It is repeatedly submitted that 'obtaining' by itself is not an offence and to make it an offence there must be abuse or misuse of office, which is lacking in this case.  It is further submitted that in case even the process of 'obtaining' was not complete and everything was inchoate.

**68.** It is further submitted that even otherwise the order dated 01.02.2002 is not binding on the Government as no right fructified in the operators, who were seeking additional spectrum. The Government was free to change the allocation of spectrum as well as the rate of AGR at which it was to be allocated.  It is further submitted that nothing prevented the Government from changing it, if it was wrong and even succeeding Ministers followed it and it continues till date.  It is repeatedly submitted that there was no concluded contract and Government was not obliged to follow the order as the order itself was subject to several limitations like availability of spectrum, justification, subscriber base etc.  It is repeatedly submitted that this order just created an expectation and no right.  It is repeatedly submitted that a right is created when a licence agreement is signed or when the spectrum is actually assigned and till date there is no right and no obligation and as such no 'obtainment'.  It is repeatedly emphasized 'obtainment' is when the frequency is actually assigned.  The order dated 01.02.2002 did not commit anything nor any spectrum was to be kept in reserve or store for the

accused companies.

**69.**It is further submitted that even the public servants were not the same when the first tranche was granted on 17.07.2002 and when the next tranche was granted in 17.07.2003 (D-108), as by that time Sh. Shyamal Ghosh had retired and late Sh. Pramod Mahajan was no longer the Minister.  It is submitted that as such the persons who were participating in the event, the subject matter as well as the period had changed.

**70.** It is further submitted by him that paucity of spectrum to the existing operators was highlighted by the TRAI.  He has referred to document D-228 to emphasize that recommendations of TRAI were there and a level playing field had to be maintained between the WLL operators and mobile operators.  Moreover, fourth cellular was going to be introduced and as such adequate spectrum had to be allocated to the existing operators to ensure quality of service.  It is submitted that the telecom companies and the COAI were requesting for additional spectrum since long.

**71.**It is further submitted that as far as rate or percentage of revenue is concerned, there is nothing on record to indicate that for every tranche of 1.8 MHz of spectrum percentage of AGR has to be increased by 1% and even the multiple or tranche of spectrum is not fixed and it can be 1.8 MHz or below it or more than it depending upon availability. It is repeatedly submitted that allocation of spectrum has an element of availability.  It is submitted that there is no rule that every time one tranche of spectrum is allocated, AGR has to be increased by one percentage point.  It is further submitted that everybody was having his own opinion on this.  It is

repeatedly submitted that about the increase by percentage point or amount of tranche of spectrum, there were no set benchmarks or slabs and the Minister could change the slab or benchmark for AGR as well as for allocation of spectrum in his discretion. It is further submitted that there was no haste in passing the order dated 31.01.2002 and the matter was duly considered.  It is further submitted that everybody was kept in the loop.  It is further submitted that this order cannot be linked to IPO of Bharti as that IPO was already oversubscribed.  It is repeatedly submitted that there is absolutely no material on record to link the decision of the Minister with the IPO or that the IPO getting success due to the decision of the Minister.

**72.** It is further submitted that it cannot be said that Minister took a decision, which he was not authorized to take or that the decision was contrary to law or that the power was used to give something, which he was not authorized by law.  It is submitted that everything was legally and validly done.  It is submitted that the ingredients of Section 13(1)(d) are not fulfilled in this case as neither corrupt or illegal means have been used nor official position has been misused.

**73.** It is further submitted that the Minister had the power to decide the matter and he decided it correctly.  It is further submitted that power to decide also include power to decide wrongly and for that alone an official cannot be prosecuted.  It is further submitted that even otherwise the spectrum of 10 MHz + 10 MHz being allocated with AGR of 4% is wrong as the accused companies were demanding it at the rate of 2% of AGR and everybody was speaking in the same voice that additional spectrum must be granted.

**74.** It is further submitted that grant of additional spectrum is not a policy matter and is well within the discretion of the Minister to grant it without consultation with other bodies.

**75.** It is further submitted that since tranche of 5 MHz + 5 MHz was introduced for the first time for allocating spectrum to WLL operators at the rate of 2% of AGR, level playing field had to be maintained by allocating spectrum upto 10 MHz + 10 MHz to the cellular operators by limiting the percentage of AGR at 4%.

**76.** It is repeatedly emphasized by the learned Sr. Advocate that entire allocation of spectrum has been done as per objective standards with a view to maintain level playing field, taking into account the need of additional spectrum to the existing operators.  It is submitted that there is no material on record, which could incriminate the act of Bharti Cellular Limited.  To emphasize his point, relevant portion of charge sheet, statements of witnesses and various documents have been read out at the bar extensively for two days.  It is prayed that it is a fit case for discharge.

**77.** Sh. Harish Salve, learned Sr. Advocate has also placed on record a volume of documents submitting that these documents contain the necessary material to disprove the allegations of prosecution and these are part of the prosecution record itself.

My attention has been invited to the various provisions of PC Act, CrPC and IPC.

My attention has also been invited to the following case law:
**Ram Krishan & Anr. Vs. State of Delhi, AIR 1956 SC 476;**
**M. W. Mohiuddin Vs. State of Maharashtra, (1995) 3 SCC 567;**

**C. K. Damodaran Nair Vs. Govt. of India, (1997) 9 SCC 477;**
**K. R. Purushothaman Vs. State of Kerala, (2005) 12 SCC 631;**
**C. K. Jaffer Sharief Vs. State (through CBI), (2013) 1 SCC 205;**
**State of M. P. Vs. Sheetla Sahai and ors., (2009) 8 SCC 617;**
**Shri Raghunandan Panda Vs. State of Orissa & Ors., (1975) 1 SCC 106;**
**Narendra Kumar Maheshwari Vs. Union of India and Ors., 1990 Supp SCC 440;**
**Sethi Auto Service Station and Anr. Vs. Delhi Development Authority & Ors., (2009) 1 SCC 180;**
**G. B. Mahajan & Others Vs. Jalgaon Municipal Council & Ors., (1991) 3 SCC 91;**
**Bachittar Singh Vs. State of Punjab and Anr., AIR 1963 SC 395;**
**MGB Gramin Bank Vs. Chakrawarti Singh, (2014) 13 SCC 583;**
**Commissioner of Municipal Corporation, Shimla Vs. Prem Lata Sood & Ors., (2007) 11 SCC 40;**
**M. Narayanan Nambiar Vs. State of Kerala, AIR 1963 SC 1116;**
**Tarlochan Dev Sharma Vs. State of Punjab & Ors., (2001) 6 SCC 260; and**
**Sharma Transport Vs. Government of A. P. and Others, (2002) 2 SCC 188.**

**78.** In continuation of the arguments for accused Bharti Cellular Limited, it is submitted by Sh. S. V. Raju, learned Sr. Advocate, that for this accused the case is only of conspiracy based on circumstantial evidence.  It is submitted that there is no direct evidence in the case and there are no allegations of quid pro quo.  It is repeatedly submitted that it is a simple case of conspiracy.  It is submitted that for proving conspiracy, prosecution is required to prove ingredients of an agreement and the agreement must be between two or more persons and that agreement must be either an agreement to do an illegal act or an act which is not illegal, by illegal means.  It is submitted that neither the grant of spectrum is an illegal act being prevented by any statute nor the

same has been allocated in an illegal manner or by illegal means. It is submitted that the allocation of spectrum is a legal act and has been achieved by legal means. It is repeatedly submitted that there is no material on record to indicate that there was any meeting of mind between the public servants and accused companies to commit an illegal act. It is submitted that it is a case based on circumstantial evidence and all circumstances cited in the charge sheet are irrelevant. The charge sheet is based on pure speculation and surmises. It is repeatedly submitted that there is no evidence of conspiracy. To emphasize this point, relevant portions of the charge sheet have been read at the bar.

**79.**It is submitted that there was no hasty decision in this case. The accused company was demanding additional spectrum since 1999 and if there is any haste, though there is none, it is attributed to public servant and not to the company. It is submitted that how can the company be held responsible for any procedural mistake committed by the public servants. To emphasize this point, statements of Sh. J. R. Gupta recorded under Section 161 as well as under Section 164 CrPC have been read out.

**80.**It is submitted that all links which constitute conspiracy are missing in this case. It is submitted that there is no material to indicate as to when and where the conspiracy was hatched, what was the conspiracy and who were the conspirators. It is repeatedly submitted that only pick and choose been done and three companies have been arrayed as accused on flimsy ground of being first beneficiaries of allocation of additional spectrum beyond 6.2 MHz. It is also submitted that no period of conspiracy has been

specified as to when the conspiracy began and when it terminated.  It is repeatedly submitted that conspiracy must precede the event and in this case the event is the order dated 31.01.2002 passed by the then Minister subsequent to which a formal order was passed on 01.02.2002 but the prosecution has narrated events upto 31.03.2010 in the charge sheet.  It is submitted that this has been done to prejudice the mind of the Court.

**81.**In order to emphasize that there is no material to show existence of prima facie case Section 10 of Evidence Act, 120-B IPC and some other provisions have been read out at the bar.

**82.**It is submitted that mere suspicion by itself is no proof of conspiracy.  It is repeatedly submitted that what to talk of mere suspicion, the material on record does not even create a suspicion.  It is submitted that it is a case of no suspicion.  It is further submitted that even if there is a grave suspicion and the same has been explained by the accused, the accused deserves to be discharged.  It is further submitted that motive alone also cannot be ground for framing charge.  For framing charge of conspiracy, an agreement to do an illegal act or to do an act by illegal means must be proved and both are lacking in this case.

**83.**It is repeatedly submitted by him that there is no evidence at all, what to talk of incriminating evidence, on the record.  To emphasize his point, he has read out the relevant paragraphs of charge sheet as well as statements of witnesses.  It is prayed that the accused may be discharged.

Sh. S. V. Raju, learned Sr. Advocate has also invited my attention to the following case law:

Yogesh alias Sachin Jagdish Joshi Vs. State of Maharashtra, (2008) 10 SCC 394;

State of Madhya Pradesh Vs. Sheetla Sahai and others, (2009) 8 SCC 617;

Kehar Singh and ors. Vs. State (Delhi Administration), (1988) 3 SCC 609;

State (NCT of Delhi) Vs. Navjot Sandhu alias Afsan Guru, (2005) 11 SCC 600;

Damodar Vs. State of Rajasthan, (2004) 12 SCC 336;

Arun Kumar Agarwal Vs. UOI and Ors., (2014) 2 SCC 609;

P. K. Narayanan Vs. State of Kerala, (1995) 1 SCC 142;

Saju Vs. State of Kerala, (2001) 1 SCC 378;

State of Karnataka Vs. L. Muniswamy and Ors., (1977) 2 SCC 699;

Sherimon Vs. State of Kerala, (2011) 10 SCC 768;

Jethsur Surangbhai Vs. State of Gujarat, (1984) Supp. SCC 207

Bhagwan Swarup Vs. The State of Maharashtra, AIR 1965 SC 682;

CBI Vs. V. C. Shukla & Ors., (1998) 3 SCC 410;

Mohd. Khalid Vs. State of W. B., (2002) 7 SCC 334;

State of Gujarat Vs. Mohd. Atik & Ors., (1998) 4 SCC 351;

Balmokand Vs. Emperor, AIR 1915 Lahore 16

State through Supdt. of Police, CBI/SIT Vs. Nalini & Ors., (1999) 5 SCC 253;

Babubhai Bhimabhai Bokhiria & Anr. Vs. State of Gujarat & Ors., (2014) 5 SCC 568;

Subramanian Swamy Vs. A. Raja, (2012) 9 SCC 257;

Union of India Vs. Prafulla Kumar Samal & Anr., (1979) 3 SCC 4;

Hanumant Vs. The State of MP, AIR 1952 SC 343;

Sharad Birdhichand Sarda Vs. State of Maharashtra, (1984) 4 SCC 116;

Balkar Singh Vs. State of Haryana, (2015) 2 SCC 746;

Century Spinning & Manufacturing Co. Ltd. & Ors. Vs. State of Maharashtra, (1972) 3 SCC 282;

Dilawar Balu Kurane Vs. State of Maharashtra, (2002) 2 SCC 135;

L. Krishna Reddy Vs. State by Station House Officer and Ors, (2014) 14 SCC 401;

Arun Kumar Agrawal Vs. UOI & Ors., (2013) 7 SCC 1;

State of MP and Ors Vs. Nandlal Jaiswal and Ors, (1986) 4 SCC 566;

**Villianur Lyarkkai Padukappu Maiyam Vs. Union of India & Ors., (2009) 7 SCC 561;**
**Natural Resources Allocation, In Re, Special Reference No. 1 of 2012, (2012) 10 SCC 1;**
**M. P. Oil Extraction and Anr. Vs. State of M. P. and Ors, (1997) 7 SCC 592;**
**State of U. P. through Central Bureau of Investigation Vs. Dr. Sanjay Singh and Anr., 1994 Supp (2) SCC 707;**
**Baliya Alias Bal Kishan Vs. State of Madhya Pradesh, (2012) 9 SCC 696;**
**Sunil Bharti Mittal Vs. CBI, (2015) 4 SCC 609;**
**State of Kerala Vs. P. Sugathan and Anr., (2000) 8 SCC 203; and**
**Firozuddin Basheeruddin and Ors. Vs. State of Kerala, (2001) 7 SCC 596;**

**84.** For accused Hutchison Max (P) Limited, it is submitted by Sh. Sidharth Luthra, learned Sr. Advocate, that whenever Government takes a decision it gives some right to a citizen.  It is submitted that it can be faulted only when there is an element of dishonesty.  It is submitted that in the instant case the decision to allocate spectrum beyond 6.2 MHz is a policy decision in which no illegal gratification is alleged and as such no criminality can be inferred in that.  It is submitted that spectrum beyond 6.2 MHz upto 10 MHz was correctly allocated by restricting the percentage of AGR at 4% as spectrum should not be so costly that it becomes difficult for consumers to afford a mobile phone.

**85.** It is further submitted that the issue of spectrum charges/ royalty was vexing the Government since the beginning of the mobile telephony and the issue was being considered since 2000.  It is submitted that different officers were giving different opinions and ultimately percentage of AGR was fixed

for spectrum usage charges.  It is submitted that there is no fixed rule in this regard and all this happened before 31.01.2002.  It is submitted that the company is an old licensee since 1994 and nobody had an interest in giving anything extra to the company.  It is submitted that in fixing the percentage of revenue share the implications of migration package have to be kept in view.  It is submitted that the issue of spectrum charges was pending before late Sh. Pramod Mahajan joined the Ministry.

**86.**It is further submitted that Hutchison Max (P) Limited was granted spectrum of 4.4 MHz + 4.4 MHz on 31.05.1995 and an additional 1.8 MHz + 1.8 MHz on 04.02.1997.  It is further submitted that since 1999 itself the company was asking for additional spectrum which was not forthcoming for one reason or the other.  It is submitted that the demand of spectrum was prior in time, limited and specific and that demand was before late Sh. Pramod Mahajan joined the Ministry.  It is further submitted that nobody from the company met him nor the rates were discussed or demanded.  It is submitted that COAI was demanding spectrum, of which this company is also a member.  It is submitted that in such a situation where is the question of conspiracy.  In order to emphasize his point various documents and statements of the witnesses have been read out at the bar.

**87.**It is submitted that the order dated 01.02.2002 is valid one and its validity was recognized in the subsequent orders also.  It is submitted that spectrum beyond 6.2 MHz was allocated as fourth operator was also entering the field and before allocating spectrum to them, need of existing operators for additional spectrum had to be satisfied.  It is further submitted that the

accused company was not asking for 3.8 MHz of spectrum.  It is submitted that the company was asking only for 2.6 MHz of spectrum and Sterling Cellular Limited was asking only for 1.2 MHz of spectrum.  It is repeatedly submitted that they were not asking spectrum upto 10 MHz.  It is submitted that it was the decision of the Government to issue order/ guideline for allocating spectrum upto 10 MHz. It is further submitted that how can the companies be held responsible for this.

**88.**It is repeatedly submitted that there is no evidence at all to show existence of the conspiracy between the company and the accused.  It is further submitted that even otherwise there is no evidence as to when the conspiracy began and when it terminated and what the conspirators were talking about and to whom.

My attention has been invited to the relevant documents, statements of witnesses as well as provisions of law.  It is prayed that the accused may be discharged.

Sh. Sidharth Luthra, learned Sr. Advocate has also invited my attention to the following case law:

**Arun Kumar Agrawal Vs. UOI & Ors., (2013) 7 SCC 1;**
**Prakash Mishra Vs. State of Odisha and Ors., CRLMP No. 1152 of 2014;**
**State of Uttaranchal and Anr. Vs. Sunil Kumar Vaish and Ors., (2011) 8 SCC 670;**
**Dilawar Balu Kurane Vs. State of Maharashtra, (2002) 2 SCC 135;**
**Shreya Jha Vs. CBI, 2007 (3) JCC 2318;**
**Velji Raghavji Patel Vs. State of Maharashtra, AIR 1965 SC 1433;**
**K. R. Purushothaman Vs. State of Kerala, 2005 (12) SCC 631;**
**State of M. P. Vs. Indrajeet Singh, 1997 CriLJ 348; and**
**Dr. Manmohan Singh Vs. CBI, Order dated 01.04.2015 (SC)**

**89.**For accused Sterling Cellular Limited, it is submitted by Sh. Ramesh Gupta, learned Sr. Advocate that the accused company was an independent company at the time of alleged offence, though at present it is under the same management.  It is submitted that there is no evidence at all to show that the accused company was conspiring with anyone.  It is submitted that it is a case of no evidence against the accused companies and the only ground on which they have been arrayed as accused is that they were the immediate beneficiaries of an order passed by DoT.  It is submitted that this is no ground in the eyes of law for proving the existence of a conspiracy. It is submitted that the order was issued by the department for which they cannot be held responsible unless there is good evidence showing that it was passed at the instance of companies, but there is no such evidence on record, except that companies were demanding additional spectrum since 1999 itself.  It is submitted that there is no evidence that any benefit was obtained by any of the two public servants.

**90.**It is further submitted that it was a policy decision to allocate additional spectrum considering the need of existing operators.  It is further submitted that the order continues till today.  It is further submitted that the public servants had full authority to take decision and the decision was taken correctly in the facts and circumstances of the case.  It is submitted that how can the three companies be held responsible for the decision taken in the department in the absence of evidence that three companies were acting as a cartel, though in fact they are competitors and there is no question of them

joining hands.  It is further submitted that the distinction made by the prosecution between immediate beneficiaries and the incidental beneficiaries is contrary to law.  It is submitted that immediate beneficiaries cannot be prosecuted only for being coincidentally first beneficiary of a Government decision. Somebody would naturally be a first beneficiary in every such situation and one cannot be prosecuted simply for being first in such a situation. It is submitted that there is no other evidence against this company except that it was one of the first beneficiaries.

**91.**It is further submitted that the case is based on a wrong assumption/ analogy that for every tranche of 1.8 MHz of spectrum, percentage of AGR must be increased by 1%.  It is submitted that there is no such rule.  It is further submitted that if the additional spectrum was allocated illegally, then COAI must also have been arrayed as an accused as it was also doing the same thing on behalf of the companies. It is repeatedly submitted that there is no evidence indicating the existence of any conspiracy before 31.01.2002. It is submitted that for inferring conspiracy the incriminating evidence must be prior to this date.  However, the entire evidence and the allegations in the charge sheet relate to period after this date.

**92.**It is submitted that if the allegations in the charge sheet are read carefully, one can easily infer that there is no evidence at all in support of them indicating meeting of mind of the accused persons or any agreement between them.  It is repeatedly submitted that since there is no incriminating material on record, the accused may be discharged.

Sh. Ramesh Gupta, learned Sr. Advocate has also invited my attention to the

following case law:

**L. K. Advani & Ors. Vs. CBI, 1997 JCC 294;**

**Saju Vs. State of Kerala, (2001) 1 SCC 378;**

**CBI Vs. V. C. Shukla & Ors., (1998) 3 SCC 410;**

**Niranjan Singh Karam Singh Punjabi, Advocate Vs. Jitendra Bhimraj Bijjaya and Ors., (1990) 4 SCC 76; and**

**S. P. Bhatnagar & Anr. Vs. The State of Maharashtra, 1979 CriLJ 566**

**93.**All four accused have also placed on record written submissions, copies of which have been supplied to the prosecution.

**94.**In rebuttal, it is submitted by Sh. Anand Grover, learned Spl. PP, has argued the case quite comprehensively, as earlier his submissions were relatively brief, for two days taking me through the charge sheet, statements of witnesses, documents and case law to emphasize that a prima facie case good enough for framing charge against the accused is made out.

**95.**It is submitted by him that the present stage is only the stage for framing of charge and for that there is more than enough incriminating material on record necessitating the framing of charge. It is submitted that in DoT there are different layers of decision making in which recommendations of TRAI, approval of Telecom Commission and consultation with the officials of the department is required.  However, the decision dated 31.01.2002 is not a decision in which these elements were involved.  It is submitted that it was not a collective decision.  It is submitted that the role of Member (F) of Telecom Commission is quite important and he cannot be ignored but in the instant case he has been completely sidelined.  Furthermore, important policy decisions are required to be placed before Telecom Commission and

its approval sought but this was not done in this case.

**96.**It is further submitted that Sh. Shyamal Ghosh in his note dated 10.01.2002 suggested one time fee for additional spectrum which was in complete violation of NTP 1999 which introduced revenue share.  It is further submitted that spectrum is to be utilized efficiently and rationally and to ensure that the recommendations of TRAI are required to be obtained.

**97.** It is further submitted that with each tranche of spectrum 1% of AGR is required to be charged as by 2001 the market had matured and spectrum being a scarce resource has to be charged for its scarcity value.  Every tranche of spectrum should attract additional percentage of AGR.

**98.**It is further submitted that as far as principle of parity between CDMA operators and cellular operators is concerned, the principle is that CDMA operators had to follow the CMTS operators.  It is submitted that first tranche of 4.4 MHz + 4.4 MHz of spectrum was allocated to CMTS operators with revenue share of 2%, following this CDMA operators were also allocated first tranche of 5 MHz + 5 MHz of spectrum with revenue share of 2%.  As such, CDMA operators had to maintain parity with CMTS operators and not other way round.  It is submitted that the case of the defence that CMTS operators were to be treated at par with CDMA operators by allocating 10 MHz + 10 MHz of spectrum with revenue share of 4% is wrong.  It is submitted that it is a wrong way to apply the principle of parity or level playing field.  The fact of the matter is that CDMA operators had to follow the CMTS operators.

**99.**It is further submitted that companies were seeking additional spectrum

but they were not utilizing the same efficiently.  It is submitted that the congestion which the companies were reporting could have been handled in two ways either by enhancing capacity by technological inventions or by obtaining additional spectrum.  Since spectrum is a scarce resource it was better for the companies to invest in technological inventions for enhancing capacity and removing congestion and they were being asked to do the same. However, the companies were demanding additional spectrum as they were having the advantage of early start and as such allocation of additional spectrum would be much more beneficial to them than to the others.

**100.** It is further submitted that in COAI presentation on 04.10.2001, Sh. Shyamal Ghosh asked the operators to convince DoT that already allocated spectrum was being utilized efficiently and all technical solutions have been tried and exhausted before seeking additional allocation but he ignored this when recording his note dated 31.01.2002 and submitting the same to the Minister.  It is further submitted that it was also decided in the meeting to appoint a technical committee to assess the need of additional spectrum and the said committee was appointed on 23.10.2001 under Sh. N. K. Mangla, Sr. DDG (TEC) and the committee gave its report on 21.11.2001 not recommending allocation of additional spectrum but this report was also ignored, both regarding allocation of additional spectrum and incremental increase of AGR with each tranche of spectrum.  It is submitted that incremental increase is necessary as spectrum charges are bandwidth dependent.

**101.** It is further submitted that Sh. Shyamal Ghosh then asked about the

status of spectrum on 26.11.2001 and when the same is reported to him on 05.12.2001 by Wireless Advisor he decided to place the same before the empowered committee but it was also not done.

**102.** It is further submitted that then he asked for an approach paper on allocation of spectrum and the same was put to him on 04.01.2002, in the light of discussions held yesterday, that is, 03.01.2002.  It is further submitted that the consensus reached on 31.01.2002 was to increase AGR by one percentage point for each slab of spectrum.  It is submitted that there was no consensus that spectrum be allocated upto 10 MHz and that too without increasing AGR with each slab.  It is submitted that it was a policy matter and should have been placed before the Telecom Commission. Furthermore, Member (F) should have been consulted. It is repeatedly submitted that the recommendation of 31.01.2002 of Sh. Shyamal Ghosh was his unilateral decision, which was approved by the Minister.  It is repeatedly submitted that it was not a collective decision and the decision is contrary to the material on record.  It is submitted that the case has to be put on trial for this reason alone.

**103.** It is further submitted that the decision was taken in a great hurry without waiting for the report of joint testing committee on congestion appointed under Sh. Asit Kadayan, Director, as the report might have put impediment in the plan of Sh. Shyamal Ghosh and late Sh. Pramod Mahajan.

**104.** It is further submitted that there was no need for any additional spectrum and it was decided to be allocated by the accused public servants in conspiracy with the companies and the decision was taken in great hurry.  In

order to emphasize conspiracy between the Minister, Secretary and companies, statements of Sh. J. R. Gupta, Sh. N. K. Mangla, Sh. R. N. Aggarwal, Sh. Ajoy Mehta and other witnesses have been read out at the bar.

**105.** It is further submitted that the order dated 31.01.2002, following which formal order was issued on 01.02.2002 created right in favour of the companies.  It is submitted that reaching of subscriber base was a done case and once the accused companies started paying spectrum charges at the rate of 4% on allocation of 1.8 MHz beyond 6.2 MHz upto 8 MHz, a contingent contract came into existence by which the Government was bound.  It is submitted that the concept of promissory estoppel would prevent the Government from reneging on its promise of not allocating spectrum beyond 8 MHz upto 10 MHz without any increase in AGR and the company would demand it as a matter of right. It is further submitted that all three accused companies were allocated spectrum on 17.07.2002 upto 8 MHz and immediately thereafter they started demanding spectrum beyond 8 MHz which was also allocated in 2003 or 2004 depending upon circle.

**106.** It is further submitted that the order dated 31.01.2002 was passed in conspiracy with the companies including Bharti Cellular Limited to boost the Prospectus of its IPO which was not doing well.  It is submitted that it is wrong to say that issue was already oversubscribed.  The relevant witnesses and the documents have been read out at the bar to emphasize that the order was passed to facilitate the IPO as it was mentioned as a risk factor in the Prospectus but once it was announced that additional spectrum has been granted the IPO got the desired success.

**107.** It is next submitted that appointment of Sh. Shyamal Ghosh to the post of Chairman, USO Fund also shows that the accused were in conspiracy with each other.  It is submitted that this was also done on the request of late Sh. Pramod Mahajan.

**108.** It is submitted that as far as legal position is concerned, the duty of the prosecution is to show existence of grave suspicion only for the purpose of charge and the material on record is good enough to show it.  It is submitted that it was not a collective decision of the department but is a unilateral one taken by the Minister and the Secretary in conspiracy with the companies.

**109.** It is further submitted that in this case there is no need for sanction under Section 197 CrPC as it was no part of the duty of the Secretary to take decision in violation of law, procedure and practice without consultation with the relevant authorities.

**110.** In the end, Sh. Anand Grover, learned Spl. PP has summarized his submissions as under:

There was no immediate need for taking decision on 31.01.2002 itself;

It was not a collective decision as neither recommendations from TRAI were sought nor approval of Telecom Commission was obtained;

Sh. Shyamal Ghosh had asked the operators to take certain steps to improve the efficiency of their network and also to place the matter of availability of spectrum before Telecom Commission but did not follow both the points to logical end;

Mangla Committee appointed but its recommendations were not followed;

Wireless Advisor reported that no spectrum was available but still he went

ahead with the order dated 31.01.2002;

The activities of Sh. Shyamal Ghosh and the Minister were unusual leading to the order dated 31.01.2002;

Joint testing report of the Sh. Asit Kadayan was also not awaited;

The order on 31.01.2002 was passed to boost the chances of IPO of Bharti; and

Sh. Shyamal Ghosh was appointed Chairman of USO Fund post-retirement.

**111.**It is repeatedly submitted and emphasized by referring to various documents and statements that all these facts point towards a conspiracy between the accused persons.

**112.**As far as period of conspiracy is concerned, it is submitted by him that conspiracy began on the appointment of late Sh. Pramod Mahajan as Minister for Communication on 01.09.2001 and continued till the first tranche of additional spectrum was allocated on 17.07.2002.  It is further submitted that the order created contract between the Government and the operators and as such they got a right and it was an 'obtainment' attracting the provisions of PC Act.

**113.** It is further submitted that the concept of immediate beneficiary being conspirator is valid one as one who comes first has huge advantage in market and the three accused companies got the additional spectrum first on 17.07.2002 whereas others got it late.  It is submitted that their coming first is relevant and is indicative of conspiracy.

My attention has been invited to the following case laws:
**i)Harihar Prasad, etc. Vs. State of Bihar, (1972) 3 SCC 89;**
**ii)Hardeo Singh Vs. State of Bihar and another, (2000) 5 SCC 623;**

iii)Amit Kapoor Vs. Ramesh Chander and another, (2012) 9 SCC 460;

iv)State of Maharashtra and others Vs. Som Nath Thapa and others, (1996) 4 SCC 659;

v)State of Orissa Vs. Debendra Nath Padhi, (2005) 1 SCC 568;

vi)Mir Nagvi Askari Vs. Central Bureau of Investigation, (2009) 15 SCC 643;

vii)Central Bureau of Investigation, Hyderabad Vs. K. Narayana Rao, (2012) 9 SCC 512;

viii)M/s Motilal Padampat Sugar Mills Co. Ltd. Vs. State of Uttar Pradesh and others, (1979) 2 SCC 409; and

ix)Rojasara Ramjibhai Dahyabhai Vs. Jani Narottamdas Lallubhai (dead) by LRs and another, (1986) 3 SCC 300.

**114.**It is submitted by learned Spl. PP that there is enough material on record warranting framing of charge and the charges may be framed.

**115.**Since learned Spl. PP had not argued his case in detail during his first submissions when he started arguments on charge and he raised major issues only in rebuttal, the defence requested for an opportunity to advance further arguments and the same was allowed. The learned defence counsel, including Sh. Harish Salve, Sh. S. V. Raju, Sh. Sukumar Pattajoshi, Sh. Sidharath Luthra and Sh. Ramesh Gupta, all learned senior advocates, in response to the rebuttal arguments made submissions on behalf of the accused and controverted all the submissions of the prosecution in detail for two days. Thereafter, Sh. Anand Grover, learned Spl. PP, also briefly addressed the Court re-emphasizing his case.

**116.**I have carefully considered the submissions made at the bar in the light of material on record.

**117.**The case of the prosecution begins with the letter of COAI dated

04.09.2001 and its presentation to DoT on 04.10.2001. This letter and presentation has been dealt with in file D-6.

**118.**However, in order to understand this voluminous, complex, technical and old case in proper perspective, some background material is required to be not only highlighted but illuminated in order to unearth and understand the truth behind the events and to arrive at a just and fair decision as to whether charges are made out against the accused or not. These background facts would help in understanding the truth of allegations in charge sheet as well as in knowing if the order dated 31.01.2002 was passed legally or illegally. This order is at the heart of the matter. This material pertains to:

(a)Opening up of telecom sector and NTPs;

(b)Migration package and TRAI recommendations for fourth cellular and BSO with WLL;

(c)Guidelines for fourth cellular operators;

(d)Basic service operators and WLL services;

(e)Guidelines for BSOs providing WLL services;

(f)WPC Charges: Origin and notification of percentage ofrevenue share, incremental increase and reasons thereof;

(g)Request for additional spectrum: Treatment thereof;

(h)Reasons for opening of files D-4 and D-6 and significance thereof;

(i)Filing of documents and strange conduct of Prosecution; and

(j)Contradictory stand of witnesses inter se and vis-a-vis documents.


**A.Opening up of Telecom Sector and NTPs:**

**119.**The telecom sector was opened to private sector in 1991. In 1992, eight tenders were invited for four metro cities of Delhi, Mumbai, Kolkata and Chennai for Cellular Mobile Telephone Services (CMTS), that is, two tenders for each of the metro. These companies were granted licences for

running cellular mobile services in 1994 and they began their operations in 1995. These were known as <u>First Cellular</u>.

**120.**In the meanwhile, Government came out with National Telecom Policy-1994. The basic services were also opened to private sector and in 1995 tenders were issued  for fixed service providers on non-exclusive basis in various telecom circles and they were also granted licences. Similarly, tenders were also issued for cellular mobile services in the remaining seventeen telecom circles and they were issued licence in 1996 to run mobile services, known as <u>Second Cellular</u>.

<u>NTP-99</u>:

**121.**However, with the passage of time, Government recognized that the results of privatization were not satisfactory and it came out with NTP-1999. It is relevant to extract some parts of paragraph 1.2, which deals with NTP-94- objectives and achievements and paragraph 1.3 with the heading "Need for a new Telecom Policy" (D-274), which are as under:

> "1.2*NTP 1994- objectives and achievements*
>
> …...................................................
>
> …............................................................
>
> <u>The Government recognises that the result of the</u> <u>privatisation has so far not been entirely</u> <u>satisfactory. While there has been a rapid rollout of</u> <u>cellular mobile networks in the metros and states</u> <u>with currently over 1 million subscribers, most of</u> <u>the projects today are facing problems. The main</u> <u>reason, according to the cellular and basic</u> <u>operators, has been the fact that the actual revenues</u> <u>realised by these projects have been far short of the</u> <u>projections and the operators are unable to arrange</u>

financing for their projects and therefore complete their projects. Basic telecom services by private operators have only just commenced in a limited way in two of the six circles where licenses were awarded. As a result, some of the targets as envisaged in the objectives of the NTP 1994 have remained unfulfilled. The private sector entry has been slower than what was envisaged in the NTP-1994.

The government views the above developments with concern as it would adversely affect the further development of the sector and recognises the need to take a fresh look at the policy framework for this sector.

1.3 *Need for a new telecom policy*

In addition to some of the objectives of NTP 1994 not being fulfilled, there have also been far reaching developments in the recent past in the telecom, IT, consumer electronics and media industries world-wide. Convergence of both markets and technologies is a reality that is forcing realignment of the industry. At one level, telephone and broadcasting industries are entering each other's markets, while at another level, technology is blurring the difference between different conduit systems such as wireline and wireless. As in the case of most countries, separate licences have been issued in our country for basic, cellular, ISP, satellite and cable TV operators each with separate industry structure, terms of entry and varying requirement to create infrastructure. However this convergence now allows operators to use their facilities   to deliver some services reserved for

other operators, necessitating a relook into the existing policy framework. The new telecom policy framework is also required to facilitate India's vision of becoming an IT superpower and develop a world class telecom infrastructure in the country."

**122.**One of the objectives of NTP-1999 was: "Transform in a time-bound manner the telecommunication sector to a greater competitive environment in both urban and rural areas providing equal opportunities and level playing field for all players". The policy thus recognized the importance of level playing field. The policy also recognized that the revenues realized by telecom projects have been far short of projections and operators were facing difficulty in arranging finances.

**123.**The policy recognized also the role of cellular mobile service providers (CMSPs) as well as fixed service providers (FSPs).

**124.**Para 3.1.1 deals with cellular mobile service providers, which is as under:

> "Cellular Mobile Service Providers
>
> The Cellular Mobile Service Providers (CMSP) shall be permitted to provide mobile telephony services including permission to carry its own long distance traffic within their service area without seeking an additional licence. Direct interconnectivity between licensed CMSP's and any other type of service provider (including another CMSP) in their area of operation including sharing of infrastructure with any other type of service provider shall be permitted. Interconnectivity between service providers in

different service areas shall be reviewed in consultation with TRAI and the same would be announced by August 15, 1999 as a part of the structure for opening up national long distance. The CMSP shall be allowed to directly interconnect with the VSNL after opening of national long distance from January 1, 2000. The CMSP shall be free to provide, in its service area of operation, all types of mobile services including voice and non-voice messages, data services and PCOs utilizing any type of network equipment, including circuit and/or packet switches, that meet the relevant International Telecommunication Union (ITU)/ Telecommunication Engineering Center (TEC) standards.

CMSP would be granted separate licence, for each service area. Licences would be awarded for an initial period of twenty years and would be extendible by additional periods of ten years thereafter. For this purpose, service areas would be categorized into the four metro circles and Telecom circles as per the existing policy. CMSP would be eligible to obtain licences for any number of service areas.

Availability of adequate frequency spectrum is essential not only for providing optimal bandwidth to every operator but also for entry of additional operators. Based on the immediately available frequency spectrum band, apart from the two private operators already licenced, DOT / MTNL would be licenced to be the third operator in each service area in case they want to enter, in a time bound manner. In order to ensure level playing field between different service providers in similar

situations, licence fee would be payable by DoT also. However, as DoT is the national service provider having immense rural and social obligations, the Government will reimburse full licence fee to the DoT.

It is proposed to review the spectrum utilisation from time to time keeping in view the emerging scenario of spectrum availability, optimal use of spectrum, requirements of market, competition and other interest of public. The entry of more operators in a service area shall be based on the recommendation of the TRAI who will review this as required and no later than every two years.

CMSP operators would be required to pay a one time entry fee. The basis for determining the entry fee and the basis for selection of additional operators would be recommended by the TRAI. Apart from the one time entry fee, CMSP operators would also be required to pay licence fee based on a revenue share. It is proposed that the appropriate level of entry fee and percentage of revenue share arrangement for different service areas would be recommended by TRAI in a time-bound manner, keeping in view the objectives of the New Telecom Policy."

**125.** Similarly, para 3.1.2 deals with Fixed Service Providers (FSPs), which is as under:

"Fixed Service Providers

The Fixed Service Providers (FSP) shall be freely permitted to establish 'last mile' linkages to provide fixed services and carry long distance traffic within

their service area without seeking an additional licence. Direct interconnectivity between FSP's and any other type of service provider (including another FSP) in their area of operation and sharing of infrastructure with any other type of service provider shall be permitted. Interconnectivity between service providers in different service areas shall be reviewed in consultation with TRAI and the same would be announced by August 15, 1999 as a part of the structure for opening up of national long distance. The FSP shall be allowed to directly interconnect with the VSNL after the opening up of national long distance from January 1, 2000. The FSP may also utilize last mile linkages or transmission links within its service area made available by other service providers. The FSP shall be free to provide, in his service area of operation, all types of fixed services including voice and non-voice messages and data services, utilizing any type of network equipment, including circuit and/or packet switches, that meet the relevant International Telecommunication Union (ITU) / Telecommunication Engineering Center (TEC) standards.

The FSP shall be granted separate license, on a non-exclusive basis, for each service area of operation. Licences would be awarded for an initial period of twenty years which shall be extended by additional periods of ten years thereafter. The FSPs shall be eligible to obtain licences for any number of service areas.

While market forces will ultimately determine the number of fixed service providers, during transition, number of entrants have to be carefully

decided to eliminate non-serious players and allow new entrants to establish themselves. Therefore, the option of entry of multiple operators for a period of five years for the service areas where no licences have been issued is adopted. The number of players and their mode of selection will be recommended by TRAI in a time-bound manner.

The FSP licencees would be required to pay a one time entry fee. All FSP licencees shall pay licence fee in the form of a revenue share. It is proposed that the appropriate level of entry fee and percentage of revenue share and basis for selection of new operators for different service areas of operation would be recommended by TRAI in a time-bound manner, keeping in view the objectives of the New Telecom Policy.

As in the case for cellular, for WLL also, availability of appropriate frequency spectrum as required is essential not only for providing optimal bandwidth to every operator but also for entry of additional operators. It is proposed to review the spectrum utilisation from time to time keeping in view the emerging scenario of spectrum availability, optimal use of spectrum, requirements of market, competition and other interest of public.

The WLL frequency shall be awarded to the FSPs requiring the same, based on the payment of an additional one time fee over and above the FSP entry fee. The basis for determining the entry fee and the basis for assigning WLL frequency shall be recommended by the TRAI. All FSP operators utilising WLL shall pay a licence fee in the form of a revenue share for spectrum utilization. This

<u>percentage of revenue share shall be over and above the percentage payable for the FSP licence</u>. It is proposed that the appropriate level of entry fee and percentage of revenue share for WLL for different service areas of operation will be recommended by TRAI in a time-bound manner, keeping in view the objectives of the New Telecom Policy."

**126.** Para 5.0 deals with spectrum management and states that spectrum usage fee shall be charged.

**127.** The policy also recognizes the role of regulator, that is, Telecom Regulatory Authority of India (TRAI), created under The Telecom Regulatory Authority of India Act, 1997.

**128.** The policy also recognizes that DoT/ MTNL would be licenced as Third Operators and <u>that entry of more operators in a service area shall be on the recommendation of TRAI</u>.

The policy also proposes that CMSP operators would be required to pay licence fee based on revenue share, which would be recommended by TRAI. Thus, the policy shifts from fixed free regime to revenue share regime.

**129.** <u>It is important to note that the policy recognizes that technology is blurring the difference between different technologies such as wireline and wireless. It also recognizes the importance of level playing field amongst different players</u>.

**B.** **Migration Package and TRAI Recommendations for Fourth Cellular and BSO with WLL**

**130.**As the telecom industry was facing certain problems including revenue related and the NTP-99 had recognized a new regime of revenue share for all operators, old as well as new entrants, so in 1999 itself, the Government proposed migration of existing licencees of telecom services to NTP-1999 regime, that is, revenue sharing regime, to ensure uniform application of NTP-1999 across the country. This regime was approved in July 1999 for migration of existing licencees of <u>Cellular and Basic</u> service providers to revenue sharing regime and the cut-off date of migration was decided to be 01.08.1999.

**131.**Accordingly, TRAI recommendations were sought by DoT. Vide letter dated 23.04.1999 (D-14, page 9 & D-274, page 46), DoT sought recommendations on <u>appropriate level of entry fee, the percentage of revenue to be shared with the licensor</u>, definition of revenue for the purpose and the basis of selection of new operators.

**132.**Vide letter dated 12.07.1999 (D-274, page 72), recommendations were sought by DoT from TRAI <u>in regard to licence fee arrangement for migration of the existing operators to NTP-1999 regime</u>, which reads as under:

"<u>Most Immediate</u>

GOVERNMENT OF INDIA
MINISTRY OF COMMUNICATIONS
DEPARTMENT OF TELECOMMUNICATIONS
(VAS CELL)

SANCHAR BHAWAN,
20, ASHOKA ROAD,
NEW DELHI – 110 001

No. 842-153/99-VAS (Vol. V)    Dated 12th July, 1999

To
The Secretary,
Telecom Regulatory Authority of India,
Jawahar Vyapaar Bhawan,
Janpath,
New Delhi.

Subject: Recommendations of TRAI in regard to licence fee arrangement for migration of the existing operators of Cellular Metros, Cellular Circles and Basic Services to NTP-99 regime.

Dear Sir,

I am directed to inform that pursuant to announcement of New Telecom Policy-1999 (NTP-99), the Government have now taken the following decisions:

Permit migration of existing licensees of Cellular, Basic and other Value Added Telecom Services to NTP-99 regime. Under the scheme of migration, it is the Government's intention to issue additional licences early for Cellular as well as Basic Telecom Services in the Service Areas in which the existing licensees opt to migrate to NTP-99 regime.

In the case of Cellular Services, as per present availability of spectrum DoT/MTNL will be the

third operator.  DoT/ MTNL would pay licence fee as per NTP-1999.  <u>In addition there will be one more private operator; bid for this licence will be issued on the new licensing regime i.e. a one time entry fee plus percentage share of revenue as licence fee</u>; decision on the percentage share of revenue to be taken on receipt of TRAI's recommendations.  Question of issue of more licences in future would be decided based on emerging scenario of Spectrum availability and based on recommendations of TRAI (as per NTP-99, TRAI will review this as required and no later than every two years).

In the case of Basic Telecom Services, bids for new licences to be invited on the new licensing regime i.e. one time entry fee plus percentage share of revenue as licence fee; decision on numbers of operators and the percentage share of revenue to be taken on receipt of TRAI's recommendations.

<u>The cut off date for change-over to NTP-99 regime for the existing Cellular and Basic Service Operators will be 1.8.1999</u>.  Starting from this date, the percentage of gross revenue to be paid towards licence fee will be the same as would apply in future to the new licensee(s) in the same service area.  <u>The licence fee dues payable upto 31.7.1999 would be treated as the Entry Fee for the existing operators</u>. The new operators will bid for the Entry Fee.

2. In the light of the above decisions of the Government and keeping in view the earlier references sent to TRAI vide letter No.842-153/99-VAS/Vol.IV dated 23.4.1999 regarding CMSP

licences and No.10-6/99-BS.I dated 23.4.1999 regarding Basic Service Licences and also keeping in view the time frame of migration, TRAI may kindly provide their recommendations on an urgent basis regarding the licence fee arrangement (revenue share) for the existing Cellular Metros, Cellular Circles and Basic Service Operators to be made applicable to them on migration with effect from 1.8.1999 (the same percentage of revenue share will be made applicable to the new Licensees of Cellular Metros, Cellular Circles and Basic Service respectively).

3. I am, therefore, directed to request the following:

(a)Recommendation of TRAI as per para 2 above, may kindly be provided latest by 31.7.1999. <u>In case it is not feasible for TRAI to forward its recommendation by this date, the Government will take interim decision to fix up an appropriate percentage of gross revenue as the provisional licence fee to be adjusted retrospectively as per final Government decision to be taken on receipt of recommendations of TRAI</u>. This will enable the Government to implement the policy decision for migration of the existing licensees to NTP-99 regime with effect from 1.8.99.

(b) The recommendation regarding the number of new operators for <u>Basic Telecom Service as sought</u> under letter No.10-6/99-BS.I dated 23.4.1999 may be expedited.

(c) Other relevant recommendations in regard to <u>Basic Telecom Services</u> as sought under letter No. 10-6/99-BS.I dated 23.4.1999 and Cellular Services

vide letter No.842-153/99-VAS/Vol.IV dated 23.4.1999 may also be provided.

Thanking you,

Yours faithfully,

(N. Parmeshwaran)
DY. DIRECTOR GENERAL (LR)"

**133.** In response to the aforesaid letter, TRAI made its recommendation dated 23.06.2000 (D-274) and recommended entry of DoT/ MTNL as third operator and recognized the need for the entry of fourth operator in para 4.3 as under:

> "DOT/MTNL wherever they come in as the third operator as also the fourth operator to be introduced will be required to pay as licence fee the same percentage share of their revenue as recommended by TRAI for the existing CMSPs who are being allowed to migrate to revenue sharing arrangement in accordance with NTP 99. The fourth operator will also pay an entry fee which will be fixed through a process of bidding."

**134.** Para 4.15 dealt with entry of fourth operator and it is stated as under:
> "DOT/MTNL, the incumbent in basic services, are to enter the field of cellular mobile services as the third operator in terms of NTP 99 with the existing availability of spectrum. TRAI, however, has no information about the availability of spectrum either for the third or the fourth operator. The financial analysis conducted by the TRAI for the purpose of studying the revenue share which the operators can part with as licence fee assumes entry of the third operator in the sixth year of licence i.e. in the current year and of another i.e. the fourth operator

<u>two years later in accordance with NTP 99</u>. The analysis reveals that even if the business in each of these metropolitan areas and circles is required to produce a reasonable IRR say 16-18 % and a decent return on the capital say around 20%, it would still enable the operators to share upto about 25% of the Gross (adjusted) revenue as the licence fee. In the circumstances, it would be reasonable to assume that on purely economic grounds, <u>in most circles there is even at present, a fair case for the entry of the fourth operator. In this context, however, more than the market, the determining factor has to be the availability of a spectrum and its optimal utilisation. Moreover, it is also a matter for careful consideration that even when additional spectrum is released, whether it should be utilised to augment the number of service providers or for improving the quality and coverage of the already available services. In the GSM 900 band the maximum frequency spectrum made available to the operators in a large number of countries is a pair of 12.5 MHz. Against this in India the circle operators have been given a pair of less than 5 MHz and the metro operators of less than 7 MHz. It is learnt that in a number of metros and circles, no further expansion of services is possible unless additional spectrum is made available to the existing operators. Paucity of frequency spectrum is also adversely affecting the quality of service in a number of service areas</u>. In the circumstances a fair balance between the two objectives of increasing competition on the one hand and improving the quality, coverage and price-efficiency of the service on the other will have to be struck so that the larger objective of providing quality services at affordable prices is not jeopardised. A sub-optimal cost structure and quality of service may finally turn out to be detrimental to the growth of tele-density notwithstanding a higher number of service providers. Similar views were expressed also by the BICP in their

report on Cellular Mobile Services (para 20 page-V of the report). <u>Accordingly, TRAI is of the opinion that a view can be taken in this matter only after getting a full report from the DOT on the quantum of spectrum being made available for the CMSPs, existing as well as the proposed new entrants and its location i.e. whether it is going to be in the 900 MHz or in 1800 MHz bands</u>."

**135.** Paragraphs 5 and 5.1 to 5.9 deal with revenue share as licence fee, <u>both by new operators</u> as well as <u>existing operators migrating to revenue sharing regime/ NTP-1999 regime</u> and are as under:

"5. <u>Any exercise undertaken for arriving at a given percentage of revenue share as licence fee can neither be foolproof nor incontestable.</u>  Despite all the care taken so that the data used for the analysis is fully representative and reliable, the scenario of growth and profitability built thereupon remains somewhat hazy. Nonetheless, an effort is required to be made and <u>very widely divergent views on revenue sharing which range from the least possible revenue to be shared i.e. around 1-2 % to 40% of the revenue to be shared as licence fee, have to be balanced</u>.

5.1 A detailed analysis of the business cases of different operators in the metros and some of the circles carried out by the TRAI on the basis of figures provided by them, indicates that it would be possible for them to get from the businesses an IRR of 16-18 % and in some cases even more as also a return on equity (ROE) of 20% or more. The figures for the analysis have been provided by six out of eight metro operators and nine out of thirty four operators in the circles. An important conclusion emerging from the analysis is also that by and large the IRR available on the business is not very highly

impacted by the amount of revenue shared if the difference remains within a range. Tables 1-2 in Section 1 of the memorandum attached thereto indicate that a revenue share of even higher than the present provisional 15 % can be borne by the operators without any difficulty. The results of the analysis including the numbers relating to IRR and ROE emerging therefrom form a part of the discussion paper issued by the TRAI on the subject.

5.2 As stated above the responses in regard to the revenue share which should be payable by the operators as licence fee ranged from the very low 2-3% to as high as 40% and more depending upon the viewpoint owned by the persons/ organisations concerned. A careful examination of all the issues involved, however, leads us to the conclusion that the real answer lies not in any one of the two extremes but in a rational synthesis of the two points of views.

5.3 While the operators should share a part of the revenue for the advantages gained, they should also be enabled to generate and retain funds from the business so that they can continue to make further investments in the business. Fast growth as well as changing technology will make such further investments inevitable. Surpluses beyond that requirement can be passed on to the customers by way of reduction in prices, either voluntarily by the operation themselves or through a tariff regime enforced by the regulator.

5.4 TRAI considers that in the overall revenue share taken as licence fee there have to be two components viz. (a) an identifiable part to cover the cost of USO, R&D, and administration and regulation and (b) a reasonable amount of rent. In our view the revenue share parted

with as licence fee has also to represent a payment for frequency spectrum which is a highly limited national resource. It should be seen as a price for the opportunity of using the spectrum in the present situation of limited competition and is not being recommended as a means for raising revenue. If the business generates high net surpluses the appropriate mode for the Government to partake of such surpluses will be through the taxation regime to which all operators will in any case be subject.

5.5 In this context it would be desirable to dwell for a while also upon the view that license fee should be the bare minimum, just enough to cover the cost of administering it. This has been professed quite persistently by the Cellular Operators' Association of India (COAI). Having examined it carefully we have found it to be unsustainable in the Indian context. The revenue share paid by the operators needs also to represent a fair compensation for the utilisation of the limited spectrum which provides them opportunities of business in preference to others. In other countries too a sizable payment has had to be made by the operators for the use of frequency spectrum. It has also to be taken into consideration that no particular sector of economic activity ought to be allowed to operate with such advantages as are unavailable to other sectors of the economy, as it would tend to produce distortions in the investment flow making corrections inevitable in not too distant a future. And finally, it must be remembered that the question of revenue share is being considered in the background of the existing operators having migrated to revenue sharing regime from the earlier fixed licence fee arrangement and that if the operators were to follow the initially contracted system of paying the licence fee, in terms of revenue share it would have worked out to be in excess of 30% in the metros as well as in the majority of

the circles.

5.6 <u>Having considered all the connected issues and the different views expressed in the course of the discussions we find that the revenue share recommended by us in the paragraph-5.9 is the most reasonable and practical</u>. It is also recommended that the overall percentage be clearly bifurcated in two parts as outlined above i.e. one to cover USO, R&D and the cost of administering the licence and regulation and the other as the fee for licence. In the case of NLDO we had recommended the first component to be at a figure of 7 %, 5% for the USO and 2% for the R&D, administration as well as regulation. While even these figures are provisional and a detailed work on U.S.O. estimation is still in process, in order to introduce the levy, here too we would recommend that this much revenue may be segregated and accounted for separately from the total amount to be received as the licence fee. In a country as big as ours and with so huge a deficiency in universal service requirements, the related levy may have to be revised upwards from time to time at least for the next 10 years.

5.7 As we follow the above structure of licence fee, it would mean that as from the 1st of August, 1999, which is the date from which migration is to become affective certain recoveries would need to be made from the operators. It would be desirable to place this entire amount on recovery in a separate account towards the USO/R&D/ administration cost of the proposed license fee. In these cases, therefore, a lower revenue sharing has been suggested. This may be kept subject to review after a period of 5 years. The review will be with the objectives of considering the desirability of bringing it at par with other circles.

5.8 In this connection the TRAI has also taken into consideration the weak business case of some of the circles two of which namely Jammu & Kashmir and Andamans and Nicobar could not attract so far even a single operator. Both these are category 'C' circles which do not seem to hold any attraction for the operators without some special incentive, at least, in the initial years of the business.

5.9 In the conclusion we recommend the following licence fee for the various vacant slots:-
the percentage of revenue share for the 4 vacant slots in the Andamans and Nicobars and Jammu & Kashmir circles will be 10% percent of the adjusted gross revenue;
The percentage of revenue share for incumbent migrating CMSPs in the 42 slots shall be 17% percent of the adjusted gross revenue.
The percentage of revenue share for the one slot each available in Assam and West Bengal will be 17% percent of the adjusted gross revenue.
The percentage of revenue share for fourth operators slot in 18 circles and 4 metros will be 17% percent of the adjusted gross revenue.
DTS/MTNL will pay the same percentage of revenue share as licence fee for the respective metros and circles in which they are licenced as the third operator."

**136.**However, as noted above, information was sought by TRAI from DoT regarding availability of spectrum for existing operators as well as proposed new entrants and in response to that a letter No. 842-153/98/VAS (Vol. VIII), dated 10.10.2000 (D-76, page 60) was written by DoT to TRAI, whereby it intimated that there was no hurdle in inviting tenders for the Fourth cellular

operators forthwith as spectrum of 6.2+6.2 MHz in 1800 band is committed to be made available.

URGENT
Out Today

"GOVERNMENT OF INDIA
MINISTRY OF COMMUNICATIONS
DEPARTMENT OF TELECOMMUNICATIONS
(VAS CELL)

SANCHAR BHAVAN,
20, ASHOKA ROAD,
NEW DELHI-110 001

No. 842-153/98-VAS (Vol. VIII)
     Dated Oct. 10, 2000
To
The Secretary,
Telecom Regulatory Authority of India,
Jawahar Vyapaar Bhawan,
Janpath,
New Delhi.

Subject:Recommendation of TRAI with regard to Cellular Mobile Service Providers (CMSPs) Induction of fourth operators.

Sir,
This has reference to recommendations of TRAI on the above subject vide D. O. No. 250-14/2000-Fin. (DF)(Vol.II) dated 23.6.2000.

2.With regard to entry of fourth operator, it was indicated that a view can be taken by TRAI, only after getting a full report from DoT on the quantum of spectrum being made available for CMSPs, existing as well as proposed new entrants and its

location i.e. whether it is going to be in 900 MHz or 1800 MHz.

3.With regard to the above, it is to intimate as follows:

(i)As per the License Agreement, there is a commitment of 4.4 MHz/4.5 MHz bandwidth for the existing cellular operators. At several places 'in principle' availability upto 6.2 MHz has been conveyed to the existing operators. The frequency band 890-902.5/ 935-947.5 (12.5 + 12.5) MHz has been ear-marked for the two private operators.

(ii)For DTO/MTNL, the band 902.5-915/947.5-960 MHz is ear-marked; 4.4 MHz has been allotted at some of the places. 4.4 MHz is committed and will be made available throughout the country. However, additional band upto 6.2 MHz is also committed but can be made available after coordination.

(iii)For the fourth private operator, 6.2 + 6.2 MHz in the band 1710-1785/1805-1880 MHz is committed to be made available; this, however, may not be contiguous and may be in smaller chunks but will be coordinated.

A detailed report from WPC Wing is enclosed as Annexure-I.

4.In the light of the above, there appears to be no hurdle in inviting tenders for the fourth operator forthwith.  If TRAI have any further comments in the matter, the same may be communicated, it will be appreciated if the comments are sent within a

<u>fortnight</u>.

5.Further, it is to intimate with regard to the recommendations of TRAI on Cellular Mobile Service, that the views of DoT do not coincide with those of TRAI on the definition of 'Adjusted Gross Revenue'. The definition of AGR was considered separately by TRAI in two stages in case of GMPCS service. In the present case of Cellular Mobile Service, DoT proposes to adopt the same stand on definition of AGR as conveyed in case of GMPCS Service.

(J. R. Gupta)
Dy. Director General (VAS)

**137.**<u>It is interesting to note that in note dated 23.11.2000, page 34 (D-76), Sh. J. R. Gupta, DDG (VAS), inter alia, records:</u>
<u>"(ii)Sufficient spectrum is apparently free, however, WPC still states that it will have to be coordinated on case to case basis. This is perhaps becoming too non-committal</u>."

**138.**In response to this letter, TRAI wrote to Secretary (T) Sh. Shyamal Ghosh letter/ recommendation dated <u>24.10.2000 (D-274, page 86)</u>, relevant part of which is as under:
"Dear Shri Ghosh,
Subject: <u>Recommendations of TRAI with regard to Cellular Mobile Service Providers (CMSPs)</u> - Induction of fourth operator.

This has reference to the DOT's letter No. 842-153/98-VAS(Vol.VIII) dated October 10, 2000 on the subject.

2.As regards entry of the fourth operator, TRAI while making its recommendation with regard to Cellular Mobile Service Providers (CMSPs) vide its d.o. letter No. 250-14/2000-Fin. (Vol. II) dated 23.6.2000 had expressed the opinion that a view could be taken in the matter after getting <u>a full report from the DOT on the quantum of spectrum being made available for the CMSPs, existing as well as the proposed new entrants and its location i.e. whether it is going to be in the 900 MHz or in 1800 MHz bands. TRAI had also raised the issue of optimal utilisation of the additional spectrum i.e. whether it should be utilised to increase the number of service providers or for meeting the quality of service norms of the existing services in the GSM 900 MHz band</u>.

3.It would appear from the DOT's letter under reference <u>that the fourth operator is proposed to be accommodated in the GSM 1800 MHz band so that the additional frequency</u> being made available would be utilised by a network based on 1800 MHz standards rather than by the existing networks which are based on GSM 900 standard. <u>We, therefore, support the move of the Department of Telecom to allot this frequency spectrum for the entry of the fourth operator. The cellular market is expanding and time is now ripe for enhanced competition which will improve the quality, pricing and variety of services available to the public</u>.

4.<u>However, the issue of paucity of frequency spectrum particularly in metro cities which has also been brought out in our report needs to be addressed. During our consultation process it had</u>

come into sharp focus that the quality of services (QoS) particularly in Mumbai and Delhi had been adversely affected due to paucity of frequency spectrum. It is learnt that the metro operators have already requested for allocation of additional frequency to improve the QoS in their service areas, where they are facing the problem of congestion. We would, therefore, recommend to the Department of Telecom to address this problem on a priority basis and consider allotting additional frequency to the existing operators, so that QoS norms specified in the License Agreement are not violated.
…...............................................................................
........................................"

**139.**In 2000, BSNL/ MTNL were licenced as Third Cellular, though MTNL was also granted a licence as third mobile operator in 1997 itself for Delhi and Mumbai service areas.

**C.Guidelines for Fourth Cellular Operators:**

**140.**On entry of fourth cellular being recommended by TRAI and Government having accepted the same, Guidelines for issue of licence for Cellular Mobile Telephone Service (D-272, page 42) were issued in first week January 2001, the introductory part of which and clauses 11 and 23, both of which deal with allocation of frequency and charges thereof, read as under:

"The New Telecom Policy'99 envisaged entry of more operators for Cellular Mobile Telephone Service

(CMTS) in a service area based on the recommendations of Telecom Regulatory Authority of India. The Government has decided to award licenses for fourth operator for CMTS for most of the service areas in the country (as listed in Annexure-I) and also for filling up existing vacant slots (A & N-2, West Bengal-1).

Following are the broad guidelines for issue of Licence for provision of CMTS in India. These guidelines are only for the purpose of General information and do not constitute any legally binding commitment. The conditions of the tender document and license agreement should be properly read and understood by the bidder companies before submission of bids. The eligibility criteria and the structure of the bidding process is given in Annexure-II.

…...................................................................................

.....................................................

11. In addition to the Entry fee described above, the Licensee shall also pay License fee annually @ 17% of "**Adjusted Gross Revenue**" for the Metro cities & Telecom Circles (exception being 10% for Andaman & Nicobar Circle) as **Revenue Share** generated from the Service in accordance with the procedure prescribed in the License Agreement document. This licence fee will now be applicable for both existing and new operators.

The above License Fee as Revenue share includes rent for the license and also contribution towards (i) USO, (ii) R&D, Administration and Regulation and (iii) 2% revenue share towards WPC Charges covering royalty payment for the use of cellular spectrum of **upto** 4.4 MHz + 4.4 MHz and License fee for Cellular Mobile handsets & Cellular Mobile Base Stations and also for possession of wireless telegraphy equipment as per the details prescribed by Wireless Planning & Coordination

Wing (WPC). Any additional band width, if allotted subject to availability and justification shall attract additional license fee as revenue share (typically 1% additional revenue share if Bandwidth allocated is upto 6.2 MHz + 6.2 MHz in place of 4.4 MHz + 4.4 MHz. In this case the license fee to be charged shall become 18% in place of 17% and 11% in place 10% respectively). This component of license fee towards WPC charges for fee/ royalty payment for use of spectrum is subject to review by WPC Wing from time to time.

….................................................................................

....................................................

23. The frequencies shall be assigned by WPC from the designated bands prescribed in National Frequency Allocation Plan – 2000. (NFAP-2000). Appropriate frequency spots in GSM band of 890-915 MHz paired with 935-960 MHz will be assigned to operators selected for vacant slots and 1710-1785 MHz paired with 1805-1880 MHz will be assigned to fourth cellular operator. A cumulative maximum of upto 4.4 MHz + 4.4 MHz will be permitted. Based on usage, justification and availability, additional spectrum upto 1.8 MHz + 1.8 MHz making a total of 6.2 MHz + 6.2 MHz, may be considered for assignment, on case by case basis, on payment of additional license fee. The frequencies assigned may not be contiguous and may not be same in all cases, while efforts would be made to make available larger chunks to the extent feasible."

These guidelines make it clear that these are for general information and do not constitute any legally binding commitment.

**D. Basic Service Operators and WLL Services:**

**141.** It is also relevant to note that on 31.08.2000, in response to the letter

dated 23.04.1999 and 12.07.1999, TRAI made recommendations for grant of Basic Service Operators licences in fifteen vacant circles and migration of basic service operators in six circles from fixed licence fee to revenue sharing. It recommended the entry of operators on payment of specified entry fee and also licence fee in the form of revenue share and the licence fee recommended was 12%, 10% and 8% respectively for three categories of circles A, B and C.

**142.**In continuation of the aforesaid recommendations relating to Basic services, TRAI made further recommendations dated 08.01.2001 on WLL services by the Basic Service Operators (Reference in D-153). In these recommendations the Authority considered the following questions:

> "...............................................................................
> ..............................................
> (i)Whether WLL with mobility (WLL(M)) should be permitted;
> (ii)If it is to be permitted what should be its extent i.e. how much mobility is to be allowed;
> (iii)The likely economic consequences of the mobility granted as in (ii) above and their impact on the main stake holders, and;
> (iv) In case the likely consequences of the grant of mobility are adverse for any of the stake holders in economic terms do these merit mitigation? If so, to what extent such mitigation is feasible and needed and what would be the modus operandi to achieve it.
> …...........................................................................
> ..............................................
> **(i) Whether mobility in WLL should be permitted**
> …...........................................................................

...............................................

The TRAI is, therefore, of the view that as long as the extent of WLL mobility is not comparable with that of the mobility and roaming enjoyed by mobile subscribers of GSM networks, the apprehensions of the CMSOs that they may be priced out of the market are exaggerated. In the short run, there would be some loss of revenue as the CMSOs in their effort to retain the customers reduce their tariffs to match that of their competitors. However, in the longer run the effect will largely be mitigated as with the reduced tariff the customer base expands faster. It also needs to be kept in view that due to paucity of the available frequency spectrum the supply of WLL services will be limited.

As regards the argument that permitting WLL mobility will amount to violation of the CMSOs license terms, it needs to be noted that with the acceptance of migration to NTP 99, the CMSOs have accepted that their markets will no more be protected for them by the terms of their licenses. NTP 99 as well as the recent policy announcements acknowledge greater competition as the policy norm in both basic and cellular mobile sectors. Increased competition, therefore, cannot be denied. Of course, it will have to be ensured that such competition is generated without making the level playing field uneven. In making these recommendations, TRAI has been conscious of the need to address this aspect of the issue adequately.

…..........................................................................

...............................................

In view of the foregoing, TRAI has arrived at the conclusion that in case the WLL mobility is not the same as that of the cellular mobile services and provided that the disturbance expected to be

created in the level playing field by the BSOs introducing this service can be evened out by making some necessary policy changes, permitting WLL with mobility will be in the best interests of the consumer and the telecom services in the country.

**(ii)What should be the extent of mobility i.e. how much mobility should be allowed.**

…............................................................................

..............................................

Above all, at present, it is nobody's case that the WLL service should be brought at par with the Cellular Mobile Services. These are two different licenses and different services and, therefore, it is required that differences in the character of the Basic and Cellular Mobile Services are understood and retained.

The Authority is of the view that considering the entitlements under the two licenses i.e. one for the Fixed Service Offered by BSOs and the other offered by the CMSOs with full mobility and roaming facility, in the interest of level playing field, there is need to maintain a clear service differentiation. Although both WLL systems and Mobile systems employ similar Air Interface and network infrastructure such as cells, there are significant differences between the two. While in cellular mobile systems, such as GSM based networks which are operational in a large number of telecom circles in the country, there is a mobile exchange called mobile switching center (MSC) capable of extensive mobility management/ roaming function, the WLL systems are engineered essentially to provide the so called 'last mile' linkage with the existing exchange, and these do

not have an exchange viz. mobile switching centers as part of the WLL system. <u>Considering this essential difference and also the intrinsic characteristics of WLL as indicated by the nomenclature itself i.e. 'local loop', the TRAI is of the view that extension of WLL mobility only up to the local area i.e. SDCA will be the most optimal solution and serve interest of telecom growth in the country best. Accordingly, the Authority recommends that the Basic Service Operator (BSO) be allowed to offer WLL with mobility within the local area i.e. Short Distance Charging Area (SDCA)</u>.

**(iii) The likely consequences of the mobility granted as in (ii) above and their effect on the main stake holders**

…............................................................................ ................................................

<u>Among service providers, the main beneficiary in the emerging situation are likely to be the main incumbents, i.e. BSNL and MTNL.</u> These service providers already have a presence in all SDCAs and will be able to roll out WLL (M) infrastructure in their service areas with relatively low incremental costs. <u>They are the ones likely to make a dent in the cellular mobile market in the country as a whole and increase their market power. The Authority, nonetheless, is recommending WLL with limited mobility because ultimately it will increase competition in both basic and cellular mobile segments and lead to a faster growth in tele-density</u>. This will be to the considerable advantage of the customers.

The Authority recognizes that immediately, the

incumbents, who are the dominant basic operators, could gain a further competitive edge by this policy change. This will not be in keeping with the principle of providing a level playing field for all competitors and therefore, some steps will have to be taken to even out, as far as practicable, the effects of undue advantages/ disadvantages caused by the policy changes. Whenever such differentials tend to hamper open competition, these need to be removed. The case for regulatory and policy intervention becomes stronger when undue differentials arise not because of market forces but as results of policy changes.

Therefore, in the interest of promoting fair competition in the market the Authority is of the view that for the cellular services to maintain their competitive ability, some policy changes and ameliorative measures would need to be adopted. These are discussed in the following paragraphs.

**(iv)In case the likely consequences of the grant of mobility are adverse for any of the stake holders in economic terms do these merit mitigation? If so, to what extent such mitigation is feasible and needed and what would be the modus operandi to achieve it?**

…..........................................................................
..............................................

But, the above mitigating factors notwithstanding, it should be acknowledged that WLL mobile service will provide to the BSOs entry into an area which till now the CMSOs consider to be exclusively theirs. As a result of this development they may have to recast their business projections and some of their financial plans. It may, therefore,

be necessary to give them some relief in the terms and conditions of their license. By doing so it should be possible to ensure for them a level playing field vis-a-vis the BSO operator, if they are to be allowed to offer WLL services with mobility.

## Maintaining a level playing field between the BSOs and the CMSOs

The cellular service operators have pointed out superior and advantageous conditions favouring the BSOs in the following areas :-
(1)Licence fee and revenue share percentage
(2)Spectrum charges
(3)Inter-connection principles and charges.
(4)Demarcation of service areas
(5)Scope of the licensed service

In the following paragraphs each of these points has been examined and recommendations for changes wherever considered necessary in the interest of creating a level playing field between the BSOs and the CMSOs have been made.
(1)*License fee and revenue share percentage*
…............................................................................
...............................................

Basic Services
12 percent for Metros and 'A' Circles, 10 percent for 'B' Circles and 8 percent for 'C' Circles.

Cellular Mobile Services
17 percent for all Service Areas, except Jammu & Kashmir and Andamans and Nicobar islands for which revenue sharing of 10% was recommended.
…............................................................................
...............................................

Considering all the above factors, TRAI is of the view that it would be desirable to keep the license fees of both BSOs and CMSOs at comparable levels. It is, therefore, recommended that revenue share as license for the CMSOs may be prescribed at 12% of the annual revenue which will be the same as revenue share prescribed for BSOs in Metros and category-A Circles. This will bring the two services at par in terms of license fee and provide immediately, mitigation for the loss of market which the CMSOs may have to face as a result of the introduction of WLL services with mobility by the BSOs.

(2) *Spectrum Charges:*

Availability of frequency spectrum and the price at which it is available to the service provider is going to be the most critical factor in the growth of telecom services. It must, however, be appreciated by the service provider that this is a very scarce national resource and will have to be priced always keeping in view its utilisation and demand. As is the case with most developed countries, when the competition is fully open and market forces are allowed to rule, the service provider prepared to pay the highest for the spectrum available, gets it. The concept of pricing the spectrum will, therefore, have to continue. However, since in our conditions the considerations of growth continue to be over-riding, it will be some time before the market forces become the sole determinants and the pricing of spectrum is fully market determined. It is, therefore, recommended that the frequency spectrum made available to both BSOs and CMSOs should be very reasonably priced so as not to create

a serious pressure on their revenues. The TRAI would also like to recommend that the basis of allotment and pricing while being in accordance with the national plan should be the same for both BSOs and the CMSOs.

…..........................................................................

..............................................

## II. Other Related Issues:

### (B) Basis for assigning WLL frequency

…..........................................................................

..............................................

Each RF Channel needs 1.25 MHz. A typical operator would require a minimum of say two RF carriers of 1.25 MHz each i.e. each operator would need a minimum of 2.5 MHz + 2.5 MHz in the two paired frequency slots. At present only 20MHz + 20MHz is available for CDMA WLL. With 8 MHz already reserved for BSNL/MTNL, only 8MHz is available for other private operators and 4MHz is in reserve. If this distribution is not changed, practically only one private basic services operator can enter the market in each Circle as a competitor to the incumbent.   This will severely limit competition and will virtually result in continuance of a duopoly regime for quite some time. The Authority would therefore, strongly recommend that instead of 8MHz, the allotment of spectrum for WLL services be only 5MHz so that at least three BSOs in addition to the incumbent can be accommodated in 800/900 MHz CDMA band. The Authority would also recommend allocation of the other (10 MHz paired) frequency spectrum in 800/900 MHz band also for the use by WLL systems of the BSOs.

…...........................................................................
..............................................

**(C) Amount of Entry Fee and spectrum charges as a percentage of revenue to be charged from the Basic Service Operator for extending the above facility in respect of existing as well as future Basic Service Licensees, so as to ensure a level playing field with the Cellular Operators.**

…...........................................................................
..............................................

Frequency Spectrum Charges

At present, there are two types of charges for spectrum. First, a one-time fee, which is termed as "license fee". Second, an annual spectrum charge which is termed as annual royalty fee. NTP 1999 and all subsequent TRAI recommendations have used the terminology of one time entry fee for the license and an annual license fee as a percentage share of revenue. Consistent with this usage, we will term the one time fee as the spectrum entry fee, and the royalty as the license fee for spectrum.

Entry fee for spectrum

It is observed by TRAI that the formula for spectrum charges for use of WLL frequencies is the same for Basic Service Operators and Cellular Mobile Service Operators.

The Authority would like to recommend that the existing mode of frequency charge i.e. what is applicable in case of CMTS should be applicable for WLL mobile service provided by Basic Service Providers.

For WLL, no change in methodology for frequency allocation is proposed. Existing WLL operators have already made payments for cities where RF channels have been allocated by WPC based on request of Basic Service Operators at city level. As Basic Service tariff rates will continue to apply for wire-line as well as WLL fixed and hand held terminal mobility operations within the SDCA, the Authority is of the opinion that there is no justification for any additional Entry Fees for the Spectrum. Existing mode of charging for spectrum should be applied for new operators also.

In this context we would like to mention that the Authority has received a request for intervention from the Cellular Operators Association of India (COAI) regarding WPC royalty charges levied for use of frequency spectrum by CMSOs.  In their request the COAI has brought to the notice of the Authority that according to them, the Govt. i.e. WPC wing of the Ministry of Communications, has wrongly levied royalty and license fee for the frequencies assigned to the circle cellular operators. According to them the present basis of charging city-wise, instead of service area wise is violative of the terms of the licenses granted to the cellular operators. In support of their contention they have stated that whereas for the Metro cities of Delhi, Mumbai, Calcutta  and Chennai, the basis of charging is the service area as a whole, in case of telecom circles, the method of city-wise charging has been adopted thereby imposing a heavy financial burden on them. It is understood that they have also represented the licensor DOT and the matter is being examined by the licensor. The Authority would therefore withhold any

<u>intervention in the matter till a decision is taken by the licensor on the representation filed by the COAI with them. However, we would like to recommend that the basis of charging for WLL frequency spectrum in the CDMA band and the cellular mobile spectrum in the GSM band should be identical</u>. In the long run frequency spectrum being a limited national resource may have to be auctioned both for CDMA based WLL systems and GSM based CMTS.

### E.<u>Guidelines for BSOs providing WLL services</u>

**<u>143.</u>**The Telecom Commission accepted the recommendations on WLL services by Basic Service Operators in its meeting on 24.01.2001 and spectrum was to be allocated to these service providers of 5+5 MHz with 2% of AGR as royalty for spectrum and DoT issued guidelines dated <u>25.01.2001</u> (D-228) in this regard. Clauses 14, 17 and 26 of it are quite instructive and are as under:

> "14. The applicant company shall pay one time prescribed entry fee (as specified in annexure I) …......................
>
> …............................................................
>
> <u>There will be no separate entry fee payable for allocation and usage of spectrum in a service area for deploying wireless access system.</u>
>
> 17. In addition to entry fee described above, the licence fee @ 12%, 10% & 8% respectively of the annual gross revenue shall be payable for the three categories of telecom circles A, B & C as described in Annexure-I. *<u>An additional revenue share of 2% of Annual Gross Revenue earned from WLL subscribers shall be levied as spectrum charge for</u>*

*allocation of 5 plus 5 MHz in paired band in 800 / 900 MHz band in a complete Service Area (not city-wise) for wireless subscriber access system. This will include royalty for spectrum of 5+5 MHz as well as the licence fee for the base station and subscriber terminal (handheld or fixed)*. The same principle shall be followed for spectrum charges in 1800/1900 MHz band.

26. For Wireless operations in subscriber access network, the frequencies shall be allocated by WPC Wing from the designated bands prescribed in National Frequency Allocation Plan- 2000. (NFAP-2000). However, the frequency in GSM band of 890-915 MHz paired with 935-960 MHz and 1710-1785 MHz pared with 1805-1880 MHz will not be allocated under any circumstances to the Licensees. *For Wireless Access Systems in local area, not more than 5+5 MHz in 824-844 MHz paired with 869-889 MHz band shall be allocated to any Basic Service Operator including the existing ones on first come first served basis*.. The same principle shall be followed for allocation of frequency in 1880-1900 MHz band for Micro cellular architect based system.

**144.**The percentage of revenue share recommended by TRAI inclusive of spectrum charges, in its recommendations dated 23.06.2000, is 17%. In its recommendations dated 31.08.2000 for BSOs, it recommended licence fee of 12%, 10% and 8% respectively for the three categories of circles. However, in its recommendations dated 08.01.2001 relating to limited mobility, it recommended licence fee, both for BSOs and CMSOs, at 12% of annual

revenue in metro and category 'A' circles.

**145.**It is clear from the record that percentage of revenue share at 17%, inclusive of spectrum charge of 4.4 MHz, was first considered and approved by the Telecom Commission in its meeting dated 22.12.2000. It was also approved that any additional spectrum beyond 4.4 + 4.4 MHz up to 6.2 + 6.2 MHz, if assigned, would also attract additional percentage of revenue share, at the rate of 1%   (D-8, page 203). But it was not notified. However, it appears that this percentage of revenue share was made part of Guidelines for CMTS issued in first week of January 2001, as referred to above. As noted above, the TRAI recommendations on limited mobility came on 08.01.2001 and it recommended licence fee at the rate of 12%, both for BSOs and CMSOs in metro and category 'A' circles. In its meeting held on 24.01.2001, Telecom Commission approved proposal dated 19.01.2001 as under (D-153, pages 19-20):

> "..............................................................................
> ...............................................
>
> g)In view of above it is proposed as follows:
>
> (i)The new formulation on spectrum charges on revenue share basis of 2% of AGR for spectrum upto 4.4 MHz + 4.4 MHz ( or 3% of AGR for spectrum upto 6.2 MHz + 6.2 MHz, as the case may be) be made effective from the cut off date of change over to NTP-99 regime i.e. 1.8.99.
>
> (ii)The license fee as 17% of AGR for all Metros and circles (10% for A&N and J&K Circles) be charged, which will include WPC charges for spectrum upto 4.4 MHz + 4.4 MHz (additional 1%

for spectrum upto 6.2 MHz + 6.2 MHz) from the cut-off date of change over to NTP-99 regime of Revenue Sharing till the date of guidelines for issue of licenses to Basic Service Operators for providing limited mobility using WLL come into effect.

(iii) Thereafter, the license fee to be charged from cellular operators shall be as follows:

| Category of Circles | Licence Fee | Spectrum charges |
|---|---|---|
| 'A' & Metros | 12% of AGR | 2% of AGR for spectrum upto 4.4 MHz + 4.4 MHz or 3% of AGR for spectrum upto 6.2 MHz + 6.2 MHz. |
| 'B' | 10% of AGR | -Do- |
| 'C' | 8% of AGR | -Do- |

**Note:** Spectrum charges to be charged in addition to the licence fee, include component of charges towards annual royalty and license fee for base stations and Mobile Handsets for spectrum up to 4.4 MHz + 4.4 MHz or 6.2 MHz + 6.2 MHz as the case may be.
…...........................................................................
..............................."

This was approved by the Government and accordingly Guidelines for BSOs with limited mobility were issued, the relevant part of which has already been extracted.

**146.** These four recommendations of TRAI, that is, dated 23.06.2000, 31.08.2000, 24.10.2000 and 08.01.2001, are important and go to the root of the matter and the CBI also knew about it and it also knew about the importance of date of 31.01.2002, as is clear from letter dated 17.05.2012 (D-274) of TRAI written to the investigating officer Sh. R. A. Yadav, which

is as under:

"No. 103-1/2012-MN        Dated 17.05.2012

To

Shri R. A. Yadav,

Dy. Suptd. Of Police,

CBI/ACB/Delhi,

Central Bureau of Investigation,

Anti Corruption Branch,

5-B, CGO Complex, Lodhi Road,

New Delhi-110003.

Subject:Investigation in Case RC 24(A)/2011/CBI/ DLI u/s 120-B IPC r/w 13 (2) r/w 13 (1) (d) of PC Act, 1988 against Sh. Shyamal Ghosh, the then Secretary, DoT & others – reg.

**Reference:** Your office letter dated 14th May 2012

Kindly refer to your above letter. In this regard, it may kindly be noted that <u>all recommendations of TRAI are available on TRAI website www.trai.gov.in</u>

2.From the recommendations issued prior to <u>31st January 2002(from 1999), it can be seen that the issue of adequacy of spectrum in Metro and Circles</u> has, inter-alia, been dealt in Para 4.15 of TRAI's recommendations dated 23rd June, 2000 on 'Issues relating to Cellular Mobile Services' vide D.O. No. 250- 14/ 2000-Fin.(DF)(Vol.II). <u>This has also been, inter-alia, dealt for Delhi & Mumbai service areas in Para 4 of TRAI's recommendations dated 24th October 2000 with regard to 'Cellular Mobile Service Providers (CMSPs)</u> – Introduction of fourth operator' vide letter no 4-30/CP/

250-14/2000-Fin.(DF)(vol.II).

3.As desired, a certified copy of above said recommendations as taken from TRAI website is being enclosed herewith.

4.This is issued with the approval of the Competent Authority.

(K. Sasidhar)
Senior Research Officer (MN)
Encls: As Above.

## F.WPC Charges: Origin and Notification of Percentage of Revenue Share, Incremental Increase and Reasons Thereof

**147.**On grant of telecom licences, frequency allocation is done by the WPC wing of DoT. Initially, on grant of CMTS licences in 1994, frequency allocation was done and spectrum charges for that were charged as per a formula as is indicated in clauses 20.3 and 20.4 of licence agreement for CMTS services signed with Bharti Cellular Limited on 29.11.1994 for Delhi service area, D-79, which are as under:

"20.3. A cumulative maximum of upto 4.5 MHz in the bands 890-902.5 & 935-947.5 MHz would be permitted based on appropriate justification. Exact 200 KHz RF channel frequencies will be assigned contiguously as far as practicable on case by case basis, after due coordination, wherever considered necessary.

20.4. Licence fee and Royalty shall have to be paid for grant of licence which will be subject to revision from time to time.

(Note:- A sample calculation of the rates of royalty and licence fee for the time being in force is as follows:-

Royalty :- Rs. 4,800 x 8 x 22 = Rs. 8,44,800/- per annum where 22 is the number of RF channels of 200 khz each and 8 is the number of voice equivalent channels per RF carrier.

Licence Fee : Rs. 100/- per Base Station per annum in each cell is liable to be reviewed)."

**148.**However, after some time of the introduction of First and Second Cellular, differences arose between DoT and the service providers relating to payment of WPC charges.  To deal with the matter, a file bearing No. L-10442/04/98 NTG (D-8) was opened on 20.08.1998 relating to non-payment of royalty and licence fee charges for CMTS by service providers. The service providers were disputing the calculation of WPC charges contending that circle should be taken as a single service area instead of calculating charges on city-wise basis and that each frequency pair (TX / RX) was being counted as one instead of two frequency spots.  There were some issues also.  This issue kept agitating the department and service providers without any solution, as is revealed by the perusal of the file. NTP-99 introduced revenue sharing regime in place of fixed fee regime. As already noted above, TRAI recommended 17% of licence fee, inclusive of spectrum charges, in its recommendations dated 23.06.2000. Now the question is: where from the figure of 2%, 4MHz +4MHz spectrum and 1% for additional tranche of 1.8MHz came and for what reasons?

**149.**Page 199 of this file contains extracts of proceedings recorded in file No.

842-50/2000-VAS(Vol. V) of a meeting held on 23.10.2000 in Sanchar Bhavan between the DoT and COAI, recorded by Sh. A. K. Srivastava, Director (VAS-I) and chaired by Chairman (TC) regarding the issue of royalty and licence fee charges towards spectrum use and para 4(b) of the note, which contains view of COAI, reads as under:

> "Option II:The revenue share proposal seems to be more workable, but is not acceptable in the proposed form. It could be considered subject to the following changes.
>
> (i) The charge of 2% for spectrum usage should be a part of the overall license fee revenue share that will be applicable to CMSP's.
>
> (ii) The 2% must comprise both:
>
> - GSM Royalty & License fee for Base Stations and Mobile handsets AND
>
> -Royalty for MW access frequencies and License fee for MW stations.
>
> (iii)The 2% charges should not be limited to a typical bandwidth of 4.4 MHz + 4.4 MHz but instead should cover the already allotted 6.2 MHz + 6.2 MHz and also future allotments to meet optimum requirements of the QoS parameters prescribed by TRAI."

**150.**Then next to it, there is a note regarding royalty and  licence fee charges towards spectrum use dated 10.11.2000 recorded again by Sh. A. K. Srivastava, Director (VAS-I) which reads as under:

> "**Subject**:-Royalty & License Fee charges towards Spectrum usage.
>
> Note on page 3 – 4/N ante may kindly be seen.
>
> 2. Subsequent to discussions held in the meeting with COAI and Cellular Operators to discus the

above issue on 23.10.2000 at 12 Hrs. in second Floor, Committee Room, Sanchar Bhawan, COAI has since provided its inputs / response on the issue, vide their letter dated 30.10.2000.   The matter is to be placed before Full Telecom Commission for decision.  The input / information as furnished to VAS Cell by WPC Wing is placed at page 8/C below, which may kindly be seen.  The input has been used to prepare the Memo for Full Telecom Commission.

2. The Note for Full Telecom Commission for decision on WPC Charges towards royalty and licensee fee of Spectrum usage may kindly be seen and approved for submission to Full Telecom Commission.

DFA please."

**151.** Then, there is again a note on 23.11.2000 recorded by Sh. J. R. Gupta, DDG (VAS), which reads as under and this note was approved by the Chairman (TC):

"Notes on pre-page regarding putting up a Note for Full Telecom Commission on the subject of "Royalty and License Fee charges towards spectrum usage for cellular operators" may please be seen.

The draft Note is based on the data furnished by WPC Wing. In the meanwhile, minutes of the meeting of 'Strategic Management Group' under the chairmanship of the Principal Secretary of PM held on 6.11.2000, have been received (p. 11/c). This meeting was attended by Chairman, Telecom Commission.  It was decided by the SMG as follows:

"Decision taken : Endorsing the

consensus reached at the meeting held
on 11.10.2000, it was agreed that it
would be appropriate to peg revenue
share at 17% which will be inclusive
of spectrum charges."

The above has also been included in the draft Note.
Since the Note deals with WPC charges, it may be
issued from the WPC file under their signature with
the approval of concerned Member."

152. In the course of proceedings, Chairman (TC) Sh. Shyamal Ghosh

records on the file a note dated 14.07.2000, which reads as under:

"We had given an impression during the
presentation to the Sub-Group on GOT-IT that we
will review this matter in a manner so as to provide
some relief to the operators. The basic issue relates
to the concept of what should be construed as an
unit. All these issues should have been sorted out
before issuing the licence agreement. In fact, the
licence fee to be charged in this connection,
perhaps, also should have been stipulated in the
licence agreement.

2. The question that should be addressed is what is
the most logical and acceptable method of
calculating royalty charges for usage of spectrum.
While spectrum is certainly a valuable resource, it
should not become so costly as to make
affordability a problem for the subscribers.

3. I would suggest that all the issues raised by
Member (F) should be incorporated in a note which
we could discuss in the Empowered Committee
urgently. This may please be done in about a
week's time."

Sh. Shyamal Ghosh recognizes that some relief is required to be provided to the operators. He also recognizes that while spectrum is certainly a valuable resource, yet it should not become so costly as to make affordability a problem for subscribers.

**153.** Then there is note recorded by Member (F) Sh. A. Prasad at 50/N on 14.12.2000, which reads as under:

> "Chairman (TC) may please see his minutes at page 49/N.
>
> The Full Telecom Commission decided earlier that the licence fee of 17% (in the form of share of gross revenue) should be uniformly applied except in two circles, viz., Andaman & Nicobar and J & K where the licence fee will be 10% of gross revenue. The break up of 17% included 2% as administrative and regulation charges and 5% as USO. In other words, it is clear that spectrum charges were not included in the computation of licence fee of 17%.
>
> Even logically spectrum charge could not have been taken as part of the 17% revenue share because both prior to migration and as of now, spectrum usage is authorized by a separate licence and spectrum charge was leviable as an additionality in pre-migration days as is the position now. Therefore, the background of the decision taken by the Strategic Management Group that spectrum charge shall be of a part of the overall 17% will need to be elucidated. Apparently, the circumstances warrant levying 2% as spectrum charge over and above the licence fee segment of 17%. This may go up to 3% in case an operator asks for the usage of 6.2 MHz.
>
> …................................................"

It is thus clear that the concept of levying 2% as spectrum charge is introduced here by Member (F) Sh. A. Prasad, but no reason is recorded for arriving at this percentage. After recording this note, he marked it to Chairman (TC).

**154.**On the next date, that is, 15.12.2000, Sh. Shyamal Ghosh, Chairman (TC) records his note which is as under:

> "I have discussed this matter with Member (Finance) and I have pointed out that in paragraph 5.4 of the TRAI's recommendations on licence fee for cellular services, <u>it has been mentioned that the revenue share parted with as licence fee has also to represent a payment for frequency spectrum</u>. The recommendations also went on to say that the revenue share paid by the operator need also represents a fair compensation for the utilization of the limited spectrum, which provides opportunities to users in preference to others. <u>In other words, it implies that the 17% revenue share proposed by the regulator includes a component reflecting payment for frequency spectrum</u>.
> 2.In view of the above, the TC Memo may be suitably modified and placed before the next Full TC."

**155.**PW 44 Sh. Satya Pal, Retired Secretary (T), who was working with Hutchison Max Telecom Limited states that as  tele-density was required to be increased at affordable rates, it was requested to restrict spectrum charges upto 2% of AGR irrespective of spectrum allocated.

**156.**Ultimately, in the 68th Full Telecom Commission Meeting held on 22.12.2000 (D-38, pages 80 and 167), the proposal as contained in item No. 68.7 (D-8, page 210), in which the views of COAI as well as department are incorporated, was approved and the relevant part of the proposal is as under:

> "It is proposed that following may be considered for approval:
>
> i)Considering the commitment already made in the Licence Agreement to permit a cumulative maximum of upto 4.4 MHz in the GSM bands, and the decision of SMG, 2% of AGR as revenue share for spectrum usage should be a part of the overall revenue share of 10% for J&K and A&N Circles and 17% for all other circles & metros, per annum for spectrum assignment upto 4.4 MHz + 4.4 MHz. In this context it is to be noted that spectrum charges are fundamentally bandwidth dependent and it may not be appropriate to make these totally independent of spectrum bandwidth. Anything to the contrary would result in inefficient use of spectrum as well as complications and undue demands on the spectrum which is a scarce limited resource. Therefore, Any additional spectrum beyond 4.4 MHz + 4.4 MHz, upto a total of 6.2 MHz + 6.2 MHz, if assigned, should attract additional percentage of revenue share @ 1% p.a.........."

**157.**The proposal was approved, as indicated, by recording at page 52/N and also minutes as available at page 214 of the file.

**158.**However, the aforesaid decision taken on 22.12.2000 was not communicated to the concerned parties for long. Thereafter, a note sheet

dated 21.09.2001 recorded in this regard by Sh. Sukhpal Singh, Assistant Wireless Adviser, reads as under:

"The case relates to spectrum charges to be levied from Cellular Mobile Telephone Operators in Metro cities as well as in Circles. In this context, it may be recalled that Note for the Full Telecom Commission (FTC) was considered on this issue by the FTC in its 68th Meeting held on 22 December 2000. Vide Minutes of the said Meeting, the proposal contained in the TC Memo was kindly approved.

2. It is mentioned that COAI and some other Cellular Operators have filed Petitions before Hon'ble TDSAT regarding WPC Charges. The Petitions No. 4 and 5 /2001 came up for hearing on 29 August 2001 at Hon'ble TDSAT. After hearing both sides, Hon'ble TDSAT passed the Order, which includes, among others, that the Government has expressed that it will consider representation of COAI as regards WPC charges prospectively i.e. from 1.8.1999. Further, Hon'ble TDSAT ordered that the Government should come to a decision on this point by 11 September 2001 and Government Counsel would inform Hon'ble TDSAT about the decision of the Government on the next hearing, which was fixed to be 12 September 2001.

3. In the meantime, Union Cabinet was reshuffled and new Hon'ble MOC took charge. Immediately, thereafter, Hon'ble MOC proceeded on official tour abroad as per his earlier programme. In view of this, Government Counsel filed an application for directions in the TDSAT and requested extension of time till 25.9.2001 for complying with the directions given by the Hon'ble TDSAT in its order of 29.8.2001. The application was heard on

> 12.9.2001 and Hon'ble TDSAT ordered that the
> petition is adjourned to 24 September 2001. The
> decision of the Government on WPC charges is
> required to be communicated to Hon'ble TDSAT
> before 24 September 2001.
>
> 4. As mentioned earlier, Full Telecom Commission
> (FTC) had considered this issue and approved the
> proposal on WPC charges. In the mean time, a
> case regarding amendment to the licence
> agreements based on decision of FTC has been
> submitted for kind approval of Hon'ble MOC. In
> view of the urgency it is proposed that an
> administrative order be issued regarding WPC
> charges for informing Hon'ble TDSAT before 24
> September 2001. A draft order to this effect is
> placed below for kind consideration and approval."

**159.** With this note, draft of a order proposed to be issued on the subject was placed.

**160.** Thereafter, there is a note sheet dated 22.09.2001 recorded by Sh. A. K. Srivastava, Director (VAS-I), which reads as under:

> "The administrative orders as proposed on pre-page
> should be issued.
>
> However, it needs to be clarified that in terms of the
> note for the Telecom Commission dated 18.12.2000
> (68/C) submitted by WPC, the Full Telecom
> Commission had approved the new formulation of
> the spectrum charges to be made applicable from
> prospective date. Further to this note another note
> was submitted by BS Branch (TC Memo No.
> 10-2/2000-BS-II dated 19.01.2000), whereafter the
> Full Telecom Commission had approved on
> 24.01.2001 that the applicability of spectrum
> charges as per new formulation of revenue sharing

basis shall be effective from 01.08.99, which is cut-off date for migration.  This was also approved by the Hon'ble MOC on 25.01.2000 and announced in a press conference by the Hon'ble MOC.

The proposal for issue of amendment to the Licence Agreement for Cellular Services has already been submitted to the Hon'ble MOC.  As issue of formal amendment may take a few more days, the Administrative orders which is in terms of the scheme already approved by the then MOC may please be approved for issue, as proposed on pre-page in view of the hearing in TDSAT fixed for 24.09.2001.

Submitted please."

The proposal was approved.

**161.**Accordingly, the following order was issued under the signature of Sh. Sukhpal Singh, Assistant Wireless Adviser on 22.09.2001, which reads as under:

"Government of India
Ministry of Communications
Department of Telecommunications
WPC Wing

No. L-14041/06/2000-NTG
Date: 22.9.2001

**O R D E R**

Subject: Royalty and Licence fee charges towards WPC spectrum usage by cellular mobile telephone service providers.

The issue of charging royalty and licence fee for cellular mobile telephone service has been reviewed and it has now been decided that the cellular licensees shall pay spectrum charges with

effect from 1.8.99, the cut off date of change over to NTP-99 regime, on revenue share basis of 2% Adjusted Gross Revenue (AGR) towards WPC charges covering royalty payment for the use of cellular spectrum upto 4.4 MHz + 4.4 MHz and licence fee for cellular mobile handsets and cellular mobile base stations and also for possession of wireless telegraphy equipment as per the details prescribed by Wireless Planning and Coordination Wing (WPC). <u>Any additional bandwidth if allotted subject to availability and justification shall attract additional royalty and licence fee as revenue share (typically 1% additional revenue share if bandwidth allocated is upto 6.2 MHz + 6.2 MHz in place of 4.4 MHz + 4.4 MHz).</u>

2..............................................................................
.............................................

3. The above spectrum charge is subject to review by WPC Wing from time to time.

(Sukhpal Singh)
Asstt. Wireless Adviser
to the Govt. of India"

**162.** PW 3 Sh. Sukhpal Singh has also narrated all these facts in his statement.  In the statement, he says that COAI had filed certain petitions before Hon'ble TDSAT regarding WPC charges and on 12.09.2001, TDSAT ordered that the decision of the Government on WPC charges was required to be communicated to it before 24.09.2001, though the proposal was approved by the Commission in its 68th meeting on 22.12.2000, minutes of which were confirmed in 69th meeting on 29.12.2000.  <u>He states that the</u>

order was issued in view of the urgency in light of TDSAT order to convey
the decision of the Government on 24.09.2001.

**163.**As per note dated 22.09.2001, recorded by Sh. A. K. Srivastava at 54/N,
the applicability of spectrum charges as per new formulation of revenue
share basis shall be effective from 01.08.1999, which is cut off date for
migration.  This was approved by the Full Telecom Commission in its
meeting on 24.01.2001.

**164.**It is also very interesting to read a note dated October 3, 2000 recorded
by Sh. Shyamal Ghosh in file No. 842-153/98-Vol.VIII, extracts of which are
available in file D-76 at page 58 relating to availability of frequency
spectrum for fourth  cellular operator.  TRAI in its recommendations on
Fourth  cellular operator dated 23.06.2000 had asked for information on
availability of spectrum, both for existing as well as Fourth cellular operator.
Its all recommendations were accepted except definition of AGR by the
Government and TRAI was intimated about the availability of spectrum, in
the course of which, the aforesaid note was recorded by Sh. Shyamal Ghosh,
which reads as under:

> "From pre page
>
> The recommendations of the TRAI for induction of
> the fourth cellular operator have been broadly
> accepted by the Telecom Commission. The TRAI
> recommendations also cover filling up of the
> vacant slots in some of the Circles as well as
> revenue sharing for the existing cellular operators.
> These recommendations have also been accepted
> by the Telecom Commission.
> 2. All the above recommendations have been

accepted subject to the modification of the
definition of 'Adjusted Gross Revenue' (AGR)
where also the only difference is regarding revenue
from sale of hand sets as a deductible item in the
gross revenue.  In respect of the GMPCS licences
also TRAI had made similar recommendations but
we have finally taken a view that revenue from sale
of hand set is not a deductible item.

3.As regards spectrum, theoretically, 50 MHz
should be available in 900 MHz band.  By
providing 6.2 MHz + 6.2 MHz for each of the
cellular operators in this frequency band, it should
be possible to accommodate three private cellular
operators and BSNL / MTNL in this frequency
band.  However, it appears from the report of the
WA that the entire 50 MHz may not be available
because some of it may be occupied by Defence
and other services.  I would suggest that we may
keep whatever is residual spectrum available in this
frequency for additional requirement of the three
existing licensees and provide spectrum for the
fourth operator (new private operator) in the higher
band of 1.7 / 1.8 GHz.  While this may pose certain
operational difficulty regarding roaming between
900 MHz and 1.8 GHz, with dual band terminals
this difficulty can be overcome. Similarly, while
equipments for 1.8 GHz may be somewhat more
costly, the number of subscribers covered by each
cell would be on the higher side which may more
than compensate the higher cost.  Therefore, we
may report to TRAI that spectrum will be available
on the lines indicated in the draft.  In the draft, we
are also referring to the modification of definition
of Adjusted Gross Revenue.

4.One issue which the cellular operators are likely
to comment on is fixing of revenue sharing at 17%

for most of the Circles except J&K and Andaman & Nicobar, where revenue sharing has been fixed at 10%.  It may be recalled that in the migration package we have fixed revenue sharing at 15% on a provisional basis. Therefore, theoretically, we could fix a somewhat higher percentage also, particularly since any reduction from the level of TRAI recommendations may attract adverse comment from CAG.  At the same time, I may point out that the cellular operators have been agitated about the high fee for the spectrum except in the Metros.  Their contention is that each city / town should not be treated as separate area, since in the tender inviting bids, the entire Circle had been stated as the service area. While there are several options of revising the spectrum fees which would encourage more optimal use of spectrum, it would be fraught with administrative difficulties; particularly since the spectrum fees are collected by the Wireless Adviser as against the licence fee being collected by DOT. Therefore, in the Weekly Telecom Commission while considering the matter, it has been decided that we could discuss with the cellular operators the following two options:

(a)The revised spectrum fee calculations based on the area approach of the Circle to encourage optimal utilisation of the spectrum with an option to give up spectrum if the operator deems it necessary.

(b)Include spectrum fee as part of the revenue sharing which would facilitate collection at one place and would not lead to any dues accumulating at any point of time.  This component of revenue sharing could be 2% or more depending on the spectrum allocations.

5. We propose to hold these discussions shortly if

MOC approves the above approach. After discussing with the COAI the matter would be brought up before the Full TC for ratification.

6. In brief, therefore, approval is sought for the following:

(i)<u>Acceptance of the TRAI recommendations for entry of the fourth cellular operator in each Circle based on the continuous bidding process with the spectrum being made available in the 1.7 / 1.8 GHz frequency band</u>.

(ii)Report back to TRAI about (i) above and also that we are modifying the definition of Adjusted Gross Revenue on the lines indicated at paras 2 & 3 pre page.

(iii)Discuss with COAI the option mentioned at paras 4(a) & 4(b) above.

7.If this approach is approved, we can proceed immediately for opening up the licences for the fourth operator as well as the vacant slots in the existing Circles.

8.Member (F) may also see before the file is submitted to MOS(C) / MOC."

In this note Sh. Shyamal Ghosh recognizes availability of spectrum, both for existing operators as well as new entrants. He also recognizes that if a lower percentage of revenue share is fixed, CAG may take an adverse view.

This note was approved by the then MoC.

**165.**If the aforesaid record is read carefully, the origin of 2% charges for a bandwidth of 4.4 MHz + 4.4 MHz is found mentioned in COAI representation extracted above. However, no reason for arriving at this percentage is mentioned, more so, when there was dispute between COAI and DoT about the WPC charges.  It is not clear as to how this percentage

was arrived at by COAI. What is the basis for arriving at this percentage? Whether any material, legal, technical or economic, is required to be considered for arriving at this percentage or is it a pure guess work? In the absence of any material on record, it is safe to presume that it is just their guess work. Thereafter, this figure finds mention in the note of Member (F), Sh. A. Prasad, dated 14.12.2000 as extracted above. He also does not give any reason as to why he recommended this percentage. He just records that apparently the circumstances warrant levying 2% as spectrum charge over and above the licence fee segment of 17% and further records that this may go upto 3% in case an operator asks for usage of 6.2 MHz. In the note, he takes stand contrary to TRAI recommendations in 5.4 and misreads the same stating that the break up of 17% included 2% as administrative and regulation charges and 5% as USO, but not including spectrum charges, though the TRAI recommended that 17% should include spectrum charges also. It is also interesting to note that TRAI in its recommendations dated 23.06.2000 had observed in paragraph 5.4 that revenue share parted as licence fee has also to represent a payment for frequency spectrum, which is a highly limited national resource and then recommended the percentage of revenue share in paragraph 5.9. The quantum of spectrum allocated to an operator is not mentioned in the recommendations, when the issue of licence fee is dealt with, though the licence fee issue is applicable to both existing operators as well as new entrants. Secretary Sh. Shyamal Ghosh had taken note of this paragraph in his note dated 15.12.2000 as extracted above. It is clear that TRAI recommendations that the licence fee has to include

spectrum charge also, was ignored and a rough and ready figure, arrived at by Member (F) without any reasoning, was approved by the Telecom Commission in its meeting dated 22.12.2000. It was also perhaps taken that if higher charges for spectrum were not levied, CAG may take an adverse view, as is found noted in the note of Sh. Shyamal Ghosh extracted above.

It is thus clear that this figure of percentage for charging initial spectrum as well as incremental increase is just a guess work without any scientific, economic or legal basis arrived at for extraneous reasons including the scare of CAG. Its origin is thus doubtful being without any rational basis and as such its sanctity is not beyond legal challenge. It is perhaps for this reason that the order dated 22.09.2001 itself says that the charges are subject to change from time to time.

It is an altogether different matter that this percentage has been sanctified later on for different reasons as is clear from subsequent orders in this regard as well as the statement of PW 5 Sh. Nripendra Misra, the then Chairman, TRAI, as these rates continue till date.

**166.**It is, thus, clear that these charges are subject to change from time to time and their purpose is not to earn revenue but to prevent inefficient use of spectrum and unnecessary demand thereof. Only suitable charges were being suggested from time to time, perhaps rightly as the telecom industry was only in its sixth year and in nascent stage and everybody was reading things in his own way.

**167.**It is also to be noted that the above rates of WPC charges were approved by Telecom Commission on 22.12.2000, but the same were not formalized

by passing an official order consequent to the approval of the Commission. When these charges were not being notified by the Government, COAI went to Hon'ble TDSAT by presenting a petition in this regard. The aforesaid notes reveal that WPC charges were notified only when the DoT was pressed hard by the Hon'ble TDSAT. The formal order was issued only on 22.09.2001. What was the reason for this delay? Was the Government not sure of legal basis of these charges or were there some other reasons?

**G. Request for additional spectrum: Treatment thereof (D-108 and 109):**

**168.** The telecom companies were demanding additional spectrum beyond 6.2 MHz in order to provide better quality of telecom services. The earliest letter in this regard is dated **26.07.1999**, written by Airtel to the Wireless Advisor, requesting for allocation of bandwidth of 8.2 MHz against 6.2 MHz. Essar wrote a letter **08.10.1999** asking for assignment of additional 1.2 MHz of bandwidth. Hutchison Max Telecom Limited wrote a similar letter dated **17.11.1999** requesting for allocation of additional 2.6 MHz to meet capacity and quality requirements. Vide letter dated **19.05.2000**, Airtel again repeated its request asking for allocation of bandwidth up to 9.6 MHz against 6.2 MHz, already allocated to it. Through this letter it also reminded that in 1996 itself, it had requested for allocation of 9.6 MHz, but due to constraints of availability, its allocation was only up to 6.2 MHz (D-109).

**169.** PW 43 Sh. T. R. Dua, Director (Regulation), Bharti Cellular Limited, has stated that 6.2 MHz spectrum was not enough to meet the required grade

of service, call drops etc. in high density areas like CP, Nehru Place, Karol Bagh and other areas.  PW 44 Sh. Satya Pal, Retired Secretary (T), who was working with Hutchison Max (P) Limited since 1991 as Advisor has stated that during 2001, the company had been facing acute congestion in network, call drops due to inadequate spectrum.  To the same effect is the statement of PW 45 Sh. Manoj Kumar Pant, Vice President, Hutchison Max Telecom (P) Limited.

**170.**There is no document or file indicating as to how these requests made by the aforesaid companies were dealt with by DoT. However, the earliest letter/ document which could be traced regarding the treatment given to these requests by DoT is found in D-140 at pages 92 and 232, which is a letter written by Sh. A. K. Srivastava, Director (VAS-I), on 09.04.2001 to COAI, refusing spectrum, which reads as under:

> "..................................................................................
> ..............................................
>
> **Subject**:Additional frequency spectrum for Cellular Mobile Telephone Service- request from Operators regarding.
>
> Dear Sirs,
> This office has received requests on the above subject from existing cellular operators for additional spectrum in 900/1800 MHz Band for Cellular services and for allocation of frequency spectrum in 800 MHz band for CDMA services.
>
> 2.It is seen that proper and sufficient justification for additional frequency spectrum and details of alternate methods adopted for optimal capacity enhancement has not been given.

It is, therefore, imperative that request for additional frequency spectrum in the designated band (as per the guidelines issued) for cellular service must accompany detailed justification. You should also indicate as to what alternate methods have been adopted for capacity enhancement and whether all available options have been exhausted.

3.The Cellular Services are to be operated by the existing licensees in designated Cellular Mobile Telephone Service band i.e., 890-915 MHz paired with 935-960 MHz. The operators have been permitted to operate the Cellular Mobile Telephone Service in any technology, however, the technology shall be digital and has to operate in the designated frequency band. <u>As such, no additional frequency spectrum needs to be allocated</u>.
…................................"

**<u>171.</u>**The letters written by the companies do not find mention in statement of any witness. PW 22 Sh. Kamalakar Rao, Dy. Wireless Advisor mentions letters written by the companies in the years 2002 and 2003 only.  PW 23 Sh. A. K. Srivastava, the then Director (VAS-I) begins his statement with the letter dated 19.09.2001 written by COAI to the Secretary (T) for a meeting relating to quantum of spectrum to CMSPs and charges for GSM spectrum. The files as to how these applications were processed and disposed of have not been produced before the Court. Only the aforesaid letters culled out from the DoT record have been placed before the Court. Perhaps it has been done deliberately to indicate that the demand for additional spectrum started only in 2001 on late Sh. Pramod Mahajan joining the Ministry. At the cost of

repetition I may add that no witness speaks about the demand for additional spectrum being pending since 1999. Similarly, these letters do not find mention anywhere in the charge sheet also.

## H.Reasons for opening of files D-4 and D-6 and Significance thereof

**172.**It appears from the perusal of record that these two files constitute the base of the case and, as such, it is necessary to take note as to why and how these files came into existence. Statements of all important witnesses are primarily based on these two files. These two files constitute the base of the case of the prosecution. The issue is whether these files, in fact, deal with allocation of additional spectrum, particularly in view of the fact that demands for additional spectrum were there since 1999, coupled with the recommendations of TRAI of 23.06.2000 and 24.10.2000.

**173.**File D-4 was opened only on 10.01.2002, when on the asking of the then MOC&IT late Sh. Pramod Mahajan, Sh. Shyamal Ghosh recorded a note dated 10.01.2002, in which he also took note of the report of Mangla Committee and the note reads as under:

" **F. No. 842-50/2001-VAS/Vol. V** (part)

**Ministry of Communications & IT**
**(Department of Telecom)**
***

MOC & IT had desired that we should examine the question of giving additional frequency to the cellular operators, particularly those facing problems in Delhi and Mumbai.
2.The question of optimal utilization of frequency

has been under our consideration for some time. The Telecom Engineering Centre had been asked to review the position in this regard. The Report prepared is at Flag 'A'. It would be apparent from the Report that there is no immediate need for additional spectrum if the allocated spectrum is optimally utilized with better network configuration by decreasing the cell size and decreasing the distance between these cell sites to about half a kilometer. In fact, the data available in respect of Beijing and Shanghai would indicate that, with proper planning, it would be possible to sustain even a larger subscriber base with the existing allocation of spectrum.

3.However, it is a fact that during the course of the next year or so, if the present growth rate of subscribers is sustained, it would be necessary to give additional frequency. In the 900 Mhz GSM band, we have given to three operators at the rate of 6.2 Mhz per operator. The balance has been given to Railways (1.8 Mhz) and the rest are with Defence. Similarly, in the 1800 Mhz band, we have been able to earmark 10 Mhz for the cellular operators apart from the band made available for WLL. Of this 10 Mhz, we have given 6.2 Mhz to the Fourth Operator. There is about 65 Mhz presently under use by Defence. I have asked the Wireless Advisor to analyse the manner of usage by Defence and Railways, particularly with a view to ascertaining as to whether additional frequencies could be made available in Delhi and Mumbai. This is so because the immediate concern is relating to these two Metros.

4.Another related issue is the additional charges to be recovered for allocation of additional frequency. At the moment, we have prescribed 2% of revenue

share for frequency up to 4.4 Mhz and an additional 1% for frequency up to 6.2 Mhz. In addition, the operators have to pay certain microwaves access charges. <u>However, the cellular operators are not satisfied with these rates and are having further discussions in this regard with Member (P)</u>.

5.<u>For frequency allotment beyond 6.2 Mhz, perhaps the better option would be to impose an additional allocation fee rather than increasing the revenue share</u>. The benchmark for the additional fee could be the entry fee in respect of the Fourth Cellular Operator for Delhi and Mumbai pro rated for the frequency allotted. However, details in this regard are being finalized separately.

6.The above is being submitted for present information of MOC &IT. A final Paper in this regard will be prepared separately and put up shortly.

(Shyamal Ghosh)
10.1.2002
<u>MOC & IT</u> "

The file was later on titled Additional Frequency Allotment to Cellular Mobile Operators with No. 842-50/2001-VAS (Vol.V) (Part). It means that initially these issues relating to additional spectrum were being dealt with in some other file.

**174.**It appears from page 8/N of D-6 that this note was separately put to the then MOC&IT late Sh. Pramod Mahajan as a copy of the aforesaid note has also been placed in that file.  PW 53 Sh. Ajoy Mehta, the then Private Secretary to Sh. Pramod Mahajan, also states that this note was received in the PS section of the Minister on 10.01.2002. However, the note does not

bear the signature of Sh. Pramod Mahajan.

**175.**It is a note for the information of the Minister regarding the current status as prevailing on that date.

**176.**Thereafter, in this file another note dated 31.01.2002 is recorded by Sh. J. R. Gupta, the then DDG (VAS), <u>continuing the issue from "pre-page"</u> <u>indicating that it was in continuation of the material on the earlier page and</u> <u>reads as under:</u>

> "-2/N-
>
> (from pre page)
>
> The matter regarding allotment of additional spectrum beyond 6.2 Mhz in 900 Mhz band to the existing cellular operators was further discussed today, <u>at length</u>.
>
> <u>It was felt that there would be need to allocate</u> <u>additional spectrum in Mumbai & Delhi Metro</u> <u>Service Areas soon, where congestion as well as</u> <u>drop in quality of service has been reported by the</u> <u>cellular operators $^{'x'}$. One operator has reached</u> <u>nearly 5 lakhs subscribers in Delhi and other</u> <u>operators in Delhi & Mumbai are expected to reach</u> <u>the level of 5 lakh customers in a few months time;</u> <u>they are at present approaching towards a customer</u> <u>base of 4 lakhs. Therefore, a consensus has</u> <u>emerged after discussions that additional spectrum</u> <u>to the tune of 1.8 (paired) in 1800 Mhz band may</u> <u>be allocated on case to case co-ordination basis to</u> <u>the operators after they reach the level of 4 lakhs</u> <u>customers , if a request is made in this behalf.</u> <u>However, the actual release of spectrum should</u> <u>take place only after a customer base of 5 lakh is</u> <u>reached in the service area under a particular</u> <u>license. This would add to a total spectrum of 8</u>

Mhz (paired) to such operators.

As regards charges for the additional spectrum, it is recalled that consequent to change over to revenue sharing regime, 2% of revenue (AGR) is charged for GSM spectrum upto 4.4 Mhz (paired) & additional 1% of revenue is charged for additional spectrum of 1.8 Mhz (paired). On the same analogy, further additional spectrum charge of 1% of revenue (AGR) would be levied for spectrum beyond 6.2 Mhz. However, at present spectrum upto 1.8 Mhz (paired) only will be allocated/ assigned as stated above. In future, it may be possible to allot further spectrum subject to availability to add to a total of upto 10 Mhz; this would be only after a suitable subscriber base is reached.

The above scheme was also discussed by Member (F) with officers from WPC & he was agreeable to the scheme (he has gone out of station in the afternoon).

Submitted for approval.

(J. R. Gupta)
DDG (VAS)

'X'

"The report of the Committee of Sr. DDG (TEC) at Flag 'A' states (para 18/c of report) about congestion & other problems. Sr. DDG (TEC) has carried out testing of congestion etc. in Delhi networks and would be shortly sending a report, as informed by him.

**Wireless Advisor- Retiring today**

**Member (P)/(F)- Out**


**Chairman (TC)**

For allocation of spectrum beyond 6.2 Mhz and upto 10 Mhz additional 1% revenue sharing would imply & total spectrum charge @ 4% of Adjusted Gross Revenue for such cellular operators.

Shyamal Ghosh
31|1|02
**MOC**

MOS (c) away

प्रमोद् महाजन्
31.01.02"

**177.**Thereafter, necessary follow up order was issued on 01.02.2002, which reads as under:

"Government of India
  Ministry of Communications
    Department of Telecommunications
    WPC Wing
No. L-14041/06/2000-NTG      Dated: 01.02.2002

**ORDER**

Subject:-Allocation of additional Cellular Radio Frequency Spectrum to the Cellular Mobile Telephone Service (CMTS) Providers

In order to meet the requirements of growth of subscribers, it has been decided to assign additional spectrum upto 1.8 Mhz + 1.8 Mhz to the CMTS operators. Any operator may apply for allotment of additional spectrum after reaching a customer base of 4 Lakh or more under a license in a service area,

after which the process of allotment would be initiated ; however, actual assignment of the spectrum would be made, subject to availability and coordination on case to case basis, after a customer base of 5 Lakh or more has been reached in the service area. This additional assignment will be beyond already allocated spectrum of 6.2 Mhz + 6.2 Mhz. The additional spectrum of 1.8 Mhz + 1.8 Mhz would be assigned in 1800 Mhz Band.

2.The cellular licensees are to pay spectrum charge with effect from 1.8.99 on revenue share basis at the rate of 2 % of Adjusted Gross Revenue (AGR) for spectrum upto 4.4 Mhz + 4.4 Mhz and 3% of AGR for spectrum upto 6.2 Mhz + 6.2 Mhz.

3.Further, for this additional spectrum of 1.8 Mhz + 1.8 Mhz, if assigned for any one or more places in a Service Area, beyond 6.2 Mhz + 6.2 Mhz, an additional charge of 1% of AGR will be levied. Thus, the total spectrum charge to be paid by such operators would be 4% of AGR from the Service in the respective Service Area. This spectrum charge of 4% of AGR would also cover allocation of further spectrum , which may become possible to allocate in future subject to availability, to add up to a total spectrum allocation not exceeding 10 Mhz + 10 Mhz per operator in a Service Area. Such additional allocation could be considered only after a suitable subscriber base, as may be prescribed, is reached.

4.This order is issued in partial modification to the order of even number dated 22nd September, 2001; other terms and conditions of the said order shall remain unchanged.

(R. K. Srivastava)
Engineer"

**178.** Perusal of the abovesaid note sheet reveals that the file came into existence only on 10.01.2002 with the note of Sh. Shyamal Ghosh. It is a new file. The files in which issues relating to additional spectrum were being dealt with have not been produced before the Court. This is a new file and order for allocation of additional spectrum beyond 6.2 MHz has been passed in this file without reference to previous files. Anyway, it is this order which is under question and led to the filing of the charge sheet.

Opening of file D-6 (COAI matters)

**179.** The next question is as to why file D-6 was opened? The DoT had issued Guidelines for basic operators with WLL, as noted above on 25.01.2001. Protesting against the introduction of WLL through Guidelines dated 25.01.2000, COAI wrote a letter dated 08.02.2001 to Sh. Shyamal Ghosh, pointing out its concerns and also seeking level playing field with the WLL service providers and thereafter, on 19.02.2001, Spice Communications Limited, a CMTS service provider, also wrote a letter asking certain clarifications about WLL services and praying for level playing field. To deal with these two letters, primarily seeking level playing field and not asking for spectrum, this file was opened. It is beneficial to quote these two letters verbatim.

**"Cellular Operators Association of India**

TVR/COAI/055
February 8, 2001

Shri Shyamal Ghosh
Secretary, DoT & Chairman,
Telecom Commission
Sanchar Bhavan
20 Ashoka Road
New Delhi 110 001

Dear Sir,

### WLL Mobility for FSPs

This is pursuant to our ongoing submissions on the subject.

We have been representing that **the introduction of WLL Mobility by FSPs in violation of NTP 99 and their license contracts and on hugely economically privileged terms, will have an unfair and disastrous impact on the cellular industry.**

The COAI has repeatedly stated that it welcomes increased competition, advance of technology, technology neutrality and ensuing consumer benefits – all tenets enshrined in NTP 99.  We have only insisted that the principles of level playing field – another tenet of NTP 99, be scrupulously observed.

In the light of the above, the COAI wishes to clarify that we have never suggested that the operating range of WLL be artificially restricted to SDCA limits.  In all our submission, we have

<u>emphasized our concern that the network architecture used by FSPs for WLL will enable full mobility. This desire for full circle-wide mobility has also been expressed by the FSPs subsequent to the DoTs announcement of SDCA based WLL Mobility</u>.

In fact COAI would like to propose that full circle-wide mobility should be permitted to the FSPs. However, the principles of level playing field dictate that all operators offering mobile services must be governed by identical terms and conditions viz. <u>Identical terms of entry, spectrum availability and charges, revenue share and interconnect terms</u>. Anything less would tantamount to discriminating against one technology and its providers in favour of another.

We seek your support in this matter.

Sincerely,

**T V Ramachandran** Director General"


**180.** Letter of Spice Communications Limited:

"February 19, 2001

**The Chairman**
Telecom Commission
Department of Telecommunications
Sanchar Bhavan
New Delhi

Dear Sir,

Sub: **Extension of Fixed Service by Cellular**

**operators.**

This is with reference to the guidelines announced vide Press Note dated 25th January, 2001 making certain changes in the Telecom Policy.

It is noted from the guidelines that while announcing the changes <u>the Government is taking steps to ensure level playing field between Basic Service Operators and Cellular Operators and in pursuance thereto has permitted the latter to provide fixed phones based on their existing GSM Cellular network infrastructure in their respective licensed service areas</u>.

In this connection we have to submit that we are operating Cellular Mobile Telephone Service in Punjab and Karnataka circles and our network covers all Districts and towns in the 2 circles. We propose to launch fixed phone service based on our network in the above areas at the earliest. We request you to kindly confirm that the inter-connectivity and all other charges payable to the Government for fixed service at our network will be the same as that paid by basic service providers for fixed phones at their network.

We request you to further confirm that the inter-connectivity and other charges payable by us for the Mobile Services at our network will be same as those payable by Basic Service operators for mobile services to be provided by them through WLL technology on their network. <u>The above two measures are necessary to provide a level playing field and also ensure that similar service offered by the two operators in an area are available to the customer at the same comparable cost</u>.

Thanking you,

Yours faithfully,
For **SPICE COMMUNICATIONS LIMITED**

> **RAJIV K. GUPTA**
> **Executive Director"**

**181.** How these two letters were dealt with is disclosed by the reading of the note sheets recorded in the file.

**182.** First note of Sh. A. K. Srivastava, Director (VAS-I) dated 22.03.2001 reads as under:

> **"Subject:** Limited Mobility service within a SDCA using WLL technology by FSPs and operation of Fixed Service by Cellular Mobile Telephone Service Providers.
>
> PUC-I is a letter from COAI offering their comments on permission for Limited Mobility in SDCA using WLL Technology by Fixed Service Providers. COAI has proposed that they will like FSPs to be given full circle-wide Mobility. However, the principles of level playing field dictate that all operators offering Mobile Services must be covered by identical terms and conditions, viz., Spectrum availability / charges, Revenue Sharing and Interconnect terms etc.
>
> PUC-II is a letter from M/s Spice Communications Ltd. proposing to launch Fixed Phone Service based on their GSM Cellular Network in their licensed areas of Punjab and Karnataka Telecom Circles at the earliest. A confirmation has been sought from DOT that Interconnectivity and all other charges payable to the Government for **Fixed Service provided by Cellular Operators on their network** will be same as that paid by FSPs for Fixed Phone Service. <u>They have sought further confirmation that the interconnectivity and other charges payable by **Cellular Operators for Mobile Services at their network will be same as**</u>

**those payable by FSPs for Mobile Services using WLL Technology.** According to the company, these two measures are necessary to provide a level playing field.

2. Copy of guidelines on the subject announced by Hon'ble MOC on 25th January, 2001 in the matter, placed below (3/C) may kindly be seen.

The decision to permit Limited Mobility Service in a SDCA using WLL by FSPs was taken in the interest of consumers to ensure competition and growth, accessibility and resultant Tele-density for the masses. While offering the limited mobility service, the FSPs shall be required to follow the numbering plan of SDCA. This will effectively mean that no roaming between two SDCAs shall be possible, the limited mobility within a SDCA shall be, thus, basically an extension of PSTN number.

The Cellular Operators have already been permitted various concessions such as, reduction in license fee payable as percentage of AGR, permission to provide Fixed Phone Service based on their existing GSM Cellular Network infrastructure and retention of 5% out of the charges collected for Fixed Leg of calls etc.

3. Since the permission to Cellular Operators for Fixed Phone Service clearly stipulates that they are to provide the Service (by using Fixed Wireless Telephones – FWTs) on their existing GSM Cellular Network Infrastructure, this imparts clarity that there is no dilution / change in the terms and conditions viz., Spectrum availability and charges, revenue share and interconnect terms etc. for provision of said Fixed Phone Service by Cellular Operators which shall be same as that for Cellular Mobile Telephone Service. We may accordingly convey clarification to all Cellular Operators /

COAI.
DFA please."

**183.** Then there is note of Sh. J. R. Gupta, DDG (VAS) dated 23.03.2001,

which reads as under:

> "Notes on pre-page may please be seen.
>
> While on one hand cellular operators have initiated
> legal proceedings in the TDSAT challenging
> limited mobility under WLL permitted by DoT, on
> the other hand, they are seeking clarifications as per
> the letters mentioned. Since the matter is subjudice,
> we may perhaps, not issue any clarifications for the
> present.  However, if a clarification is desired, it
> may be as per draft submitted.
>
> However, amendment to the licences with a clause
> that the same will be subject to the outcome of the
> court case, is under process."

**184.** Then there is note of Sh. Shyamal Ghosh, Chairman (TC) dated

23.03.2001, which reads as under:

> "We may consult the L.A.  I feel a clarification in
> terms of paragraph (3) on pre-page could be given
> with the stipulation that the final decision would
> depend on the outcome of the proceedings before
> TDSAT."

**185.** Then the file goes to Legal Advisor (LA) and note of Sh. O. P. Nahar,

Legal Adviser (Conveyancing) dated 03.04.2001 reads as under:

> "DEPARTMENT OF LEGAL AFFAIRS
> MIN. OF LAW, JUSTICE & COMPANY
> AFFAIRS

The Cellular Operators Association of India has written a letter as at 1/c wherein it has proposed for Full Circle-wise Mobility to the Basic Service Providers and simultaneously in the guise of principles of level playing field for its members arguing for favourable change to cellular operators in the terms and conditions of the licence with regard to spectrum availability, revenue sharing charges etc. Another letter as at 2/c is written by M/s Spice Communications Limited who is an operator in Punjab & Karnataka Circles for cellular service. This letter has wanted a confirmation from DoT that interconnectivity and other charges payable by fixed / basic service and interconnectivity and other charges payable by cellular service will be the same or similar.

2. The question has been raised what reply DoT should send against these two letters.

3. The matter is already subjudice and pending before Telecom Disputes Settlement Appellate Tribunal where COAI is the petitioner, M/s Spice Communications Limited is a member of such Association. It appears that M/s Spice Communications Limited is trying to show its dexterity. It is a sort of catch net. In case DoT gives any reply to the letter in positive terms, then an estopal will arise against the Government. The query raised by COAI is also unbecoming especially when the matter is subjudice. To demand from Govt. anything extra at this stage when COAI has taken the matter to TDSAT can again be termed as paying clever.

4. Hence it appears appropriate to send a reply, if so felt necessary, with cautious language. It can be stated that matter is already subjudice where the counter affidavit has already been filed. The scope

> of the permissibility only extends within the limits
> whatever have been stated before TDSAT.  Further,
> no extra concession can be thought of even
> remotely at the stage when TDSAT is seized of the
> whole matter."

**186.** Note of Sh. Shyamal Ghosh, Chairman (TC) dated 09.04.2001 reads as under:

> "The matter has now been referred to GOI – IT.  Let us
> await the outcome."

**187.** These note sheets indicate as to how the officers are not sure about the concept of level playing field. The Legal Advisor himself seems apprehensive and confused and was leading the department to the wrong path rather than clarifying the difficulties being faced or the doubts being entertained by the operators in the implementation of a new policy introducing WLL services. The department does not know as to how to respond to the queries of operators, perhaps rightly as the things were in a flux on account of introduction of migration package, WLL services by BSOs, introduction of revenue share regime etc. Sh. Shyamal Ghosh himself was not sure and pushed the matter in the Court of GOI-IT. What was the view of GOI-IT on this? That material has not been placed before the Court.

**188.** Thereafter, papers relating to COAI presentation on 04.10.2001 are introduced or interposed in this file on 27.09.2001 and the file is utilized for dealing with the issue of additional spectrum. A file which was opened for dealing with a query of operators regarding level playing field, and not for asking additional spectrum, has been used for dealing with the issue of

additional spectrum. The opening of this file indicates that a file can be opened by the department for dealing with even a single letter. When the operators were demanding additional spectrum since 1999, some files must have been opened for dealing with those letters, but these files have not been produced before the Court as already noted above.

**189.** In the same file one more letter dated 05.04.2001 is also available at page 4/c, written by COAI to the then MOC Sh. Ram Vilas Paswan, seeking as favourable terms as were given to the fixed service operators and the relevant part of the letter is as under:

> "..................................................................................
> ...............................................
>
> However, the recent announcement by the DoT to allow provision of CDMA based mobile services, not under the terms of a mobile license like all present operators, but under vastly advantageous terms of a fixed service license threatens to destroy our industry. More importantly, a step claiming to support consumer interest will actually achieve the opposite and run contrary to all principle enshrined in NTP'99.
>
> Driven to the wall, we have approached the Telecom Dispute Settlement Tribunal to seek recourse against this announcement. This has been for us the least desirable option. **We request your intervention to initiate a transparent *de novo* review of the matter which is fair and just to all concerned, and we would much prefer to engage than litigate.**
>
> …..........................................................................
> .........................................."

**190.**All these letters indicate that that CMSPs were desperately seeking terms equal to the Fixed Service Providers, who were offering WLL services, but the department was not sure as to how to respond. It was indeed a stage of bureaucratic nebula, where nobody knew what to do.

## (I)Filing of Documents and Strange Conduct of Prosecution

**191.**First, it is necessary to take note of the facts as to how the documents were filed in Court by the Prosecution and how it behaved while filing these documents and as to whether all the relevant documents have been filed in the Court, if so, in what manner.

### A.Filing of Documents: Tactics of "relied upon" and "unrelied upon"

The instant charge sheet was filed by CBI on 21.12.2012. However, two weeks' time was sought by the Prosecution for filing documents as copies thereof were not ready and the same was allowed and the case was adjourned to 14.01.2013. Thereafter, the documents were handed over to the Ahlmad by the IO on the 04.01.2013, numbering D-1 to D-131, as mentioned in the charge sheet.

On the next date, that is, 14.01.2013, the factum of filing of these documents was taken on record and the Ahlmad was directed to check them. It was also submitted that some unrelied upon documents, which were seized during investigation, but have not been relied upon, were also lying with the CBI and the same may also be ordered to be placed on the Court record. Relevant part of the order dated 14.01.2013 reads as under:

"Present:Sh. A. K. Singh and Sh. A. K. Rao Sr. PPs

for CBI with IO Dy. SP R. A. Yadav and Inspector
Manoj Kumar.

…..............................................................................

.................................................

It is further submitted that some more documents,
which were seized, but have not been relied upon
by the prosecution, are also lying with the CBI. It is
submitted by him that these documents may also be
ordered to be deposited with the Court. Allowed.
All unrelied upon documents be also deposited with
the Court.

…...................................................................

…............................................"

**192.**Thereafter, the case was adjourned to 30.01.2013.  On this date of 30.01.2013, prosecution filed an application of even date praying that the documents seized during investigation, but not relied upon by the prosecution, as listed in the Annexure A to the application, as D-132 to D-274, may kindly be taken on record. The relevant part of the application reads as under:

"...........................................................

**Subject:Depositing of Not Relied Upon
Documents seized in the instant case during
investigation-reg.**

**MAY IT PLEASE YOUR HONOUR**

1.That the petitioner is the investigating officer of
the instant case in which Charge Sheet was filed
before this Hon'ble Court on 21.12.2012 against
Sh. Shyamal Ghosh & others for the offences
punishable u/s 120 B- IPC r/w Sec. 13 (2) r/w Sec.
13(1) (d) of PC Act, 1988. This case is at the stage

for consideration of cognizance.

2.That on 14.01.2013 as prayed, the Hon'ble Court was pleased to allow for depositing the documents collected during investigation but have not been relied upon while filing the charge sheet before this Hon'ble Court and fixed the matter for today i.e. on 30.01.2013 for consideration of cognizance.

3.That the original Not Relied Upon Documents as per the list enclosed vide Annexure 'A' are submitted before this Hon'ble Court.

**PRAYER**

It is, therefore, prayed that the original Not Relied Upon Documents as per list attached vide Annexure 'A' may kindly be taken on record by this Hon'ble Court.

…..............................................."

**193.**The application was disposed of on the same day, that is, 30.01.2013, but in the course of arguments, the prosecution changed its stand submitting that the prosecution also wishes to rely upon these documents and the following order was passed:

"30.01.2013

Present:Sh. A. K. Singh Sr. PP for CBI with IO Dy. SP R. A. Yadav.

Heard. It is submitted by learned Sr. PP that documents listed as annexure A to this application were earlier not relied upon by the prosecution. However, prosecution wishes to rely upon the same also and accordingly, the same may also be taken on record as relied upon documents. Prayer allowed. The documents, as listed in annexure A to the application, be also taken on record, as relied upon documents.

Application stands disposed of."

**194.**The cognizance of the case was taken on 19.03.2013. By twice referring to the documents D-132 to D-274 as unrelied upon documents, the prosecution lowered the usefulness of these documents in the eyes of Court. The unrelied upon documents are ordered to be deposited with the Court generally to avoid the grievance of the defence that the documents which are in favour of the accused have been withheld from the Court. The unrelied upon documents are by and large considered to be of no use to the prosecution. In the instant case, on 14.01.2013 and also in the application dated 30.01.2013, the prosecution referred to the documents as unrelied upon, but in the course of submission changed its stand that these documents may also be taken as relied upon one. This change of stage distracted the attention of the Court from these documents. In a sense, these documents lost credibility.

**195.**Accordingly, the cognizance of the case was taken on 19.03.2013, as pointed out by the learned Spl. PP, by going through only the charge sheet, statements of witnesses and documents annexed to the charge sheet and believing the same to be correct. The documents D-132 to D-274 were not taken note off as the same were twice dubbed by the prosecution as unrelied upon conveying to the Court that the documents are of no consequence to the prosecution. This resulted into not only taking cognizance of the case, but also into summoning of additional accused as well.

**196.**Even in their written submissions at this stage the prosecution is

labouring under the impression of "relied upon" and "unrelied upon" documents, as is clear from para 2.2 of their written arguments, which reads as under:

> "At this stage, the only documents that are relevant are the chargesheet and documents accompanying the chargesheet. Other unrelied upon documents are to be excluded from the realm of consideration at the stage of framing of charge."

## B. Curious Case of D-153

**197.** List of documents initially filed with the charge sheet contained documents D-1 to D-131 as relied upon documents. Thereafter, vide order dated 30.01.2013, as already noted, documents D-132 to D-274 were also placed on record, which were initially stated to be unrelied upon, but during arguments they were changed into relied upon documents. Sh. Shyamal Ghosh had filed an application dated 04.03.2015, seeking return of certain documents, which were seized by the CBI from his residence vide seizure memo dated 19.11.2011, as listed at serial No. 1 to 20 in the memo, stating them to be not relevant to the case. CBI filed reply to the said application under the signature of Sh. R. A. Yadav giving its no objection to the return of these documents and paragraph 4 is as under:

> "That, during investigation, these documents and items have not been found to be relevant to the offence as alleged in the instant chargesheet filed before this Hon'ble Court. In view of the above, the CBI has no objection if this Hon'ble Court is pleased to pass orders for release of seized documents, FDRs, locker keys and to issue

> necessary directions to the bank for operation of the
> said lockers as prayed for in the instant application
> filed by applicant/accused Sh. Shyamal Ghosh."

**198.**However, during arguments on the application, it came to notice that the documents sought by the accused have been filed in the Court as D-153 to D-171 and the prosecutor Sh. K. K. Goel, learned Sr. PP, with IO, opposed their return to applicant as the same had become part of the judicial record and the prayer of the accused was refused as far as these documents were concerned, except item No. 20, which were locker keys. Now the question is if these documents were found not to be relevant, why were they filed in the Court with the prayer that they may also be treated as relied upon documents?

**199.**Thereafter, the accused filed another application dated 25.03.2015 seeking the return of the same documents stating that the documents mentioned at serial No. 1 to 19 of seizure memo dated 19.11.2011 are his personal papers and documents relate to residential flat of the applicant, income tax returns, statements, bonds, FDRs, vehicle insurance policies etc. He further stated that these documents, though part of judicial record, are not relevant for the trial of the case and no prejudice would be caused to the prosecution if the same are returned to the applicant.

**200.**The CBI filed reply dated 01.04.2015, under signature of Sh. R. A. Yadav, and relevant part of which is as under:

> "**3.** That, as regards the remaining documents of the
> search list mentioned at its Sl. No. 1 to 19, it is
> submitted that the same have been relied upon as

Document No. 153 to 171 in this case. The prosecution, though, has no objection in return of these documents, however, the Hon'ble Court may kindly put on record the photocopies of these documents, duly certified by the applicant with an undertaking that he shall not dispute the recovery, authenticity and genuineness of the documents at any point of time."

**201.** These documents were ordered to be returned to the accused vide order dated 01.04.2015, with the direction that only document figuring at serial No. 1, D-153, of the seizure memo is an official paper and copy thereof alone be retained on the record of the Court and the accused shall not dispute either its recovery or authenticity in future.

**202.** The narration of the above events indicate that both the parties, that is, accused Shyamal Ghosh and prosecution, were ad idem that the aforesaid documents, that is, D-153 to D-171, were not relevant to the disposal of the case as the same were his personal papers. However, D-153 contains copies of Notes for full Telecom Commission dated 19th January 2001, copies of minutes of 70th meeting of full Telecom Commission held on 24th January 2001 and photocopies of part of TRAI report dated 08.01.2001, and some other sundry papers.

**203.** However, during arguments D-153 has been the most referred document, both by the prosecution as well as accused Shyamal Ghosh. This is clear from the volume of papers filed by the prosecution where it refers to this document at serial No. 9 and 10 and accused Shyamal Ghosh refers to

these documents at serial No. 19 of his volume. Accused Shyamal Ghosh has used this document to submit that while limiting the rate of AGR to 4% for spectrum beyond 6.2 MHz up to 10 MHz, he used the analogy of CDMA spectrum of 5MHz + 5MHz being allocated to WLL operators with 2% AGR to maintain level playing field between the two operators, that is, CMSP and WLL operators. In simple words, his case is that if 5MHz of spectrum is allocated with 2% AGR to WLL operators, then to maintain level playing field, 10 MHz of spectrum is required to be allocated to CMSP operators at 4% AGR. Whereas, the prosecution has used this document to emphasize the point that the level playing field/ parity was to be maintained otherwise, that is, initial tranche of 4.4MHz + 4.4 MHz to CMSPs was allocated with 2% of AGR and 5MHz + 5MHz was allocated to WLL operators at 2% AGR, then if further spectrum is to be allocated to WLL operators, then they will follow the CMSP model, that is, each tranche of further spectrum would attract an additional 1% of AGR as WPC charges.

**204.** Now the issue is if the document was so important, why both parties termed it irrelevant at the beginning? The case is more serious for the prosecution. When Sh. K. K. Goel, Sr. PP, was questioned about the DoT file relating to this document, he had no clue except stating that the file was not seized.

**205.** It is thus clear that prosecution has no idea as to what their case is all about and what document they are relying upon and what documents they are not relying. The aforesaid facts make it clear that D-153 to D-171 were in the beginning unrelied upon documents, then vide order dated 30.01.2013

the CBI submitted that they also wish to rely upon unrelied upon documents, which included D-153 to D-171 also. Again, when Sh. Shyamal Ghosh requested for the return of these documents, they became not relevant for the CBI for disposal of the case. Again, D-153 becomes most important document for the CBI. I may note that documents D-132 to D-274 were deliberately rendered inconsequential by prosecution by twice dubbing them to be unrelied one. This is strange conduct of the prosecution.

**C. Non-production and concealment of documents**

**206.** TRAI recommendations dated 23.06.2000 and 24.10.2000 are part of D-274. NTP-99 is also part of this document. CMTS guidelines issued in first week of January 2001 are part of D-272. BSO guidelines with WLL facility are part of D-228. TRAI recommendations for BSOs dated 31.08.2000 and TRAI recommendations on WLL services by BSOs dated 08.01.2001 are not part of the record, despite TRAI letter dated 17.05.2012 to the IO, already extracted above. Furthermore, the files as to how the recommendations of TRAI dated 23.06.2000 and 24.10.2000, particularly in reference to allocation of additional spectrum to the existing operators, were dealt with in the department have not been produced before the Court. All these documents are important documents for the disposal of the case and the conduct of the prosecution in relegating most of these documents to a distant stage by not making them part of documents initially filed with the charge sheet and then dubbing them as unrelied upon and not placing on record certain other documents having important bearing on the case, cannot be approved of. It has resulted into a distorted understanding of the case.

Moreover, important documents like TRAI recommendations were placed in documents initially claimed to be unrelied upon in such adverse or strategic places that they cannot easily be found out by the Court. Furthermore, TRAI recommendations on BSOs with WLL services, which have most important bearing on the case, have not been placed on the Court record. Files relating to migration package, except one file in which opinion of learned AG was sought, that is, D-14, and D-134 which relates to technical matters, have not been placed on the Court record. The issue is what led the Government to offer migration package and what was the financial health of the telecom industry at that time. Then, files relating to the processing and disposal of applications of the companies, which they had made in 1999 and 2000 seeking additional spectrum have also been withheld from the Court, except the applications as already noted above which are contained in D-108 and 109.  As such, it is not clear as to how the applications were dealt with and what were the views of the department regarding the prayer for additional spectrum of the existing operators. With great difficulty only one letter dated 09.04.2001 could be traced in D-140, whereby additional spectrum was declined.

It is thus clear that important documents have been withheld from the Court or attempts have been made to distract the attention of the Court from the important documents.

**D.** **Burdening the Court with irrelevant documents**

**207.** As already noted above the prosecution has stated that entire bunch of documents listed as D-1 to D-274 are its relied upon documents. It is a case

of criminal misconduct under Section 13(1)(d) of PC Act pertaining to misuse of official power by public servants. It is not a DA case. In such a situation, how can personal papers of Sh. Shyamal Ghosh listed at D-154 to D-171, D-223, D-236 to D-240, D-243 and D-245 to D-250 can be of any use to the prosecution. Similarly, there are personal papers of Sh. J. R. Gupta from D-172 to D-177, D-233 to D-235 and D-244. Similarly, D-16 is a file relating to a Delegation for the meeting of ITU in Queens Town, New Zealand in March 2002. D-17 is about a vacancy in ITU. Of what use these can be to the prosecution? This has been done to just burden the Court with unnecessary papers, so that its attention is distracted from the real issues. There are numerous other papers which are of no use to the prosecution, but have been placed before the Court by stating that every document is relied upon document without explaining its relevance to the prosecution.

**208.**When a document has been placed before the Court and it is claimed that it is a relied upon document, then the Court is required to read every document and in such a process lot of time is wasted and attention is distracted from the important papers. Apart from that that there is flip-flop of the prosecution regarding relied upon and unrelied upon documents and most of the important papers were found to be in the papers initially claimed to be unrelied upon. This dichotomy was deliberately done by the prosecution or the IO as they knew that sooner or later the Court would come to know of these documents and in that case, they can easily claim that the documents were already with the Court. Many working days have been wasted in these unnecessary papers and searching out the documents which

really matter for the case.

### (J)Contradictory stand of witnesses inter se and vis-a-vis Documents

**209.**In this case, witnesses have made contradictory statements and also statements against the record on some very important points. PW 4 Sh. J. R. Gupta states that the matter was discussed in the forenoon with Member (F), where officers from WPC were also present. Even his note dated 31.01.2002 records that the matter was discussed at length. However, in his statement Member (F) Sh. R. Ramanathan states that he might have discussed the allocation of additional spectrum in general, but he does not recall having discussed anything specific, as mentioned in the note of Sh. J. R. Gupta. He also states that he had not given any financial concurrence. However, note of Sh. R. K. Srivastava, Engineer, dated 01.02.2002 in D-2 at 55/N, also records that the subject matter was discussed yesterday by Member (P/F) in detail. He also records that subsequently discussions were also held with Chairman (TC). However, in his statement he gives up this record and says that no concurrence of Member (F) was obtained. Similar is the fate of PW 20 Sh. P. K. Garg, the then Wireless Advisor and he evades responsibility by claiming that it was his first day in office. Similar contradictions are there in the statements of other witnesses also, inter se as well as with the documents on record. The approach paper in D-6 also states that the matter of allocation of additional spectrum was discussed by Member (F). This file was seen by Member (F) on 05.01.2002. File D-4 in which allocation of additional

spectrum was approved by Minister on 31.01.2002 was also seen by Member (F) on 05.02.2002, as is indicated by his signature on 5/N. Above his signature is a note of Sh. Shyamal Ghosh in which, he, inter alia, recorded that a decision has been taken separately to increase the spectrum. It is clear that witnesses are taking stands contradictory not only to each other, but to the record also. It is also to be noted that in case of financial matters, if the view of Member (F) are not obtained or are ignored, he had access to the Finance Minister. There is no material on record that Member (F) exercised this option. This conduct indicates his consent or concurrence or at least acquiescence to what had happened. What would be the impact of this contradictory stand of the witnesses on the case of the prosecution. This is also an issue to be pondered over. On important issues, there are almost two versions.

**210.**The above facts explain the sequence of events as they happened prior to the relevant date, that is, 31.01.2002, and facilitate easy understanding of long, tedious and complicated facts.

In the light of the above facts, I proceed to consider the issue whether prima facie case is made out warranting framing of charge against the accused or not. Whether the facts, as narrated in the charge sheet, disclose true and full events leading to the passing of the order dated 31.01.2002? Whether the allegations in the charge sheet are as per the documents and the statements on record? Whether the allegations in the charge sheet can be taken at their face value in the light of material on record, as extracted above? Whether the allegations in the charge sheet are as per material on record or it contains

allegations without any factual foundation? Whether entire material on record and surrounding circumstances were taken into consideration by the investigating agency at the time of drafting the charge sheet or it contains a blinkered view of events based on distorted facts? The most important question in such circumstances would be whether the material in the charge sheet can be taken to be true, as forcefully pleaded by Sh. Anand Grover, learned Spl. PP?

**211.** Sh. Anand Grover, learned Spl. PP, has emphasized with great energy and vigour that only contents of charge sheet and documents attached therewith and statements of witnesses are to be considered for considering whether charge is made out or not. He has further submitted that at this stage entire material is to be taken as true and evidentiary value thereof cannot be considered. He has referred to several cases for emphasizing that material provided by the prosecution with the charge sheet only is to be considered and the same is required to be taken as true. He has specifically invited my attention to paragraph 16 of **Debendra Nath Padhi (supra)**, which is as under:

> "All the decisions, when they hold that there can only be limited evaluation of materials and documents on record and sifting of evidence to prima facie find out whether sufficient ground exists or not for the purpose of proceeding further with the trial, have so held with reference to materials and documents produced by the prosecution and not the accused. The decisions proceed on the basis of settled legal position that the material as produced by the prosecution alone is to be considered and not the one produced by the

accused. The latter aspect relating to the accused though has not been specifically stated, yet it is implicit in the decisions. It seems to have not been specifically so stated as it was taken to be a well-settled proposition. This aspect, however, has been adverted to in *State Anti-Corruption Bureau v. P. Suryaprakasam* where considering the scope of Sections 239 and 240 of the Code <u>it was held that at the time of framing of charge, what the trial court is required to, and can consider are only the police report referred to under Section 173 of the Code and the documents sent with it</u>. *The only right the accused has at that stage is of being heard and nothing beyond that.* (emphasis supplied) The judgment of the High Court quashing the proceedings by looking into the documents filed by the accused in support of his claim that no case was made out against him even before the trial had commenced was reversed by this Court. It may be noticed here that learned counsel for the parties addressed the arguments on the basis that the principles applicable would be same – whether the case be under Sections 227 and 228 or under Sections 239 and 240 of the Code."

<u>212.</u>However, case law is required to be read in the light of facts of each case. I find myself in agreement with the learned Spl. PP that at the stage of charge, facts, as presented by the prosecution, are to be taken as correct, but it is not a holy mantra to be blindly followed in all cases under all circumstances. First of all it is to be understood that Court orders are not be read as provisions of a statute. They are to be read in the light of the facts and circumstances of a case. It is instructive to take a look on law regarding

reading of judgments of superior Courts. In this regard, it is relevant to quote an authority reported as **Madhav Rao Jivaji Rao Scindia Vs. Union of India, (1971) 1 SCC 85**, wherein Hon'ble Supreme Court, in paragraphs 228 and 229 observed, as under:

"**228**. But these observations are obiter. The learned Judges in that case had no occasion nor did they go into the scope of Article 291 or Article 363. Every observation of this Court is no doubt entitled to weight but an obiter cannot take the place of the ratio. Judges are not oracles. In the very nature of the things, it is not possible to give the same attention to incidental matters as is given to the actual issues arising for decision. Further much depends on the way the case is presented to them.

**229**. In *State of Orissa v. Sudhansu Sekhar Misra* [AIR 1968 SC 647 : (1968) 2 SCR 154 : (1968) 2 SCJ 263] dealing with the question as to the importance to be attached to the observations found in the judgments of this Court, this is what this Court observed:

"A decision is only an authority for what it actually decides. What is of the essence in a decision is its ratio and not every observation found therein nor what logically follows from the various observations made in it. On this topic this what Earl of Halsbury, L.C. Said in *Quinn v. Leathem*, (1901) AC 495:

'Now before discussing the case of *Allen v. Flood*, (1898) ACI and what was decided therein, there are two observations of a general character which I wish to make, and one is to repeat what I have very often said before, that every judgment must be read

<u>as applicable to the particular facts proved or assumed to be proved, since the generality of the expressions which may be found there are not intended to be expositions of the whole law, but governed and qualified by the particular facts of the case in which such expressions are to be found</u>. The other is that a case is only an authority for what it actually decides. I entirely deny that it can be quoted for a proposition that may seem to follow logically from it. Such a mode of reasoning assumes that the law is necessarily a logical code, whereas every lawyer must acknowledge that the law is not always logical at all'.

<u>It is not a profitable task to extract a sentence here and there from a judgment and to build upon it</u>."

**213.** Similar observations are there in an authority reported as **Islamic Academy of Education and Another Vs. State of Karnataka and Others, (2003) 6 SCC 697**, wherein paragraph 139 reads as under:

"<u>A judgment, it is trite, is not to be read as a statute</u>. The *ratio decidendi* of a judgment is its reasoning which can be deciphered only upon reading the same in its entirety. The *ratio decidendi* of a case or the principles and reasons on which it is based is distinct from the relief finally granted or the manner adopted for its disposal........................."

**214.** Furthermore, while dealing with reading and understanding of observations of the superior Courts, Hon'ble Supreme Court in another authority reported as **Bharat Petroleum Corporation Ltd. and Anr. Vs. N. R. Vairamani and Anr., 2004 IX AD (SC) 556**, observed in paragraph 9 as

under:

> "**9**. Courts should not place reliance on decisions without discussing as to how the factual situation fits in with the fact situation of the decision on which reliance is placed. <u>Observations of Courts are neither to be read as Euclid's theorems nor as provisions of the statute and that too taken out of their context. These observations must be read in the context in which they appear to have been stated. Judgments of Courts are not to be construed as statutes. To interpret words, phrases and provisions of a statute, it may become necessary for judges to embark into lengthy discussions but the discussion is meant to explain and not to define</u>. Judges interpret statutes, they do not interpret judgments. They interpret words of statutes; their words are not to be interpreted as statutes. In **London Graving Dock Co. Ltd.** Vs. **Horton** (1951 AC 737 at p.761), Lord Mac Dermot observed:
>
> <u>**"**The matter cannot, of course, be settled merely by treating the ipsissima vertra of Willes, J as though they were part of an Act of Parliament and applying the rules of interpretation appropriate thereto. This is not to detract from the great weight to be given to the language actually used by that most distinguished judge."</u>

**215.** It is also useful to quote para 10 of **Prafulla Kumar Samal (supra)**, which contains basic law on charge, which is as under:

> "Thus, on a consideration of the authorities mentioned above, the following principles emerge:
> That the Judge while considering the question of

framing the charges under Section 227 of the Code has the underlined power to sift and weigh the evidence for the limited purpose of finding out whether or not a prima facie case against the accused has been made out:

Where the materials placed before the Court disclose grave suspicion against the accused which has not been properly explained the Court will be fully justified in framing a charge and proceeding with the trial.

The test to determine a prima facie case would naturally depend upon the facts of each case and it is difficult to lay down a rule of universal application. By and large however if two views are equally possible and the Judge is satisfied that the evidence produced before him while giving rise to some suspicion but not grave suspicion against the accused, he will be fully within his right to discharge the accused.

That in exercising his jurisdiction under Section 227 of the Code the Judge which under the present Code is a senior and experienced Court cannot act merely as a Post Office or a mouth-piece of the prosecution, but has to consider the broad probabilities of the case, the total effect of the evidence and the documents produced before the Court, any basic infirmities appearing in the case and so on. This however does not mean that the Judge should make a roving enquiry into the pros and cons of the matter and weigh the evidence as if he was conducting a trial".

**216.** Now I proceed to discuss the case issue/ fact-wise.

**I.Recommendations of TRAI not sought.**

**217.**A major allegation in the charge sheet is that before passing order dated 31.01.2002, the DoT was required to obtain recommendations of TRAI regarding the quantum of additional spectrum to existing operators as well as percentage of AGR to be charged as WPC charges. Since Telecom Regulatory Authority of India is a statutory body, created under the Telecom Regulatory Authority of India Act, 1997, not seeking its recommendations may render an act illegal. Hence, this is the most important issue to the examined. The case of the prosecution is that before passing the aforesaid order, no recommendations were sought, while defence is submitting that TRAI recommendations were already there being recommendations dated 23.06.2000 and 24.10.2000.

Section 11 (1)(a) of the Act reads as under:

> "**11.    Functions    of    Authority.-**    [(1) Notwithstanding anything contained in the Indian Telegraph Act, 1885 (13 of 1885), the functions of the Authority shall be to-
>
> *(a)* make recommendations, either *suo motu* or on a request from the licensor, on the following matters, namely:-
>
> *(i)* need and timing for introduction of new service provider;
>
> *(ii)* terms and conditions of licence to a service provider;
>
> *(iii)* revocation of licence for non-compliance of terms and conditions of licence;
>
> *(iv)* measures to facilitate competition and promote efficiency in the operation of telecommunication services so as to facilitate growth in such services;
>
> *(v)* technological improvements in the services

provided by the service providers;

*(vi)* type of equipment to be used by the service providers after inspection of equipment used in the network;

*(vii)* measures for the development of telecommunication technology and any other matter relatable to telecommunication industry in general;

*(viii)* efficient management of available spectrum;

…..........................................................................

.............................................,,

**218.** It is the case of the prosecution that while granting spectrum beyond 6.2 MHz up to 10 MHz vide order dated 31.01.2002, which was notified on 01.02.2002, recommendations of TRAI were not sought. In this regard, the statement dated 31.08.2012 of PW 23 Sh. A. K. Srivastava is relevant, wherein he states as under:

"..........................................................................

.............................................

As such the recommendations of TRAI u/s 11 (1) (b) of the TRAI Act, 1997 was mandatorily required to be sought by DoT before issuing the order dtd. 01.02.2002 for allocating additional spectrum beyond 6.2 MHz + 6.2 MHz. In fact, no such recommendations were taken from TRAI in the year 2002 nor this proposal was placed before Telecom Commission."

**219.** PW 5 Sh. Nripendra Misra, the then Chairman, TRAI, and PW 7 Sh. Jaipal Singh Tomar, Joint Advisor, TRAI, have also stated that on such issues, TRAI recommendations are required. PW 8 Sh. Sumeet Hemrajani,

Technical Officer, TRAI, has also stated that no such recommendations were sought.

However, I have already extracted above in detail the recommendations dated 23.06.2000 and 24.10.2000, wherein the TRAI had highlighted the inadequacy of spectrum to the existing operators and even insisted on the DoT to intimate it about the availability of spectrum for these existing operators as well as fresh entrants. In response to this, Sh. J. R. Gupta wrote a letter dated 10.10.2000 to TRAI intimating it about the availability of spectrum and earmarking of 12.5 MHz + 12.5 MHz of spectrum in 900 MHz band for the existing operators. TRAI has, in fact, stopped short of recommending the entry of Fourth Cellular till it was informed about the availability of spectrum. Only on the information being sent to it through this letter dated 10.10.2000, that it recommended the entry of Fourth Operator vide letter dated 24.10.2000, again highlighting the inadequacy of spectrum to the existing operators and making a case for consideration of their request for additional spectrum. As such, it is not true to say that there were no TRAI recommendations. In fact, TRAI had given priority to existing operators as far as their case for consideration of additional spectrum is concerned.

PW 29 Sh. Vinod Vaish, the then Secretary (T), who joined on 01.06.2002, states in his statement:

> "I was also made aware at that time that TRAI has pointed out to the DoT that for improvement in quality of service, the existing service providers need to be allocated additional spectrum and in support of this contention, TRAI had mentioned about the allocations of higher quantity of spectrum

in other countries of the world"

**220.** Regarding allocation of spectrum, he, inter alia, states:

> "Approval of MOC&IT was taken on the file of Wireless Wing and the proposal has the approval of the then Member (Technology) in the Telecom Commission. <u>It was not necessary to consult TRAI on this matter as the TRAI opinion was already available in the records of DoT wherein it had been pointed out that the existing mobile operators needed additional spectrum for maintaining the desired Quality of Service Standards</u>."

**221.** PW 4 Sh. J. R. Gupta in his statement dated 20.06.2012 called TRAI recommendations as strong observations of TRAI on paucity of spectrum to existing cellular operators, wherein he states as under:

> "<u>With a view to bring balance of all these factors and keeping in view the TEC Committee recommendations as well as strong observations in TRAI about paucity of spectrum to cellular operators, a view point emerged unanimously during the meeting that additional 1.8 MHz spectrum should be given to the operators beyond the existing 6.2 MHz</u>."

**222.** This is for the first time that there is any material on the record indicating the weight given to TRAI observations. However, both the witnesses were not questioned as to which TRAI recommendations or observations were they referring to. It is obvious that the witnesses were referring to the recommendations dated 23.06.2000 and 24.10.2000, as

already noted above.

**223.**As noted above, TRAI recommendations dated 23.06.2000 and 24.10.2000 are already there, emphasizing the need for allocation of additional spectrum to existing operators, particularly in the metro cities of Delhi and Mumbai. Now the question is: when the recommendations are already there, why this ground has been taken in the charge sheet?  A close reading of the charge sheet would make it clear that the charge sheet begins with the representation of COAI on 04.10.2001 to the DoT. Earlier events have not been taken note of in the charge sheet. This reading of limited events gives an impression that for order dated 31.01.2002, separate recommendations were required, though the same are already there. The TRAI went to the extent of not making specific recommendations for the entry of fourth cellular operator in its recommendations dated 23.06.2000 unless a full report was received from DoT on the quantum of spectrum being made available to the CMSPs, existing as well as proposed new entrants and its location, that is, whether it is going to be in the 900 MHz or 1800 MHz bands. Only when the availability of spectrum was conveyed by DoT to TRAI vide its letter dated 10.10.2000, inter alia, stating that 12.5+12.5 MHz is earmarked to the existing operators in 900 MHz band, that it recommended the entry of fourth operator in its recommendations dated 24.10.2000, yet again emphasizing the need for making available spectrum to the existing operators.

**224.**TRAI recommendations are not to be sought on day-to-day basis. They are to be sought or given as and when needed. Section 11 of TRAI Act does

not prescribe any time limit or interval for seeking recommendation for the Government or for TRAI to give them suo motu. However, NTP-99 prescribes that in reference to entry of new operators, they are to be sought every two years. As such, the recommendations regarding allocation of spectrum to the existing operators given by TRAI on 23.06.2000 and 24.10.2000 were fully applicable in the instant case and this has been endorsed by Sh. Vinod Vaish and Sh. J. R. Gupta also, as noted above.

It is to be noted that these recommendations cover both inadequacy of existing spectrum to the existing operators and also need for additional spectrum and also the rate at which spectrum is to be charged. In brief, the need for allocation of additional spectrum as well as charges for spectrum, both are covered. The licence fee was pegged at 17% inclusive of spectrum charges.

In view of the above discussion, I find myself in agreement with the learned defence counsel that TRAI recommendations were already there and DoT was not required to ask for fresh recommendations. This view is further strengthened by the conduct of the prosecution in concealing these two recommendations in documents which were initially dubbed as unrelied upon with a view to distract the attention of the Court at the time of taking cognizance of the case and at subsequent stages also.

**II. Allotment of spectrum beyond 6.2 MHz up to 10 MHz in efficient band of 900 MHz instead of 1800 MHz.**

**225.** The case of the prosecution is that as a result of conspiracy between the

accused public servants and the companies, additional spectrum was allocated to the three companies in the most efficient band of 900 MHz, though as per the order dated 01.02.2002, the spectrum was to be allocated in 1800 MHz band. It is the case of the prosecution that in this way the three accused companies have been wrongly favoured. The accused have denied this. Let me examine the issue in the light of material on record.

**226.**In this regard, the statement dated 20.03.2012 of PW 20 Sh. P. K. Garg, the then Wireless Advisor, is relevant, wherein he states as under:

> "..............................................................................
> ..................................................
>
> Qu.The additional spectrum in 900 MHz bands being more efficient and effective than that of in 1800 MHz band was allocated by you to Bharti Airtel and Hutchison Max i.e. Vodafone Ltd. in order to show favour to them whereas the said spectrum in 900 band was not co-ordinated by JCES and moreover, the spectrum in 1800 band was co-ordinated for 4th Cellular Operator. What is your say in this regard, please explain?
>
> Ans:The Defence Services had expressed their difficulty in co-ordinating spectrum in 1800 MHz band in Delhi area, even for the 4th Cellular Operator, which has been explained in the detailed statement above. Large number of meetings were held with them, during first half of 2002 in addition to exchange of letters up to the level of Ministers of Communications and Defence. In one of the meetings, the Defence representatives had proposed if partial co-ordination in 1800 MHz band and another part in 900 MHz band would serve the purpose. It was replied to Defence Services that

spectrum in one band only was required for 4th Cellular Operator. However, some spectrum which could be co-ordinated by them in 900 MHz band, could be used for additional spectrum requirements of existing service providers, for which demands had already come up after issue of orders dtd. 01.02.2002 regarding additional spectrum beyond 6.2 MHz. At that point of time, no significant difference between 900 and 1800 MHz band was felt and also the spectrum charges were uniform, irrespective of allotment of spectrum in 900 or 1800 MHz band.

During these meetings with Defence Services, various technical measures like change of one or two Defence troposcatter frequencies, and use of better filters for Defence troposcatter equipment were also discussed, however, these were not found feasible. In consultation and agreement with Defence Services, interference trial was conducted from mid July, 2002 onwards on specific frequencies in 900 MHz and 1800 MHz bands. Those frequencies where interference was observed, were changed for further trials. After the Defence Services had co-ordinated specific frequencies based on these trials, these were earmarked to the 4th Cellular operator in Delhi as well as additional spectrum for existing operators i.e. Bharti and Hutch in Delhi and Hutch in Mumbai. Hence, the allotment of spectrum beyond 6.2 MHz in 900 MHz band was due to these technical constraints of Defence Services and not as favour to anyone."

**227.** Further, the statement of PW 29 Sh. Vinod Vaish, the then Secretary (T)

is also important, which is extracted as under:

"Q.In view of the approval of the then MoC&IT dated 31.01.2002 and the order dated 01.02.2002 issued by Sh. R. K. Srivastava, Engineer WPC Wing on the basis of the said approval of the Minster, additional spectrum beyond 6.2 MHz + 6.2 MHz was approved in 1800 band only. There was sufficient frequency available in 1800 MHz band in spite of it you preferred to recommend the trial for allocation of additional spectrum in 1800 band for 4th cellular operator whereas recommended in 900 band for existing telecom operators of Delhi and Mumbai Metro. The frequencies in 900 band were more efficient and smoother than those of in 1800 band and thereby it was deliberately opted to recommend frequencies in 900 band to existing telecom operators in order to show them undue favour. What is your say in this regard?

Ans.With regard to the availability of 1800 MHz band, it is clarified that the spectrum in 1800 band was not available in sufficient quantity at that time in Delhi and Mumbai Service Metro areas. Defence authorities had expressed difficulties in this regard which was taken into account for arriving at a practical solution. It is clearly recorded in the file by the Wireless Advisor, Sh. P. K. Garg, that the Defence authorities has expressed their inability to release spectrum in the 1800 MHz band for providing it to the existing operators, but instead, had offered to explore the same in the 900 MHz band. At the relevant point of time when this decision was taken there was no distinction in valuation of spectrum between these two bands. If

the DoT had stuck to the earlier view indicated in the OM dated 01.02.2002 to assign additional spectrum in the 1800 MHz band only, and rejected the offer to Min of Defence to explore vacation of spectrum in the 900 MHz band, it would have given a poor and negative image to the Dept and the connectivity related problems wherever subscriber base had crossed 5 lacs would have deteriorated and revenue loss would have been caused to the Govt.  <u>Whatever coordinated by the Ministry of Defence was assigned as per the eligibility to the operator concerned.  No grievance alleging any discrimination came to light nor did anyone move any Court of Law in this regard.</u>  This decision was taken with the approval of then MoC and IT late Pramod Mahajan.  With regard to the earmarking of the frequencies, I state that I was guided in regard to these technical details by the Wireless Advisor and Member (Technology), Telecom Commission who were the technical experts in the department on this matter."

**228.** This is also supported by file notings dated 17.06.2002 and 05.07.2002 (D-130). In note sheet dated 17.06.2002, relating to fourth cellular operator coordination of frequency spectrum, inter alia, it has been recorded by Sh. R. K. Srivastava, Engineer, in paragraphs 5 and 6 as under:

"5. During informal discussions with defence representatives, which are continuing on frequent basis, it was learnt that coordination of spectrum for Delhi, Jodhpur, Bikaner and Hoshiarpur is extremely difficult, <u>Delhi posing the maximum problem.  Still, they are working on it for a solution.  In between, the defence services had also enquired if coordination for part of the spectrum in</u>

<u>1800 MHz band and the remaining in 900 MHz</u>, <u>would serve the purpose</u>, to which they have been informed that it would make the network planning extremely complex, go against the principle of level playing field, in addition to higher network cost, and thus might not be acceptable to the service provider.

6. Also, we have requested for coordination of additional spectrum for the existing two service providers each in Delhi and Mumbai, for growth of their services, as they have crossed / about to cross the subscriber base of 5 Lakh.  <u>In view of difficult situation, we had informed the defence services that additional spectrum for the existing operators can be coordinated in 900 MHz band, as their networks are already using this frequency band, though we had indicated to the existing operators that spectrum for further expansion might have to be assigned in 1800 MHz band</u>."

**229.**It is also interesting to note as to what Sh. Shyamal Ghosh, Secretary (T), recorded on 03.10.2000 in 32/N in file No. 842-153/98-VAS(Vol.VIII) Part, extract of which are available in D-76, a file relating to frequency spectrum for fourth cellular operators, which note sheet was approved by the Minister of Communications also on 09.10.2000, which has already been extracted above in full, but para 3 of which is again extracted for ready reference, which reads as under:

"3.As regards spectrum, theoretically, 50 MHz should be available in 900 MHz band.  <u>By providing 6.2 MHz + 6.2 MHz for each of the cellular operators in this frequency band, it should</u>

be possible to accommodate three private cellular operators and BSNL / MTNL in this frequency band. However, it appears from the report of the WA that the entire 50 MHz may not be available because some of it may be occupied by Defence and other services. I would suggest that we may keep whatever is residual spectrum available in this frequency for additional requirement of the three existing licensees and provide spectrum for the fourth operator (new private operator) in the higher band of 1.7 / 1.8 GHz. While this may pose certain operational difficulty regarding roaming between 900 MHz and 1.8 GHz, with dual band terminals this difficulty can be overcome. Similarly, while equipments for 1.8 GHz may be somewhat more costly, the number of subscribers covered by each cell would be on the higher side which may more than compensate the higher cost. Therefore, we may report to TRAI that spectrum will be available on the lines indicated in the draft. In the draft, we are also referring to the modification of definition of Adjusted Gross Revenue."

**230.** This note sheet indicates that 900 MHz band was already earmarked for allocating additional spectrum to existing operators and TRAI was also informed about this.

**231.** As per PW 20 Sh. P. K. Garg, during the year 2001-02, Bharti Airtel, Sterling Cellular (later Hutch and Vodafone) and Idea Cellular were the three service operators in Delhi metro service area and Hutchison Max (later Vodafone), BPL Cellular and Bharti Airtel were in Mumbai metro service area, apart from MTNL. It is to be noted that existing operators had already

been allocated spectrum up to 6.2+6.2 MHz and they were requesting for spectrum beyond 6.2 MHz and this note of Sh. Shyamal Ghosh is required to be read in this background. Bharti Cellular was allocated start-up spectrum of 4.4+4.4 MHz for Delhi service area on 31.05.1995 and further additional spectrum on 1.8+1.8 MHz in 900 band on 31.12.1996. Similarly, Hutchison Max Telecom (P) Limited was allocated start-up spectrum of 4.4+4.4 MHz on 31.05.1995 and was allocated additional spectrum of 1.8+1.8 MHz in 900 band on 04.02.1997 for Mumbai metro service area. Sterling Cellular Limited was allocated start-up spectrum of 4.4+4.4 MHz on 05.07.1995 and additional spectrum of 1.8+1.8 MHz on 31.12.1996, both in 900 band for Delhi metro service area. This is also clear from the close reading of TRAI recommendations dated 23.06.2000 and 24.10.2000, as the existing operators were demanding spectrum beyond 6.2 MHz as they had already got 4.4+4.4 MHz and 1.8+1.8 MHz. TRAI was speaking for existing operators, most of whom were demanding spectrum beyond 6.2 MHz as fourth operator had not yet entered.

It is thus clear that department had kept residual spectrum earmarked for the existing operators in 900 MHz band and had also reported the same to the TRAI. The witnesses state that though the order dated 01.02.2002 envisaged that additional spectrum was to be allocated to the existing operators in 1800 MHz band, but ultimately it was allocated in 900 MHz band on account of technical constraints. This band was initially earmarked for the existing operators as they were already operating in this band. Despite my best efforts, I could not lay my hand on any document or statement to the effect

that band was wrongly changed.

As such, it cannot be said that the band was changed for extraneous reasons.

## III.Approval of Telecom Commission, concurrence of Member (F) and Hasty Decision

**232.**It is the case of the prosecution that grant of spectrum beyond 6.2 MHz up to 10 MHz and also the percentage of AGR which was to be charged for each tranche of 1.8 MHz of additional spectrum were required to be approved by Telecom Commission, these being policy matters. It is the case of the prosecution that no approval of Telecom Commission was sought before approval was granted by late Sh. Pramod Mahajan on 31.01.2002 in this regard on the recommendation of Sh. Shyamal Ghosh and consequent to which formal order was issued on 01.02.2002. It is also the case of the prosecution that in such matters, concurrence of Member (F) was also mandatory, which was also not obtained. It is the case of the prosecution that ignoring all these procedures, a hasty decision was taken by late Sh. Pramod Mahajan on the recommendation of Sh. Shyamal Ghosh and the decision was the result of criminal conspiracy between these two high ranking public servants and the three companies.

**233.**The issue whether approval of Telecom Commission was taken or not and what were the views of Member (F) in this regard is required to be considered in the light of material on record and while taking note of this it would also become clear if the decision was hasty or not. All these issues are inter-linked. So, I wish to take them together.

**234.**The Telecom Commission was constituted as per Government resolution dated 11.04.1989 (D-119). The Telecom Commission shall be responsible:

> (a)For formulating the policy of Department of Telecommunications for approval of the Government;
>
> (b)…...............................................
>
> (c)…..............................................."

**235.**As per para 5 of this resolution, the duties and powers of Chairman, Telecom Commission, are as under:

> (a)The Chairman, in his capacity as Secretary to the Government of India in the Department of Telecommunications, shall be responsible under the Ministry of Communications for arriving at decisions on technical questions and advising Government on policy and allied matters of telecommunications. All recommendations of the Commission on policy and allied matters shall be put to the Minister of Communications through the Chairman.
>
> (b)<u>In case of any difference of opinion in the meetings of the Commission, the decision of the Chairman will be final, but in financial matters, Member (Finance) of the Commission will have access to Finance Minister</u>.
>
> (c)…..............................................."

**236.**PW 6 Sh. C. Vardarajan, the then Member (T), and PW 15 Dr. Ashok Chandra, the then Deputy Wireless Advisor, later on Wireless Advisor, have stated that the matter was required to be placed before Telecom Commission for approval. PW 25 Sh. Tarun Mittal, Section Officer, TC, has stated that the

matter was not placed before Telecom Commission.

**237.**The issues of allotment of additional spectrum and WPC charges were discussed by Sh. Shyamal Ghosh, Secretary (T), with COAI on 04.10.2001, when a presentation was made by COAI to the department, in which Member (F) was also present. The operators were demanding additional spectrum, but the department was not in favour of that.

**238.**However, note sheet dated 04.01.2002, at 7/N in D-6, speaks about an approach paper in the light of discussion of yesterday, which has been seen by Wireless Advisor as well as Member (F) and had been marked to Chairman (TC), on a note being initiated by Sh. J. R. Gupta and the approach paper is regarding additional frequency allotment to cellular mobile telephone operators and paragraphs 4 and 5 of the same are as under: (pages 375 and 376)

> "4.**Procedure for allocation of additional spectrum**:
>
> 4.1The conditions announced in the Tender document and stipulations in NTP99 with regard to spectrum allocation may be kept in view.
> (i)The Tender document stipulated the following:-
> "... … … the cellular licensees shall pay spectrum charges on revenue share basis of 2% of AGR towards WPC Charges covering royalty payment for the use of cellular spectrum upto 4.4 MHz + 4.4 MHz and Licence fee for Cellular Mobile handsets & Cellular Mobile Base Stations and also for possession of wireless telegraphy equipment as per the details prescribed by Wireless Planning & Coordination Wing (WPC). Any additional band width, if allotted subject to availability and

justification shall attract additional Licence fee as revenue share (typically 1% additional revenue share if Bandwidth allocated is upto 6.2 MHz + 6.2 MHz in place of 4.4 MHz + 4.4 MHz)."

(ii)The NTP-99 stipulates the following with regard to spectrum for cellular services:-

"It is proposed to review the spectrum utilization from time to time keeping in view the emerging scenario of spectrum availability, optimal use of spectrum, requirements of market, competition and other interest of public. The entry of more operators in a service area shall be based on the recommendation of the TRAI who will review this as required and no later than every two years."

5.The following approach could be adopted:-

(i)The spectrum of 3.8 Mhz may be allotted equally to the four operators in Delhi & Mumbai Metros; there is no justification for additional spectrum at other places.

(ii)A suitable one time fee could be charged for the additional spectrum."

**239.**This note sheet and the approach paper indicates that the issue of allocation of additional spectrum to the existing operators was discussed and debated in the department on 03.01.2002 and 04.01.2002, as the approach paper was put to Member (F) and other officers on 04.01.2002. The note sheet also indicates that the matter was urgent.

**240.**Further, on this point it is interesting to read the statement of Sh. R. N.

Aggarwal, the then Wireless Advisor. He states that a meeting was taken by the Minister regarding spectrum after the presentation was given by COAI in October 2001 and after this meeting of Minister, a technical committee under the chairmanship of Sh. N. K. Mangla was appointed on 23.10.2001. His statement dated 13.09.2001 reads as under:

> "On being asked, I, hereby state that to the best of my memory, a meeting was held by Late Sh. Pramod Mahajan, the then MoC&IT after the presentation given by COAI in October, 2001 seeking additional spectrum beyond 6.2 MHz. In the said meeting I was also called in which Sh. Ajoy Mehta, the then PS to the said MoC&IT, Sh. Shyamal Ghosh, the then Secretary (DoT) and TEC officers were also present. In the said meeting, the Technical Officers and I submitted that the better use of technology could avoid grant of additional spectrum which is really a scarce resource. We also submitted in the said meeting that there was no need for allocating additional spectrum beyond 6.2 MHz to the Service Providers requesting Delhi and Mumbai Service Areas. However, Late Sh. Pramod Mahajan, the said Minister was of the opinion that for growth of Telecom Sector additional spectrum might be necessary. Later on, a Technical Committee was formed under the chairmanship of Sh. N.K. Mangla as per the orders of Sh. Shyamal Ghosh in order to assess the optimal utilization of additional spectrum and the transparent basis for allocation of need based spectrum. The Committee gave its report in November, 2001 observing that the additional spectrum was not required for the period as mentioned in the said report. As regards the subsequent facts and events, I have already stated in my earlier statements."

**241.** This statement indicates that the matter was discussed by the Minister in which Sh. Shyamal Ghosh and other Technical Officers were present. After this meeting only, technical committee under Sh. N. K. Mangla was constituted as per the order of Sh. Shyamal Ghosh, though the Minister was in favour of allocation of additional spectrum.

**242.** Furthermore, it is also interesting to take note of the statement of PW 53 Sh. Ajoy Mehta, the then Private Secretary to late Sh. Pramod Mahajan, which reads as under:

> "................................................................................
> ...............................................
>
> Sh. Sunil Mittal of Bharti Cellular Ltd. (now Bharti Airtel) often used to meet late Sh. Pramod Mahajan at his office. Sh. Sunil Mittal had met the Minister during 2001-02 for getting allocated additional spectrum beyond 6.2 MHz for Delhi Service Area of Bharti. I had seen Mr. Sunil Mittal having met with late Sh. Pramod Mahajan. Mr. Rajeev Chandrashekhar, resident of Bangalore (who later on became MP) had been meeting late Sh. Pramod Mahajan at his office for additional spectrum for the company Hutch or BPL in Mumbai. Sometime in the later part of 2001 or early part of 2002, I had the occasion to attend one meeting chaired by the Minister in which Sh. Shyamal Ghosh, Secretary (DoT) and other officers of DoT including Wireless Advisor were also present. In the said meeting the Technical Officers had said that the better use of technology could avoid grant of additional spectrum which is a scarce resource. They thereby told that there was no need of additional spectrum. However, the said Minister i.e. late Sh. Pramod

> Mahajan insisted that grant of additional spectrum was necessary for growth of Telecom Sector and therefore, such proposal was put up by the DoT officers as I came to know later on (since this file was not routed through me) and the Minister took decision on the same day in the early part of 2002 for allocating additional spectrum beyond 6.2 MHz upto 10 MHz by charging 1% of AGR. …..........................................................................................................."

**243.** The statement indicates that a meeting was taken by the Minister in which Secretary (T) and other officers of DoT were present and the views of the Minister were different from the views of the officers. The Minister insisted on allocation of additional spectrum. The witness states that the Minister took the decision on the same day. This means that this meeting must have taken place on 31.01.2002, because the decision was taken by the Minister on this day alone.

**244.** It is to be noted that PW 28 Sh. R. N. Aggarwal and PW 53 Sh. Ajoy Mehta speaks of different meetings taken by Minister on different dates. It is clear from the statement of Sh. R. N. Aggarwal that after the meeting of the Minister, Technical Committee under Sh. N.K. Mangla was appointed. It is on record that Mangla Committee was appointed on 23.10.2001. On the other hand, Sh. Ajoy Mehta says that the meeting was held by the Minister in the later part of 2001 or early part of 2002, in which the Minister insisted that grant of additional spectrum was necessary for growth of telecom sector and a proposal was put up on the same date on which decision was taken.

This is indicative of the fact that at least two meetings were taken by the Minister in this regard. One, somewhere in October, after which Secretary appointed the Mangla committee and the other either in later part of 2001 or early part of 2002, but most probably on 31.01.2002, as the decision was taken on this date.

**245.**Furthermore, PW 4 Sh. J. R. Gupta, the then DDG (VAS), has stated in his statement dated 02.03.2012, that:

> "Thereafter, on the verbal directions of Sh. Ghosh, Secretary (DoT), the matter was discussed in a meeting chaired by Sh. R. Ramanathan, Member (P/F) in his chamber on 31.1.2002 during pre-lunch period. Keeping the recommendation of TEC committee in mind and also the analogy of the past, it was decided in this meeting to propose allotment of only 1.8 MHz additional spectrum beyond 6.2 MHz in 1800 MHz band up to 8 MHz at an incremental charge of 1% of AGR.
>
> Towards the end of the office working hours on 31.1.2002, Sh. Ghosh, Secretary (DoT) called me on phone and asked me to submit the file with the proposal on the subject matter, as soon as possible, before leaving office on the said day i.e. 31.01.2002. While directing so he also conveyed to me that the Minister i.e. late Sh. Pramod Mahajan had asked him to send the file to him on the same day. Accordingly, I brought out the gist of discussions of the meeting of Member (P/F) in my note, though in a hurried manner.
> …..........................................................................
> .............................................
>
> After migration from fixed fee regime to revenue

sharing regime effective from 1-8-1999 as per Cabinet decision, charges of 2% & 3% respectively for 4.4 & 6.2 MHz of spectrum were decided in the recent past by the Telecom Commission and <u>an order dated 22/09/2001 was issued by WPC. Therefore, as per this precedence, charging of spectrum beyond 6.2 MHz, should have also been referred to the Telecom Commission for taking necessary decision</u>.

**246.** He further states in his statement dated 20.06.2012 as under:

"<u>I state that the Meeting taken by Member (F) / (P), Sh. R. Ramanathan in the forenoon of 31.01.2002 in his chamber wherein myself and officers from WPC (Wireless Planning and Coordination Wing) were present, was as per directions of Sh. Shyamal Ghosh, the then Secretary, DoT</u>. During the meeting chaired by Member (F) / (P), following aspects of the prevailing situation of mobile service Telecom Industry were deliberated:-

i. …........................................................

ii. …........................................................

iii. …........................................................

iv. …........................................................

v. <u>With a view to bring balance of all these factors and keeping in view the TEC Committee recommendations as well as strong observations of TRAI about paucity of spectrum to cellular operators, a view point emerged unanimously during the meeting that additional 1.8 MHz spectrum should be given to the operators beyond the existing 6.2 MHz</u>.

vi. Efficient and optimum utilization of spectrum, a finite natural resource, was also considered. It was observed that keeping in mind the TEC Committee recommendation of making available spectrum

12-18 months in advance of reaching the level of 9 lakhs customers, it would mean that such additional allotment should be made when the customer base is 5 lakhs, keeping in mind 80% annual growth (5% month on month growth). To take care of the processing time and coordination, it was agreed that operators may apply when there reach the level of 4 lakhs customer, however, the actual release of spectrum should take place after the customer base of 5 lakh is reached. Since one or two operators were nearing that stage, it was felt that it would be in order to issue the orders from DoT so that forward path is made known transparently, to all concerned, well in time.

vii. As regards charges for the additional spectrum, it was indicated by Member (F) / (P), being head of the Financial Wing as well as Financial Advisor to be DoT, that keeping in mind the analogy of the past of charging additional 1% for increase of 1.8 MHz from 4.4 MHz to 6.2 MHz, the same additional 1% charge should be applied to the additional spectrum of 1.8 MHz beyond 6.2 MHz. This was unanimously accepted in the meeting.

Keeping the recommendation of TEC in mind, analogy of the past and all the factors mentioned above it was decided in the meeting chaired by Member (F) / (P) to propose allotment of only 1.8 MHz additional spectrum beyond 6.2 MHz, in 1800 MHz band, at an incremental charge of 1% for so allotted full amount of 8 MHz. The decision for allotting higher spectrum to the level of 10 MHz, as demanded by the operators, was left to be taken in future.

I further stated that with regard to the implementation of the decision taken in file by MoC&IT, Late Sh. Pramod Mahajan, I sent the file

to the Wireless Advisor. Towards implementation of Minister's decision, a note was initiated on the very next day (i.e. 01.02.2002) in the WPC file by Mr. R. K. Srivastava, Engineer / WPC and signed by other WPC officer, which states: "*the subject matter was discussed yesterday (by) with Member (P) / (F) in detail. Subsequently, discussions were also held with Chairman (TC) (i.e. Sh. Shyamal Ghosh, Secretary, DoT)*" Clearly, the WPC officers were participants in the discussions with Member (F) / (P). They independently held subsequent discussions with Chairman (TC), Sh. Shyamal Ghosh. I am unaware about the details of the subsequent discussions as indicated in the WPC file, held between the then WPC officers (i.e. Sh. R. K. Srivastava and others) and the then Chairman (TC), Sh. Ghosh. Therefore, the statement in the note dated 01.02.2002 shows that there was no communication gap between the attendees of the meeting chaired by Member (F) / (P) on 31.01.2002 in which WPC officer and myself were present. Moreover, my note of 31.01.2002 at the end states (in print): "*the above scheme was also discussed by Member (F) with officers from WPC & he was agreeable to the scheme (he has gone out of station in the afternoon).*"

The WPC officers had seen this note the very next day and the note originated by them on 01.02.2002 affirmed discussions held by Member (F)(P). Their note was in continuation of and made reference to my note dated 31.01.2002. As such it is cleared that, my note dated 31.01.2002 in file is a true and faithful gist of the discussions and proposal arrived at in the meeting of 31.01.2002 chaired by the then Member (F)/(P), Sh. R. Ramanathan."

**247.**This statement of Sh. J. R. Gupta also indicates that the matter was discussed in a meeting in pre-lunch session in DoT under the chairmanship of Sh. R. Ramanathan, Member (F/P) on 31.01.2002 and TRAI observations were also taken note of. The witness also states that the meeting in the pre-lunch session took place on the direction of Sh. Shyamal Ghosh.

**248.**Statements of Sh. Ajoy Mehta and Sh. J. R. Gupta indicate that the matter was discussed twice on 31.01.2002, that is, once in a meeting taken by the Minister and other in a meeting chaired by Sh. R. Ramanathan, Member (F/P).

**249.**It is to be noted that though the views of the officers were different, but it is clear that the matter has been discussed at least four times in the department, that is, when an approach paper was prepared on 04.01.2002, in the light of discussion held yesterday, that is, 03.01.2002, then in a meeting taken by the Minister before the appointment of Mangla committee, then by the Minister in a meeting held on the day on which he passed the order, that is, 31.01.2002, and then in a meeting held under the chairmanship of R. Ramanathan in the morning of 31.01.2002.

Above discussion makes it clear that though the views of officers and Minister were different, but the matter of additional spectrum was discussed at least four times in the department.

**250.**Though not necessary, it is also interesting to note the views of the Secretary (T) Sh. Shyamal Ghosh vis-a-vis Minister late Sh. Pramod Mahajan. COAI made a presentation on 04.10.2001 before Sh. Shyamal Ghosh in which all officers of DoT including Member (F) were present. In

that meeting, Sh. Shyamal Ghosh observed that operators should convince DoT that the spectrum already allocated to them is being efficiently utilized and all possible technical solutions have been tried and exhausted before any further allocation of spectrum is considered (D-6, page 147). It is also decided to appoint a technical committee. Thereafter, as per PW 28 Sh. R. N. Aggarwal, a meeting is taken by the Minister in which the Minister was of the opinion that for growth of telecom sector additional spectrum might be necessary, though the officers were not in favour of that. By that time, technical committee was not appointed under Sh. N. K. Mangla. Though Minister was in favour of allocation of spectrum, but Sh. Shyamal Ghosh responded by appointing a technical committee on 23.10.2001, which gave its report on 21.11.2001, on expected lines, that is, on the same lines, as was taken by the department while dealing with earlier demands of the companies in its letter dated 09.04.2001, extracted above. Thereafter, Minister asked for information about the current status and the Secretary responds by recording note dated 10.01.2002 indicating that there was no immediate need for allocating additional spectrum by citing Mangla Committee report and making some other suggestions also. It is on the record that this note went to the PS Section of the Minister, as indicated in file D-6, but there is no signature of the Minister. Before the Minister could act on the note, the Secretary responds again by appointing a joint committee on congestion in second week of January 2002 under Sh. Asit Kadayan, which also gave report on the expected lines that there was no congestion, though it noted that some of the call drop was due to radio resource

congestion. Now the question is: when the Secretary and the Minister were differing on every point, how can they be conspirators? Moreover, Sh. Shyamal Ghosh was not in favour of allocating additional spectrum to the existing operators at least from 09.04.2001, when the letter was sent to COAI declining additional spectrum and thereafter, at every step, he was resisting it, despite commitment to TRAI that 12.5MHz + 12.5MHz has been earmarked for existing operators.

**251.**I may also note that reports of Mangla committee and Joint Committee on Congestion under Sh. Asit Kadayan do not otherwise inspire confidence as they are too technical in nature and take a narrow view of issues without taking note of:

(a)(i)TRAI recommendations dated 23.06.2000 and 24.10.2000 or observations as the prosecution call them, regardinginadequacy of spectrum for the existing operators and itsobservations that paucity of frequency spectrum wasadversely affecting the quality of service in number ofservice areas and that no further expansion of service ispossible unless additional spectrum is made available toexisting operators;

(ii)Nascent stage of telecom industry and local hindrances in erecting cell sides/ towers including Municipal laws;

(iii)Financial health of the telecom industry as technical solutions and establishment of towers require infusion of fresh capital and cannot be done overnight; and

(b)The reports are equivocal in nature, that is, one can read the same in any manner one feels like. If one wishes to grant spectrum, he can grant, if not

today, then tomorrow and if one wishes not to grant, he can refuse by taking recourse to these reports.

Ultimately these reports are meant to support the view of Sh. Shyamal Ghosh that no additional spectrum is required to be granted without countering the views of TRAI.

**252.**However, as per Sh. J. R. Gupta, in the end a consensus emerged that spectrum need to be allocated to the existing operators, though there are differences as to what for the consensus was.

The aforesaid discussion clearly indicates that the matter was discussed and debated in the department and, as such, it cannot be said that it was a decision taken unilaterally  in haste and without concurrence or consultation with Member (F). Though it is a fact that no formal decision was taken by the Telecom Commission, but the chairman Sh. Shyamal Ghosh and Member (F/P) Sh. R. Ramanathan were involved in discussion at all stages. It is also a fact that it was for the chairman to put the matter before Telecom Commission and not for others. PW 27 Sh. J. K. Roy, the then Member (T), has stated that such policy matters are normally put before the Telecom Commission. It is indicative of the fact that putting a matter before Telecom Commission is not compulsory, though normally it should be put. However, as noted above Sh. Shyamal Ghosh was always blocking allocation of additional spectrum and when he finally agreed, he agreed in a note recorded in laconic manner without citing any reason, which brought disaster to everyone, including himself.

This is the only procedural lapse which could be faulted but it may be due to

the fact that the the Secretariat of DoT and Telecom Commission, an 'attached office' type advisory body, are both headed by Secretary (T), as Secretary (T) is ex-officio Chairman of Telecom Commission, and also operate from the same building and are manned and serviced almost by same staff. The distance between the two institutions is not only blurred but almost totally eliminated. Furthermore, the four members, that is, Member (F), Member (T), Member (Productions) and Member (Services), are also senior officers of the department, though Member (F) is representative of Finance Ministry and acts as Advisor (Finance) to Secretary (T). These are the pitfalls when two institutions are headed by the same person and operate from the same building. Moreover, the note dated 31.01.2002 is also signed by him as Chairman (TC). Sh. Shyamal Ghosh and Sh. R. Ramanathan were signing the papers as Chairman (TC) and Member (F/P), creating an impression as if they were signing the papers by circulation. But it is a fact that there is no formal decision of Telecom Commission, but its gravity is lessened when its two senior most functionaries are involved in the decision making. Not only this, TRAI was informed by DoT vide letter dated 10.10.2000 that 12.5 MHz + 12.5 MHz has been earmarked for existing operators. The only question remained to be decided was of allocation. In such a situation, there is also a doubt if the question of pure allocation of spectrum was a policy matter or not.

**253.** In view of the above discussion, it is clear that the need for additional spectrum to the existing operators was recognized and a decision in that regard was taken that additional spectrum is required to be allocated, though

as noted above there are differences as to what the consensus was in the department. The central question is: whether the Minister discussed the matter in the department with the relevant authorities or not? The material discussed above reveals that the matter was discussed in detail in the department by the relevant authorities. There is no obligation on a superior to always honour the view of subordinates. Once a matter is discussed, the superior, in this case Secretary (T) and Minister, were free to take decision in their discretion in the light of existing facts and circumstances. As such, it cannot be said that the decision was taken in haste without consultation or concurrence with Member (F), but certainly there is no formal decision of Telecom Commission.

## IV. Rate of Spectrum Charges/ Pricing: Principle of Parity

**254.** Now the next question is as to at what rate additional spectrum should have been allocated? This issue is at the heart of this case as the allegations of the prosecution are that 1.8 MHz spectrum beyond 8 MHz up to 10 MHz was allocated free and this caused loss to the exchequer.

The CMSP operators were demanding parity with the WLL service providers. It was a new service introduced subsequent to guidelines issued on 25.01.2001. Their grievances in this regard have already been extracted above.

Now the question is as to how the parity in charges between the two services shall be maintained, that is, how and when to ensure identical charges of the two services? The case of the prosecution is that the WLL operators were to

pay spectrum charges equivalent to CMSP operators as and when they were granted spectrum beyond 5 MHz. The gist of their case is that the WLL operators had to maintain parity with the CMSP operators in spectrum charges beyond 5 MHz. It is their case that beyond 4+4 MHz, there is incremental increase by one percentage point for each tranche of 1.8 MHz and it should continue for both the services, as the quantum allocation of spectrum goes up, with each tranche of 1.8 MHz being separately charged. On the other hand, the case of the defence is that when WLL operators were granted 5+5 MHz with spectrum usage charge of 2% of AGR, then the principle of parity demanded that when the CMSPs operators were granted spectrum beyond 6.2 MHz and up to 10 MHz, the spectrum charges should not exceed 4% of AGR. Their case is that when 5+5 MHz is charged 2% of AGR as spectrum charge, then 10+10 MHz cannot be charged beyond 4%.

**255.**I proceed to examine the whole issue in the light of material on record.

**256.**Now the question is:

(a) Who was aggrieved with the WPC Charges?

(b) Who was requesting for additional spectrum beyond 6.2 MHz?

(c) Who was seeking level playing field with BSOs providing limited mobility by Wireless in Local Loop (WLL), which service was introduced very recently?

(d) Who would suffer, if level playing field is disturbed? and

(e) Who had represented even before TRAI for level playing field as is revealed by recommendation dated 08.01.2001?

**257.**In this regard, the letters dated 08.02.2001 & 05.04.2001, written by

COAI to DoT, as well as letter dated 19.02.2001 written by Spice Communications Limited to DoT (D-6), as already noted above, are relevant. The NTP-99 also recognized the importance of level playing field as well as the fact that technology is blurring difference between technologies such as Wireline and Wireless. TRAI also recognized this in its recommendations dated 08.01.2001.

**258.** As per spectrum allocation criteria dated 23.03.2001 (D-140, page 213), the WLL service providers were allocated CDMA spectrum in three steps:

(1) 2.5 + 2.5 MHz;

(2) 1.25 + 1.25 MHz; and

(3) 1.25 + 1.25 MHz

However, the maximum charges remained same, that is, 2% of AGR. As per this criteria, when the first tranche of spectrum of 2.5 + 2.5 MHz was allocated, the spectrum charges were 2% of AGR. When the next two tranche of 1.25 and 1.25 MHz were allocated the charges remained same and no additional charges were imposed for the next two tranche. (D-228, page 213). It appears that as per guidelines dated 25.01.2001, clause 17, the maximum charges were pegged at 2%. This criteria was subject to the outcome of petition No. 1 of 2001, titled COAI Vs. Union of India, pending before TDSAT.

**259.** In this regard, the statement 14.06.2012 of PW 20 Sh. P. K. Garg, the then Wireless Advisor, is relevant, which is extracted as under:

> "To start the network, a minimum of 2 CDMA carriers (2.5+2.5 MHz spectrum) are required, whereas, for GSM system, minimum 22 carriers,

i.e. 4.4+4.4 MHz spectrum are required and therefore the start-up spectrum 2.5+2.5 MHz in CDMA and 4.4+4.4 MHz in GSM were necessarily required to be allocated. In order to cater the further growth/ capacity in the network, one additional CDMA carrier i.e. 1.25+1.25 MHz is allotted based on the subscriber criteria. As such it made the total spectrum allotted to the CDMA operator as 3.75+3.75 MHz. On further growth, one more CDMA carrier i.e. 1.25+1.25 MHz is allotted making a total of four carriers i.e. 5+5 MHz spectrum, as per criteria.

After NTP- 99, the spectrum charges for CDMA spectrum were also based on revenue share and 2% of AGR was levied as spectrum charge up to four CDMA carriers i.e. 5+5 MHz spectrum. For this purpose, 5+5 MHz CDMA spectrum was considered at par/equal to 4.4+4.4 MHz GSM spectrum because the CDMA carriers and spectrum has to be allotted in multiples of 1.25+1.25 MHz. Therefore, 5+5 MHz slab of CDMA spectrum is the closest to 4.4+4.4 MHz GSM spectrum. This revenue share for CDMA spectrum is indicated at Sl. no. 17 in the Guidelines for issue of licence for basic service (guidelines no. 10 – 2/2000- BS – II dtd. 25.01.2001) and were effective from the same date i.e. 25.01.2001. This is also incorporated at Clause no. 5.3. in the License Agreement for Basic Telephone Service which was subsequently changed to Unified Access Services License- UASL.

After the UASL came into being in 2003, the Association of Unified Service Providers of India (AUSPI) were demanding parity with GSM and

wanted a way forward for CDMA spectrum beyond 5+5 MHz. As orders for allotment criteria and revenue share for GSM spectrum upto 10+10 MHz were available at that time, the criteria for allotment of CDMA spectrum upto 10+10MHz were also evolved. Regarding revenue share towards spectrum charges, a parity was maintained with GSM spectrum i.e. 3% upto 6.25MHz and 4% for spectrum upto 10MHz (Order no. J14025/200 (3)/04 – NT dtd. 21.04.2004). However, the CDMA spectrum beyond 5+5 MHz has not been allotted so far to any operator in India.

Accordingly, for allotment of one carrier i.e. 1.25+1.25 MHz beyond four carriers i.e. making a total of 6.25+6.25 MHz spectrum, the revenue share for spectrum charges increases to 3% of AGR as envisaged from the Order no. J14025/200 (3)/04 – NT dtd. 21.04.2004 issued under the signatures of Sh. Sukhpal Singh, the then AWA, WPC Wing (MR RC No. 24 (A)/2011/DLI, MR II (memo 35, Sl. No. A(8). For any further allotment of carriers up to total of eight carriers i.e. up to 10+10 MHz spectrum in CDMA, the revenue share for spectrum charges was increased to 4% of AGR. Hence, the spectrum charges for CDMA and GSM spectrum are similar. For CDMA the carrier band width is 1.25 MHz hence, the slabs for spectrum charges are in multiples of 1.25 MHz. The table below indicates the revenue share for spectrum charges for GSM & CDMA systems:

| Sl. No. | Amount of spectrum | Revenue share | Remarks |
|---|---|---|---|
| 1. | GSM 4.4 MHz CDMA 5 MHz | 2% | CDMA spectrum is allotted in multiples of 1.25 MHz as each carrier is 1.25 MHz wide. |

| | | | |
|---|---|---|---|
| 2. | GSM 6.2 MHz<br>CDMA 6.25 MHz | 3% | -do- |
| 3. | GSM 10 MHz<br>CDMA 10 MHz | 4% | -do- |

> However, the CDMA spectrum beyond 5+5 MHz has not been allotted so far to any operator in India.

Naturally it were CMSPs which were demanding level playing field with the WLL operators as they were granted licences at a considerably easy terms and were also likely to eat up the market of CMSPs, that is, mobile operators. It were these operators who would suffer if level playing field was disturbed at that time. Their grievances should have been addressed in this regard, considering the fact that WLL operators were encroaching upon mobile market and the CMSPs were loosing market, but as noted above, the department did not do anything except sending the matter to GOI-IT.

**260.**Subsequent events have also shown that the request for level playing field put forward by the CMSP operators was not without basis. Reliance Infocom, a basic operator with WLL services, advertised its services as full cellular mobile service and ate up the market of CMSP operators. TRAI in its report dated 27.10.2003 observed in paragraph 7.21 as under:

> "M/s Reliance Infocomm, one of the country wide basic service operators, has been advertising its services as if the service is a full Cellular Mobile Service without any restriction of mobility. It has been doing it by obtaining a license as a BSO almost throughout the country and using multiple registration/call forwarding facility. This implies that right from the effective date of the license agreement, M/s. Reliance has competed as a cellular mobile service provider with just one

<u>exception</u> - that the service drops at the time of moving from one SDCA to another. TRAI vide its letter dated 14.08.2003 had already written to DoT to clarify/amend the license conditions so that the condition of limited mobility within SDCA is implemented in letter and spirit. However, for unified licensing, TRAI considers that since M/s Reliance Infocomm by virtue of offering mobility even beyond SDCAs, has acted like a cellular operator right from the day of signing the license agreement, M/s Reliance infocomm is liable to pay the penal interest w.e.f the date of signing its license agreement till the date of migrating to the Unified Access License Regime in addition to the entry fee paid by 4th cellular operators in respective circles."

**261.** Later on, as per Cabinet decision dated 31.10.2003, Reliance Infocom had to pay Rs. 1096 crore for migration in addition to penalty of Rs. 485 crore for offering cellular type services. Moreover, the WLL services were held illegal by the Hon'ble TDSAT vide judgment dated 08.08.2003 in petition No. 1 of 2001.

**262.** It needs to be emphasized at the cost of repetition that the principle of parity between BSOs providing WLL services and CMSP operators providing mobile services was emphasized by TRAI in its recommendations dated 08.01.2001, but this report is not part of the record nor it has been taken note of by the CBI. As already noted above, on the introduction of WLL services, the CMSP operators were agitated and were demanding level playing filed as this service would eat up their market as it was granted

numerous other benefits like no additional entry fee for providing WLL services and no additional entry fee for spectrum. Their letters seeking level playing field have already been extracted above. There is no material on record that WLL operators were seeking level playing field with CMSP operators, though there is material on record to indicate that first tranche of 5MHz + 5MHz of CDMA spectrum was allocated at the rate of 2% of AGR following the example of 4MHz + 4MHz being allocated to the CMSP operators at the rate of 2% of AGR. Learned Spl. PP has used this analogy to emphasize that the principle of parity was to apply other way round, that is, WLL operators had to follow CMSP operators.

**263.**However, the initial tranche of 5MHz + 5MHz to WLL operators and 4MHz + 4MHz to CMTS operators was allocated at the rate of 2% of AGR. Up to this, one can say that both were being charged same percentage of AGR as WPC charges. Now the question is: who was seeking additional spectrum and who was seeking level playing field? The concept of level playing field is not a fixed notion. This notion is very elastic and keeps changing. In economic matters there cannot be any arithmetical equality. Once the WLL operators were allocated spectrum of 5MHz + 5MHz with 2% of AGR, alongwith numerous other benefits, the CMTS operators were concerned that their market will shrink and their profits would decline and, as such, they were seeking level playing field as far as the allotment of spectrum beyond 6.2MHz up to 10MHz was concerned.

**264.**As noted above, Sh. J. R. Gupta in his note dated 31.01.2002 had indicated that 4.4MHz (paired) has been allocated by charging 2% of AGR

and additional 1% is being charged for additional spectrum of 1.8MHz (paired). He suggested that on the same analogy, further additional spectrum be also charged with 1% of AGR for spectrum beyond 6.2MHz, that is, his view was that for spectrum up to 8MHz, 4% AGR be charged.

**265.**However, the most interesting part is that though in earlier part of this note, he records that a consensus had emerged for allocating additional spectrum to the tune of 1.8MHz (paired) in 1800 MHz band, yet in later part of the note he records that in future it may be possible to allot further spectrum, subject to availability, to add to a total of up to 10MHz and this would be only after a suitable subscriber base is reached. Now the question is: when the consensus was for allocating only 1.8MHz of additional spectrum, why should he record it that in future spectrum up to 10MHz may also be allocated? He should have closed his note with allocation of spectrum up to 8MHz only, but he went on to allocation of 10MHz in future. Why? It appears that though in discussion with Member (F), the officers were of the view that in future spectrum up to 10MHz can also be allocated but were not sure as to what rate of additional revenue is to be charged for that, so he did not record it in the note and left the issue open for his superiors.

It appears that on this, following the principle of parity, more so, when the CMTS operators were vociferous in their demand on this, as is reflected by the perusal of file D-6, Sh. Shyamal Ghosh restricted the rate of AGR to 4% up to spectrum of 10MHz, which was to be allocated in future on reaching the prescribed subscriber base and this was approved by the Minister also on

the same date, that is, 31.01.2002. In the facts and circumstances of the case restricting the AGR to 4% is not unusual.

The matter is further compounded by the fact that the TRAI recommendations dated 08.01.2001 have not been placed on the file by the CBI, which had emphasized the principle of parity between the two categories of service providers, that is, CMSPs and BSOs with WLL services. It has been deliberately done to create an impression that limiting of charges to 4% was an unusual thing.

In the end, limiting of AGR to 4% for 10MHz of spectrum is compatible with the circumstances prevailing in the industry at that time, more so, when the concept of rate of percentage of AGR to be charged itself was not fully firmed up and everybody was suggesting his own rate of percentage charges.

**266.**Following this approval, a formal order was issued by the department on 01.02.2002. Now the question is: what is the legal status of this order?

**V.Guidelines: Need, nature and legality**

**267.**It is the case of the prosecution that the order dated 01.02.2002 created an obligation on the department to allocate additional spectrum once specified conditions were fulfilled. It is their case that at least it created a contingent contract or created conditions for application of doctrine of promissory estopple against the department. On the contrary, the defence has argued that at best the order created an expectation. It is submitted that the order was not binding on the department and conferred no benefit on the operators. It is their case that it only lays down a future course of action for

allocation of spectrum.

**268.**Let me examine the legality of the order. Departments keep issuing guidelines for the  guidance, knowledge and information of its officers as well as public at large. Business of the department is regulated by the statutes which it administers and also rules framed thereunder. In the instant case, Indian Telegraph Act, Indian Wireless Telegraphy Act and TRAI Act and Rules framed thereunder govern the field. Telecom licences are granted under Section 4 of Indian Telegraph Act. Section 7 of the Act provides for power to Central Government to make rules by notification in the official Gazette. Apart from the Acts and Rules, guidelines are also issued from time to time, as for example the Guidelines issued in first week of January 2001 for CMTS operators. These guidelines are issued in terms of the policy of the Government. Now a question arises as to what is the need and legal nature of these guidelines? In this regard, it is instructive to quote from **Principles of Administrative Law, 7th Edition, Volume I, by N. P. Jain and S. N. Jain, page 251**, which reads as under:

> "In addition to the various forms of delegated legislation adverted to in the previous pages, a modern phenomenon in administrative process is the emergence of the institution of directions. Issuing directions has become an essential and normal administrative technique in modern times. This is a kind of informal or *quasi*-legislation made by the Administration. Directions are less formal than rules. Administrative authorities churn out directions for a variety of purposes and in a variety of ways, *e.g.*, through letters, circulars, instructions, orders,   memoranda,   directives,   bulletins,

guidelines, manuals, pamphlets, public notices, press notes, clarifications, trade notices *etc*. At times, directions may even be published in the government gazette. A direction may be specific, being applicable to a specific person or matter or case; or it may be general in nature laying down some general norm or principle or policy, practice or procedure to be followed in all similar cases. …...................................

…..........................................."

269. The learned authors further writes at page 256 as under:

"...............................................................................

................................................

A department may be faced with a new problem for which no past experience is available to it and may for the time being have to experiment with the method of trial and error until some stable norms are evolved which may be capable of being laid down in the form of rules. Until a particular problem has been worked out for a sufficient period, norms and standards may have to be kept somewhat flexible and in such a situation, directions rather than the rules may be regarded as being more expedient from an administrative point of view. Further, directions may be used when the factors for operation of the Administration are fluid and subject to rapid changes. Directions provide the Administration with a certain degree of flexibility as it does not have to follow the formalities involved in rule-making, *e.g.,* publication in the gazette, laying before Parliament, *etc*. Therefore, the government may change a direction any time without much formality. Directions are less formal than rules. A direction can be amended by issuing

another direction, but a rule can only be amended by a rule and not a direction."

**270.** In an authority reported as **State of Haryana Vs. Mahender Singh and others, (2007) 13 SCC 606**, Hon'ble Supreme Court observed in paragraph 39 as under:

> "**39.** It is now well settled that any guidelines which do not have any statutory flavour are merely advisory in nature. They cannot have the force of a statute. They are subservient to the legislative Act and the statutory rules."

**271.** Similarly, while dealing with question of guidelines, Hon'ble Supreme Court in an authority reported as **Narendra Kumar Maheshwari (supra)**, observed in paragraphs 106 and 107 as under:

> "**106.** It may, however, be stated that being not statutory in character, these guidelines are not enforceable. A policy is not law. A statement of policy is not a prescription of binding criterion. In this connection, reference may be made to the observations of Sagnata Investments Ltd. v. Norwich Corpn. Also the observations in British Oxygen Co. v. Board of Trade. See also Foulkes' Administrative Law, 6[th] edn. at pp.181-184. In R. v. Secretary of State, ex parte Khan the court held that a circular or selfmade rule can become enforceable on the application of persons if it was shown that it had created legitimate expectation in their minds that the authority would abide by such a policy/ guideline. However, the doctrine of legitimate expectation applies only when a person had been given reason to believe that the State will

abide by the certain policy or guideline on the basis of which such applicant might have been led to take certain actions. This doctrine is akin to the doctrine of promissory estoppel. See also the observations of Lord Wilberforce in *IRC v. National Federation*. However, it has to be borne in mind that the guidelines on which the petitioner have relied are not statutory in character. These guidelines are not judicially enforceable. The competent authority might depart from these guidelines where the proper exercise of his discretion so warrants.

….......................................................................

...............................................

107.This is because guidelines, by their very nature, do not fall into the category of legislation, direct, subordinate or ancillary. They have only an advisory role to play and non-adherence to or deviation from them is necessarily and implicitly permissible if the circumstances of any particular fact or law situation warrants the same. Judicial control takes over only where the deviation either involves arbitrariness or discrimination or is so fundamental as to undermine a basic public purpose which the guidelines and the statute under which they are issued are intended to achieve."

272.Similarly in an another authority reported as **Poonam Verma and others Vs. Delhi Development Authority, (2007) 13 SCC 154**, Hon'ble Supreme Court observed in paragraphs 27 and 28 as under:

"**27.** Guidelines per se do not partake of the character of statute. Such guidelines in absence of the statutory backdrop are advisory in nature. Mr. Ram Prakash himself has relied upon a decision of this Court in *Narendra Kumar Maheshwari v.*

*Union of India* wherein it has been laid down (SCC p. 510, para 107)

"*107*. … This is because guidelines, by their very nature, do not fall into the category of legislation, direct, subordinate or ancillary. They have only an advisory role to play and non-adherence to or deviation from them is necessarily and implicitly permissible if the circumstances of any particular fact or law situation warrants the same. Judicial control takes over only where the deviation either involves arbitrariness or discrimination or is so fundamental as to undermine a basic public purpose which the guidelines and the statute under which they are issued are intended to achieve.

**28.** Guidelines being advisory in character per se do not confer any legal right."

**273.** Guidelines issued for CMTS in first week of January 2001 are broad guidelines for the issue of licence for provision for cellular mobile services. These guidelines themselves state that these are only for the purpose of general information and do not constitute any legally binding commitment.

**274.** In view of the law quoted above and the guidelines itself indicating that these are not legally binding commitment, it becomes clear that guidelines are not legally binding. These are only for information and guidance of general public as well as officials of the department. These guidelines made provision for allotment of frequency of 4.4 MHz +4.4 MHz and based on usage, justification and availability, additional spectrum up to 1.8 MHz +1.8 MHz, making a total of 6.2 MHz + 6.2 MHz.

**275.** Now a questions arises as to what is the nature of order dated

01.02.2001 making provision for spectrum beyond 6.2 MHz + 6.2 MHz up to 10 MHz + 10 MHz. This order makes provision for spectrum beyond 6.2 MHz up to 10MHz. In a sense this order is an addendum/ supplement to the guidelines issued for CMTS operators, referred to above. Its legal force is same as that of the aforesaid guidelines. Though designated as an order, it is just a supplemental guideline making provision for spectrum beyond 6.2 MHz. Even PW 2 Sh. T. K. Vardakrishnan, Joint Wireless Advisor, and PW 21 Sh. Rama Kant Srivastava have called the order dated 01.02.2002 as criteria for allocation of additional spectrum beyond 6.2MHz + 6.2MHz. Allocation of additional spectrum was subject to various conditions like availability, justification, subscriber base etc., which indicates towards non-binding nature of order dated 01.02.2002.

This discussion also makes it clear, that the concept of incremental increase does not carry the value of a rule or a binding precedent for being considered in reference to the order dated 31.01.2002. Considering the nascent stage of the telecom industry and the introduction of WLL services, it had, by that time, not acquired the status of a binding precedent or became de rigueur, an absolute essential, to be compulsorily followed, as argued by the prosecution.

**276.**The above detailed discussion reveals that all the substantive allegations in the charge sheet are either distorted one or contrary to record. In such a situation, there is no need to discuss issues, which allegedly occurred subsequent to the order dated 01.02.2002. That is:

(a)Appointment of Sh. Shyamal Ghosh as administrator of Universal Service

Obligation Fund;

(b)IPO of Bharti; and

(c)Loss to Exchequer.

**277.**The above discussion makes it clear that the charge sheet has been drafted in such a manner as to create an impression that the demand for additional spectrum began only on the joining of late Sh. Pramod Mahajan as Minister with the presentation of COAI to DoT on 04.10.2001, consequent to their letter dated 19.09.2001. Relevant documents, such as TRAI reports, principle of level playing field etc., as already noted above, have not been taken note of in the charge sheet and even do not find mention in the statements of witnesses. Many relevant documents have either not been produced before the Court or were kept away from the attention of the Court by initially dubbing them as unrelied upon and an attempt was made to mislead the Court.

**278.**The conclusion of aforesaid analysis of the events, evidence, documents and other material on record is that the charge sheet is a distorted and fabricated document, based on deliberately redacted and garbled facts. It has been so drafted as to create an impression of a grave crime, where there is none. An attempt has been made to create an impression in the charge sheet that everything was done on a single day in the dark hours of evening of 31.01.2002. There is no doubt that the charge sheet has been filed for extraneous reasons.

In the end, I find that there is no incriminating material on record against the accused and the accused deserve to be discharged. Accordingly, the accused

stand discharged.

**279.**Since the charge sheet has been found to be full of distorted and fabricated facts and an attempt has also been made to mislead the Court, Director, CBI, is directed to conduct an inquiry against the erring officials and take action against them as per law.

**280.**File be consigned to Record Room. Since most of the files are official files of DoT, the department is at liberty to seek their return after time of filing of appeal is over.

Announced in open Court          **(O. P. Saini)**
today on October 15, 2015          Spl. Judge/CBI(04)
    (2G Spectrum Cases)
    New Delhi
**Indu/ Ratnesh**

# EXHIBIT 12

Case 2:18-cv-01360-TSZ Document 2-1 Filed 09/13/18 Page 395 of 550

You are here: Home > Collections > Cbi

# Vinod Rai: CBI can't be as autonomous or independent as CAG

PTI   Sep 12, 2014, 05:22PM IST

**Tags:** Vinod Rai | CBI | CAG

NEW DELHI: Raising concerns over CBI being under the "direct control" of the Prime Minister, former top auditor Vinod Rai has said that "a police dominated" agency can't enjoy autonomy or independence available to the CAG or the Election Commission.

Rai, who has been critical of former Prime Minister Manmohan Singh in the context of 2G and coal scams, said that the control structure of CBI makes it vulnerable to becoming an "easy game" for various allegations and speculations.

## RELATED ARTICLES

Is CBI director Ranjit Sinha becoming the new Vinod Rai?
*August 25, 2013*

Former Comptroller and Auditor General Vinod Rai backs CB...
*March 15, 2014*

CBI chief Ranjit Sinha hits back after former CAG Vinod...
*February 12, 2014*

## IN-DEPTH COVERAGE

Cbi

Cag

Vinod Rai

"It is true that a police dominated investigative agency cannot enjoy the kind of autonomy or independence offered to the Election Commission or the CAG..." Rai has written in his book, 'The Diary of the Nation's Conscience Keeper - Not Just An Accountant'.

The book, in which Rai talks about his experience as the Comptroller and Auditor General (CAG) of India during 2008-2013, has incidentally come amid a long-running debate on independence and autonomy of CBI, while a controversy has also erupted about alleged meetings of current CBI chief Ranjit Sinha with those linked to entities under its probe.

While observing that successive governments and various political parties have always been critical of CBI, Rai said that none of them actually took any "steps to correct the CBI's administrative control structure when they come to power".

"It can certainly be decoupled from the direct control of the Minister for Personnel or the Prime Minister. Such a move will not only lend a great degree of credibility to the initiating government, but will also help establish an agency with professionalism and integrity of its own," he said.

In the 267-page book, Rai further said that CBI has always been blamed by the political parties to be a "handmaiden of the government in power" and of being misused for "narrow political ends".

"The CBI, unfortunately, gets caught in the crossfire. Being an executive agency functioning in the Department of Personnel - which is directly under the Prime Minister - makes it vulnerable to speculations," he said.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 405 (USDC NO. 2:18-cv-01360)**

## FEATURED ARTICLES

### SPOTLIGHT

**Defence Deal**



India eyes the UAV deal with US during Obama visit

**India eyes the UAV deal with US during Obama visit**

With defence trade as a key talking point during the visit, UAVs are among the items that the two sides are looking to co-produce and co-develop.

- Putin's visit could help sort out glitches in India-Russia defence ties
- Private firms provide only 3-4% of defence equipment in India: Parrikar





How a two-year-old firm is hitting a daily turnover of Rs 4,000 crore today



10 best tax-saving investments



Apple cuts online price of iPhone 5S to clear stocks; ties up with Amazon, Flipkart and Snapdeal

**More:**

Apple cuts online price of iPhone 5S to clear stocks; ties up with Amazon, Flipkart and Snapdeal

India's first e-reader Wink unveiled, supporting 15 languages

Facebook signs up IIT graduates for Rs 1.55 crore; companies offer more jobs this placement season

Tableau Software, Atlassian prepare for IPO amid market woes

BITS-Goa student Krunal Kishorbhai Patel lands Rs 1.4-crore offer from Google

Hyundai: Price war under way in US car market

---

## THE ECONOMIC TIMES
www.economictimes.com

© 2014 Bennett, Coleman & Co. Ltd. All rights reserved

Index by Date | Index by Keyword

Advertise with us | Terms of Use | Privacy Policy | Feedback

# EXHIBIT 13

PCA CASE NO. 2013-09

**IN THE MATTER OF AN ARBITRATION ARISING UNDER THE AGREEMENT BETWEEN THE GOVERNMENT OF THE REPUBLIC OF MAURITIUS AND THE GOVERNMENT OF THE REPUBLIC OF INDIA FOR THE PROMOTION AND PROTECTION OF INVESTMENTS ENTERING INTO FORCE JUNE 20, 2000 AND THE ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW 1976**

_____

-between-

**CC/DEVAS (MAURITIUS) LTD.,
DEVAS EMPLOYEES MAURITIUS PRIVATE LIMITED., and
TELCOM DEVAS MAURITIUS LIMITED.**

(the "Claimants")

-and-

**THE REPUBLIC OF INDIA**

(the "Respondent," and together with the Claimants, the "Parties")

_____

**AWARD ON JURISDICTION AND MERITS**

**July 25, 2016**

_____

**<u>Arbitral Tribunal</u>**

The Hon. Marc Lalonde, P.C., O.C., Q.C. (Presiding Arbitrator)
Mr. David R. Haigh, Q.C.
The Hon. Shri Justice Anil Dev Singh

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 399 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page i of xi

## TABLE OF CONTENTS

CHAPTER I - INTRODUCTION.................................................................................1
  A. THE PARTIES.................................................................................................1
  B. THE DISPUTE.................................................................................................1
CHAPTER II - PROCEDURAL HISTORY ...............................................................2
  A. COMMENCEMENT OF THIS ARBITRATION .....................................................2
  B. CONSTITUTION OF THE ARBITRAL TRIBUNAL................................................2
  C. ADOPTION OF THE TERMS OF APPOINTMENT AND THE FIRST PROCEDURAL
    MEETING .................................................................................................3
  D. CHALLENGES TO THE APPOINTMENT OF ARBITRATORS ................................4
  E. THE PARTIES' WRITTEN SUBMISSIONS ..........................................................5
  F. THE PARTIES' REQUESTS FOR THE PRODUCTION OF DOCUMENTS....................5
  G. HEARING ON JURISDICTION AND LIABILITY ..................................................6
  H. THE NEW DOCUMENTS PRODUCED BY THE RESPONDENT ON DECEMBER 20,
    2014.......................................................................................................8
  I. THE LAUNCHING OF GSAT-6................................................................................9
  J. THE ICC FINAL AWARD IN *DEVAS MULTIMEDIA PRIVATE LIMITED V. ANTRIX
    CORPORATION LIMITED*.......................................................................10
CHAPTER III - FACTUAL BACKGROUND .........................................................10
  A. THE KEY ACTORS - CORPORATE AND STATE ENTITIES AND ORGANS OF THE
    STATE ....................................................................................................11
  B. BACKGROUND TO THE DEVAS PROJECT .....................................................15
    1. The S-band and Its Allocation within India ...........................................15
    2. The Proposed Devas Satellite-Terrestrial Communications System................16
    3. Negotiations Leading to the Devas Agreement......................................18
  C. THE DEVAS AGREEMENT..............................................................................19
    1. Leased Capacity ......................................................................................19
    2. Upfront Capacity Reservation Fees ......................................................20
    3. Regulatory Approvals..............................................................................21
    4. Delay Damages ......................................................................................21
    5. Termination.............................................................................................22
    6. Force Majeure ......................................................................................25
  D. THE INITIAL DEVELOPMENT OF THE DEVAS PROJECT .........................................26
    1. Establishment of Corporate Infrastructure and Initial Financing...................26
    2. Delays to the Delivery of Satellites........................................................27
  E. THE PARALLEL REVIEW PROCESS OF THE DEVAS AGREEMENT AND ITS
    SUBSEQUENT ANNULMENT...................................................................29
    1. India's Internal Discussions on Security Needs for S-band Capacity..............29
    2. The Suresh Report ................................................................................30
    3. The Space Commission's Determination to Annul the Devas Agreement.......32
    4. The Opinion of the Additional Solicitor-General....................................35
    5. DOS' Note for the CCS and the CCS' Decision to Annul the Devas Agreement...........37
  F. THE PERIOD FOLLOWING THE ANNULMENT OF THE DEVAS AGREEMENT....40

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 400 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page ii of xi

    1. Initial Reactions of Devas and Antrix to the Annulment of the Devas Agreement.........40
    2. The Satellites ...................................................................................................................41
    3. Related Arbitration Proceedings .....................................................................................42
CHAPTER IV - REQUESTS FOR RELIEF ..............................................................................43
CHAPTER V - THE MEANING OF "INVESTMENT" FOR THE PURPOSES OF THE
TREATY ......................................................................................................................................44
  A. THE PARTIES' ARGUMENTS..........................................................................................44
    1. The Respondent's Position .............................................................................................45
    2. The Claimants' Position .................................................................................................49
  B. THE TRIBUNAL'S ANALYSIS .......................................................................................52
    1. The Devas Agreement.....................................................................................................52
    2. Investment Under the Treaty...........................................................................................52
CHAPTER VI - THE "ESSENTIAL SECURITY INTERESTS" PROVISION ........................56
  A. INTERPRETATION OF ARTICLE 11(3) OF THE TREATY IN CONTEXT .................56
    1. What Constitutes "Essential Security Interests"? .........................................................56
      a. Can "Essential Security Interests" Be Construed as a Matter of Self-judgment by the
        Respondent?..........................................................................................................56
        i. The Respondent's Position .......................................................................................56
        ii. The Claimants' Position .........................................................................................57
        iii. The Tribunal's Analysis ........................................................................................58
      b. What Conditions Must the Respondent Meet to Show that its Measures Were "Directed to
        the Protection of its Essential Security Interests"? .................................................59
        i. The Respondent's Position .......................................................................................59
        ii. The Claimants' Position .........................................................................................60
        iii. The Tribunal's Analysis ........................................................................................62
    2. Does Article 11(1) of the Treaty Allow for the Introduction of Customary International
      Law Restrictions Imposed on a State of Necessity Defence?............................................66
      a. The Claimants' Position.........................................................................................66
      b. The Respondent's Position .....................................................................................67
      c. The Tribunal's Analysis .........................................................................................68
    3. Can the Claimants Invoke Article 11(4) of the Treaty? ................................................69
      a. The Claimants' Position.........................................................................................69
      b. The Respondent's Position .....................................................................................70
      c. The Tribunal's Analysis .........................................................................................72
    4. Does Article 11(3) Prevent Entitlement to Compensation?...........................................78
      a. The Claimants' Position.........................................................................................78
      b. The Respondent's Position .....................................................................................78
      c. The Tribunal's Analysis .........................................................................................79
  B. APPLICATION OF THE LAW TO THE FACTS ..............................................................79
    1. The Parties' Arguments .................................................................................................80
      a. Historical Analysis of Demands for S-band Spectrum in India.............................80
        i. The Claimants' Position ..........................................................................................80
        ii. The Respondent's Position ......................................................................................82

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 401 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page iii of xi

  b. MSS Demands Versus BSS Demands .................................................................83
   i. The Claimants' Position .................................................................................83
   ii. The Respondent's Position ............................................................................85
 **2. The Tribunal's Analysis** .............................................................................................**86**
**CHAPTER VII - EXPROPRIATION** ...................................................................................**101**
 **A. THE PARTIES' ARGUMENTS** ..................................................................................**101**
  **1. The Existence of an Expropriation** ...........................................................................**102**
   a. The Claimants' Position ...................................................................................102
   b. The Respondent's Position ..............................................................................103
  **2. Lawfulness of the Expropriation** .............................................................................**104**
   a. Public Purpose .................................................................................................104
    i. The Claimants' Position ..............................................................................104
    ii. The Respondent's Position .........................................................................106
   b. Due Process .....................................................................................................106
    i. The Claimants' Position ..............................................................................106
    ii. The Respondent's Position .........................................................................107
  **3. Potential Discrimination in the Expropriation** ......................................................**108**
   a. The Claimants' Position ...................................................................................108
   b. The Respondent's Position ..............................................................................108
  **4. Fair and Equitable Compensation** ..........................................................................**109**
   a. The Claimants' Position ...................................................................................109
   b. The Respondent's Position ..............................................................................109
  **5. The Pendency of a Breach of Contract Claim** .......................................................**110**
   a. The Claimants' Position ...................................................................................110
   b. The Respondent's Position ..............................................................................111
 **B. THE TRIBUNAL'S ANALYSIS** ................................................................................**112**
  **1. The Existence of an Expropriation** ...........................................................................**112**
  **2. The Lawfulness of the Expropriation** .......................................................................**113**
   a. Public Purpose .................................................................................................113
   b. Due Process .....................................................................................................113
   c. Potential Discrimination in the Expropriation .................................................114
   d. Fair and Equitable Compensation....................................................................114
   e. The Pendency of a Breach of Contract Claim .................................................114
  **3. Conclusion** ...............................................................................................................**115**
**CHAPTER VIII - FAIR AND EQUITABLE TREATMENT** ...............................................**115**
 **A. THE PARTIES' ARGUMENTS** ..................................................................................**115**
  **1. The Applicable Standard of Treatment** ...................................................................**116**
   a. The Claimants' Position ...................................................................................116
   b. The Respondent's Position ..............................................................................118
  **2. The Alleged Violation of the FET Standard** ...........................................................**121**
   a. The Claimants' Position ...................................................................................121
   b. The Respondent's Position ..............................................................................122
 **B. THE TRIBUNAL'S ANALYSIS** ................................................................................**124**

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 402 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page iv of xi

**CHAPTER IX - UNREASONABLE OR DISCRIMINATORY MEASURES**.............................**131**

  **A. THE PARTIES' ARGUMENTS**.............................................................................................**131**

    **1. The Claimants' Position** ...............................................................................................**131**

    **2. The Respondent's Position** ...........................................................................................**132**

  **B. THE TRIBUNAL'S ANALYSIS** .........................................................................................**133**

**CHAPTER X - MOST-FAVOURED-NATION TREATMENT**......................................................**134**

  **A. THE PARTIES' ARGUMENTS**.............................................................................................**135**

    **1. The Possibility of Importing the 'Full Legal Protection and Security' Clause of the Serbia-India BIT** ...............................................................................................................**135**

      a. The Claimants' Position..............................................................................................135

      b. The Respondent's Position .........................................................................................136

    **2. The Respondent's Alleged Violation of the 'Full Legal Protection and Security' Provision** .........................................................................................................................**137**

      a. The Claimants' Position..............................................................................................137

      b. The Respondent's Position .........................................................................................138

  **B. THE TRIBUNAL'S ANALYSIS** .........................................................................................**138**

**CHAPTER XI - DECISIONS**.......................................................................................................**139**

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 403 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page v of xi

## LIST OF DEFINED TERMS

| | |
|---|---|
| **Antrix** | Antrix Corporation Ltd, an Indian corporation wholly owned by the Government of India that is under the administrative control of DOS and purports to operate as the commercial marketing arm of ISRO and DOS. Antrix was created to promote the commercial exploitation of India's space program. |
| **ASG** | The Additional Solicitor-General of India, one of the law officers of the Republic of India who represents the Government of India in the Supreme Court and provides it with legal advice. |
| **AV** | Audio-video. |
| **Balachandhran Report** | Report issued by Mr. G. Balachandhran on January 9, 2011. |
| **BIT(s)** | Bilateral investment treaty (or treaties). |
| **BSS** | Broadcast satellite services. |
| **BWA** | Broadband wireless access. |
| **CC/Devas** | CC/Devas (Mauritius) Ltd., the first Claimant, which was formed in 2006 and has its registered office in Port Louis, Mauritius. It is affiliated with Columbia Capital LLC, a venture capital firm based in Alexandria, Virginia. Shareholder of Devas. |
| **CCS** | The Indian Cabinet Committee on Security, a select Cabinet committee that, among other matters, deals with all defence related issues, issues relating to law and order, and internal security and economic and political issues impinging on national security. It is composed of the Prime Minister, the Minister of Home Affairs, the Minister of External Affairs, the Minister of Finance, and the Minister of Defence. |
| **CGC** | Complementary Ground Components, which would constitute the terrestrial segment of the hybrid communication system planned by Devas. Also referred to as ATC (Ancillary Terrestrial Components). |
| **Chandrasekhar Report** | Report issued by Mr. K.M. Chadrasekhar on April 12, 2011. |
| **Chaturvedi Committee** | High Powered Review Committee constituted by the Indian Prime Minister on February 9, 2011, chaired by Mr. B.K. Chaturvedi. |
| **Chaturvedi Report** | Report issued by the Chaturvedi Committee on March 12, 2011. |
| **COAI** | Cellular Operators Association of India. |
| **DEMPL** | Devas Employees Mauritius Private Limited, the second Claimant, which was formed in 2009 and has its registered office in Port Louis, Mauritius. It is a subsidiary of Devas Employees Fund US, |

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 404 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page vi of xi

| | |
|---|---|
| | LLC, a Delaware limited liability company with membership units owned by certain non-Indian Devas employees pursuant to an Equity Incentive Plan. Shareholder of Devas. |
| **Devas** | Devas Multimedia Private Limited, an Indian company incorporated in Karnataka, Bangalore, India on December 17, 2004, with its registered office at 2nd Floor, Prema Gardenia, 357/6, 1st Cross, I Block, Jayanagar, Bangalore, India. The three Claimants hold shares in Devas and made their alleged investments in India through this company. |
| **Devas Agreement/The Agreement** | Agreement for the Lease of Space Segment Capacity on ISRO/ANTRIX S-band Spacecraft between Antrix Corp. Ltd. and Devas Multimedia Private Ltd. (Agreement No. ANTX/203/DEVAS/2005), dated January 28, 2005. |
| **Devas Services** | BWA and AV services to be offered by Devas to mobile users across India under the terms of the Devas Agreement. |
| **DOS** | The Indian Department of Space, the government department responsible for the development of India's space policy and the implementation of the decisions of the Space Commission. Since its establishment in 1972 under Prime Minister Indira Ghandi, DOS has formed part of the Prime Minister's portfolio and has reported to the PMO. |
| **DOT** | The Indian Department of Telecommunications. |
| **DRDO** | Defence Research and Development Organization. |
| **DT Asia** | Deutsche Telekom Asia, shareholder of Devas. |
| **EGoM** | Empowered Group of Ministers of the Government of India. |
| **FET** | Fair and Equitable Treatment. |
| **Forge Advisors** | Forge Advisors LLC, a U.S. company headed by Mr. Ramachandran Viswanathan. |
| **ICC** | Indian Satellite Coordination Committee (also referred to as INSAT Coordination Committee). |
| **ICC Arbitration** | Arbitration under the rules of the International Chamber of Commerce captioned Devas Multimedia (Private) Limited v. Antrix Corp. Ltd. (No. 18051/CYK). |
| **ICJ** | International Court of Justice. |
| **ILC Articles** | International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts 2001, Yearbook Of The International Law Commission (2001), Vol. II, Part Two. |
| **IPTV** | Internet Protocol Television. |

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 405 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page vii of xi

| | |
|---|---|
| **ISP** | Internet Service Provider. |
| **ISRO** | The Indian Space Research Organization, a body of the Government of India under the direction of DOS and the Space Commission that engages in research and testing in order to encourage the rapid development of activities connected with space science, space technology and space applications with responsibility in the entire field of science and technology of outer space. ISRO builds, launches, operates and leases satellites for various uses, including telecommunications, television and radio broadcasting. |
| **ITU** | International Telecommunications Union. |
| **JCB** | Joint Chronological Core Hearing Bundle, provided by the Parties to the Tribunal on August 16, 2014. |
| **Leased Capacity** | Transponder capacity to be leased to Devas in PS1 and PS2 pursuant to Article 2 of the Devas Agreement. |
| **MFN** | Most Favored Nation. |
| **MHz** | Megahertz. |
| **MOD** | Ministry of Defence of the Republic of India. |
| **MSS** | Mobile satellite services. |
| **NFAP** | National Frequency Allocation Plan. |
| **Note for the CCS** | Note from DOS to the Space Commission, dated February 16, 2011. |
| **Note for the EGoM** | Note for the Empowered Group of Ministers on Vacation of Spectrum, authored by the Department of Space, dated March 1, 2012. |
| **Opinion of the ASG** | Opinion issued by the ASG on July 12, 2010. |
| **PMO** | Office of the Prime Minister of India, including his staff. |
| **PS (PS1 and PS2)** | Primary and Secondary Satellite System, respectively. Also referred to as GSAT-6 and GSAT-6A. |
| **S-band** | Portion of the electromagnetic spectrum found at 2500-2690 MHz. |
| **S-BSS** | Portion of the S-band allocated for BSS. |
| **S-MSS** | Portion of the S-band allocated for MSS. |
| **Serbia-India BIT** | Agreement between The Government of The Republic Of India and The Federal Government of The Federal Republic of Yugoslavia |

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 406 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page viii of xi

| | for The Reciprocal Promotion and Protection of Investments, dated January 31, 2003. |
|---|---|
| **Shankara Committee** | High Power Committee constituted in May 2004 at the direction of the Chairman of ISRO to review the technical feasibility, risk mitigation, time schedule, financial and organizational aspects of the Devas project, chaired by Dr. K.N Shankara. |
| **Space Commission** | The Indian Space Commission, which formulates the policies and oversees the implementation of the Indian space program to promote the development and application of space science and technology for the socioeconomic benefit of the country. The Space Commission is composed of appointees from across the Government of India, including the Minister of State, the National Security Advisor (who reports to the Prime Minister), the Cabinet Secretary, the Principal Secretary to the Prime Minister, the Secretary for Economic Affairs in the Ministry of Finance, the Secretary Department of Expenditure, Secretary to the Government of India, and senior directors of ISRO centers. |
| **Suresh Committee** | Committee instituted by DOT on December 8, 2009 to perform a comprehensive review of all aspects of the Devas Agreement. |
| **Suresh Report** | Report issued by the Suresh Committee in May 2010. |
| **TAG** | Technical Advisory Committee of the Indian Satellite Coordination Committee. |
| **Telcom Devas** | Telcom Devas Mauritius Limited, the third Claimant, which was formed in 2006 and has its registered office in Port Louis, Mauritius. It is affiliated with Telcom Ventures LLC, a United States venture capital firm owned by Dr. Rajendra Singh. Shareholder of Devas. |
| **Term Sheet** | 'Definitive binding term sheet' proposed by Devas to Antrix on September 20, 2004. Precursor of the Devas Agreement. |
| **TRAI** | Telecom Regulatory Authority of India. |
| **Treaty** | Agreement Between The Government Of The Republic Of Mauritius And The Government Of The Republic Of India For The Promotion And Protection Of Investments Entering Into Force June 20, 2000. |
| **VCLT** | Vienna Convention on the Law of Treaties. |
| **WPC** | Wireless Planning and Coordination Wing, an organ of DOT. |
| **WPC License** | Operating license issued by the WPC to operators of terrestrial electromagnetic spectrum. |

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 407 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page ix of xi

# DRAMATIS PERSONAE

| | |
|---|---|
| **Alex, Dr. T.K.** | Member of Space Commission (from March 2010); Director of ISRO Satellite Centre (June 01, 2008 to June 30, 2012). |
| **Anand, Mr. A. Vijay** | Joint Secretary of Department of Space and Chief Vigilance Officer beginning July 2009 (subsequently became Additional Secretary of Department of Space). *Has submitted a witness statement in support of Respondent's Statement of Defence.* |
| **Babbio, Mr. Larry** | Former Vice-Chair of Verizon Communications, Inc. who became a director of Devas Multimedia Private Limited ("**Devas**") in 2007. *Has submitted witness statement in support of Claimants' Statement of Claim.* |
| **Balachandran, Mr. G.** | Additional Secretary (from April 1, 2009 to January 11, 2011), Department of Space. |
| **Bhaskaranarayana, Dr. A.** | Scientific Secretary (from August 27, 2007 to December 29, 2009) and Director, Satellite Communications Program Office, ISRO (from 2003 to 2009). |
| **Chandrasekhar, Dr. M.G.** | Former Scientific Secretary, ISRO, Member-Secretary of the Apex Management Council of ISRO and Director, Earth Observations Programme. Left ISRO in December 1997. Became Chief Operating Officer and Executive Vice President of WorldSpace in 2000; then Vice President, International Sales for GeoEye LLC in 2005; and subsequently joined Devas as Chairman of the Board of Directors in 2005. *Has submitted a witness statement in support of Claimants' Statement of Reply.* |
| **Chaturvedi, Mr. B.K.** | Member, Planning Commission; former Cabinet Secretary (from June 6, 2009 to May 26, 2014). |
| **Gupta, Mr. Arun** | Partner of Columbia Capital LLC; Devas board member from May 2006. *Has submitted witness statements in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| **Kasturirangan, Dr. Krishnaswamy** | Chairman of (a) the Space Commission, (b) ISRO, and (c) Antrix, and (d) Secretary of DOS from April 1994 to August 2003; Member (Science), Planning Commission, from 2009 to March 2014. |
| **Katti, Mr. Vadiraj R.** | Program Director, GEOSAT, ISRO (from December 31, 1997 to October 31, 2010); joined Devas board in April 2008 and submitted resignation in October 2010. |

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 408 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page x of xi

| Kibe, Dr. S.V. | Program Director, SATNAV, Associate Director, INSAT Programme Office (from June 7, 2000 to December 31, 2009). |
|---|---|
| Lewis, Mr. John | Electrical engineer who has worked at or with the International Telecommunications Union ("**ITU**") since 1981 related to the use of electromagnetic spectrum, including by satellite system operators, and the coordination of such use among nations. <br><br> *Has submitted expert reports in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| Madhusudhana, Mr. H.N. | Associate Scientific Secretary, ISRO (from July 2011); Executive Director, Antrix (August 2010 to July 2011). |
| Menon, Mr. Shivshankar | National Security Advisor to Prime Minister Manmohan Singh (from January 2010 to May 2014). |
| Murthi, Mr. K.R. Sridhara | Executive Director, Antrix (from August 23, 2001 to January 16, 2008) and Managing Director, Antrix (from January 17, 2008 to September 30, 2010). |
| Nair, Dr. G. Madhavan | Chairman of (a) the Space Commission, (b) ISRO, and (c) Antrix; and (d) Secretary of DOS from September 2003 to October 2009. |
| Parasaran, Mr. Mohan | Additional Solicitor-General of India (from 2004 to 2013) and Solicitor General of India (from 2013 to 2014). |
| Parsons, Mr. Gary | Founder of SkyTerra LP ("**SkyTerra**") and XM Satellite Radio Holdings, Inc. Former CEO and President of American Mobile Satellite Corporation, which had a number of subsidiaries, including TerreStar Networks, Inc. ("**TerreStar**"). Devas board member from September 2007 and shareholder in Devas. <br><br> *Has submitted witness statements in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| Pitroda, Mr. Sam | Prime Minister Manmohan Singh's Public Information Infrastructure and Innovation Advisor (from October 2009 to June 2014). |
| Radhakrishnan, Dr. K. | Beginning in October 2009, (a) Chairman of the Space Commission, (b) Chairman of ISRO, and (c) Secretary of DOS, and (d) Chairman of Antrix through July 2011. |
| Sayeenathan, Mr. S. | Associate Director, Satellite Communication and Navigation Program Office, ISRO (from February 2010); prior to February 2010 Deputy Director, Frequency Management Office, ISRO. |
| Sethuraman, Mr. K. | Associate Director, Satellite Communication Program at the Satellite Communication and Navigation Program Office, ISRO (from April 6, 2009). <br><br> *Has submitted witness statements in support of Respondent's Statement of Defence and Respondent's Rejoinder.* |

Case 2:18-cv-01360-TSZ   Document 2-1   Filed 09/13/18   Page 409 of 550

PCA Case No. 2013-09
Award on Jurisdiction and Merits
Page xi of xi

| Shankara, Dr. K.N. | Director, ISRO Space Applications Centre (from October 31, 2002 to July 4, 2005); Head of Shankara Committee that issued the "Report of the ISRO/Antrix Committee on lease of space segment capacity on ISRO/Antrix S-band spacecraft to Devas Multimedia Pvt Ltd for delivery of video, multimedia and information services to mobile receivers in vehicles and mobile phones" (the "**Shankara Report**"). |
|---|---|
| Singh, Dr. Manmohan | Prime Minister of India from 2004-14; among other things, was head of the Union Government, head of the executive branch, and the Minister of Space. |
| Singh, Dr. Rajendra | Founder, President and Chairman of the Board of Telcom Ventures LLC; Devas board member from May 2006.<br><br>*Has submitted witness statements in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| Suresh, Dr. B.N. | Director of the Indian Institute of Space and Technology (from 2007 to 2010), Thiruvananthapuram; member of Space Commission (from November, 2005 to August, 2008). Author of "*Report on GSAT-6*" delivered to Chairman, ISRO/Secretary, Department of Space on June 7, 2010 (the "**Suresh Report**"). |
| Venugopal, Mr. D. | Devas co-founder and Chief Technical Officer. Electronics and communications engineer specializing in satellite communications; worked at ISRO from 1980-98.<br><br>*Has submitted a witness statement in support of Claimants' Statement of Reply.* |
| Viswanathan, Mr. Ramachandran | CEO of Devas.<br><br>*Has submitted witness statements in support of Claimants' Statement of Claim and Claimants' Statement of Reply.* |
| Viswanathan, Mr. T.K. | Advisor to the Minister for Law and Justice (from November 1, 2009 to September 30, 2010). |

# CHAPTER I - INTRODUCTION

## A.    THE PARTIES

1.    The Claimants in this matter are CC/Devas (Mauritius) Ltd. ("CC/Devas"), Devas Employees Mauritius Private Limited ("DEMPL") and Telcom Devas Mauritius Limited ("Telcom Devas"), three companies incorporated in Mauritius. The Claimants bring their claims under the Agreement between the Government of the Republic of Mauritius and the Government of the Republic of India for the Promotion and Protection of Investments entering into force June 20, 2000 (the "Mauritius-India BIT" or "Treaty").

2.    The Claimants are represented in this arbitration by Mr. John L. Gardiner and Mr. Timothy G. Nelson of Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036-6522, United States of America, and by Mr. David Kavanagh, of Skadden, Arps, Slate, Meagher & Flom LLP, 40 Bank Street, Canary Wharf, London E14 5DS, United Kingdom.

3.    The Respondent in this matter is the Republic of India.

4.    The Respondent is represented in this arbitration by Mr. George Kahale III and Mr. Benard V. Preziosi, Jr., of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, 35th Floor, New York, New York 101178, United States of America, and by Mr. Shri S. Srinivasan, Government of India, Department of Space, Antariksh Bhavan, New BEL Road, Bangalore 560 231, India. Between March 14, 2013 and May 9, 2014, the Respondent was also represented by Mr. Sanjeev Kapoor of Khaitan & Co, 1105 Ashoka Estate, 24 Barakhamba Road, New Delhi, India.

## B.    THE DISPUTE

5.    The dispute concerns the annulment of a contract, entitled Agreement for the Lease of Space Segment Capacity on ISRO/ANTRIX S-Band Spacecraft (the "Devas Agreement" or the "Agreement"),[1] concluded on January 28, 2005 between Devas Multimedia Private Limited ("Devas"), an Indian company, and Antrix Corporation Limited ("Antrix"), an Indian State-owned company. The annulment of the Devas Agreement followed a policy decision taken by the Government of India to reserve a part of the electromagnetic spectrum known as the S-band "for

---

[1]    Agreement for the Lease of Space Segment Capacity on ISRO/ANTRIX S-Band Spacecraft between Antrix Corp. Ltd. and Devas Multimedia Private Ltd. (Agreement No. ANTX/203/DEVAS/2005), January 28, 2005 (the "**Devas Agreement**") (Ex. C-16/JCB-37).

national needs, including for the needs of defence, para-military forces, railways and other public utility services as well as for societal needs, and having regard to the needs of the country's strategic requirements."[2] Part of that spectrum had originally had been leased to Devas under the Devas Agreement for the purpose of offering broadband wireless access and audio-video services throughout India.

6.   The Claimants, who are shareholders of Devas, maintain that this policy decision taken by the Government of India amounted to an expropriation of the Claimants' investments in India and was not accompanied by payment of fair and equitable compensation, in breach of the Treaty. They also allege other breaches under Articles 3 and 4 of the Treaty.

7.   The Respondent argues that its policy decision was intended to satisfy the national security needs of the nation; that Devas had no right to proceed with the Devas Agreement uninterrupted by any governmental action; and that the Claimants have no claim under the Treaty.

## CHAPTER II - PROCEDURAL HISTORY

### A.   COMMENCEMENT OF THIS ARBITRATION

8.   By a Notice of Arbitration dated July 3, 2012, the Claimants commenced arbitration proceedings against the Respondent pursuant to Article 3 of the Arbitration Rules of the United Nations Commission on International Trade Law (1976) (the "UNCITRAL Rules") and Article 8 of the Mauritius-India BIT.

### B.   CONSTITUTION OF THE ARBITRAL TRIBUNAL

9.   On July 3, 2012, the Claimants appointed Professor Francisco Orrego Vicuña as Co-arbitrator.

10.   On December 26, 2012, the Respondent appointed the Honorable Shri Justice Anil Dev Singh as Co-arbitrator.

11.   On January 24, 2013, the Co-arbitrators selected the Honorable Marc Lalonde, P.C., O.C., Q.C., as Presiding Arbitrator. On January 26, 2013, the Hon. Marc Lalonde accepted his appointment as Presiding Arbitrator, which was notified to the Parties on February 4, 2013.

---

[2]   Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220). *See also Prime Minister Manmohan Singh's Interaction with Editors of the Electronic Media*, The Hindu, February 16, 2011, pp. 6-7 (Ex. R-36/JCB-218).

## C.  ADOPTION OF THE TERMS OF APPOINTMENT AND THE FIRST PROCEDURAL MEETING

12.   By letter dated February 4, 2013, the Tribunal invited the Parties to comment on certain matters, including, inter alia, the need for the Respondent to appoint counsel; administration of the arbitration by the Permanent Court of Arbitration ("PCA"); and an outline of steps to be taken in the conduct of the proceedings.

13.   In response, the Claimants urged the Tribunal, by letter dated February 5, 2013, to convene an initial conference whereas the Respondent, by letter dated February 13, 2013, sought to defer addressing these issues until the process of engaging counsel was concluded.

14.   By letter dated February 14, 2013, the Claimants noted that the Respondent's position was "completely unsatisfactory and appears purposefully calculated to compound the already extensive delays that the Respondent's conduct has engendered in this proceeding," by reference to the case record. In any case, the Claimants stated that there was "no basis for further delay," citing the Respondent's good faith obligations to promptly participate, and proposed possible venues for an initial conference on a date to be fixed by the Tribunal.

15.   On March 14, 2013, the Respondent notified the appointment of Khaitan & Co. as counsel.

16.   By letter dated April 2, 2013, the Tribunal requested that the Parties advance an initial deposit and designated the PCA to administer the initial case deposit. The Tribunal further proposed that the PCA act as registry and administer the arbitral proceedings, which was accepted by the Parties.

17.   On April 16, 2013, the PCA wrote to the Parties regarding the details of the first procedural meeting to be held on May 15, 2013, at the Peace Palace in The Hague.

18.   Following an exchange of views upon the Tribunal's invitation, the Parties submitted a draft Proposed Terms of Appointment and a draft Proposed Procedural Timetable on May 10, 2013.

19.   On May 10, 2013, the Respondent informed that it had engaged Curtis, Mallet-Prevost, Colt & Mosle LLP as counsel along with M/s Khaitan & Co.

20.   On May 15, 2013, a first procedural meeting was held at the Peace Palace in The Hague, the Netherlands ("First Procedural Meeting"), in which the Parties agreed to and signed the Terms of Appointment.

## D.    CHALLENGES TO THE APPOINTMENT OF ARBITRATORS

21.    By e-mail dated May 11, 2013, the Respondent notified the Claimants and the Tribunal of its intention to challenge the appointments of the Hon. Marc Lalonde as Presiding Arbitrator and Professor Francisco Orrego Vicuña as Co-arbitrator.

22.    Following the First Procedural Meeting, at which the Respondent again raised its intention to bring the challenge, the Tribunal circulated an unsigned Procedural Order No. 1 "to be used as a guide for the Parties in their preparation of their upcoming submissions during the pendency of the challenge."

23.    By letter dated May 20, 2013, the Respondent submitted the challenge to H.E. Judge Peter Tomka, then President of the International Court of Justice and Appointing Authority pursuant to Article 8(2)(d)(i) of the Mauritius-India BIT.

24.    On June 3, 2013, the Appointing Authority made two disclosures and invited the Parties to submit their comments on them by June 10, 2013. By letters dated June 5, 2013, the Claimants and the Respondent indicated that they had no comments with regard to the Appointing Authority's disclosures.

25.    Between May and June 2013, the Claimants and the Respondent made submissions in respect of the challenge in accordance with the agreed timetable. The Hon. Marc Lalonde and Professor Orrego Vicuña also submitted comments on the challenge by letters dated June 5 and 6, 2013, respectively.

26.    On September 30, 2013, the Appointing Authority issued his decision on the challenge— upholding the Respondent's request to disqualify Professor Orrego Vicuña, and rejecting the Respondent's request to disqualify the Hon. Marc Lalonde.

27.    Following the Appointing Authority's decision on the challenge, the Claimants appointed Mr. David R. Haigh, Q.C., as Co-arbitrator on October 9, 2013. The Tribunal issued Procedural Order No. 1 on October 16, 2013.

28.    By letter dated May 23, 2015, the Respondent submitted a challenge to Mr. David R. Haigh, Q.C. to H.E. Judge Ronny Abraham, the current President of the International Court of Justice and Appointing Authority pursuant to Article 8(2)(d)(i) of the Mauritius-India BIT. By letter dated June 3, 2015, the Claimants opposed the challenge.

29.    On June 11, 2015, pursuant to the schedule set forth by the Appointing Authority on June 5, 2015, the Respondent provided its comments to the Claimant's letter of June 3 2015. On June 19, 2015, the Claimants provided their comments on the Respondent's submissions. By letter dated June 25, 2015, Mr. Haigh responded to the submissions of the Parties.

30.    On August 3, 2015, the Appointing Authority issued his decision on the Challenge rejecting the Respondent's request to disqualify Mr. David R. Haigh Q.C.

## E.    THE PARTIES' WRITTEN SUBMISSIONS

31.    On July 1, 2013, the Claimants submitted their Statement of Claim (the "Statement of Claim").

32.    On December 2, 2013, the Respondent submitted its Statement of Defence (the "Statement of Defence").

33.    On March 18, 2014, the Claimants submitted their Statement of Reply on Jurisdiction and Liability (the "Statement of Reply").

34.    On July 1, 2014, the Respondent submitted its Rejoinder (the "Respondent's Rejoinder").

## F.    THE PARTIES' REQUESTS FOR THE PRODUCTION OF DOCUMENTS

35.    On January 14, 2014, the Parties submitted their respective requests for the production of documents in accordance with paragraph 4 of Procedural Order No. 1.

36.    On January 31, 2014, the Tribunal issued Procedural Order No. 2 concerning the Parties' Document Production Requests of January 14, 2014, setting out its determinations and a timetable for the Parties to produce documents.

37.    By letter dated May 16, 2014, the Claimants submitted that the Respondent had not complied fully with Procedural Order No. 2. Accordingly, the Claimants requested: (i) the production of additional documents in response to the Claimants' document production requests Nos. 16 and 17; (ii) a statement by the Respondent certifying the names of the entities, agencies and departments whose records were searched in response to the Tribunal's Order; (iii) the disclosure "of every page of every document" improperly redacted by the Respondent, "indicating the reason for every instance in which text has been redacted;" and (iv) the disclosure of all redacted names of people involved in a transaction or communication reflected in a document produced by the Respondent.

38.   By letter dated June 6, 2014, the Respondent requested that the Claimants' application be denied. Notwithstanding this, the Respondent stated that, in connection with the Claimants' application, it had located "a few additional documents that [were] arguably responsive" to their requests. Also, by reference to an ongoing related ICC case and document production decisions made by the tribunal in that case, the Respondent noted that it was "prepared to provide the same materials regarding the redacted documents that Antrix will be providing Devas in the ICC case."

39.   In a further communication dated June 9, 2014, the Respondent provided the Tribunal with the text of the direction given by the ICC tribunal in respect of the redacted documents, which was confirmed by the Claimants on the same day.

40.   By e-mail dated June 12, 2014, the Respondent indicated that it had produced to the Claimants the newly located documents referenced in its June 6, 2014 letter.

41.   On June 16, 2014, the Tribunal issued Procedural Order No. 3 concerning the Claimants' Document Production Request of May 16, 2014, setting out the procedure and timetable for the Respondent to revert on outstanding issues.

42.   In accordance with Procedural Order No. 3, on July 12, 2014, the Respondent produced a key corresponding to individual's names that were redacted, which was verified by the PCA on June 24, 2014; and confirmed on August 1, 2014 that there were no additional documents meeting the Claimants' document production requests Nos. 16 and 17.

## G.   HEARING ON JURISDICTION AND LIABILITY

43.   On August 4, 2014, the Parties and the Tribunal held a telephone conference in preparation for the Hearing on Jurisdiction and Liability, scheduled on September 1-5, 2014.

44.   On September 1-5, 2014, a Hearing on Jurisdiction and Liability was held at the Peace Palace in The Hague, the Netherlands. The following persons attended:

> **The Tribunal**
>
> The Honorable Marc Lalonde, P.C, O.C., Q.C. (Presiding Arbitrator)
> Mr. David R. Haigh, Q.C.
> The Honorable Shri Justice Anil Dev Singh
>
> **The Claimants**
>
> Mr. Ramachandran Viswanathan
> Dr. Rajendra Singh
> Mr. Arun Gupta

Mr. Lawrence T. Babbio
Mr. John Lewis
Mr. D. Venugopal
Dr. M.G. Chandrasekhar
Mr. Gary Parsons
*(Representatives and Witnesses)*

Mr. John L. Gardiner
Mr. David Kavanagh
Mr. Timothy G. Nelson
Ms. Elizabeth A. Hellmann
Ms. Sharmistha Chakrabarti
Ms. Jennifer Huang
Mr. Gunjan Sharma
Ms. Angela Leonard
Mr. Kvehl McDermott
Mr. Aaron Shorr
*(Skadden, Arps, Slate Meagher & Flom LLP)*

Mr. Harish Salve, Q.C.
Mr. Ciccu Mukhopadhaya
Mr. Kripa Pandit

**The Respondent**

Mr. S. Srinivasan
Mr. A. Vijay Anand
Ms. Kalyani Sethuraman
Mr. M.S. Krishnan
Mr. K. Sethuraman
*(Representatives and Witnesses)*

Mr. George Kahale III
Mr. Benard V. Preziosi
Mr. Fernando A. Tupa
Mr. Kabir A.N. Duggal
Mr. Fuad Zarbiyev
Ms. Gloria Bujan-Diaz
Mr. Philip M. Hwang
Mr. Christopher Grech
*(Curtis, Mallet-Prevost, Colt & Mosle LLP)*

**The Permanent Court of Arbitration**

Ms. Fiona Poon
Mr. José Luis Aragón Cardiel

**Court reporters**

Ms. Diana Burden
Ms. Laurie Carlisle

45.   During the hearing, examination of fact and expert witnesses occurred in the following order:

**For the Claimants**

Mr. Ramachandran Viswanathan
Dr. Rajendra Singh
Mr. Arun Gupta
Mr. Gary Parsons
Mr. Lawrence T. Babbio
Dr. M.G. Chandrasekhar
Mr. D. Venugopal
Mr. John Lewis

**For the Respondent**

Mr. K. Sethuraman
Mr. A. Vijay Anand

## H.   THE NEW DOCUMENTS PRODUCED BY THE RESPONDENT ON DECEMBER 20, 2014

46.   On September 22, 2014, the Tribunal informed the Parties that it would not be necessary for them to produce post-hearing briefs on the questions raised by the Tribunal during the Hearing on Jurisdiction and Liability. The Tribunal also stated that, if it wished "to obtain additional information, it [would] communicate with the Parties in due course."

47.   On December 20, 2014, the Respondent submitted two additional exhibits that had been referred to in a related ICC arbitration: (i) the "Norms, Guidelines and Procedures for Implementation of the Policy Frame-work for Satellite Communications in India" (the "Norms, Guidelines and Procedures"); and (ii) the Technical Statement from the Joint Wireless Advisor posted on the official website of the Wireless Planning & Coordination Wing of the Department of Telecommunications (the "JWA Technical Statement", and, together, the "**New Documents**").

48.   On December 23, 2014, the Claimants argued, inter alia, that the Respondent's December 20, 2014 submission was unsolicited and thus contravened the Tribunal's September 22, 2014 directive. It further submitted that it would be procedurally unfair to allow the record to be added to.

49.   On December 26, 2014, the Respondent submitted a response to the Claimants' objection on the Additional Documents.

50.   On January 6, 2015, the Claimants submitted a further response to the Respondent's December 26, 2014 communication.

51.   On January 7, 2015, the Respondent submitted some brief comments to the Claimants January 6, 2015 communication.

52.    On January 28, 2015, the Tribunal issued Procedural Order No. 4, Concerning the Respondent's Documents Submitted on December 20, 2014. The Tribunal admitted the Norms, Guidelines and Procedures into the record, while the JWA Technical Statement was admitted into the record by a majority, with reservations. The Tribunal also invited the Claimants to submit a written statement with their views on the New Documents, and granted the Respondent an opportunity to provide responsive comments.

53.    On March 2, 2015, the Claimants submitted a written statement as directed by Procedural Orders No. 1 and 4.

54.    On March 28, 2015, the Respondent submitted a response to the Claimants' March 2, 2015 written statement pursuant to Procedural Order No. 4.

I.    THE LAUNCHING OF GSAT-6

55.    On August 31, 2015, the Respondent submitted six news articles and a video by public service broadcaster *Doordarshan* reporting the launch of a satellite named "GSAT-6" on August 27, 2015.

56.    On September 21, 2015, the Tribunal issued Procedural Order No. 5. In that Order, the Tribunal conditionally accepted the Respondent's submission of August 31, 2015 without ruling on the significance or probative value of the Respondent's submission. The Tribunal also invited the Respondent to explain, within two weeks from the Order, the relevance and probative value of its submission and invited the Claimants to submit, within two weeks of the receipt of the Respondent's explanation, any comment they may wished to make.

57.    The Respondent, on October 5, 2015, submitted a further article published by the Institute of Defence Studies and Analyses entitled "GSAT-6: India's Second Military Satellite Launched" in Annex A, "which reviewed the launch and its significance for the military." In its letter, the Respondent stated *inter alia* that "the video of the event and accompanying press reports attest to the event's significance and leave no doubt that what Respondent told this Tribunal about the reconfiguration of the satellite for military use and the reservation of the S-band capacity for non-commercial, strategic use was completely accurate."

58.    On October 19, 2015, the Claimants submitted to the Tribunal their comments on the documents newly submitted by India relating to satellite launch. The Claimants argued that the Tribunal should focus on contemporaneous evidence to the events of February 2011 and that the new

materials do not provide evidence that in 2011 a policy decision was made to reserve the S-band for military needs.

**J.     THE ICC FINAL AWARD IN *DEVAS MULTIMEDIA PRIVATE LIMITED V. ANTRIX CORPORATION LIMITED***

59.     On June 29, 2011, Devas had commenced an arbitration under the ICC rules pursuant to Article 20 of the Devas Agreement, captioned *Devas Multimedia (Private) Limited v. Antrix Corp. Ltd.* (No. 18051/CYK) ("**the ICC arbitration**"), in which Devas had sought both specific performance of the Devas Agreement and/or damages.[3]

60.     On September 14, 2015, the ICC tribunal issued its award, ordering Antrix to pay USD 562.5 million to Devas Multimedia Private Limited for damages caused by Antrix's wrongful repudiation of the Devas Agreement, plus interest.

61.     On October 1, 2015, the Claimants, with the consent of the Respondent, informed the Tribunal that it wished to provide the *ICC* Final Award to the members of the present Tribunal and that the Parties would make simultaneous submissions concerning the impact on this arbitration of the Final Award on October 9, 2015 and reply submissions on October 19, 2015.

62.     On October 2, 2015, the Tribunal approved the approach agreed between the Parties. The ICC Final Award was communicated to the Tribunal on the same day.

63.     On October 9, 2015, the Parties made submissions pursuant to the agreed approach, and on October 19, 2015, the Parties made reply submissions pursuant to the agreed approach. The content of the Parties' submissions is briefly discussed below.

**CHAPTER III - FACTUAL BACKGROUND**

64.     The following summary draws on the Parties' submissions to provide context to the alleged violations of the Treaty by the Respondent in respect of the Claimants' investments in India that are at issue in this arbitration. The Parties differ in significant respects concerning the characterization and relevance of the factual developments; such differences are noted as they arise.

---

[3]     Notice of Arbitration, paras 7, 51-55; Statement of Claim, para. 146; Statement of Defence, para. 61.

A.    THE KEY ACTORS - CORPORATE AND STATE ENTITIES AND ORGANS OF THE STATE

65.    The Claimants provide a useful and largely uncontested outline of the key actors involved in the present case, which is reproduced below in relevant part.[4]

66.    The key actors on the Claimants' side are as follows:

(a)    The First Claimant, CC/Devas, was formed in 2006 and has its registered office in Port Louis, Mauritius. It is affiliated with Columbia Capital LLC, a venture capital firm based in Alexandria, Virginia;

(b)    The Second Claimant, DEMPL, was formed in 2009 and has its registered office in Port Louis, Mauritius. It is a subsidiary of Devas Employees Fund US, LLC, a Delaware limited liability company with membership units owned by certain non-Indian Devas employees pursuant to an Equity Incentive Plan;

(c)    The Third Claimant, Telcom Devas, was formed in 2006 and has its registered office in Port Louis, Mauritius. It is affiliated with Telcom Ventures LLC, a United States venture capital firm;

(d)    Devas Multimedia Private Limited, an Indian company incorporated in Karnataka, Bangalore, India on December 17, 2004, with its registered office at 2nd Floor, Prema Gardenia, 357/6, 1st Cross, I Block, Jayanagar, Bangalore, India.[5] This is the vehicle through which the three Claimants hold shares in Devas;

(e)    Mr. Ramachandran Viswanathan, the CEO of Devas;

(f)    Dr. Rajendra Singh, the founder and owner of Telcom Ventures LLC and a Devas board member. According to the Claimants, Dr. Singh is also a pioneer in the field of hybrid satellite-terrestrial communications systems;

(g)    Mr. Arun Gupta, a partner of Columbia Capital, a Devas board member and Chairman of DEMPL;

---

[4]      Statement of Claim, paras 23-30.

[5]      *Id.*, fn. 32; Certificate of Incorporation, Devas Multimedia Private Ltd., December 17, 2004 (Ex. C-14/JCB-33).

(h)    Mr. Gary Parsons, a Devas board member, and, according to the Claimants, a pioneer in hybrid satellite-terrestrial systems; and

(i)    Mr. John Lewis, an expert on ITU coordination and satellite communications systems.

67.    The key actors on the Respondent's side, which the Claimants assert are emanations of the Respondent, are as follows:

(a)    The Prime Minister of India, who is the head of the Union Government, head of the executive branch, and the chief advisor to the President (who is the head of State). At all relevant times, the Prime Minister was also the Minister of Space and a member of the Cabinet Committee on Security. From 2004 to May 25, 2014, the office of Prime Minister was held by Dr. Manmohan Singh, member of the Congress Party and leader of the then government (of which the Congress Party was the senior coalition partner). Following an election in 2014, Shri Narendra Damodaras Modi became Prime Minister on May 26, 2014;

(b)    The Office of the Prime Minister of India ("**PMO**"), which includes the Prime Minister's staff;

(c)    The Union Cabinet, or the Union Council of Ministers, a core decision-making body of the Government of India;

(d)    The Indian Cabinet Committee on Security ("**CCS**"), a select Cabinet committee that, among other matters, "deal[s] with all Defence related issues," "issues relating to law and order, and internal security" and "economic and political issues impinging on national security."[6] It comprises the Prime Minister, the Minister of Home Affairs, the Minister of External Affairs, the Minister of Finance, and the Minister of Defence;[7]

(e)    The Indian Space Commission (the "**Space Commission**"), which "formulates the policies and oversees the implementation of the Indian space programme to promote the development and application of space science and technology for the socioeconomic benefit of the country."[8] The Space Commission comprises appointees from across the

---

[6]    Composition and Functions of the Cabinet Committees, August 30, 2011 (Ex. C-148/JCB-235).

[7]    *Id*.

[8]    Introduction, About ISRO, Indian Space Research Organization, viewed June 12, 2013 (Ex. C-190/JCB-267).

Government of India, including the Minister of State, the National Security Advisor (who reports to the Prime Minister), the Cabinet Secretary, the Principal Secretary to the Prime Minister, the Secretary for Economic Affairs in the Ministry of Finance, the Secretary Department of Expenditure, Secretary to the Government of India, and senior directors of ISRO centres;

(f)     The Department of Space ("**DOS**"), the government department responsible for the development of India's space policy and the implementation of the decisions of the Space Commission. Since its establishment in 1972 under Prime Minister Indira Ghandi, DOS has formed part of the Prime Minister's portfolio and has reported to the PMO;[9]

(g)     The Indian Space Research Organization ("**ISRO**"), a body of the Government of India under the direction of DOS and the Space Commission that engages in research and testing in order to encourage the "rapid development of activities connected with space science, space technology and space applications" with "responsibility in the entire field of science and technology of outer space."[10] ISRO builds, launches, operates and leases satellites for various uses, including telecommunications, television and radio broadcasting;[11]

(h)     Antrix, a corporation wholly owned by the Government of India[12] that is under the administrative control of DOS and that purports to operate as the commercial marketing arm of ISRO and DOS. Antrix was created to promote the commercial exploitation of India's space program. Antrix is expected to seek out "[v]enture capital funding" from private partners and to promote the transfer of technology from such commercial entities to ISRO[13] in order to develop India's space-related, industrial capabilities.[14] Among other things, Antrix leases transponder capacity on satellites to companies that provide satellite communications and broadcasting services. Antrix was Devas' counterparty in the Devas Agreement; and

---

[9]     *See* PM's Team, Prime Minister of India, viewed on June 12, 2013 (Ex. C-189).

[10]    Report of the High Powered Review Committee on Various Aspects of the Agreement between Antrix & M/S. Devas Multimedia Pvt. Ltd., March 12, 2011, paras 1.4-1.5 ("**Chaturvedi Report**") (Ex. C-137/JCB-227).

[11]    Chaturvedi Report, March 12, 2011, paras 2.16-2.18.1 (Ex. C-137/JCB-227).

[12]    Antrix Articles of Association, September 28, 1992 (Ex. C-2/JCB-4).

[13]    Chaturvedi Report, March 12, 2011, paras 1.11-1.13 (Ex. C-137/JCB-227).

[14]    Antrix Corporation, Creating Value from Space (undated), p. 9 (Ex. C-192/JCB-289).

(i)     The Additional Solicitor-General (the "**ASG**"), one of the law officers of the Republic of India who represents the Government of India in the Supreme Court and provides it with legal advice. The highest legal officer in India is the Attorney General, who holds a constitutional post. By statute, the Attorney General is assisted by the Solicitor-General of India (the second highest law officer in India), who in turn is assisted by the Additional Solicitor-General.

68.   The Claimants also provide the following chart indicating the relationships among some of these emanations, which was reproduced from the ISRO website:[15]



69.   According to the Claimants, at all times relevant to this dispute, the Space Commission, DOS, ISRO and Antrix operated in an integrated manner, with the same person serving as the Chairman of the Space Commission, Secretary of DOS, Chairman of ISRO, and Chairman of Antrix. Specifically, Dr. K. Kasturirangan served in these positions until August 2003. He was succeeded by Dr. G. Madhavan Nair, who served in these positions from September 2003 to October 2009; and thereafter from November 2009 until around July 2011, Dr. K.R. Radhakrishnan held these

---

[15]    Statement of Claim, para. 29; Introduction, About ISRO, Indian Space Research Organization, viewed June 12, 2013 (Ex. C-190/JCB-267).

positions.[16] The Claimants characterize Dr. Radhakrishnan as the "central actor in these proceedings."[17]

70.  The Respondent denies this allegation and maintains that Antrix remained distinct from the other entities at all times.[18]

## B.    BACKGROUND TO THE DEVAS PROJECT

71.  The Devas Agreement forms the contractual framework to enable and facilitate the Devas project, which proposed to utilize part of the S-band capacity previously allocated to India by the International Telecommunications Union ("**ITU**").[19]

### 1.    The S-band and Its Allocation within India

72.  The S-band is a portion of the electromagnetic spectrum found at 2500-2690 MHz (the "S-band").[20] The S-band is a scarce and highly desirable spectrum due to its specific characteristics—its frequencies have low attenuation (i.e. the signal does not fade) and the signal can be sent and received by small units, such as mobile phones and laptop computers, without requiring the antenna on such units to be pointed directly at the satellite.[21]

73.  Of the capacity allocated to India, further allocations were made internally by India pursuant to its national planning, for example, to enable mobile satellite services ("**MSS**")[22] and broadcast satellite services ("**BSS**").[23]

74.  The Parties disagree with regard to the allocation and utilization of S-band capacity in India. According to the Respondent, both the S-MSS and the S-BSS frequencies, from the outset of India's space program until the early part of the last decade, were utilized solely for non-

---

[16]    Statement of Claim, para. 30.

[17]    Transcript, Day 1, 51:10-11.

[18]    Statement of Defence, para. 8.

[19]    Statement of Claim, para. 3; Statement of Reply, para. 21. India was allocated a total of 190 MHz of capacity in the portion of the S-band encompassing frequencies between 2500 MHz and 2690 MHz.

[20]    Statement of Claim, paras 3, 41; Statement of Defence, para. 32.

[21]    Statement of Defence, para. 33.

[22]    The portion of the S-band allocated for mobile satellite services, amounting to 110 MHz, is referred to as "**S-MSS**" (*see* Witness Statement of Mr. A. Vijay Anand, dated December 2, 2013, para. 2 ("**Anand I**")).

[23]    The portion of the S-band allocated for broadcast satellite services, amounting to 80 MHz, is referred to as "**S-BSS**" (*see* Anand I, para. 2). *See* Transcript, Day 1, 18:1-7.

commercial, national strategic and societal purposes at all relevant times.[24] It adds that, in the early 2000s, 40MGz of S-MSS capacity were assigned to the Department of Telecommunications for use in the terrestrial communications industry, leaving the Department of Space with 80MGz of S-BSS and 70MGz capacity. The Claimants, however, contend that in 2001, the DOS was left with that latter capacity, which was not utilized at the time and that it needed to find ways of making commercial use of its allocated S-band spectrum in order to retain that allocation which would otherwise, under the ITU regulations, expire by September 2010 if it remained unused.[25]

## 2. The Proposed Devas Satellite-Terrestrial Communications System

75. Early discussions concerning the proposed Devas project took place in 2003 between Antrix and Forge Advisors LLC ("**Forge Advisors**"), a U.S. company headed by Mr. Ramachandran Viswanathan,[26] which led to a signed Memorandum of Understanding "to explore mutually beneficial opportunities in the area of digital multimedia services."[27]

76. The Devas project envisaged the establishment of a hybrid satellite-terrestrial communications system involving both satellite and terrestrial transmission[28] due to certain perceived advantages over a satellite-only communications system.[29] This system would enable Devas to offer two main services to customers in India: broadband wireless access ("BWA") and audio-video ("AV") services, to facilitate the delivery of video, multimedia and information services across India to mobile users (together, "Devas Services").[30]

77. According to the Claimants, this hybrid communications system required the construction of a network of Complementary Ground Components ("CGC"), often referred to as 'towers' or 'repeaters', on the surface of the earth that use the same frequency as a satellite.[31] Satellite

---

[24]   Statement of Defence, para. 32; Witness Statement of Mr. K Sethuraman, dated December 2, 2013, para. 6 ("**Sethuraman I**").

[25]   Statement of Defence, para. 32; Statement of Reply, paras 21-24; Witness Statement of Ramachandran Viswanathan, dated June 29, 2013, paras 26-27 ("**Viswanathan I**"); Transcript, Day 1, 20:19-21:18.

[26]   Statement of Claim, para. 55.

[27]   Memorandum of Understanding between Forge Advisors and Antrix, July 28, 2003 (Ex. C-6/JCB-14).

[28]   Statement of Claim, paras 37, 38.

[29]   Statement of Claim, para. 37, noting that one key advantage is that satellite-only systems require the 'end-user' on the surface of the earth to have a direct line of sight to the satellite in order to send and receive radio signals.

[30]   Notice of Arbitration, para. 31; Statement of Claim, paras 4, 37.

[31]   Statement of Claim, paras 38-41.

transmission would be augmented by terrestrial transmission to enable the reuse of satellite signals seamlessly.[32]

78.     It was proposed that ISRO would be responsible for developing the satellite segment by building, launching and operating two satellites and leasing transponder capacity on these satellites to Devas.[33] In turn, Devas would be responsible for the terrestrial segment by, among other things, building the CGC elements of the network,[34] notwithstanding the fact that the Devas Agreement did not address this latter aspect.[35]

79.     The following is a diagrammatic representation of how the Devas System would provide services, which was prepared for a presentation by Devas to Columbia Capital LLC and Telcom Ventures LLC in 2005:[36]

---

[32]     *Id.*, para. 38; *Report on GSAT-6*, Submitted by Dr. B.N. Suresh, Director, Indian Institute of Space and Technology, Thiruvananthapuram, Submitted to: Chairman, ISRO/Secretary, Department of Space, delivered June 7, 2010, para. 5 ("**Suresh Report**") (Ex. C-94/JCB-146); Witness Statement of Dr. Rajendra Singh, dated June 26, 2013, para. 16 ("**Singh I**").

[33]     Statement of Claim, para. 44; Statement of Defence, para. 16.

[34]     Statement of Claim, para. 37; Statement of Defence, paras 8, 35-36.

[35]     Statement of Defence, para. 8.

[36]     Presentation by Devas to Columbia Capital & Telcom Ventures, December 9, 2005 (Ex. C-20/JCB-45).



80.    One critical component of the hybrid communications system was sufficient S-band capacity, since the S-band signal could be received and sent from units in motion using compact omni-directional antennae.[37] As a practical matter, any S-band capacity allocated for Devas' use could not be simultaneously used by another operator as this could cause significant interference with the system or the total unavailability of the service.[38]

### 3.    Negotiations Leading to the Devas Agreement

81.    In May 2004, at the direction of the chairman of ISRO, a High Power Committee was constituted to review the "technical feasibility, risk mitigation, time schedule, financial and organizational aspects" of the Devas project. This committee was chaired by Dr. K.N. Shankara (the "**Shankara Committee**").[39]

82.    The Shankara Committee concluded that the contemplated system of "satellite transmission [...] augmented by terrestrial transmission so as to reuse the signals seamlessly in Indian environment"

---

37    Statement of Defence, para. 34.

38    Statement of Claim para. 41; *see also* Statement of Claim, para. 102.

39    *Id*., para. 55.

was "technically sound and reliable" as well as "quite attractive." After further discussions, the Antrix Board "approved the draft agreement negotiated with Devas [and recommended by the Shankara Committee]."[40]

83. The Respondent attaches significance to a "definitive binding Term Sheet" proposed by Devas on September 20, 2004 (the "**Term Sheet**"),[41] particularly with respect to the grounds for termination and its consequences, which will be addressed in greater detail below. The Claimants, however, emphasize that the provisions of the Devas Agreement have superseded these negotiations, and consider them irrelevant as a matter of law.[42]

## C.   THE DEVAS AGREEMENT

84. The operative version of the Devas Agreement between Devas and Antrix was concluded on January 28, 2005.[43]

85. As a preliminary matter, the Claimants emphasize that this is not a case based on a breach of contract, but rather a treaty claim.[44] Accordingly, the Claimants focus on the rights ensuing to Devas from the Agreement. The Respondent also closely examines the nature of Devas' rights but place additional significance on Antrix's corresponding obligations—arguing that they are limited in nature. The Parties discuss at length the following aspects of the Devas Agreement:

### 1.   Leased Capacity

86. The Devas Agreement provided for the lease of transponder capacity on a first satellite (identified as "PS1" or "GSAT-6") and it also gave Devas the option to lease transponders on a second satellite ("PS2" or "GSAT-6A"), which it exercised.[45]

---

[40]   *Id.*, paras 55-56.

[41]   *See* E-mail from Mr. R. Viswanathan, Forge Advisors, to Mr. K.R. Sridhara Murthi, Antrix Corporation Ltd., and Dr. A. Bhaskaranarayana, ISRO, with Attachment, September 20, 2004 (Ex. R-12/JCB-23); Draft of "Binding Term Sheet" presented on or about September 12, 2004 (Ex. R-13/JCB-20). The Respondent notes that the Claimants submitted a witness statement of Mr. Viswanathan that references the proposed "binding term sheet" without introducing it. *See* Viswanathan I, paras 48-49; Statement of Defence, para. 22.

[42]   Transcript, Day 1, 33:23-34:1.

[43]   Notice of Arbitration, para. 27; Statement of Claim, para. 58; Statement of Defence, para. 43; *see* Devas Agreement (Ex. C-16/JCB-37).

[44]   Transcript, Day 1, 91:1-12.

[45]   *See* Notice of Arbitration, para. 27; Statement of Claim, paras 44, 46; Statement of Defence, para. 16.

87. In essence, the Devas Agreement provided for the lease of 75% of India's S-BSS allocation (30 MHz for each satellite, for a total of 60 MHz of India's total of 80 MHz of S-BSS) and 10 MHz of the S-MSS allocated for use by DOS.[46] Overall, it was agreed that 90% of the total bandwidth of the satellites was allocated to Devas, and the other 10% was allocated to DOS.[47]

88. The Claimants stress that the Devas Agreement provided that the Leased Capacity would be a "Non-Preemptible service, except as specifically provided for in Article 7,"[48] which gave Devas the exclusive right to the Leased Capacity.[49] The Claimants also highlight that, under the Devas Agreement, Devas could assign the Leased Capacity at its sole discretion upon sixty days' advance notice to Antrix,[50] which enabled Devas to undertake a range of transactions with investors.[51]

### 2. *Upfront Capacity Reservation Fees*

89. Under the Devas Agreement, Devas was required to pay Antrix an upfront capacity reservation fee of the INR equivalent of USD 20 million, to be paid in three equal instalments, in order to reserve transponder capacity on the first satellite.[52] The first such instalment was due upon notice from Antrix that it had received all necessary approvals for the capacity lease service for the satellite.[53]

90. Within 30 months of payment of the first installment of that fee (with a 6-month grace period), ISRO was required to deliver a fully operational and ready PS1.[54] Devas had to pay an upfront capacity reservation fee of the INR equivalent of USD 20 million to reserve transponder capacity on the second satellite as well.[55] In addition to these upfront fees, Devas was also required to pay

---

[46]   Statement of Defence, para. 36.

[47]   Statement of Claim, para. 45.

[48]   Devas Agreement, Article 2 (Ex. C-16/JCB-37).

[49]   Statement of Claim, para. 48.

[50]   Devas Agreement, Article 17 (Ex. C-16/JCB-37).

[51]   Statement of Claim, para. 50.

[52]   *Id.*, para. 46; Statement of Defence, para. 19.

[53]   Statement of Defence, para. 19; Devas Agreement, Exhibit B, Article 2.1.1 (Ex. C-16/JCB-37).

[54]   Statement of Claim, para. 46; Devas Agreement, Articles 2 and 3(b) (Ex. C-16/JCB-37).

[55]   *Id.*

Antrix an ongoing annual lease fee for the transponders of the INR equivalent of USD 9 million, rising to the INR equivalent of USD 11.25 million once Devas became cash flow positive.[56]

### 3.   Regulatory Approvals

91.   The activities contemplated by the Devas Agreement were subject to a number of approvals and licenses to be obtained in part by Devas and in part by Antrix. Under the Devas Agreement, Antrix was obligated to acquire "all necessary Governmental and Regulatory Approvals relating to orbital slot and frequency clearances, and funding for the satellite to facilitate DEVAS services."[57] Antrix also undertook "through ISRO/DOS" to obtain clearances of all relevant international and national agencies"[58] and to "provide appropriate technical assistance to Devas on a best effort basis for obtaining required operating licenses and Regulatory Approvals."[59]

92.   What is significant in the Respondent's view is that no governmental body of India was party to the Devas Agreement or gave any commitment to grant the necessary approvals to Devas.[60] The role of the Government of India in connection with the Devas Agreement was limited to that of a regulator,[61] and, accordingly, the Devas Agreement contained a comprehensive set of provisions allocating risks and responsibilities in the event that the governmental approvals required for full implementation of the project were not obtained.[62]

### 4.   Delay Damages

93.   The Devas Agreement provided for "Delay Damages" of USD 416,666 per month (for a cap of USD 5 million after 12 months' delay) if Antrix failed to deliver PS1 within three years of the

---

[56]   Statement of Claim, para. 46; Devas Agreement, Articles 4 and 5, Exhibit B (Ex. C-16/JCB-37).

[57]   Statement of Claim, para. 47; Devas Agreement, Articles 2 and 3(c) (Ex. C-16/JCB-37).

[58]   Statement of Claim, para. 47; Devas Agreement, Articles 9 and 12(a)(ii) (Ex. C-16/JCB-37).

[59]   Statement of Claim, para. 47; Devas Agreement, Articles 2 and 3(c) (Ex. C-16/JCB-37).

[60]   The Respondent submits that this is an undisputed material fact in this case; See Transcript, Day 1, 123:15-124:4; Day 5, 1277:19-1278:15.

[61]   Statement of Defence, paras 8, 17. The Respondent submits that this is an undisputed material fact in this case; See Transcript, Day 1, 112:21-114:22; 1274:16-1275:13.

[62]   Statement of Defence, para. 20. The Respondent emphasizes that the implementation of the project was subject to government approvals, and submits that this is an undisputed material fact in this case. See Transcript, Day 1, 114:23-118:13; Day 5, 1273:5-13.

first upfront capacity reservation payment.[63] It also provided that the failure to deliver PS1 within four years from the first payment would be a material breach of the agreement.[64]

### 5.   Termination

94.   The Respondent places special emphasis on Article 7 of the Devas Agreement, setting forth the rights and obligations of the parties upon termination, which could be triggered by either party to the Agreement on a series of grounds:[65]

> Article 7. Termination
>
> a. Termination for convenience by DEVAS
>
> DEVAS may terminate this Agreement in the event DEVAS is unable to get and retain the Regulatory Approvals required to provide the Devas Services on or before the completion of the Pre Shipment Review of PS1. In the event of such termination, DEVAS shall forfeit the Upfront Capacity Reservation Fees made to ANTRIX and any service or other taxes paid by DEVAS and those outstanding to be paid to ANTRIX till such date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement.
>
> b. Termination by DEVAS for fault of ANTRIX
>
> DEVAS may terminate this Agreement at any time if ANTRIX is in material breach of any provisions of this Agreement and ANTRIX has failed to cure the breach within three months after receiving notice from DEVAS setting out the nature of breach and reasons for considering the same as material breach. In such event, ANTRIX shall immediately reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding taxes if applicable, received by ANTRIX till that date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called).
>
> c. Termination for convenience by ANTRIX
>
> ANTRIX may terminate this Agreement in the event ANTRIX is unable to obtain the necessary frequency and orbital slot coordination required for operating PS1 on or before the completion of the Pre Shipment Review of the PS1. In the event of such termination, ANTRIX shall immediately reimburse DEVAS all the Upfront Capacity Reservation Fees and corresponding service taxes received by ANTRIX till that date. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called).
>
> d. Termination by ANTRIX for fault of DEVAS
>
> ANTRIX may terminate this Agreement at any time if:

---

[63]   Statement of Claim, para. 52; Devas Agreement, Articles 2 and 3(c) (Ex. C-16/JCB-37).

[64]   Statement of Claim, para. 52; Devas Agreement, Exhibit B, paras 2.1., 2.2 (Ex. C-16/JCB-37).

[65]   *See* Statement of Defence, paras 20, 21; Devas Agreement, Article 7 (Ex. C-16/JCB-37).

i.   DEVAS is in material breach of any provisions of this Agreement and DEVAS has failed to cure the breach within three months after receiving notice from ANTRIX regarding such breach or,

ii.   Non payment of (a) the Lease Fees and other charges (such as spectrum monitoring charges) by DEVAS for a continued period of twelve (12) months, or if such accumulated delays from recurrent non payments exceed 60 (sixty) months, whichever occurs earlier or, (b) Upfront Capacity Reservation Fees, already due

iii.   In the event that:

a.   A liquidator trustee or a bankruptcy receiver or the like is appointed by a competent court and such appointment remains un-stayed or un-vacated for a period of 90 (ninety) days after the date of such order by a competent court in respect of DEVAS, or

b.   If a receiver or manager is appointed by a competent court in respect of all or a substantial part of the assets of DEVAS and such appointment remains un-stayed or unvacated for a period of 90 (ninety) days after the date of such appointment, or

c.   If all or a substantial part of the assets of DEVAS have been finally confiscated by action of any Governmental Authority, against which no appeal or judicial redress lies.

It is expressly agreed that ANTRIX shall have no right to terminate this Agreement if DEVAS enters into any scheme or arrangement with its creditors, a corporate re-organization or restructuring of its debt and liabilities as long as DEVAS continues to make the Annual Lease Payments to ANTRIX.

In the event of such termination, DEVAS shall forfeit the Upfront Capacity Reservation Fees made to ANTRIX and DEVAS shall be liable to pay any outstanding dues to be paid to ANTRIX by DEVAS. Upon such termination, neither Party shall have any further obligation to the other Party under this Agreement nor be liable to pay any sum as compensation or damages (by whatever name called).

95.   The Respondent emphasizes that, under these provisions, the only consequence arising from the termination of the Devas Agreement is either the retention or the refund of the upfront capacity reservation fees paid by Devas to Antrix.[66]

96.   The Respondent notes that the termination provisions of the Devas Agreement were heavily negotiated.[67] The Respondent relies on the Term Sheet,[68] which contains a set of termination provisions that are, in the Respondent's view, substantially different from those agreed by the parties in Article 7 of the Devas Agreement.[69] The Term Sheet provided (i) that Antrix would

---

[66]   Statement of Defence, para. 21.

[67]   Id., paras 22-28.

[68]   See E-mail from Mr. R. Viswanathan, Forge Advisors, to Mr. K.R. Sridhara Murthi, Antrix Corporation Ltd., and Dr. A. Bhaskaranarayana, ISRO, with Attachment, September 20, 2004 (Ex. R-12/JCB-23); Draft of "Binding Term Sheet" presented on or about September 12, 2004 (Ex. R-13/JCB-20). The Respondent notes that the Claimants submitted a witness statement of Mr. Viswanathan that references the proposed "binding term sheet" without introducing it; See Viswanathan I, paras 48-49; Statement of Defence, para. 22.

[69]   Statement of Defence, para. 22.

"not be entitled to terminate [the agreement] except for non-payment of fees by DEVAS;"[70] and (ii) that Antrix would have to pay liquidated damages, in addition to refunding amounts that may have been paid by Devas to Antrix, in case of termination for any reason other than Devas' non-payment of fees.[71]

97.   Moreover, the Respondent points out that there was nothing in Devas' proposed binding term sheet that provided for liquidated damages running from Devas to Antrix in the event that Devas were to terminate the agreement for its convenience, or in the event of breach by Devas.[72]

98.   Ultimately, the Term Sheet was never executed, and Article 7 of the Devas Agreement, which provides for a single remedy in the event of termination for any reason, was agreed instead.[73]

99.   The Respondent argues that this difference between the termination provisions proposed by Devas and those agreed to by the parties in Article 7 of the Devas Agreement is significant. As a result of the negotiations, the parties' mutual intention and agreement at the time of entry into the Devas

---

[70]   *Id.*, para. 23; E-mail from Mr. R. Viswanathan, Forge Advisors, to Mr. K.R. Sridhara Murthi, Antrix Corporation Ltd., and Dr. A. Bhaskaranarayana, ISRO, with Attachment, September 20, 2004, para. 2.7.1 (Ex. R-12/JCB-23).

[71]   Statement of Defence, paras 23-24; E-mail from Mr. R. Viswanathan, Forge Advisors, to Mr. K.R. Sridhara Murthi, Antrix Corporation Ltd., and Dr. A. Bhaskaranarayana, ISRO, with Attachment, September 20, 2004, paras 2.7.2-2.7.5 (Ex. R-12/JCB-23), which provides:

2.   In the event that ANTRIX terminates the Definitive Agreement for any other reason following signature of Definitive Agreements and prior to DEVAS raising its institutional financing, ANTRIX shall refund to DEVAS all the amounts paid by DEVAS to ANTRIX for any reason whatsoever, plus liquidated damages of INR 460 million for investment in the business and related losses including but not limited to investments, capital raising costs, lost business opportunities, reputation loss, penalties, development costs, mobile receiver and terrestrial repeater development, infrastructure costs, severances, and vendor and dealer negotiation costs[.]

3.   In the event that ANTRIX terminates the Definitive Agreement for any other reason following signature of Definitive Agreements and after DEVAS has raised its first institutional round of funding, ANTRIX shall refund to DEVAS all the amounts paid by DEVAS to ANTRIX for any reason whatsoever, plus liquidated damages of INR 6.9 billion for investment in the business and related losses including but not limited to investments, capital raising costs[,] lost business opportunities, reputation loss, penalties, development costs, mobile receiver and terrestrial repeater development, infrastructure costs, severances, and vendor and dealer negotiation costs[.]

5.   DEVAS may terminate this binding Term Sheet or Definitive Agreements for cause, which shall include failure of ANTRIX to meet its obligations, or breach of Agreement, or withdrawal of approvals and licenses controlled by ANTRIX. In the event of such termination, DEVAS shall be entitled to a refund of all the amounts paid by DEVAS to ANTRIX for any reason whatsoever plus liquidated damages of INR 6.9 billion for investment in the business and related losses, including but not limited to investments, capital raising costs, lost business opportunities, reputation loss, penalties, development costs, mobile receiver and terrestrial repeater development, infrastructure costs, severances, and vendor and dealer negotiation costs."

[72]   Statement of Defence, para. 25.

[73]   *Id.*, para. 26.

Agreement was to limit liability in the event of a termination. The maximum liability was either the retention (or refund, as the case may be) by Antrix of the upfront capacity reservation fees paid to date.[74]

100.   The Claimants contend that Antrix never properly invoked the termination regime in Article 7 of the Devas Agreement. Moreover, it argues, even if those provisions operated to shield Antrix from damages for its unlawful renunciation and/or repudiation of the Agreement (which is denied), Article 7 still would not provide a 'safe harbor' for India in this proceeding.[75]

### 6.   *Force Majeure*

101.   Article 11 of the Devas Agreement provided that neither Devas nor Antrix was "liable for any failure or delay in performance of its obligations" in the event of a *force majeure* as defined in this Article.[76]

102.   A *force majeure* event was limited to matters "beyond reasonable control of the party affected" which prevented performance "despite all efforts of the Affected Party to prevent it or mitigate its effects."[77] In the Claimants' view, this notion of *force majeure* cannot be reconciled with Antrix's eventual declaration of *force majeure*, which was premised upon a Union Cabinet policy decision and was purposefully procured by Antrix/ISRO/DOS in an effort to extricate Antrix from the Devas Agreement.[78]

103.   In turn, the Respondent highlights that Article 11 of the Devas Agreement defined "Force Majeure event" to include "acts of or failure to act by any governmental authority acting in its sovereign capacity."[79] It is obvious, in the Respondent's view, that the Government of India had the power to take action to prevent the performance by either or both parties to the Devas Agreement.[80]

---

[74]   *Id.*, para. 22.

[75]   Statement of Reply, paras 15, 129-37.

[76]   Statement of Claim, para. 53; Statement of Defence, para. 29; Devas Agreement, Article 11 (Ex. C-16/JCB-37).

[77]   Statement of Claim, para. 53; Devas Agreement, Articles 8-9, 11(b) (Ex. C-16/JCB-37).

[78]   Statement of Claim, paras 53, 178-84.

[79]   Statement of Defence, para. 29; Devas Agreement, Article 11(a) (Ex. C-16/JCB-37).

[80]   Statement of Defence, para. 29. The Respondent submits that this is an undisputed material fact in this case. *See* Transcript, Day 1, 118:14-119:6; Day 5, 1273:14-1274:15.

D.     THE INITIAL DEVELOPMENT OF THE DEVAS PROJECT

1.     *Establishment of Corporate Infrastructure and Initial Financing*

104.   According to the Claimants, shortly after the conclusion of the Devas Agreement in early 2005, Devas formed its management team and established its company infrastructure, including an office in Bangalore.[81]

105.   On December 1, 2005, the Union Cabinet formally approved the construction and launch of satellite PS1,[82] and the Devas Agreement became effective on February 2, 2006, upon the issuance of a letter by Antrix informing Devas that it had obtained all required approvals for the Devas project[83] including all the necessary frequencies and the orbital slots in which the satellites PS1 and PS2 were to operate.[84]

106.   The Claimants consider as significant that the Government of India worked continuously to protect its rights at the ITU in furtherance of the Devas Agreement after it came into effect.[85]

107.   On March 16, 2006, CC/Devas and Telcom Devas made a first round of investment of approximately USD 7.5 million each,[86] part of which was used by Devas to pay the first instalment of the upfront capacity reservation fee for PS1 on June 21, 2006, pursuant to the Devas Agreement.[87]

108.   A second round of investment, of approximately the same amount, was made on June 18, 2007, to pay the first instalment of the upfront capacity reservation fee for PS2.[88] The Claimants also

---

[81]   Statement of Claim, para. 58.

[82]   Notice of Arbitration, para. 36; Statement of Claim, paras 60, 61.

[83]   Notice of Arbitration, para. 37; Statement of Claim, paras 62, 63; Letter from Antrix (Murthi) to Devas (Viswanathan), February 2, 2006 (Ex. C-24/JCB-51).

[84]   Statement of Claim, para. 62.

[85]   *Id.*, para. 60 with respect to protecting its orbital slot and Statement of Claim, para. 64; Respondent's Rejoinder, para. 9.3; Expert Report of John Lewis, dated June 25, 2013, para. 68 ("**Lewis I**"); *See* Notice of Arbitration, para. 35 and Transcript, Day 1, 42:22-43:5 with respect to securing a grandfathered right to use higher allowable amounts of power in a satellite beam operating in the S-band.

[86]   Statement of Reply, para. 19(b); Respondent's Rejoinder, para. 9.1.

[87]   Statement of Claim, para. 65; Statement of Reply, para. 19(b); Respondent's Rejoinder, para. 9.2; Share Subscription Agreement among Devas, the Devas Founders and CC/Devas and Telcom Devas, March 16, 2006 (Ex. C-31/JCB-59); Minutes of Devas Board Meeting, May 19, 2006 (Ex. C-34/JCB-60); Receipt for Payment of First Installment of Upfront Capacity Reservation Fee from Devas to Antrix, June 21, 2006 (Ex. C-35/JCB-61).

[88]   Notice of Arbitration, para. 38; Statement of Claim, para. 65; Statement of Reply, para. 19(c); Respondent's Rejoinder, para. 9.2; Share Subscription Agreement among Devas, the Devas Founders and CC/Devas and

procured an additional investment from Deutsche Telekom Asia ("**DT Asia**") that gave Devas approximately USD 75 million of additional capital as well as access to some of DT Asia's business resources.[89]

109. In April 2008, representatives of Devas and Antrix attended the first of the nine design reviews of PS1, which continued until August 2010.[90] Devas also secured licenses to deliver internet services throughout India[91] and to conduct experimental trials,[92] a first round of which successfully took place in Bangalore in September 2009 in the presence of Dr. Radhakrishnan.[93]

### 2. *Delays to the Delivery of Satellites*

110. Although the Devas Agreement imposed a deadline for the launch of the satellites by June 2009 at the latest,[94] Antrix was unable to meet the contractual deadline, but promised that the launch would take place in late 2009 or early 2010.[95] Delivery of PS1 was subjected to further delays until September 1, 2010,[96] despite efforts by Devas to supervise the completion of satellites.[97]

111. Irrespective of these delays, Claimants continued to meet financial obligations and technical and strategic milestones, including a further capital injection of USD 25 million in Devas by

---

Telcom Devas, March 16, 2006 (Ex. C-39/JCB-59); Receipt for Payment of First Installment of Upfront Capacity Reservation Fee for PS2 from Devas to Antrix, June 18, 2007 (Ex. C-40/JCB-70); Singh I, paras 39-40; Witness Statement of Arun Gupta, dated June 26, 2013, paras 20-21 ("**Gupta I**").

[89]   Statement of Claim, para. 67; Statement of Reply, para. 19(f); Respondent's Rejoinder, para. 9.5. Reply Witness Statement of Arun Gupta, dated March 14, 2014, paras 14-17 ("**Gupta II**").

[90]   Statement of Claim, para. 68; GSAT-6 Design Reviews, April 16, 2008, onwards (Ex. C-46/JCB-82); Witness Statement of Gary Parsons, dated June 26, 2013, para. 39 ("**Parsons I**").

[91]   Statement of Claim, para. 66; Statement of Reply, para. 19(g); Viswanathan I, para. 97.

[92]   Statement of Claim, para. 69; Statement of Reply, para. 19(i); Viswanathan I, paras 120-26. *See also* GSAT-6A Spacecraft Project Report by ISRO (draft), July 2009, paras 1, 3 (Ex. C-67/JCB-108); License to Import Wireless Transmitting and/or Receiving Apparatus into India, March 26, 2009 (Ex. C-61/JCB-100).

[93]   Statement of Claim, para. 69; Statement of Reply, para. 19(j); Respondent's Rejoinder, para. 9.8; Viswanathan I, paras 130-33; Singh I, paras 52-54; Reply Witness Statement of Dr. Rajendra Singh, dated March 14, 2014, para. 12 ("**Singh II**"); Gupta I, para. 27; Gupta II, paras 11-12; Witness Statement of Lawrence T. Babbio, Jr., dated June 26, 2013, para. 26 ("**Babbio I**"); Suresh Report, para. 9 (Ex. C-94/JCB-146).

[94]   Statement of Claim, para. 70, quoting Devas Agreement, Articles 2 and 3(b) (Ex. C-16/JCB-37).

[95]   Statement of Claim, para. 71; Compilation of Presentations by ISRO to Devas, April 11, 2009 onwards (Ex. C-64/JCB-103).

[96]   Statement of Claim, paras 80-83; Viswanathan I, para. 161; Gupta I, para. 32; Singh I, para. 59.

[97]   Statement of Claim, para. 75; Viswanathan I, para. 157; GSAT-6 Overview (Pratap), November 12, 2009, p. 32 (Ex. C-85/JCB-131).

CC/Devas, Telcom Devas, and DT Asia[98] and purchase of Devas shares by DEMPL in 2009 and 2010.[99] With respect to the technical and strategic aspects of the Devas project, Devas duly reported its progress to the Director of the Satellite Communication and Navigation Programs at ISRO[100] and continued to successfully conduct phase II experimental trials in the summer of 2010.[101]

112. Around May 2010, the Claimants allege that "the Indian press began to publish recklessly erroneous allegations about Devas and the Devas Agreement."[102] In an attempt to dispel the negative reports, Devas held numerous meetings with various Indian governmental ministries in the summer and autumn of 2010, in which no concerns about the Devas Project or about Devas' allocation in the S-band were raised.[103]

113. Moreover, Devas kept pressing for delivery of PS1,[104] as evident from communications with Dr. Radhakrishnan;[105] relevant parties at Antrix[106] and the Space Commission[107] spanning from July 2010 to October 2010.

114. According to the Claimants, the last meeting between Devas and officials of ISRO, DOS and Antrix occurred on January 10, 2011,[108] after which the Government of India ceased all communications.[109]

---

[98]  Statement of Claim, para. 73; Viswanathan I, paras 135-37; Singh I, para. 56; Gupta I, paras 29-31.

[99]  Statement of Claim, para. 74; Viswanathan I, paras 138-43; Amendment No. 5 to FIPB approval No. FC.II. 107(2006)/43(2006), September 29, 2009 (Ex. C-82/JCB-124).

[100]  Statement of Claim, para. 85; Presentation by Devas to Director, SCNP, ISRO, April 21, 2010, p. 16 (Ex. C-93/JCB-140).

[101]  Notice of Arbitration, para. 38; Statement of Claim, para. 84; Statement of Reply, para. 19(k); Viswanathan I, para. 162.

[102]  Viswanathan I, para. 165; *see* Statement of Claim, paras 86, 110.

[103]  Statement of Claim, para. 87; Viswanathan I, para. 167; Babbio I, para. 31.

[104]  Statement of Claim, paras 102-06.

[105]  Letter from Devas (Viswanathan) to DOS/ISRO/Antrix (Radhakrishnan), October 11, 2010 (Ex. C-108/JCB-180); *See also* Viswanathan I, para. 181.

[106]  Letter from Devas (Viswanathan) to Antrix (Murthi), July 20, 2010 (Ex. C-98/JCB-166).

[107]  Letter from Devas (Viswanathan) to Space Commission (Alex), September 2, 2010 (Ex. C-106/JCB-177). *See also* Viswanathan I, para. 176.

[108]  Statement of Claim, para. 107; Viswanathan I, para. 186.

[109]  Statement of Claim, paras 107-09.

115.   The Claimants maintain that, as of February 2011, Devas was in a position to deliver state-of-the-art hybrid satellite and terrestrial telecommunication services across India.[110]

116.   The Respondent dismisses the Claimants' recitation of these factual matters as irrelevant or unhelpful to the Claimants' case, stating that none of these facts relied upon give rise to a legal claim or an acquired right of the Claimants to implement the Devas project.[111]

## E.   THE PARALLEL REVIEW PROCESS OF THE DEVAS AGREEMENT AND ITS SUBSEQUENT ANNULMENT

117.   Both Parties acknowledge that several Indian authorities undertook a unilateral review of the terms of the Devas Agreement in parallel with the initial performance of its provisions, ultimately culminating in its annulment. What follows is a summary of key events that were unbeknownst to the Claimants at the time, but occurred in parallel to the initial performance of the Devas Agreement, from 2005 to February 2011.

### 1.   India's Internal Discussions on Security Needs for S-band Capacity

118.   In 2005, India's military and paramilitary agencies started expressing a demand for S-band capacity for non-commercial purposes.[112] In the period 2005-2007, these demands took the form of reviews and projections of future S-bandwidth requirements.[113] However, in September 2007, a concern emerged that if S-band spectrum was "not safeguarded against the bid of commercial operators in India, this spectrum [would] not be available for any future utilization for the military applications…," which would "severely jeopardize the future Defence services plans of providing SATCOM connectivity."[114]

---

[110]   Statement of Reply, para. 20.

[111]   Respondent's Rejoinder, paras 8-9. *See*, generally, Transcript, Day 1, 139:8-146:22.

[112]   HQ Integrated Defence Staff, Note, October 14, 2005 (App. VA-2/JCB-42).

[113]   Minutes of Third Task Force Meeting with DoS Held on February 21, 2006 at HQ IDS New Delhi, March 6, 2006 (App. VA-3/JCB-56); HQ Integrated Defence Staff ops Branch/IW & IT Dte, Note, *Bandwidth Requirements- Satellite Commn*, August 9, 2006 (App. VA-4/JCB-64); Minutes of the Integrated Space Cell Meeting Held on February 19, 2007 at HQ IDS, March 26, 2007 (App. VA-5/JCB-66); HQ Integrated Defence Staff, Convening Order, *Constitution of an Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 GHz to 2.69 GHz (S-Band) by Defence Services*, August 30, 2007 (App. VA-6/JCB-73).

[114]   Report of the Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 to 2.69 GHz (S-band) by Defence Services, September 2007, paras 10-12 (App. VA-7/JCB-92).

119. The armed forces' needs for S-band spectrum continued to be reviewed in the following years.[115] The Claimants remained unaware of the existence of any needs for S-band spectrum of the Indian military until the Government of India announced that the CCS had decided to annul the Devas Agreement in February 2011. According to Claimants, they were not made aware of "competing demands for S-band capacity" until the date of Antrix's termination notice."[116]

### 2. The Suresh Report

120. The Respondent explains that, in November 2009, Mr. A. Vijay Anand, the new Joint Secretary of the Department of Space and Chief Vigilance Officer, learned of possible irregularities relating to the Devas Agreement.[117] These irregularities, notably the allegedly unauthorized amendment to the minutes of a January 6, 2009 meeting of a review committee of the Technical Advisory Committee ("**TAG**") of the Indian Satellite Coordination Committee ("**ICC**"), had the effect of eliminating significant comments that had been made by the representatives of the Wireless Planning and Coordination Wing (the "**WPC**"), a body responsible for the issuance of an operating license and frequency allocation.[118]

121. The Respondent contends that the disclosure of potential irregularities and the information obtained at the preliminary stage of this internal investigation led Dr. Radhakrishnan to institute a comprehensive review of the Devas Agreement on December 8, 2009. The review was to be conducted by a committee established through the Department of Telecommunications ("**DOT**") and chaired by Dr. B.N. Suresh, Director of the Indian Institute of Space and Technology (the "**Suresh Committee**").[119]

---

[115] Minutes of the Special ISC Meeting Between Reps of ISRO & Reps of Three Services to Address Satellite Based Communication Related Issues, November 25, 2008 (App. VA-8/JCB-92); Office Order of ISRO, May 20, 2009 (App. VA-9/JCB-105); Minutes of Meeting held on December 15, 2009 at ISAC, Bangalore between ISC of HQ IDS, MOD and ISRO, January 25, 2010 (App. VA-10/JCB-134).

[116] Statement of Reply, para. 29; Respondent's Rejoinder, para. 114.

[117] Statement of Defence, para. 39.

[118] According to the Respondent the statement that was allegedly omitted from the transcript implied, in essence, that Devas would not be permitted to use the S-BSS frequencies for terrestrial transmission under existing policy, yet that is precisely what it wanted to do; *See* Statement of Defence, para. 39; Anand I, paras 8-11.

[119] Statement of Defence, para. 42; Anand I, para. 12; Memorandum from K. Radhakrishnan, Chairman, ISRO, to Dr. B. N. Suresh, Former Member, Space Commission & Director, ISST, Shri. S.K. Jha, Director, Department of Space, Shri S. Sayeenathan, Dy. Director, FMO, and Shri Parameshwaran, Director, BD, ACL, Constitution of a Committee to Look into Devas Multimedia Contract and Terms of Reference, December 8, 2009 (App. VA-17/JCB-133). *See also* Notice of Arbitration, para. 41; Statement of Claim, para. 78; Statement of Reply, para. 90.

122. The Suresh Committee acted on its mandate to review the "legal, commercial, procedural and technical aspects" of the Devas Agreement[120] and produced a report dated May 2010 (the "**Suresh Report**").[121] However, its existence was not made public until the February 8, 2011 press conference.[122]

123. While the Suresh Report made certain suggestions concerning future contractual negotiations by Antrix and ISRO, the Claimants highlight that it did not find any fault in Devas' conduct in reaching the Agreement.[123] In particular, the Suresh Report noted that there was "absolutely no doubt on the technical soundness of the digital multimedia services as proposed in this hybrid satellite and terrestrial system."[124] Nor did the Suresh Report suggest that the Devas Agreement should be annulled because there was an overwhelming military need for S-band spectrum.[125] Instead, say the Claimants, the report contradicts India's case that there was a military need for all available S-band:

> Considering the fact ISRO/DOS has developed these complex technologies to start a new service in the national interest it is noted that the agreement does not make any mention of preference being offered explicitly to ISRO **in case there is a demand on ISRO/DOS for use of this service under emergent conditions for strategic or any other essential applications**.[126]

124. In response, the Respondent submits, Dr. Suresh remarked that only 10% of the capacity to be leased under the Devas Agreement would be available for ISRO, which "would bring in certain limitations on the availability of spectrum for any essential demands in future." Moreover, he recommended that:

> The utilization of the S-band frequency spectrum allotted for satellite based services to ISRO/DOS for satellite communications is extremely important. Therefore this aspect has to be critically examined considering all usages including GSAT-6 and GSAT-6A by a

---

[120]    Statement of Claim, para. 78; Statement of Defence, para. 42; Suresh Report, enclosure 1 (Ex. C-94/JCB-146); Memorandum from K. Radhakrishnan, Chairman, ISRO, to Dr. B. N. Suresh, Former Member, Space Commission & Director, ISST, Shri. S.K. Jha, Director, Department of Space, Shri S. Sayeenathan, Dy. Director, FMO, and Shri Parameshwaran, Director, BD, ACL, Constitution of a Committee to Look into Devas Multimedia Contract and Terms of Reference ISRO, Memorandum, Constitution of a Committee to Look into Devas Multimedia Contract and Terms of Reference, December 8, 2009 (App. VA-17/JCB-133).

[121]    Suresh Report (Ex. C-94/JCB-146).

[122]    Statement of Claim, paras 77-78; Transcript, ISRO press conference, CNN-IBN special telecast, February 8, 2011, p. 4 (Ex. C-125/JCB-206).

[123]    Statement of Claim, para. 88.

[124]    *Id*., para. 88, citing Suresh Report, p.1 (Ex. C-94/JCB-146).

[125]    Statement of Reply, paras 33-34.

[126]    *Id*., para. 33, citing Suresh Report, para. 14(vii) (Ex. C-94/JCB-146) (emphasis by the Claimants).

competent technical team on high priority. **The strategic and other essential needs of the country should also be considered**.[127]

125. In any event, the Respondent notes that the Devas Agreement was ultimately cancelled for national security reasons based on the nation's strategic requirements for the spectrum, which had crystallized by the end of 2009.[128]

### 3.    The Space Commission's Determination to Annul the Devas Agreement

126. The Parties disagree as to why DOS decided to pursue the review of the Devas Agreement after the Suresh Report was issued.

127. In this regard, the Claimants emphasize that, towards the end of May 2010, the media in India had begun making assertions that DOS had given away valuable S-band spectrum to Devas "on the quiet" and calling on the Government of India to annul the Agreement.[129] However, according to the Claimants, despite the negative press reports, in the numerous meetings held with various Indian governmental ministries during the summer and autumn of 2010, in particular with the Advisor to the Prime Minister and the National Security Advisor where Devas delivered presentations on its history, accomplishments and progress on collaboration with the Government of India,[130] no concerns about the Devas Project or about Devas' allocation in the S-band were raised.[131]

128. In the Claimants' perspective, it was the prospect of a further government scandal that caused Dr. Radhakrishnan to seek to cancel the Devas Agreement and execute his "termination plan," and not any "crystalized" need of the military.[132] To support this contention, the Claimants rely on a number of communications from DOT to Mr. Balachandhran, Additional Secretary of ISRO, and to Dr. Radhakrishnan dated June 4, 2010 and June 14, 2010, respectively enclosing two

---

[127]  Statement of Defence, para. 42, citing Suresh Report, para. 15.1 (Ex. R-24/JCB-146) (emphasis by the Respondent). The Claimants interpret this remark of the Suresh Report as merely suggesting that "a competent technical team should take a look at whether the spectrum is being optimized through these systems"; *See* Transcript, Day 1, 64:25-65:3.

[128]  Statement of Defence, para. 43.

[129]  Statement of Claim, para. 110; Viswanathan I, para. 165; Statement of Reply, para. 36.

[130]  *See* Presentation by Devas to Advisor to the Prime Minister of India on Public Information, Infrastructure & Innovations (Pitroda), June 10, 2010 (Ex. C-95/JCB-147); Presentation by Devas to the National Security Advisor, June 22, 2010 (Ex. C-271/JCB-159).

[131]  Statement of Claim, para. 87; Viswanathan I, para. 167; Babbio I, para. 31.

[132]  Statement of Reply, paras 36-38; Transcript, Day 1, 68:13-14; *See* Statement of Reply, para. 37(a)-(c).

newspaper articles and asking both officials to expedite their comments on them.[133] Following such communications, Mr. Balachandran requested Antrix immediately to provide six copies of the Devas Agreement, which was done the same day.[134] The allegation of the Claimants is that, "within two days of receiving the unwelcome news of another potential government scandal,"[135] on June 16, 2010, Dr. Radhakrishnan sought ways of annulling the Devas Agreement by sending two memoranda to the DOT and the Ministry of Law and Justice seeking advice as to how to annul the Devas Agreement.[136]

129. In reply, the Respondent produces a letter from the Ministry of Defence addressed to the ISRO dated April 23, 2010 in which the latter provided its estimated bandwidth requirements in respect of Army, Airforce and Navy up to year 2022.[137] In accordance with the letter, the demand for S-band in particular would increase up to 52.5 MHz by 2017 and to 102.5 MHz by 2022. The Respondent further cites the letter from Dr. Suresh to Dr. Radhakrishnan dated June 7, 2010 to prove the delivery of the Suresh Report to the latter on the same date.[138]

130. The Respondent explains that the two memoranda from Dr. Radhakrishnan on June 16, 2010 only followed the letter from the Ministry of Defence and the receipt of the Suresh Report, rather than the two newspaper articles as the Claimants assert.[139] The purpose of these memoranda, contrary to the Claimant's allegation, was to consult DOT and the Ministry of Law and Justice regarding whether, rather than how, the Devas Agreement needed to be annulled in order firstly, to preserve

---

[133]   *See* Letter from Dr. Ashok Chandra to ISRO (Balachandhran), June 4, 2010 (Ex. C-210/JCB-144); Letter from DOT (P.J. Thomas) to DOS/ISRO (Radhakrishnan), June 14, 2010 (Ex. C-211/JCB-149).

[134]   Statement of Reply, para. 37(c); *See* Letter from DOS (Balachandhran) to Antrix (Murthy), June 14, 2010 (Ex. C-212/JCB-150); Letter from Antrix (Parameswaran) to DOS (Balachandran), June 14, 2010 (Ex. C-213/JCB-151).

[135]   Statement of Reply, para. 4.

[136]   *See* Memorandum from Dr. Radhakrishnan, Secretary, Department of Space, to Secretary, Department of Telecommunications, June 16, 2010 (Ex. R-25/JCB-153); Memorandum from Dr. Radhakrishnan, Secretary, Department of Space, to Mr. Viswanathan, Advisor to the Minister for Law and Justice, Ministry of Law and Justice, June 16, 2010 (Ex. R-26/JCB-154).

[137]   *See* Letter from the Ministry of Defence to ISRO/Department of Space (Redacted), April 23, 2010 (Ex. R-150/JCB-141).

[138]   *See* Letter from Dr. Suresh, ISRO to Dr. Radhakrishnan, ISRO (enclosing *Report on GSAT-6*, Submitted by Dr. Suresh, Director, Indian Institute of Space and Technology, Thiruvananthapuram, Submitted to: Chairman, ISRO/Secretary, Department of Space), June 7, 2010 (Ex. R-125/JCB-145).

[139]   Respondent' Rejoinder, para. 10.

the S-band spectrum for the strategic requirements of the nation and, secondly, to ensure a level playing field for the other service providers using terrestrial spectrum.[140]

131. In a note responding to Dr. Radhakrishnan's memorandum, Mr. Viswanathan, Advisor to the Minister for Law and Justice, indicated that, during a discussion with Dr. Radhakrishnan, it was mentioned that after the conclusion of the Devas Agreement new strategic needs emerged which required accommodation in the S-band.[141] He noted that, given that Devas Agreement would give Devas 90% of the capacity of the satellites in the S-band, the result was that there would be little space available in the satellite for catering for strategic demands.[142] The Advisor also gave his opinion as to how the Agreement could be annulled through the invocation of its termination provisions.[143]

132. On the other hand, DOT advised Dr. Radhakrishnan that "the spectrum planned by DOS for strategic use is not to be shared with commercial applications as in the case of [Devas]."[144] Considering that the Devas Agreement would allow Devas to offer BWA services in India, DOT further noted that in India, in accordance with the 2008 National Frequency Allocation Plan, only a part of the S-band "has been enabled for BWA applications in view of the satellite based strategic requirement projected by DOS."[145] Regarding the potential terrestrial use of the S-band,

---

[140] Statement of Defence, para. 44; *See* Anand I, paras 14-16; Memo from K. Radhakrishnan, Secretary, Department of Space, to Secretary, Department of Telecommunications, June 16, 2010 (Ex. R-25/JCB-153); Memo from K. Radhakrishnan, Secretary, Department of Space, to T.K. Viswanathan, Advisor to Law Minister, Ministry of Law and Justice, June 16, 2010 (Ex. R-26/JCB-154). The Ministry of Law and Justice noted that "[t]he Central Government (Department of Space)[,] in exercise of its sovereign power and function…may take a policy decision that due to the needs of strategic requirements, the Central Govt/ISRO would not be able to provide orbital slot in S band for operating PS1 to the Antrix for commercial activities," whereas DOT stated that "[t]he spectrum planned by DOS for strategic use is not to be shared with commercial applications as in the case of M/s Devas Multimedia."; *See* Note from T. K. Viswanathan, Advisor to the Minister for Law and Justice, Ministry of Law and Justice, to the Department of Space, June 18, 2010, para. 12 (App. VA-18/JCB-156); Memorandum from P. J. Thomas, Secretary, WPC Wing, to Secretary, Department of Space, July 6, 2010, para. 2(i) (App. VA-19/JCB-163), respectively.

[141] *See* Note from Viswanathan, Advisor to the Minister for Law and Justice, Ministry of Law and Justice, to the Department of Space, June 18, 2010 (Ex. VA-18/JCB-156).

[142] *Id*.

[143] *Id*.

[144] *See* Memorandum from P.J. Thomas, Secretary, WPC Wing, to Secretary, Department of Space, July 6, 2010 (Ex. R-138/VA-19/JCB-163).

[145] *Id*.

DOT mentioned the recommendation of the Telecom Regulatory Authority of India (the "**TRAI**") that "spectrum other than the band 800, 900 and 1900 should be auctioned."[146]

133. Following DOS' consultations with DOT and the Ministry of Law and Justice, DOS requested from Antrix the reports of its financials since inception and those of Devas and was provided therewith.[147] Through Dr. Radhakrishnan, DOS brought the Devas Agreement to the attention of the Space Commission, in the form of a note during a regularly scheduled meeting,[148] and sought guidance on a further course of action.[149] In this note, DOS referred to three reasons for examining the Devas Agreement—the demands of strategic requirements; the opaqueness of the Agreement, which did not observe the principle of non-exclusiveness when allotting S-band to private players; and the lack of consultation with DOT over a service that includes terrestrial connectivity.[150] The Claimants point to a statement in this note to the effect that, on June 16, 2010, when Dr. Radhakrishnan approached the Ministry of Law and Justice for the above reasons, he did so "to request Ministry of Law and Justice to give its opinion as to how to annul the contract."[151]

134. After its deliberations, the Space Commission concluded that DOS, "in view of priority to be given to nation's strategic requirements including societal ones may take actions necessary and instruct [Antrix] to annul the [Devas Agreement],"[152] and that "Department may evolve a revised utilization plan for GSAT-6 and GSAT-6A satellites, taking into account the strategic and societal imperatives of the country."[153]

### 4.    *The Opinion of the Additional Solicitor-General*

135. Subsequent to the determination of the Space Commission, DOS sought the opinion of Mr. Mohan Parasaran, the ASG of India, on whether the Devas Agreement could "be annulled by invoking any of the provisions of the contract in order to (i) preserve precious S-band spectrum

---

[146]    *Id*.

[147]    *See* Letter from Antrix (Krishnan) to DOS, June 17, 2010 (Ex. C-214/JCB-155); Letter from DOS (Rajamma) to Antrix, June 19, 2010 (Ex. C-215/JCB-157); Letter from Antrix (Murthi) to DOS (Balachandhran), June 21, 2010 (Ex. C-216/JCB-158).

[148]    Note to the Space Commission, July 2, 2010 (Ex. C-219/JCB-160); *See* Statement of Reply, para. 37(i).

[149]    Statement of Defence, para. 45.

[150]    Note to the Space Commission, July 2, 2010, para. 14.1 (Ex. C-219/JCB-160).

[151]    *See* Statement of Reply, para. 37(i).

[152]    *See* Minutes of 117th Meeting of the Space Commission Held at DOS Branch Secretariat, New Delhi, on July 2, 2010, signed July 21, 2010 (Ex. R-23/JCB-161).

[153]    *See* Statement of Defence, para. 47; Statement of Reply, para. 37(i).

for strategic requirements of [India] and (ii) to ensure a level playing field for other service providers using terrestrial spectrum."[154] The ASG issued his Opinion on July 12, 2010 (the "**Opinion of the ASG**").[155]

136.  The Opinion of the ASG revisited the background of the Devas Agreement and India's need of the S-band spectrum "for strategic and societal applications" of several Indian agencies, including the armed forces and Indian Railways.[156] Thereafter, the Opinion of the ASG reviewed the terms of the Devas Agreement to identify "justifiable or legal grounds existing for [its] termination,"[157] namely Article 11(b) of the Agreement, containing the *force majeure* clause.

137.  The Opinion of the ASG concluded that "any policy taken by the Government of India with regard to allocation and use of S bandwith [sic] [...] would fall within the doctrine of force majeure, as envisaged in the [Devas Agreement]," and it considered "more prudent" that such decision be taken by means of "a policy decision having the seal and approval of the Cabinet," and not by DOT, since "to disable one of the parties to perform its obligations under the contract, the act must be an act by the governmental authority acting in its sovereign capacity."[158]

138.  In the Claimants' view, the Opinion of the ASG suggests that the Respondent was to concoct a *force majeure* event based on a "policy" decision having the "seal and approval of the Cabinet,"[159] and on India's new alleged needs for national strategic requirements for the S-band spectrum that had been allocated to Devas, even though no such need was ever expressed to Devas in its many meetings with India's government agencies and officials.[160]

139.  The Respondent rejects the Claimants' characterization of the Opinion of the ASG, maintaining that there is no indication that the security reasons motivating the decision were contrived, concocted, engineered or fabricated or that the Devas Agreement should be terminated for commercial reasons. According to the Respondent, the Opinion of the ASG merely reflects the

---

[154]  Opinion of Mr. Mohan Parasaran, Additional Solicitor General of India, to Secretary, Department of Space, July 12, 2010 (the "**Opinion of the ASG**"), p. 3 (Ex. R-30/JCB-165).

[155]  Opinion of the ASG (Ex. R-30/JCB-165).

[156]  *Id.*, pp. 1-2.

[157]  *Id.*, p. 2.

[158]  *Id.*, p. 5.

[159]  Statement of Claim, paras 95-101; Statement of Reply, paras 37(k)-(m).

[160]  Notice of Arbitration, para. 5; Statement of Claim, para. 101.

view that the Government of India had the absolute right to terminate the Devas Agreement for legitimate security grounds.[161]

### 5. *DOS' Note for the CCS and the CCS' Decision to Annul the Devas Agreement*

140. The Respondent explains that, as mandated by the Space Commission in its decisions taken at its July 2, 2010 meeting, the Additional Secretary of the Department of Space, Mr. G. Balachandran, was asked to review the Suresh Report and provide his comments so that appropriate internal actions could be taken.[162]

141. Mr. Balachandran issued his report on January 9, 2011 (the "Balachandran Report").[163] According to the Balachandran Report, the allocation of S-band spectrum to Devas under the Devas Agreement would not "leave enough spectrum for ISRO/DOS use if required"[164] and expressed views that "[s]trategic and other essential needs of [India] should be the first priority"[165] in any such allocation. In this regard, the Balachandran Report noted that Antrix had failed to consult with the ICC regarding the national needs of S-band spectrum prior to the conclusion of the Devas Agreement.[166] The Balachandran Report concluded that the termination of the Devas Agreement ordered by the Space Commission "need[s to] be expedited."[167]

142. On February 8, 2011, at a press conference initiated by Dr. Radhakrishnan together with Dr. Kasturirangan, then senior member of Antrix, the Space Commission's decision to annul the Devas Agreement was announced.[168] Dr. Radhakrishnan revealed that DOS had instituted a review of the Devas Agreement in December 2009, and that the decision to cancel the Devas Agreement had been taken in July 2010 by the Space Commission in light of the "high priority

---

[161]   Statement of Defence, para. 48.

[162]   *Id.*, para. 50.

[163]   *Report on Dr. Suresh Committee Report on ANTRIX-DEVAS Agreement & Issues Arising From Therein*, Submitted by Mr. G. Balachandran, Additional Secretary, Department of Space, January 9, 2011 (the "**Balachandran Report**") (Ex. R-31/JCB-194).

[164]   Balachandran Report, p. 18 (Ex. R-31/JCB-194).

[165]   *Id.*, pp. 10, 13-14.

[166]   *Id.*, p. 20.

[167]   *Id.*, p. 25.

[168]   Statement of Claim, para. 111; Transcript, ISRO press conference, CNN-IBN special telecast, February 8, 2011, p. 4 (Ex. C-125/JCB-206).

for the country's strategic requirements and the societal applications which have to be met using the S-band spectrum that is in the possession of ISRO."[169]

143. DOS also commissioned Mr. Balachandran with the preparation of a Note for the CCS, which was finalized on February 16, 2011 (the "**Note for the CCS**").[170]

144. The stated purpose of the Note for the CCS was to seek approval of the CCS for the annulment of the Devas Agreement "in view of priority to be given to nation's strategic requirements including societal ones."[171] This Note also identified a number of demands for S-band spectrum from several defence and security agencies in India[172] and summarized the deliberations of the July 2010 meeting of the Space Commission.[173]

145. On February 9, 2011, the Indian Prime Minister constituted a "High Powered Review Committee" chaired by Mr. B.K. Chaturvedi (the "**Chaturvedi Committee**").[174] The Chaturvedi Committee's mandate was the same as for the Suresh Committee (i.e. "review the technical, commercial, procedural and financial aspects of the [Devas Agreement]"),[175] but it was also required to "tak[e] into account the report of internal review conducted by [DOS]," as well as the "review mandated by the Space Commission at its [...] meeting, held on July 2, 2010."[176]

146. On February 17, 2011, the CCS took the decision to annul the Devas Agreement. On the same day, the Government of India issued a press release announcing that the CCS had decided to annul the Devas Agreement. The press release reads in full:

---

[169] Transcript, ISRO press conference, CNN-IBN special telecast, February 8, 2011, p. 4 (Ex. C-125/JCB-206).

[170] Department of Space, Note for the Cabinet Committee on Security, *Annulling the "Agreement for the Lease of Space Segment Capacity on ISRO/Antrix S-Band Spacecraft by Devas Multimedia Pvt Ltd."* , February 16, 2011 (the "**Note for the CCS**"), paras 44.1-44.7 (Ex. C-229/JCB-219).

[171] Note for the CCS, para. 1 (Ex. C-229/JCB-219).

[172] *Id.*, paras 20-22.

[173] *Id.*, paras 34-35.

[174] Statement of Claim, para. 114; Statement of Defence, para. 67; Report of the High Powered Review Committee on Various Aspects of the Agreement between Antrix & M/S. Devas Multimedia Pvt. Ltd., March 12, 2011 (the "**Chaturvedi Report**") (Ex. C-137/JCB-227).

[175] Chaturvedi Report (Ex. C-137/JCB-227).

[176] *Id.*

### CCS Decides to Annul Antrix-Devas Deal

Cabinet Committee on Security (CCS) has decided to annul the Antrix-Devas deal. Following is the statement made by the Law Minister, Shri M. Veerappa Moily on the decision taken by the CCS which met in New Delhi today:

"Taking note of the fact that Government policies with regard to allocation of spectrum have undergone a change in the last few years and there has been an increased demand for allocation of spectrum for national needs, including for the needs of defence, para-military forces, railways and other public utility services as well as for societal needs, and having regard to the needs of the country's strategic requirements, the Government will not be able to provide orbit slot in S band to Antrix for commercial activities, including for those which are the subject matter of existing contractual obligations for S band.

In the light of this policy of not providing orbit slot in S Band to Antrix for commercial activities, the 'Agreement for the lease of space segment capacity on ISRO/Antrix S-Band spacecraft by Devas Multimedia Pvt. Ltd.' entered into between Antrix Corporation and Devas Multimedia Pvt. Ltd. on 28th January, 2005 shall be annulled forthwith."[177]

Citing the decision of the CCS, Antrix, on February 25, 2011, gave notice to Devas that the Devas Agreement was terminated.[178]

147. On March 12, 2011, the Chaturvedi Committee issued its report (the "Chaturvedi Report").[179]

148. According to the Claimants, the Chaturvedi Report implies that the foreign ownership of Devas was a further motivating factor in the Government of India's decision to annul the Devas Agreement.[180]

149. The Respondent submits that two further commissions of enquiry reviewed the Devas Agreement.

150. First, following the issuance of the Chaturvedi Report, Mr. K.M. Chandrasekhar of the Cabinet Secretariat was asked to examine its findings and to submit recommendations to DOS, which took the form of a report issued on April 12, 2011 (the "**Chandrasekhar Report**").[181]

---

[177] Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220). *See also Prime Minister Manmohan Singh's Interaction with Editors of the Electronic Media*, The Hindu, February 16, 2011, pp. 6-7 (Ex. R-36/JCB-218).

[178] Letter from Antrix (Madhusudhan) to Devas, February 25, 2011 (Ex. C-135/JCB-223).

[179] Chaturvedi Report, (App. KS-10/JCB-227).

[180] Statement of Claim, paras 133-34, citing Chaturvedi Report, para. 3.5.9 (App. KS-10/JCB-227), which reads: "The shareholding in Devas and changes in it subsequently have also been a serious cause of concern…. The original proposal, which had envisaged development and innovation by some former ISRO scientists, seem to have been diluted with the entry of major foreign players. While technically this was permitted, the entry of foreign telecom companies with huge premiums indicated that they had used this as an opportunity for entering the telecom market, which had in the meanwhile expanded rapidly in India during 2005-10. This was not an intended purpose of the original agreement."

[181] Report by Mr. K.M. Chandrasekhar, Cabinet Secretariat Doc No. 601/1/4/2011-TS, Rashtrapati Bhavan, *Report of the High Powered Review Committee (HPRC) on various aspects of the agreement between*

151.  The Respondent notes that the Chandrasekhar Report questioned Devas' need for "such a huge bandwidth;" and mentioned that the Chaturvedi Report characterized the allocation of S-band to Devas as "an unjustified risk from the security point of view;" and signaled that full discussion of Devas' proposal at the ICC[182] would have enabled a well-considered assessment of how the national interests of India could have been best served.[183]

152.  Second, in accordance with a recommendation of the Chaturvedi Committee, a High Level Team Committee was constituted by the Government of India to review the technical, commercial, procedural and financial aspects of the Devas Agreement, which noted, in its September 2, 20011 report, several irregularities with Devas' financing and recommended consideration of sanctions against some officials.[184]

## F.  THE PERIOD FOLLOWING THE ANNULMENT OF THE DEVAS AGREEMENT

### 1.  *Initial Reactions of Devas and Antrix to the Annulment of the Devas Agreement*

153.  According to the Claimants, following the announcement regarding the annulment of the Devas Agreement,[185] Devas attempted to communicate several times with Dr. Radhakrishnan without success.[186]

154.  On February 25, 2011, Antrix issued a letter to Devas giving notice of termination of the Devas Agreement.[187]

---

*ANTRIX and M/s Devas Multimedia Pvt. Ltd*., April 12, 2011 (the "**Chandrasekhar Report**") (Ex. R-44/JCB-229).

[182]  The Indian Satellite Coordination Committee is referred to by the Parties as "ICC", not to be mistaken with the International Chamber of Commerce.

[183]  Statement of Defence, para. 71, referring to Chandrasekhar Report, para. 11(iii) (Ex. R-44/JCB-229).

[184]  Statement of Defence, para. 70; Government of India, *Conclusions and Recommendations from The Report of the High Level Team on the Agreement between M/s Antrix Corporation Limited and M/s Devas Multimedia Private Limited*, September 2, 2011, para. 6.10 (Ex. R-43/JCB-236).

[185]  *See supra*, para. 142.

[186]  Statement of Claim, paras 117-19; Viswanathan I, paras 192-93; Letter from Devas (Viswanathan) to Antrix (Radhakrishnan), February 11, 2011 (Ex. C-132/JCB-214); Letter from Dua Associates to Chairman, Antrix Corporation Limited (Radhakrishnan), February 11, 2011 (Ex. C-130/JCB-212); Letter from Devas (Viswanathan) to DOS/ISRO/Antrix (Radhakrishnan) February 14, 2011 (Ex. C-133/JCB-216).

[187]  Letter from Antrix (Madhusudhan) to Devas, February 25, 2011 (Ex. C-135/JCB-223).

155. In response, Devas objected to the validity of the termination notice[188] and attempted, unsuccessfully, to hold "senior management" consultations in conformity with the pre-dispute procedures in Article 20 of the Devas Agreement.[189]

156. On April 15, 2011, Antrix tendered Devas a check for the INR equivalent of USD 13 million as reimbursement of the upfront capacity reservation fees that Devas had already paid to Antrix pursuant to Article 7(c) of the Devas Agreement.[190] In a matter of days, Devas returned Antrix's check, arguing that Antrix had failed to state a proper basis for terminating the Devas Agreement and that the events allegedly giving rise to Antrix's claim of *force majeure* were self-induced.[191]

157. Finally, the Claimants allege that, since 2011, Devas has been subject to a range of harassing measures from various parts of the Indian government, including its Registry of Companies, India's enforcement directorate, tax authorities and other government entities.[192] The Claimants characterize these measures as retaliation in response to the exercise of rights by Devas and the Claimants, respectively.[193]

### 2.   *The Satellites*

158. According to the Respondent, DOS has made alterations to the two satellites to conform them to defence needs,[194] and the GSAT-6 satellite was scheduled to be launched at the end of 2014.[195] A successful launch was achieved on August 27, 2015.[196]

159. On August 31, 2015, the Respondent submitted a set of documents in connection with the launch of the GSAT-6 satellite. The documents consist of five newspaper articles and a note from Mr. V.K. Pant, Assistant Wireless Adviser, in DOT. The articles refer to the launch of a military satellite but simultaneously indicate that the satellite is utilized to serve the "strategic sector" and

---

[188]   *Id.*

[189]   Statement of Claim, para. 130; Statement of Defence, para. 60.

[190]   Statement of Claim, para. 131; Letter from Antrix (Madhushudhana) to Devas, April 15, 2011 (Ex. C-138/JCB-230). The Respondent submits that this is an undisputed material fact in this case; *see* Transcript, Day 1, 138:9-139:7; Day 5, 1287:6-9.

[191]   Statement of Claim, para. 132; *see* Statement of Defence, para. 60.

[192]   Statement of Claim, para. 148; Viswanathan I, paras 216-33.

[193]   Statement of Claim, para. 148.

[194]   Statement of Defence, para. 74; Anand I, para. 24.

[195]   Respondent's Rejoinder, para. 23; Supplemental Witness Statement of Mr. K. Sethuraman, dated June 30, 2014, paras 11-12 ("**Sethuraman II**"); Transcript, Day 4, 847:14-848-11.

[196]   Press reports submitted by the Respondent on August 31, 2015.

"various government purposes". The note contains an extract of the document issued by the Cabinet to the Ministry of Defence on March 12, 2015 which reads: "The band segments (a) 2500-2635 MHz (35MHz) (b) 2555-2535 MHz (80 MHz) and (c) 2655-2690 MHz (35 MHz) will be used for Defence, security and societal applications."

160.   The Respondent further submitted an article published by the Institute of Defence Studies and Analyses on October 5, 2015 which, according to the Respondent, "reviewed the launch and its significance for the military."

### 3.    *Related Arbitration Proceedings*

161.   As noted above, on June 29, 2011 Devas commenced an arbitration under the ICC rules pursuant to Article 20 of the Devas Agreement, captioned *Devas Multimedia (Private) Limited v. Antrix Corp. Ltd.* (No. 18051/CYK), in which Devas sought both specific performance of the Devas Agreement and/or damages.[197] On 14 September 2015, a final award was issued in this Arbitration, which was communicated, by agreement of the Parties, to the present Tribunal on October 2, 2015. Under that award, Antrix was ordered to pay USD 562.5 million to Devas Multimedia Private Limited for damages caused by Antrix's wrongful repudiation of the Devas Agreement, plus interest.

162.   The Respondent also notes that DT Asia (Devas' other major shareholder together with the Claimants) has instituted a third arbitration against India arising out of the same facts but under the bilateral investment treaty between Germany and India.[198]

163.   Pursuant to mutual agreement, the Parties made simultaneous submissions on October 9 and 19, 2015 as to what significance, if any, the ICC final award might have on the deliberations of this Tribunal. While drawing different conclusions from various parts of the ICC award, both Parties recognized that the two arbitrations involve distinct claims, parties, and remedies.

164.   Reference was made by the Claimants to the final award of the ICSID tribunal in *Mobil v. Venezuela*.[199] In that instance, one of the claimants, Mobil Cerro Negro, had brought separate ICC

---

[197]   Notice of Arbitration, paras 7, 51-55; Statement of Claim, para. 146; Statement of Defence, para. 61.

[198]   Statement of Defence, para. 4, fn. 3.

[199]   *Venezuela Holdings B.V. et al* (case formerly known as *Mobil Corporation, Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd., Mobil Venezolana de Petroles Holdings, Inc., Mobil Cerro Negro, Ltd., and Mobil Venezolana de Petroles Inc.) v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/07/27, Award, 2014.

proceedings against two State-owned companies, under one of their agreements providing for indemnity in the event of certain alleged discriminatory government measures.

165.   When considering the effects of the prior ICC arbitration, the ICSID tribunal observed:

> It is clear that the ICC Award and the present case concern the liability of different parties under different normative regimes. The State was not a party to the ICC arbitration. Neither are PDVSA and PDVSA-CN parties to this case. These proceedings concern the responsibility of the State for breach of the Treaty and international law, a matter that was not (and could not) have been resolved by the ICC tribunal, which jurisdiction was limited to the contractual dispute.[200]

166.   Similarly, in the present case, there are major differences with the ICC case. First of all, the parties are different; neither Devas Multimedia (Private) Limited (the claimant in the ICC case) nor Antrix (the respondent) are parties to this case. Secondly, the proceedings in this case relate to the responsibility of the State of India for alleged breaches of the Treaty and international law, while the ICC tribunal was strictly concerned with Antrix's contractual liability under the Agreement. It dealt more specifically with the actions of Dr. Radhakrishnan in his capacity as Chairman of Antrix. It also referred to some of his activities in his other functions. In that respect, it considered some of the same facts as those submitted to this Tribunal; in fact, the Tribunal was informed by the Claimants in their response of October 19, 2015 that, during the ICC proceedings, the Respondent had provided the tribunal with the whole transcript of the hearing in this case. However, what this Tribunal is called upon to address is not whether Antrix breached its contractual obligations but whether the State of India, acting in its sovereign capacity and through the appropriate authority, properly invoked the protection of its essential security interests when it decided to annul the Devas Agreement or whether, in doing so, it breached its obligations under the Treaty and international law. This is the issue which this Tribunal will be addressing in the rest of this award. While the Tribunal should "attempt to avoid inconsistent outcomes whenever possible,"[201] one can readily conceive situations where Antrix's liability would be incurred under the Agreement and some where the Respondent's would be exempt of liability under the Treaty and *vice-versa*.

## CHAPTER IV - REQUESTS FOR RELIEF

167.   The Claimants request that the Tribunal issue an award:

(a)      Declaring that the Tribunal has jurisdiction over all of Claimants' claims;

---

[200]      *Id.*, para. 216

[201]      *Id.*, para. 217

(b)    Declaring that Respondent has unlawfully expropriated Claimants' investments, in breach of Articles 6 and 7 of the Mauritius-India BIT;

(c)    Declaring that Respondent has failed to accord fair and equitable treatment to the Claimants' investments, in violation of Article 4(1) of the Mauritius-India BIT;

(d)    Declaring that Respondent has engaged in unreasonable and/or discriminatory measures with respect to Claimants' investments, in violation of Article 4(1) of the Mauritius-India BIT;

(e)    Declaring that Respondent has failed to provide full legal protection and security with respect to Claimants' investments, in violation of the "most favored nation" provisions of Articles 4(2) and 4(3) of the Mauritius-India BIT, which incorporate Article 3(2) of the Serbia-India BIT;

(f)    Declaring that Respondent is liable to pay the costs of these proceedings to date; and

(g)    Ordering that these proceedings continue for the purposes of determining the reparations due to Claimants, including a determination of the damages owed to Claimants, and the allocation of costs and other matters related to quantum.[202]

168.  The Respondent requests that "all claims raised by [the] Claimants should be dismissed and all costs arising of this proceeding should be assessed against [the] Claimants."[203]

169.  In addition, the Respondent raises a series of objections to the Tribunal's consideration of the merits of the Parties' dispute. First, the Claimants' alleged investments fail to meet the definition of an investment under the Treaty and constitute "pre-investment" activities that are not protected by the Treaty. Secondly, the Respondent submits that the Tribunal lacks jurisdiction over the claims in this case by operation of the "essential security interests" ("**ESI**") provision of the Treaty. The Claimants reject all of these objections and submit that the Tribunal has jurisdiction over its claims.

## CHAPTER V - THE MEANING OF "INVESTMENT" FOR THE PURPOSES OF THE TREATY

### A.    THE PARTIES' ARGUMENTS

170.  Article 1(1)(a) of the Treaty defines an "investment" as "every kind of asset established or acquired under the relevant laws and regulations of the Contracting Party in whose territory the investment is made." Moreover, Article 2 of the Treaty restricts the scope of the Treaty to "investments made by investors of either Contracting Party in the territory of the other Contracting Party, accepted as such in accordance with its laws and regulations."

---

[202]    Statement of Claim, para. 229; Statement of Reply, para. 188.

[203]    Statement of Defence, para. 173; Respondent's Rejoinder, para. 145.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 463**
**(USDC NO. 2:18-cv-01360)**

1.    **The Respondent's Position**

171.   The Respondent's primary contention is that this case "only involves pre-investment activities that are outside the scope of protection afforded by the [Treaty]."[204] In support, the Respondent relies on the "admission clause model" adopted in its BITs, which only extends protection to "assets invested and admitted in accordance with the laws and regulations of the host State," and not to "pre-investment activities,"[205] and advances authorities to that effect.[206]

172.   According to the Respondent, the Devas Agreement is clear that certain essential governmental licences and approvals were prerequisites to the project, including the orbital slot frequency allocation for the satellites and the WPC License.[207] Accordingly, Devas' failure to apply for the WPC License rendered all activities conducted by Devas as being properly characterized as "pre-investments."[208]

173.   The Respondent refers to the WPC, the body within DOT from which, it says, Devas would have been required to seek its operating license and frequency allocation (the "**WPC License**").[209] According to the Respondent, the policy decision of the CCS not only meant that the Devas Agreement would be terminated, but it also left no doubt that no license could be issued to Devas to operate the Devas System and therefore Devas would be unable to obtain the requisite licenses under the Devas Agreement.[210]

174.   The Respondent focuses on a terrestrial spectrum license to be issued by the WPC.[211] In this regard, the Respondent refers to Devas' Statement of Claim in the ICC arbitration, wherein Devas acknowledges that it "fully expected that it would be granted a [WPC License] once the GSAT-6 satellite had been launched," that Devas was preparing a license application to the WPC and that

---

[204]   Statement of Defence, para. 90; *See* generally Transcript, Day 1, 167:15-174:7. Day 5, 1288:5-1297:15.

[205]   Statement of Defence, paras 91-93.

[206]   *Id.*, paras 94-97; *See,* for instance*, Mihaly International Corporation v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/00/2, Award, 2002, paras 60-61; *William Nagel v. Czech Republic (Ministry of Transportation and Telecommunications)*, SCC Case No. 49/2002, Final Award, 2003, paras 17, 45, 326, 328-29; *Petrobart Ltd. V Kyrgyz Republic*, SCC Case No. 126/2003, Award, 2005, p. 69; *Zhinvali Development Limited v. Republic of Georgia*, ICSID Case No. ARB/00/1, Award, 2003, para. 388 (Ex. R-60).

[207]   Statement of Defence, para. 98; *See* Devas Agreement, Articles 3(c), 12(b)(vii) (Ex. C-16/JCB-37).

[208]   Statement of Defence, para. 98.

[209]   *Id.*, para. 39; Anand I, paras 8-11 (*see supra*, para. 120).

[210]   Statement of Defence, para. 62.

[211]   The Respondent submits that this is an undisputed material fact in this case; *See* Transcript, Day 1, 121:7-123:14; Day 5, 1276:15-1277:18.

Devas "was [...] in a position to submit this application just as soon as the satellite launch date and vehicle were identified by ISRO."[212]

175.   In this regard, the Respondent argues that any preparatory steps cannot be equated with the grant of a license, which Devas needed, did not have, and had no legal right to obtain, as it was for the Government of India to determine whether a license could be issued.[213]

176.   The Respondent submits that the Statement of Claim plainly demonstrates Devas' awareness that it had no right to obtain the WPC License.[214] The Respondent claims that Devas was deliberately deferring the submission of its WPC License application until after the satellites were launched in order to place itself in the position of being the only alternative, "as a practical matter," capable of using the S-band spectrum allocated to it.[215] Devas would have then been in a position to force the Government of India (i.e. the TRAI) to change its policy[216] regarding BSS, which would have been necessary to obtain the specific WPC License for BSS that Devas needed in order to provide Devas Services.[217]

177.   According to the Respondent, other items in the record also demonstrated Devas' knowledge that it had no acquired right to obtain the WPC License.[218] First, the negotiating history of the Devas Agreement shows that Antrix went from being required to obtain "clearances, licenses, and other approvals" for "frequency allocation" (including terrestrial augmentation) in the Term Sheet,[219] to   providing   "appropriate   technical   assistance…on   a   best   efforts   basis"   in   the   Devas

---

[212]   Statement of Defence, para. 63, referring to *Devas Multimedia Private Limited v. Antrix Corporation Limited*, ICC Case No. 18051/CYK; Claimant's Statement of Claim, February 20, 2012, paras 93-95 (Ex. R-2).

[213]   Statement of Defence, para. 64; Sethuraman II, para. 22.

[214]   Statement of Defence, paras 65-66, referring to Statement of Claim, para. 102, which reads: "Immediately upon launch of PS1, Devas would have been in a position to commence its A/V broadcasting. In addition, Devas (as the only entity with the right to lease transponder capacity on that satellite, or to use the 70 MHz of S-Band spectrum allocated to it in the Devas Agreement) would, immediately upon launch of PS1, have filed for a WPC license. As the sole holder of the Leased Capacity, as a practical matter, Devas was the only operator capable of using the S-band allocated to it, and because Antrix had promised to assist in obtaining any needed governmental license necessary for the Devas System, Devas had every reason to expect to obtain a WPC license promptly, and, indeed, expected to receive such license for a nominal fee." (emphasis by the Respondent).

[215]   Statement of Defence, para. 66.

[216]   In particular, the NFAP of India (*see infra*, fn. 391).

[217]   Statement of Defence, para. 66, fn. 161; Sethuraman I, paras 4, 6-10, Transcript, Day 5, 1258:18-1265:13.

[218]   Respondent's Rejoinder, paras 26-27.

[219]   E-mail from Forge Advisors to Antrix and ISRO, September 20, 2004, with attached "binding term sheet," para. 1.3.2 (Ex. R-12); *See supra*, para. 96.

Agreement.[220] Also, Devas itself acknowledged that ISRO's support would be critical in the license application,[221] which suggests that obtaining such authorization was not a matter of certainty.[222]

178.   Moreover, regardless of the policy decision of the CCS and of the fact that Devas had no acquired right to obtain the WPC License, the Respondent notes that Devas would still have had to participate in a public auction of all the S-band spectrum to be used for terrestrial services, as the TRAI recommended in July 2008 and the WPC confirmed in 2010.[223] According to the Respondent, this poses a significant hurdle as the auction price for the terrestrial use of the spectrum would have been USD 1.24 billion, which would have substantially diminished the net present value of Devas.[224]

179.   Also, the Respondent alleges that, under a long-standing TRAI policy, new terrestrial services such as those proposed by Devas would have been subjected to review and analysis by the TRAI. Moreover, other stakeholders would have been notified and given an opportunity to comment,[225] including the terrestrial operators of telecommunication services who, as conceded by the Claimants, had been clamoring for more spectrum—including the S-band—for the expansion of their services.[226]

180.   In this regard, the Respondent rejects the Claimants' argument that, had the satellites been launched, and assuming that the Devas Agreement had not been annulled, terrestrial operators

---

[220]   Devas Agreement, Articles 3(c), 12(b)(vii) (Ex. C-16/JCB-37). The Respondent also notes that Devas was told during the negotiations leading to the Devas Agreement that Antrix "cannot take the responsibility for obtaining clearances and approvals from statutory bodies and departments of the Government of India." E-mail from Mr. M.N. Sathyanarayana, ISRO, to Dr. M.G. Chandrasekar, Devas Multimedia Pvt. Ltd., September 20, 2004 (Ex. R-15/JCB-24); *See also* Respondent's Rejoinder, para. 26.

[221]   Statement of Defence, fn. 161; Respondent's Rejoinder, para. 27; Presentation by Devas to Chairman of ISRO (Radhakrishnan) February 4, 2010, slide 13 (Ex. C-89/JCB-137); Presentation by Devas to Director, SCNP, ISRO, April 21, 2010, slide 31 (Ex. C-93/JCB-140); Presentation by Devas to Minister of State & Member, Space Commission (Chavan), October 26, 2010, slide 11 (Ex. C-110/JCB-182); Presentation by Devas to Space Commission (Narasimha) November 30, 2010, slide 16 (Ex. C-115/JCB-187).

[222]   Respondent's Rejoinder, para. 27.

[223]   Statement of Defence, fn. 161; Respondent's Rejoinder, para. 28; Sethuraman I, paras 11-15; Transcript, Day 1, 122:4-12.

[224]   Statement of Defence, fn. 161; Respondent's Rejoinder, para. 28; *Devas Multimedia Private Limited v. Antrix Corporation Limited,* ICC Case No. 18051/CYK, Expert Report on Valuation, Vladimir Brailovsky & Daniel Flores, November 15, 2013, p. 17 (Ex. R-4/JCB-271).

[225]   Respondent's Rejoinder, para. 28.

[226]   *Id.*, para. 28.

would not have been able to use the S-band frequencies that Devas would have been using for its space-to-earth transmissions because of interference.[227] In Mr. Sethuraman's words:

> If Devas was using a 10 MHz segment of S-band, say 2560-2570 MHz, in a particular region for space-to-earth transmissions, a terrestrial operator could certainly use a different 10 MHz segment (as in the CGC of the Devas system), say 2600-2610 MHz, in the same region. So long as there is enough of a separation between the frequencies, interference is not an issue for diverse services. It is only if Devas had been using these two 10 MHz segments in the region, the first for space-to-earth transmissions and the second in its CGC, that terrestrial operators could be "'boxed-out' of that spectrum," as Mr. Parsons claims.[228]

181. The Respondent denies that Devas could have rolled out any satellite-based service without the WPC License.[229] According to the Respondent, Mr. Sethuraman detailed during the Hearing on Jurisdiction and Liability, how, even on the basis of the ISP and IPTV licenses, Devas would still have required additional licenses or additional telecommunications media to provide any kind of service,[230] and how, in any event, obtaining the WPC License would have been the last step of a well-structured process that Devas still had to follow.[231] For instance, the ISP License makes clear that it could not prevail over national security concerns, and that its effectiveness would be subject to any government regulation on satellite communication policy.[232]

182. In addition to the failure of the Claimant to obtain the WPC License, the Respondent also criticizes the Claimants' failure to "identify precisely the investment in question," which it argues is not the Claimants' shares in Devas,[233] but the allegedly binding right to proceed with the Devas project pursuant to the Devas Agreement.[234] To this end, the Respondent considers that the critical and dispositive issue is that the relevant approvals were not obtained; without them the project could not proceed; and that Devas had no contractual right to obtain those approvals.[235]

---

[227]   Sethuraman I, para. 10.

[228]   *Id*., para. 10, referring to Parsons I, para. 18.

[229]   Transcript, Day 5, 1212:16-24; 1213: 21-25.

[230]   Transcript, Day 4, 867:10-869:13.

[231]   *Id*., 869:18-870:14; *See also* Transcript, Day 5, 1260:19-1266:6; Letter from Respondent to Claimants, February 3, 2014 (Ex. R-130/JCB-278).

[232]   Transcript, Day 5, 1263:20-1266:6; ISP License, May 2, 2008, p. 39, Articles 10.1, 10.4-5 (Ex. C-48/JCB-84).

[233]   Respondent's Rejoinder, paras 75-77.

[234]   *Id*., para. 78.

[235]   *Id*., para. 79, citing Venugopal I, para. 30.

2.      *The Claimants' Position*

183.    According to the Claimants, the Respondent misconstrues both Articles 1 and 2 of the Treaty and fails to take into account the actual facts concerning the Claimants' investments.[236] The Claimants argue that "the facts show that the investments indeed were admitted in accordance with Indian law."[237]

184.    The Claimants recall that the relevant "investments" comprise their respective shareholding interests in Devas; and partial indirect ownership of Devas' business assets.[238] In arguing that their shareholding interests qualified as "investments" falling within the scope of Articles 1 and 2, the Claimants rely on the general and specific definitions of "investment" pursuant to Article 1(a)(1) and the prior approval obtained from the Foreign Investment Promotion Board as evidencing acceptance "in accordance with [India's] laws and regulations."[239] On the Claimants' submission, the statement in Article 2 of the Treaty that an investment must be "accepted as such" under Indian law means only that the investment must comply with laws governing admission of foreign investments.[240]

185.    Turning to the indirect ownership of Devas' assets, the Claimants' assert that the contractual rights under the Devas Agreement and the proprietary Devas System satisfy the general and specific definitions of "investment" contained in Article 1(a)(1).[241] The Claimants do not dispute the need for a license from the WPC in order for Devas to operate the terrestrial portion of the hybrid Devas System.[242] However, the Claimants reject India's attempt to characterize its activities as "pre-investment" by reference to the approvals obtained from DOS officials and the Shankara

---

[236]    Statement of Reply, para. 108; *See* generally Transcript, Day 5, 1142:19-1147-24.

[237]    Statement of Reply, para. 108.

[238]    Statement of Claim, para.156; Statement of Reply, para. 109.

[239]    *Id*., para. 110.

[240]    *Id*., para. 110, fn. 212; *See,* for instance, *Churchill Mining PLC v. Republic of Indonesia*, ICSID Case No. ARB/12/14, Decision on Jurisdiction, 2014, paras 287, 289-90, 295, 313; *Desert Line Projects LLC v. Yemen*, ICSID Case No. ARB/05/17, Award, 2008, paras 92, 102, 104 (Ex. CL-7)

[241]    Statement of Reply, para. 111; *See*, for instance, *Fedax N.V. v. The Republic of Venezuela,* ICSID Case No. ARB/96/3, Decision on Jurisdiction, 1997, paras 18, 43 (Ex. CL-13); *Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award, 2005, paras 144-45.

[242]    Transcript, Day 5, 1138:2-10; 1163:4-8.

Committee and confirmation by Antrix dated February 2, 2006, that ISRO had the "necessary approval for building, launching and leasing the capacity of S-band satellite."[243]

186.  In the Claimants' view, the record shows that India—including through Antrix, DOS, ISRO and the WPC—had consistently and proactively supported the Devas Agreement and System for approximately six years. Had India continued to deliver on Antrix's commitment, the Claimants consider it inconceivable that the WPC License would not have been granted.[244] In this regard, the Claimants point out that Devas started preparing its application for the Licence; however it did not receive any answer.[245] Relevantly, the Claimants point to the obligation of DOS/ISRO/Antrix to provide technical assistance under the Devas Agreement, which included jointly approaching the WPC with Devas when applying for this license.[246]

187.  The Claimants also reject the Respondent's argument that a BSS license in the S-band was not authorized under Indian policy and therefore could not have been granted to Devas.[247] Neither the 2002 nor the 2008 NFAP prohibited BSS licenses outright, as claimed by Mr. Sethuraman.[248] According to the Claimants, the text of the NFAP is clear: there is no *per se* rule precluding the WPC from granting terrestrial licenses in the S-band.[249] Even more so, the license to re-use satellite spectrum terrestrially for which Devas would have applied was perfectly consistent with the 2002, 2008 and 2011 NFAPs.[250] If such a re-use license could never have been granted without a change in policy, the Claimants contend that there would have been prior mention and experimental licenses would not have been granted to Devas.[251] In this regard, it bears noting the complete absence of any reference in the Note to the CCS that the terrestrial component was not authorized under existing Indian policy.[252]

---

[243]  Statement of Reply, para. 112, referring to Letter from Antrix (Murthi) to Devas (Viswanathan), February 2, 2006 (Ex. C-24/JCB-51).

[244]  Statement of Reply, para. 62; Reply Witness Statement of D. Venugopal ("**Venugopal I**"), paras 17-22; 30-34.

[245]  Letter from Devas (Viswanathan to Antrix (Murthi), July 20, 2010 (Ex. C-98).

[246]  Venugopal I, para. 34; Transcript, Day 5, 1111:3-19; 1136:7-21.

[247]  Statement of Reply, para. 63.

[248]  *Id*., para. 63, referring to Sethuraman I para. 7. *See* Reply Expert Report of John Lewis, dated March 14, 2014, paras 17-22 ("**Lewis II**"); Venugopal I, para. 55; Note for the EGoM, p. "10 of 59" (Ex. C-232/JCB-247).

[249]  Statement of Reply, para. 63.

[250]  *Id*., para. 64.

[251]  *Id*., para. 63; *see* Venugopal I, paras 23-24.

[252]  Statement of Reply, para. 64, referring to Note for the CCS, para. 38 (Ex. C-229/JCB-219).

188.  The Claimants also rely on the practice of other countries, including the United States, Europe and Korea, which impose low or no fees for re-use of satellite spectrum.[253] Devas expected that the advantages of efficiency and public benefit acknowledged by regulators in other countries would also persuade the WPC to issue a frequency authorization and operating license to Devas, and would be fully supported by ISRO/Antrix due to their "best efforts" obligation. Moreover, the Claimants expected that such license would be issued to Devas for a reasonable fee in line with international norms that had by then been established in other countries.[254]

189.  In any event, the Claimants do not accept that the auction rule applicable to the allocation of terrestrial spectrum would be indiscriminately applied to satellite spectrum that is used terrestrially since the two types of spectrum are not comparable.[255] In particular, the potential for interference as a result of uncoordinated spectrum use would not have been completely disregarded. Devas' terrestrial re-use of the allocated S-band satellite spectrum would have "boxed-out" any other potential user of terrestrial S-band spectrum.[256] In such circumstances, the Claimants submit, the reality is that an auction of S-band terrestrial spectrum would have been moot as Devas would have been the sole bidder and operator capable of using the relevant portion of S-band satellite.[257]

190.  Finally, the Claimants argue that, even if Devas had not obtained the WPC License, it still had an absolute right to receive the Leased Capacity from the ISRO satellites under the Devas Agreement.[258] Upon launching the satellites, Devas would have been in a position to roll out satellite-only services, therefore providing the very societal applications proposed by India.[259]

191.  All this shows, the Claimants submit, that Devas had secured a binding contract, obtained capital and was established as a company in India at all relevant times from 2005 to 2011.[260]

---

[253]  Parsons I, para. 24.

[254]  *Id*., para. 29; *See also* Transcript, Day 2, 420:24- 425:21.

[255]  Transcript, Day 5, 1172:9-24.

[256]  Parsons I, para. 18; Reply Witness Statement of Gary Parsons, dated March 14, 2014, paras 4-13 ("**Parsons II**").

[257]  Transcript, Day 2, 421:25-423:12; Day 5, 1172:3-24.

[258]  *Id*., 1116:21-1117:9.

[259]  Transcript, Day 2, Testimony of Mr. Vishwanathan, 307:12-309:2 (referring to Ex. C-80/JCB-116); Day 3, 204:13-16; 384:15-19; Day 5, 1120:5-23. According to the Claimants, the services that they refer to are satellite-based services which fall under the provision of the ISP license that Devas had already received, including streaming video and audio services.

[260]  Statement of Reply, para. 114.

## B.   THE TRIBUNAL'S ANALYSIS

192.   The Tribunal will first address this threshold question to determine whether it has jurisdiction over the present dispute between the Parties.

### 1.   The Devas Agreement

193.   There is no disagreement between the Parties with regard to the fact that the Devas Agreement was concluded on January 25, 2005,[261] nor with regards to the fact that, at the Respondent's insistence, the Agreement was signed by Antrix, "the marketing arm of [the] Department of Space and [...] the entity through which ISRO engages in commercial activities."[262] Under the Agreement, a number of approvals and licenses had to be obtained in part by Devas and in part by Antrix.

194.   The Respondent argues that no governmental body was party to the Agreement or gave any commitment to grant the necessary approvals and licenses required under the Agreement.[263] In its view, as long as the WPC License was not obtained, the only recourses that the Claimants might have were the ones against Antrix provided for under the Agreement.[264]

195.   The present case is not a recourse against Antrix but a recourse against the State of India for alleged breaches of the applicable Treaty. It is under the provisions of that Treaty that the Tribunal must determine whether the Claimants qualify as investors.

### 2.   Investment Under the Treaty

196.   The question that the Tribunal has to address is a double-barreled one. It is whether the Claimants are investors under the Treaty and, if so, whether they have made qualifying investments under it.

197.   The Respondent does not dispute that the Claimants are "investors" as defined under Article 1(1)(b) of the Treaty, being corporations "incorporated or constituted in accordance with the law of [a] Contracting Party," i.e. Mauritius.

---

[261]   Devas Agreement (Ex. C-16/JCB-37).

[262]   Id., p. 1.

[263]   Statement of Defence, para. 8.

[264]   Id., para. 98.

198.  The disagreement between the Parties is whether the dispute is in relation to an investment as defined in Article 1(1)(a) of the Treaty. This Article, as in many other investment protection treaties, contains a very broad definition of "investment." It covers:

> every kind of assets established or acquired under the relevant laws and regulations of the Contracting Party in whose territory the investment is made, and, in particular, though not exclusively, includes:
>
> (i)    movable and immovable property as well as other rights in rem such as mortgages, liens or pledges;
>
> (ii)   shares, debentures and other form of participation in a company;
>
> (iii)  claims to money, or to any performance under contract having an economic value;
>
> (iv)   intellectual property rights, goodwill, technical processes, know-how, copyrights, trade-marks, trade-names and patents in accordance with the relevant laws of the respective Contracting Parties;
>
> (v)    business concessions conferred by law or under contract, including any concessions to search for, extract or exploit natural resources.

199.  The Tribunal does not agree with the Respondent's contention that this case "only involves pre-investment activities that are outside the scope of protection afforded by [the Treaty]."

200.  First, the Claimants' "shares, debentures and any other form of participation" in Devas and their indirect partial ownership of Devas business assets are assets "established or acquired under the relevant laws and regulations" of the Respondent. The Claimants received the approval of the Foreign Investment Promotion Board prior to their share subscriptions.[265] Moreover, the Tribunal has received no evidence to the effect that the Claimants' investment was not properly made "under the relevant laws and regulations."

201.  Secondly, the Tribunal finds deficient the Respondent's argument that the Claimants' activities were "only pre-investment activities" because their investment was the alleged right to proceed with the Devas project pursuant to the Devas Agreement and because said project could not

---

[265]  *See* Statement of Claim, para. 36; Amendment No. 5 to FIPB approval No. FC.II. 107(2006)/43(2006), September 29, 2009 (Ex. C-82/JCB-124); FIPB approval No. FC II. 107(2006)/43(2006) from the Department of Economic Affairs, Indian Ministry of Finance to Devas, May 18, 2006 (Ex. C-33); Amendment No. 1 to FIPB approval No. FC.II. 107(2006)/43(2006), May 19, 2008 (Ex. C-49/JCB-85); Amendment No. 2 to FIPB approval No. FC.II. 107(2006)/43(2006), August 7, 2008 (Ex. C-51/JCB-87); Amendment No. 3 to FIPB approval No. FC.II. 107(2006)/43(2006), October 28, 2008 (Ex. C-55); Amendment No. 4 to FIPB approval No. FC.II. 107(2006)/43(2006), December 17, 2009 (Ex. C-78/JCB-114).

proceed without the WPC License, which Devas had no right to receive under the Devas Agreement.[266]

202.  The Devas Agreement was a valid contract between Devas and Antrix, a State-owned commercial corporation. It provided that Antrix was leasing to Devas space segment capacity on ISRO/Antrix S-band spacecraft. That leased capacity was on a non-pre-emptible basis, which meant that it could not be "utilized or repurposed for use by another party during life of the satellite and when this Agreement is effective and when Devas is not in default of its obligations or payments."[267]

203.  The Agreement spelled out, among other provisions, the period of the lease and its terms and conditions, the contributions to be made as well as the circumstances and consequences of termination by each party, including in the case of *force majeure*. It also provided that it would become effective "on the date that ANTRIX is in receipt of all required approvals and communicates to DEVAS in writing regarding the same."[268]

204.  On February 2, 2006, Antrix informed Devas that "it has received the necessary approval for building, launching and leasing capacity of S-band satellite, henceforth designated as INSAT-4E," adding that it "is now in a position to go ahead with the building and launch of the INSAT 4-E spacecraft and lease the capacity on the same to Devas Multimedia Pvt. Ltd, as per Agreement No. Antrix/2003/DEVAS/2005 dated 28 January 2005."[269] The Agreement thereby became effective on February 2, 2006.

205.  Under the Agreement, the Claimants had to pay Upfront Capacity Reservation fees for the first and the second satellites. They paid the first instalments as per the Agreement on June 21, 2006 for the first satellite (GSAT-6)[270] and on June 18, 2007[271] for the second satellite (GSAT-6A); these payments represented a total of about USD 13 million.

---

[266]  Statement of Defence, para. 98; Respondent's Rejoinder, para. 26.

[267]  Devas Agreement, p. 20 (Ex. C-16/JCB-37).

[268]  *Id.*, p. 17.

[269]  Letter from Antrix (Murthi) to Devas (Viswanathan), February 2, 2006 (Ex. C-24/JCB-51).

[270]  Receipt for Payment of First Installment of Upfront Capacity Reservation Fee from Devas to Antrix, June 21, 2006 (Ex. C-35/JCB-61).

[271]  Receipt for Payment of First Installment of Upfront Capacity Reservation Fee for PS2 from Devas to Antrix, June 18, 2007 (Ex. C-40/JCB-70)

206.  The Agreement also provided that Antrix was responsible for obtaining certain governmental authorizations[272] (which it did) and that Devas was responsible for obtaining others, with best effort support from Antrix[273] (which it obtained for two licenses but did not reach the point of obtaining the third). But there is nothing in the Agreement which makes its validity dependent on Devas obtaining such permits, and at no time during the course of the Agreement or at the time of its annulment by Antrix was it argued by Antrix or any governmental authority that it was not in full effect. The non-issuance of a governmental license may pertain to the quantum of damages that may be claimed against the Respondent, if there was a breach of the Treaty, but it does not pertain to the validity of the Agreement or whether an investment was made by the Claimants.

207.  The lease was binding on both Antrix and Devas and, by itself, it was an investment with significant value as was shown by the additional investment of some US$ 75 million in March 2008.[274]

208.  It has been established that the Claimants made significant investments in time and money in Devas and that Devas honoured its obligations under the Agreement until its annulment by Antrix, including the payment of Upfront Capacity Reservation Fees of some US$ 13 million.

209.  As to the Respondent's argument that the Claimants had no acquired right to obtain the WPC License and that they had no guarantee that they would obtain such license, it is a matter that does not go to the definition of investment for jurisdictional purpose but rather to the value of that investment. On the basis of the evidence received by the Tribunal, it is satisfied that, even without a WPC license, Devas could have rolled out satellite-only services. The Tribunal also notes that it has been satisfactorily established that, because of problems of interference, it would not have been possible for competing services to operate in the same spectrum. The lack of a WPC license would be a matter to be considered when deciding on the quantum of damages, if the Respondent is found in breach of the Treaty.

210.  The Tribunal therefore concludes that not only were the Claimants qualified investors under Article 1(1)(b) of the Treaty but that they also made qualifying investments under Article 1(1)(a) of that Treaty.

---

[272]   Devas Agreement, Article 12(a)(ii) (Ex. C-16/JCB-37).

[273]   *Id*., Article 3(c).

[274]   Share Subscription Agreement between Devas and DT Asia, March 19, 2008 (Ex. C-45/JCB-81); Viswanathan I, para. 108, Singh I, para. 50.

## CHAPTER VI - THE "ESSENTIAL SECURITY INTERESTS" PROVISION

### A.    INTERPRETATION OF ARTICLE 11(3) OF THE TREATY IN CONTEXT

211.   Article 11(3) of the Treaty provides:

> The provisions of this Agreement shall not in any way limit the right of either Contracting Party to apply prohibitions or restrictions of any kind or take any other action which is directed to the protection of its essential security interests, or to the protection of public health or the prevention of diseases in pests or animals or plants.

212.   The Respondent's defence in this case rests on the "essential security interests" of the State, as defined in this Article. The Parties have raised both legal and factual issues in connection with this defence and before analyzing the facts relating to this issue, the Tribunal will first set out its views on the legal interpretation to be given to Article 11(3) of the Treaty and other matters raised by the Claimants relating to Articles 11(1) and 11(4), which can be summarized in the following questions:

(a)    What constitutes "essential security interests"?

(b)    Does Article 11(1) of the Treaty allow for the introduction of customary international law restrictions imposed on a state of necessity defence?

(c)    Can the Claimant invoke Article 11(4) of the Treaty?

(d)    Does Article 11(3) preclude an entitlement to compensation?

#### 1.    *What Constitutes "Essential Security Interests"?*

##### a.    **Can "Essential Security Interests" Be Construed as a Matter of Self-judgment by the Respondent?**

###### i.    The Respondent's Position

213.   The Respondent submits that Article 11(3) of the Treaty is of "central importance [...] on the facts of this case"[275] as it entitles India "to take measures directed to the protection of its essential security interests without incurring responsibility under any substantive provision of the [...] Treaty otherwise providing protection to investors."[276]

---

[275]    Statement of Defence, para. 76.

[276]    *Id.*, para. 76.

214. The Respondent considers that the Tribunal may only examine whether a measure is related to national security matters. The Respondent argues that the Tribunal may not "sit as a supranational regulatory or policy-making body to review the policy decisions of the Cabinet Committee on Security" as national authorities "are uniquely positioned to determine what constitutes a State's essential security interests in any particular circumstance and what measures should be adopted to safeguard those interests."[277]

215. The Respondent refers to an UNCTAD study on a clause of the Peru-Singapore investment treaty which contains language identical to Article 11(3) of the Mauritius-India BIT. That study considers that this provision "establishes objective conditions for invoking the (security) exception, (but its) practical effect comes very close to a self-judging clause."[278]

ii.     The Claimants' Position

216. The Claimants do not accept India's argument, which is premised on a characterization of Article 11(3) of the Treaty as "self-judging,"[279] by reference to the consistent and emphatic rejection of this notion by the International Court of Justice,[280] and universally reaffirmed by arbitral tribunals.[281]

217. Moreover, the Claimants submit that the language of this provision affords no basis for inferring that its application is self-judging. Such an application, according to the Claimants, requires "clear and specific language,"[282] which is notably absent in the present case.

---

[277]   *See Id*., paras 78-83; Rejoinder, para. 34.

[278]   UNCTAD, The Protection of national security in IIAs, UNCTAD Series on International Investment Policies for Development, 2009, pp. 94-95 (Ex. R-168).

[279]   Statement of Reply, para. 66.

[280]   Statement of Reply, paras 67-73. *See, inter alia, Military and Paramilitary Activities in and against Nicaragua* (Nicaragua v. United States of America), Jurisdiction and Admissibility, Judgment, I.C.J. Reports 1984, p. 392, paras 221-22; *Oil Platforms* (Islamic Republic of Iran v. United States of America), Preliminary Objection, Judgment, I.C.J. Reports 1996, p. 803, para. 20; *Oil Platforms* (Islamic Republic of Iran v. United States of America), Judgment, I.C.J. Reports 2003, p. 16, para. 73.

[281]   Statement of Reply, para. 74; s*ee*, for instance, *Gabčíkovo-Nagymaros Project* (Hungary v. Slovakia), Judgment, I.C.J. Reports 1997, p. 7, para. 51; *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, paras 370, 373; *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007, paras 331, 332; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 561 (Ex. CL-11).

[282]   Statement of Reply, paras 75-76.

### iii.   The Tribunal's Analysis

218.   This first question can be disposed of quickly in this case as the Respondent itself has stated that it is not arguing that "India (or Peru, or any other State having a treaty with a similar provision [to Article 11(3) of the Treaty]) can dismiss any case simply by saying that it considers the actions forming the basis of the claim to be in its 'essential security interests.'"[283]

219.   Indeed, it is well established by judgments of the International Court of Justice (the "**ICJ**")[284] and investment arbitration awards[285] that, unless a treaty contains specific wording granting full discretion to the State to determine what it considers necessary for the protection of its security interests,[286] national security clauses are not self-judging. Turning to the text of Article 11(3) of the Treaty, it plainly does not contain any explicit language that the Tribunal would regard as granting discretion of that nature to the State.

---

[283]   Respondent's Rejoinder, para. 36.

[284]   *Military and Paramilitary Activities in and against Nicaragua* (Nicaragua v. United States of America), Jurisdiction and Admissibility, Judgment, I.C.J. Reports 1984, p. 392, para. 282; *Oil Platforms* (Islamic Republic of Iran v. United States of America), Judgment, I.C.J. Reports 2003, p. 16, para. 43; *Gabčíkovo-Nagymaros Project* (Hungary v. Slovakia), Judgment, I.C.J. Reports 1997, p. 7, para. 51.

[285]   *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, paras 370, 373; *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007, paras 331, 332; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 561 (Ex. CL-11).

[286]   Self-judging "essential security interests" provisions are far from being unknown in international law. *See*, for instance, Article XXI of the General Agreement on Tariffs and Trade 1947 ("**GATT**"): "Nothing in this Agreement shall be construed: (a) to require any contracting party to furnish any information the disclosure of which it considers contrary to its essential security interests; or (b) to prevent any contracting party from taking any action which it considers necessary for the protection of its essential security interests…" (emphasis added); Article 6.12 of the Comprehensive Economic Cooperation Agreement between the Republic Of India and the Republic of Singapore, signed on June 29, 2005: "1. Nothing in this Chapter shall be construed: (a) to require a Party to furnish any information, the disclosure of which it considers contrary to its essential security interests; or (b) to prevent a Party from taking any action which it considers necessary for the protection of its essential security interests…" (emphasis added); Article 18 of the Treaty between The United States of America and The Oriental Republic of Uruguay Concerning the Encouragement and Reciprocal Protection of Investments, signed on November 4, 2005: "Nothing in this Treaty shall be construed: 1. to require a Party to furnish or allow access to any information the disclosure of which it determines to be contrary to its essential security interests; or 2. to preclude a Party from applying measures that it considers necessary for the fulfilment of its obligations with respect to the maintenance or restoration of international peace or security, or the protection of its own essential security interests" (emphasis added); Article 18 of the Treaty between The Government of The United States of America and The Government of The Republic of Rwanda Concerning the Encouragement and Reciprocal Protection of Investment, signed on February 19, 2008: "Nothing in this Treaty shall be construed: 1. to require a Party to furnish or allow access to any information the disclosure of which it determines to be contrary to its essential security interests; or 2. to preclude a Party from applying measures that it considers necessary for the fulfillment of its obligations with respect to the maintenance or restoration of international peace or security, or the protection of its own essential security interests" (emphasis added).

220.  However, while the Parties agree that the Tribunal may examine whether the preconditions to invoke the essential security clause have been met, they disagree as to the meaning or content of the preconditions laid down in the clause. The Tribunal must therefore address the following question.

### b.  What Conditions Must the Respondent Meet to Show that its Measures Were "Directed to the Protection of its Essential Security Interests"?

#### i.  The Respondent's Position

221.  The Respondent argues that the determinations by national authorities as to what constitutes "essential security interests" should be afforded "a wide measure of deference"[287]—a view that it says is supported by commentators and international jurisprudence.[288] Essentially, the Respondent cautions against "second-guessing" by international tribunals of national security determinations made by national authorities.[289] The Respondent refers again, in that respect, to the UNCTAD study on the Peru-Singapore investment and notes that "only in extreme cases will an arbitral tribunal conclude that the host country measure has no relation whatsoever to the national security interests of a party."[290]

222.  In the present case, the Respondent contends that the policy decision of the CCS, in its capacity as the highest authority in India for matters of internal and external security and defence, takes into consideration the growing demands of the Indian military for S-band capacity, which undoubtedly form part of the Respondent's essential security interests.[291] Furthermore, the Respondent refers to the express terms of the decision of the CCS and the extensive record, which plainly reflect the strategic needs for spectrum capacity.[292] Moreover, the fact that the Claimants

---

[287]  Statement of Defence, para. 78.

[288]  *Id.*, paras 78-82; *See, inter alia, Recent Cases on "Automatic" Reservations to the Optional Clause*, Robert Y. Jennings, p. 362. (Ex. R-45); *Council of Civil Service Unions v. Minister for Civil Service*, 22 November 1984, pp. 374, 412 (Ex. R-46); *J.R.C. v. Costa Rica*, United Nations Human Rights Committee, Communication No. 296/1988, CCPR/C/35/D/296/1988, Decision on Admissibility, April 3, 1989, para. 8.4; *Protocol No. 7 to the Convention for the Protection of Human Rights and Fundamental Freedoms*, Council of Europe, Explanatory Report, para. 15 (Ex. R-48).

[289]  Statement of Defence, para. 83; Transcript, Day 1, 153:3-13.

[290]  UNCTAD, The Protection of national security in IIAs, UNCTAD Series on International Investment Policies for Development, 2009, pp. 94-95 (Ex. R-168).

[291]  Statement of Defence, para. 84.

[292]  *Id.*, paras 39-61, 84.

were not included in the national security deliberations, of which the Claimants complain, is not significant given the sensitive nature of such issues.[293]

223. The Respondent criticizes the Claimants' failure to engage directly on this provision and characterizes its only submission as a suggestion that the Tribunal "disregard all [...] evidence and hold that the entire national security establishment of the Government acted in bad faith and with no motive other than to cause damage to Devas and its shareholders."[294] Such an argument, the Respondent contends, "cannot be countenanced under well-established principles of both Indian and international law."[295]

ii.    The Claimants' Position

224. Given that India's claim to essential security is not self-judging, the Claimants submit that an international tribunal has the power to conduct "an objective inquiry into whether an essential security clause was validly invoked and whether its conditions are satisfied."[296] The Claimants do not accept that India has made out the requisite elements by reference to the evidentiary record, which has not established that the measures were "directed at *any* security interest"[297] and, in any event, the "disproportionate and gratuitous nature" of these measures "fails to meet the standard of necessity observed by customary international law."[298]

225. As to the Claimants, they consider that two objective preconditions need to be fulfilled for the essential security clause to be triggered.

- The Tribunal must first verify whether a measure was aimed at the protection of the Respondent's security interests. In their view, the measure must be specifically directed at the State's essential security interests.[299]

- Additionally, the Claimants construe a requirement of necessity from the words "essential security interests." In other words, the Tribunal must verify that the security interest in question is so "vital…absolutely necessary; extremely important" that protection must be

---

[293]    *Id.*, para. 85.

[294]    *Id.*, paras 86-88.

[295]    Respondent's Rejoinder, para. 38.

[296]    Statement of Reply, para. 80.

[297]    *Id.*, paras 89-90 (emphasis by the Claimants).

[298]    *Id.*, paras 91-96; *See* generally Transcript, Day 5, 1188:14-1190:18.

[299]    Statement of Reply, para. 84.

warranted, and that such interest is actually under a threat that warranted the asserted measures of protection.[300]

226.  The Claimants engage in a word-by-word analysis of the essential security clause to define the meaning of the objective conditions that are required to invoke the security exception.

227.  First, according the Claimants, the use of the words "directed to" in the Article 11(3) implies that the Respondent's measures in question must have been "aimed at the protection of India's security interests." Measures that are not actually directed at the protection of such interests do not qualify.[301]

228.  Second, the use of the word "essential" implies that the security interest in question must be so "vital…absolutely necessary; extremely important" such that protection is warranted. According to the Claimants, the literal meaning of the term "essential" is "important…absolutely necessary, indispensably requisite…unavoidable;"[302] The Claimants invoke several legal authorities in support of this statement, including the following:

- In the *Nicaragua* case, it had been claimed that the various actions directed against the Nicaraguan government were justified on "essential security" grounds. Rejecting this claim, the ICJ held that:

    No evidence at all is available to show how Nicaraguan policies had in fact become a threat to "essential security interests" in May 1985, when those policies had been consistent, and consistently criticized by the United States, for four years previously, the Court is unable to find that the "embargo" was necessary to protect those interests.[303]

- In a similar vein, the Claimants rely on the *Oil Platforms*[304] and the *Total v. Argentina*[305] cases to argue that the nature of the security interest to be protected must be "absolutely necessary, extremely important," and that such interest was actually under a "threat" that warranted the asserted measures of "protection."[306]

---

[300]  *Id.*, para. 85.

[301]  *Id.*, para. 84.

[302]  *Id.*, fn.174, citing, *inter alia,* Oxford English Dictionary (2014).

[303]  *Military and Paramilitary Activities in and against Nicaragua* (Nicaragua v. United States of America), Jurisdiction and Admissibility, Judgment, I.C.J. Reports 1984, p. 392, paras 125 and 282.

[304]  *Oil Platforms* (Islamic Republic of Iran v. United States of America), Preliminary Objection, Judgment, I.C.J. Reports 1996, p. 803, paras 811, 820.

[305]  *Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010.

[306]  Statement of Reply, para. 86, fn. 179.

- Finally, the Claimants argue that, in any event, the customary standard of necessity appearing in Article 25 of the Articles on State Responsibility adopted by the International Law Commission (the "**ILC Articles**") applies to Article 11(3) of the Treaty by operation of Article 11(1).[307] In the Claimants' view, there exists in customary international law a regime governing the same issue dealt with by Article 11(3), i.e. the extent to which a State may respond to the alleged threats to the "essential interests" of the State. And, if these customary rules impose a "stricter" set of requirements on the host State, then the customary rules also qualify under Article 11(1) because they afford the Claimants treatment more favourable than that provided for by Article 11(3).

    iii.    The Tribunal's Analysis

229.  The Tribunal faces two distinct issues. The first issue concerns the interpretation of the terms of Article 11(3) of the Treaty, which vies to determine the exact conditions that are required by this provision to trigger an "essential security interests" exception, including in particular, whether Article 11(3) includes a requirement of necessity to display its effects. A separate question concerns whether the standard of necessity under customary international may apply, regardless of the terms of the Treaty, in invoking the "essential security interests" clause.

230.  As to the first issue, the Tribunal is faced with elucidating the meaning of Article 11(3) of the Treaty within the framework of Articles 31 and 32 of the Vienna Convention on the Law of Treaties (the "**VCLT**").

231.  Article 31 of the VCLT makes clear that any interpretation must rest primarily on the ordinary meaning of the text of the treaty, only to be supplemented by considerations of content, object and purpose if the ordinary meaning of the text is not clear. In performing this exercise of interpretation, the Tribunal must be particularly cautious not to rephrase or otherwise alter the plain meaning of the text, which is considered to reflect the common intention of the Contracting

---

[307]    *Id.*, para. 92.

Parties.[308] In the words of the *El Paso v. Argentina* tribunal, "the content of the treaty's provisions is paramount, and what is not there cannot be read into them."[309]

232. Also, pursuant to Article 32 of the VCLT, the Tribunal may only resort to supplementary means of interpretation if the outcome of an interpretation conducted under Article 31 of the VCLT "leaves the meaning ambiguous or obscure, or…leads to a result which is manifestly absurd or unreasonable."

233. The first condition laid down in Article 11(3) of the Treaty that the Tribunal must consider concerns the nexus that must exist between the State measures at stake and the essential security interests of the State for the exception to be triggered, which is embodied in the terms "directed to."

234. In that respect, the Tribunal is mindful of the broad terms of Article 11(3) of the Treaty. It clearly provides that the Treaty "shall not in any way limit the right of either Contracting Party to apply prohibitions or restrictions of any kind or to take any action which is directed to the protection of its essential security interests…" [Tribunal's underlining.]

235. In the Tribunal's view, while these terms provide the State with considerable freedom as to the action it can take, it is important to note that such action must be directed not to any security interest but only to "essential security interests." Measures that would not actually be directed to the protection of the essential security interests would not qualify.

236. This parameter will guide the Tribunal when applying the law to the facts of this case.

237. However, the Parties disagree on the existence of a requirement of necessity in Article 11(3) of the Treaty, such that the "essential security interests" exception could only be triggered when the State measures are "necessary" for the protection of the State's national security.

238. It is worth noting that the word "necessity" or any reference thereof is absent in the ESI clause. By contrast, all of the cases on which the Claimants rely to advance a requirement of necessity are based on a Treaty in which the relevant ESI clause expressly contains the word "necessary"

---

[308] *See* R.K. Gardiner, *Treaty Interpretation* (Oxford University Press 2008), p. 145, citing R.H. Berglin, 'Treaty Interpretation and the Impact of Contractual Choice of Forum Clauses on the Jurisdiction of International Tribunals: the Iranian Forum Clause Decisions of the Iran-United States Claims Tribunal' (1986) 21 Texas International Law Journal 39, p. 44.

[309] *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 590 (Ex. CL-11).

and therefore included necessity as an objective precondition for provoking the exception. In particular, *CMS*,[310] *Enron*,[311] *Sempra*,[312] *LG&E*,[313] *Continental Casualty*[314] and *El Paso*[315] were all brought under the aegis of the 1991 Argentina-U.S. BIT which reads at Article XI: "(t)his treaty shall not preclude the application by either Party of <u>measures necessary</u> [Tribunal's underlining] for the maintenance of public order, the fulfilment of its obligations with respect to the maintenance or the restoration of international peace or security, the protection of its own essential security interests."

239.   The UNCTAD study mentioned above identifies four basic approaches relating to the issue of necessity in international investment agreements ("IIAs"): (1) self-judging clauses; (2) necessity as objective precondition; (3) no reference to necessity; and (4) exclusion of judicial review.

240.   That study clearly brings the Mauritius-India BIT under the third category where there is no mention of the requirement of necessity and it is sufficient that the measures be "directed to the protection of its essential security interests." As an example, it refers specifically to the Hungary-India BIT (2003) which contains a national security clause practically identical with the present one. Article 12 of that BIT reads in part as follows: "[…] nothing in this Agreement precludes the host Contracting Party <u>from taking action for the protection of its essential security interests</u> or in circumstances of extreme emergency in accordance with its laws normally and reasonably applied on a non-discriminatory basis." [Tribunal's underlining.] The Study also mentions the Peru-Singapore BIT (2003) which uses wording similar to the Mauritius-India BIT. Its Article 11 reads as follows: "The provisions of this Agreement shall not in any away limit the right of either Contracting Party to <u>apply prohibitions or restrictions of any kind or to take any other action which is directed to the protection of its essential security interests,</u> or to the protection of public health or the prevention of diseases and pests in animals or plants." [Tribunal's underlining.]

241.   The UNCTAD study concludes as follows: "Although the two examples above establish objective conditions for invoking the exception, their practical effect comes very close to a self-judging clause. Only in extreme cases will an arbitral tribunal conclude that the host country measure has no relation whatsoever to the national security interests of a party." This would caution against

---

[310]   *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005.

[311]   *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007.

[312]   *Sempra Energy International v. Argentina*, ICSID Case No. ARB/02/16, Award, 2007.

[313]   *LG&E Energy Corporation v. Argentina*, ICSID Case No ARB/02/1, Decision on Liability, 2006.

[314]   *Continental Casualty Co. v. Argentina*, ICSID Case No. ARB/03/9, Award, 2008.

[315]   *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011.

imposing a requirement of necessity in ESI clauses unless it can be clearly inferred from the terms of the clause. In the words of the *El Paso v. Argentina* tribunal: "… the content of the treaty's provision is paramount, and what is not there cannot be read into them."[316]

242.  The study would appear however to go too far in stating that such clauses are "very close to self-judging clauses." In situations like the one in this case or in those mentioned in the UNCTAD study, a tribunal is called upon to assess whether the measure adopted by the State is not only directed to the protection of its security but that it must also be for the protection of its essential security interests. In the case of self-judging clauses, it suffices for the State to declare, in its discretion, that it considers the adopted measure necessary for the protection of its security interests.[317]

243.  While, in the present case, the Respondent does not have to demonstrate necessity in the sense that the measure adopted was the only one it could resort to in the circumstances, it still has to establish that the measure related to its essential security interests; it cannot therefore be any security interest but it has to be an "essential" one. In that respect, the Tribunal has no difficulty endorsing the definition of that word proposed by the Claimants and taken from the following dictionaries: "Essential" definition (meanings 3(b), 4(a)), *Oxford English Dictionary* (2014) ("important (…) absolutely necessary, indispensably requisite (…) unavoidable");[318] "Essential" definition (meaning 1), *The Random House Dictionary of the English Language* (1966) ("absolutely necessary; indispensable")[319] "Essential" definition (meanings 2(a), 2(b)), *Webster's Third New Int'l Dictionary* (1976) ("necessary, indispensable, or unavoidable").[320]

244.  In performing this analysis, however, the Tribunal has also no difficulty in recognizing the "wide measure of deference" mentioned by the Respondent.[321]

245.  An arbitral tribunal may not sit in judgment on national security matters as on any other factual dispute arising between an investor and a State. National security issues relate to the existential core of a State. An investor who wishes to challenge a State decision in that respect faces a heavy

---

[316]   *Id.*, Award, 2011, para. 590 (Ex. CL-7).

[317]   *See supra*, para. 219 and fn. 286.

[318]   Oxford English Dictionary (2014) (excerpt) (Ex. CL-61).

[319]   The Random House Dictionary of the English Language (1966) (excerpt) (Ex. CL-62).

[320]   Webster's Third New Int'l Dictionary (1976) (excerpt) (Ex. CL-64).

[321]   *See supra*, para. 221.

burden of proof, such as bad faith, absence of authority or application to measures that do not relate to essential security interests.

**2.    Does Article 11(1) of the Treaty Allow for the Introduction of Customary International Law Restrictions Imposed on a State of Necessity Defence?**

**a.  The Claimants' Position**

246.  In addition to invoking a "necessity" requirement into Article 11(3) of the Treaty, the Claimants argue that, by virtue of Article 11(1), the Respondent must demonstrate that it meets the conditions of a state of necessity defence under customary international law.

Article 11(1) of the Treaty reads as follows:

> If the provisions of the law of either Contracting Party or obligations under international law existing at present or established hereafter between the Contracting Parties, in addition to the present Agreement, contain rules, whether general or specific, entitling investments and returns of investors of the other Contracting Party to treatment more favourable than that provided for by the present Agreement, such rules shall, to the extent that they are more favourable, prevail over the present Agreement.

247.  According to the Claimants,[322] Article 11(1) applies to Article 11(3), thereby allowing them to claim the more restrictive standards imposed upon the Respondent by Article 25 of the ILC Articles on State Responsibility concerning a state of necessity defence. These Articles are considered as a consolidation of current customary international law.

248.  Article 25 reads as follows:

> 1.  Necessity may not be invoked by a State as ground for precluding the wrongfulness of an act not in conformity with an international obligation of that State unless the act:
>
> (a) is the only way for the State to safeguard an essential interest against a grave and imminent peril; and
>
> (b) does not seriously impair an essential interest of the State or States towards which the obligation exists, or of the international community as a whole.
>
> 2.  In any case, necessity may not be invoked by a State as a ground for precluding wrongfulness if:
>
> (a) the international obligation in question excludes the possibility of invoking necessity; or

---

[322]    Statement of Reply, paras 91-96.

(b) the State has contributed to the situation of necessity.[323]

249. In the Claimants' view, these strict requirements on a host State invoking a state of necessity must be applied in the interpretation of Article 11(1) of the Treaty which allows them to make a claim on the basis that they are entitled to a "treatment more favorable than that provided for by the present Agreement," including Article 11(3). Relying in particular on *EDF International*,[324] *Suez/AWG*[325] and *Gabčikovo-Nagymaros*,[326] they argue that the Respondent must demonstrate that "the wrongful act was the only way to safeguard (India's) essential interest under Article 25(1)."[327]

### b.    The Respondent's Position

250. The Respondent argues that Article 11(1) of the Treaty is not a vehicle which allows bringing Article 25 of the ILC Articles into this case. According to it, Article 11(1) is nothing but a "preservation of rights" clause—which provides that the Treaty is not designed to take away substantive protections offered by international law—but "has nothing to do with the state of necessity defence incorporated in Article 25 of the ILC Articles, which does not confer benefits on private investors, but rather outlines a defence available to States under customary international law."[328]

251. Moreover, pointing out the clear and categorical text of Article 11(3) which states that "(t)he provisions of this Agreement shall not limit in any way the right" of the State to protect its essential security interests, the Respondent argues that Article 11(1) cannot negate the applicability of Article 11(3).[329]

---

[323] International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts 2001, Yearbook Of The International Law Commission (2001), Vol. II, Part Two, p. 28 (Ex. R-116 and R-117).

[324] *EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, para. 1171.

[325] *Suez, Sociedad General de Aguas de Barcelona, S.A. and Vivendi Universal, S.A. v. Argentina*, ICSID Case No. ARB/03/19, Decision on Liability, 2010; *AWG Group Ltd. v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 260.

[326] *Gabčikovo-Nagymaros Project* (Hungary v. Slovakia), Judgment, I.C.J. Reports 1997, p. 7, para. 57.

[327] Statement of Reply, para. 95, quoting *EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, para. 1171.

[328] Respondent's Rejoinder, para. 55.

[329] *Id.*, para. 56.

### c.    The Tribunal's Analysis

252.    The Tribunal is of the view that Article 11(1) does not result in a restrictive application of Article 11(3). It is true that, when a State was invoking a "state of necessity" defence, the ICJ and a number of arbitral tribunals[330] have recognized the right of international investors to challenge such defence under customary international law, on the basis that it was not the only way for a State to safeguard its essential interests or that the State was at least partly responsible for the situation which led a State to invoke a state of necessity situation (These are the only two restrictions mentioned in Article 25 of the Articles that might apply in this case).

253.    However, in face of the very clear and strong wording of Article 11(3), it would be strange to give Article 11(1) preponderance over it. Indeed, Article 11(3) provides that "(t)he provisions of this Agreement shall not in any way limit the right of either Contracting Party to apply prohibitions or restrictions of any kind or take any other action which is directed to the protection of its essential security interests […]" [Tribunal's underlining.]

254.    Secondly, the Respondent is right in pointing out that the "preservation of rights" under Article 11(1) of the Treaty has nothing to do with the "state of necessity" defence which, under customary international law, is available to a State as a ground for precluding the wrongfulness of an act which would otherwise be in breach of an international obligation of that State.

255.    Finally, the Respondent in the present case is not invoking a state of necessity defence under customary international law but, instead, the specific provision of Article 11(3) of the Treaty concerning the protection of its essential security interest and it is the analysis of that provision which will guide the Tribunal in determining whether or not the Respondent is in breach of the Treaty.

256.    The Tribunal therefore concludes that the conditions attached to the state of necessity defence under customary international law are not applicable in the present situation. The Tribunal

---

[330]    *EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, para. 1176; *Suez, Sociedad General de Aguas de Barcelona, S.A. and Vivendi Universal, S.A. v. Argentina*, ICSID Case No. ARB/03/19, Decision on Liability, 2010, paras 259-260; *Gabčíkovo-Nagymaros Project* (Hungary v. Slovakia), Judgment, I.C.J. Reports 1997, p. 7, paras 49-59; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras 613-620 (Ex. CL-7).

observes that this approach is consistent with that taken by the tribunal in *Continental Casualty v. Argentina*[331] and the annulment committee in *CMS v. Argentina.*[332]

### 3. Can the Claimants Invoke Article 11(4) of the Treaty?

257. Article 11(4) of the Treaty provides:

> Each Contracting Party shall, however, honour any obligation it may have entered into with regard to investments of investors of the other Contracting Party.

#### a. The Claimants' Position

258. The Claimants advance two arguments based on Article 11(4) to preclude the Respondent from invoking the "essential security interests" provision. First, the Claimants argue that the language of Article 11(4) is intended to restrain the Respondent from acting inconsistently with its own obligations. According to the Claimants, the Respondent owes obligations under the Devas Agreement, which preclude the Respondent from now terminating its contractual commitments.[333]

259. The Claimants maintain that the policy decision resulting in the annulment of the Devas Agreement is affirmed by the Opinion of the ASG as "an act by the governmental authority acting in its sovereign capacity." In view of this statement, the Claimants do not consider it necessary to reach the issue of whether Antrix' actions are attributable to the State in order to conclude that there has been an expropriation by India.[334] Yet, the Claimants advance a notion of agency and rely on the "inseparability" of Antrix, DOS and ISRO in practice.[335]

260. Secondly, in the Claimants' view, India is also precluded from invoking "essential security" to "excuse situations of its own making" as evidenced by statements of a rule of general international

---

[331] *Continental Casualty Company v. Argentine Republic,* ICSID Case No. ARB/03/9, Award, 2008, para. 167.

[332] *CMS Gas Transmission Company v Argentina,* ICSID Case No ARB/01/8, Decision on Application for Annulment, 2007, paras 128-136.

[333] Statement of Reply, para. 98.

[334] Statement of Claim, para. 172.

[335] *Id.*, para. 214. *See supra*, para. 69.

law to that effect in *El Paso*,[336] *Continental Casualty*[337] and *LG&E*.[338] In the present case, the Claimants interpret the factual record as showing that "the allocation of the S-band to DOS for 'commercial operations—the scenario that led to Devas signing the Devas Agreement—was the result of conscious and deliberate policy-making on its part.'"[339] Having recalled India's assessment of its national priorities from 1999 to 2008[340] and its conduct in allowing the Devas Agreement to proceed, the Claimants submit that the Respondent cannot now "claim that it was 'essential' that these commercial uses be terminated" because it "supposedly formed a different assessment of its "national needs at a later time."[341]

### b.    The Respondent's Position

261.  The Respondent contends that the Claimants' first argument proceeds on the flawed basis that "the obligations under the Devas Agreement are the obligations of the Government, not Antrix" when the factual record establishes that the Government had no such obligations.[342]

262.  The Respondent argues that Devas knew that the Government of India was not a party to the Devas Agreement and maintained a distinct personality from Antrix for the purposes of the Devas Agreement.[343] As to allegations that Antrix and the Government of India are "inseparable,"[344] the very fact that the Claimants identify Antrix as the entity which entered into and annulled the Devas Agreement upon the instructions of several governmental bodies shows that Antrix and the Government of India are not "inseparable," and Antrix did not enter into the Devas Agreement "on behalf of the Government." Rather, the negotiating history of the Devas Agreement shows

---

[336]  *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras 614-15, 620, 624 (Ex. CL-11).

[337]  *Continental Casualty Co. v. Argentina*, ICSID Case No. ARB/03/9, Decision on Annulment, 2011, paras 139-43.

[338]  Statement of Reply, para. 101. *See LG&E Energy Corporation v. Argentina*, ICSID Case No. ARB/02/1, Decision on Liability, 2006, para. 212.

[339]  Statement of Reply, para. 104.

[340]  *Id*., para. 104.

[341]  *Id*., para. 105.

[342]  Respondent's Rejoinder, paras 59-62.

[343]  Statement of Defence, para. 155.

[344]  *Id*., para. 145; *See* Statement of Claim, para. 214.

that Devas wanted ISRO to be its counterparty in the deal, which was not accepted and Antrix ultimately signed the Agreement.[345]

263. The Respondent then refers to what it characterizes as a "unanimous line of Indian authority" rejecting conflation of the legal personalities of State-owned companies and the government,[346] as well as international authorities following the same trend.[347] These authorities suggest that a clear distinction must be drawn between Antrix, a "private company limited by shares" within the meaning of the Indian Companies Act,[348] and the Government of India. The Respondent notes the Claimants' failure to bring any Indian authority to support their position.[349] Moreover, international authorities such as the ILC Articles lend further support to the Respondent's position that the acts of Antrix are not attributable to the State, save in certain circumstances that are inapplicable in the present case.[350]

---

[345]   *See* Transcript, Day 5, 1223:11-1224:22; 1227:15-20; Term Sheet (Ex. R-12/JCB-23). According to the Respondent, the fact that Devas and Antrix (and not ISRO or DOS) were the parties to the Devas Agreement is an undisputed material fact of the case; *See*, *inter alia*, Transcript, Day 5, 1268:20-1269:15.

[346]   Statement of Defence, paras 148-51, citing *Electronics Corporation of India Ltd. and Ors. v. Secretary, Revenue Department, Govt. of Andhra Pradesh and Ors*., Supreme Court of India, Judgment, 5 1999, AIR 1999 SC 1734, para. 15 (Ex. R-106); *Western Coalfields Limited v. Special Area Development Authority, Korba and Anr. And Bharat Aluminum Company Limited v. Special Area Development Authority, Korba and Ors*., Supreme Court of India, Judgment, 1981, AIR 1982 SC 697, para. 21 (Ex. R-107); *Steel Authority of India Ltd. v. Shri Ambica Mills Ltd. and Ors., Supreme Court of India*, Judgment, 1997, AIR 1998 SC 418, paras 16-18 (Ex. R-108); *Dr. S.L. Agarwal v. The General Manager, Hindustan Steel Ltd*., Supreme Court of India, Judgment, 1969, AIR 1970 SC 1150, para. 10 (Ex. R-109); *The State Trading Corporation of India Ltd. and Ors. v. The Commercial Tax Officer, Visakhapatnam and Ors*, Supreme Court of India, Judgment, 1963, AIR 1963 SC 1811, paras 152, 154 (Ex. R-110); *Heavy Engineering Mazdoor Union v. State of Bihar and Ors., Supreme Court of India*, Judgment, 1969, AIR 1970 SC 82, para. 4 (Ex. R-111); *Principles Of Administrative Law*, M.P. Jain and S.N. Jain, pp. 1018-1019 (Ex. R-112).

[347]   Statement of Defence, para. 152, citing, *inter alia*, *Amoco International Finance Corporation v. The Government of Islamic Republic of Iran et al*., Iran-U.S.C.T. Case No. 56, Partial Award No. 310-56-3, 1987, paras 161-162, 164 (Ex. R-113); *Limited Liability Company Amto v. Ukraine*, SCC Case No. 080/2005 (ECT), Final Award, 2008, para. 110; M. Feit, 'Responsibility of the State under International Law for the Breach of Contract Committed by State-Owned Entity' (2010) 28 Berkeley Journal of International Law 132, p. 154 (Ex. R-114).

[348]   *See* Indian Companies Act, Section 3(1)(iii) (Ex. R-105).

[349]   Statement of Defence, para. 146. According to the Respondent, the relevance of Indian law at this level derives from the fact that "[i]n determining whether a company possesses independent and distinct legal personality, international law looks to the rules of the relevant domestic law." *Ahmadou Sadio Diallo* (Republic of Guinea v. Democratic Republic of the Congo), Preliminary Objections, Judgment, I.C.J. Reports 2007, p. 582, para. 61.

[350]   International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts 2001, Yearbook Of The International Law Commission (2001), Vol. II, Part Two, p. 26 and p. 48 (Ex. R-116 and R-117).

264.  In any case, even if Article 11(4) was applicable (which the Respondent denies), the Respondent argues that the "essential security interests" provision would prevail on its clear and unambiguous terms.[351]

265.  As to the Claimants' second argument, the Respondent submits that the authorities and principle relied upon, even if accepted as correct, are "totally irrelevant" for two reasons: India had no contractual commitment of any kind to Devas nor did it "contribute" to any "crisis."[352]

### c.   The Tribunal's Analysis

266.  In order to invoke Article 11(4), two requirements must be satisfied. First, the obligation mentioned in Article 11(4) has to be one which the Respondent has itself entered into. Second, the Respondent must fail to honour such an obligation.

267.  The task of the Tribunal will therefore be to determine whether the Agreement constitutes such an obligation and whether the annulment of the Agreement constitutes failure of the Respondent to honour the obligation.

268.  The Tribunal notes that, although stating that it is not necessary to decide on the attribution of Antrix's actions to the Respondent in order to conclude that there has been an expropriation, the Claimants nonetheless rely on the "inseparability" of Antrix, DOS and ISRO in practice. This latter claim is made particularly in connection with a breach of the FET standard, the Claimants arguing that the Respondent cannot evade liability for its various bad faith actions by claiming that they were solely attributable to Antrix.

269.  Articles 4, 5 and 8 of the ILC Articles containing the applicable principles of attribution read as follows:

Article 4. Conduct of organs of a State

1.  The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.

2.  An organ includes any person or entity which has that status in accordance with the internal law of the State.

---

[351]   Respondent's Rejoinder, para. 63.

[352]   *Id.*, paras 65-66.

Article 5. Conduct of persons or entities exercising elements
of governmental authority

> The conduct of a person or entity which is not an organ of the State under Article 4 but which is empowered by the law of that State to exercise elements of the governmental authority under international law, provided the person or entity is acting in the capacity in the particular instance.

Article 8. Conduct directed or controlled by the State

> The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of that State in carrying out the conduct.

270. Article 4(2) of the ILC Articles makes clear that the legal personality of a State-owned company is governed by domestic law. The acts of such a company can only be attributed *en bloc* to the State when it is considered a governmental body under domestic law.

271. This view was confirmed by the ICJ in the *Ahmadou Sadio Diallo* case. The Court ruled that:

> As the Court recalled in the Barcelona Traction case, "(t)here is …no need to investigate the many different forms of legal entity provided for by the municipal laws of States (I.C.J. Reports 1970, p.34, para.40). What matters, from the point of view of international law, is to determine whether or not these have a legal personality independent of their members. (…). In determining whether a company possesses independent and distinct legal personality, international law looks to the rules of the relevant domestic law."[353]

272. In the present instance, the Respondent has provided clear evidence that Antrix cannot be considered an organ of the State under Indian law. Antrix's constituent documents make clear that it is a "private company limited by shares" within the meaning of the Indian Companies Act.[354]

273. Even if the determination of the legal status of a State-owned company is a matter governed by domestic law, the actions of such company may still engage the international responsibility of the State. The acts of the company will have to be examined on a case-by-case basis, in light of ILC Articles 5 and 8, to determine whether they constitute a breach of international law that may be attributed to the State.

274. The Claimants however hold a different position. They rely on a notion of agency to argue that "in assessing the Respondent's liability, Antrix's various actions … should be directly attributed to India."[355] However, most of the authorities relied upon by the Claimants do not support the

---

[353] *Ahmadou Sadio Diallo* (Republic of Guinea v. Democratic Republic of the Congo), Preliminary Objections, Judgment, I.C.J. Reports 2007, p. 582, para. 61.

[354] Statement of Defence, para. 147; Indian Companies Act, Section 3(1)(iii) (Ex. R-105).

[355] Statement of Claim, para. 214.

existence of a notion of agency in international law, such that every act of an agent (including the repeated assurances of Antrix's support for the Devas System, referred to by the Claimants) may be attributed to the State.

275.   Thus, the Claimants rely on the *Wintershall* arbitration, in which the tribunal decided that the State-owned company at stake operated "as an arm or agent of the Government" but only "as a matter of Qatari law,"[356] i.e. agency was found to exist on the basis of domestic law. The ICC case *Deutsche Schachtbau v. United Arab Emirates* was a purely commercial case that concerned the extension of an arbitration clause from a contract signed by a State entity to the State itself through a multiplicity of contracts.[357] Moreover, in the *Nykomb* ICSID award, the tribunal decided that, in the circumstances of the case, Latvia had to "be considered responsible for (the State's entity) actions under the rules of attribution in international law."[358] Finally, in *Maffezini v. Spain*, the tribunal concluded that, for the exclusive purpose of determining the jurisdiction of ICSID, it is sufficient if the investor is able to make a *prima facie* case that the relevant company/entity is a State-entity acting on behalf of the Respondent State.[359] Attribution matters were actually left to be decided for the merits phase.[360]

276.   Suffice it to say that ILC Articles 4, 5 and 8 do not provide general rules of attribution meaning that any act can be attributed to the State if the requirement of structure, function or control is met. The scope of these provisions is, rather, limited to conduct which constitutes a violation of international law, and should not be confused with rules on agency as they exist under private law.[361]

277.   There remains the provision of Article 8 of the ILC Articles concerning the conduct of a person or group of persons directed or controlled by the State. In that circumstance, that conduct "shall be considered as an act of a State under international law if the person or group of persons is in

---

[356]   *Wintershall et al. v. Government of Qatar,* UNCITRAL, Partial Award on Liability, 1988, 28 International Legal Materials 798 (1989), pp. 812 (Ex. CL-39).

[357]   *Deutsche Schachtbau- und Tiefbohrgesellschaft v. United Arab Emirates,* ICC Case No. 3572, Final Award, 1982, Yearbook of Commercial Arbitration 111 (1989), para. 23-27.

[358]   *Nykomb Synergetics Techonology Holding A.B. v. The Republic of Latvia,* SCC, Award, 2003, para. 4.2 (Ex. CL-26).

[359]   *Emilio Agustín Maffezini v. Kingdom of Spain*, ICSID Case No. ARB/97/7, Decision on Jurisdiction, 2000, para. 75.

[360]   *Id.*, para. 89.

[361]   M. Feit, 'Responsibility of the State under International Law for the Breach of Contract Committed by State-Owned Entity' (2010) 28 Berkeley Journal of International Law 132, p. 154 (Ex. R-114).

fact acting on the instructions of, under the direction or control of that State in carrying out the conduct."

278. The Tribunal is of the view that "a person or group of persons" includes any corporation legally created. One may wonder why Article 5 of the ILC Articles refers to "conduct of a person or entity" while Article 8 mentions instead "persons or group of persons" but it is generally recognized in modern legal systems that "person" includes not only a natural person but also a legal person, such as a corporation. Moreover, the Mauritius-India BIT itself defines "investor" as covering both a natural person[362] and a legal person.[363]

279. The Tribunal notes in this regard that treaties concluded in the area of international investment protection appear generally to include juridical entities, such as corporations, within the definition of a "person." To cite only two conspicuous examples, pursuant to Article 25(2) of the ICSID Convention a "national of another Contracting State" is defined to include "any natural person" and "any juridical person."[364] Similarly, Article 13 of the MIGA Convention includes "any natural person" and "any juridical person" within the ambit of "eligible investors."[365]

280. Finally, it would make no sense to impose a restrictive interpretation that would allow a State to circumvent the rules of attribution by sending its direction or instruction to a corporate entity rather than a physical person or group of physical persons. Even when addressed to a corporation, the direction or instruction has to be received and acted upon by a person or a group of persons, be they the chairman, the president or the board of directors of that corporation.

281. In the present case, having regard to the circumstances leading to the Devas Agreement as they emerge from the pleadings of the Parties, the Tribunal concludes that, when entering into the Agreement, Antrix was not acting as an organ of the Respondent, whether under the provisions of Articles 4 and 5 of the ILC Articles. The Agreement itself does not constitute an obligation the Respondent has entered into within the meaning of Article 11(4).

---

[362]     Article 1(1)(b)(i) of the Treaty.

[363]     *Id*.

[364]     Convention on the Settlement of Investment Disputes between States and Nationals of Other States, March 18, 1965.

[365]     Convention establishing the Multilateral Investment Guarantee Agency, October 11, 1985.

**HELLMANN DECL IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD - 494**
**(USDC NO. 2:18-cv-01360)**

282. A question arises however as to whether, when Antrix served the Claimants with a notice of *force majeure*, Antrix was acting "on the instructions of, or under the direction or control" of the Respondent,[366] as described in Article 8 of the ILC Articles.

283. It is important to note that Article 2 of the ILC Articles states that two conditions must be met for the attribution to a State of an internationally wrongful act: (i) the act must be attributable to the State under international law; and (ii) it must constitute a breach of an international obligation of the State. The answer to these questions has nothing to do with the liability of Antrix for breach of its contractual obligations under Indian law, a matter which has been dealt with by the ICC tribunal referred to in the present award.

284. As stated by James Crawford and Simon Olleson:

> It is important that international law, and in particular the law of State responsibility, should not be made to do too much. In particular, international law should not be applied to decide issues to which it is not properly applicable and a fortiori, should not be applied to decide issues which, on analysis, are properly governed by a particular system of domestic law. As will be seen, this is a particular danger with the rules of attribution, which are often prayed in aid in relation to issues which in reality have nothing to do with questions of State responsibility.[367]

285. A similar line of thought was expressed by Michael Feit when he observed:

> The basic difference between the principle of "piercing the corporate veil" and the rules of attribution as reflected in the ILC Articles is that under the former, the contract itself is attributed to the state, while under the latter, only the act which constitutes the breach of international law is attributed for the purpose of state responsibility.[368]

286. The interpretation of Article 8 of the ILC Articles has been the subject of helpful analysis in the recent award and the decision on annulment relating to the *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey* case.[369] In that case, the tribunal, by majority, ruled that "while Emlak (the Turkish joint-venture partner of the claimant) was subject to TOKI's (a State entity) corporate and managerial control, Emlak's conduct with respect to the execution,

---

[366] The Claimants specifically raised this issue in the Statement of Claim (para. 214), where they argue that "Antrix purportedly also undertook to terminate the Devas Agreement upon the instructions of the Space Commission and under the direction of the Department of Space." *See* Letter from B.S. Anantharamu, Deputy-Secretary, Department of Space to Executive Director, M/s. Antrix Corporation, Ltd., 23 February 2011 (Ex. R-37/JCB-221).

[367] J. Crawford and S. Olleson, 'The Application of the Rules of State Responsibility', in M. Bungenberg, J. Griebel, S. Hobe and A. Reinisch (eds), *International Investment Law* (Nomos 2015), p. 414-415.

[368] M. Feit, 'Responsibility of the State under International Law for the Breach of Contract Committed by State-Owned Entity' (2010) 28 Berkeley Journal of International Law 132, p. 151 (Ex. R-114).

[369] *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Award, 2014, paras 301-326 and Decision on Annulment, 2015, paras 186-202.

maintenance and termination of the Contract is not attributable to the State under Article 8 of the ILC Articles due to an absence of proof that the State used its control as a vehicle directed towards achieving a particular result in its sovereign interests."[370] The tribunal also concluded that purely contractual claims were not covered by the relevant BIT.[371] Moreover, it unanimously decided that the challenged actions, including those of TOKI, the Supreme Audit Board, the Prime Ministry and the police, did not constitute violations of the relevant BIT.[372]

287.   Quoting the award approvingly, the annulment committee had this to say:

> Relying thus on Article 8 and its Commentary, the Tribunal stated that:
>
> The relevant enquiry remains whether Emlak was being directed, instructed or controlled by TOKI with respect to the specific activity of administering the Contract with Tulip JV in the sense of sovereign direction, instruction or control rather than the ordinary control by a majority shareholder in the company's perceived commercial interests.
>
> The Committee has no doubt that the Tribunal correctly interpreted Article 8 of the ILC Articles and applied the relevant test, that of effective control."[373]

288.   The Tribunal endorses the analysis of Article 8 contained in the *Tulip* case; however, based on the factual situation, the end result is quite different. While in the *Tulip* case, the tribunal concluded that there was no evidence supporting attribution of Emlak's acts to the State, there can be no doubt that, in the present case, Antrix, in invoking *force majeure*, was "acting on the instructions of, or under the direction or control of that State in carrying out the conduct," to quote Article 8.

289.   The text of the press release issued by the Government of India on February 17, 2011 confirmed the decision of the CCS to annul the Devas Agreement "forthwith"[374] and authorized the DOS to "instruct ANTRIX to annul the ANTRIX-DEVAS contract."[375] On February 23, 2011, the Deputy

---

[370]   *Id*., Award, para. 326.

[371]   *Id*., para. 361.

[372]   *Id*., para. 368-369 and Decision on Annulment, para. 35.

[373]   *Id.*, Decision on Annulment, paras.188-189 (emphasis in original).

[374]   Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal,* February 17, 2011. (Ex. C-134/JCB-220).

[375]   Minutes of 117th Meeting of the Space Commission Held at DOS Branch Secretariat, New Delhi, on July 2, 2010, signed July 21, 2010, para. 117.6.12 (Ex. R-23/JCB-161)

Secretary of DOS advised Antrix that it would be unable to lease any transponders in the S-band and that the Agreement "shall be annulled forthwith."[376]

290. Having found that Antrix's notice of annulment is attributable to the Respondent under Article 8 of the ILC Articles, it remains however to be determined whether, in the continuum of activities which led to the annulment of the Devas Agreement, the Respondent breached the provisions of the BIT—a question that the Tribunal will address in Chapters VII, VIII, IX and X of this Award.

### 4.   *Does Article 11(3) Prevent Entitlement to Compensation?*

#### a.   **The Claimants' Position**

291. The Claimants argue that "Article 11(3) merely provides that certain sovereign powers are unimpaired; it does not purport to suspend compliance with co-existent obligation of international law (including as stated in Articles 4, 6 and 7) regarding the treatment of investors nor does it override other obligations of international law. Accordingly, even if the annulment of the contract was authorized by Article 11(3)," the Claimants submit that their right of—and India's corresponding obligation to provide—compensation as a result of measures supposedly authorized by Article 11(3) "remains fully operative."[377]

#### b.   **The Respondent's Position**

292. The Respondent, however, argues that there could be no basis for compensation if the "essential security interests" provision of Article 11(3) is found to apply in this case. To support its argument, the Respondent refers to the *Continental Casualty* case[378] and the *CMS* annulment committee decision,[379] which in effect conclude that there is no possibility of compensation when the "essential security interests" provisions are invoked.[380]

---

[376]   Letter from B.S. Anantharamu, Deputy-Secretary, Department of Space to Executive Director, M/s. Antrix Corporation, LTD. (Ex. R-37/JCB-221).

[377]   Statement of Reply, para. 106; *See EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, para. 1178.

[378]   *Continental Casualty Company v. Argentine Republic,* ICSID Case No. ARB/03/9, Award, 2008, para.164.

[379]   *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, para. 146.

[380]   Respondent's Rejoinder, paras 69-72. *See Continental Casualty Co. v. Argentina*, ICSID Case No. ARB/03/9, Award, 2008, para. 164; *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, para. 146.

### c.    The Tribunal's Analysis

293. The Tribunal has no doubt that, if a State properly invokes a national security exception under an investment treaty, it cannot be liable for compensation of damages going forward. This is made clear in the *CMS* annulment committee decision when it opines in relation to the Article of the relevant treaty relating to state of necessity: "Article XI [*NB:* the security interests clause under the Argentina-United States BIT], if and for so long as it applied, excluded the operation of the substantive provisions of the BIT. That being so, there could be no possibility of compensation being payable during that period."[381] It added: "Article XI is a threshold requirement: if it applies, the substantive obligations under the Treaty do not apply."[382] Similarly, the *Continental v. Argentina* award noted that "if Art. XI is applicable because the measure at issue was necessary in order to safeguard essential security interest, then the treaty is inapplicable to such measure."[383] It has to be noted that, in the *CMS* case, Argentina argued that the economic measures adopted by Argentina were to be of a temporary nature and, as such, did not imply a permanent expropriation. However, the fact that in the present case the expropriation was of a permanent nature does not justify a different conclusion.

294. However, this does not resolve the question as to what happens if a State has engaged in treaty breaches during the period preceding the invocation of national security. In such a case, a State could not, by invoking national security at a certain moment, simply erase the effect of previous wrongful actions.

295. It will therefore be for the Tribunal to decide whether, even if national security interests were properly invoked by the Respondent, the Respondent breached provisions of the Treaty during the period previous to the invocation of Article 11(3) and, if so, whether damages resulted from such action.

### B.    APPLICATION OF THE LAW TO THE FACTS

296. The Parties fundamentally disagree as to whether there was a real need on the part of the military and security agencies of India to reserve S-band capacity, such that the intended uses could not be reconciled with the terms of the Devas Agreement.

---

[381] *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, para.146.

[382] *Id.*, para. 129.

[383] *Continental Casualty Co. v. Argentina*, ICSID Case No ARB/03/9, Award, 2008, fn. 236.

1.    **The Parties' Arguments**

   a.    **Historical Analysis of Demands for S-band Spectrum in India**

   i.    The Claimants' Position

297.   The Claimants first note that at all times prior to Dr. Radhakrishnan's announcement of the annulment of the Devas Agreement on February 8, 2011 they remained unaware of any claim that any governmental user had a need for the S-band spectrum that had been allotted to Devas.[384]

298.   According to the Claimants, it was partly because DOS/ISRO was not making effective use of the allocated S-band spectrum that India caused DOS to give back 40 MHz of S-MSS spectrum to DOT.[385] The Claimants contend that in 2003, when Mr. Viswanathan first met Dr. Kasturirangan, the then Chairman of the Space Commission, Secretary of DOS and Chairman of ISRO and Antrix, Dr. Kasturirangan, indicated that DOS/ISRO was looking to explore ways of making commercial use of its allocated S-band spectrum in order to ensure that it retained that spectrum.[386]

299.   In the Claimants' view, India conveniently ignores that by 2008 terrestrial cellular operators had their eyes firmly fixed on the S-band, and were seeking to have DOS vacate the S-band spectrum that had been allocated to it for space services.[387] These claims were reviewed by the TRAI, which recommended that "DOT/WPC should coordinate with [DOS] and ascertain the feasibility of vacation of additional spectrum" in the S-band.[388] Nonetheless, India's policy in this regard

---

[384]   Statement of Claim, paras 87, 123; Statement of Reply, para. 29.

[385]   Statement of Reply, para. 21.

[386]   *Id.*, para. 23, Viswanathan I, paras 36-39. The Claimants also rely on a note from DOS to the Space Commission, which reads: "ISRO initiated serious discussions in early 2003 for introduction of Satellite-based Digital Multimedia in the country, especially taking note of the fact that the allocation of the S-Band spectrum for ISRO/DOS [...]. would expire by September 2010 unless [DOS/ISRO] placeS-Band Satellites in the orbit and demonstrate that necessary advance actions to build the Satellites have been taken." Note to Space Commission dated July 2, 2010 (Ex. C-219/JCB-160) (emphasis by the Claimants).

[387]   Statement of Claim, paras 135-37; Statement of Reply, paras 26-28. The Claimants note that, in March 2008, the Cellular Operators Association of India (the "**COAI**") has requested DOT that India's National Frequency Allocation Plan ("**NFAP**") be revised to reorient the S-band for purely terrestrial cellular operations; *See* COAI's Proposal for Review of Draft NFAP 2008, March 10, 2008, pp. 4-5 (Ex. C-43/JCB-80).

[388]   Statement of Reply, para. 28, citing Telecom Regulatory Authority of India, *Recommendations on Allocation and Pricing for 2.3-2.4GHz, 2.5-2.69 GHz & 3.3-3.6 GHz bands*, July 11, 2008, p. 16 (Ex. C-50/JCB-86).

remained unchanged, and there was no suggestion that the performance of the Devas Agreement might be interrupted because of alleged competing demands for S-band capacity.[389]

300.  Notwithstanding the fact that Devas was never informed of competing demands from the Ministry of Defence, the Claimants reject the Respondent's claims that India's military needs for all available S-band capacity started to emerge in 2003[390] and had crystallized by December 2009. According to the Claimants, the only evidence of early "competing demands" is that DOS/ISRO/Antrix willingly pursued an agreement with Devas with full knowledge of these competing "demands", and that Antrix represented to Devas that it could provide 70 MHz of S-band through the satellites on a "Non-Preemptible" basis.[391]

301.  According to the Claimants, if the military had genuine demands for the S-band allocated to Devas under the Devas Agreement, then this fact would prominently feature in key documents produced during the review of the Devas Agreement by several Indian governmental agencies and officials.[392] Instead, Dr. Radhakrishnan's Note for the CCS does not mention any "crystallized" military needs,[393] and the policy decision of the CCS merely notes that Antrix was not going to use an orbital slot for commercial purposes. Moreover, it makes no decision regarding spectrum.[394] In any event, the Claimants contend that the CCS did not have the power to reserve S-band spectrum for the "crystallized needs" of the military, which would have had to be taken up at the ICC.[395]

302.  In the Claimants' view, the formulations used in these documents to refer to these "national needs" are intentionally non-exhaustive and indeterminate, and are drafted in order for the

---

[389]  Statement of Reply, para. 29.

[390]  *Id*., para. 52.

[391]  *See supra*, Chapter III - BC.

[392]  *See* Statement of Reply, paras 50, 53 referring to Suresh Report, May 2010, (Ex. C-94/JCB-146); Memo from K. Radhakrishnan, Secretary, Department of Space, to T.K. Viswanathan, Advisor to Law Minister, Ministry of Law and Justice, June 16, 2010 (Ex. R-26/JCB-154); Note for the CCS, paras 44.1-44.7 (Ex.C-229/JCB-219); Note to the Additional Solicitor General (Parasaran) by DOS (Radhakrishnan) July 8, 2010 (Ex. C-220/JCB-164); Opinion of the ASG, pp. 1-2 (Ex. R-30/JCB-165); HQ Integrated Defence Staff, Note, October 14, 2005 (App. VA-2/JCB-42).

[393]  Statement of Reply, para. 37(j), referring to Note for the CCS (Ex. C-229/JCB-219).

[394]  Transcript, Day 1, 89:6-17.

[395]  *Id*.; Day 5, 1204:13-21.

Government of India to "back and fill" whatever *post-hoc* justification might suit its convenience in subsequent litigation that surely would follow.[396]

303.  The true motivation behind the cancelation of the Devas Agreement, in the Claimants' view, was the prospect of a government scandal, which could end up lying at the feet of the Prime Minister (and Minister of Space) himself, and not any "crystallized needs" of the military.[397]

ii.  The Respondent's Position

304.  The Respondent contends that, even prior to the conclusion of the Devas Agreement, the need for S-band had already been the subject of discussion within the agencies charged with national security and defence.[398] The Respondent recounts a lengthy record of facts to support this contention,[399] spanning from 2003 to 2011. What emerges from this record, the Respondent submits, is that the needs and demands arising from military and defence purposes were consistently emphasized by statements of the India Air Force,[400] senior military officers,[401] the

---

[396]  Statement of Reply, para. 49.

[397]  *Id.*, para. 36; *See* Statement of Claim, paras 86-87; Statement of Reply, para. 37; Viswanathan I, para. 165; Letter from Dr. Ashok Chandra to ISRO (Balachandhran), June 4, 2010 (Ex. C-210/JCB-144); Letter from DOT (P.J. Thomas) to DOS/ISRO (Radhakrishnan), June 14, 2010 (Ex. C-211/JCB-149); *Madhumathi D.S. & Thomas K Thomas, Devas gets preferential allocation of ISRO's spectrum,* The Hindu Business Line, May 31, 2010 (Ex. C-208/JCB-142); *Another Spectrum Sold in the Quiet*, The Hindu Business Line, June 1, 2010 (Ex. C-209/JCB-143).

[398]  Statement of Defence, paras 37-38; Respondent's Rejoinder, paras 12-13; *See also* Anand, paras 4-6; *We Need Military Satellite: Air Chief,* The Hindu, June 28, 2003 (Ex. R-20/JCB-12); Directorate of Naval Signals, *Draft Naval Staff Qualitative Requirements for Naval Communications Satellite*, April 5, 2004, paras 9, 11 (App. VA-1/JCB-16).

[399]  *See* Statement of Defence, para. 37; Respondent's Rejoinder, para. 12. The Respondent submits that the fact that the record is replete with documents tracing the needs of the military and security agencies for S-band spectrum is an undisputed material fact in this case; *See* Transcript, Day 1, 125:4-136:14; Day 5, 1281:8-1286:18.

[400]  Rajat Pandit, *IAF is Keen on Aerospace Command, Says New Chief*, Times of India, January 7, 2005 (Ex. R-21/JCB-35).

[401]  HQ Integrated Defence Staff, Note, October 14, 2005 (App. VA-2/JCB-42).

Ministry of Defence,[402] and warranted the creation of expert committees of military leaders,[403] and a taskforce at the ISRO[404] to address these issues.

305.   The Respondent avers that, as a consequence of a detailed review of capacity requirements for strategic purposes, it became clear that the national security requirements far exceeded India's S-band capacity, assuming that the orbital slot and frequency allocations necessary for the Devas Agreement were to be granted to Devas.[405] It was this fact that motivated the policy decision to reserve the S-band for strategic use, and not a bad faith conspiracy, as argued by the Claimants.[406] In any event, the Respondent notes, referring to a meeting that took place in 2014, that "the reservation of S-band capacity for strategic purposes was made in 2011 and continues in effect today, with the satellites being configured for strategic use and the defence agencies picking up the tab."[407]

### b.   MSS Demands Versus BSS Demands

#### i.   The Claimants' Position

306.   The Claimants assert that India's defence suffers a fatal lacuna: the military's stated desires all involved MSS frequency, whereas the Devas Agreement pertained to the use of the BSS spectrum.[408] In the Claimants' view, this fact disproves the Respondent's contention that there

---

[402]   Minutes of the Integrated Space Cell Meeting held on February 19, 2007 at HQ IDS, March 26, 2007 (App. VA-5/JCB-66).

[403]   HQ Integrated Defence Staff, Convening Order, Constitution of Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 GHz to 2.69 GHz (S-band) by Defence Services, August 30, 2007 (App. VA-6/JCB-73).

[404]   Office Order from G. Madhavan Nair, Chairman, ISRO/Secretary, Department of Space, Task Team for Configuring an S-band Communication Satellite for HQ IDS, May 20, 2009 (App. VA-9/JCB-105).

[405]   In particular, the Respondent notes that, in addition to the 8 MHz of S-band that were to be utilized by the satellite for the Navy that was ordered in 2004 and launched in August 2013, a number of additional military and paramilitary needs had been identified, including 17.5 MHz for immediate requirements of the armed forces, another 40 MHz during the five year period from 2012 to 2017, another 50 MHz during the subsequent five year period (2017-2022) and requirements for security agencies and India Railways. *See* Statement of Defence, para. 38; Anand I, paras 5-6, fn. 21; Minutes of Meeting held on December 15, 2009 at ISAC, Bangalore between ISC of HQ IDS, MOD and ISRO, p. 3 (App. VA-10/JCB-134); Note for the CCS, paras 20-21 (Ex.C-229/JCB-219); Minutes of 117th Meeting of the Space Commission held at DOS Branch Secretariat, New Delhi, on July 2, 2010, signed July 21, 2010 (Ex. R-23/JCB-161).

[406]   Respondent's Rejoinder, para. 11. The Respondent emphasizes that it is not disputed that the CCS reserved the S-band for strategic purposes. *See* Transcript, Day 1, 124:5-125:3.

[407]   Transcript, Day 1, 136:15-138:8. *See* Minutes of 128th Meeting of Space Commission held on April 12, 2014 at DoS Branch Secretariat, New Delhi (Redacted), May 16, 2014 (App. KS-17/JCB-288).

[408]   Statement of Reply, para. 54.

were genuine military or strategic needs for the portion of the S-band spectrum that had been allocated to Devas.

307. To support this contention, the Claimants rely on a "Note for the Empowered Group of Ministers ("**EGoM**")[409] on Vacation of Spectrum," authored by DOT and dated March 1, 2012 (the "**Note for the EGoM**").[410] This note and its annexures were all issued more than a year after the Devas Agreement was annulled.

308. First, the Note for the EGoM clarifies that the "strategic and government" need of S-band spectrum is for MSS, and that DOS was seeking to convert the existing BSS spectrum (including the 60 MHz of BSS spectrum allocated to Devas) to MSS.[411] In the Claimants' view, this demonstrates that there was no existing military need for BSS spectrum.[412] The Claimants also note that the EGoM and DOT were aware that this conversion would contravene the ITU's regulations.[413]

309. Secondly, the Note for the EGoM and Annexure 10 thereto, as well as a letter dated February 21, 2012 from Mr. Chandrashekhar to Dr. Radhakrishnan,[414] state that DOS was requested to vacate part of the 80 MHz of S-BSS spectrum assigned to it if DOS had no plan for BSS applications in this band. The Claimants argue that such a recommendation would not have been made to the EGoM, of which the Minister of Defence is a member, if the crystallized military plans for BSS existed. A similar remark is made with regard to the minutes of the EGoM meeting held on March 5, 2012, which reflect that DOS was asked to apprise the EGoM as to its plans for using BSS spectrum.[415]

310. In the Claimants' view, the documents above disprove Mr. Anand's unsupported statement that the military demanded BSS spectrum "due to the limitations of the MSS."[416]

---

[409]   According to the Claimants, an EGoM is "virtually a mini cabinet" that may decide on issues normally reserved to the Indian Union Cabinet. *See* Transcript, Day 1, 86:15-87:8.

[410]   Note for the Empowered Group of Ministers on Vacation of Spectrum March 1, 2012 (the "**Note for the EGoM**") (Ex. C-232/JCB-247).

[411]   Statement of Reply, para. 56; Note for the EGoM, pp. "52/59", "54/59" (Ex. C-232/JCB-247).

[412]   Statement of Reply, para. 56.

[413]   *Id*., para. 57; Note for the EGoM, pp. "10 of 59", "58/59" (Ex. C-232/JCB-247).

[414]   Statement of Reply, para. 57; Note for the EGoM, March 1, 2012, pp. "10 of 59", "58/59" (Ex. C-232/JCB-247).

[415]   Statement of Reply, para. 59.

[416]   *Id*., para. 55, referring to Anand I, fn. 5.

ii.      The Respondent's Position

311.  The Respondent emphasizes the intensifying discussions within the Government of India over the use of the S-band as the military learned of the limitations of MSS frequency for their data communication.[417] These limitations arose from the fact that two-way communications such as MSS cannot support sending large amounts of data to multiple users simultaneously, as opposed to satellite broadcasting, which is the case of BSS.[418]

312.  The Respondent characterizes the Claimants' argument that the Note for the EGoM disproves the existence of genuine military needs for the S-band[419] as a "quantum leap" that suffers a twofold deficiency:

313.  First, it is undisputed that the CCS reserved the S-band for non-commercial, strategic use, and such reservation remains in effect.[420] This is true notwithstanding any debates taking place before, during or after the policy decision of the CCS, which are legitimate and inherent to the democratic spirit of India.[421] The Note for the EGoM proves nothing as to the continued effectiveness of the policy decision of the CCS.[422]

314.  Secondly, the Claimants overlook a number of documents produced to them together with the Note for the EGoM, including:

i.      A March 1, 2012 letter from Dr. Radhakrishnan, as Secretary of DOS, to the Secretary of DOT,[423] referring to the letter dated February 21, 2012 from Mr. Chandrashekhar to Dr. Radhakrishnan,[424] which makes clear that the strategic, non-commercial needs for S-band continued to exist and that, in light of those needs, it would not be possible to vacate S-band spectrum for commercial BWA purposes;[425] and

---

[417]   Statement of Defence, para. 38.

[418]   *Id*., para. 38; *see* Anand I, para. 4; Sethuraman I, paras 6, 17, fn. 37.

[419]   Respondent's Rejoinder, paras 20-23, referring to Statement of Reply, para. 56.

[420]   The Respondent submits that this is an undisputed material fact in this case. *See* Transcript, Day 1, 119:7-121:6; Day 5, 1278:16-1281:1.

[421]   Respondent's Rejoinder, para. 21.

[422]   *Id*., para. 22.

[423]   Letter from DOS to DOT, March 1, 2012 (Ex. C-233).

[424]   Note for the EGoM, March 1, 2012, pp. "10 of 59", "58/59" (Ex. C-232) (*see supra*, para. 309).

[425]   Letter from DOS (Radhakrishnan) to DOT (Chandrasekhar), March 1, 2012 (Ex. C-233/JCB-248), which reads, in relevant part: "Hence, considering the national imperatives for space-based communication

ii.   A Note produced by DOS on March 28, 2014, in preparation for the 128th Space
      Commission Meeting, regarding the revised cost estimates and revised utilization plan
      for GSAT-6 and GSAT-6A. This note explains that the Defence Research and
      Development Organisation (the "DRDO"), which works under the Ministry of Defence,
      is responsible for the development of the ground segment related to the operations of
      the satellites.[426] That segment involves "a) Design and Development of Hub Station, b)
      Development and realization of Ground Terminals, c) Design and Development of
      Scalable Network Management System for Network Resource Management."[427]

## 2.   The Tribunal's Analysis

315.   The Tribunal will first consider whether there was a genuine need on the part of the military and
       security agencies of India to reserve S-band capacity. The Respondent contends that that is the
       case. The Claimants, on the other hand, question that the S-band demands expressed by the Indian
       military between 2003 and 2009 were genuine. They insist that all the references to "national
       needs" featuring in the documents produced during the review of the Devas Agreement are
       intentionally non-exhaustive and indeterminate, and were merely used as a pretext by India to
       concoct a *force majeure* event that would enable Antrix to terminate said Agreement on
       advantageous terms.

316.   The Tribunal did not have the benefit of testimonies from senior officials who were directly
       involved in the process leading to the CCS decision of February 17, 2011, such as Dr. K.
       Radhakrishnan who, since late 2009, was Chairman of the Space Commission, Chairman of
       ISRO, Secretary of DOS and, until July 2011, Chairman of Antrix, or Mr. G. Balachandran,
       Additional Secretary of DOS from April 1, 2009 to January 11, 2011, or Mrs. Geeta Varadhan,
       Director of Special Projects at DOS, who appears to have had long exposure to the needs of the
       military concerning the S-band and who, according to Mr. Anand, was the person who, at a
       meeting of senior officials of DOS in June 2010, raised the issue of the needs of the military over
       the S-band.[428] Nor was the Tribunal provided with any testimony from any member of the
       Department of Defence.

---

        systems for strategic applications, it will not be possible or be prudent to vacate this 80 MHz (2555-2635
        MHz) of the S-band for BWA applications. The EGOM may kindly be briefed accordingly."

[426]   Department of Space, Note to Space Commission for the 128th Space Commission Meeting, March 28,
        2014, paras 4.6 and 4.7 (Ex. KS-15/JCB-287).

[427]   *Id.*, paras 4.6 and 4.7.

[428]   Transcript, Day 4, 913:6-15.

317. Messrs. Sethuraman and Anand were cooperative and helpful witnesses but a large part of their testimony consisted in presenting their interpretation of many documents in the preparation of which they had no participation whatsoever.

318. As far as the Claimants are concerned, they produced a number of witnesses and experts who provided considerable information concerning the negotiation and the implementation of the Agreement as well as expertise on the allocation and management of spectrum. However, in spite of over a dozen meetings with government officials between June 2010 and the end of January 2011, none of the Claimants was informed of the internal government process which led to the CCS decision of February 17, 2011, until Dr. Radhakrishnan's press conference of February 8, 2011 at which he announced for the first time the Space Commission's decision of 2 July 2010 to annul the Agreement. They therefore were in no position to shed light on the deliberations of governmental authorities during the most relevant period.

319. The Tribunal finds itself having to rely very much on the documents submitted by the Parties in reaching its own conclusion as to the Respondent's decision to annul the Agreement and reserve the GSAT-6 and 6A satellites "having regard to the needs of [India's] strategic requirements."[429]

320. The Tribunal has summarized above the events surrounding the decision to annul the Agreement. The Tribunal is faced with the difficult task of assessing whether that decision was based on genuine security needs of the State or whether these alleged needs were a mere pretext to annul a contract which was becoming a political embarrassment and to meet the wishes expressed by other groups in the communications industry providing terrestrial services.

321. The Tribunal is left with no doubt that, inside the Indian administration, during the discussions leading to the request to the CCS for the annulment of the Devas Agreement, a mix of factors was at play.

322. First and foremost, the fear of a political scandal similar to the previous one relating to the attribution of G2 licenses and arising out of the publication of some articles on the subject in Indian media is a likely explanation of the sudden frenzy in June 2010 of the DOS, and of Dr. Radhakrishnan in particular, in agitating for and obtaining from the Space Commission in less than a month the decision to annul the Devas Agreement.

---

[429] Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220).

323. All this occurred in a context where at no time between the signing of the Agreement in 2006 and the decision to annul it in 2011, and in spite of alleged repeated requests since 2006 by the military for the allocation to it of at least part of the S-band, did the Respondent give any indication to the Claimants that the Agreement might be in jeopardy because of such needs.

324. After the publication of press articles on May 31 and June 1, 2010[430] suggesting that there might have been some inappropriate dealings in connection with the Agreement, DOT, by letter of June 4, 2010[431] requested the Additional Secretary of ISRO "to provide your comments […] immediately;" this was followed by another letter of June 14, 2010[432] to the same effect addressed to Dr. Rhadakrishnan. These letters initiated a flurry of actions by ISRO aimed at annulling the Agreement.

325. On the same date, Dr. Rhadakrishnan requested from Antrix six copies of the Agreement which were immediately provided.[433] On June 16, 2010 in a letter to DOT, after pointing out that two issues were confronting the Respondent, he sought DOT's "opinion on whether ANTRIX-Devas contract need be annulled invoking any of the provisions of the contract in order (i) to preserve the precious S band for the strategic requirements of the nation and (ii) to ensure a level playing field for the other service providers using terrestrial spectrum."[434] On the same date, Dr. Rhadakhrisnan wrote to the Advisor to the Law Minister, raising the same two issues and seeking a legal opinion "on whether ANTRIX-Devas contract need be annulled invoking any of the provisions of the contract […]."[435] He also flew from Bangalore to New Delhi to discuss the matter with the Advisor. Two days later, on June 18, 2010 the Advisor produced a note[436] stating that "the Central Government (Department of Space), in exercise of its sovereign power and function, if so desire and feel appropriate, may take a policy decision to the effect that due to the needs of strategic requirements, the Central Govt/ISRO would not be able to provide orbit slot in S-band for operating PS1 to the ANTRIX for commercial activities. In that event, ANTRIX in

---

[430] Madhumathi D.S. & Thomas K. Thomas, *Devas gets preferential allocation of ISRO's spectrum*, The Hindu Business Line, May 31, 2010 (Ex. C-208); *Another spectrum sold on the quiet*, The Hindu Business Line June 1, 2010 (Ex. C-209/JCB-143).

[431] Letter from Dr. Ashok Chandra to ISRO (Balachandhran), June 4, 2010 (Ex. C-210/JCB-144).

[432] Letter from DOT (Thomas) to DOS/ISRO (Radhakrishnan), June 14, 2010 (Ex. C-211/JCB-149).

[433] Letter from Antrix (Parameswaran) to DOS (Balachandran), June 14, 2010 (Ex. C-213/JCB-151).

[434] Memo from K. Radhakrishnan, Secretary, Department of Space, to Secretary, Department of Telecommunications, June 16, 2010 (Ex. R-25/JCB-153).

[435] Memo from K. Radhakrishnan, Secretary, Department of Space, to T.K. Viswanathan, Advisor to Law Minister, Ministry of Law and Justice, June 16, 2010 (Ex. R-26/JCB-154).

[436] Note from T.K. Viswanathan, Advisor to the Minister for Law and Justice, Ministry of Law and Justice, to the Department of Space, June 18, 2010 (App. VA-18/JCB-156).

terms of Article 7(c) read with Article 11, of the agreement may terminate the agreement and inform M/s Devas accordingly."[437] He added: "As far as the second issue relating to terrestrial supplementation and level playing field since the Department of Telecom is administratively concerned that Department may also be consulted."[438]

326.  Following the submission of an extensive note by DOS to the Space Commission, that Commission decided, among other things, at its meeting of 2 July 2010, that the Department of Space "in view of priority to be given to nation's strategic requirements including societal ones may take the actions necessary and instruct Antrix to annul the ANTRIX-Devas contract" and "may evolve a revised utilization plan for GSAT-6 and GSAT-6A satellites, taking into account the strategic and societal imperatives of the country."[439]

327.  Subsequent to that decision and following a request from DOS, the Additional Solicitor General stated in a letter of 12 July 2010 that his opinion had been sought as to whether the Agreement "can be annulled by invoking any provisions of the contract in order to (i) preserve precious S band spectrum for strategic requirements of the nation and (ii) to ensure a level playing field for other service providers using terrestrial spectrum."[440] He advised that, instead of a mere decision by the Department of Space, "it would be more prudent that a decision is taken by the Government of India, as a matter of policy, in exercise of its executive power or in other words, a policy decision having the seal and approval of the Cabinet and duly gazetted as per the Business Rules of the Government of India."[441]

328.  Finally, in its Note for the Cabinet Committee on Security of February 16, 2011, DOS, after describing the need of "S-band spectrum for vital and societal applications,"[442] again refers to its concerns about ensuring "a level-playing field for the other service providers using terrestrial spectrum."[443]

---

[437] *Id*., para. 12.

[438] *Id*., para. 13.

[439] Minutes of 117th Meeting of the Space Commission Held at DOS Branch Secretariat, New Delhi, on July 2, 2010, signed July 21, 2010, para. 117.6.12 (Ex. R-23/JCB-161).

[440] Opinion of the ASG, p. 2 (Ex. R-30/JCB-165).

[441] *Id*., p. 4.

[442] Note for the CCS, para. 19-22 (Ex.C-229/JCB-219).

[443] *Id*., para. 24.

329. This, by itself, however cannot be a basis for the Tribunal to conclude that the decision of the Respondent to annul the Agreement was invalid.

330. First, it is a regular phenomenon in public administration that decisions are influenced by a number of factors including, sometimes, purely political ones.

331. Second, and more important, while records of deliberations at senior levels of the Respondent's public administration might be helpful to understand the context in which a particular decision was reached, what should guide the Tribunal is the actual decision taken by the highest authority of the Government, i.e. its Cabinet, which had delegated to the Cabinet Committee on Security decisions concerning that subject, a Committee which was presided by the Prime Minister himself, who was also the Minister responsible for the DOS.

332. The decision of the CCS concerning the Devas Agreement was communicated in the form of a press release of February 17, 2011 which reads:

> Cabinet Committee on Security (CCS) has decided to annul the Antrix-Devas Deal. Following is the statement made by the Law Minister, Shri M. Veerappa Moily on the decision taken by the CCS which met in New Delhi today:
>
> Taking note of the fact that the Government policies with regard to the allocation of spectrum has undergone a change in the last few years and there has been an increased demand for allocation of spectrum for national needs, including the needs of defence, para-military forces and other public utility services as well as for societal needs, and having regard to the needs of the country's strategic requirements, the Government will not be able to provide orbit slot in S band to Antrix for commercial activities, including for those which are the subject matter of existing contractual obligations for S band.
>
> In the light of this policy of not providing orbit slot in S band to Antrix for commercial activities, the "Agreement for the lease of space segment capacity on ISRO/Antrix S-Band spacecraft by the Devas Multimedia Pvt. Ltd" entered into between Antrix Corporation and Devas Multimedia Pavt. Ltd. on 28th January, 2005 shall be annulled forthwith.[444]

333. In fact, the decision of the CCS as reported in the statement of the Law Minister replicates word for word the approval sought by the DOS in its Note to the CCS of February 16, 2011.[445]

---

[444] Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220).

[445] Note for the CCS, para. 45(1) and (2) (Ex. C-229/JCB-219).

334. Nothing in that decision implies that it was reached in whole or in part to accommodate the concerns expressed by other service providers using terrestrial spectrum or to deal with the risk of a political scandal in connection with the Antrix-Devas Agreement.[446]

335. Moreover, the fact that the CCS did not make a specific allocation of the spectrum cannot be considered as a deciding element in considering whether the CCS decision was taken for the protection of the Respondent's essential security interests. As the Claimants themselves have argued, such function came under the authority of the ICC. This fact does not restrict the power of the CCS to decide that any particular activity be "directed to the protection of (the) essential security interests" of the State. In the present case, if such a decision was taken, there was nothing inappropriate in leaving it to the proper administrative authorities to decide how the spectrum would be allocated between the various interested parties.

336. The Tribunal has received uncontroverted evidence that, starting as early as 2004, officials in the Ministry of Defence were concerned about the needs of the Indian military for S-band capacity.

337. On April 5, 2004, the Naval Headquarters wrote to ISRO regarding the requirement of the Navy for a dedicated satellite. In this communication it was stated as follows:

> The importance of reliable, secure, real time and uninterrupted tactical as well as strategic communications, in the Navy can never be over emphasised. Ship shore communications serve command and control functions, need to be global in nature and are therefore termed strategic communications.[447]

338. The importance of space capabilities for the Defence forces was brought out in a note of the Vice Admiral, Headquarters Integrated Defence Staff dated October 14, 2005. The relevant extract of the note reads:

> 1.  Space Systems are beginning to become an integral component of the total combat potential of many nations. It is but imperative that our Defence Forces do not lack in the exploitation of Space for War fighting. Till 2008 Indian Space capability and programmes have been defined and there is no alternative but to exploit available assets except for minor up gradations where feasible, during this time frame.

---

[446]   In a note of April 12, 2011 to the Prime Minister (Ex.R-44/JCB-229, para.36) concerning the Report of March 11, 2011 by the High Powered Review Committee which was appointed after the CCS decision to study various aspects of the Agreement (Ex.C-137/JCB 227), Mr.Chandrashekhar, the Cabinet Secretary, writes as one of his conclusions that "seem to emerge from the analysis of the HPRC report and other evidences" is that "[…] since the agreement has now had  to be cancelled on account of reasons related to non-transparency and one-sided skew in risk sharing arrangements, ISRO/DOS are left with a satellite […] which has no immediate commercial application.". However, there is no indication in the HPRC Report that such concerns were a factor in the CCS decision; such concerns do not appear either in the reasons invoked by the CCS in support of its February 17, 2011 decision.

[447]   Directorate of Naval Signals, Draft Naval Staff Qualitative Requirements for Naval Communications Satellite, April 5, 2004, p. 2 (Ex. VA-1/JCB-16).

However, beyond that period our Defence Forces should be able to examine and specify the needs to enable our technologists to support our requirements. Space capabilities are vital tools of the Information Revolution and critical to activities of the Defence Forces. Space is emerging as a centre of gravity for information dependent forces and it is highly probable that continued and assured access to Space will be a major determinant of national power [...].

2. Lack of Policy with respect to exploitation of Space Systems, which are now a universally accepted phenomenon, by the Armed Forces, could lead to a void in Space related research and the Defence Forces, could miss the opportunity for early involvement and influence over Space Programmes. This has possibly occurred till 2008 as a fait accompli and we must plan our strategy for space asset accruels beyond 2008. This document would prima facie address our broad technology requirements based on mission statements of our Defence Forces.

3. [...].

4. Defence Space Vision 2020 is intended to be futuristic in content and would be the Base Document for formulating the Space Strategy and Space Doctrine for the Armed Forces, after approval of the COSC, which was eventually accorded on October 14, 2005.[448]

339. Para. 2 of the aforementioned note talks about planning strategy for space. Para. 4 refers to the Defence Space Vision, 2020, intended for formulating the space strategy. An appendix to the document, *inter-alia*, reflects the requirement of S-band for strategic use:

| 2010 | 86 MWZ |
|------|--------|
| 2015 | 151 MWZ |
| 2020 | 208 MWZ |

340. The minutes of the third task force meeting between various representatives of the Army, Air Force, Navy and Department of Space held on February 21, 2006 recorded a concern about the rapid build-up of the Chinese Space Programme and need to take cognisance of this aspect and develop a space programme to effectively combat the proliferation. The minutes also point out the inescapable necessity of S-band for the armed forces for interference free communications. The required projection of S-band required for armed forces was mentioned as under:

86MHZ-151 MHZ-208 MHZ for short, medium and long term respectively.[449]

341. HQ Integrated Defence Staff in its note of August 9, 2006, sent to Ms. Geeta Vardan PD(SP) ISRO HQ and three officers of the Defence establishment, referred to the Bandwidth Projections of Service HQs for Satellite communications mentioned in Defence State Vision 2020 (DSV) dated October 14, 2005 and requested that the matter be taken up with the DOT for blocking the

---

[448]   HQ Integrated Defence Staff, Note, October 14, 2005 (Ex. VA-2/JCB-42).

[449]   Minutes of Third Task Force Meeting with DoS held on February 21, 2006 at HQ IDS New Delhi, March 6, 2006 (Ex, VA-3/JCB-56).

bandwidth in the S-band and in some other bands specified therein for satellite communications of the three services as per requirements envisaged in DSV 220.[450]

342.    The minutes of the integrated space cell meeting held on February 19, 2007 projected the requirement of S-band based on the number of satellite projects already operational and planned in the future. From the bandwidth projections worked out, it was expressed that the present series "INSAT" and "GSAT" cannot meet the army's futuristic requirement of bandwidth and it was proposed to have a Dedicated Army Communication Satellite.[451]

343.    On August 30, 2007, the Chiefs of Staff Committee directed that an Expert Committee be formed by HQ Integrated Defence Staff, which was to be guided by the following terms of reference:

    a.    Spectrum uses by various services in Band 2.5GHz and 2.69 GHZ.

    b.    Present and planned satellite uses by the services on satellite bands by DoS.

    c.    Defence services support to DoS or otherwise at various national and international forums for protection of band 2.5GHz and 2.69GHz in favour of DoS without laying under constitution to satellite services."[452]

344.    While directing that the Expert Committee be formed, it was recorded that the Defence Services had present and future applications in the band from 2.5 GHz to 2.69 GHz on various satellites launched by the DOS and representatives of the DOS were actively involved in the protection of said bands at various national and international forums.

345.    Pursuant to the direction of the Chiefs of Staff Committee, the Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 to 2.69 GHz (S-band) was constituted. The following observations of the Expert Committee dated September 7, 2007 need to be noticed:

    11.    If this spectrum (2.5-2.69 GHz) is lost to commercial operators, it would severely jeopardize the future Defence services plans, of providing mobile SATCOM connectivity.

    12.    In view of the above, it is strongly recommended that the 'S' band Spectrum be safeguarded from being poached by the commercial operators for meeting the future requirements of the Defence Services. Proposal from the IAF for a dedicated satellite to utilize the 'S' Band spectrum, which is under finalization, would also strengthen

---

[450]    HQ Integrated Defence Staff Ops Branch/IW & IT Dte, Note, Bandwidth Requirements - Satellite Commn, August 9, 2006 (Ex. VA-4/JCB-64).

[451]    Minutes of the Integrated Space Cell Meeting held on February 19, 2007 at HQ IDS, March 26, 2007 (Ex. VA-5/JCB-66).

[452]    HQ Integrated Defence Staff, Convening Order, Constitution of Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 GHz to 2.69 GHz (S-band) by Defence Services, August 30, 2007 (Ex. VA-6/JCB-73).

the case for retention of spectrum. The non availability of the Spectrum could stymie the future operational plans of the Defence services.[453]

346.  On November 19, 2008 a special meeting was held, which was attended by representatives of the Army, Air Force, Navy and ISRO to address satellite-based communication issues. A representative of ISRO proposed that the HQ Integrated Defence Staff need to consolidate the requirement of S-band for various services to enable an optimal utilisation by way of the dedicated S-band-specific satellite.[454]

347.  On December 15, 2009 at a meeting in ISAC, Bangalore, between ISC, HQ Integrated Defence Staff, Ministry of Defence and ISRO, the military presented details concerning the national security requirements for satellite services. At this meeting, the armed forces set forth their requirements for S-band as follows: "(i) to cater for requirements up to 2012—120 Carriers, 17.5 MHz. out which 50 Carriers are being used by the armed forces;(ii) Additional in 12th Plan—40 MHz.; (iii) Additional in 13th Plan—50 MHz."[455]

348.  Joint Communications Electronic Staff of HQ Integrated Defence Staff, by its letter dated April 23, 2010[456] informed ISRO of the bandwidth requirements of the Army, Navy and Airforce. As per the Appendix attached to the letter, the requirement of the three wings of the armed forces for S-band were specified:

|  | Addl. | Total |
|---|---|---|
| 2012 | 17.5 | 120 |
| 2012 to 2017 | 50 | 52.5 |

349.  The note of the Additional Secretary, Department of Space dated June 30, 2010 referred to the meeting between the Integrated Space Cell and ISRO. The note not only projected the need for S-band by the armed forces but it also referred to the demands of other security agencies such as

---

[453]   Report of the Expert Committee on Spectrum and Satellite Uses of Frequency Band 2.5 to 2.69 GHz (S-band) by Defence Services, September 2007 (Ex. VA-7/JCB-74).

[454]   Minutes of the Special ISC Meeting between Reps of ISRO & Reps of Three Services to Address Satellite Based Communication Related Issues, November 25, 2008 (Ex. VA-8/JCB-92).

[455]   Minutes of Meeting held on December 15, 2009 at ISAC, Bangalore between ISC of HQ IDS, MOD and ISRO, January 25, 2010 (Ex. VA-10/JCB-134).

[456]   Letter from the Ministry of Defence to ISRO/Department of Space, April 23, 2010 (Redacted) (Ex. R-150/JCB-141).

the BSF, CISF, CRPF and the police for S-band transponders. The requirement for S-band was also projected by the railways for tracking of trains.[457]

350. The Tribunal has also received evidence that, subsequently to the CCS decision of February 2011, significant changes have been made to GSAT-6 to accommodate the specific needs of the armed forces[458] and that the Defence Research and Development Organization was made responsible for the ground segment development of GSAT-6 and GSAT-6A.[459]

351. But this is not the end of the matter. While the events related above provide helpful information concerning the administrative process followed both before and after the CCS decision, what is the determinant factor for the Tribunal is that decision itself and whether it was directed to the protection of the Respondents essential security interests.

352. The Tribunal does not question the right of the Respondent to terminate the Agreement and to decide that the S-band would be reserved in the future for non-commercial activities. Two avenues were opened to it; one under Article 6 of the Treaty whereby the Respondent could expropriate for public purposes the rights of the Claimant under the conditions enunciated in that Article and the other one under Article 11(3) when, among other things, the Respondent's decision was "directed to the protection of the essential security interests" of the State. Each of these avenues however leads to very different conclusions in terms of liability and compensation.

353. Article 11(3) constitutes an important exception to the provisions of the Treaty and, while proper deference must be given to State authority in defining what its essential security interests are, it must be interpreted in accordance with the provisions of the VCLT.

354. The problem in the present case is that the decision of the CCS itself contains a mix of objectives. Even though there is nowhere in the CCS decision any specific reference to the Respondent's "essential security interests," the Tribunal, by majority, has no difficulty concluding that the reservation of spectrum for the needs of defence and para-military forces can be classified as "directed to the protection of its essential security interests", coming under the exclusion covered in Article 11(3) of the Treaty; however, the same cannot be said when it comes to taking over the spectrum allocated to the Claimants for "railways and other public utility services as well as for

---

[457]   Department of Space, Note to Space Commission, Agenda Item No. 4: GSAT-6/6A - Contract between M/s. Antrix Corporation Limited (ACL) and M/s. Devas Multimedia Pvt. Ltd., signed July 2, 2010, paras 8.1, 8.2 and 8.3 of the Note and para. 7 of Annex III (Ex. C-219, exhibited in part as R-29/JCB-160).

[458]   Testimony of Mr. Sethuraman, Transcript Day 4, pp. 839-840.

[459]   Department of Space, Note to Space Commission for the 128th Space Commission Meeting, March 28, 2014, paras 4.6 and 4.7 (Ex. KS-15/JCB-287) and Testimony of Mr. Anand, Transcript Day 4, 1082:20-25.

societal needs, and having regard to the needs of the country's strategic requirements,"[460] as stated in the CCS decision.

355.  While it could quite properly expropriate the Claimants' rights under Article 6 of the Treaty for "public utility services as well as for societal needs," it could not have recourse to Article 11(3) for such purposes and confiscate their rights.

356.  Even the reference to "the country's strategic requirements," unless made specific, such as for the military and para-military needs, would not be restricted to the meaning of the provisions of Article 11(3). That Article does not refer to strategic needs but to essential security interests and the expression "strategic requirements" can cover a whole range of government activities; governments all over the world pursue a number of different policies which they describe as strategies essential to the attainment of public interest objectives (economic strategies, public health strategies, energy strategies, etc.) and the situation does not appear to be different in the case of the Respondent. That expression can be found not only in the CCS decision of February 17, 2011, but also in a number of documents produced by the Respondent, such as the Space Commission Note to the CCS of February 16, 2011 and in the Suresh Committee Report and there is no indication in the evidence received by the Tribunal, except the say-so of Messrs. Sethuraman and Anand, that this expression should be interpreted exclusively for "the protection of essential security interests."

357.  Messrs. Sethuraman and Anand, in their oral testimony,[461] argued that, in India, "strategic" means the armed forces. However, their interpretation appears to be contradicted by the words of the Space Commission itself which, in its direction of July 2, 2010, read: "Department, in view of priority to be given to nation's strategic requirements including societal ones may take action necessary and instruct ANTRIX to annul the ANTRIX-DEVAS contract." Similarly, in its Note to the CCS of February 16, 2011, the Space Commission stated that the purpose of the Note was "to seek approval of the Cabinet Committee on Security for Annulling" the Devas Agreement, "in view of priority to be given to nation's strategic requirements including societal ones."[462] The same document, in the Approval Sought from the Cabinet Committee on Security, states that due to an "increased demand for allocation of spectrum for national needs, including for the needs of defence, para-military forces, railways and other public utility services as well as for societal

---

[460]   Press Information Bureau, Government of India, Cabinet, *CCS Decides to Annul Antrix-Devas Deal*, February 17, 2011 (Ex. C-134/JCB-220).

[461]   Testimonies of Mr. Sethuraman (Transcript Day 3, p. 712) and of Mr. Anand (Transcript Day 4, p. 932).

[462]   Note for the Cabinet Committee on Security, para. 1 (Ex. C-229/JCB 220).

needs, and having regard to the needs of the country's strategic requirements, the Government will not be able to provide orbit slot in S band to Antrix for commercial activities (…)."[463]

358.   It is therefore clear to the Tribunal that the expressions "strategic needs" or "strategic requirements" covered a range of activities which went far beyond the military or paramilitary sectors or the "essential security interests" of the Respondent.

359.   As to the reference to railways mentioned in the DOS Note to the CCS, the Tribunal was told that it had to do with train tracking (train safety and signaling).[464] The Tribunal does not see how such function could come within the ambit of essential security interests.

360.   As to "societal needs," the Respondent itself has recognized that these words cover a wide range of government activities which clearly have no relationship with the essential security interests of the State. When asked by the Claimants to describe the meaning of these words, Mr. Anand, appearing on behalf of the Government of India, stated: "I told you that societal requirements is a pretty wide spectrum. It covers the whole gamut of services which goes under societal tele education, telemedicine, crop forecasting, disaster management, rural communications—there is a huge gamut of activity which goes on the societal applications".[465] The DOS Note to the Space Commission also refers to "other national societal requirements for emergency communication, dissemination of disaster warnings, tele-education, tele-health and rural communication".[466]

361.   In the view of the Tribunal, the inclusion of "other public utility services and for societal needs" covers a lot more than the "essential security interests" mentioned in Article 11(3) of the Treaty.

362.   It is important to note that the CCS, in its February 17, 2011 decision, did not proceed to any allocation of the spectrum but referred the matter to the ICC, a dormant institution which was revived for the purpose. The Tribunal was informed that, by the time of the hearing, that no decision had been taken by the ICC.[467] The Tribunal received no information that a decision was taken in that regard even subsequently to the hearing.

---

[463]   *Id.*, para. 45.1

[464]   Testimony of Mr. Anand (Transcript Day 4, p. 959).

[465]   Transcript Day 4, p. 1000: 9-15.

[466]   Department of Space, Note to Space Commission, July 2, 2010, paras. 8.1-8.4 (Ex. R-29/JCB-160).

[467]   Transcript, Day 4, 1014:24-25; 1015:1-7; 1059:8-19.

363. It is striking in this respect that the uncertainty in that respect has continued right up to the time of the launch of GSAT-6 on August 27, 2015.

364. In a note of March 28, 2014, to the Space Commission for its 128th meeting of April 12, 2014, Mr. Prahlad Rao, Director SCNP, mentions that, following discussions by the Department of Space "with the user agencies to arrive at a revised utilization plan for GSAT-6/6a," it was now proposed to utilize the space segment capacity of GSAT-6 and GSAT-6A spacecrafts for meeting the communication needs (Broadcast and Mobile Applications) of strategic sector including Defence, Paramilitary forces and societal sector including Disaster Management Support and Indian Railways."[468]

365. At the meeting of the Space Commission on April 12, 2014, the Chairman "stated that there is an issue of spectrum (BSS) for GSAT-6/6A[.] DOT wants ISRO to vacate the spectrum and auction it. The subject matter was discussed in EGoM and ISRO was asked to provide S-BSS usage to DOT."[469]

366. Subsequently, in a letter to the Tribunal on August 31, 2015, the Respondent submitted a group of documents in connection with the launch of GSAT-6, the submission of which the Tribunal conditionally accepted. Although there are occasional references to the launch of a military satellite in the headlines or the core of some newspaper articles, none of these assertions are based on any reported statement by a public official and the Tribunal cannot consider such references as reliable evidence; in fact, the submitted documents tend to demonstrate that the GSAT-6 satellite continues to be planned for a multiplicity of purposes.

367. Thus, the Chairman of ISRO, Mr. Kiran is quoted as saying that "(t)he users for this will be the strategic sector as it gives a tremendous opportunity for using very small handheld devices in the remotest places."[470] The same person is reported by the Times of India to have said on the same day that the satellite would be used for various government purposes.[471] The Respondent, who

---

[468] Note to Space Commission for the 128th Space Commission Meeting, March 28, 2014, para. 4.2 (App. KS-15/JCB-287).

[469] Minutes of the 128th Meeting of Space Commission held on April 12, 2014, para. 128.4.1 (App. KS-17/JCB-288).

[470] *ISRO's Big Launch: Military Communications Satellite GSAT-6,* NDTV, August 27, 2015, available at www.ndtv.com (Annex 3 submitted by the Respondent on August 31, 2015).

[471] Janani Sampath, *ISRO's GSLV-D6 with Indigenous Cryo Engines Successfully Places GSAT-6 in Orbit,* The Times of India, August 27, 2015, available at timesofindia.indiatimes.com (Annex 5 submitted by the Respondent on August 31, 2015).

produced these press articles, gave no indication to the effect that the statements attributed to the Chairman of ISRO were not accurate.

368.   Even more significant is Annex 6 of the documents submitted by the Respondent on August 31, 2015.[472] The note from Mr. V.K. Pant, Assistant Wireless Adviser, in DOT, states that "(b)ased on the decisions of the Cabinet a document on Defence Band and Defence Interest Zone has been issued to Ministry of Defence on 12th March 2015. The relevant extract relating to the S band is enclosed, as desired." That extract reads as follows: "The band segments (a) 2500-2635 MHz (35MHz) (b) 2555-2535 MHz (80 MHz) and (c) 2655-2690 MHz (35 MHz) will be used for Defence, security and societal applications." It therefore appears that, right up to the time of the launch of the satellite, GSAT-6 was destined to a mixed application, some of it coming under wording of Article 11 (3) and some of it being clearly for the pursuit of a public purpose under Article 6 of the Treaty.

369.   The Respondent has submitted evidence showing substantial requirements by the Department of Defence for S-band spectrum (17.5 MHz up to 2012, an additional 40 MHz up to 2017 and 50MHz up to 2022).[473] The evidence submitted to the Tribunal demonstrates that these requests covered both the MSS and the BSS parts of the spectrum. As to the Claimants' argument that, in reallocating a BSS part of the spectrum to MSS spectrum, the Respondent would have contravened the ITU's Radio Regulations[474], Mr. John Lewis, an expert retained by the Claimants, has clearly answered in his oral testimony that, once a particular international frequency table has been allocated to a country by the ITU, the decision as to the re-allocation between BSS and MSS applications is a matter of "national decision, and the ITU has no role to monitor or overview decisions of this nature."[475] In addition, Mr. Sethuraman testified that the two satellites 6 and 6A would not be sufficient to meet the requirements of the military.[476] However, if the Respondent was willing to approve the large allocation requests of the armed forces, it would have simply done so by reserving the S-band to meet its essential security needs. The Tribunal has received no evidence of any specific assignment of spectrum to the military and paramilitary sectors and, as indicated above, there were even debates inside the administration in 2014 as to the possible

---

[472]   Memo from V.K. Pant, Department of Telecommunications, to Member (Finance), Department of Space, April 1, 2015 (Annex 6 submitted by the Respondent on August 31, 2015).

[473]   *See supra*, para. 347.

[474]   Claimants' Statement of Reply, para. 57,

[475]   Testimony of Mr. John Lewis, Transcript Day 3, p. 568:12-14.

[476]   Testimony of Mr. Sethuraman, Transcript Day 4, p. 848:15-25.

auctioning of some part of the S-band spectrum to the private sector, notwithstanding the CCS decision of 2011 to exclude commercial activities from that spectrum.

370. Although the requests of the military for part of the S-band spectrum are large, the Tribunal notes that no specific allocation has been made by the Respondent, and the Tribunal cannot assume that such requests will be approved in full by the Respondent. All around the world, governments are faced every year with very large demands for funds for various projects from their military establishment and, just as regularly, governments grant only a percentage of such requests.

371. The Tribunal, by majority, therefore concludes that, although the CCS decision of 2011 appears to have been in part "directed to the protection of its essential security interests," that part remained undefined and several other objectives were included in that decision, which had nothing to do with national security. In the circumstances, the Tribunal rules that, although the Respondent was fully entitled to reassign the S-spectrum to non-commercial use, the part which was not reserved for military or paramilitary purposes would be subject to the provisions of Article 6 of the Treaty concerning expropriation.

372. Moreover, in the present case, the request by the armed forces for the attribution of spectrum is spread over a number of years (up to 2022) and, looking at the past performance of the space program, it is extremely doubtful that the envisaged schedule could be realistic. In fact, the requirement of 17.5 MHZ up to 2012 had not even been allocated by the time of the launch of GSAT-6 in 2015.

373. On the basis of the evidence submitted to it as described above and bearing in mind that the Respondent had already reserved to itself 10% of the spectrum in question,[477] the Tribunal, by majority, is of the view that a reasonable allocation of spectrum directed to the protection of the Respondent's essential security interests would not exceed 60% of the S-band spectrum allocated to the Claimants, the remaining 40% being allocated for other public interest purposes and being subject to the expropriation conditions under Article 6 of the Treaty. It will be up to the Tribunal, in the next phase of this arbitral process (damages), to establish the compensation due to the Claimants in that respect.

374. This is independent of any liability Antrix may have incurred for contractual breach of the Devas Agreement.

---

[477]     Statement of Claim, para. 45; Statement of Defence, para. 42.

# CHAPTER VII - EXPROPRIATION

## A.   THE PARTIES' ARGUMENTS

375.   The Claimants contend that, as a result of the measures of India's various governmental agencies leading to the annulment of the Devas Agreement, the Respondent has unlawfully expropriated their investments in India in violation of Articles 6 and 7 of the Treaty.[478]

376.   The Respondent's primary contention is that no identifiable right or asset of the Claimants was expropriated,[479] but in any event, rejects the Claimants' analysis of this claim.[480]

377.   Article 6 of the Treaty provides as follows:

> (1)   Investments of investors of either Contracting Party in the territory of the other Contracting Party shall not be nationalised, expropriated or subjected to measures having effects equivalent to nationalisation or expropriation except for public purposes under due process of law, on a non-discriminatory basis and against fair and equitable compensation. Such compensation shall amount to the market value of the investment expropriated immediately before the expropriation or before the impending expropriation became public knowledge, whichever is the earlier, shall include interest at a fair and equitable rate until the date of payment, shall be made without unreasonable delay and shall be effectively realizable and be freely transferable.

> (2)   The investor affected by the expropriation shall have the right, under the law of the Contracting Party making the expropriation, to review, by a judicial or other independent authority of that Party, of his or its case and of the valuation of his or its investment in accordance with the principles set out in this paragraph.

> (3)   Where a Contracting Party expropriates, nationalises or takes measures having effect equivalent to nationalisation or expropriation against the assets of a company which is incorporated or constituted under the laws in force in any part of its own territory, and in which investors of the other Contracting Party owns shares, it shall ensure that the provisions of paragraph (1) of this Article are applied to the extent necessary to ensure fair and equitable compensation as specified therein to such investors of the other Contracting Party who are owners of those shares.

378.   Article 7, which deals with transfer of investment capital and returns, provides that "(a)ll transfers shall be effected without reasonable delay in any freely convertible currency at the market rate of exchange prevailing on the date of transfer."

---

[478]   Notice of Arbitration, paras 57-61; Statement of Claim, paras 160-98; Statement of Reply, paras 116-41; Transcript, Day 5, 1149:12-1150-17.

[479]   Statement of Defence, paras 99-120; Respondent's Rejoinder, paras 91-103.

[480]   Respondent's Rejoinder, paras 113-15. *See* generally Transcript, Day 1, 174:4-180:7; Day 5, 1298:18-1299:24.

### 1.  The Existence of an Expropriation

#### a.  The Claimants' Position

379.  According to the Claimants, whether or not there is an expropriation for the purpose of Articles 6 and 7 of the Treaty turns on whether an investment is "subjected to measures having effects equivalent to nationalisation or expropriation."[481] In this context, the Claimants argue that "expropriation" includes "covert or incidental interference with the use of property which has the effect of depriving the owner, in whole or in significant part, of the use or economic benefit of property;"[482] and "direct or indirect interference with intangible assets including contract rights."[483]

380.  Accordingly, the Claimants' assets and rights, such as its interest in Devas, indirect ownership of the Devas Agreement and indirect ownership of the Devas system and business and pre-emptive right to an allocation of the S-band under the Devas Agreement were capable of being and, in fact were, directly and indirectly expropriated and/or nationalized by the Government of India.[484] Such an expropriation, the Claimants submit, is evident from the factual record demonstrating that the coordinated measures adopted by the CCS, DOS, the Space Commission and ISRO/Antrix during the review process of the Devas Agreement,[485] which led to the annulment of the Devas Agreement and rights therein, plainly had the deliberate and objective effect of depriving the Claimants of the use or reasonably-to-be-expected economic benefit of their investments in Devas.[486]

---

[481]   Statement of Claim, para. 163, referring to Agreement between the Government of the Republic of Mauritius and the Government of the Republic of India for the Promotion and Protection of Investments, September 4, 1998, Article 6(2) (Ex. C-1/JCB-8).

[482]   Statement of Claim, para. 163, referring to *Metalclad Corp. v. Mexico*, ICSID Case No. ARB(AF)/97/1, Award, 2000, para. 103 (Ex. CL -23). The Claimants note that other arbitral decisions have upheld a similar notion of expropriation, including *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 606 (Ex. CL-5); *Gemplus S.A. v. Mexico; Talsud S.A. v. Mexico*, ICSID Cases Nos. ARB(AF)/04/3 & ARB(AF)/04/4, Award, 2010, paras 8-23 (Ex. CL-15); or *RosInvestCo. UK Ltd. v. Russia*, SCC, No. 079/2005, Final Award, 2010, para. 624 (Ex. CL-28).

[483]   Statement of Claim, para. 164; *Deutsche Bank AG v. Sri Lanka*, ICSID Case No. ARB/09/02, Award, 2012, para. 506 (Ex. CL-8); *Occidental Petroleum Corp. v. Ecuador*, ICSID Case No. ARB/06/11, Award, 2012, para. 455 (Ex. CL-27).

[484]   Statement of Claim, paras 165, 173.

[485]   *See supra*, Chapter III - E; Statement of Claim, para. 166.

[486]   Statement of Claim, paras 122, 167; Statement of Reply, paras 117, 125.

      b.      **The Respondent's Position**

381.    According to the Respondent, the Claimants' expropriation claim is fundamentally flawed in that no identifiable right or asset was expropriated,[487] a point which the Respondent says the Claimants do not dispute.[488]

382.    The Respondent criticizes the Claimants' failure to identify precisely the scope of the rights or assets at issue, but in any event, argues that the Claimants' claim is deficient as they seek compensation for rights that they never had. Notably, the assets and interests identified by the Claimants as being expropriated are (i) not rights or assets of any kind belonging to the Claimants themselves; and (ii) entirely dependent on Devas acquiring rights under the Devas Agreement that could not be affected by governmental action.[489]

383.    The Respondent denies that the Claimants' shareholdings in Devas have been expropriated[490] and insofar as Claimants' investments derive from the Devas Agreement,[491] the Respondent argues that the only right acquired by Devas was the right to a refund of the upfront capacity reservation fees paid prior to the date of termination of the agreement.[492]

384.    Moreover, the Claimants are not assisted by their survey of expropriation cases, which the Respondent submits are not applicable as they have no bearing on the issues in this case.[493]

---

[487]    Statement of Defence, para. 99.

[488]    Respondent's Rejoinder, para. 93.

[489]    Statement of Defence, para. 101.

[490]    *Id.*, para. 102.

[491]    *Id.*, para. 104.

[492]    *Id.*, paras 104-05; *Devas Multimedia Pvt. Ltd. v. Antrix Corp. Ltd.*, Antrix's Statement of Defence, November 15, 2013, paras 12-20, 138-54 (Ex. R-3); *see supra*, para. 95.

[493]    Respondent's Rejoinder, para. 93, referring to Statement of Reply, para. 116.

## 2.  Lawfulness of the Expropriation

385.  The Claimants argue that India's expropriation was unlawful because it does not satisfy the four conditions set out in Article 6 of the Treaty.[494] In fact, they say, none of those conditions are satisfied, such that India's expropriation was unlawful in every respect.[495]

386.  The Respondent, by contrast, maintains its primary argument that the Claimants did not possess any "acquired rights" such that no expropriation occurred,[496] and, in any case, rejects the Claimants' allegation of unlawful expropriation.[497]

### a.  Public Purpose

#### i.  The Claimants' Position

387.  The Claimants contend that the "public purpose" condition within the Treaty[498] requires the Respondent to demonstrate that (i) its measures were actually for public purposes, and not based on a mere assertion;[499] (ii) the expropriation was proportional to the purported public purpose;[500] and (iii) the expropriatory measures must not be "financially motivated," either in favor of the State itself or other investors.[501]

388.  In the Claimants' view, the facts of the case dispel any notion of a taking for "public purposes,"[502] especially as the "purpose" admitted by Dr. Radhakrishnan was to terminate the contract "without

---

[494]  Statement of Claim, para. 174; Statement of Reply, para. 139, both referring to Agreement between the Government of the Republic of Mauritius and the Government of the Republic of India for the Promotion and Protection of Investments, September 4, 1998, Article 6(1) (Ex. C-1/JCB-8) (emphasis by the Claimants).

[495]  Statement of Claim, paras 174-98.

[496]  Statement of Defence, paras 99-20; Respondent's Rejoinder, paras 113-14.

[497]  Statement of Defence, fn. 258; Respondent's Rejoinder, paras 113-15.

[498]  Statement of Claim, paras 176-77; Statement of Reply, paras 139-41.

[499]  Statement of Claim, para. 176; *ADC Affiliate Ltd. v. Hungary*, ICSID Case No. ARB/03/16, Award, 2006, paras 430-32 (Ex. CL-1).

[500]  Statement of Claim, para. 176; *James v. United Kingdom*, (Eur. Ct. H.R.) App. No. 8793/79, Judgment (Merits), 1986, para. 50 (Ex. CL-19); *Occidental Petroleum Corp. v. Ecuador*, ICSID Case No. ARB/06/11, Award, 2012, para. 456 (Ex. CL-27).

[501]  Statement of Claim, para. 177; *Deutsche Bank AG v. Sri Lanka*, ICSID Case No. ARB/09/02, Award, 2012, para. 523 (Ex. CL-8)

[502]  Statement of Claim, paras 178-84.

causing much of embarrassment and damage and financial loss to the government."[503] As a matter of law, the Claimants do not accept that a desire to escape a commercial arrangement, or avoid political outcomes, is a "public purpose."[504]

389. Furthermore, the Claimants rely on the following to challenge the alleged "public purposes:"

(a)   the lack of involvement of any agencies that purportedly had "needs" of S-band spectrum throughout Dr. Radhakrishnan's process to annul the Devas Agreement;[505]

(b)   the state of disuse of the S-band spectrum for any purpose, including for those purported "needs" of any agencies;[506]

(c)   the continuing call for the S-band spectrum to be made available to other commercial operators,[507] which first began in 2008 and were evident at the time of Dr. Radhakrishnan's "review" of the Devas Agreement;[508]

(d)   the contrast[509] between India's covert and *ad hoc* "policy" to extricate itself from the Devas Agreement in 2011[510] and the careful analysis performed by the Shankara Committee prior to the initial decision to enter into the Devas Agreement in 2004.[511]

390. Even if a "public purpose" could be ascribed to the expropriation, the Claimants contend that the Respondent's actions were not "proportional" to that purpose.[512] In support, the Claimants refer

---

[503]   *Id.*, para. 179, Transcript, ISRO press conference, CNN-IBN special telecast, February 8, 2011, p. 4 (Ex. C-125/JCB-206). The Claimants explain that Dr. Radhakrishnan consulted with DOT and the Department of Law and Justice, but does not refer to any agencies concerned with "defence, paramilitary forces, railways or other public utility services," whose "needs" supposedly animated the policy decision of the CCS.

[504]   Statement of Claim, paras 177, 182, fn. 236; Statement of Reply, para. 140(a).

[505]   Statement of Claim, paras 178-79, referring to Opinion of the ASG (Ex. R-30/JCB-165).

[506]   Statement of Claim, para. 178.

[507]   *Id.*, para. 180.

[508]   *Id.*, paras 135-37; *see* Economic Times, *Pitroda asks PM to reactivate GoM on spectrum vacation*, May 17, 2013 (Ex. C-186/JCB-265), which reads, in relevant part: "Pitroda is of the view that 80 megahertz of airwaves frequencies for 4G services can be freed from the spectrum held by the Department of Space (DoS)."

[509]   Statement of Claim, para. 181.

[510]   *Id.*, para. 181.

[511]   The Claimants refer to India securing a "grandfathered" right for Devas at the ITU (*see supra*, para. 106) and to the SATCOM policy that was enacted. *See* Statement of Claim, para. 181.

[512]   Statement of Claim, para. 183.

to the categorical nature of the decision of the CCS to annul the Devas Agreement for unspecified and vaguely-described "needs,"[513] and the manner in which India took action covertly and unilaterally, in circumstances where Devas would have been willing to work with the Government of India to accommodate those needs (within the context of the Devas Agreement) if they had been approached.[514]

        ii.     The Respondent's Position

391. According to the Respondent, the termination of the Devas Agreement was based on national security grounds, constituting a quintessential public purpose.[515] Even more so, the Claimants cannot cite any authority to the contrary to this effect.[516] The Respondent criticizes the Claimants' failure to explain the relevance of their submission that the policy decision of the CCS "was grossly disproportionate to any supposed 'purpose.'"[517]

      **b.**    **Due Process**

        i.     The Claimants' Position

392. The Claimants submit that the concept of "due process" in Article 6 of the Treaty requires more than mere compliance with local law; it also incorporates principles of international due process.[518] These include: (i) the obligation of the host State to notify the investor of the proposed expropriatory measure and give it the opportunity to be heard and/or mitigate the impact of the threatened measures;[519] and (ii) the conduct of the expropriation with "reasonable advance notice and a fair hearing" and not "in a manner that can at best be described as opaque." Due process

---

[513]    *Id.*, para. 183.

[514]    *Id.*, para. 183; Parsons I, paras 35-37, 49-51.

[515]    Statement of Defence, fn. 258, referring to *Goetz and Others v. Republic of Burundi*, ICSID Case No. ARB/95/3, Decision on Liability, 1998 (6 ICSID Reports 5-2004), para. 126 (Ex. R-70).

[516]    Respondent's Rejoinder, para. 114(1).

[517]    *Id.*, para. 114(2), referring to Statement of Reply, para. 140(a).

[518]    Statement of Claim, para. 186; *Kardassopoulos v. Georgia; Fuchs v. Georgia*, ICSID Cases. Nos. ARB/05/18 & ARB/07/15, Award, 2010, para. 394 (Ex. CL-20).

[519]    Statement of Claim, para. 187, referring to *Siag v. Egypt*, ICSID Case No. ARB/05/15, Award, 2009, paras 36, 442 (Ex. CL-32); *Middle East Cement Shipping & Handling Co. S.A. v. Egypt*, ICSID Case No. ARB/99/6, Award, 2002, para. 143 (Ex. CL-24).

can also be denied substantively, i.e. when a host State ignores and violates its own and/or international law in the conduct of an expropriation.[520]

393.   According to the Claimants, India's clandestine conduct leading up to the cancellation of the Devas Agreement is a classical denial of due process.[521] The whole review process of the Devas Agreement and the decision to cancel it[522] were made behind closed doors, and were presented without any prior notice to Devas or Claimants as a *fait accompli*, with no opportunity to present objections to India's decisions[523]—a fact acknowledged by the Respondent.[524] All this is exacerbated by India's public indications of support for the Devas system and Devas' performance of the Devas Agreement, in reliance upon those indications of support.[525] As the *Kardassopoulos* tribunal remarked, "[b]ack-door press reports are the opposite of due process."[526]

394.   Moreover, the Claimants aver that the decision to fabricate a *force majeure* event was carried out in contravention of the contractual requirement that a *force majeure* event must be "beyond the reasonable control of the party affected" and have only have occurred "despite all efforts of the Affected Party to prevent it or mitigate its effects."[527]

   ii.   The Respondent's Position

395.   The Respondent argues unequivocally that due process does not require consultation with the Claimants as to national security matters, and the Claimants simply had no vested right to be consulted on this issue.[528]

---

[520]   Statement of Claim, para. 188, referring to *Kardassopoulos v. Georgia; Fuchs v. Georgia*, ICSID Cases. Nos. ARB/05/18 & ARB/07/15, Award, 2010, para. 441 (Ex. CL-20).

[521]   Statement of Claim, paras 189-91.

[522]   *See supra*, Chapter III - E.

[523]   Statement of Claim, para. 189.

[524]   Statement of Reply, para. 140(c).

[525]   Statement of Claim, para. 190; *see supra*, Chapter III - D.

[526]   Statement of Claim, para. 191, referring to *Kardassopoulos v. Georgia; Fuchs v. Georgia*, ICSID Cases. Nos. ARB/05/18 & ARB/07/15, Award, 2010, para. 402 (Ex. CL-20).

[527]   Statement of Claim, para. 189, referring to Devas Agreement, Article 11 (Ex. C-16).

[528]   Statement of Defence, para. 85, fn. 258; Respondent's Rejoinder, para. 114(4).

### 3.   Potential Discrimination in the Expropriation

#### a.   The Claimants' Position

396.   In the Claimants' view, discrimination in the expropriation context occurs when an investment is nationalised "for reasons unrelated to the host State's legitimate regulatory objectives;" such that expropriation of a foreign investment solely due to foreign ownership would violate this condition.[529]

397.   According to the Claimants, the measures in question were discriminatory because they were aimed exclusively at extinguishing the interests of Devas, and were motivated in part by the fact that Devas had foreign ownership interests by the Claimants and DT Asia.[530]

#### b.   The Respondent's Position

398.   The Respondent denies that the Government of India's policy decision to reserve the S-band for non-commercial, strategic use was discriminatory in any way, as there was no differentiation in the treatment accorded to the Claimants as compared to other entities or sectors.[531] Regarding the Claimants' argument that India's "attacks" on the Devas Agreement "were motivated in part by the fact that the Claimants were non Indian," the Respondent points out that the CCS did not reserve S-band for commercial use of Indians; it reserved S-band for non-commercial, strategic use, preventing any private use of S-band by anyone, irrespective of nationality or ownership.[532]

---

[529]   K.J. Vandevelde, *Bilateral Investment Treaties* (OUP 2010), p. 273 (Ex. CL-45); *see also ADC Affiliate Ltd. v. Hungary*, ICSID Case No. ARB/03/16, Award, 2006, para. 443 (Ex. CL-1); *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 612 (Ex. CL-5).

[530]   Statement of Claim, para. 194, citing Chaturvedi Report, March 12, 2011, para. 3.5.9 (App. KS-10), which reads: "The shareholding in Devas and changes in it subsequently have also been a serious cause of concern…. The original proposal, which had envisaged development and innovation by some former ISRO scientists, seem to have been diluted with the entry of major foreign players. While technically this was permitted, the entry of foreign telecom companies with huge premiums indicated that they had used this as an opportunity for entering the telecom market, which had in the meanwhile expanded rapidly in India during 2005-10. This was not an intended purpose of the original agreement." *See also* Statement of Claim, paras 135-37; *see supra*, fn.391.

[531]   Statement of Defence, para. 164, fn. 258.

[532]   Respondent's Rejoinder, para. 114(3).

### 4.    Fair and Equitable Compensation

#### a.    The Claimants' Position

399.    The Claimants note that Article 6(1) of the Treaty mandates that "fair and equitable compensation" "made without unreasonable delay" is a condition of any expropriation.[533] The failure to pay "market value" compensation alone constitutes a breach of the Treaty, and is no different from a complete failure to make any payment.

400.    In this instance, the Claimants emphasize that the Respondent has not even attempted to pay the Claimants the fair market value of their lost investment,[534] and has in fact repudiated its duty to do so.[535] The purported tender by Antrix of a refund of the upfront capacity reservation fee, even assuming that the tender could be attributed to India, manifestly does not correlate to the fair market value of the Devas system and business at the time of the taking.[536]

#### b.    The Respondent's Position

401.    The Respondent argues that India did not offer to pay compensation because the Claimants had no right to compensation.[537] Antrix tendered a check to Devas to reimburse the upfront capacity reservation fees paid by Devas prior to the termination of the Devas Agreement, which was rejected by Devas.[538] The Respondent characterizes this conduct by the Claimants as an unjustified attempt to claim additional compensation from the State in circumstances where their claim is dependent on and limited by the Devas Agreement.[539] In any event, the Respondent submits that the fair market value would be less than the amount tendered to and rejected by Devas.[540]

---

[533]    Statement of Claim, para. 195, referring to Agreement between the Government of the Republic of Mauritius and the Government of the Republic of India for the Promotion and Protection of Investments, September 4, 1998, article 6(1) (Ex. C-1/JCB-8).

[534]    Statement of Claim, paras 131-32; *see supra*, para. 89.

[535]    Statement of Claim, para. 198; Statement of Reply, para. 140(d).

[536]    Statement of Reply, para. 140(d). *See supra*, para. 89.

[537]    Respondent's Rejoinder, para. 114(5).

[538]    *See supra*, para. 156.

[539]    Respondent's Rejoinder, para. 114(5).

[540]    *Id*., para. 114(5); referring to *Devas Multimedia Pvt. Ltd. v. Antrix Corp. Ltd.*, Expert Report on Valuation, Vladimir Brailovsky & Daniel Flores, November 15, 2013 (Ex. R-4).

### 5.   The Pendency of a Breach of Contract Claim

#### a.   The Claimants' Position

402.   The Claimants aver that, regardless of the outcome of the ICC arbitration, the provisions of the Devas Agreement do not preclude a finding of expropriation or obviate the Respondent's obligation to pay damages for such expropriation.[541]

403.   According to the Claimants, "the fact that a breach may give rise to a contract claim does not mean that it cannot also—and separately—give rise to a treaty claim. Even if the two perfectly coincide, they remain analytically distinct, and necessarily require different enquiries."[542] Accordingly, although "a mere failure to comply with a contractual obligation [would not] constitute expropriation," a violation of a contract "which was the result of use of sovereign power, such as a decree annulling the contractual rights, may amount to an expropriation."[543] Therefore, the Respondent cannot escape liability for expropriation by relying on the provisions of the Devas Agreement.[544]

404.   In this instance, the Claimants assert that the *force majeure* clause[545] of the Devas Agreement cannot justify the expropriation. Notwithstanding the results of the contractual dispute in the ICC arbitration,[546] nothing in this agreement or in the Treaty insulates the Respondent from its own State responsibility under the Treaty for the action it took *qua* sovereign to "annul" a contract.[547]

405.   In the same vein, the Respondent cannot escape liability for expropriation by relying upon Article 7(b) and (c) of the Devas Agreement, governing the termination of this contract.[548] To accept the Respondent's position would give "Antrix *carte blanche* to terminate the contract on any basis it

---

[541]   Statement of Reply, para. 137.

[542]   *Id.*, para. 126, citing *Impregilo S.p.A. v. Pakistan*, ICSID Case No. ARB/03/3, Decision on Jurisdiction, 2005, para. 258 (Ex. CL-17). The Claimants note that the Respondent's own authorities recognize this distinction; *See* Statement of Reply, paras 126-27, referring to *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 2009, para. 444; *AWG Group v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 184; *Malicorp Ltd. v. Egypt*, ICSID Case No. ARB/081/18, Award 2011, para. 103(c).

[543]   Statement of Reply, para. 127, citing M. Feit, 'Responsibility of the State under International Law for the Breach of Contract Committed by State-Owned Entity' (2010) 28 Berkeley Journal of International Law 132, p. 160 (Ex. R-114).

[544]   Statement of Reply, paras 128-136.

[545]   Devas Agreement, Article 11 (Ex. C-16). *See supra*, para. 101.

[546]   *See supra*, para. 161.

[547]   Statement of Reply, paras 128, 134.

[548]   *Id.*, paras 129-33; *See supra*, para. 94.

wanted and then cap its contractual liability by refunding Devas the Upfront Capacity Reservation Fees."[549]

406.    In any event, the Claimants argue that the Respondent acknowledges that the provisions of Article 7(b) and (c) are not operative.[550] The ASG recognized that Article 7(c) was inoperative by July 2010, once the frequency and orbital slot coordination was obtained.[551] The Respondent's invocation of Article 7(b) fares no better, as its effects could have only been triggered if Devas had exercised its option to terminate the contract under this Article—and not Antrix, as it actually happened.[552]

407.    Finally, even if, as the Respondent asserts,[553] Article 7 were construed as limiting Antrix's contractual damages in the event of improper termination, the Claimants submit that this cannot operate to insulate the Respondent from liability for violations of the Treaty, especially in light of the fact that Antrix would have been obliged to perform the contract had the expropriation not occurred.[554]

### b.    The Respondent's Position

408.    The Respondent submits that the Claimants' argument regarding the pendency of a breach of contract claim responds to a non-issue in this arbitration.[555] The Respondent agrees that a distinction exists between a breach of contract by a State acting in a commercial capacity and a breach effected through the exercise of sovereign powers.[556] Nonetheless, in the Respondent's view, the Claimants' discussion is relevant only to a case where the State has breached its contractual obligations through the exercise of sovereign authority, whereas no claim has been raised that India breached the Devas Agreement.[557] Rather, the issue is whether the State exercised its sovereign authority to abrogate any commitment it had to the Claimants, and, on that score,

---

[549]    Statement of Reply, para. 129, referring to Statement of Defence, para. 8. *See supra*, para. 94.

[550]    Statement of Reply, paras 129-32.

[551]    *Id.*, paras 130-31, referring to Opinion of the ASG, p. 3 (Ex. R-30/JCB-165).

[552]    Statement of Reply, para. 133.

[553]    *Id.*, para. 136, referring to Statement of Defence, fn. 5.

[554]    Statement of Reply, para. 136 (emphasis by the Claimants).

[555]    Respondent's Rejoinder, para. 104.

[556]    *Id.*, para. 105, referring to Statement of Reply, para. 127.

[557]    Respondent's Rejoinder, paras 105, 108 (emphasis by the Respondent).

there can be no genuine dispute.[558] The Respondent contends that, in a case where the State has no contractual obligation, adopting the Claimants' theory would mean that any exercise of sovereign authority having an adverse impact on a private party would constitute an expropriation, which is untenable.[559]

409.  In the Respondent's view, nothing in the Claimants' discussion on the *force majeure* clause and the termination provisions of the Devas Agreement has any bearing on these basic points.[560] The Respondent first denies that it could have ever stated, as the Claimants submit, that "the expropriation was justified merely because the contract contemplated a 'Force Majeure Event,'"[561] since it has always been the Respondent's position that no expropriation occurred in this case.[562] The relevance of the *force majeure* clause, as well as all other provisions of the Devas Agreement reviewed in the Statement of Defence,[563] is that they all make clear that Devas did not have an acquired right to proceed with the Devas Agreement uninterrupted by any governmental action, and that implementation of the project required a number of governmental approvals which the Government of India had no commitment whatsoever to issue.[564]

## B.    THE TRIBUNAL'S ANALYSIS

410.  The Tribunal will address seriatim the arguments raised by the Parties. In light of the above conclusion of the Tribunal establishing the Respondent's partial liability, any liability under Article 6 of the Treaty would only apply to the 40% of the value of the Agreement resulting from the application of the CCS decision to matters other than the essential security interests of the State.

### 1.    The Existence of an Expropriation

411.  The Tribunal has already ruled above[565] that the Claimants were qualifying both as investors and having made an investment under the Treaty, and that part of the CCS decision opened the door

---

[558]   *Id.*, para. 107.

[559]   *Id.*, paras 106, 112.

[560]   *Id.*, paras 109-11.

[561]   *Id.*, para. 110, referring to Statement of Reply, para. 128.

[562]   Respondent's Rejoinder, para. 110.

[563]   *See supra*  Chapter III - C.

[564]   Statement of Defence, paras 8-9; Respondent's Rejoinder, para. 111.

[565]   *See supra*, para. 210.

to claims for expropriation under the Treaty. There is no need to repeat here the considerations which led the Tribunal to that conclusion. The Claimants therefore had property which could be the subject of expropriation.

## 2.   *The Lawfulness of the Expropriation*

412.   The Tribunal will proceed to analyze the five elements covered by the Parties in that respect.

### a.   **Public Purpose**

413.   The Tribunal is of the view that the expropriation by the Respondent was made for a public purpose. Even leaving aside the military and paramilitary needs which the Tribunal has found to come under Article 11(3) of the Treaty, the reference by the Respondent in the CCS decision to "other public utility services as well as for societal needs" clearly indicate that the annulment of the Devas Agreement was made for public purposes. Article 6 of the Treaty does not require the Respondent to spell out in detail what these specific public purposes are but, in any event, Mr. Anand, in his testimony referred to above,[566] has described the wide spectrum of services which could come under that definition and which are clearly coming under the public purpose condition mentioned in Article 6.

414.   As to the Claimants' argument that the Respondent's actions were not "proportional" to that purpose, the Tribunal recognizes that, as stated in *Deutsche Bank AG v. Sri Lanka*,[567] "(a) number of tribunals, including *Tecmed v. Mexico, Azurix v. Argentina and LG&E v. Argentina* have adopted a proportionality requirement in relation to expropriatory treatment." On the basis of the evidence submitted, the Tribunal is of the view that the measure adopted by the CCS was justified by a substantial public interest.

### b.   **Due Process**

415.   The difficulty in the present case is the dual purpose of the decision of the CCS, which acted in part for reasons of national security under Article 11(3) and for general public purposes covered by Article 6 of the Treaty.

---

[566]   *See supra,* para. 360, fn. 467.

[567]   *Deutsche Bank AG v. Sri Lanka*, ICSID Case No. ARB/09/02, Award, 2012, para. 522

416. As to the argument of the Respondent that due process does not require consultation as to national security matters, the Tribunal agrees that such circumstances absolve the Respondent from following the principles of international due process enunciated above by the Claimants.

417. As to the non-security purposes of the CCS decision, the Tribunal considers that the principles of international due process mentioned by the Claimants should apply. In that respect, the Respondent breached that condition of Article 6 of the Treaty.

### c.  Potential Discrimination in the Expropriation

418. Although there is passing reference to foreign parties or foreign investment in the DOS Note for the Cabinet Committee on Security of February 16, 2011, none of these references give any indication that the participation of foreign parties or foreign investment was a factor that played any role in the recommendation of DOS to the CCS. Furthermore, nothing in the decision of the CCS can lead to the conclusion that such factors were taken into account in any way.

419. The argument of the Claimants in this respect is therefore rejected.

### d.  Fair and Equitable Compensation

420. The Tribunal, by majority, has concluded that the Claimants would be entitled to compensation for the part of the decision of the CCS that does not relate to "the essential security interests" of the State.

421. The fact that Antrix tendered a check to Devas to reimburse the upfront capacity reservation fees paid by Devas under the Agreement is irrelevant for this matter. As indicated above, the Parties agree that a distinction must be made between the contractual obligations between Devas and Antrix and the obligations of the Respondent under the Treaty.

422. In the present instance, it is uncontested that the Respondent paid no compensation whatsoever to the Claimants when it expropriated the Claimants' investment for purposes other than its "essential security interests."

### e.  The Pendency of a Breach of Contract Claim

423. The debate between the Parties on this subject has been in good part been overtaken by events, the ICC tribunal having found that Antrix was in breach of its contractual obligations and that it must pay USD 535 million plus interest to Devas.

424.   In the present case, there was no contractual obligation between the Claimants and the Respondent and the Tribunal is only called upon to decide whether there has been a breach of obligations under the Treaty.

### 3.   Conclusion

425.   On the basis of the above analysis, the Tribunal has come to the conclusion that the Claimants are entitled to claim compensation under Article 6 of the Treaty for the expropriation of their investment for the part of the Respondent's decision which relates to matters other than national security, as discussed above.

## CHAPTER VIII - FAIR AND EQUITABLE TREATMENT

## A.   THE PARTIES' ARGUMENTS

426.   Article 4(1) of the Treaty provides, in relevant part:

> (1) Investments and returns of investors of either Contracting Party shall at all times be accorded fair and equitable treatment in the territory of the other Contracting Party.

427.   According to the Claimants, the expropriatory nature of the Respondent's actions, as well as its violation of the Claimants' "legitimate expectations" as investors in India mandate the conclusion that the Respondent has breached the fair and equitable treatment ("**FET**") standard embodied in Article 4(1) of the Treaty. According to the Claimants, such breach exists regardless of the actual content of the FET standard applicable under the Treaty.[568]

428.   The Respondent's primary contention is that the FET standard embodied in the Treaty does not go beyond the minimum standard required by customary international law, and, even if an expansive FET standard were applicable, the Claimants' claims would still be untenable.[569]

---

[568]   Statement of Claim, paras 199-215; Statement of Reply, paras 142-68; *See* Notice of Arbitration, paras 65-67; Transcript, Day 5, 1150:18-1155:18.

[569]   Statement of Defence, paras 121-56; Respondent's Rejoinder, paras 116-33; Transcript, Day 1, 180:8-184:25; Day 5, 1299:25-1301:22.

1.   *The Applicable Standard of Treatment*

    a.   **The Claimants' Position**

429.   The Claimants' position is that a broad standard of FET applies to the present case. This standard
       of treatment is construed as "an obligation to treat a foreign investor's investment in a way that
       does not frustrate the investor's underlying legitimate and reasonable expectations,"[570] and not in
       a way that is manifestly inconsistent, non-transparent, unreasonable…or discriminatory…."[571]
       This standard also includes "the exercise of good faith or the absence of manifest irrationality,
       arbitrariness or perversity by [the host State],"[572] and "a proportionate relationship" between the
       supposed governmental aims and the State measures in question.[573]

430.   For the Claimants, the Respondent's argument that no broad FET standard applies is negated by
       the *White Industries* award,[574] in which the equivalent clause in the Australia-India BIT was
       interpreted as "a mainstream treaty FET clause, protecting an investor's 'legitimate
       expectations.'"[575] Accordingly, the Respondent's submission that the FET clause in India's BITs
       should be interpreted differently than other similarly-worded clauses fails.[576]

431.   Moreover, the Respondent's invocation of the "customary minimum treatment" standard,[577] is at
       odds with two decades of jurisprudence and commentary.[578] The Claimants note that "[t]he

---

[570]   Statement of Claim, para. 201, citing *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial
        Award, 2006, para. 309 (Ex. CL-31).

[571]   *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 309 (Ex. CL-31).

[572]   Statement of Claim, para. 200, citing *Gemplus S.A. v. Mexico; Talsud S.A. v. Mexico*, ICSID Cases Nos.
        ARB(AF)/04/3 & ARB(AF)/04/4, Award, 2010, paras 7-2, 7-72 (Ex. CL-15).

[573]   Statement of Claim, para. 203, citing *Occidental Petroleum Corp. v. Ecuador*, ICSID Case No. ARB/06/11,
        Award, 2012, para. 416 (Ex. CL-27); *See also MTD Equity Sdn Bhd, v. Chile*, ICSID Case No. ARB/01/7,
        Award, 2004, para. 113; *Parkerings-Compagniet A.S. v. Lithuania,* ICSID Case No. ARB/05/8, Award,
        2007, para. 8.1.4.1, para. 333; *Ioan Micula v. Romania*, ICSID Case No. ARB/05/20, Award, 2013, para.
        667; *AWG Group v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 223; *Bayindir Insaat Turizm
        Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 2009, para.
        163; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 2009, para. 240; *CMS Gas
        Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, para. 85. In the
        Claimants' view, these cases, providing for the protection of the legitimate expectations of the investor,
        embody the FET standard applicable under Article 4(1) of the Treaty.

[574]   Statement of Reply, paras 143-44, referring to *White Industries Australia Ltd. v. India*, UNCITRAL, Final
        Award, 2011 (Ex. CL-38).

[575]   *White Industries Australia Ltd. v. India*, UNCITRAL, Final Award, 2011, paras. 4.3, 5.2, 10.3 (Ex. CL-38).

[576]   Statement of Reply, para. 144.

[577]   *Id.*, para. 150, referring to Statement of Defence, para. 127.

[578]   Statement of Reply, para. 142.

customary international law minimum standard of treatment may evolve in accordance with changing State practice, manifesting to some degree expectations within the international community."[579] In this regard, the Claimants contend that there is presently no material distinction in practice between the FET standard and the obligations owed by India under customary international law.[580]

432. Even if the 1969 OECD Draft Convention on the Protection on Foreign Property (the **"OECD Draft Convention"**)[581] treats a treaty-based FET clause as equivalent to the customary international law level of protection,[582] the Claimants contend that the manifest intention of this Draft Convention was to buttress the customary international law minimum standard by emphasizing that it already required FET.[583]

433. The Claimants also consider the excerpts and authorities relied upon by the Respondent to reject an expanded FET standard beyond the minimum standard of treatment provided by customary international law and argue that they do not support the Respondent's case.[584] According to the Claimants, these are all post-2001 NAFTA authorities, which are not useful in an analysis of the FET provision in the Treaty[585] because of specific Notes of Interpretation by the three NAFTA

---

[579]   *Id.*, fn. 320, citing *Cargill, Inc. v. Mexico*, ICSID Case No. ARB(AF)/05/2, Award, 2009, para. 282.

[580]   Statement of Reply, paras 150-57 (emphasis by the Claimants). *See CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, para. 284; *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 2002, para. 125; *Thunderbird Gaming Corporation v. The United Mexican States*, NAFTA/UNCITRAL, Award, 2006, para. 194; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras 335-37, 364 (Ex. CL-11).

[581]   Draft Convention on the Protection of Foreign Property, OECD, Article 1 and Notes and Comments to Article 1, para. 4(a) (Ex. R-73). *See* Statement of Reply, para. 151, referring to Statement of Defence, paras 123-24.

[582]   Statement of Reply, para. 151, referring to Statement of Defence, paras 123-24.

[583]   Statement of Reply, fn. 296 (emphasis by the Claimants); C. McLachlan, 'Investment Treaties and General International Law' (2008) 57 International and Comparative Law Quarterly 361, p. 382 (Ex. CL-71). The Claimants make a similar argument regarding the Respondent's reliance on Swiss government policy (*see* Statement of Defence, para. 124, fn. 265, citing *Opinions of the Public International Law Directorate of the Swiss Federal Political Department* (*Mémoire de la Direction du Droit International Public du Département Politique Fédéral*), in L. Caflisch, *La pratique suisse en matière de droit international public*, p. 178 (Ex. R-74). According to the Claimants, if read in context, the Swiss government's statements equating FET with the customary standard appear to be an attempt to promote both standards, not weaken them.

[584]   Statement of Reply, paras 156-57, referring to Statement of Defence, paras 125-27.

[585]   Statement of Reply, para. 156. At Statement of Reply, para. 157, the Claimants make a similar argument regarding India's reliance on the U.S. and Canadian Model BITs and on resolutions of European institutions, as they expressly limit, or purport to limit, their FET standard to customary minimum treatment standard (*see supra*, fn. 603).

States pursuant to which the NAFTA FET standard was defined as not requiring "treatment in addition to or beyond that which is required by the customary minimum standard of treatment."[586]

434.  Whatever the answer to the relationship between the FET standard and customary international law, the Claimants argue that the *Neer* standard cited by India is inapposite to the present case.[587] Notably, (i) *Neer* is not an investment protection case, as it concerned the host State's alleged failure to punish criminals responsible for the killing of a U.S. citizen;[588] (ii) *Neer* does not discuss the words "fair and equitable" that the Tribunal must interpret;[589] (iii) the so-called *Neer* test— which turns on whether conduct has fallen below "international standards"—is ultimately a circular standard that leaves those standards undefined.[590] Finally, even under NAFTA's 2001 revision, only *Glamis Gold* has expressed the "customary international law minimum" in terms of the *Neer* standard.[591] A majority of cases follows the *Mondev* view that customary international law has moved on since *Neer* and now sustains a broader concept of FET.[592]

### b.    The Respondent's Position

435.  The Respondent submits that the applicable standard is the minimum standard of FET under customary international law, the content of which is to be construed from a number of decisions following the 1926 *Neer v. Mexico* decision,[593] which provides that "the threshold [for the

---

[586]    NAFTA Free Trade Commission, Notes of Interpretation of Certain Chapter 11 Provisions, para. 2(2), July 31, 2002.

[587]    Statement of Reply, para. 158, referring to *L.F.H. Neer and Pauline E. Neer v. Mexico*, Mexico-U.S. General Claims Commission, Docket No. 136, Opinion, 15 October 1926 (1927) 21 American Journal Of International Law 555, p. 556 (Ex. R-88) (*see supra*, para. 437).

[588]    Statement of Reply, para. 159(c).

[589]    *Id*., para. 159(d).

[590]    *Id*., para. 159(e). *See Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 2002, para. 116, noting that "[t]o the modern eye, what is unfair or inequitable need not equate with the outrageous or the egregious."

[591]    *Glamis Gold, Ltd. v. The United States of America*, NAFTA/UNCITRAL, Award, 2009, paras. 22, 614, 616.

[592]    Statement of Reply, para. 160, referring to *Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, 2002, para. 116.

[593]    The Tribunal in *Neer v. Mexico* held that in order to violate this standard, the treatment of an alien "should amount to an outrage, to bad faith, to wilful neglect of duty, or to insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency." *See L.F.H. Neer and Pauline E. Neer v. Mexico*, Mexico-U.S. General Claims Commission, Docket No. 136, Opinion, 15 October 1926 (1927) 21 American Journal Of International Law 555, p. 556 (Ex. R-88).

application of the standard] is extremely high" and "outrageous or egregious conduct is required before a violation is established."[594]

436.   Moreover, attempts to expand the FET concept beyond the minimum standard of treatment provided by customary international law in the absence of evidence evincing such intention of the Contracting Parties have been severely and widely criticized.[595] The Respondent also notes that neither the language of the Treaty nor its *travaux préparatoires* indicates that anything beyond the minimum standard of treatment under customary international law applies.[596]

437.   As a general proposition, the Respondent further argues that the FET clause of Indian BITs was inspired by the OECD Draft Convention,[597] which provides for the application of this minimum standard of treatment.[598] The Respondent submits that this position is reinforced by other countries, such as the three NAFTA States by their interpretive statement confirming that the concept of FET has never been intended to reach beyond this minimum standard of treatment,[599]

---

[594]   Statement of Defence, para. 128, referring to *Alex Genin, Eastern Credit Limited, Inc. and A.S. Baltoil v. Republic of Estonia*, ICSID Case No. ARB/99/2, Award, 2001, para. 367; *International Thunderbird Gaming Corporation v. The United Mexican States*, NAFTA/UNCITRAL, Award, 2006, para. 194; *Glamis Gold, Ltd. v. United States of America*, NAFTA/UNCITRAL, Award, 2009, para. 824; *Cargill, Incorporated v. United Mexican States*, ICSID Case No. ARB(AF)05/02, NAFTA, Award, 2009, paras 284, 286.

[595]   Statement of Defence, paras 125-27. *See* J.R. Picherack, 'The Expanding Scope of the Fair and Equitable Treatment Standard: Have Recent Tribunals Gone Too Far?' (2008) 9(4) The Journal of World Investment and Trade 255, p. 272 (Ex. R-75); Marcos Orellana, 'International Law on Investment: The Minimum Standard of Treatment (MST)' (2004) 1(3) Transnational Dispute Management, p. 7 (Ex. R-76); G. Van Harten, *Investment Treaty Arbitration And Public Law* (OUP 2007), p. 89 (Ex. R-77); *Suez, Sociedad General de Aguas de Barcelona S.A. and Interagua Servicios Integrales de Agua S.A. v. Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Liability, Separate Opinion of Arbitrator Pedri Nikken, 2010, para. 3; *Public Statement on the International Investment Regime*, 31 August 2010, para. 5 (Ex. R-80); Description of the U.S. Model BIT, Submitted by the State Department, July 30, 1992, Hearing before the Committee on Foreign Relations, United States Senate, 102nd Congress, 2d Session, 1992, S. HRG 102-795, p. 62 (Ex. R-81); *Resolution on the Future European International Investment Policy* (2010/2203(INI)), European Parliament, 2011 (Ex. R-86).

[596]   Statement of Defence, paras 121-22; Respondent's Rejoinder, para. 118.

[597]   Draft Convention on the Protection of Foreign Property, OECD, Article 1 and Notes and Comments to Article 1, para. 4(a) (Ex. R-73). Regarding the Respondent's contention that the FET clause in India's BITs was inspired upon the OECD Draft Convention, *see* Fax from the Indian Embassy in Moscow to Ministry of Finance of India, November 15, 1994 (Ex. R-71); S.P. Subedi, 'India's New Bilateral Investment Promotion and Protection Treaty with Nepal: A New Trend in State Practice' (2013) 28(2) ICSID Review 384, p. 393 (Ex. R-72).

[598]   *See* A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment* (Kluwer Law International 2009), p. 268-69 (Ex. R-57); *Opinions of the Public International Law Directorate of the Swiss Federal Political Department* (*Mémoire de la Direction du Droit International Public du Département Politique Fédéral*), in L. Caflisch, *La pratique suisse en matière de droit international public*, p. 178 (Ex. R-74).

[599]   Respondent's Rejoinder, paras 119, 126. At Respondent's Rejoinder, para. 120, the Respondent also responds to the Claimants' interpretation of Swiss government policy, under which both the customary and

and that arbitral tribunals upholding an expansive interpretation of FET were acting contrary to their intentions.[600] In the Respondent's view, its authorities[601] disprove the Claimants' contention that "customary international law has moved on considerably since *Neer*…and the modern customary minimum now approaches, if not equals, the full scope of the modern FET standard."[602] First and foremost, the Claimants' view is not supported by the consensus necessary to constitute a rule of customary international law as established in the *North Sea Continental Shelf* case.[603] Also, the Respondent explains that if there was no difference between the Claimants' broad concept of FET and the minimum customary standard, there would have been no reason for the NAFTA countries to enter an interpretive statement clarifying that such is not the case.[604]

438.   According to the Respondent, even if the Claimants' broader FET standard applied, in the absence of a specific commitment by the State, this could not deprive the State of its inherent sovereign right to regulate the conduct of business within its borders, and an investor cannot assume that there will be no adverse changes in law or policy affecting its investment.[605] A similar approach

---

the broad FET standards are promoted, by highlighting that no such affirmation is made (*see* Statement of Reply, fn. 296, citing *Opinions of the Public International Law Directorate of the Swiss Federal Political Department* (*Mémoire de la Direction du Droit International Public du Département Politique Fédéral*), in L. Caflisch, *La pratique suisse en matière de droit international public*, p. 178 (Ex. R-74). Likewise, the Respondent is critical about the Claimants' reliance on Professor Mann to contend that the minimum treatment envisaged by FET goes beyond the minimum standard (*see* Statement of Reply, para. 153, citing F.A. Mann, 'British Treaties for the Promotion and Protection of Investments' (1981) 52 The British Yearbook of International Law 241, p. 244 (Ex. CL-56). According to the Respondent, Professor Mann's subsequent writings directly contradict this view. *See* Respondent's Rejoinder, para. 121, citing F.A. Mann, *The Legal Aspect of Money* (5th Edition, OUP 1992), p. 510 (Ex. R-161).

[600]   Respondent's Rejoinder, para. 119.

[601]   *See supra*, fn. 599.

[602]   Respondent's Rejoinder, paras 123-27, referring to Statement of Reply, para. 159(b).

[603]   Respondent's Rejoinder, paras 126-27, citing North Sea Continental Shelf, Judgment, I.C.J. Reports 1969, p. 3, paras 74 and 77, which notes that "[n]ot only must the acts concerned amount to a settled practice, but they must also be such, or be carried out in such a way, as to be evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it."

[604]   Respondent's Rejoinder, para. 122.

[605]   *See* Statement of Defence, para. 130; Respondent's Rejoinder, para. 129, citing, *inter alia*, *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, paras. 284, 305 (Ex. CL-31); *Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010, paras. 117, 309(b) (Ex. CL-36); *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras. 368, 371 (Ex. CL-11); *Parkerings-Compagniet A.S. v. Lithuania*, ICSID Case No. ARB/05/8, Award, 2007, paras. 332, 344; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 2009, para. 217; Restatement (Third) on Foreign Relations Law, 1987, para. 712(g) (Ex. CL-46); A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment* (Kluwer Law International 2009), p. 282 (Ex. R-57); J. Crawford, 'Treaty and Contract in Investment Arbitration' (2008) 24(3) Arbitration International 351, p. 373 (Ex. R-92).

is taken by Indian law,[606] which governs the Devas Agreement.[607] As the Supreme Court of India has held, there is a distinction between "legitimate expectations" and "a wish, a desire or a hope."[608] Accordingly, no claim for violation of legitimate expectations can be made where the Government's decision is a matter of policy in accordance with public interest[609] "unless, in a given case, the decision or action taken amounts to an abuse of power."[610]

### 2. The Alleged Violation of the FET Standard

#### a. The Claimants' Position

439. The Claimants argue that, throughout DOS' approval and repeated endorsement of the Devas Agreement, which carried the full imprimatur of the Government of India,[611] the Respondent created the legitimate expectation that Devas had a non-pre-emptible, exclusive right to use the S-band and operate the Devas system, and therefore that the State would not seek to undermine the Devas Agreement.[612] Many of these assurances were made directly to the Claimants, and were thus plainly intended to induce the Claimants to inject capital.[613]

440. According to the Claimants, the Respondent thereafter fabricated a *force majeure* decision to try to mask a deliberate revocation of the Devas Agreement,[614] making only abrupt, "ambush" announcements regarding its intentions.[615] The Claimants allege that their legitimate expectations

---

[606]    Statement of Defence, paras. 131-32.

[607]    Devas Agreement, Article 19 (Ex. R-1/JCB-37).

[608]    *Union of India and others v. Hindustan Development Corpn. and others*, Supreme Court of India, Order, 1993, AIR 1994 SC 998, para. 29 (Ex. R-94); *Monnet Ispat and Energy Ltd. v. Union of India (UOI) and Ors*, Judgment, 2012, 11 SCC 1, para. 153(iii) (Ex. R-96).

[609]    *PTR Exports (Madras) Pvt. Ltd. and others v. The Union of India and others*, Supreme Court of India, Order, 9 May 1996, AIR 1996 SC 3461, paras 3-5 (Ex. R-95); *Monnet Ispat and Energy Ltd. v. Union of India (UOI) and Ors*, Judgment, 2012, 11 SCC 1, para. 153(iv) (Ex. R-96). *See also* Respondent's Rejoinder, para. 129, citing *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 305 (Ex. CL-31).

[610]    *Union of India and others v. Hindustan Development Corpn. and others*, Supreme Court of India, Order, 1993, AIR 1994 SC 998, para. 34 (Ex. R-94).

[611]    Statement of Claim, para. 210; Statement of Reply, para. 163, citing *White Industries Australia Ltd. v. India*, UNCITRAL, Final Award, 2011, para. 10.3.7 (Ex. CL-38).

[612]    Statement of Reply, para. 164.

[613]    Statement of Claim, para. 210; Statement of Reply, para. 163.

[614]    Statement of Reply, para. 166.

[615]    *See supra*, Chapter III - E.

in connection with their investment in Devas were completely subverted by these actions.[616] Such conduct, the Claimants argue, constitutes an abuse of regulatory discretion seeking to destroy the agreed legal framework for the investment,[617] not only in violation of the duty to act transparently and consistently[618] but also against good faith.[619]

441.    The Claimants also argue that the Respondent's conduct unjustly enriched the State at the expense of the investor—a recognized indicia of unfair and inequitable conduct.[620] The Claimants underline that the bad faith conduct of the Government of India has been compounded by harassing measures in order to punish Devas and the Claimants for exercising their respective rights.[621] All of these actions undertaken by the Respondent constitute a violation of the FET standard embodied in Article 4(1) of the Treaty.[622]

### b.    The Respondent's Position

442.    The Respondent's stance is that the Claimants' FET claims would not have merit even under their broad interpretation of the FET provision of the Treaty[623] and are an attempt to fill *pro forma* the hole in their expropriation case.[624]

443.    The Respondent avers that the Claimants' "legitimate expectations" are based on a number of mistaken assumptions[625] and ignore various key facts. First, the Government of India was not a party to the Devas Agreement, but a regulator, and no commitment or stabilization clause prevented it from taking policy decisions that might affect the Devas Agreement.[626] Second, the

---

[616]    Statement of Claim, para. 209; Statement of Reply, para. 165.

[617]    Statement of Reply, para. 168, citing *AWG Group v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 236.

[618]    Statement of Claim, para. 212, citing *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 309 (Ex. CL-31). *See also* Statement of Reply, para. 163.

[619]    Statement of Reply, para. 167.

[620]    Statement of Claim, para. 211, citing *Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010, para. 112 (Ex. CL-36).

[621]    Statement of Claim, para. 213, citing *Desert Line Projects LLC v. Yemen*, ICSID Case No. ARB/05/17, Award, 2008, paras. 186-94 (Ex. CL-7). *See supra*, para. 157.

[622]    Statement of Claim, paras 208-13; Statement of Reply, paras 162-72.

[623]    Statement of Defence, paras 130-42; Respondent's Rejoinder, paras 129-33.

[624]    Respondent's Rejoinder, para. 133.

[625]    *See* Statement of Defence, para. 134.

[626]    Statement of Defence, para. 138; Respondent's Rejoinder, paras 129, 131-32, citing, *inter alia*, *Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010, para. 117 (Ex. CL-36); *EDF (Services)*

S-band spectrum could not be used for terrestrial communications under current Indian regulations and policies.[627] Third, the Government of India could not issue a license for the terrestrial component of the proposed Devas Services without auction, in contravention of TRAI policy.[628] Finally, the Devas Agreement itself set forth a comprehensive scheme for its potential termination, which had been thoroughly negotiated and provided for nothing but the refund of the paid upfront capacity reservation fees if it were invoked.[629]

444. The Respondent then denies that the Government of India fabricated "a sham '*force majeure*' decision to try to mask a deliberate revocation of the [Devas Agreement]."[630] Such an allegation ignores the extensive documentary record recalling the extensive deliberation process[631] establishing the basis for the Government of India's decision to reserve S-band for national security purposes,[632] as well as the terms and conditions of the Devas Agreement itself.[633] It would also require the Tribunal to assume the *mala fide* of the Government of India when acting in its official capacity, which is improper as a matter of law.[634]

445. Furthermore, the Respondent notes that the Claimants do not point to any fact to support the allegation that its conduct "unjustly enriched the state at the expense of the investor."[635] The Claimants stance cannot prevail because (i) the Claimants had no acquired rights in this case; and (ii) the State did not take the policy decision to enrich itself, as the S-band was reserved for non-commercial, strategic purposes.[636]

---

*Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 2009, para. 217; *Parkerings-Compagniet A.S. v. Lithuania,* ICSID Case No. ARB/05/8, Award, 2007, para. 332.

[627]  *See supra,* paras 177-179.

[628]  *See supra,* paras 177-179.

[629]  Devas Agreement, Article 7 (Ex. R-1). *See* Statement of Defence, para. 136; *see supra*, para. 95.

[630]  Statement of Defence, para. 137, referring to Statement of Claim, para. 209.

[631]  *See supra*, Chapter III - E.

[632]  *See supra*, para. 304.

[633]  *See* Devas Agreement, Article 11 (Ex. R-1).

[634]  Statement of Defence, para. 137, fn. 323; Respondent's Rejoinder, para. 130; Transcript, Day 5, 1301:23-1308:13. *See,* for instance, *Lake Lanoux Arbitration (France v. Spain)*, Award, 1957, p. 126 (Ex. R-98); *Tacna-Arica Question (Chile, Peru)*, Opinion and Award, 1925, p. 930 (Ex. R-99).

[635]  Statement of Defence, para. 139, referring to Statement of Claim, para. 211.

[636]  Statement of Defence, para. 139. *See Total S.A. v. Argentina*, ICSID Case No. ARB/04/1, Decision on Liability, 2010, para. 112 (Ex. CL-36); *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 368 (Ex. CL-11).

446. The Respondent finally argues that Government officials requesting corporate information or conducting tax audits cannot be legitimately said to be acting "in bad faith."[637] Also, the Claimants have shown that they are perfectly capable of exercising the right to seek a remedy for such allegedly improper investigations in the appropriate courts of India.[638]

## B.   THE TRIBUNAL'S ANALYSIS

447. The Tribunal has concluded that the Claimants made a qualifying investment under the Treaty but that the Respondent was partly justified in invoking Article 11(3) of the Treaty and thereby ordering Antrix to annul its contract with Devas.

448. This being said, Devas had between February 7, 2006 and February 17, 2011 a valid and effective contract with Antrix, and the Claimants were entitled to the protections of the Treaty.

449. Article 4(1) of the Treaty reads:

> Investments and returns of investors of either Contracting Parties shall at all times be accorded fair and equitable treatment in the territory of the other Contracting Party. Neither Contracting Party shall in any way impair by unreasonable or discriminatory measures the management, maintenance, enjoyment or disposal of investments in its territory by investors of the other Contracting Party.

450. For the purpose of this section of this Award, the Tribunal will concentrate on the first sentence of this Article. The question therefore is: were the Claimants granted fair and equitable treatment between February 7, 2006 and February 17, 2011?

451. The Parties spent some considerable time debating whether the FET clause under Article 4(1) was limited to the minimum standard of treatment under customary international law.

452. According to the Respondent, there is nothing in the language of the Treaty or in its *travaux préparatoires* which would incorporate anything beyond the minimum standard of treatment under customary international law. It refers to the 1969 OECD Draft Convention on the Protection of Foreign Property which in one of its comments states that "the standard required conforms in effect to the 'minimum standard' which forms part of customary international law."[639] The Respondent also quotes a number of commentators and arbitral awards criticizing an expansive interpretation of the FET concept beyond the minimum standard provided under customary

---

[637]   Statement of Defence, para. 141, fn. 323.

[638]   *Id.*, para. 141, referring to Viswanathan I, paras 218-19, 222; Respondent's Rejoinder, para. 130.

[639]   Draft Convention on the Protection of Foreign Property, OECD, Article 1 and Notes and Comments to Article 1 (Ex. R-73).

international law.[640] It also notes that some countries have introduced a clear statement in their model BITs to the effect that FET is to be determined in accordance with the customary international law minimum standard.

453.   In the Respondent's view, the standard expressed in the 1926 Opinion of the Mexico-US General Claims Commission in the *Neer v. Mexico* case[641] remains valid at least in terms of requiring an extremely high threshold.[642] The *Neer* standard was to the effect that, in order to constitute a breach of customary international law, the treatment of an alien "should amount to an outrage, to bad faith, to wilful neglect of duty, or to insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency." It quotes, in support, a few (mainly NAFTA) arbitral awards.[643]

454.   In any event, says the Respondent, no violation of the FET standard occurred in this case, even under an expansive interpretation of it. Citing a number of authors, arbitral awards and Indian judgments, it argues that (i) an FET obligation cannot, absent a specific commitment by the State, deprive the State of its inherent sovereign right to regulate the conduct of business within its borders; (ii) the mere existence of a BIT is no substitute for such a commitment; (iii) absent such a specific commitment, an investor cannot assume that there will be no adverse changes in law or policy affecting its investment; and (iv) hopes and dreams are not legitimate expectations.[644]

455.    As to the Claimants, they counter, referring also to a number of arbitral awards and commentaries that (i) the FET obligation means more than the minimum standard of treatment under customary international law as presented by the Respondent;[645] (ii) that the Respondent's invocation of the customary minimum treatment standard is unavailing, as it assumes a material distinction in practice between the FET standard and the obligations it owes under customary international

---

[640]   Statement of Defence, para. 125.

[641]   *See L.F.H. Neer and Pauline E. Neer v. Mexico*, Mexico-U.S. General Claims Commission, Docket No. 136, Opinion, 15 October 1926 (1927) 21 The American Journal Of International Law 555, p. 556 (Ex. R-88).

[642]   Statement of Defence, para. 128.

[643]   *Id.*, para. 128.

[644]   *Id.*, para. 130.

[645]   Statement of Reply, paras 142-149.

law;[646] and (iii), on any view, Article 4(1) creates a higher level of investment protection than the 1926 *Neer* standard invoked by the Respondent.[647]

456.  On this debate, the Tribunal shares the view expressed in *El Paso:*

> The Tribunal considers this discussion to be somewhat futile, as the scope and content of the minimum standard of international law is as little defined as the BIT's FET standard, and as the true question is to decide what substantive protection is granted to foreign investors through the FET. The issue is not one of comparing two undefined or weakly defined standards; it is to ascertain the content and define the BIT standard of fair and equitable treatment.[648]

457.  The Tribunal does not subscribe to the view that, today, a violation of the customary minimum standard was frozen as defined in *Neer* "to an outrage, to bad faith, to wilful neglect of duty, or to insufficiency of governmental action so far short of international standards that every reasonable and impartial man would readily recognize its insufficiency."[649] It is now generally recognized that customary international law has evolved since 1926, some awards giving the required minimum treatment a wider interpretation than others.[650] FET in the Treaty, as in most other treaties, is not defined and the Treaty contains no wording limiting its scope and content to some external standard, whether it be international customary law or something else. In determining that scope and content, the Tribunal must rely on Article 31 of the VCLT,[651] which requires a treaty to be "interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

---

[646]   *Id.*, paras 150-157.

[647]   *Id.*, paras 158-161.

[648]   *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 335 (Ex. CL-11).

[649]   *L.F.H. Neer and Pauline E. Neer v. Mexico*, Mexico-U.S. General Claims Commission, Docket No. 136, Opinion, 15 October 1926 (1927) 21 The American Journal Of International Law 555, p. 556 (Ex. R-88).

[650]   The formulation may vary somewhat (e.g., *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, para. 284: "The Treaty standard of fair and equitable treatment (…) is not different from the international law minimum standard and its evolution under customary international law"; *Azurix v. Argentina*, ICSID Case No. ARB/01/12, Award, 2006, para. 361, after stating that FET and full protection and security permits an interpretation setting "higher standards than required by international law," goes on to say that the Tribunal "considers that its content is substantially similar whether the terms are interpreted in their ordinary meaning, as required by the Vienna Convention, or in accordance with customary international law." However, it is now well established that the concept of the minimum standard of customary law cannot be equated with the *Neer* description of it.

[651]   Vienna Convention on the Law of Treaties, Article 31(1), done on May 23, 1969, 1155 U.N.T.S., 331.

458.   As stated in *El Paso*, "the legitimate expectations of the investors have generally been considered central in the definition of FET, whatever its scope."[652] There is an overwhelming trend to consider the touchstone of fair and equitable treatment to be found in the legitimate and reasonable expectations of the parties, which derive from the obligation of good faith. This has been aptly stated by the tribunal in *Waste Management II:* "In applying this standard it is relevant that the treatment is in breach of representations made by the Host State which were reasonably relied on by the claimant."[653] And the tribunal in *Saluka* reiterated the same idea, when stating: "The standard of 'fair and equitable treatment' is therefore closely tied to the notion of legitimate expectations which is the dominant element of that standard."[654]

459.   A number of cases mentioned by each Party (quoting different sections) reached a similar conclusion.

460.   In *Suez/AWG*,[655] the tribunal, by majority, held that the FET standard is breached when a State "frustrates or thwarts" the "legitimate expectations" on which an investment was based.

461.   In *Bayindir*,[656] the tribunal stated that the FET imposes the "obligation to act transparently and grant due process, to refrain from taking arbitrary or discriminatory measures, from exercising coercion or from frustrating the investor's legitimate expectations with respect to the legal framework affecting the investment."

462.   In *CMS*,[657] the tribunal described the FET standard as "inseparable from stability and predictability" and held that "this is an objective requirement unrelated to whether the Respondent had any deliberate intention or bad faith in adopting the measures in question." The annulment committee in that case[658] addressing this part of the award, declared that "it was adequately

---

[652]   *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 348 (Ex. CL-11).

[653]   *Waste Management, Inc. v. Mexico* ("Number 2"), ICSID Case No. ARB(AF)/00/3, Award, 2004, para. 98.

[654]   *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 302 (Ex. CL-31).

[655]   *Suez, Sociedad General de Aguas de Barcelona, S.A. and Vivendi Universal, S.A. v. Argentina*, ICSID Case No. ARB/03/19, Decision on Liability, 2010; *AWG Group Ltd. v. Argentina*, UNCITRAL, Decision on Liability, 2010, para. 223.

[656]   *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 2009, para. 178.

[657]   *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, paras. 276-280.

[658]   *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Decision on Annulment, 2007, paras 85, 89.

founded on the applicable law and the relevant facts" and added that "legitimate expectations …
may be relevant to the application of the fair and equitable treatment clause."

463.   The Tribunal need not enter into a lengthy discussion of the concept and scope of the FET standard
in general. Suffice it to say for the purpose of this case that, whatever the scope of the FET
standard, the legitimate expectations of the investors have generally been considered central to its
definition. That concept however is not unlimited. Thus, the Claimants could not have had
legitimate expectations that Article 11(3) of the Treaty would never be invoked. That provision
was in full effect at the time of the signing of the Agreement in 2006 and no clause in that
Agreement or any subsequent statement by the Respondent would indicate that the Claimants
would be protected from the invocation of that provision of the Treaty. In that respect, the Tribunal
has already found that 60% of the Respondent's decision validly relied on the protection of its
essential security interests under Article 11(3) of the Treaty, while 40% would come under the
expropriation provision of its Article 6.

464.   As mentioned in the *El Paso* case,[659] FET is an objective concept; it is the result of interests and
rights of both the investor and the State and the result of such balancing may vary with the
circumstances. In that context, transparency and good faith are key factors.

465.   Independently of the text of the Devas Agreement,[660] the Claimants were entitled to legitimate
expectations that, in accordance with the text of the Treaty as well as under a general obligation
under international law, the Respondent would deal with them in good faith.

466.   The preamble of the Treaty mentions the desire of the Contracting Parties "to create favourable
conditions for greater flow of investments." In Article 3(2), it states that "[e]ach Contracting Party
shall in accordance with its laws render assistance to the investors of the other Contracting Party,
whose investments were made in its territory, for obtaining the required clearances and
permissions." To these general statements must be added the provisions of Articles 4 and 6 of the

---

[659]   *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, paras 356-365
(Ex. CL-11).

[660]   Article 21 of the Devas Agreement states: "The Parties hereby agree that they intend to discharge their
obligations in utmost good faith. They therefore agree that they will, at all times, act in good faith and make
all attempts to resolve all differences however arising out of or in connection with this Agreement by
discussion." Similarly, Exhibit B of the Devas Agreement states in Articles 3.1.1.1 and 3.1.1.2: "However,
immediately following the launch failure or total satellite failure, if ANTRIX has sufficient reasons to
believe that the implementation of accelerated schedule is not feasible, both parties will discuss in good
faith to arrive at a mutually acceptable solution." (Ex R-1/JCB -37).

Treaty dealing with the treatment of investments and expropriation which have already been extensively considered in this award.

467. If one searches for a general obligation of good faith under international law, one need not go further than the Vienna Convention on the Law of Treaties in which one can find no less than five mentions of the requirement of good faith.[661] This principle of good faith is not only self-standing, but it also stems from the concept of FET. In this regard, the Tribunal agrees with the *Tecmed* panel that "the commitment of fair and equitable treatment… is an expression and part of the bona fide principle recognized in international law."[662] However, this does not mean that every violation of FET by a State requires bad faith.[663] The good faith principle may simply require that the foreign investment must be treated in a manner such that it "will not affect the basic expectations that were taken into account by foreign investor to make the investment."[664]

468. Reviewing the facts of this case, the Tribunal must conclude that, if the Respondent had acted in good faith, it would have informed the Claimants about the decision of the Space Commission of 2 July 2010 to annul the Agreement. Unfortunately, nothing of the sort occurred; in fact, the evidence shows that right up to February 8, 2011, the Claimants were completely left in the dark about the Space Commission's decision and the alleged growing needs of the military and their possible impact on the Agreement; apart from notices that there were delays in the launching of the satellite, there were no signals from the Respondent, all along, that the Agreement might be challenged or modified. This includes a number of meetings with senior officials (including one with the National Security Advisor to the Prime Minister on June 22, 2010) and Government Ministers and various correspondence, as well as the assurance given by Dr. Radhakrishnan during a meeting in Prague on September 29, 2010, that the GSAT-6 satellite would be shipped

---

[661] VCLT, Preamble, Articles 26, 31, 46(2), 69. India has not acceded to the VCLT; nonetheless, it is recognized that Articles 31 and 32 of the VCLT reflect the customary international law regarding international treaty provisions. See *Dispute Regarding Navigational & Related Rights (Costa Rica v. Nicaragua)*, Judgment, 2009 I.C.J. Rep. 213, at 237, para. 47 and *Saluka Invs. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 296.

[662] *Técnicas Medioambientales Tecmed, S.A. v. Mexico*, ICSID Case No. ARB (AF)/00/2, Award, 2003, para. 153.

[663] *See Mondev International Ltd. v. United States of America*, ICSID Case No. ARB (AF)/99/2, Award, 2002, para. 116; *Occidental Exploration and Production Company v. Ecuador*, LCIA Case No. UN3467, Award, 2004, para. 186; *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, para. 280; *El Paso Energy International Co. v. Argentina*, ICSID Case No. ARB/03/15, Award, 2011, para. 372 (Ex. CL-11).

[664] *Técnicas Medioambientales Tecmed, S.A. v. Mexico*, ICSID Case No. ARB (AF)/00/2, Award, 2003, para. 154; *Sempra Energy International v. The Argentine Republic*, ICSID Case No. ARB/02/16, Award, 2007, para. 298.

in early December 2010.[665] The Tribunal has unchallenged evidence that at none of those meetings did the Respondent indicate that the Space Commission had decided to annul the Devas Agreement or that that there were competing military or other societal needs for the S-band spectrum which had been allocated to Devas.

469.  It would be to no avail for the Respondent to argue that such strategic information could not be communicated to the Claimants. Indeed, the required disclosure would not entail informing the Claimants of the nature of those needs or revealing any secret information. The Respondent could and should have simply informed the Claimants that the Agreement was in jeopardy because of societal and strategic needs; it would then have been up to the Claimants to decide how much financial and other resources they were willing to put at risk in that context or to propose to the Respondent possible alternative solutions.

470.  Leaving aside the requirement of "utmost good faith" contained in the Agreement, the Respondent's conduct constitutes a clear breach of the simple good faith required under international law and the FET clause of Article 2 of the Treaty; the Respondent must be liable for this wrongful behavior and must compensate the Claimants for damages that they may have suffered thereby from July 2, 2010 to February 17, 2011, the date of the CCS decision. The Respondent's liability subsequent to that decision has been addressed earlier in this award.

471.  As to the Claimants' argument that, by its conduct, the Respondent's unjustly enriched itself, it need not be separately addressed, taking into account the Tribunal's decision concerning expropriation and the breach of good faith under the FET provision of the Treaty.

472.  As to the alleged harassing measures that the Respondent would have taken, the Tribunal has not received sufficient evidence to conclude that these measures were taken to punish the Claimants or Devas for exercising their respective rights. There is a world of difference between this case and the *Desert Line Projects LLC v. Yemen* upon which the Claimants rely, where the Tribunal held that a settlement agreement "was imposed onto the Claimant under physical and financial duress."[666]

---

[665]  Singh I, para. 64.

[666]  *Desert Line Projects LLC v. Yemen*, ICSID Case No. ARB/05/17, Award, 2008, para. 186.

## CHAPTER IX - UNREASONABLE OR DISCRIMINATORY MEASURES

### A.     THE PARTIES' ARGUMENTS

473.    Article 4(1) of the Treaty provides, in relevant part:

> (1) ….Neither Contracting Party shall in any way impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of investments in its territory by investors of the other Contracting Party.

#### *1.     The Claimants' Position*

474.    The Claimants aver that "the determination of reasonableness is in its essence a matter for the arbitrator's judgment,"[667] but they also identify a number of elements from which unreasonableness may be derived. First, a finding of unfair and inequitable treatment may derive in unreasonableness.[668] Second, reasonableness requires that the State's conduct "bears a reasonable relationship to some rational policy."[669] Third, "withdrawal of undertakings and assurances given in good faith to investors as an inducement to [them] making an [investment] is by definition unreasonable…."[670] Fourth, unreasonableness is a synonym for arbitrariness, as is also pleaded by the Respondent.[671] On these grounds, the Respondent's measures—consisting of the nullification of an investment on specious grounds through a fabricated and self-made *force majeure* in direct contravention of numerous prior State approvals and assurances of support— are plainly "unreasonable."[672]

475.    The Claimants further argue that, separately and independently, the Respondent's measures also violated Article 4(1) of the Treaty because they were "discriminatory," in that they deliberately targeted investors[673] precisely on the grounds of them being foreigners standing to gain from the

---

[667]    *BG Group Plc. v. Argentina*, UNCITRAL, Final Award, 2007, paras 342-43 (Ex. CL-3); *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 612 (Ex. CL-5).

[668]    *Rumeli Telekom A.S. v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 2008, para. 679 (Ex. CL-29).

[669]    *Id*.

[670]    *BG Group Plc. v. Argentina*, UNCITRAL, Final Award, 2007, para. 343 (Ex. CL-3).

[671]    *National Grid plc v. Argentina*, UNCITRAL, Award, 2008, para. 197.

[672]    Statement of Claim, para. 221.

[673]    *Id*., para. 223; *see CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 612 (Ex. CL-5); *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 347 (Ex. CL-31); *Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 2010, para. 261 (Ex. CL-21).

investment.[674] The Claimants stress that the Respondent has failed to respond to the documented evidence that has been submitted in support of this contention.[675]

### 2.   The Respondent's Position

476.  The Respondent submits that the term "unreasonable" in Article 4(1) of the Treaty is interchangeable with "arbitrary," which appears to be agreed by the Claimants.[676] In turn, the standard definition of arbitrariness is a "wilful disregard of due process of law, and act which shocks, or at least surprises, a sense of juridical propriety,"[677] or a "manifest impropriety."[678] The threshold of proof for arbitrary conduct is high, and the burden is on a claimant to meet that standard.[679] Conversely, a measure is reasonable when there is a rational policy to which the measure in question is reasonably related.[680] On this basis, the Respondent concludes that there was nothing improper, shocking or unreasonable in the Government of India's decision to reserve the S-band spectrum for non-commercial, strategic requirements in light of the nation's burgeoning security needs.[681]

477.  Further, the Respondent denies that these measures were discriminatory, since no "capricious, irrational or absurd differentiation in the treatment accorded to [the Claimants] as compared to other entities or sectors"[682] was present. The CCS reserved S-band for non-commercial, strategic use, prohibiting its use by all private parties, Indian and foreign.[683]

---

[674]  Statement of Claim, para. 222; Statement of Reply, para. 171; *See* Chaturvedi Report, March 12, 2011, para. 3.5.9 (App. KS-10).

[675]  Statement of Reply, para. 172.

[676]  Statement of Defence, para. 158; Respondent's Rejoinder, para. 135, citing *National Grid plc v. Argentina*, UNCITRAL, Award, 2008, para. 197.

[677]  Statement of Defence, para. 158, citing *Elettronica Sicula S.P.A. (ELSI)*, Judgment, I.C.J. Reports 1989, p. 15, para. 128. *See also Alex Genin, Eastern Credit Limited, Inc. and A.S. Baltoil v. Republic of Estonia*, ICSID Case No. ARB/99/2, Award, 2001, para. 371; *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, 2009, para. 303.

[678]  *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007, para. 281.

[679]  Statement of Defence, para. 161, citing A. Newcombe and L. Paradell, *Law and Practice of Investment Treaties: Standards of Treatment* (Kluwer Law International 2009), pp. 302-03 (Ex. R-57).

[680]  Statement of Defence, para. 162, citing *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 2010, para. 10.3.7-10.3.8.

[681]  Statement of Defence, paras 162-63; Respondent's Rejoinder, para. 135. *See supra*, para. 304; Anand I, paras 5-6.

[682]  *Enron Corp. and Ponderosa Assets, L.P. v. Argentina*, ICSID Case No. ARB/01/3, Award, 2007, para. 282.

[683]  Statement of Defence, para. 164; Respondent's Rejoinder, para. 136.

## B.    THE TRIBUNAL'S ANALYSIS

478.    According to the Claimants, its case—"featuring covert action to undermine a contract, a bogus 'policy' decision engineered towards commercial ends, and an insincere after-the-fact attempt to justify these self-interested actions under the mantra of 'security'—overwhelmingly proves a breach of Article 4(1)'s prohibition on 'unreasonable' actions."

479.    The Tribunal, by majority, has already concluded that, although extraneous factors may have played a role in the Respondent's decision, the Respondent had reasonable justification of military and other societal needs to take that decision partly under Article 11(3) and partly under Article 6 of the Treaty.

480.    The Claimants also argue, quoting the *BG Group* award[684] that this case involves the "withdrawal of undertakings and assurances given in good faith to investors as an inducement to their making investments" and that such action is "by definition unreasonable and a breach of the Treaty."[685] In that particular respect, the Claimants are on more solid ground and the Tribunal has already covered this issue above when discussing good faith and transparency. As demonstrated in a number of arbitral awards, while FET may have a broader meaning than "unreasonable or discriminatory measures," such measures would automatically constitute a breach of FET.[686]

481.    As to the argument about discrimination, the Claimants refer to statements made by officials after the nullification of the Agreement, in which they sought to justify their actions on the grounds that foreigners might have profited from the Devas system and some reference to that argument can be found in documents anterior to the Government decision.

482.    However, looking at the Space Commission Note for the Cabinet Committee on Security,[687] one can find a few references to foreign ownership but there is no suggestion that the Devas Agreement should be annulled because of that fact. Thus, in Article 2 of that Note, the Commission refers to the SATCOM policy approved by the Government of India on June 24,

---

[684]    *BG Group Plc. v. Argentina*, UNCITRAL, Final Award, 2007, paras 342-43.

[685]    Statement of Reply, para. 170.

[686]    *See, inter alia, CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB/01/8, Award, 2005, para. 290; *Saluka Investments. B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2006, para. 460 (Ex. CL-31); *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 2008, paras. 679-81; *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Liability, 2010, paras. 259, 418.

[687]    Department of Space, Note for the Cabinet Committee on Security, Annulling the "Agreement for the Lease of Space Segment Capacity on ISRO/Antrix S-Band Spacecraft by Devas Multimedia Pvt Ltd.," February 16, 2011 (Ex. C-229/R-22/JCB-219).

1997, which authorized foreign parties to lease INSAT capacity. In Article 37, there is a mention that, among other subjects, the Commission, at its July 2, 2010 meeting, deliberated on foreign equity in Devas but the minutes of that meeting merely state that the Chairman answered these various queries.[688] Elsewhere in these minutes, it is stated:

> Noting that ICC has not met since 2004, Commission suggested for reviving the ICC mechanism immediately. Also, as the activities of the Antrix have grown in the recent past involving execution of several contracts, and many of them with foreign parties, Commission suggested to set up a mechanism to review the structure and functioning of Antrix with a view to enhance the efficiency and to ensure due diligence of financial, contractual and legal aspects.[689]

483.   That suggestion is restated in the Space Commission Note to the CCS.[690] The same recommendation is made in the Note to the Space Commission. But, even more significantly, nowhere in the publication, on February 17, 2011,[691] of the CCS decision is there any indication that foreign ownership may have played any role in its conclusion that the S-band should be reserved for non-commercial purposes and that the Devas Agreement should be annulled.

484.   The claim under Article 4(1) of the Treaty is therefore rejected.

## CHAPTER X - MOST-FAVOURED-NATION TREATMENT

485.   Paragraphs 2 and 3 of Article 4 of the Treaty provide as follows:

> (2)    Each Contracting Party shall accord to investments of investors of the other Contracting Party, treatment which shall not be less favorable than that accorded either to investments of its own or investments of investors of any third State.

> (3)    In addition, each Contracting Party shall accord to investors of the other Contracting Party, including in respect of returns on their investments, treatment which shall not be less favorable than that accorded to investors of any third State.

---

[688]   *Id*., Annexure 5, para. 117.6.10.

[689]   *Id*., Annexure 5, para. 117.6.9.

[690]   *Id*., paras. 41 and 42.

[691]   Press Information Bureau, Government of India, CCS Decides to Annul Antrix-Devas Deal, February 17, 2011, available at pib.nic.in (C-134/R-35/JCB-220).

## A.   THE PARTIES' ARGUMENTS

486.   The Claimants' position is that, pursuant to the most favored nation ("**MFN**") clauses in paragraphs 2 and 3 of Articles 4 of the Treaty, they are entitled to the protections set forth in Article 3(2) of the Serbia-India BIT,[692] which provides as follows:

> (2)     Investments and returns of investors of each Contracting Party shall at all times be accorded fair and equitable treatment in the territory of the other Contracting Party and shall enjoy full legal protection and security.[693]

487.   The Respondent's main contention is that the MFN clauses in the Treaty cannot be relied upon by the Claimants to create an entirely new right as the one embodied in Article 3(2) of the Serbia-India BIT.[694] Even if it were possible, there would be no breach of the full legal protection and security clause of the Serbia-India BIT on the facts of the case.

### 1.   *The Possibility of Importing the 'Full Legal Protection and Security' Clause of the Serbia-India BIT*

#### a.   **The Claimants' Position**

488.   The Claimants submit, following the reasoning of the tribunal in *White Industries v. India,* that the '"full legal protection and security' clause of Article 3(2) of the Serbia-India BIT, which they seek to import, is a 'more favorable substantive provision…in a third party treaty,'"[695] which, by the plain terms of Article 4(2) and (3), is importable.[696] According to the Claimants, this approach is fully consistent with numerous arbitral decisions,[697] and must be distinguished from importing

---

[692]   Notice of Arbitration, para. 75; Statement of Claim, paras 224-25; Statement of Reply, paras 173-87. Throughout their Notice of Arbitration, the Claimants gave notice that, on the basis of Articles 4(2) and (3) of the Treaty, they would rely on several provisions of BITs signed between India and third countries. Their final position, recalled in this award, is different from the one expressed in the Notice of Arbitration. *See* Notice of Arbitration, paras 63, 70.

[693]   Agreement between The Government of The Republic Of India and The Federal Government of The Federal Republic of Yugoslavia for The Reciprocal Promotion and Protection of Investments, dated January 31, 2003, Article 3(2) (Ex. CL-40) (the "**Serbia-India BIT**").

[694]   Statement of Defence, paras 166-68; Respondent's Rejoinder, paras 137-39.

[695]   *White Industries Australia Ltd. v. India*, UNCITRAL, Final Award, 2011, para. 11.2.3 (Ex. CL-38).

[696]   Statement of Reply, paras 173-83.

[697]   *See* Statement of Reply, para. 177, citing *Rumeli Telekom A.S. v. Kazakhstan*, ICSID Case No. ARB/05/16, Award, 2008, paras 575, 681 (Ex. CL-29); *EDF International S.A. v. Argentina*, ICSID Case No. ARB/03/23, Award, 2012, paras 931-32; *MTD Equity Sdn Bhd, v. Chile*, ICSID Case No. ARB/01/7, Award, 2004, para. 104; *Bayindir Insaat Turizm Ticaret Ve Sanayi A.Ş. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 2009, paras 146-49, 165; *Arif v. Moldova*, ICSID Case No. ARB/11/23, Award, 2013, para. 396.

"an entirely new provision from another treaty," which is what the Respondent alleges the Claimants are attempting.[698]

489.   In the Claimants' view, the Respondent's claim that relying on the 'full protection and security' clause of the Serbia-India BIT would entail creating wholly new rights is based on selective quotations and misreading of a number of decisions, including *Paushok*[699] and *Hochtief*.[700] Whereas *Paushok* is of no assistance to India because the MFN clause at stake only extended MFN treatment in respect of the obligation to afford fair and equitable treatment,[701] *Hochtief* is, according to the Claimants, helpful to their own position. The claimant in *Hochtief* sought to rely, by means of an MFN clause, on a dispute resolution clause in a third party treaty which, unlike the applicable BIT, did not require the parties to litigate in the Argentine courts for 18 months before resorting to arbitration. The *Hochtief* tribunal allowed this importation because "the 18-month pre-arbitration litigation requirement should be regarded as a matter of the treatment of investors in exercising their rights in relation to dispute settlement and not as the subject of a distinct right."[702] Equally, the Claimants contend that, the 'full legal protection and security' clause of the Serbia-India BIT can be imported because both this BIT and the Treaty cover the same subject matter, i.e. the treatment of investments, meaning that the rights in the Serbia-India BIT are not "wholly distinct" from those in the Treaty.[703]

### b.   The Respondent's Position

490.   The Respondent avers that the Claimants' attempt to import an entirely new provision from another treaty would be improper because it would entail creating a standard that is not present in the applicable Treaty.[704] Investor-State tribunals, such as the ones in *Hochtief v. Argentina*,

---

[698]   Statement of Reply, para. 178, referring to Statement of Defence, para. 166.

[699]   *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. Mongolia*, UNCITRAL, Award on Jurisdiction and Liability, 2011, paras 362-3, 570-72.

[700]   *Hochtief Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction, 2011.

[701]   Statement of Reply, para. 180, citing *Sergei Paushok, CJSC Golden East Company and CJSC Vostokneftegaz Company v. Mongolia*, UNCITRAL, Award on Jurisdiction and Liability, 2011, paras 361-62 (citing the Russia-Mongolia BIT, Article 3).

[702]   *Hochtief Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction, 2011, paras. 83-86.

[703]   Statement of Reply, para. 183.

[704]   Statement of Defence, paras 166-69; Respondent's Rejoinder, paras. 137-39.

*Paushok v. Mongolia* and *Accession Mezzanine v. Hungary*[705] have recognized that an MFN clause cannot be relied upon to create wholly new rights.[706]

### 2. *The Respondent's Alleged Violation of the 'Full Legal Protection and Security' Provision*

#### a. The Claimants' Position

491. The Claimants argue that the Respondent has breached the 'full legal protection and security' clause of Article 3(2) of the Serbia-India BIT, and, in turn, Article 4(2) and (3) of the Treaty.[707] This clause obligates the host State "to ensure that neither by amendment of its laws nor by actions of its administrative bodies is the agreed and approved security and protection of the foreign investor's investment withdrawn or devalued."[708] This standard has been violated by (i) the Indian Cabinet's actions, and other affirmative acts, which caused a "withdrawal and devaluation" of the investment, and (ii) the several government acts that served as a pretextual basis for annulling the Devas Agreement.[709]

492. The Claimants argue that *AES v. Hungary*, cited by India, does not lead to a different conclusion.[710] In that case the tribunal held that the respondent State had not breached the "most constant protection and security obligation" because it had acted "with a view to achieving objectively rational public policy goals." By contrast, the Respondent's measures leading to the annulment of the Devas Agreement were not aimed, in the Claimants' case, at a legitimate and objective policy goal.[711]

493. Finally, the Claimants argue that it is no answer to the Respondent to claim that, because the Devas Agreement contained a *force majeure* clause applicable in the case of "sovereign action," there was no "withdraw[al]" or "devaluat[ion]" of the "agreed and approved security and

---

[705]   *Accession Mezzanine Capital L.P. and Danubius Kereskedőház Vagyonkezelő Zrt. v. Hungary*, ICSID Case No. ARB/12/3, Decision on Respondent's Objection under Arbitration Rule 41(5), 2013, paras. 73-74.

[706]   *See Hochtief Aktiengesellschaft v. Argentine Republic*, ICSID Case No. ARB/07/31, Decision on Jurisdiction, 2011, para. 81.

[707]   Statement of Claim, paras. 224-25; Statement of Reply, paras. 184-86.

[708]   Statement of Claim, para. 224, citing *CME Czech Republic B.V. v. Czech Republic*, UNCITRAL, Partial Award, 2001, para. 613 (Ex. CL-5).

[709]   Statement of Claim, para. 225, Statement of Reply, para. 184.

[710]   Statement of Reply, para. 185, referring to Statement of Defence, paras 170-72.

[711]   Statement of Reply, para. 185.

protection" applicable to the Claimants' investment.[712] That clause did not give a license to Antrix to rely upon a self-generated *force majeure* defence.[713]

### b.   The Respondent's Position

494.  According to the Respondent, even if the Tribunal disregarded its argument that the 'full protection and security' clause of Article 3(2) of the Serbia-India BIT cannot be imported into the Treaty, there would still be no breach of such clause on the facts of the case because it cannot operate as a legal stabilization clause.[714] In the words of the *AES v. Hungary* tribunal:

> To conclude that the right to constant protection and security implies that no change in law that affects the investor's rights could take place, would be practically the same as to recognizing the existence of a non-existent stability agreement as a consequence of the full protection and security standard.[715]

495.  The Respondent then denies that the 'full security and protection' clause obligates the host State "to ensure that neither by amendment of its laws nor by actions of its administrative bodies is the agreed and approved security and protection of the foreign investor's investment withdrawn or devalued."[716] In the Respondent's view, it is unclear what "agreed and approved security" the Claimants refer to because the Devas Agreement made clear that the Government of India could take decisions in its sovereign capacity, without being limited by a stabilization clause.[717]

## B.   THE TRIBUNAL'S ANALYSIS

496.  As to the possibility of importing the "full protection and security" clause of the Serbia-India BIT, the Tribunal shares the views expressed by the Claimants concerning the possibility of importing the "full protection and security" clause of the Serbia-India BIT. The numerous arbitral awards mentioned by the Claimants and referred to above confirm that conclusion. Moreover, the three cases mentioned by the Respondent do not support its argument that accepting the importation of the relevant provision of the Serbia-India BIT would entail creating a standard that is not present in the applicable Treaty.

---

[712]   Statement of Reply, para. 186, referring to Statement of Defence, para. 171, fn. 387.

[713]   Statement of Reply, para. 186.

[714]   Statement of Defence, paras 170-72; Respondent's Rejoinder, paras 140-42.

[715]   *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 2010, para. 13.3.5.

[716]   *See* Statement of Claim, para. 224.

[717]   Statement of Defence, fn. 387; Respondent's Rejoinder, para. 142.

497.   As far as the alleged violation by the Respondent of the "full legal protection and security provision" is concerned, the Tribunal disagrees with the Claimants' conclusion.

498.   As to the State obligation under the FPS standard, it is generally described as an "obligation of vigilance and due diligence"[718] and it has generally been applied in the context of "use of force."[719]

499.   The nature of that provision has been aptly described in the *El Paso* award as "no more than the traditional obligation to protect aliens under international customary law and (that) it is a residual obligation provided for those cases in which the acts challenged may not in themselves be attributed to the Government, but to a third party."[720] If, on the other hand, the acts can be attributed to the Government, then the FET standard would apply.

500.   The Tribunal has already decided that the invocation of *force majeure* by Antrix is attributable to the State under Article 8 of the ILC Articles. The Claimants' claim under full protection and security is therefore rejected.

## CHAPTER XI - DECISIONS

501.   **For the reasons set out above, the Tribunal decides and awards as follows:**

(a)   **Unanimously, that the Claimants' claims relate to an "investment" protected under the Treaty;**

(b)   **Unanimously, that the notice of termination of the Devas Agreement sent by Antrix to Devas constituted an act of State attributable to the Respondent.**

---

[718]   *Técnicas Medioambientales Tecmed, S.A. v. Mexico,* ICSID Case No. ARB (AF) /00/02, Award, 2003, para. 177; *El Paso Energy International Company v. The Argentine Republic,* ICSID Case No. ARB/03/15, Award, 2011, paras 522-523; *Pantechniki S.A. Contractors & Engineers (Greece) v. The Republic of Albenia,* ICSID Case No. ARB/07/21, Award, 2009, paras 77 and 81.

[719]   *Saluka Investments B.V. (The Netherlands) v. the Czech Republic,* Partial Award, 2006, para. 483; *Asian Agricultural Products Ltd. (APPL) v. Sri Lanka,* ICSID Case No. ARB/87/3, Award, 1990, paras 46-53; *Wena Hotel Limited v. Egypt,* ICSID Case No. ARB/98/4, Award, 2000, para. 84; *Eastern Sugar v. The Czech Republic,* Arbitration Institute of the Stockholm Chamber of Commerce, Partial Award, 2007, para. 203.

[720]   *El Paso Energy International Company v. The Argentine Republic,* ICSID Case No. ARB/03/15, Award, 2011, para. 522.

(c)   **By majority, that the Tribunal lacks jurisdiction over the Claimants' claims insofar as the Respondent's decision to annul the Devas Agreement was in part directed to the protection of the Respondent's essential security interests;**

(d)   **By majority, that the Respondent has expropriated the Claimants' investment insofar as the Respondent's decision to annul the Devas Agreement was in part motivated by considerations other than the protection of the Respondent's essential security interests;**

(e)   **By majority, that the protection of essential security interests accounts for 60% of the Respondent's decision to annul the Devas Agreement, and that the compensation owed by the Respondent to the Claimants for the expropriation of their investment shall therefore be limited to 40% of the value of that investment;**

(f)   **Unanimously, that the Respondent has breached its obligation to accord fair and equitable treatment to the Claimants between July 2, 2010 and February 17, 2011.**

(g)   **Unanimously, that the Claimants' other claims shall be dismissed;**

(h)   **Unanimously, that any decision regarding the quantification of compensation or damages, as well as any decision regarding the allocation of the costs of arbitration, shall be reserved for a later stage of the proceedings.**

Place of Arbitration: The Hague, the Netherlands

Date of Award:  July 25, 2016

Mr. David R. Haigh, Q.C.
(Subject to the attached dissenting opinion)

The Honorable Shri Justice Anil Dev Singh

The Honorable Marc Lalonde, P.C., O.C., Q.C.
President