1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

DEVAS MULTIMEDIA PRIVATE
LTD.

                    Petitioner,

          v.

ANTRIX CORP. LTD.,

                    Respondent.

C18-1360 TSZ

ORDER

13    THIS MATTER comes before the Court on Petitioner Devas Multimedia Private

14  Ltd.'s Petition to Confirm Foreign Arbitral Award ("Petition"), docket no. 1.  Having

15  reviewed all papers filed in support of, and in opposition to, the Petition, *see* docket

16  nos. 1, 13, 22, 26, 41, & 43, and having held oral argument on October 14, 2020, the

17  Court now concludes that the Award should be confirmed for the reasons stated in this

18  Order.

19  **Background**

20    In January 2005, Petitioner, a corporation formed under the laws of the Republic

21  of India, and Respondent Antrix Corp. Ltd., a corporation wholly owned by the

22  Government of India, entered an agreement for the lease of "Space Segment Capacity on

23

ISRO/Antrix S-Band Spacecraft" ("Agreement"), in which Respondent agreed to build, launch, and operate two satellites and to make available 70 MHz of S-band spectrum to Petitioner.  Petition at ¶¶ 1–2, 7.  Article 20 of the Agreement contained a binding arbitration clause, providing in relevant part:

> a.      In the event of there being any dispute or difference between the Parties hereto as to any clause or provision of this Agreement . . . or otherwise in any way relating to this Agreement such dispute or difference shall be referred to the senior management of both Parties to resolve within three (3) weeks failing which it will be referred to an Arbit[r]al Tribunal comprising of three arbitrators, one to be appointed by each party (i.e. DEVAS and ANTRIX) and the arbitrators so appointed will appoint the third arbitrator.
>
> b.      The seat of Arbitration shall be at NEW DELHI in India.
>
> c.      The Arbitration proceedings shall be held in accordance with the rules and procedures of the ICC (International Chamber of Commerce) or UNCITRAL.
>
> . . . .
>
> f.      Any decision or award made by the board of Arbitration shall be final, binding and conclusive on the Parties and entitled to be enforced to the fullest extent permitted by Laws and entered in any court of competent jurisdiction.

Agreement, Ex. 3 to Hellmann Decl. (docket no. 2-1 at 124–25).

In February 2011, Respondent repudiated the Agreement, which allegedly "destroy[ed]" Petitioner's business.  Petition at ¶ 12.  To enforce its rights under the Agreement, in June 2011, Petitioner commenced arbitration proceedings in accordance with the Rules of Arbitration of the International Chamber of Commerce ("ICC").  *Id.* at ¶ 17.  Respondent initially refused to participate in the ICC arbitration and refused to nominate an arbitrator in connection with that arbitration. Supreme Court of India Judgment, Ex. 3 to Meehan Decl. (docket no. 15-1 at 24)  Instead, Respondent invoked the rules and procedures of UNCITRAL and nominated an arbitrator outside of the

ORDER - 2

ongoing ICC arbitration.  *Id.* at 25.  Respondent also filed a petition with the Supreme

Court of India pursuant to Section 11 of the India Arbitration and Conciliation Act of

1996 ("India Arbitration Act"), requesting that India's highest court order the parties to

proceed under the rules and procedures of UNCITRAL.  In May 2013, the Supreme

Court of India held:

> In view of the language of Article 20 of the Arbitration Agreement which provided that the arbitration would be held in accordance with the rules and procedures of the International Chamber of Commerce or UNCITRAL, [Petitioner] was entitled to invoke the Rules of Arbitration of the ICC for the conduct of the arbitration proceedings.
>
> . . . .
>
> Once the provisions of the ICC Rules of Arbitration had been invoked by [Petitioner], the proceedings initiated thereunder could not be interfered with [by Respondent] in a proceeding under Section 11 of the [India Arbitration Act].
>
> . . . .
>
> Where the parties had agreed that the procedure for the arbitration would be governed by the ICC Rules, the same would necessarily include the appointment of an Arbitral Tribunal in terms of the Arbitration Agreement and the said Rules.

Supreme Court of India Judgment, Ex. 3 to Meehan Decl. (docket no. 15-1 at 54–55).

In September 2015, a three-member ICC panel[1] based in New Delhi issued a final

arbitral award ("Award"), concluding that Respondent "wrongful[ly] repudiat[ed]" the

Agreement and awarding Petitioner $562.5 million plus interest.  Award, Ex. 1 to

Hellmann Decl. (docket no. 2-1 at 98).  That same month, Petitioner sought to enforce the

---

[1] The ICC panel was comprised of English barrister V.V. (Johnny) Veeder, Q.C., former Supreme Court of India Chief Justice Dr. A.S. Anand, and Professor Michael Pryles of Australia.  Joint Status Report (docket no. 39 at 3 & n.2).

ORDER - 3

1   Award in a court located in New Delhi; the following month, Respondent filed a petition

2   to set aside the Award in a different court, located in Bangalore.  Roy Decl. at ¶¶ 2–3

3   (docket no. 42).  The parties then proceeded to litigate which court—the one in New

4   Delhi or Bangalore—has jurisdiction over the proceedings concerning the parties'

5   Award.  *Id.* at ¶¶ 4–7.  To date, the jurisdictional issue remains unresolved.  *Id.* at ¶ 7;

6   Joint Status Report (docket no. 39 at 2).

7           Within three years of the Award being issued, in September 2018, Petitioner filed

8   the instant Petition, docket no. 1, to confirm the Award.  Respondent then filed a Motion

9   to Dismiss, docket no. 13.  The Court concluded that Respondent was subject to this

10  Court's personal jurisdiction pursuant to 28 U.S.C. § 1330(b), declined to otherwise

11  dismiss the case, and entered a one-year stay.  Minute Order (docket no. 28 at 2).

12          On September 17, 2020, the Court lifted the stay after considering the factors

13  identified in *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310 (2d Cir.

14  1998), giving substantial weight to the prolonged nature of the case and its indeterminate

15  resolution.  Order (docket no. 45 at 10–11).  The Court further concluded that the issues

16  raised in the Petition are ripe for consideration.  *Id.* at 11.

17  **Discussion**

18  **A.        Jurisdiction**

19          Confirmation of foreign arbitration awards is governed by the Convention on the

20  Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or

21  "Convention"), June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, and by federal law

22  implementing the Convention, 9 U.S.C. § 201.  The Court has jurisdiction over this

23

ORDER - 4

1  proceeding under 9 U.S.C. § 203 and under the Foreign Sovereign Immunities Act

2  ("FSIA"), 28 U.S.C. § 1330.  Although foreign states, such as Respondent, are generally

3  "immune from the jurisdiction of the courts of the United States," there is an exception

4  when a party seeks to confirm an arbitral award against the foreign state that is "governed

5  by a treaty or other international agreement in force for the United States calling for the

6  recognition and enforcement of arbitral awards."  28 U.S.C. §§ 1604, 1605(a)(6).

7          Respondent does not dispute that it is "an agency or instrumentality of a foreign

8  state," defined under FSIA as "any entity . . . which is a separate legal person, corporate

9  or otherwise, and which is the organ of a foreign state or political subdivision thereof, or

10  a majority of whose shares or other ownership interest is owned by a foreign state or

11  political subdivision thereof."  28 U.S.C. § 1603(b); *see* Motion to Dismiss (docket

12  no. 13 at 18).  Respondent also acknowledges the statutory basis for personal jurisdiction

13  under 28 U.S.C. § 1330(b), but it argues that the constitutional constraints of the Due

14  Process Clause preclude the Court's assertion of personal jurisdiction over it.  *Id.* at 18–

15  19.  The Court previously ruled in its Minute Order entered April 16, 2019, docket no.

16  28, that because Respondent is wholly owned and controlled by a foreign state, the Due

17  Process Clause does not apply and statutory personal jurisdiction under FSIA is all that is

18  required.  Minute Order (docket no. 28 at 1–2); *see First Inv. Corp. of Marshall Islands v.*

19  *Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 752 (5th Cir. 2012); *Frontera Res.*

20  *Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 400–01 (2d

21  Cir. 2009); *see also GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 815 (D.C. Cir.

22  2012) ("Whenever a foreign sovereign controls an instrumentality to such a degree that a

23

ORDER - 5

principal-agent relationship arises between them, the instrumentality receives the same

due process protection as the sovereign: none.").

Even if Respondent was entitled to due process protection, due process has been

satisfied in this case because Respondent possesses the requisite "minimum contacts"

with the United States. *See Gregorian v. Izvestia*, 871 F.2d 1515, 1529–30 (9th Cir.

1989) (holding that "the district court properly 'aggregated' all contacts with the United

States rather than only considering those contacts in California").  "Federal due process

permits a court to exercise personal jurisdiction over a nonresident defendant if that

defendant has at least minimum contacts with the forum such that the exercise of

jurisdiction does not offend traditional notions of fair play and substantial justice." *Glob.*

*Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101,

1106 (9th Cir. 2020) (internal quotation marks and citations omitted).  To assert that a

court has specific jurisdiction over a nonresident, as Petitioner does here, a party must

show (1) that "the non-resident defendant . . . purposefully direct[ed] his activities or

consummate[d] some transaction with the forum or resident thereof; or perform[ed] some

act by which he purposefully avail[ed] himself of the privilege of conducting activities in

the forum, thereby invoking the benefits and protections of its laws"; and (2) that "the

claim . . . arise[s] out of or is related to the defendant's forum-related activities." *Id.* at

1107 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir.

2004)).  The burden then shifts to the nonresident defendant "to 'present a compelling

case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting

*Schwarzenegger*, 374 F.3d at 802).

1    In this case, Respondent does not seriously dispute the underlying facts

2  establishing its contacts with the United States[2]—principally its long-term negotiations

3  with Forge Advisors, a Virginia-based consulting firm, which resulted in the

4  establishment of Petitioner's corporation and the execution of the Agreement. *See*

5  Award, Ex. 1 to Hellmann Decl. (docket no. 2-1 at 18–19).  Beginning in the summer of

6  2003, the former Chairman of Antrix and ISRO, Dr. Krishnaswamy Kasturirangan,

7  visited Washington D.C.; while there, he signed a memorandum of understanding with

8  Forge Advisors providing that Respondent had a "long-term objective" of building "a

9  strategic partnership that leverages Antrix's satellite & space capabilities to enable new

10 social & commercial applications." *Id.* at 18; March 2011 Report by Government of

11 India, Ex. 29 to Second Hellmann Decl. (docket no. 24 at 47).  In May 2004, Forge

12 Advisors made a presentation to the "ANTRIX/ISRO [Chairman] and senior officers of

13 ANTRIX/ISRO[]" and proposed the establishment of Devas.  March 2011 Report by

14 Government of India, Ex. 29 to Second Hellmann Decl. (docket no. 24 at 47–48).  After

15 Petitioner's company was established, at least five U.S. citizens served on its board of

16 directors, three of whom testified against Respondent in the underlying arbitrations.

17 Ahmad Supp. Decl. at ¶ 7 (docket no. 25); Second Hellmann Decl. at ¶ 3 (docket no. 24).

18 During negotiations of the Agreement, Petitioner's CEO, Ramachandran Viswanathan,

19 _____

20 [2] Respondent asks the Court to distinguish between Antrix and ISRO and argues that "ISRO's contacts with the United States cannot be attributed to Antrix for purposes of establishing personal jurisdiction over Antrix."  Reply (docket no. 26 at 10). Although the Court notes that "[a]t all relevant times, . . . the

21 Chairman of ISRO . . . and the Chairman of Antrix were the same person," Award, Ex. 1 to Hellmann Decl. (docket no. 2-1 at 16), it confines its analysis to Antrix's contacts with the United States.  *See*

22 *Gregorian*, 871 F.2d at 1530.

23

ORDER - 7

1    explained to "ISRO/Antrix" representatives that "Devas would need to raise immediate

2    and considerable outside venture capital . . . most likely from the United States."

3    Viswanathan Witness Statement, Ex. 28 to Second Hellmann Decl. (docket no. 24 at 31).

4    After the Agreement was executed, in September 2009, the new ISRO/Antrix Chairman,

5    Dr. G. Madhavan Nair, met with Petitioner's CEO and three of its U.S.-based directors in

6    Washington D.C. "to discuss the progress of the Devas project." *Id.* at 2, 35.

7        Considering the parties' entire course of dealing—beginning with Respondent's

8    relationship with Forge Advisors and culminating in the execution of the Agreement

9    between Respondent and Petitioner (an entity controlled in part by U.S.-based

10   directors)—the Court concludes that Respondent purposely availed itself of the privilege

11   of conducting business activities in the United States.  The U.S. Supreme Court has

12   "emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is

13   'ordinarily but an intermediate step serving to tie up prior business negotiations with

14   future consequences which themselves are the real object of the business transaction.'"

15   *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985) (citation omitted).  This

16   Court, in concluding that Respondent purposely established minimum contacts with the

17   United States, evaluates not just the terms of the Agreement itself, but also the parties'

18   "prior negotiations and contemplated future consequences, along with the . . . parties'

19   actual course of dealing."  *Id.*; *see also Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726

20   F.2d 1209, 1215–16 (7th Cir. 1984) (concluding exercise of personal jurisdiction over

21   defendant was proper because "the discussions that took place in [the forum] . . . played a

22   part in subsequent negotiations between [the parties], which led to the contract between

23

1  [the parties]").  Moreover, Respondent's dealing in the United States relates to the

2  execution of the parties' Agreement, the breach of which gave rise to the Award at issue

3  in this case.  *See Burger King*, 471 U.S. at 472–73.  Finally, it is not unreasonable for

4  Respondent "to expect that it would be haled into [this Court] to fulfill its obligations and

5  to account for the harm it foreseeably caused" to Petitioner.  *Glob. Commodities*, 972

6  F.3d at 1109; *see also Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172 (3d Cir. 2006)

7  (concluding "the fact that a proceeding was for the enforcement of an arbitral award,

8  rather than an adjudication on the merits, rightly colors [the court's minimum contacts]

9  analysis" and that "the desire to have portability of arbitral awards prevalent in the

10  Convention influences the answer as to whether [the respondent] 'reasonably

11  anticipate[d] being haled into'" the forum).  The Court's assertion of personal jurisdiction

12  over Respondent in this action is proper.[3]

13  **B.**    **The New York Convention**

14      Under the New York Convention, a "court shall confirm the award unless it finds

15  one of the grounds for refusal or deferral of recognition or enforcement of the award

16  specified in the . . . Convention."  9 U.S.C. § 207.  Article V of the Convention lists

17  seven grounds for refusing to confirm an award, two of which are relevant here:

18  •   "The composition of the arbitral authority or the arbitral procedure was not in
        accordance with the agreement of the parties . . . .";  and

19  •   "The recognition or enforcement of the award would be contrary to the public
        policy of that country."

20

21  _____

22  [3] For the reasons stated in its previous Minute Order, docket no. 28, the Court declines to dismiss this
    action based on the doctrine of forum non-conveniens.

23

ORDER - 9

1   New York Convention, T.I.A.S. No. 6997, art. V, §§ 1(d), 2(b).  These "defenses are

2   interpreted narrowly," and Respondent "has the burden of showing the existence of a

3   New York Convention defense."  *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 836

4   (9th Cir. 2010).  The Respondent's "burden is substantial because the public policy in

5   favor of international arbitration is strong."  *Id.*; *see Mitsubishi Motors Corps. v. Soler*

6   *Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (concluding the policy favoring

7   arbitration "applies with special force in the field of international commerce").

8       **1.     Article V(1)(d)—Compliance with Agreement's Arbitral Procedures**

9           Respondent argues that because the Award was not made by arbitrators appointed

10  in accordance with the Agreement, the Court should refuse to confirm the Award under

11  Article V(1)(d) of the New York Convention, T.I.A.S. No. 6997, art. V, § 1(d).  That

12  provision allows a court to refuse to recognize or enforce an arbitral award if "[t]he

13  composition of the arbitral procedure was not in accordance with the agreement of the

14  parties . . . ."  *Id.*  A court "may not 'overlook agreed-upon arbitral procedures' in favor

15  of the *enforcement* of an arbitration award" or "utilize the federal policy favoring

16  arbitration to justify the imposition of general procedural rules at the expense of the

17  parties' agreement."  *Polimaster*, 623 F.3d at 841 (emphasis in original).  Instead, the

18  court must "adhere[] to the parties' agreed-upon procedures . . . , such as where relevant

19  to . . . the appointment of arbitrators."  *Id.* (citations omitted).

20          Nevertheless, when a party has adequate notice of its duty to appoint an arbitrator

21  in accordance with the parties' agreement and *fails* to do so, courts have confirmed the

22  arbitral award, rejecting any defense under Article V(1)(d).  *See, e.g.*, *Stati v. Republic of*

23

1  *Kazakhstan*, 302 F. Supp. 3d 187, 207 (D.D.C. 2018), *aff'd by* 773 F. App'x 627 (D.C.

2  Cir. 2019) (rejecting respondent's Article V(1)(d) defense because the arbitration "rules

3  plainly allow[ed]" the arbitral tribunal to appoint an arbitrator on respondent's behalf

4  after respondent failed to do so by the set deadline); *Belize Bank Ltd. v. Gov't of Belize*,

5  191 F. Supp. 3d 26, 37 (D.D.C. 2016) (rejecting respondent's Article V(1)(d) defense

6  because it "forfeited its right to appoint a[n] . . . arbitrator by not initially participating in

7  the . . . [a]rbitration" and concluding that the arbitral tribunal was "authorized to appoint

8  one in its stead under" the arbitration rules).

9         The parties in this case agreed, under Article 20 of the Agreement, that the arbitral

10  panel shall be "compris[ed] of three arbitrators, one to be appointed by each party (i.e.

11  DEVAS and ANTRIX) and the arbitrators so appointed will appoint the third arbitrator."

12  Agreement, Ex. 3 to Hellmann Decl. (docket no. 2-1 at 125).  They also plainly agreed

13  that the "Arbitration proceedings shall be held in accordance with the rules and

14  procedures of the ICC . . . or UNCITRAL," and that the parties must "discharge their

15  obligations in utmost good faith."  *Id.*  In July 2011, after Petitioner had commenced the

16  arbitration in the ICC Court, Respondent did not respond to the ICC's request to

17  nominate an arbitrator and instead challenged its jurisdiction to arbitrate the parties'

18  dispute.  Award, Ex. 1 to Hellmann Decl. (docket no. 2-1 at 8–9).  The ICC informed the

19  parties that Respondent's objections would be settled by the ICC Court or the three-

20  member panel appointed by the parties, and it again invited Respondent to appoint an

21  arbitrator by August 8, 2011.  Antrix Letter to ICC, Ex. 1 to Meehan Decl. (docket

22  no. 15-1 at 3).  Respondent did not do so and renewed its objections to arbitration before

23

1   the ICC.  *Id.* at 3–4.  In August 2011, the ICC informed the parties that the "arbitration

2   shall proceed" pursuant to the ICC Rules, and the ICC again requested that Respondent

3   appoint an arbitrator within 21 days.  *Id.* at 5–6.  In September 2011, the ICC informed

4   the parties that it would appoint an arbitrator on Respondent's behalf "pursuant to

5   Article 8(4) of the ICC Rules . . . but that any nomination received from [Respondent]

6   before the ICC Court made the appointment will be communicated to the ICC Court."

7   Award, Ex. 1 to Hellmann Decl. (docket no. 2-1 at 9–10).  The ICC never received any

8   nomination from Respondent.  *Id.* at 10.[4]  Accordingly, on October 13, 2011, the ICC

9   appointed former Supreme Court Chief Justice Dr. A.S. Anand on Respondent's behalf in

10  accordance with the ICC Rules.  *Id.* at 10; Joint Status Report (docket no. 39 at 3 n.2).

11  The relevant provision of the ICC Rules, former Article 8(4), provides that "[i]f a party

12  fails to nominate an arbitrator, the appointment shall be made by the [ICC] Court."

13  Article 8(4) of the ICC Rules (1998).[5]

14          Respondent argued in its briefs and at oral argument that the ICC lacked

15  jurisdiction to arbitrate the dispute based on an alleged defect in the Agreement's

16  arbitration clause.  However, the Supreme Court of India expressly concluded that under

17  the plain terms of Article 20 of the Agreement, Petitioner "was entitled to invoke the

---

19  [4] Respondent maintains that it had notified the ICC that it appointed former Justice Sujata V. Manohar "as
20  an arbitrator in accordance with the Parties' Agreement," but that appointment was made with respect to a
    different arbitration, not the ICC arbitration.  *Compare* Motion to Dismiss (docket no. 13 at 14 & 23),
    *with* Antrix Letter to ICC, Ex. 1 to Meehan Decl. (docket no. 15-1 at 4 & 4 n.7).

21  [5] The 1998 version of the ICC Rules is available at https://www.trans-lex.org/750200/_/icc-arbitration-
22  rules-1998/#head_13.  The current version of ICC Rules contains similar language under Article 12(2),
    available at https://iccwbo.org/dispute-resolution-services/arbitration/rules-of-arbitration/#article_13.

1   Rules of Arbitration of the ICC for the conduct of the arbitration proceedings."  Supreme

2   Court of India Judgment, Ex. 3 to Meehan Decl. (docket no. 15-1 at 54–55).  The parties

3   also disputed at oral argument whether the ICC's decision to exercise jurisdiction is

4   entitled to deference.  *See BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 41, 134

5   (2014).  Regardless of whether the ICC's decision to exercise jurisdiction is entitled to

6   deference, the Supreme Court of India has already resolved the issue.

7           Construing Article V(1)(d) of the Convention narrowly, as the Court must,

8   Respondent has not met its substantial burden to show that the ICC's appointment of an

9   arbitrator on its behalf is a ground for refusing to confirm the Award.  *See Polimaster*,

10   623 F.3d at 836.  While the parties' Agreement provides that "one [arbitrator is] to be

11   appointed by each party," it does not address what follows when a party altogether

12   refuses to appoint an arbitrator.  Agreement, Ex. 3 to Hellmann Decl. (docket no. 2-1 at

13   124–25).  The ICC gave Respondent at least three opportunities to appoint its own

14   arbitrator in accordance with the Agreement and the ICC Rules, and Respondent never

15   did so.  The Court also notes that although Respondent challenged the ICC's jurisdiction

16   to arbitrate the dispute, it never specifically challenged the ICC's appointment of former

17   Supreme Court Chief Justice Dr. A.S. Anand[6] on its behalf.  *See* Award, Ex. 1 to

18   Hellmann Decl. (docket no. 2-1 at 39–43).

19

20   _____

21   [6] Acknowledging Justice Anand's unquestionable credentials to serve as an arbitrator, *see* Award, Ex. 1 to
     Hellmann Decl. (docket no. 2-1 at 10), the Court further concludes that Respondent has not shown that its

22   inability to appoint a different arbitrator "worked substantial prejudice" to it.  *See Purus Plastics GmbH v.
     Eco-Terr Distributing, Inc.*, No. C18-0277JLR, 2018 WL 3064817 at *7 (W.D. Wash. June 21, 2018).

23

The Court concludes that Respondent's repeated refusal to appoint an arbitrator with respect to the ICC arbitration essentially operated as a forfeiture of its right to do so. *Belize Bank*, 191 F. Supp. 3d at 37.  The Court also concludes that the ICC properly made the appointment in accordance with the ICC Rules and the Agreement itself, which expressly incorporated the ICC Rules.  *See Stati*, 302 F. Supp. 3d at 207.  Article V(1)(d) does not provide a basis to refuse confirmation of the Award.

### 2.    Article V(2)(b)—Public Policy Considerations

Respondent also argues that two public policies justify the Court's refusal to confirm the Petition: (1) a policy of "respect for the sovereignty of other nations and respect for foreign arbitral awards" and (2) a policy "against corruption."  Motion to Dismiss (docket no. 13 at 24–26).  Article V(2)(b) of the New York Convention allows a court to refuse confirmation if "[t]he recognition or enforcement of the award would be contrary to the public policy of that country."  New York Convention, T.I.A.S. No. 6997, art. V, § 2(b).  The Ninth Circuit has held that the public policy defense "applies only when confirmation . . . of a foreign arbitration award 'would violate the forum state's most basic notions of morality and justice.'"  *Ministry of Def. & Support for the Armed Forces of the Republic of Iran v. Cubic Def. Sys.*, 665 F.3d 1091, 1097 (9th Cir. 2011) (citation omitted).  "Although this defense is frequently raised, it 'has rarely been successful.'"  *Id.* (citation omitted).

Neither public policy identified by Respondent provides grounds to refuse confirmation of the Award.  First, it is true that "[a]ctions against foreign states in our courts raise sensitive issues concerning foreign relations of the United States," *Verlinden*

1   *B.V. v. Cen. Bank of Nigeria*, 461 U.S. 480, 494 (1983).  However, that concern, standing

2   alone, cannot override "the emphatic federal policy in favor of arbitral dispute

3   resolution," which applies "with special force in the field of international commerce."

4   *Belize Soc. Dev. Ltd. v. Belize*, 668 F.3d 724, 727, 733 (D.C. Cir. 2012) (concluding that

5   the district court exceeded its authority under the Convention in staying confirmation

6   proceedings against the Government of Belize (quoting *Mitsubishi*, 473 U.S. at 631)); *see*

7   *Newco Ltd. v. Gov't of Belize*, 650 F. App'x 14, 15–16 (D.C. Cir. May 13, 2016)

8   (affirming confirmation of arbitral award against the Government of Belize); *but see*

9   *Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*,

10  314 F. Supp. 3d 95, 110, 114 (D.D.C. 2018) (refusing to confirm the "specific

11  performance portion" of an arbitral award against the Government of India because of "a

12  policy interest in respecting the right of other nations to control the extraction and

13  processing of natural resources within their own sovereign territories").  Indeed, FSIA

14  expressly contemplates "jurisdiction over foreign countries in suits seeking compensatory

15  (but not punitive) damages, and allowing for specific, domestic methods of ensuring that

16  plaintiffs receive those damages."  *Hardy*, 314 F. Supp. at 113; *see* 28 U.S.C.

17  § 1605(a)(6).  This "demonstrates the United States' public policy commitment to

18  respecting the sovereignty of foreign nations by only holding them liable for certain

19  forms of relief."  *Hardy*, 314 F. Supp. at 113.  In this case, there is no question that the

20  Award provides for pure monetary relief without reference to specific performance or

21  punitive damages.  Award, Ex. 1 to Hellmann Decl. (docket no. 2-1 at 98).  Accordingly,

22

23

ORDER - 15

1    Respondent has not established that this Court's confirmation of the Award would violate

2    the sovereignty of India.

3            Second, Respondent argues that confirming the Award would violate the United

4    States' policy against corruption. Motion to Dismiss (docket no. 13 at 25–26).

5    Respondent does not argue, let alone cite any facts showing, that the Agreement was the

6    product of corruption or that Respondent annulled the Agreement on that basis. *See id.*

7    Instead, Respondent takes issue with the Award's purported conclusion that a former

8    Antrix Chairman, Dr. Radhakrishnan, "was required to derogate from his sovereign

9    responsibilities as a government official and place the commercial interests of Antrix's

10   contracting partner, Devas, above the critically important sovereign priorities." *Id.* at 25;

11   Reply (docket no. 26 at 14–15).  Even assuming that such a conclusion amounts to

12   "corruption" or violates our country's "most basic notions of morality and justice,"

13   Respondent misconstrues the ICC panel's findings and conclusions.  The Award found

14   that if Dr. Radhakrishnan had "done everything in his power to ensure that the

15   [A]greement remained on foot, . . . *he would not have taken any of the steps that led to*

16   *the [government] being asked to approve the annulment of the [A]greement*."  Award,

17   Ex. 1 to Hellmann Decl. (docket no. 2-1 at 59) (emphasis added).  Based on the finding

18   that the proposal to annul the Agreement was not "beyond Antrix's reasonable control,"

19   the Award concluded that Respondent could not rely on the Agreement's "Force Majeure

20   Events" clause as a reason to justify its actions.  *Id.* at 60.  Respondent's alternate reading

21   of the Award is simply not a ground to refuse its confirmation.

22

23

1    Finding no other basis under Article V of the Convention to refuse or defer its

2    recognition,[7] the Court hereby confirms the Award.

3    **Conclusion**

4    For the foregoing reasons, the Court ORDERS:

5    (1)    The Petition to Confirm Foreign Arbitral Award, docket no. 1, is

6    GRANTED;

7    (2)    The Court will enter Judgment in the amount of (i) the full amount of the

8    Award, $562.5 million, together with (ii) pre-Award simple interest at the rate of three-

9    month USD LIBOR + 4%, from February 25, 2011, to the date of the Award, September

10   14, 2015 ($672,791.593.75); (iii) post-Award simple interest at the rate of 18% per

11   annum of the amounts in subsections (i) and (ii) of this Section, from the date of the

12   Award, September 14, 2015, to the date that Judgment is entered ($331,787.64 per day);

13   and (iv) post-Judgment interest pursuant to 28 U.S.C. § 1961 at the rate of twelve

14   hundredths of one percent (0.12%) per annum.  *See* Award, Ex. 1 to Hellmann Decl.

15   (docket no. 2-1 at 98);[8]

16

17

———————————————————

18   [7] In a footnote, Respondent briefly argues that Article V(1)(c) provides an additional defense, asserting
     that the ICC arbitrators "exceeded their powers" by failing to apply a well-established principle of Indian
19   law where a plaintiff is unable to prove the quantum of damages.  Motion to Dismiss (docket no. 13 at 26
     n.8).  Rather, the Award, which is thorough and well-reasoned, extensively discussed its calculation of
20   Petitioner's damages and expressly relied on the law of India.  Award, Ex. 1 to Hellmann Decl. (docket
     no. 2-1 at 81–96 & 81 n.359).

21   [8] In its supplemental brief, docket no. 43 at 16, Petitioner calculated the daily amount of interest
     associated with the 18% per annum interest rate using a 360-day calendar (i.e., $336,395.80 per day); the
22   Court, however, has calculated the daily amount of interest associated with the 18% per annum interest
     rate using a 365-day calendar (i.e., $331,787.64 per day).

23

1       (3)     Any objections to the amount of the Judgment shall be filed on or before

2   Tuesday, November 3, 2020;

3       (4)     Each party shall bear their own legal fees and costs incurred as a result of

4   this proceeding; and

5       (5)     The Clerk is directed to send a copy of this Order to all counsel of record.

6       IT IS SO ORDERED.

7       Dated this 27th day of October, 2020.

8

9                                              Thomas S Zilly

10                                             Thomas S. Zilly
                                               United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER - 18